1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON; STATE OF
OREGON; CONFEDERATED TRIBES
OF THE CHEHALIS RESERVATION;
CONFEDERATED TRIBES OF THE
COOS, LOWER UMPQUA AND
SIUSLAW INDIANS; COW CREEK
BAND OF UMPQUA TRIBE OF
INDIANS; DOYON, LTD.;
DUWAMISH TRIBE;
CONFEDERATED TRIBES OF THE
GRAND RONDE COMMUNITY OF
OREGON; HOH INDIAN TRIBE;
JAMESTOWN S'KLALLAM TRIBE;
KALISPEL TRIBE OF INDIANS; THE
KLAMATH TRIBES; MUCKLESHOOT
INDIAN TRIBE; NEZ PERCE TRIBE;
NOOKSACK INDIAN TRIBE; PORT
GAMBLE S'KLALLAM TRIBE;
PUYALLUP TRIBE OF INDIANS;
QUILEUTE TRIBE OF THE
QUILEUTE RESERVATION;
QUINAULT INDIAN NATION;
SAMISH INDIAN NATION;
CONFEDERATED TRIBES OF SILETZ
INDIANS; SKOKOMISH INDIAN
TRIBE; SNOQUALMIE INDIAN
TRIBE; SPOKANE TRIBE OF
INDIANS; SQUAXIN ISLAND TRIBE;
SUQUAMISH TRIBE; SWINOMISH
INDIAN TRIBAL COMMUNITY;
TANANA CHIEFS CONFERENCE;
CENTRAL COUNCIL OF THE
TLINGIT & HAIDA INDIAN TRIBES
OF ALASKA; UPPER SKAGIT

NO.

COMPLAINT

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

INDIAN TRIBE; CONFEDERATED
TRIBES AND BANDS OF THE
YAKAMA NATION; AMERICAN
HISTORICAL ASSOCIATION;
ASSOCIATION OF KING COUNTY
HISTORICAL ORGANIZATIONS;
CHINESE AMERICAN CITIZENS
ALLIANCE; HISTORIC SEATTLE;
HISTORYLINK; MUSEUM OF
HISTORY AND INDUSTRY; OCA
ASIAN PACIFIC ADVOCATES –
GREATER SEATTLE; WASHINGTON
TRUST FOR HISTORIC
PRESERVATION; and WING LUKE
MEMORIAL FOUNDATION D/B/A
WING LUKE MUSEUM,

                              Plaintiffs,

        v.

RUSSELL VOUGHT, in his capacity as
Director of the OFFICE OF
MANAGEMENT AND BUDGET;
DAVID S. FERRIERO, in his capacity as
Archivist of the NATIONAL
ARCHIVES AND RECORDS
ADMINISTRATION; ADAM BODNER,
in his capacity as Executive Director of
the PUBLIC BUILDINGS REFORM
BOARD; EMILY W. MURPHY, in her
capacity as the Administrator of the
GENERAL SERVICES
ADMINISTRATION; NATIONAL
ARCHIVES AND RECORDS
ADMINISTRATION; OFFICE OF
MANAGEMENT AND BUDGET;
PUBLIC BUILDINGS REFORM
BOARD; and GENERAL SERVICES
ADMINISTRATION, agencies of the
United States,

                              Defendants.

## I.    INTRODUCTION

1.    Without prior notice to Tribes, the State of Washington, or other stakeholders, the federal government is planning to sell the National Archives building in Seattle and scatter

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

its invaluable, irreplaceable, original historical records to facilities in Kansas City, Missouri and Riverside, California. This action shows a callous disregard for the people who have the greatest interest in being able to access these profoundly important records, which include Tribal and treaty records, case files under the Chinese Exclusion Act, and records related to Japanese American internment during World War II. Talmadge Hocker, a Kentucky real-estate executive appointed to the Public Buildings Reform Board by President Trump in 2018, recently stated that his agency's recommended sale of the Archives facility would allow the building to "become a part of the community, as opposed to what it is today."[1] Mr. Hocker's statement underscores the indifference with which Defendants are severing the Pacific Northwest's connection to its own history.

2.      In their haste to dispose of the property, Defendants failed to realize that the Archives facility is legally exempt from being sold under the statute at issue, the Federal Assets Sale and Transfer Act. Moreover, Defendants failed to follow the statute's mandatory procedural requirements or to consult with Tribes and others for whom loss of access to the records will be devastating. Selling the property is unlawful under the Act and must be enjoined before these millions of un-digitized, original records lose their home in Seattle.

3.      This is an action under the Administrative Procedure Act, 5 U.S.C. § 706, to halt the federal government's unlawful and procedurally deficient sale of the National Archives at Seattle facility.

4.      The Federal Archives and Records Center, located at 6125 Sand Point Way NE, Seattle, Washington, 98115, houses the National Archives at Seattle. The facility contains the DNA of our region. It provides public access to permanent records created by Federal agencies and courts in Alaska, Idaho, Oregon, and Washington. It houses a significant body of tribal and treaty records relating to the federally recognized tribes and native corporations throughout the Pacific Northwest and Alaska, including Treaty records and other records from Bureau of

---

[1] https://www.latimes.com/world-nation/story/2020-12-06/national-archives-seattle-sale.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Indian Affairs offices and Indian agencies and schools in Alaska, Idaho, Oregon, and Washington. It also maintains more than 50,000 original files related to the Chinese Exclusion Act of 1882, as well as original records related to the internment of Japanese-Americans in World War II.

5.      The records at the National Archives at Seattle are essential and irreplaceable to this region. History and conservation of it define our past, present, and future. One user described her time at the Archives in a way that is deeply personal but yet relatable to what so many others have felt:

> I had no clue what a powerful experience it would be to hold some of the original Klamath Tribal roll sheets in my hands. To see names I had only heard of written out or even an "X" for those who did not read or write English was a powerful experience. Even more overwhelming for me was seeing my Grandmother Marilynn Hall's handwritten Tribal Council notes from her time as Tribal Secretary. The whole time I reviewed the records, all I wanted to do was share the experience with my family members, knowing how much it would mean to them.

Gabriann Hall, a member of the Klamath Tribes, Historian, and Teacher.

6.      A tribal attorney and frequent user of the National Archives at Seattle describes her experience as follows:

> The word "archives," from the view of law firms, businesses and courts, tends to conjure an image of a records storage facility for "dead files." I view the National Archives at Seattle as a vibrant, special collection *library* . . . . A visit to the National Archives in Washington D.C. inspires awe in every visitor, as the permanent home of the original Declaration of Independence, Constitution of the United States, and Bill of Rights. A visit to the National Archives at Seattle, for native people whose ancestral historical and cultural records are housed there, fills a deep cultural yearning to know, honor and understand the lives and sacrifices of their ancestors. This unique and precious collection includes irreplaceable records that came from this area, that are by and about the native people of this area descendants – held in trust for them and protected by the United States.

Tallis King George, tribal attorney for the Puyallup Tribe of Indians.

7.      Records at the National Archives at Seattle also hold an important place for Chinese and Japanese American communities. As one advocate explained:

1
2
3
4

Most Chinese Americans left few records of their lives and history prior to 1950, but the Archive's record of the exclusion files document families, marriages, lifestyles, occupations, businesses, land ownership, religion, food, medicine, travels to and from China, networking, organizations, and other information that otherwise cannot be obtained.

5  Connie So, President of OCA Asian Pacific Advocates, Greater Seattle Chapter.

6      8.    And as another Seattle-area historian and genealogist expounded:

7
8
9
10
11
12
13
14

I can attest to the preciousness and vital nature of the Sand Point National Archives and its staff to our region. The connections made there, and the opportunities to share and transfer knowledge preserved in the facility's records, is immense and cannot be replaced. Records of specific importance are those involving the Chinese Exclusion Act of 1882; as well as the records on the forced removal of Washington residents of Japanese ancestry during WWII 1941-1945 which include anti-Asian organizing by Washington state business owners 1910-1950, records of the War Relocation Authority and documents relating to early Japanese community, business and industry records including logging, railroad, hotels, domestic and fishery, in addition to community organizations and history . . . . The damage [that removal of those records out of Washington State and the Pacific Northwest] will cause to the Chinese and Japanese American communities in the Pacific Northwest cannot be overstated.

15  Bif Brigman, member of the Minidoka Pilgrimage Planning Committee.

16      9.    On January 24, 2020, the Office of Management and Budget (OMB) approved

17  a recommendation of a little known federal agency, the Public Buildings Reform Board

18  (PBRB), to sell the Seattle Archives Facility. This facility houses the National Archives at

19  Seattle and is currently occupied and operated by the National Archives and Records

20  Administration (NARA) and is owned by the General Services Administration (GSA).

21      10.    The PBRB report recommending the sale of the Seattle Archives Facility (the

22  PBRB Report) indicates that the federal records and archival materials at the Seattle facility,

23  including the materials at the National Archives at Seattle, will be removed from the Pacific

24  Northwest and relocated to NARA facilities in Kansas City, Missouri and Riverside,

25  California. In announcing the Seattle facility's closure, NARA recognized that its closure "will

26

1   have a negative impact on researchers, Federal agencies, and other customers that use our

2   facility."[2]

3          11.     Describing the National Archives at Seattle closure as merely a "negative

4   impact" dramatically understates the value of our history and the Archives. For instance, in

5   1986, after a decades' long effort, the Klamath Tribes succeeded in persuading Congress to

6   restore the Tribes' federal recognition. The information contained in the National Archives at

7   Seattle was critically important to the Tribes' successful effort at restoration.

8   Donald C. Gentry, Tribal Chairman of the Klamath Tribes, explained the profound effect that

9   removal of these records at the Seattle Archives would have:

10              Since restoration, the Tribes have been rebuilding their government, their
                institutions, and their infrastructure. In doing so, the Tribes relied significantly
11              and repeatedly on access to the National Archives at Seattle for documents,
                photos, artifacts, audio recordings, and other items of cultural and historical
12              importance related to the Tribes' treaty-making, its history of federal-tribal
                relations, and its reservation, as well as information collected from Tribal elders
13              and ancestors concerning Tribal culture, tradition and languages. Further, that
                information has continued to be relevant in reconstructing critical components of
14              institutional, cultural, and traditional infrastructure and knowledge necessary for
                the Tribes' post-restoration efforts. The Tribal leadership, administration, and
15              membership all rely on ready access to the National Archives at Seattle for such
                information, access that will disappear if the facility and its resources are moved.
16              The amount of information in the Seattle Archives is overwhelming and we have
                significant research left to do still. That information is pertinent to continuing our
17              research on and legal protection of our Tribal rights. As one key example, the
                Tribes have been involved in a forty-plus years long effort to protect, affirm, and
18              quantify its Treaty-reserved water rights. That matter has involved repeated
                litigation in federal court (including two arguments up to the Ninth Circuit Court
19              of Appeals) and a decades-long state water rights adjudication (the Klamath Basin
                Adjudication). These Treaty-reserved water rights are central to our ability to
20              hunt, fish, trap and gather on the lands of the terminated Klamath Reservation,
                since the water rights support the habitat upon which fish, plant and wildlife
21              species depend. Our staff and attorneys in these cases have spent weeks in the
                Archives researching historical documents related to land ownership and
22              associated water rights. It remains critically important to the Tribes' ongoing
                efforts in the Klamath Basin Adjudication to continue to have access to those
23

24

25

26              [2] NARA Press Release, Seattle Facility Approved for Closure (Jan. 27, 2020),
        https://www.archives.gov/press/press-releases/2020/nr20-37.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

archival records. Moving the records would be prejudicial to the Tribes' ability to carry out such research for the future of the adjudication.

These records also have significant potential to help establish and verify our oral histories.

*** Our way of life goes beyond just the physical world we live in and interact with, beyond our reservation, water, and natural resources. We need access to our songs and ceremonies to reconnect with our traditions, our ancestors, our way of life, and the world around us. We were forbidden from practicing many of our ceremonies in the 1800's by the federal government, and our Tribal children were sent off to boarding schools. In the boarding schools, the nuns severely and brutally punished any Native children who practiced traditional prayers, to the point where our peoples learned it was safer to hide these traditions than risk being beaten. As a result, we have lost access to many essential aspects of what it means to be Klamath, Modoc, and Yahooskin. We continue to practice prayer, but without a better understanding of what we used to practice, these prayers are more modern and assimilated — until we are able to re-establish our traditions, it is harder to properly connect with our world as our peoples had for generations. We have an opportunity to heal by having meaningful access to these resources. Taking away the Archives without any input from us is another familiar violence not unlike those inflicted in boarding schools and by assimilative policies.

Donald C. Gentry, Tribal Chairman of the Klamath Tribes.

12.     In addition to undervaluing the extreme negative impact that removal of archival records from the Pacific Northwest would have on the Tribes and other interest stakeholders, the agencies' hurried decision to sell the Seattle Archives Facility was procedurally flawed and legally infirm. First, the National Archives at Seattle is used for "research in connection with" Federal programs "for agricultural, recreational, or conservation purposes," rendering it ineligible for selection under the Federal Assets Sale and Transfer Act (FASTA).[3] Second, despite a clear statutory mandate in Section 11 of FASTA, OMB and GSA failed to develop or provide the PBRB with the standards, criteria, and recommendations required by the statute.

---

[3] FASTA, Pub. L. 114-287, Dec. 16, 2016, 130 Stat. 1463, as amended by Pub. L. 114-318, §7(b), (d), Dec. 16, 2016, 130 Stat. 1616, 1617; Pub. L. 115-141, div. E, title V, §527, div. P, title VI, §608(a), Mar. 23, 2018, 132 Stat. 573, 1105; Pub. L. 115-437, §1, Jan. 14, 2019, 132 Stat. 5563; Pub. L. 115-438, §1, Jan. 14, 2019, 132 Stat. 5564.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

13.     Moreover, the agencies did not conduct state, local, or tribal outreach or consultation prior to the public announcement of the sale of the facility housing the National Archives at Seattle. Notably, tribal governments were not notified or consulted in advance, notwithstanding the requirements for such consultation under federal policies. And there were no public hearings held in Washington, Idaho, Oregon, or Alaska, where members of the public could have provided input and information about the National Archives at Seattle and the importance of keeping the facility's records in the Pacific Northwest.

14.     The National Archives at Seattle is the only property among those the PBRB recommended for sale that has profound importance to the region in which it is situated and is regularly used by members of the public. Defendants' clear procedural failures, including the failure to establish the required standards, criteria, and recommendations and the failure to consult with Tribes and other stakeholders, fundamentally distorted the entire selection process, including the recommendation and decision to close and sell the National Archives at Seattle.

15.     Had Defendants followed the statutory requirement to adopt "standards, criteria and recommendations," used accurate data, consulted with tribal governments, or reached out to stakeholders or the public in general, they would have learned that the National Archives at Seattle is routinely used by researchers, historians, and tribes in the Pacific Northwest, often in connection with research for Federal programs for agricultural, recreational, or conservation purposes. They also would have realized the crucial importance of the unique records held at the National Archives at Seattle to all residents of the Pacific Northwest and beyond, including the many federally-recognized tribal governments and native corporations in this region and in Alaska, which has no National Archives facility of its own, and how removal of the facility from the Pacific Northwest would jeopardize public access to these critical federal documents.

16.     The procedurally and substantively deficient recommendation to sell the National Archives at Seattle violates FASTA, federal tribal consultation policies, and the

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Administrative Procedure Act (APA). The PBRB Report should be invalidated, and this Court should enjoin the sale of the National Archives at Seattle.

## II.    PARTIES[4]

17.    Plaintiff State of Washington is a sovereign entity and brings this action to protect its proprietary interests in access to the National Archives at Seattle, and as *parens patriae* on behalf of its affected citizens and residents. The National Archives at Seattle is a critical resource for state universities—such as the University of Washington and Washington State University— whose faculty, undergraduate and graduate students, and librarians regularly utilize these original records for educational and research purposes in a variety of subject areas. Having substantial local archival resources available has helped state universities to recruit top applicants who are interested in pursuing research in the Western United States. Washington State agencies, including the Department of Natural Resources and the Department of Archaeology and Historic Preservation, also use and/or rely upon documents from the National Archives at Seattle in assessing water rights, water navigability, sediment contamination, and historic preservation, among other State issues and functions. Additionally, researchers, historians, genealogists, and tribes in Washington, as well as private citizens and families, likewise rely on the National Archives at Seattle as an invaluable source of unique historical information. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

18.    Plaintiff State of Oregon is a sovereign entity and brings this action to protect its proprietary interests in access to the National Archives at Seattle, and as *parens patriae* on behalf

---

[4] The description of each plaintiff is provided by the party in question and represents the views of that party.

COMPLAINT

9

of its affected citizens and residents. The National Archives at Seattle is a critical resource for the state's largest research universities, including the University of Oregon and Oregon State University, whose undergraduate and graduate students, faculty, and librarians regularly rely on these original records unique to the Pacific Northwest for research, educational, and publication purposes. The federal government has been entrusted with these rare and unique historical archival documents to which local access is essential to tell and preserve our national and regional history. The sale of the Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington, and removal of the records to the proposed locations will undoubtedly damage our state's public learning institutions and the communities and individuals we serve, in addition to having a devastating impact to Oregon tribes that rely on the records for treaty and tribal membership purposes. Access to original records in their context is essential to our public universities' ability to educate scholars and the public and maintain their missions to preserve and enhance knowledge. Many of the documents at Sand Point have artifactual value that cannot be reproduced through digital representations, or that must be viewed in context with other related documents to understand their meaning and significance. Having substantial local archival resources accessible in physical form has helped our state universities to recruit top applicants interested in pursuing research in the Western United States. Our researchers, historians, genealogists, and tribes in Oregon, as well as private citizens and families, continue to rely on the National Archives at Seattle as an invaluable source of unique historical information and will be harmed by the planned removal to more distant locations. The Attorney General is the chief legal officer for the State of Oregon and is authorized by Oregon law to perform all legal services for the State. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Oregon.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

19.     Plaintiff Confederated Tribes of the Chehalis Reservation is a federally recognized Indian Tribe located in southwest Washington State. The Tribe's Reservation was created in 1864 at the site of its major villages in its Homeland. The Tribe is active in the protection of the Chehalis River basin and the Tribe's heritage and culture. The Tribe has actively sought to acquire lands within its Homelands that foster the health, safety and welfare of its tribal members. The use of the federal archives and its records are an integral part of the Tribe's protection of the Basin and the gathering of data concerning past generations of Chehalis tribal members.

20.     Plaintiff Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians (CTCLUSI) is a federally recognized sovereign tribal nation headquartered in Coos Bay, Oregon. CTLUSI is made up of two bands of Coos Tribes: Hanis Coos (Coos Proper), Miluk Coos; the Lower Umpqua Tribe; and the Siuslaw Tribe. The ancestral territory of CTCLUSI encompasses approximately 1.6 million acres along the Oregon Coast. The history of interaction with the United States significantly impacted CTCLUSI and its people. By the late summer of 1855, CTLUSI people were rounded up, imprisoned, and removed from their lands under force of arms under color of a dishonored and unratified treaty – a treaty of peace and land cession that CTLUSI ancestors signed in good faith which the Senate failed to ratify, and the United States Government refused to honor. In 1954, CTCLUSI was terminated by federal legislation. In 1984, Congress extended federal recognition to CTCLUSI. Since restoration, CTCLUSI has worked tirelessly to maintain its relationship with its lands, resources, and distinct Tribal histories and cultures. CTCLUSI has resumed its roles of stewards and caretakers of the lands and resources that were once managed by its ancestors, including Coos Bay. The National Archives facility in Seattle contains extensive records that are relevant to CTCLUSI's efforts to protect its sovereignty and preserve natural and historic resources important to CTCLUSI and its members. These efforts have included restoration of the Tribe in 1984 and recent efforts to

1    designate portions of Coos Bay as a Traditional Cultural Property on the National Register of

2    Historic Places. Moving the documents from Seattle will add significant expense and difficulty.

3        21.    Plaintiff Cow Creek Band of Umpqua Tribe of Indians ("Tribe") is a federally

4    recognized Indian Tribe located in southwestern Oregon. The Tribe entered into a Treaty in 1854

5    under which it ceded more than 800 square miles to the United States. The Tribe was restored in

6    1982 and continues to work to restore its lands for its more than 1,700 members. The National

7    Archives in Seattle houses records that are and were critical to the restoration of the Tribe and

8    the future restoration of the Tribe's ancestral lands.

9        22.    Plaintiff Doyon, Limited is one of thirteen Native regional corporations

10   authorized by Congress pursuant to the provisions of the Alaska Native Claims Settlement Act

11   of 1971 (ANCSA), as amended, 43 U.S.C. §§ 1601-1629h. Doyon owns approximately 12.5

12   million acres of surface and subsurface lands situated in the Interior of Alaska and is the largest

13   private landowner in the state. The National Archives at Seattle houses many records important

14   to Doyon and its shareholders, including original ANCSA records, pre-statehood Alaska land

15   records, Alaska Census records, Bureau of Indian Affairs (BIA) records for Alaska, and litigation

16   records for the Federal District Court for the District of Alaska. Many of these records are unique,

17   rare, un-digitized, and otherwise unavailable elsewhere. Many of our Alaska Native shareholders

18   have Certificates of Indian Blood (CIBs) that are inaccurate or incomplete. Many of our

19   shareholder records detailing shareholders' Alaska Native blood quantum are based upon

20   original BIA records from the 1970s and earlier. It is critical for Doyon and its shareholders to

21   be able to access BIA records to help correct incomplete or inaccurate CIBs that affect the

22   issuance of new stock to Alaska Natives born after the date of enactment of ANCSA as well as

23   for voting status of other shareholders. Doyon also uses the records stored at the National

24   Archives at Seattle to help protect the subsistence interests of its Alaska Native shareholders.

25   ANCSA extinguished aboriginal hunting and fishing rights for Alaska Natives throughout

26   Alaska. 43 U.S.C. §1603(b). Title VIII of the Alaska National Interest Land Conservation Act

of 1980 (ANILCA), 16 U.S.C. §§ 3111–3126, recognized a subsistence preference for rural Alaskans, including Alaska Natives, engaged in hunting, fishing and other subsistence uses on federal public lands included in federal "conservation system unit[s]" as defined in ANILCA, *see* 16 U.S.C. 3102(4).[5] These records are important in the now forty-year history of litigation in state and federal courts to protect Alaska Native subsistence rights in these conservation system units. The Seattle archives facility is therefore used in connection with Federal programs for conservation purposes, namely the Federal subsistence program in Alaska, including research in connection with that program.

23.     Plaintiff Duwamish Tribe, a party to the Treaty of Point Elliot and known as dxʷdəwʔabš or "The People of the Inside," governs itself pursuant to a constitution adopted in 1925. Its 600+ members are descended from the Duwamish Indian signers to the Treaty, and they include descendants of Chief Seattle. The Duwamish people have resided in the area of Puget Sound since time immemorial. The Duwamish Tribe and its members have a unique interest in the continued presence of the National Archives at Seattle. For over 40 years, they have worked to confirm the Tribe's rightful status as a federally recognized tribe. Direct access to physical records at the National Archives at Seattle has been, and remains, vital to the Tribe and its members in this effort to confirm federal recognition. Members of the Duwamish Tribe and their representatives have used the National Archives to support the Tribe's efforts by, among other things, researching records on early state and pre-state history for the Puget Sound area, including genealogical, anthropological, and historical studies of Washington tribes and, in particular, the Duwamish Tribe. In addition to the records already reviewed, Members know that irreplaceable records not yet reviewed are housed in the National Archives building in Seattle, and the Tribe understands that those records represent important evidence regarding the history

---

[5] "The term "conservation system unit" means any unit in Alaska of the National Park System, National Wildlife Refuge System, National Wild and Scenic Rivers Systems, National Trails System, National Wilderness Preservation System, or a National Forest Monument including existing units, units established, designated, or expanded by or under the provisions of this Act, additions to such units, and any such unit established, designated, or expanded hereafter."

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

of the Duwamish Tribe and important evidence in support of its fight for restoration of status. Moving them would certainly compromise access to those records and raises the risk of their being lost forever and certainly creates extreme hardship for the Tribe's ongoing research efforts. The federal government's unlawful and procedurally improper sale of the real property housing the National Archives at Seattle will result in a substantial burden on the Duwamish Tribe and its members. The closure of the National Archives at Seattle will obstruct the Tribe's and its members' ability to access information relevant not only to federal recognition but also to the preservation of Duwamish history for future generations. This concern is particularly acute for records in the National Archives that the Tribe and its representatives have not yet had an opportunity to review, which includes boxes housing materials not yet digitized and subject to pending research requests.

24.     Plaintiff Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde") is a federally recognized Indian tribe comprised of more than 30 tribes and bands from western Oregon, northern California, and southwestern Washington. Grand Ronde's reservation was established on June 30, 1857, by Executive Order in partial fulfillment of seven treaties, under which Grand Ronde's antecedent tribes and bands ceded nearly 14 million acres of land across western Oregon. Grand Ronde has approximately 5,400 living members. The National Archives at Seattle contain records that are indispensable to Grand Ronde and its members. Among other things, the Seattle facility houses handwritten minutes of Tribal Council meetings from the 1930's–1950's, early cartographic maps and sketches denoting tribal village sites and trails, Indian agent letters, land ownership records, and tribal ancestry records. Grand Ronde uses the records to help understand and educate its members and the public about Grand Ronde's history and to assist Grand Ronde on matters ranging from self-determination, culture and enrollment to consulting on National Historic Preservation Act and environmental protection matters. In addition, current Grand Ronde members and applicants for membership rely on the National Archives at Seattle to trace their lineage and gather other information necessary to

COMPLAINT

14

support their applications for enrollment. Many of the Grand Ronde records housed at the National Archives at Seattle are not digitized or otherwise filed and catalogued in a manner that allows them to be discovered or identified without in-person research. In fact, but for the ability to analyze records in-person, Grand Ronde would not have located certain early tribal ordinances and other important historic records. Moving the National Archives facility from Seattle would create a substantial barrier to accessing these important records.

25.     Plaintiff The Hoh Indian Tribe ("Hoh Tribe") is a federally recognized Indian tribe and recognized as the political successor in interest to a signatory tribe to the 1855 Treaty of Olympia. The Hoh Indian Reservation is located at the mouth of the Hoh River on the Olympic Peninsula of Western Washington. The reservation is approximately 670 acres with much of the acreage located in the floodplain of the Hoh River. The Hoh Tribe relies upon access to records maintained in the Sandpoint Archives to support its efforts to protect treaty rights and interest, to educate itself and surrounding communities about the history of Hoh Tribe and its members and to research eligibility for citizenship in the Hoh Tribe. The Hoh Tribe is a small tribe with limited economic development opportunities due to its location on the Olympic Peninsula. The Tribe lacks the financial resources to access these records on a necessary basis if they are moved out of the Pacific Northwest. Relocation of the Sandpoint Archive records away from the Northwest United States will significantly impact the Hoh Tribe's ability to access the records to protect and advocate its rights and document its history.

26.     Plaintiff Jamestown S'Klallam Tribe has 545 Tribal Citizens, and 423.56 acres of Trust and Reservation land located in Clallam County, Washington. The S'Klallam territory stretches across the northern Olympic Peninsula and across the Strait of Juan de Fuca to Vancouver Island and beyond. The Tribe's Treaty Rights derived from the Treaty of Point No Point promised them that treaty resources would remain and be protected. 12 Stat. 933 (1855). Instead, Jamestown S'Klallam has had to prove the historical areas where these rights attached by providing historical documentation so their rights could not be erased by the passage of time.

As part of the restoration, preservation, and protection of these important rights, the Jamestown S'Klallam Tribe has relied heavily on historical research from the National Archives regarding traditional hunting practices, gathering, fishing rights, and the identification of S'Klallam settlements and cultural sites, as well as documentation of relations with the non-Indian and federal relations with the Tribe's communities. This includes research that was done for the purpose of supporting conservation, management, and protection of cultural knowledge as part of federally funded fisheries and natural resource programs. Similarly, the S'Klallam provided research from the Archives to assist with the U.S. Navy's required compliance with the National Historic Preservation Act. Federal agencies are required to inventory cultural resources on lands they manage to ensure they are not lost. Materials that were critical to this research, found in the local archives, were written communications regarding the orders to destroy the S'Klallam settlement at Port Townsend and forcibly relocate the S'Klallams to the Skokomish Reservation. The geographic disbursement, and even potential for division of the materials, or merely digitizing them, would significantly burden the Jamestown S'Klallam Tribe, and hinder compliance with mandatory objectives and conservation goals, and ultimately harm the S'Klallam people by hiding the history of their ancestors in a less accessible site or format. Further, the decision to sell the Archives was done without any meaningful Tribal consultation.

27.     Plaintiff Kalispel Tribe of Indians is a federally recognized Indian Tribe. The National Archives at Seattle houses documents which are invaluable to the Kalispel Tribe and these archives are utilized extensively. Specifically, this facility holds thousands of the Kalispel Tribe's documents including, but not limited to, photographs, ethnographies, reports, minutes, maps, correspondence, notes from the Kalispel language, and a plethora of other important information. These documents continue to be an important resource that the Tribe needs access to and the Indigenous knowledge recorded in these documents is priceless.

28.     Plaintiff Klamath Tribes is a federally-recognized Indian tribe that has occupied the lands of South Central Oregon and Northern California since time immemorial. The Klamath

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Tribes, with a current enrollment of 5,611 members, is comprised of three historical tribes: the Klamath Tribe, the Modoc Tribe, and the Yahooskin Band of Paiute Indians. The Klamath Tribes signed the Treaty of 1864 with the United States, ceding over 22 million acres of aboriginal territory and reserving approximately one million acres for a permanent homeland. In 1954, The Klamath Tribes were subjected to the ill-considered and destructive federal policy known as "termination", and for over thirty years were not recognized as an Indian tribe by the United States. As a result of termination, the Tribes were denied the basic rights to which federally-recognized tribes are entitled, including services from the federal government for education, health care, social services, and natural resources protection. In 1986, the Tribes succeeded in persuading Congress to restore the Tribes' federal recognition, and the Tribes have been rebuilding their government, their institutions, and their infrastructure since that time. The Tribes have relied significantly and repeatedly on access to the National Archives at Seattle for documents, photos, artifacts, audio recordings, and other items of cultural and historical importance related to the Tribes' treaty-making, its history of federal-tribal relations, and its reservation, as well as information collected from Tribal elders and ancestors concerning Tribal culture, tradition and languages. The information contained in the National Archives at Seattle was very important to the Tribes' successful effort at restoration. Further, that information has continued to be relevant in reconstructing critical components of institutional, cultural, and traditional infrastructure and knowledge necessary for the Tribes' post-restoration efforts. The Tribal leadership, administration, and membership all rely on ready access to the National Archives at Seattle for such information, access that will disappear if the facility and its resources are moved.

29.    Plaintiff Muckleshoot Indian Tribe is a federally recognized, self-governing, sovereign Indian Tribe. The Muckleshoot Indian Tribe is the recognized political successor in interest to some signatory tribes and bands to the Treaty of Point Elliott and to the Treaty of Medicine Creek, and as such has the present-day right to exercise the treaty right to fish, hunt

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and gather, among other rights. *See United States v. Washington*, 384 F. Supp. 312, 365 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676, 692 (9th Cir. 1975). The Tribe is organized under a Constitution and Bylaws ratified by members of the Tribe and approved by the United States Department of the Interior pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984), as amended by the Act of June 15, 1935 (49 Stat. 378). The Muckleshoot Indian Reservation is located in Western Washington between the White and Green River southeast of the City of Auburn and has approximately 3,000 members. The Muckleshoot Indian Tribe relies upon access to records maintained in the National Archives at Seattle to support its efforts to its protect treaty rights and interests. The Muckleshoot Indian Tribe and some of its members have used the National Archives at Seattle for research that confirms Muckleshoot's oral histories, documents genealogy, confirms Muckleshoot's treaty fishing, hunting and other rights, and details Muckleshoot's Indigenous land occupancy and natural and cultural resource use and conservation and Muckleshoot's interactions and relations with other tribal governments and federally appointed agents. Representatives of the Muckleshoot Indian Tribe have used the National Archives at Seattle for decades and continues to use the National Archives at Seattle and records from that facility on a routine basis, including research in connection with federal program for natural resource conservation purposes. Were the records stored at the National Archives at Seattle moved out of the region or state, Muckleshoot and Muckleshoot's members would, practically speaking, no longer have access to those records and Muckleshoot would be irreparably harmed. By joining in this Complaint, the Muckleshoot Indian Tribe does not admit any of the factual allegations of the Plaintiff Duwamish Tribe, and specifically disclaims and denies any allegation herein regarding the "Plaintiff Duwamish Tribe" claims to be a contemporary organization that is a successor in interest to the historic Duwamish Tribe or to be an Indian Tribe or that the self-identified "Plaintiff Duwamish Tribe" is a party to the Treaty of Point Elliott. These claims have been rejected by both the federal courts and the Department of the Interior. *See United States v. Washington*, 476 F. Supp. 1101, 1105, 1111, (W.D. Wash.

1979), *aff'd*, 641 F.2d 1368 (9th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982); *see also*
Department of the Interior Decision Documents accessible at https://www.bia.gov/as-ia/ofa/025-
duwami-wa%20.

30.    Plaintiff Nez Perce Tribe is a federally-recognized Indian tribe with headquarters
on the Nez Perce Reservation in Lapwai, Idaho. The Nez Perce people, the Nimiipuu, exclusively
occupied, since time immemorial, thirteen million acres encompassing a large part of what is
today Idaho, Oregon, and Washington—stretching from the Bitterroot Mountains to the Blue
Mountains. Nez Perce also traveled far beyond this homeland to fish, hunt, gather, and pasture—
frequently going east to what is today the state of Montana, and west along the Snake and
Columbia rivers to the Pacific Ocean. Nez Perce actively maintain their connection to the land,
water, and resources of their vast homeland. Seasonal rounds and migration patterns for cultural
and subsistence uses are carefully coordinated to take full advantage of fish, wildlife, and root
crops. These annual cycles correspond not only to the unique resource needs of the Nez Perce
and the seasonal availability of their resources but also to the ceremonial activities and social
gatherings that occur throughout the year. The Nez Perce's intimate knowledge and continuous
use of their homeland over millennia has created a unique and reverential bond between people
and place that defines Nez Perce culture and identity. The Nez Perce Tribe relies on the National
Archives at Seattle for access to critical historical documents. The sale and subsequent removal
of archived materials would have a profound, negative, and irreparable impact to the Nez Perce
people. The Tribe has utilized the National Archives at Seattle for the records housed there to
gather the necessary research to protect the Tribe's interests and treaty rights. Various programs
of the Tribe use this facility to locate historically important and culturally significant archived
records and materials that they need to conduct the ongoing business of the Tribe. At one point,
documents from the Northern Idaho Agency of the Bureau of Indian Affairs—including
enrollment records, family trees of individual Nez Perce families, and superintendent reports
from the Lapwai Sanatorium—were transferred to the Seattle facility. The Tribe was assured

1   access would be close in Seattle, and Seattle is already a full day's drive for Nez Perce members.

2   All these records are not only important to the Tribe as a whole but also to each individual

3   enrolled member and their family. The Seattle facility also includes various federal land, census,

4   and other essential information that are used to establish or confirm tribal history and heritage.

5   Tribal members use these files to establish or keep membership in the Tribe. For example, proof

6   of tribal citizenship is required to obtain education funds.

7       31.    Plaintiff Nooksack Indian Tribe is a federally recognized tribe of approximately

8   2,000 members, located in its ancestral homeland in the northwest corner of Washington State.

9   The Nooksack Indian Tribe is a signatory to the Treaty of Point Elliott of 1855. Its name comes

10  from a place name in the Nooksack language and translates to "always bracken fern roots," which

11  illustrates the Nooksack Indian Tribe's close ties to its land and the resources that continue to

12  give strength to its people. The Nooksack reservation is located in Deming, Washington, just 15

13  miles east of Bellingham, 12 miles south of the Canadian border, nestled amongst majestic

14  mountains, lush forest, and the meandering and dynamic Nooksack River. The Nooksack Indian

15  Tribe relies on the Seattle archives facility primarily for research to help determine tribal

16  membership eligibility. One basis for tribal membership in Nooksack is descendance from

17  individual allottees whose allotments were originally homesteads by European settlers. The

18  Tribe is often required to research records at the archives to determine original allotments or

19  homesteads. Further, because the Nooksack Indian Tribe's usual and accustomed fishing stations

20  include the entire Nooksack River basin and adjoining marine waters, including portions of the

21  Mount Baker-Snoqualmie National Forest and of the North Cascades National Park, the Tribe

22  often uses the archives for research to support contracts with the United States Forest Service

23  over issues such as the effects of logging on water quality and instream flows and salmon habitat

24  restoration more generally.

25      32.    Plaintiff Port Gamble S'Klallam Tribe ("PGST") is a federally recognized, self-

26  governing tribal government located on approximately 1,700 acres on the Kitsap Peninsula,

COMPLAINT                                    20                 ATTORNEY GENERAL OF WASHINGTON
                                                                    Complex Litigation Division
                                                                    800 5th Avenue, Suite 2000
                                                                    Seattle, WA 98104-3188
                                                                       (206) 464-7744

Kitsap County, Washington. Approximately two-thirds of our over 1,300 enrolled PGST members live on the Port Gamble S'Klallam Reservation—100% of which is held in federal trust status. PGST is a signatory to the 1855 Point No Point Treaty with the United States and was organized pursuant to the federal Indian Reorganization Act of 1934, which was passed by the U.S. Congress in part to "conserve and develop Indian lands and resources." PGST and PGST members use the National Archives at Seattle for research that confirms S'Klallam oral histories; documents S'Klallam genealogy; and confirms PGST Treaty fishing, hunting, and other rights, S'Klallam Indigenous land occupancy and natural and cultural resource use and conservation, and PGST interactions and relations with other tribal governments and federally appointed agents. PGST has used the National Archives at Seattle for decades and continues to use the National Archives at Seattle and records drawn from that facility on a routine basis. In particular, PGST has used and continues to use that facility for research in connection with federal programs for natural resource conservation purposes. Were the records stored at the National Archives at Seattle moved out of the region or state, PGST and PGST members would, practically speaking, no longer have access to those records and PGST would be irreparably harmed.

33. Plaintiff Puyallup Tribe is a federally-recognized, sovereign tribal government also recognized by the Treaty of Medicine Creek with the United States (10 Stat. 1132). The Tribe is located in and around the urban core of Tacoma, Washington. It is governed by its own Constitution and Bylaws, a comprehensive code of laws including family protection, housing, fishing, hunting, and land use, as well as its own civil and criminal codes. Members of the Puyallup Tribe have lived, fished, harvested, hunted, protected the environment, and practiced cultural traditions in these areas since time immemorial. The Tribe's government programs numbering over 60 include departments such as historic preservation, fisheries management including the timber, fish & wildlife program, higher education, realty, law enforcement, tribal courts, the law office, business and tax licensing department, and family protective service departments including the Indian Child Welfare department, which all serve to preserve the

Tribe's existence, land, culture and to improve the general welfare of over 5,600 members and their families. Many of these departments and others carry out tribal and federal programs, functions, services, and activities under P.L. 93-638 contracts awarded by the Department of Interior pursuant to Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. §§ 5301 et seq.). Archives held at the National Archives at Seattle facility are an irreplaceable documented history of the Tribe's people, lands, natural and cultural resources, and government. With the assistance of expert archivists who have worked with records specific to tribes for decades, the tribal government, individual tribal members, and tribal community members have used and continue to use the National Archives at Seattle for historical research of a wide variety of topics from enrollment, genealogy, archaeology, historical and legal issues involving fishing, hunting, water, land, and government-to-government agreements between the tribes and other governments including the United States government. These irreplaceable archives are primarily un-digitized and do not exist elsewhere. Closure and sale of the National Archives at Seattle and relocation of the archives would pose significant economic burdens and administrative challenges on the Tribe and its membership. Not having the archives readily available, protected, and nearby will affect the Tribe's ability to use this data for all of these essential governmental purposes. By joining in this Complaint, the Puyallup Tribe of Indians does not admit any of the factual allegations of the Plaintiff Duwamish Tribe, and specifically disclaims and denies any allegation herein regarding the "Plaintiff Duwamish Tribe" claims to be a contemporary organization that is a successor in interest to the historic Duwamish Tribe or to be an Indian Tribe or that the self-identified "Plaintiff Duwamish Tribe" is a party to the Treaty of Point Elliott. These claims have been rejected by both the federal courts and the Department of the Interior. See *United States v. Washington*, 476 F. Supp. 1101, 1105, 1111, (W.D. Wash. 1979), *aff'd*, 641 F.2d 1368 (9th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982); see also Department of the Interior Decision Documents accessible at https://www.bia.gov/as-ia/ofa/025-duwami-wa%20.

34.   Plaintiff Quileute Tribe of the Quileute Reservation ("Quileute Tribe") is a federally recognized Indian tribe and signatory tribe to the 1855 Treaty of Olympia. The Quileute Reservation is located at the mouth of the Quillayute River on the Olympic Peninsula of Western Washington, and the Tribe's ceded lands extend for hundreds of square miles, reaching the Olympic Mountains. For decades, the Quileute Tribe has heavily relied upon, and will continue to heavily rely upon, the Sand Point Archives in connection with research for federal conservation programs. In just the past five years, the Quileute Tribe has used the Archives to defend its treaty rights; fulfill its obligations under various federal grant programs, including a climate change study; comply with (and ensure that the United States as its trustee complies with) the conservation requirements of numerous federal laws, including but not limited to the National Historic Preservation Act and the National Environmental Policy Act. This Court cited numerous documents obtained from the Sand Point Archives in its 2015 decision adjudicating the Quileute Tribe's treaty fishing area.[6] In just the coming decade, the Quileute Tribe intended to conduct research at the Archives for numerous purposes, including in connection with the ongoing process of moving its reservation out of the tsunami zone (see Pub L. 112-97, 126. Stat. 257), with ongoing habitat and infrastructure restoration projects, and with a National Park Service Tribal Heritage Grant to develop a cultural and language center to protect Quileute culture. The Quileute Tribe's compliance with applicable federal laws and federal conservation program requirements in carrying out these projects has involved, and will involve, continuing reliance upon the Sand Point Archives. The Quileute Tribe lacks the financial resources to access these records if they are moved out of the Pacific Northwest. Thus, relocation of the Sandpoint Archive records away from the Northwest will make it extremely difficult, if not impossible, for the Quileute Tribe to access the records its needs for these crucial federal programs and for tribal cultural preservation. This would cause irreparable harm to the Tribe, both in the form of

---

[6] See _United States v. Washington_, 129 F. Supp. 3d 1069, 1073 (W.D. Wash. 2015) (stating that the Court admitted 472 exhibits; numerous of those exhibits were obtained from the Sand Point Archives).

COMPLAINT                                      23                    ATTORNEY GENERAL OF WASHINGTON
                                                                           Complex Litigation Division
                                                                            800 5th Avenue, Suite 2000
                                                                              Seattle, WA 98104-3188
                                                                                  (206) 464-7744

1    increased costs of accessing the records and in the cultural harm caused when the Tribe is unable

2    to participate in these programs due to the prohibitive cost of accessing archival records.

3          35.    Plaintiff Quinault Indian Nation ("Quinault Nation") is a sovereign government

4    and federally-recognized Indian tribe located on the west coast of Washington. The Quinault

5    Nation is a signatory to the Treaty of Olympia (1856), ratified by Congress in 1859 (12 Stat.

6    971), in which it reserved a right to take fish at its "usual and accustomed fishing grounds and

7    stations" and the privilege of hunting and gathering, among other rights, in exchange for ceding

8    lands it historically roamed freely. Representatives of the Quinault Nation have historically

9    relied on and accessed records housed at National Archives at Seattle pertaining to its enrolled

10   membership and census records, historic cultural and treaty practices, as well as historic photos

11   and newspaper articles about the Quinault people. The Quinault Nation has a keen interest in

12   continuing to be able to access such historic records at the National Archives at Seattle without

13   the cost and stress of having to travel a longer distance than to Seattle.

14         36.    Plaintiff Samish Indian Nation ("Samish Tribe") is a federally-recognized Indian

15   tribe located in Northwest Washington. The Samish Tribe has had a contentious relationship

16   with the federal government, including the government's position in the late 1960s taken without

17   any final judicial decision that the Samish Tribe was no longer federally-recognized, and the

18   government's opposition to Samish treaty status because the Tribe was not recognized. The

19   Samish Tribe has been involved in continuous litigation for the last 45 years to confirm its treaty

20   status and its status as a federally-recognized tribe. Tribal access to the National Archives in

21   Seattle was and is critical to the Tribe's successful re-recognition litigation, its successful

22   *Carcieri* determination, and its ongoing legal efforts to confirm its treaty status. Moving the

23   Seattle Archives records back East would severely cripple the Samish Tribe's ongoing legal

24   efforts.

25         37.    Plaintiff Confederated Tribes of Siletz Indians ("Siletz Tribe") is a federally-

26   recognized Indian tribe located along the Pacific Coast in Oregon. The Siletz Tribe has a long

COMPLAINT                                    24                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 5th Avenue, Suite 2000
                                                                         Seattle, WA 98104-3188
                                                                            (206) 464-7744

1    and complicated history with the federal government; at least 27 different tribes and bands of

2    Indians under seven ratified and a number of unratified treaties were all moved to the Siletz

3    Coast Reservation established by Executive Order and confederated together. The Siletz Tribe

4    was terminated by federal legislation in 1954 and was not restored to federally-recognized status

5    until 1977. The Siletz Tribe has struggled since restoration to re-establish its status as a

6    recognized Indian tribe, and to confirm its treaty status and successorship to numerous treaties

7    and tribes and bands of Indians. Ready access to the Seattle Archives has been critical to the

8    Siletz Tribe's legal efforts during the last 50 years. Without that access and the ability to conduct

9    comprehensive cross-referenced research of relevant federal government records, the Siletz

10   Tribe's legal efforts would have been severely compromised and affected.

11       38.     Plaintiff Skokomish Indian Tribe is an Indian tribe with a governing body duly

12   recognized by the Secretary of the Interior. *Indian Entities Recognized and Eligible to Receive*

13   *Services from the United States Bureau of Indian Affairs*, 85 Fed. Reg. 5462 (January 30, 2020).

14   The Tribe is re-organized under the Indian Reorganization Act of June 18, 1934. 48 Stat. 984,

15   987, 25 U.S.C. § 5123; *Theodore H. Haas, Ten Years of Tribal Government under I.R.A.* (1947).

16   The Tribe operates under its Constitution and by-laws first adopted on April 2, 1938, and

17   approved by the Secretary of the Interior May 3, 1938, amended January 15, 1980, as approved

18   by the Secretary of the Interior March 17, 1980. *Id.*; Skokomish Const. The Tribe, as the

19   successor in interest to the Skokomish and Twana people, is a signatory to the Treaty of Point

20   No Point of January 26, 1855 and retains reserved Treaty rights. 12 Stat. 933 (Ratified Mar. 8,

21   1859 and Proclaimed Apr. 29, 1859); *United States v. Washington*, 384 F. Supp. 312, 376-377

22   at Finding Nos. 133-134 (W.D. Wash. 1974). The Tribe is located within the Hood Canal

23   drainage area of the State of Washington. *Id*. The Skokomish's Reservation is defined by an

24   Executive Order and later Proclamations. *Exec. Order of President Ulysses S. Grant*

25   (February 25, 1874). As of December 28, 2020, there are 781 enrolled members of the

26   Skokomish Indian Tribe. For more than a century, the Tribe and its members suffered at the

1  hands of agents implementing policy of the United States, which sought to strip away
2  Skokomish's language, culture, and heritage. Despite having been subject to this adversity to
3  this day the Tribe and its members' cultural identity remains strong, in part due to the ability to
4  rediscover lost knowledge preserved at the National Archives facility in Seattle. The closure of
5  this facility would undoubtedly inflict a most grievous injury upon the Tribe and its members
6  and once again cut off Skokomish's connection to the past. The Tribe relies on this critical
7  facility, for example, amongst other things to: maintain its tribal rolls; secure and preserve its
8  territory and Treaty rights to hunt, gather, and fish; and maintain cultural knowledge. The
9  members would also face undue financial harm if they could not travel to a local facility to
10 conduct their own research into their families' histories, their homeland, their Treaty, and their
11 traditional ways of life.

12     39.    Plaintiff Snoqualmie Indian Tribe is a federally-recognized sovereign Indian tribe
13 and signatory to the Treaty of Point Elliott of 1855 with reserved rights thereunder, with its
14 governmental offices at 9571 Ethan Wade Way SE, Snoqualmie, WA 98065. The Seattle
15 National Archives contain a wealth of historical information about the Snoqualmie people,
16 including but not limited to records from the Tulalip Agency (1861-1950), the Western
17 Washington Agency of the Bureau of Indian Affairs (1950-1975), and the Portland Area Office
18 (1931-1970). Snoqualmie regularly relies on the documents within the Seattle National Archives
19 to support both certain legal endeavors, including its ongoing litigation, and its continuing effort
20 to document the Tribe's ethnohistory. Closure and relocation of the Seattle National Archives
21 would pose significant challenges to Snoqualmie's ability to access these critical and
22 irreplaceable records of its history.

23     40.    Plaintiff Spokane Tribe of Indians ("Tribe") is a federally recognized Indian Tribe
24 located in Eastern Washington. The Tribe's Reservation was established in August of 1877 after
25 the Tribe was forced from its land by the United States government. *Northern Pac. Ry. Co. v.*
26 *Wismer*, 246 U.S. 283, 288 (1918). The Tribe's Reservation borders are the East Bank of

COMPLAINT                                    26                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Complex Litigation Division
                                                                      800 5th Avenue, Suite 2000
                                                                      Seattle, WA 98104-3188
                                                                      (206) 464-7744

Chamokane Creek, the South Bank of the Spokane River, the West Bank of the Columbia River and the Northern Border is the 48th parallel. 1880 WL 32483 (Exec. Ord.). The Tribe's membership of more than 2,700 live within the Reservation and throughout the region. The National Archives in Seattle contains thousands of documents that are pertain to the Spokane Tribe, its people, and its lands. These documents are invaluable in efforts to protect tribal resources, including its lands, waters, and cultural resources. Moving the documents will cost the Tribe significant time, expense, and resources to access these documents at another locations.

41.     Plaintiff Squaxin Island Tribe ("Squaxin") is a federally recognized, self-governing tribal government located in Mason County, Washington. Squaxin is a signatory to the 1854 Treaty of Medicine Creek with the United States. Squaxin uses the National Archives at the Sand Point facility to research and document Squaxin genealogy, and conduct historical research in the areas of Treaty rights (particularly fishing and hunting rights), historical political structure, land base occupancy, natural and cultural resource use and conservation, interactions and relations with other tribal governments and federally appointed agents, and uses of Indigenous plants and medicines. In the 1950s and 1960s, Squaxin used the documents at the National Archives at Sand Point to research its political continuity in a battle to prevent termination of the Tribe. From the 1960s and 1970s to the present, Squaxin has used the documents at the National Archives at Sand Point to document its reserved fishing rights under the Treaty of Medicine Creek. Beginning in the 1970s, Squaxin has used the documents at the National Archives at Sand Point to conduct genealogical research to assist the Tribe's support for national Indian Child Welfare legislation. Were the records stored at the National Archives at Seattle moved out of the region or state, Squaxin and Squaxin members would, practically speaking, no longer have access to those records and Squaxin would be irreparably harmed.

42.     Plaintiff Suquamish Tribe is a federally recognized Indian Tribe, and is a signatory to the Treaty of Point Elliott, 1855. The Port Madison Indian Reservation, home of the Suquamish Tribe, (7,657 acres) is located across the Puget Sound from Seattle (named for

Suquamish Chief Sealth) on the Kitsap Peninsula (named for Suquamish Chief Kitsap) in and around the towns of Suquamish and Indianola. The Suquamish had winter villages at Suquamish, Port Madison. Sandy Hook, Lemolo, Point Bolin, Poulsbo, Silverdale, Chico, Colby, Olalla, Point White, Lynwood Center, Eagle Harbor, Battle Point, Manette, Elwood Point, and Point No Point. The best known winter village was <u>Old Man House</u> at the modern location of Suquamish, the home of Chief Sealth and Chief Kitsap. The Sand Point archives helped the Tribe and its researchers and experts uncover many critical facts about its places and names, its language and history. The Suquamish periodically left their winter residences in the spring, summer and early fall in family canoes to travel to temporary camps at their fishing, hunting, and gathering grounds in and around the Puget Sound. The Suquamish paddled from Old Man House to the Point Elliot Treaty grounds, across the water on the Seattle side. Since treaty time and the hard times immediately thereafter, the Suquamish Tribe has continued to grow. Part of the Tribe's ability to grow and know itself as a Tribe are the unique records that the National Archives at Sand Point have provided to the Tribe's historians, attorneys, linguists, geographers and citizens. Having immediate access to the Sand Point Archives has been critical to the Suquamish Tribe's legal efforts to protect its treaty rights, its trust properties, and the Tribe's status as a Tribe during the last 50 years. Those legal efforts continue to this day, and many still require that the Tribe perform additional historical research at the Sand Point Archives. Without access to the Sand Point Facility and the ability to research federal government records related to pre-treaty activities and the Tribe's usual and accustomed areas, the Suquamish Tribe's efforts to demonstrate its presence in the pre-treaty Puget Sound would have been, and will be severely compromised. The National Archives at Sand Point also provide important genealogic and linguistic information to the Tribe's researchers. Without access to the Sand Point archives, the Tribe's ability to research everything from its language to genealogy to locations and usages would be severely compromised. The Tribe cannot afford to send members, contractors or staff to the Midwest or elsewhere for prolonged research stints. The closure of the Sand Point

Archives and the removal of the Archival materials will injure this and future generations of tribal scholars from viewing their history in its original context. It will also prevent the Suquamish Department of Education from bringing Suquamish youth to the Archive site to show them the records there and their relation to Suquamish history, geography, and language. The Suquamish governmental offices are located at 18490 Suquamish Way NE, Suquamish, WA 98392. The Suquamish Tribe, by joining this complaint, joins in the pleadings, but neither endorses nor disparages the unrelated claims of any other party advocating the preservation of the Sand Point Archives and reserves its rights to address any other such claim at another place and time.

43.     Plaintiff Swinomish Indian Tribal Community is a sovereign entity and federally-recognized Indian tribe. It is an adjudicated successor in interest to certain tribes and bands of Indians which were party to the 1855 Treaty of Point Elliott, including the Kikiallus, Lower Skagit, aboriginal Samish, and aboriginal Swinomish. The Swinomish Indian Tribal Community has regularly relied on its proximity to the Seattle branch of the National Archives and Records Administration since the facility was created at Sand Point in 1963. The Tribe's needs for a regional repository of federal records have been many and varied. For decades, Tribal staff, attorneys, and outside expert researchers and consultants have depended on Record Group 75 (RG 75), the complex web of record sets from the Bureau of Indian Affairs housed at Seattle NARA which "document the U.S. Federal government's interaction with American Indians." Materials from RG 75, and other record groups at Sand Point, have played critical roles in Swinomish's struggle to enforce tribal sovereignty and the rights reserved for them by the 1855 Treaty of Point Elliott. Additionally, these documents have informed the Tribe's creation of laws and infrastructure that govern reservation life today. Equally important to the Swinomish Indian Tribal Community has been the creation of its own repository in 2007 to preserve and understand its history. The Swinomish Tribal Archive has laid a firm foundation for this work by regularly accessing materials at Seattle NARA. The success of the Tribal Archive to build resources for

1    the community from genealogical databases to timelines that document the history of Swinomish

2    government, health care, education, land use and more, is a direct result of the materials obtained

3    in Seattle. Had this regional branch of the National Archive been located in the middle of the

4    United States, these research trips by Swinomish staff would have been prohibitively expensive

5    and out of reach.

6            44.    Plaintiff Tanana Chiefs Conference (TCC) is an intertribal organization located

7    in central Alaska and comprised of thirty-seven federally recognized Alaska Native Tribes and

8    five additional Alaska Native communities. TCC is an arm of the tribal governments which

9    created it. *Beversdorf v. Tanana Chiefs Conference, Inc.*, No. 4FA-17-01911 CI, Order of

10   Dismissal (Alaska Super. Ct. Sept. 27, 2017). TCC was formed in 1915 to protect Native land

11   rights, tribal self-determination, and regional Native unity. TCC reorganized as a nonprofit

12   corporation under Alaska law in 1962, shortly after Alaska statehood, and today provides health,

13   education, economic, and social services for Alaska Natives, American Indians, and other

14   eligible individuals throughout a 235,000 square mile region in interior Alaska. TCC has a deep

15   interest in the records currently stored in the Federal Archives and Records Center in Seattle,

16   because (among other things) that facility houses records concerning tribal aboriginal claims,

17   including claims over hunting and fishing rights acknowledged and extinguished in section 4(b)

18   of the Alaska Native Claims Settlement Act of 1971 (ANILCA), 43 U.S.C. 1603(b), and

19   subsequently addressed by Congress in Title VIII of the Alaska National Interest Lands

20   Conservation Act of 1980 (ANILCA), 16 U.S.C. §§ 3111–3126; Alaska tribal organizations;

21   Alaska Native allotments; Alaska Native townsites; educational activities in Alaska Native

22   villages; early religious (mission) activities in village Alaska; World War II (WWII) and post-

23   WWII activities across the interior of Alaska; mineral development in the interior of Alaska;

24   Alaska Native corporation and State of Alaska land selections in the interior of Alaska; and the

25   history and management of federal "conservation system unit[s]" across the interior of Alaska

26   defined in ANILCA, *see* 16 U.S.C. 3102(4). In this last respect, the archives facility houses

1    records leading to the establishment or enlargement (through ANILCA) of several conservation

2    system units of particular interest to TCC and its member Tribes, including the Gates of the

3    Arctic National Park and Preserve, Karuti National Wildlife Refuge, Koyukuk National Wildlife

4    Refuge, Innoko National Wildlife Refuge, Nowitna National Wildlife Refuge, Noatak National

5    Preserve, Yukon-Charley Rivers National Preserve, Yukon Flats National Wildlife Refuge.

6    Pursuant to Title VIII of ANILCA, 16 U.S.C. §§ 3111–3126, the residents of TCC's region

7    exercise specially reserved hunting and fishing rights for subsistence purposes in each

8    conservation system unit addressed in ANILCA, and information concerning the nature and

9    exercise of hunting and fishing activities in these and other areas across the interior of Alaska

10   are housed in the facility. Also housed in the facility are the records of the Federal Field

11   Committee for Development Planning in Alaska, whose research and 1968 report (published by

12   the Government Printing Office) provided a detailed history of the demography and lifeways of

13   Alaska Native people, including hunting and fishing activities, together with much of the

14   background that led to the development of ANCSA.

15           45.     Plaintiff the Central Council of the Tlingit and Haida Indian Tribes of Alaska

16   (Tlingit & Haida) is a regional, federally recognized Indian tribe in Southeast Alaska, organized

17   pursuant to section 16 of the Indian Reorganization Act of 1934, as amended, 25 U.S.C. § 5123,

18   and recognized by Congress in the Act of June 19, 1935, Pub. L. 74-152, 49 Stat. 388, as

19   amended *inter alia* by the Act of August 19, 1965, Pub. L. 89-130, 79 Stat. 543, and in Pub. L.

20   103-454, § 203, 108 Stat. 4792) (1994); see also Native Entities Within the State of Alaska

21   Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs,

22   85 Fed. Reg. 5462, 5466 (Jan. 30, 2020). Tlingit & Haida represents over 32,000 Tlingit, Haida

23   and Tsimshian tribal members living in Southeast Alaska, the Pacific Northwest, and throughout

24   the world. The Haida people and Tlingit people have always lived on the sacred and wondrous

25   lands and waters of Southeast Alaska and are the original occupants and guardians of these lands

26   and waters. Tlingit & Haida frequently uses and has a deep interest in the records currently stored

in the Federal Archives and Records Center in Seattle. The Seattle Archives facility has records concerning our tribal land claims, including claims over hunting and fishing rights acknowledged and extinguished in section 4(b) of the Alaska Native Claims Settlement Act, 43 U.S.C. 1603(b), and subsequently addressed by Congress in Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3111–3126; genealogical and birth records of our tribal members; the history of the federal Government's interactions with our peoples since 1867, including such episodes as the 1882 bombardment of Angoon by the United States Navy; the creation and use of the Tongass National Forest, Glacier Bay National Park, and Admiralty Island and Misty Fjords National Monuments for conservation, recreation, fisheries, and forestry purposes; the titles and histories of Alaska Native allotments in Southeast Alaska; mineral development in the Tongass National Forest and other federal lands in Southeast Alaska; Alaska Native corporation and State of Alaska land selections in Southeast Alaska; and the history and management of federal Conservation System Units across Southeast Alaska established pursuant to ANILCA. The proposed sale of the Seattle Archives property and the proposed removal of the facility's records to Missouri and California would be severely and adversely impact Tlingit & Haida's and our tribal members' access to and use of these critically important, irreplaceable records.

46.     Plaintiff Upper Skagit Indian Tribe is a federally-recognized, sovereign tribal government and successor in interest to the Treaty of Point Elliot with the United States. The Tribe post Treaty was a "landless" Tribe as its members refused relocation to the Swinomish reservation. The Upper Skagit membership continued to sustain itself in its traditional territories in and around Skagit County and adjacent marine areas. It is governed by its own Constitution and Bylaws, a comprehensive code of laws including family protection, housing, fishing, hunting, and land use, as well as its own civil and criminal codes. Members of the Upper Skagit have lived, fished, harvested, hunted, protected the environment, and practiced cultural traditions in and around the Skagit Basin since time immemorial. The Tribe's government programs

include departments such as historic preservation, fisheries management including the timber, fish & wildlife program, higher education, realty, law enforcement, tribal courts, office of Tribal Attorney, and family protective service departments including the Indian Child Welfare department, which all serve to preserve the Tribe's existence, land, culture and to improve the general welfare of over 1,300 members and their families. Many of these departments and others carry out tribal and federal programs, functions, services, and activities under P.L. 93-638 contracts awarded by the Department of Interior pursuant to Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. §§ 5301 et seq.). Archives held at the National Archives at Seattle facility are an irreplaceable documented history of the Tribe's people, lands, natural and cultural resources, and government. With the assistance of expert archivists who have worked with records specific to tribes for decades, the tribal government, individual tribal members, and tribal community members have used and continue to use the National Archives at Seattle for historical research of a wide variety of topics, including taking land into trust to establish its reservation, preservation of its Treaty rights, enrollment, genealogy, archaeology, historical and legal issues involving fishing, hunting, water, land, and government-to-government agreements between the tribes and other governments including the United States government. These irreplaceable archives are primarily un-digitized and do not exist elsewhere. Closure and sale of the National Archives at Seattle and relocation of the archives would pose significant economic burdens and administrative challenges on the Tribe and its membership. Not having the archives readily available, protected, and nearby will affect the Tribe's ability to use this data for all of these essential governmental purposes.

47.    Plaintiff Confederated Tribes and Bands of the Yakama Nation (Yakama Nation) is a sovereign, federally recognized Native Nation pursuant to its inherent sovereignty and the rights reserved in the Treaty with the Yakamas of June 9, 1855. Treaty with the Yakamas, U.S.–Yakama Nation, June 9, 1855, 12 Stat. 951. The National Archives at Seattle holds decades worth of Yakima Indian Agency (RG 75) records, making it a crucial repository for the Yakama

1    Nation's and its enrolled members' historical documents. These records include, but are not

2    limited to, early Yakama Nation Tribal Council and General Council resolutions, motions, and

3    minutes, federal-Yakama correspondence, land records, photographs, and other media.

4           48.      Plaintiff American Historical Association ("AHA") is a non-profit membership

5    organization founded in 1884 and incorporated by Congress in 1889 for the promotion of

6    historical studies. AHA is a trusted voice that advocates for history education, works to sustain

7    and enhance the professional work of historians, and promotes the critical role of historical

8    thinking in public life. As the largest organization of professional historians in the world, the

9    AHA represents approximately 11,000 members and serves historians of every historical period

10   and geographical area, and who work in a wide variety of settings. AHA's journal, the *American

11   Historical Review*, is the most widely read and frequently cited professional historical journal in

12   the world. The American Historical Association, chartered by the United States Congress "for

13   the promotion of historical studies, the collection and preservation of historical manuscripts, and

14   for kindred purposes in the interest of American history, and of history in America," depends

15   upon broad public access to National Archives records to fulfill this mission. Its Pacific

16   Northwest members rely on records held at the National Archives at Seattle in their research to

17   support policy development, teaching, publications, advocacy, and interpretation and

18   preservation at private, state, and federal historic sites and museums. The AHA's members use

19   the archives to explore and reveal every aspect of Pacific Northwest and Alaskan history, such

20   as Indigenous history, environmental history, social and cultural history, business and economic

21   history, and governmental history—from policy consideration to policy implementation. AHA

22   members' research supports historical scholarship, teaching, and museum work; informs Pacific

23   Northwest public policy in various contexts, including conservation and resource management;

24   and enables historians to serve as expert witnesses in important cases involving Tribal

25   governments and communities, along with a wide variety of other important issues. The AHA's

26   mandate from the Congress is to act on behalf of "American history, and of history in America."

In 1910, the AHA petitioned Congress to construct a national depository after finding that many governmental records from the previous century had been lost or destroyed. The resulting institution became the National Archives and Records Administration. The AHA continues to advocate on behalf of the imperative of NARA's work to ensure that the American people have access to the documents and other materials essential to understanding, and learning from, our past.

49.     Plaintiff Association of King County Historical Organizations ("AKCHO") serves as a centralized resource for and connection between King County's heritage organizations. AKCHO promotes professional standards for the heritage field and advocates for public policy that strengthens King County's heritage and history. AKCHO's membership spans more than 25 individuals and 50 organizations, including large institutions, historic houses, and institutions associated with local governments. Sharing information about where and how to access primary source documents is one way that AKCHO supports its membership as they create exhibits, write publications, and provide educational programming, particularly for children. AKCHO often recommends, and its members rely on, the National Archives at Seattle as an invaluable resource for primary source documents. AKCHO has also arranged tours of the Archives so that historical organizations and individuals throughout King County working on Pacific Northwest historical projects know about the vast resources available there. Access to the Archives is critical to the mission and programs of AKCHO and the heritage organizations it represents. Without it, AKCHO and its members would no longer have access to critical primary source materials relevant to the history and heritage of this region.

50.     Plaintiff Chinese American Citizens Alliance of Seattle (C.A.C.A. Seattle) is the Seattle chapter of one of the oldest civil rights organizations in the country. An important part of C.A.C.A. Seattle's mission is to educate the public about the history and contributions of Chinese Americans in the Pacific Northwest. A critical part of that history is the Chinese Exclusion Act and its impact on local communities. The National Archives at Seattle holds many

of the most important records about the implementation and impact of the Chinese Exclusion Act on the region. C.A.C.A. Seattle and its members also rely on the records to not just research and understand the impact of the Chinese Exclusion Act on their own families, but also to educate the Pacific Northwest community about the Act and its impact on the region as a whole. These records are central to C.A.C.A. Seattle's efforts to add the Chinese Exclusion Act studies to the Washington State K-12 curriculum. In 2018, the Chinese Exclusion Act records helped C.A.C.A. Seattle curate and host its commemoration of the 75th anniversary of the repeal of the Chinese Exclusion Act at the Wing Luke Museum. Members also utilize records, including oral histories, housed at the National Archives at Seattle to create art and to tell the stories of both the racial discrimination faced by Chinese American citizens in the Pacific Northwest and the myriad ways that Chinese Americans helped to create and build the city that Seattle is today. Relocation of the National Archives at Seattle would frustrate the mission of C.A.C.A. Seattle by depriving of it of access to many of the most critical historical documents surrounding the history of Chinese Americans in the Pacific Northwest. It would also require a diversion of resources by forcing C.A.C.A. Seattle members to travel or avail themselves of more expensive research options to continue to build out and teach the public about that history.

51.     Plaintiff Historic Seattle is a public development authority chartered and established by the City of Seattle in 1973 to acquire and rehabilitate historic properties and advocate for the thoughtful and meaningful preservation of historic buildings and landscapes. In that role, Historic Seattle provides educational programs, real estate development services, and historic resources consulting to individuals, community groups, developers, and policymakers. Historical research is an integral component of those projects and programs. Historic Seattle relies upon local and regional primary source materials, including those stored at the National Archives in Seattle, to research buildings, places, and people related to properties it owns or for which it advocates. These primary source materials are particularly important to Historic Seattle's preparation of local landmark applications, National Register of Historic Places

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

nominations, and federal historic rehabilitation tax credit applications. The National Archives is one of the key places to conduct this research in the Pacific Northwest and contains records that cannot be found anywhere else and have not been digitized, including architectural and engineering drawings, historic maps, tribal records, military records, and unique materials related to Washington state and territory. Access to the National Archives is critical to Historic Seattle's efforts to save places that matter and tell the stories of the people associated with those places, which are core components of its mission and programs.

52.     Plaintiff HistoryLink is a 501(c)(3) not-for-profit corporation established in 1997 to pioneer innovative approaches to historical research, education, and publishing. Its primary public service activity is production of HistoryLink.org, the free online encyclopedia of Washington state history and the nation's first original encyclopedia of community history created expressly for the Internet. With nearly 8,000 articles about the history of Washington state, HistoryLink.org provides professionally written and edited resources based on research in the primary sources held at archives, libraries, and historical organizations, which tell the stories of Washington and serve as a stepping stone to further research. HistoryLink also publishes books and develops curriculum materials on Washington state history across a broad range of topics, which are also grounded in the documents and other materials held at those repositories. The National Archives at Seattle (the "Archives") is a key resource for the development of HistoryLink articles, books, tours, and curriculum materials. Its writers have accessed the records there to learn about the history of federal facilities such as Hanford Nuclear Works, Sand Point Naval Air Station, the Hiram Chittenden Locks, and the Lake Washington Ship Canal, significant events such as the passage of the Donation Land Law, the 1962 World's Fair, and the Pig War incident in the San Juan Islands, and biographies of significant people who have shaped the state's history, among many other topics. These records are invaluable because there is often a dearth of secondary sources documenting local history, so historians must rely on archival collections to learn about them. The Archives' collections are particularly important because of

the federal government's significant role in shaping the region's infrastructure development, the importance of the relationship between tribal communities and federal departments and agencies, and the role federal treaties, policies, and actions have played in shaping public policy at all levels. Without easy access to the records held at the Seattle facility, HistoryLink would be severely hindered in its efforts to tell the stories of Washington's people, places, and significant events, which would have negative consequences for educators, students, journalists, elected officials, agency personnel, and the general public who use HistoryLink.org to learn about Washington's history.

53.     Plaintiff Museum of History and Industry (MOHAI) is Washington State's largest independent heritage organization, serving tens of thousands of Washington State residents, visitors and school children each year with exhibits, programs and educational activities related to the history of the Puget Sound region and the Pacific Northwest. As the region's leading resource for history and civics education, MOHAI works closely with the National Archives Seattle branch to research and share the stories of our region, using the invaluable treasures of the NARA Seattle archives to bring a historical perspective to the public discussion of contemporary issues facing the community. Because of their close proximity, MOHAI and the National Archives Seattle branch have partnered over many years on exhibits, public programs, and research projects, and MOHAI has provided a public venue for presenting National Archives materials which otherwise would be largely inaccessible to the general public. MOHAI's annual service to 30,000 students, in dozens of school districts, and its public programs and exhibits which reach over 100,000 area residents each year, would suffer significantly with the loss of the archives in our region, and the opportunity the archives presents for MOHAI to provide Northwest residents with a better understanding of our shared past.

54.     Plaintiff OCA Asian Pacific Advocates – Greater Seattle is a chapter of OCA Asian Pacific Advocates, formerly known as the Organization of Chinese Americans. Founded in 1973, the organization was founded with a vision of uniting Chinese Americans across the

38

1  United States into one representative voice. Today, OCA has transformed into a national

2  organization dedicated to advancing the social, political, and economic well-being of Asian

3  Pacific Americans in the United States. OCA is nonprofit, non-partisan organization representing

4  over 10,000 people nationally, including affiliates, college affiliates, and general membership.

5  The Greater Seattle Chapter ("OCA-GS") was formed in 1995 as an affiliate of the national OCA

6  organization. Since its inception, OCA-GS has served the Greater Seattle Chinese and Asian

7  American and Pacific Islander American community as well as other communities in the Pacific

8  Northwest. It is recognized in the local community for its advocacy of civil and voting rights as

9  well as its sponsorship of community activities and events. The National Archives facility

10  located in Seattle, Washington is fundamental to our community's conservation and educational

11  efforts relating to immigrant and Native/Indigenous ancestry and history. These Archives house

12  critical information that must remain accessible to the communities, specifically the Northwest

13  communities, since it holds our histories. For OCA's members and the communities it serves,

14  the Archives provide a critical source of information in the following ways: as an educational

15  resource for our local college and university faculty who rely on access to the Archives for

16  research and classroom teaching purposes; as a critical tool for our Asian and Native/Indigenous

17  communities to learn more about their history, and as a source for two of OCA-GS's former

18  Presidents who published books with historical significance to our community and state; as a

19  source of information that OCA-GS used to support efforts to award the Congressional Gold

20  Medal to our veterans (many of our members, including the current OCA-GS President, are

21  descendants and/or relatives of Japanese, Filipino, and Chinese veterans of World War II); and

22  as critical partners in the conservation of our community's history, including the Chinese

23  Exclusion Act files that cover not only Washington, Oregon, Idaho, and Alaska from the 1850s

24  to 1980s, but also include Chinese who entered the U.S. through any of these states but settled

25  or visited elsewhere in the U.S. Volunteers have carefully created one of the best NARA indices

26  of these files.

55.     Plaintiff Washington Trust for Historic Preservation (WTHP) is a 501(c)(3) nonprofit advocacy organization dedicated to saving the places that matter in Washington State and to promoting sustainable and economically viable communities through historic preservation. WTHP is Washington's only statewide historic preservation organization. Among other public services and programs, WTHP provides technical advice, financial assistance, and advocacy to local preservation efforts statewide. WTHP has members throughout the state of Washington. The National Archives in Seattle are an important resource for WTHP's advocacy, education, and stewardship programs. Archival research, including at the National Archives, is critical to determine whether and how to protect and advocate for historic resources. For example, WTHP recently used the Archives to complete preservation-related projects funded through the federal Transportation Enhancement and Scenic Byways programs. The records at the Archives are also particularly useful to the efforts of WTHP and its members to develop nominations to the National Register of Historic Places, materials related to the federal Rehabilitation Tax Credit program, and landmark nominations to local city and county historic registers through the Certified Local Government program. Many of the relevant records at the Archives, including property records, correspondence, historic reports, genealogy, military records, photos and other forms of documentation, are available only at the Archives and have not been digitized. Continued access to the Archives is critical to WTHP's mission and programs and to the preservation of historic resources throughout the state.

56.     Plaintiff Wing Luke Memorial Foundation (d/b/a Wing Luke Museum) is a museum whose mission is to connect everyone to the dynamic history, cultures, and art of Asian Pacific Americans through vivid storytelling and inspiring experiences to advance racial and social equity. Founded in 1966 in Seattle's historic Chinatown-International District, honoring Wing Luke, an immigrant and first person of color elected to Seattle City Council in 1962, the Wing Luke Museum is a cultural gathering place for diverse audiences spanning generations and diverse socioeconomic backgrounds. The Wing Luke Museum engages the public in the history,

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

culture, and art of Asian Pacific Americans through community-driven exhibitions, educational resources and programs, guided tours, and neighborhood revitalization activities. The Wing Luke Museum is an affiliate of the Smithsonian Institution and an Affiliated Area of the National Park Service. Research within the National Archives and Records Administration in Seattle has been integral to the creation of many exhibitions at the Wing Luke Museum, especially drawing upon the Chinese Exclusion Files. These records have illuminated the immigration experience for Chinese Americans from the 1850s to 1980s. The records also have been key to its interpretation of the historic Seattle Immigration and Naturalization Service Building. Since the records connect with individuals and their families, research at the National Archives and Records Administration has enabled the Wing Luke Museum to share and explore personal stories within its exhibitions, connecting with its visitors and immersing them in history. Indeed, research at the National Archives and Records Administration has been a powerful way to recover history that would otherwise be lost to Asian Pacific American communities in the Pacific Northwest region and beyond. Through genealogy workshops and family histories donated to the Wing Luke Museum Collections, community members cite how necessary in-person research at the National Archives and Records Administration has been to their findings. Without access to these records, the Wing Luke Museum would be without core exhibition interpretation materials, lose a vital educational resource, and be greatly reduced in its ability to serve the Asian Pacific American communities and the general public overall.

57.     Defendant Office of Management and Budget (OMB) is an agency of the United States, and is the agency responsible under FASTA for providing the PBRB with standards and criteria, as well as reviewing the PBRB's recommendations.

58.     Defendant Russel Vought is the Director of OMB, and is sued in his official capacity.

59.     Defendant Public Buildings Reform Board (PBRB) is an agency of the United States, created through FASTA.

60.     Defendant Adam Bodner is the Executive Director of the PBRB, and is sued in his official capacity.

61.     Defendant General Services Administration (GSA) is an agency of the United States, and is the agency responsible under FASTA for effectuating the sale of federal property.

62.     Defendant Emily W. Murphy is the Administrator for GSA, and is sued in her official capacity.

63.     Defendant National Archives and Record Administration (NARA) is an agency of the United States, whose public mission is: "[T]o provide public access to Federal Government records in our custody and control. Public access to government records strengthens democracy by allowing Americans to claim their rights of citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government."[7]

64.     Defendant David S. Ferriero is the Archivist of NARA, and is sued in his official capacity.

### III.     JURISDICTION AND VENUE

65.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701–706 (judicial review of agency action under the APA). The United States has waived its sovereign immunity from this suit pursuant to 5 U.S.C. § 702. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, mandamus, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 1361 and 5 U.S.C. §§ 705–706.

66.     Defendants' actions described herein constitute final agency actions or unlawfully withheld or reasonably delayed agency actions and are therefore judicially reviewable within the meaning of the APA. 5 U.S.C. §§ 704, 706.

---

[7] https://www.archives.gov/about/info/mission

COMPLAINT

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

67.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which the State of Washington resides and this action seeks relief against federal agencies and their officials acting in their official capacities. *See California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019). Moreover, venue is proper in this Court because the property that is the subject of the action is situated in the Western District of Washington. 28 U.S.C. § 1391(b)(2).

## IV.     STATEMENT OF FACTS

### A.     Factual Background

#### 1.     History of the Seattle Archives Property

68.     The National Archives at Seattle is located at 6125 Sand Point Way NE, Seattle, Washington, 98115, in the Hawthorne Hills residential neighborhood of northeast Seattle.

69.     Named for Chief Si'ahl, who was chief of the Duwamish and Suquamish Tribes, Seattle is on Duwamish land. White settlers began arriving in the Seattle area in 1851, and by the mid-1860s, Native people were prohibited from residing in Seattle, including the Duwamish, notwithstanding its status as a party to the Point Elliott Treaty, ratified in 1859. Like the rest of the city, the Seattle Archives facility sits on ill-gotten land.

70.     As documented by a now-retired senior NARA archivist, the land on which the Seattle Archives facility resides was once a thriving farm operated by members of the Uyeji family, who emigrated from Japan.[8] In the decades leading up to World War II, the Uyeji family lived and worked on the land and operated a "truck farm."

---

[8] *See* National Archives Researcher News, *Real Property Research at the National Archives at Seattle* by Ken House, at 4–5 (providing the history of the Seattle Archives facility and discussing the Uyeji family), available at https://www.archives.gov/files/research/newsletter/2013-spring.pdf.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

 

4

5

6

7

8

9

10

*Two members of the Uyeji family in their greenhouse during the 1930s and a picture of the Uyeji family farm. Their home and farm were located on the site of the current Seattle Archives facility.*
*Photos courtesy of Densho, Uyeji Collection.*

11

12

13      71.     In May 1942, when the federal government ordered the forced removal of

14   residents of Japanese ancestry in the area, the Uyeji family and their Japanese-American

15   neighbors were removed from their home and family farm.

16      72.     The Uyeji family was initially interned at the Pinedale Assembly Center in

17   central California and then later at the Tule Lake Relocation Center in northern California. The

18   Uyeji family were never able to return to their Seattle home.

19      73.     The land that the Uyeji family had lived on and farmed was parceled, sold, and

20   then subsequently condemned by the U.S. Navy in 1945 in order to build the warehouse that

21   is now used by NARA.

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
2
3
4
5
6
7
8
9
10



*The greenhouse and farm property in 1944, two years after the Uyeji family*
*were interned. This photo is located in an appraiser's file at the Seattle*
*Archives related to the 1945 condemnation proceeding.*

11
12

74.  Since 1963, the warehouse has been a NARA facility, and it currently houses
records about the Uyeji family farm—including a key to the front door of the family's former
home—as well as records related to the internment of Japanese Americans in the 1940s.[9]

75.  The National Archives at Seattle houses approximately one million boxes of
federal records, dating back to the 1840s, from Washington, Idaho, Oregon, and Alaska. This
includes military, land, court, tax, and census records for the region.[10]

76.  If these records were to be moved, replicating the direct access currently
available to residents of the Pacific Northwest would require a significant financial and time
investment, likely including flight and hotel expenses, that is out of reach for many. Despite
recent efforts to digitize some records, only a very small fraction of the millions of records at
the Seattle facility are available online. According to Susan Karren, NARA's Seattle director,

13
14
15
16
17
18
19
20
21
22
23
24
25
26

[9] *See id.* ("Remarkably, one file still contains the front door key to the Uyeji farm house. The subsequent owner mailed the key to Navy officials, and they dutifully filed it.").
[10] https://www.seattletimes.com/seattle-news/terrible-and-disgusting-decision-to-close-national-archives-at-seattle-a-blow-to-tribes-historians-in-4-states/.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   only ".001% of the facility's 56,000 cubic feet of records are digitized and available online."[11]

2   If the sale proceeds, the records will be inaccessible for an unknown period of time, as they

3   will need to be inventoried, shipped, and reprocessed at their new sites.[12] Moreover, having to

4   submit records requests from afar precludes requestors from browsing the records; the

5   requestor may not know exactly which particular records they seek.

6           **2.**        **Records Housed at the Seattle Archives Property**

7          77.     As discussed below, the National Archives at Seattle houses records that are

8   particularly unique and important to residents of the Pacific Northwest and Alaska, such as

9   census and genealogical records, tribal records, Chinese Exclusion Act records, and Japanese

10  internment records. These records are a crucial part of Pacific Northwest and Alaska history,

11  to which residents currently have direct access. Alaska, whose population is approximately

12  15% Alaska Natives, no longer has a National Archives facility after its own facility was closed

13  and the records were shipped to the Seattle facility.

14         78.     Removing these records from the Pacific Northwest will deprive residents of

15  this region with access to valuable and important historical documents. Indeed, upon

16  announcing the pending closure of the National Archives at Seattle, NARA acknowledged:

17  "We recognize that the closure of our facility will have a negative impact on researchers,

18  Federal agencies, and other customers that use our facility."[13] Closure of the National Archives

19  at Seattle is inconsistent with NARA's mission, which is to provide "public access to Federal

20  Government records in our custody and control," recognizing that "[p]ublic access to

21  government records strengthens democracy by allowing Americans to claim their rights of

22

23

24  ───────────────

    [11] https://www2.archivists.org/groups/human-rights-archives-section/more-than-a-warehouse-why-the-closure-of-seattles-national-arch.

25      [12] https://www.historyassociates.com/hai-advises-clients-to-plan-ahead-closure-of-the-national-archives-at-seattle-will-impact-litigation-research/.

26      [13] NARA Press Release, Seattle Facility Approved for Closure (Jan. 27, 2020),
https://www.archives.gov/press/press-releases/2020/nr20-37.

citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government."[14]

### a.    Tribal Records

79.    The National Archives at Seattle houses a significant body of Treaty and other records relating to the 272 federally recognized tribal governments in Alaska, Washington, Oregon, and Idaho. These include records from Bureau of Indian Affairs (BIA) offices and federal Indian agencies and schools in Alaska, Washington, Oregon, and Idaho, reports regarding usufructuary activities reserved to numerous Pacific Northwest tribal governments in their Treaties (such as fishing, hunting, and gathering), court cases regarding treaty rights and transcripts of testimony from tribal members in those cases, and other materials of extreme import to the tribal governments in the Northwest.

80.    The National Archives at Seattle also houses records transferred to Seattle when the National Archives facility in Anchorage closed in 2014. The collection that moved from Alaska includes "everything from village census records from before statehood to histories of fur seal hunts in the Pribilof Islands."[15]

81.    Direct access to these records, the vast majority of which are not digitized, is critical for Pacific Northwest tribal governments and Alaska Native corporations. As Chairman Jeromy Sullivan of Plaintiff Port Gamble S'Klallam Tribe and then Chairman David Bean of Plaintiff Puyallup Tribe of Indians noted in letters to then-Acting Director Vought on January 23, 2020, and on January 24, 2020 (respectively), tribal governments rely on physical access to critical historical documents and, as a result, sale of the Seattle facility will have a "profound, negative and irreparable impact."[16] As Chairman Bean explained, the facility "houses critical documents associated with litigation that document the Tribe's effort to protect

---

[14] About the National Archives, Mission, Vision, and Values, https://www.archives.gov/about/info/mission.
[15] https://www.alaskapublic.org/2014/06/10/national-archives-departure-impacts-broad-community/.
[16] https://www.documentcloud.org/documents/6671516-National-Archives-Puyallup-and-Port-Gamble.html.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

our treaty rights and territory." *Id.* Chairman Sullivan similarly explained that "[t]he facility also houses critical and hard-to-reproduce historical information related to the area tribes." *Id.* The records are used to confirm tribal oral histories and to develop tribal ethnohistories and to affirm

82.     Treaty and other sovereign rights, particularly natural and cultural resource conservation rights. Tribal citizens also seek and use NARA records for scores of different reasons, including to trace their lineage and ancestry, establish tribal citizenship, demonstrate and exercise tribal Treaty fishing, hunting, and other rights, and access Indian school records. Closing the Seattle facility renders these records practically inaccessible for Pacific Northwest tribal governments and Alaska Native corporations. As John Hollowed, legal adviser to the Northwest Indian Fisheries Commission, told the press following a meeting with NARA staff after closure of the Seattle facility was announced: "Everything of value to the tribes has been taken away by the federal government. Their land, their right to fish, and the worst travesty was taking away their kids."[17]



*Photographs of Metlakahtla (Tsimshean) Children in Metlakahtla, Alaska. Available at the National Archives at Seattle (Box 276).*

---

[17] https://www.seattletimes.com/seattle-news/frustrated-tribes-finally-get-hearing-with-national-archives-about-sand-point-facility-closure/.

83.     Now, the impending sale of the National Archives at Seattle threatens to take away the Pacific Northwest tribal governments and Alaska Native corporations' access to records of their own history. Shipping these records to Riverside or Kansas City will effectively *eliminate* public access to the records, creating insurmountable obstacles for local tribal governments and citizens and other affected communities in the Pacific Northwest seeking access to critical historical resources.

**b.     Chinese Exclusion Act Records**

84.     The National Archives at Seattle also contains more than 50,000 case files related to the Chinese Exclusion Act of 1882, which was passed to limit the number of Chinese laborers entering the United States. The Act was repealed in 1943.

85.     Individuals applying for entry or re-entry into the United States under the Chinese Exclusion Act had to go through an extensive application process. The Seattle facility has case files for individuals who entered the United States through ports in Portland and Seattle as well as individuals who entered through ports that were managed by officials in Seattle, including Helena, Montana; Port Townsend, Washington; Portal, North Dakota; Sumas, Washington; and Vancouver, British Columbia.[18] The Seattle facility's case files include identification photographs, biographical information, interrogation notes, copies of federal and local court records, and personal letters and photographs. *Id.*

86.     These records have been a critical resource for Chinese Americans in the Pacific Northwest looking for information about their ancestors.[19] As one individual who successfully traced his family history with the help of NARA Seattle staff explained, "[i]t's all there on paper, so you can literally recreate a picture of the village and the family tree through these documents."[20]

---

[18] https://www.archives.gov/seattle/finding-aids/chinese-exclusion-act.
[19] https://www.kuow.org/stories/first-panic-then-a-battle-to-keep-the-national-archives-in-seattle.
[20] https://iexaminer.org/concerns-raised-about-closure-of-national-archives-in-seattle-which-contains-chinese-exclusion-act-records/.

COMPLAINT                                  49                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Complex Litigation Division
                                                                       800 5th Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                           (206) 464-7744

87.     To help facilitate access to these records, there is a dedicated staff of local volunteers at the Seattle facility working to index the Chinese Exclusion Act case files.[21] The hard work of these NARA Seattle volunteers was profiled in a 2018 *Seattle Times* video, which highlights their efforts in making these files more readily accessible to the public.[22]



*Photograph from the Chinese Exclusion Act case file of Soong May Ling (National Archives at Seattle, RS Case File 1483). As an adult, Soong May Ling, also known as Madame Chiang Kai Shek, played a role in the repeal of the Chinese Exclusion Act.*

### c.     Japanese Internment Records

88.     The closure of the facility will also have a significant impact on the local Japanese American community. In 1940, there were over 14,000 Japanese and Japanese Americans living in Washington State, comprising 11.5% of the population, according to the U.S. Census.[23] As discussed above, the land on which the Seattle facility resides was once a farm operated by Japanese Americans, the Uyeji family, for several decades prior to the Second World War. After the Uyeji family were removed from their home and interned, their land was never returned to them; in 1944, it was condemned by the U.S. Navy in order to build a warehouse. The connection

---

[21] https://www.archives.gov/seattle/volunteer#profiles.
[22] https://www.seattletimes.com/video/5978784223001/its-like-reading-someones-life-seattles-chinese-exclusion-act-files.
[23] https://www2.census.gov/library/publications/decennial/1940/population-nonwhite/population-nonwhite.pdf.

between the land on which Seattle facility resides and the records it holds further underscores the profound regional importance of the National Archives at Seattle.

89.   Since 1963, the warehouse has been a NARA facility, and it currently houses records about the internment of Japanese Americans in the 1940s. For instance, the Seattle facility holds records and case files of the United States district and bankruptcy courts in the Pacific Northwest region, including those involving individuals of Japanese descent during World War II. This collection includes also records of criminal cases against Japanese Americans for curfew violations or failure to register for the Selective Training and Service Act.

90.   If the closure of the facility proceeds, these records will be transferred to facilities in Kansas City and Riverside. According to local archivist organizations like Densho, which preserve and share the history of the World War II incarceration of Japanese Americans, physically moving these archives would impede a local family's research into their roots and genealogy.[24] These records are particularly relevant to families whom the federal government forcibly removed from the Pacific Northwest, and those seeking to fully understand the impact of internment.

**B.      Statutory Background**

91.   The Federal Assets Sale and Transfer Act of 2016 (FASTA), Pub. L. 114-287, as amended, establishes a process for selling federal real property on an expedited basis. It was enacted on December 16, 2016. It created an independent reform Board, the PBRB, and a process for the PBRB to make recommendations for property disposals, consolidations, lease reductions, cost containment, and "other efficiencies" across the Federal Government.

92.   FASTA establishes a multi-step process for ensuring the PBRB has the decision making framework and data necessary to make its recommendations before it begins its work.

---

[24] https://iexaminer.org/concerns-raised-about-closure-of-national-archives-in-seattle-which-contains-chinese-exclusion-act-records/.

1      93.     Section 3 of FASTA excludes certain types of property from its definition of the "Federal civilian real property" and "civilian real property" that are eligible for sale under FASTA. One such exclusion is for "[p]roperties used in connection with Federal programs for agricultural, recreational, or conservation purposes, including research in connection with the programs." Section 3(5)(B)(viii).

94.     Section 11 of FASTA provides: "Not later than 120 days after the date of enactment of this Act, and not later than 120 days after the first day of each fiscal year thereafter until the termination of the Board,"[25] other federal agencies are required to submit "current data" (such as age and condition of the property and operating costs) and "recommendations" of certain "excess" federal civilian real properties and operational efficiencies to the Administrator and the Director of OMB. Section 11(a).

95.     Under Section 11(b), no later than 60 days after the submission deadline for such agency information and recommendations, the Director of OMB "shall (A) review the agency recommendations; (B) develop consistent standards and criteria against which the agency recommendations will be reviewed; and (C) submit to the Board the recommendations developed pursuant to paragraph (2)," which are to be developed "jointly" with the GSA Administrator. Section 11(b)(1)–(2).

96.     Section 11(b)(3) further directs that in developing these standards, the Director of OMB, in consultation with the GSA Administrator, "shall incorporate the following factors:

(A)   The extent to which the civilian real property could be sold (including property that is no longer meeting the needs of the Government), redeveloped, outleased, or otherwise used to produce the highest and best value and return for the taxpayer.

---

[25] Section 10 of FASTA provides that the PBRB "shall cease operations and terminate" in 2022.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

(B)   The extent to which the operating and maintenance costs are reduced through consolidating, co-locating, and reconfiguring space, and through realizing other operational efficiencies.

(C)   The extent to which the utilization rate is being maximized and is consistent with non-governmental industry standards for the given function or operation.

(D)   The extent and timing of potential costs and savings, including the number of years, beginning with the date of completion of the proposed recommendation.

(E)   The extent to which reliance on leasing for long-term space needs is reduced.

(F)   The extent to which a civilian real property aligns with the current mission of the Federal agency.

(G)   The extent to which there are opportunities to consolidate similar operations across multiple agencies or within agencies.

(H)   The economic impact on existing communities in the vicinity of the civilian real property.

(I)   The extent to which energy consumption is reduced.

(J)   The extent to which public access to agency services is maintained or enhanced."

97.    Additionally, Section 11(c) mandates that these standards "shall incorporate and apply clear standard utilization rates to the extent that such standard rates increase efficiency and provide performance data." The utilization rates "shall be consistent throughout each applicable category of space and with nongovernment space utilization rates." *Id.*

98.    Section 11(d) provides that, after developing these standards and incorporating the relevant utilization rates, the Director of OMB "shall submit the standards, criteria, and recommendations developed pursuant to subsection (b) to the [PBRB] with all supporting information, data, analyses, and documentation." Section 11(d)(1). FASTA also directs that the "standards, criteria, and recommendations developed pursuant to subsection (b) shall be

published in the Federal Register" and transmitted to certain congressional committees and to the Comptroller General of the United States. Section 11(d)(2).

99.     Section 12 of FASTA sets forth the duties of the PBRB, and directs the PBRB to "identify opportunities for the Government to reduce significantly its inventory of civilian real property and reduce costs to the Government." Section 12(a).

100.    The PBRB was initially charged with identifying "not fewer than five Federal civilian real properties that are not on the list of surplus or excess as of [180 days after Board members are appointed] with a total fair market value of not less than $500,000,000 and not more than $750,000,000" ("High Value Assets"). Section 12(b)(1)(A).

101.    Section 12(b) directs the PBRB to identify the High Value Asset properties "not later than 180 days after Board members are appointed[.]" Section 12(b)(1). In identifying the High Value Assets, the PBRB is instructed that it "shall consider the factors listed in section 11(b)(3)." Section 12(b)(3).

102.    The PBRB must then transmit the list of High Value Assets to the Director of OMB and to Congress as "Board recommendations," which are subject to the approval process in Section 13 of FASTA. Section 12(b)(1)(B).

103.    Under Section 12(b)(5): "Not later than 60 days after approval of Board recommendations" any "Federal agencies with custody, control, or administrative jurisdiction over the identified properties shall submit a Report of Excess to the General Services Administration."

104.    Section 12(c) directs the PBRB that it "shall perform an independent analysis of the inventory of Federal civilian real property and the recommendations submitted pursuant to section 11." Section 12(c).

105.    Section 12(d) permits the PBRB to "receive and consider proposals, information, and other data submitted by State and local officials and the private sector," and requires the

COMPLAINT                                      54                    ATTORNEY GENERAL OF WASHINGTON
                                                                            Complex Litigation Division
                                                                             800 5th Avenue, Suite 2000
                                                                              Seattle, WA 98104-3188
                                                                                 (206) 464-7744

1  Board to "consult with State and local officials on information, proposals, and other data that the

2  officials submit to the Board." Section 12(d)(1)–(2).

3      106.   Section 12(f) directs that the PBRB "shall conduct public hearings" and that "all

4  testimony at such a hearing shall be presented under oath."

5      107.   Section 13 provides that within 30 days after receiving the PBRB's

6  recommendations, the Director of OMB shall "conduct a review" and transmit to the PBRB and

7  Congress a report approving or disapproving of the recommendations. Section 13(a)–(b). If the

8  Director does not transmit to Congress an "approval and certification" within this timeframe, the

9  PBRB's multiple-round identification process under Section 12 begins anew. Section 13(d).

10     108.   Should the Director of OMB transmit the recommendations to Congress, Federal

11 agencies must "immediately begin preparations to carry out the Board's recommendations"

12 within 60 days, and "initiate all activities necessary" to do so within two years. Section 14(a)(1).

13 All recommended actions are to be completed within six years. Section 14(a)(2). However, when

14 acting on a recommendation of the PBRB, the Act obligates federal agencies to "continue to act

15 within the Federal agency's existing legal authorities." Section 14(c)(1)(A).

16 **C.    Federal Tribal Consultation Policies**

17     109.   In its dealings with tribal governments and tribal citizens, the federal government

18 is charged with "moral obligations of the highest responsibility and trust" and should be "judged

19 by the most exacting fiduciary standard." *Seminole Nation v. United States*, 316 U.S. 286, 296

20 (1942). One of the United States' responsibilities to tribal governments is to meaningfully

21 consult with them prior to taking action or making decisions of tribal implication.

22     110.   Executive Order 13175 on Consultation and Coordination with Indian Tribal

23 Governments directed the "establish[ment] [of] regular and meaningful consultation and

24 collaboration with tribal officials in the development of Federal policies that have tribal

25 implications," to, among other things, "strengthen the United States government-to-government

26

COMPLAINT                        55              ATTORNEY GENERAL OF WASHINGTON
                                                        Complex Litigation Division
                                                         800 5th Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                             (206) 464-7744

relationships with Indian tribes."[26] Defendant Vought and PBRB, GSA, and NARA must consult not only with tribal governments pursuant to Executive Order 13175; according to P.L. 108-99, they must also "consult with Alaska Native corporations on the same basis as Indian tribes under Executive Order No. 13175."[27]

111.     On November 5, 2009, President Barack Obama issued a Tribal Consultation Memorandum For the Heads of Executive Departments and Agencies affirming that "executive departments and agencies . . . are charged with engaging in regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and are responsible for strengthening the government-to-government relationship between the United States and Indian tribes."[28] The Memorandum acknowledges: "History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results." Therefore, President Barack Obama directed each federal agency to submit to Defendant OMB's Director "a detailed plan of actions the agency will take to implement the policies and directives of Executive Order 13175."

112.     According to Defendant OMB, Executive Order 13175 and President Obama's November 5, 2009, Tribal Consultation Memorandum binds "all Federal agencies," including Defendants PBRB, OMB, GSA, and NARA. Defendant GSA's Policy Toward Native American and Alaskan Tribes, for example, pledges that "GSA will consult, to the greatest extent practicable and to the extent permitted by law, with tribal governments prior to taking action or formulating policies that will significantly or uniquely affect those particular tribal governments or their tribal trust resources."

---

[26] https://www.federalregister.gov/documents/2000/11/09/00-29003/consultation-and-coordination-with-indian-tribal-governments
[27] Pub. L. 108-199, Div. H, § 161, 118 Stat. 452 (Jan. 23, 2004), *as amended* Pub. L. 108-447, Div. H, Title V, § 518, 118 Stat. 3267 (Dec. 8, 2004).
[28] https://obamawhitehouse.archives.gov/the-press-office/memorandum-tribal-consultation-signed-president

113.     Defendant GSA likewise acknowledges the importance of "Tribal Consultation" on its website, recognizing that "[t]he United States has a unique legal and political relationship with Indian tribes and a special relationship with Alaska Native entities as provided in the Constitution of the United States, treaties, and federal statutes."[29] Nevertheless, neither GSA nor any other Defendant contacted any of the Plaintiff Pacific Northwest tribal governments and Alaska Native corporations in connection with the sale of the National Archives at Seattle *before* the decision to sell that facility was made and approved.

114.     On January 23, 2020, Chairman Sullivan of Plaintiff Port Gamble S'Klallam Tribe wrote to Defendant Vought to express opposition to the decision to sell the National Archives at Seattle:

> The Sand Point Center is very important to the 272 federally-recognized tribes in the Pacific Northwest (Washington, Oregon and Idaho) and Alaska. Ours is merely one of them . . . . [O]ur Tribe relies upon the Sand Point Center for access to critical historical documents. Among many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, and Tribal leaders during treaty negotiations in the mid-19th Century, as well as original drafts of the treaties themselves. The facility also houses critical and hard-to-reproduce historical information related to the area tribes.

> If the Sand Point Center is closed, all of its archival materials will need to be moved. We understand the records will be sent all the way to Kansas City, Missouri and other archived materials will be sent to Riverside, California. Obviously, such new locations will make it much harder for our Tribe and those in the Pacific Northwest and Alaska to access these historically important and culturally significant archived records and materials. A sale of the Sand Point Center will undoubtedly have an impact on tribes. In fact, it will be a profound, negative and irreparable impact. Yet the Public Buildings Reform Board, the National Archives and Records Administration, the Office of Management and Budget, nor any other federal agency has engaged in government-to-government consultation as required by Executive Order 13175. Worse, the federal agencies did not even alert Tribes about the proposed sale. We learned about it through a news source.

[29] GSA, Tribal Consultation, https://www.gsa.gov/node/79654.

COMPLAINT                                    57                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 5th Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                        (206) 464-7744

115.    On January 24, 2020, Chairman Ron Allen of Plaintiff Jamestown S'Klallam Tribe also wrote Defendant Vought, "urgently requesting that the sale and transfer of the Sand Point Archive must be slowed down, carefully analyzed, and ultimately reconsidered and reversed." Chairman Allen continued:

> Under the FASTA process, the OMB must make its decision to approve or deny the sale within days. If OMB gives the green light, the sale process then gets fast-tracked under FASTA's guidelines. Doing so without having consulted with the area Tribes is improper and the process should and must be halted and analyzed correctly.

> The recommendation for sale is on a fast track under FASTA's expedited timelines. The impacts from the transfer of the archived materials, which represent the archived history and information on the 272 Federally recognized Tribes in the Pacific Northwest and Alaska, will be profound and irreparable. And yet, this decision has been made without following the government-to-government consultation requirements of Executive Order 13175. *** [N]owhere during this process were the area's Tribes consulted as required under Section 5(a) of E.O. 13175, despite the clear "Tribal implications" of this move.

116.    On February 11, 2020, *after* the decision to sell the National Archives at Seattle was made and approved, NARA officials conducted a meeting with a few tribal officials at that facility. No more than forty people were allowed to attend the meeting and only three tribal representatives were permitted to address NARA officials with concerns about the decision to sell National Archives facility in Sand Point. NARA officials gave only three business days' notice of the meeting. No federal officials with policymaking authority attended the meeting. Officials and representatives for Plaintiffs Port Gamble S'Klallam, Samish, and Siletz Tribes, advised NARA officials the meeting was not a consultation as contemplated by Executive Order 13175.

117.    Defendants have never consulted with any affected tribal governments, including Plaintiffs Confederated Tribes of the Chehalis Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians, Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of Indians, The Klamath Tribes,

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Muckleshoot Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute Tribe of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Confederated Tribes of Siletz Indians, Skokomish Indian Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Tanana Chiefs Conference, Central Council of the Tlingit & Haida Indian Tribes of Alaska, and Confederated Tribes and Bands of the Yakama Nation regarding the sale of the National Archives at Seattle.

118.    These Plaintiffs, based on Executive Order 13175 and the Obama Tribal Consultation Memorandum, as well as on experience and observation of agency consultation practices prior to and since the adoption of those authorities, believe that one or more of Defendants PBRB, OMB, GSA, and NARA may have adopted an internal policy requiring tribal consultation that governs these circumstances, and further believe that the evidentiary support for the existence and applicability of such federal internal tribal consultation policies could likely be developed after a reasonable opportunity for further investigation or discovery.

**D.    The National Archives at Seattle Is Exempt from Sale under FASTA**

119.    "Properties used in connection with Federal programs for agricultural, recreational, or conservation purposes, including research in connection with the programs," are exempt from sale under FASTA. Section 3(5)(B)(viii).

120.    The National Archives at Seattle falls within the Section 3(5)(B)(viii) exemption.

121.    The National Archives at Seattle is used for "research in connection with" a variety of "Federal programs for agricultural, recreational, or conservation purposes." For example, research at the National Archives at Seattle is frequently undertaken in conjunction with nominations to the National Park Service's National Register of Historic Places, which is "part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect America's historic and archeological resources."[30] Seattle Archives research is also used to develop signage and educational materials for national parks, trails, and

---

[30] National Register of Historic Places, https://www.nps.gov/subjects/nationalregister/index.htm.

1   conservation areas. And tribal governments and Alaska Native corporations frequently consult

2   the National Archives at Seattle for research used to vindicate rights that are established or

3   protected by ecological conservation, agricultural, and recreational programs of the Federal

4   government, and to implement federally funded programs under the Indian Self Determination

5   and Education Assistance Act, among other statutes.

6        122.   Research at the National Archives at Seattle also is frequently required for both

7   the federal government, tribal governments, and others to comply with numerous federal laws

8   for conservation, including the National Historic Preservation Act, 54 U.S.C. § 306102 *et seq.*

9   (NHPA).

10        123.   The NHPA requires that each federal agency establish a "preservation program"

11   for the protection of historic property. The National Park Service has established a Tribal

12   Preservation Program to "assist Indian tribes in preserving their historic properties and cultural

13   traditions through the designation of Tribal Historic Preservation Offices (THPO) and through

14   annual grant funding programs."[31] The grant funding programs for historic preservation include

15   Tribal Historic Preservation grants to assist tribes in complying with the National Historic

16   Preservation Act,[32] Tribal Heritage Grants to assist tribal governments with cultural and historic

17   preservation projects,[33] and numerous other federal preservation grant programs administered

18   by the National Park Service's State, Tribal, Local, & Grants Division.[34]

19        124.   The NHPA requires the federal government agencies to identify whether a federal

20   action "has the potential to cause effects on historic properties," including "possible historic

21   properties not yet identified" and sites that "may possess religious and cultural significance" to

22   tribal governments. *See* 36 C.F.R. §§ 800.3–.4. If the federal action has such potential, the NHPA

23   obligates the federal agency to consult with the appropriate State Historic Preservation Officer

---

[31] https://www.nps.gov/thpo/index.html.
[32] https://www.nps.gov/thpo/grants/index.html.
[33] https://www.nps.gov/thpo/tribal-heritage/index.html.
[34] *See generally* https://www.nps.gov/orgs/1623/index.htm.

COMPLAINT          60

and/or Tribal Historic Preservation Officer, involve the public and other consulting parties, and determine how to resolve potential adverse effects. *See* 36 C.F.R. §§ 800.3−.6. To comply with the NHPA and related federal agency preservation programs and federal preservation grants, the federal government, tribal governments, and states regularly consult archival records to identify the significance of the site at issue and the potential stakeholders who must be consulted.

125.    The federal government also delegates its conservation, agricultural, and recreational related research duties to tribal governments and Alaska Native corporations under the Indian Self-Determination and Education Assistance Act, Pub. L. 93-638 (ISDEAA). Under "638" or self-governance funding agreements, tribal governments and Alaska Native corporations assume responsibility for implementation of federal programs, for example, to conserve natural and cultural resources. For example, Plaintiff Port Gamble S'Klallam Tribe has assumed federal program and research responsibilities to mitigate the environmental effects of climate change and conserve forestry and fish and game habitat on and around the Kitsap and Olympic Peninsulas:

> Since at least 2015, the Tribe has received federal Cooperative Landscape Conservation—Climate Adaption funding from the Interior Department as part of our self-governance funding agreement . . . . The Tribe has used those federal program dollars to conduct a climate change impact assessment within our usual and accustomed Treaty fishing areas. In particular, the Tribe has researched on behalf of the United States the causes of high temperatures and low oxygen levels in Western Washington rivers and streams that threaten salmon species . . . . Through the Northwest Indian Fisheries Commission, the Tribe has received additional monies from the Interior Department under a 2018 contract for "Modeling Elk Response to Ecological Changes in Warming Climate." . . . Most recently, the Tribe received federal program dollars to research and study the risk to tribal shellfish resources from accelerating bluff erosion . . . Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with all of these federal climate change-related conservation program and research efforts.

> For many years, the Tribe has also received self-governance funding from the Interior Department for forestry management on the Kitsap and Olympic Peninsulas . . . . With federal [Timber, Fish and Wildlife] dollars, Tribal Natural Resources Department staff research and study impacts to wetlands and salmon streams caused by certain logging projects on the Kitsap and Olympic Peninsulas. Tribal Natural Resources Department staff have also used records obtained by the

COMPLAINT                                      61

1  Tribe from the National Archives at Seattle in connection with such federal
2  forestry and habitat conservation efforts.

3  Jeromy Sullivan, Tribal Chairman of the Port Gamble S'Klallam Tribe.

4  126.   In addition, NARA has its own programs for conserving archival documents
5  including those housed at the Seattle Archives Facility. NARA's Conservation Division is
6  generally responsible for document conservation.[35] NARA also has a unit known as the
7  "Document Conservation Laboratory" or "Conservation Lab." According to NARA's website,
8  the Conservation Lab "is responsible for conservation activities which contribute to the
9  prolonged usable life of records in their original format. Among other activities, the
10 Conservation Lab "repairs and stabilizes textual records (un-bound papers, bound volumes, and
11 cartographic items) and photographic images among the holdings of [NARA] and provides
12 custom housings for these records as needed."[36]

13 127.   NARA's website defines "Conservation" as follows: "Conservation attempts to
14 preserve records in their original format. Conservators examine records and assess their
15 condition and the materials which comprise them. Conservators then recommend remedial
16 treatments to arrest deterioration to improve condition. As they perform the recommended
17 treatments, conservators carefully document the condition of the record as well as the procedures
18 performed and materials used."[37]

19 128.   NARA also conducts conservation-related activities as to documents housed at
20 the National Archives at Seattle.

21 129.   In addition, the National Archives at Seattle is used for "research in connection
22 with" NARA's conservation-related activities, because its conserved records are available to and
23 used by researchers, historians, genealogists, tribes, and others.

24
25

---

[35] https://www.archives.gov/preservation/preservation/conservation-division.
[36] https://www.archives.gov/open/plain-writing/examples/preservation-programs-before.html.
[37] Id.

COMPLAINT

62

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  **E.    Defendants Failed to Comply with FASTA's Procedural Requirements**

2      130.    Despite FASTA's passage in 2016, a quorum of five PBRB members were not

3  sworn in until May 2019.

4      131.    As the PBRB publicly acknowledged in its High Value Assets Report to OMB, it

5  "encountered significant challenges as it developed the [High Value Asset] disposal

6  recommendations" required by FASTA.[38] Specifically, FASTA required the PBRB, not later

7  than 180 days after a quorum of members was appointed, to identify for disposal not fewer than

8  five Federal civilian real properties, that were not on the list of surplus or excess, with a total fair

9  market of not less than $500 million and not more than $750 million, and transmit the list of

10  properties to the Director of OMB as Board recommendations. FASTA, Section 12(b)(1).

11  According to the agency, "FASTA's aggressive timeframe forced the PBRB to focus on

12  properties already for sale and unneeded vacant land that can be sold quickly."[39]

13      132.    In addition to challenges caused by FASTA's accelerated statutory timeframe,

14  the PBRB faced additional "formidable" challenges "due to the procedure and time required to

15  qualify the PBRB as an independent agency."[40] As a result, "PBRB members did not have

16  Government ID's for over 2 months after being sworn in, and the PBRB had no staff for the first

17  4 months, leaving substantial work to be accomplished in just 8 weeks."[41]

18      133.    On October 31, 2019, approximately five months after a quorum of the Board

19  was established, the PBRB notified OMB that it was submitting its first set of recommendations

20  pursuant to Section 11 of FASTA. The PBRB included with its three-page letter a one-page list

21  of fourteen High Value Asset properties that it recommended for disposal. One of those

22

23      [38] High Value Assets Report: Key Findings and Recommendations Pursuant to the Federal Asset Sales and

24  Transfer Act of 2016 (hereinafter, the "PBRB High Value Assets Report"), at 12, available at

25  https://www.pbrb.gov/assets/uploads/20191227%20High%20Value%20Assets%20Report%20as%20Required%2
0by%20FASTA.pdf.

      [39] *Id.*

      [40] *Id.* at 12.

26      [41] *Id.*

1   properties was the National Archives at Seattle. The only information contained on the list was

2   the name, location, and custodial agency of each property.

3       134.    On November 27, 2019, OMB notified the PBRB that it disapproved of the

4   recommendations due to a lack of supporting information or financial execution plan. OMB gave

5   the PBRB 30 days to resubmit its recommendations.

6       135.    On December 27, 2019, the PBRB submitted a revised list of twelve High Value

7   Asset properties to OMB, and this time included a "High Value Assets Report" that included the

8   purported bases for its designation of the twelve properties, including the National Archives at

9   Seattle.

10      136.    On January 24, 2020, OMB summarily accepted the PBRB's recommendations.

11      137.    Throughout this process, OMB did not satisfy even its most basic statutory

12  obligations under Sections 11(b) through 11(d) of FASTA, including the requirement that it work

13  with the GSA Administrator to develop, submit, and publish "consistent standards and criteria

14  against which the agency recommendations will be reviewed" as well as "recommendations" to

15  the PBRB based on those standards and criteria.

16      138.    Upon information and belief, OMB did not develop, and has never developed,

17  the standards, criteria, and recommendations required by Section 11(b) of FASTA. As the PBRB

18  explained in its High Value Assets Report: "Unfortunately, the PBRB did not benefit from the

19  Section 11 FASTA directive that OMB, in consultation with GSA, develop standards and criteria

20  to use in evaluating agency submissions and making recommendations to the PBRB. To the best

21  of PBRB's knowledge, the standards and criteria were never developed."[42] In its discussion of

22  "OMB Engagement" in its Report, the PBRB further explained that "defined standards, criteria,

23  and recommendations would have significantly reduced the PBRB's challenges."[43]

24

25

26      [42] PBRB High Value Assets Report at 10.
        [43] *Id.* at 12.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

139.    By failing to develop these statutorily-required standards, criteria, and recommendations, OMB also failed to comply with numerous other statutory requirements, including: "submit[ting] the standards, criteria, and recommendations developed pursuant to [Section 11] subsection (b) to the Board with all supporting information, data, analyses, and documentation"; publishing its "standards, criteria, and recommendations" in the Federal Register; and transmitting its standards, criteria, and recommendations to the Committee on Transportation and Infrastructure of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Environment and Public Works of the Senate, the Committees on Appropriations of the House of Representatives and the Senate, and the Comptroller General of the United States, as specified in FASTA. Section 11(d).

140.    OMB's failure to develop the standards, criteria, and recommendations required by Section 11(b) of FASTA is particularly difficult to understand given that President Trump appointed all of the individuals to the PBRB and, therefore, controlled the statutory timetable on which the PBRB had to identify and transmit to OMB a list of not fewer than five High Value Assets for disposal with a fair market value between $500–750 million. OMB could have developed its standards, criteria, and recommendations prior to or immediately after the President appointed a quorum of PBRB members, but failed to do so.

141.    According to the PBRB High Value Assets Report, agencies submitted their recommendations of properties that could be sold or otherwise disposed of to the Director of OMB and the GSA Administrator on December 7, 2018, and then submitted their recommendations for leaseback opportunities on June 6, 2019.[44] FASTA required the OMB Director, in consultation with the GSA Administrator, to develop "consistent standards and criteria against which the agency recommendations [were to] be reviewed," and recommendations based on those standards and criteria by "[n]ot later than 60 days" after those

---

[44] PBRB High Value Assets Report at 7.

65

agency submission deadlines. OMB's complete failure to satisfy Congress's directive to promulgate these standards, criteria, and recommendations violated the law.

142.    In addition, OMB's failure to develop and publish its standards, criteria, and recommendations in the Federal Register and transmit them to the Committee on Transportation and Infrastructure of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Environment and Public Works of the Senate, the Committees on Appropriations of the House of Representatives and the Senate, and the Comptroller General of the United States, as required by FASTA, also lessened the ability of both the public and Congress to oversee this important process.

143.    And because it never developed its own standards, criteria, and recommendations as required by FASTA, OMB lacked the statutorily-prescribed factual basis upon which to review and assess the PBRB's recommendations.

144.    The PBRB High Value Assets Report candidly acknowledges that "defined standards, criteria, and recommendations [from OMB] would have significantly reduced the PBRB's challenges."[45] The PBRB High Value Assets Report details other "challenges in gathering the data needed to support decision making for complex real estate transactions," and specifically acknowledges "extraordinary issues with data gaps and data integrity" in the data contained in the Federal Real Property Profile (FRPP),[46] which it "relied heavily on" for its decisionmaking.[47] As one witness testified at a PBRB public meeting, the Board's data suffered

---

[46] The Federal Real Property Profile is the former government-wide inventory of information about the nature, use and extent of the Federal government's real property assets. It was developed in 2004 and housed within GSA. https://www.gsa.gov/policy-regulations/policy/real-property-policy/asset-management/federal-real-property-profile-frpp/frpp-frequently-asked-questions.
[47] Id.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  from numerous and obvious problems, such as incorrectly showing a federal building was

2  located "in the middle of an ocean."[48]

3  **F.    Defendants Failed to Consult with Tribes and Other Stakeholders**

4  145.    The PBRB compounded its errors by failing to obtain public input from state,

5  local, or tribal officials in the Pacific Northwest. No public hearings were held in Washington,

6  Idaho, Oregon, or Alaska. And in the four public meetings that were held (two in the District of

7  Columbia, one in Denver, Colorado, and one in Laguna Niguel, California), there was no public

8  identification of and/or discussion of the facility housing the National Archives at Seattle being

9  recommended for sale.[49]

10  146.    Moreover, by failing to consult with tribal officials prior to recommending the

11  facility housing the National Archives at Seattle for sale, the PBRB failed to account for the

12  agency tribal consultation policies that bind OMB, GSA, and NARA, and failed to consider the

13  tribal importance of the records housed there. In an October 2020 PBRB meeting, one of the

14  PBRB's members conceded that tribal governments had not been consulted with respect to its

15  selection of properties, stating that "[w]ith respect to tribal entities, I guess, that hasn't been

16  brought to our attention before that there was an interest there," even while acknowledging "if

17  they are a stakeholder in a property, certainly we would want to consult with them."[50] By this

18

19

20  [48] Transcript of PBRB Meeting held on June 17, 2019, at 107,
https://www.pbrb.gov/assets/uploads/Public%20Meeting%20Transcript%20June%2017%202019%20(1).pdf.

21  [49] *See* Transcript of PBRB Meeting held on June 17, 2019,
https://www.pbrb.gov/assets/uploads/Public%20Meeting%20Transcript%20June%2017%202019%20(1).pdf;

22  Transcript of PBRB Meeting held on July 16, 2019,
https://www.pbrb.gov/assets/uploads/PBRB%20Public%20Meeting%20July%2016%2C%20Agenda.pdf;

23  Transcript of PBRB Meeting held on July 24, 2019,
https://www.pbrb.gov/assets/uploads/Public%20Meeting%20July%2024th%20Laguna%20Niguel%20Notes.pdf;

24  Transcript of PBRB Meeting held on July 25, 2019,
https://www.pbrb.gov/assets/uploads/Notes%20Denver%20Public%20meeting%20July%2025th%202019%20(1).

25  pdf;
[50] Transcript of PBRB Meeting held on Oct. 1, 2020, at 23:8-24:10,

26  https://www.pbrb.gov/assets/uploads/October%201%202020%20Public%20Meeting%20-
%20Agenda%20and%20Presentation.pdf.

time, the Federal Government had received extensive feedback from tribal governments and other stakeholders who expressed their opposition to the sale after learning of it in January 2020.

147.    As a result, the decisions to recommend and approve the sale of the facility housing the National Archives at Seattle were made without the necessary consultation with tribal governments and Alaska Native corporations, who will be severely impacted by the closure of the National Archives at Seattle.

148.    There also was no informed consideration of the significant negative impact that closure of the National Archives at Seattle will have on "public access to agency services[.]" Section 11(b)(3)(J).

149.    The legislative history of FASTA emphasizes, the "requirement to consider whether public access to agency services is maintained or enhanced in the standards and criteria the Board use to develop its recommendations," and notes that "OMB is responsible for developing th[ose] standards and criteria," and that the requirement should "help prevent unintended, negative consequences of transferring agency services."[51] Based upon the lack of information solicited regarding the public's use of the National Archives at Seattle facility, and OMB's failure to develop standards and criteria incorporating the issue of public access, the type of "unintended, negative consequences" Congress sought to prevent have resulted here.

150.    These numerous multi-agency procedural and substantive failures render the decision to sell the National Archives at Seattle contrary to FASTA and thus a legal nullity. Defendants' failure to consult with tribal governments and Alaska Native corporations also violates federal and agency-specific policy requiring such consultation.

151.    In October 2020, the PBRB posted meeting minutes on its website which disclosed that the PBRB, in consultation with GSA and OMB, had decided to bundle the National Archives at Seattle with the other eleven High Value Asset properties, and would bring all 12

---

[51]    Committee Statement and Views, Purpose and Summary of H.R. 4465 (FASTA), https://www.congress.gov/114/crpt/hrpt578/CRPT-114hrpt578-pt2.pdf at 18 (discussing "Public access consideration").

1    properties to market "by early 2021," rather than selling the properties individually over the

2    course of the year as previously planned.[52] PBRB officials claimed that the COVID-19

3    pandemic's effects on the commercial real estate market justified its new sales approach and

4    timeline.[53]

5         152.   Despite significant public interest in the planned closure and sale of the National

6    Archives at Seattle, Defendants never reached out to interested stakeholders—in particular, to

7    state and tribal officials—to notify them of Defendants' plans to bring all twelve federal

8    properties to market "by early 2021."[54]

9                          **V.    CLAIMS FOR RELIEF**

10                              **Count I**
                       *By All Plaintiffs against All Defendants*
11       **Violation of the Administrative Procedure Act, Section 706(2)—**
         **Agency Action in Excess of Statutory Authority and Contrary to Law**
12

13        153.   Plaintiffs reallege and reincorporate by reference the allegations in each of the

14   preceding paragraphs.

15        154.   This Court must "hold unlawful and set aside agency action" that is, *inter alia*,

16   "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or

17   "without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

18        155.   As described above, FASTA applies only to the sale of "Federal civilian real

19   property" and "civilian real property."

20        156.   Excluded from the definition of "[f]ederal civilian real property" and "civilian

21   real property" are "[p]roperties used in connection with Federal programs for agricultural,

22   recreational, or conservation purposes, including research in connection with the programs."

23   FASTA, Section 3(5)(B)(viii).

24   ――――――――――――――――
         [52] *See* PBRB website, "Updates," https://www.pbrb.gov/; Materials and Transcript of PBRB Meeting held
25   on   Oct.   1,   2020,   https://www.pbrb.gov/assets/uploads/October%201%202020%20Public%20Meeting%20-
     %20Agenda%20and%20Presentation.pdf.
26        [53] PBRB website, "Updates," https://www.pbrb.gov/.
          [54] *Id.*

157.   The National Archives at Seattle is used for "research in connection with" a variety of "Federal programs for agricultural, recreational, or conservation purposes." For example, research at the National Archives at Seattle is frequently undertaken in conjunction with nominations to the National Park Service's National Register of Historic Places, which is "part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect America's historic and archeological resources."[55] Seattle Archives research is also used to develop signage and educational materials for national parks, trails, and conservation areas. And Pacific Northwest tribal governments and Alaska Native corporations frequently consult the National Archives at Seattle to vindicate rights that are established or protected by ecological conservation, agricultural, and recreational programs of the Federal government, and to implement federal programs using federal funds pursuant to statutes such as the Indian Self Determination and Education Assistance Act.

158.   In addition, the National Archives at Seattle is a property used in connection with NARA's preservation programs for conservation of records because it houses records subject to such conservation. Moreover, those conserved records are available to be used by researchers, historians, tribes, and others, meaning the facility is also used for "research in connection with" NARA's conservation programs.

159.   Accordingly, the National Archives at Seattle is not a "Federal civilian real property" eligible to be sold under FASTA.

160.   The actions taken by Defendants to nevertheless prepare for and effectuate the sale of the National Archives at Seattle are in excess of statutory authority under FASTA, and must be invalidated and set aside.

161.   Absent declaratory and injunctive relief vacating Defendants' recommendation to sell the National Archives at Seattle and/or prohibiting the sale from going into effect,

---

[55] National Register of Historic Places, https://www.nps.gov/subjects/nationalregister/index.htm.

70

1    Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' illegal

2    actions.

3        162.    The Court should enjoin and vacate the agencies' actions to prepare for and

4    effectuate the sale of the National Archives at Seattle as contrary to law and *ultra vires* under 5

5    U.S.C. § 706(2).

6                                        **Count II**
7                  ***By All Plaintiffs against GSA, OMB, Vought, and Murphy***
                   **Violation of the Administrative Procedure Act, Section 706(1)—**
8                  **Agency Action Unlawfully Withheld or Unreasonably Delayed**

9        163.    Plaintiffs reallege and reincorporate by reference the allegations in each of the

10   preceding paragraphs.

11       164.    This Court must "compel agency action unlawfully withheld or unreasonably

12   delayed." 5 U.S.C. § 706(1).

13       165.    Agency action may be unlawfully withheld or unreasonably delayed where, *inter*

14   *alia*, Congress has provided a timetable that the agency failed to meet; the delayed action is a

15   relatively high agency priority; or the delay prejudices the interests of stakeholders or the public.

16   *See Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 79–80 (D.C. Cir.

17   1984) ("*TRAC*"); *Agua Caliente Tribe of Cupeno Indians of Pala Reservation v. Sweeney*, 932

18   F.3d 1207, 1216 n.7 (9th Cir. 2019). The court need not "find any impropriety lurking behind

19   agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d

20   at 80.

21       166.    Sections 11(b)–11(d) of FASTA require OMB, in consultation with GSA, to

22   provide the PBRB with certain standards, criteria, and recommendations, which must

23   incorporate, *inter alia*, standard utilization rates for the properties in question. This requirement

24   must be completed "not later than 60 days after" the deadline for other federal agencies to submit

25   their recommendations under Section 11(a). OMB's standards, criteria, and recommendations,

26   along with "all supporting information, data, analyses, and documentation," must be submitted

COMPLAINT                                    71                  ATTORNEY GENERAL OF WASHINGTON
                                                                       Complex Litigation Division
                                                                       800 5th Avenue, Suite 2000
                                                                       Seattle, WA 98104-3188
                                                                           (206) 464-7744

1   to the PBRB, and "shall be published in the Federal Register" and transmitted to numerous

2   congressional committees and the Comptroller General of the United States.

3   167.   These requirements are a core function of FASTA, and ensure that public interests

4   are adequately accounted for when deciding whether to sell federal property.

5   168.   OMB, in consultation with GSA, had a discrete statutory duty to "develop

6   consistent standards and criteria against which the agency recommendations will be reviewed,"

7   and OMB and GSA had a discrete statutory duty to "jointly develop recommendations to the

8   [PBRB] based on th[ose] standards and recommendations," and lacked discretion to decline to

9   do so.

10   169.   OMB also had a discrete statutory duty to submit the standards, criteria, and

11   recommendations required by Section 11 to the PBRB, along with all supporting information,

12   data, analyses, and documentation, and lacked discretion to decline to do so.

13   170.   In addition, OMB also had a discrete statutory duty to publish its standards,

14   criteria, and recommendations in the Federal Register and to transmit the same to certain

15   congressional committees specified by FASTA and to the Comptroller General of the United

16   States, and lacked discretion to decline to do so.

17   171.   OMB failed to complete any of its Section 11 obligations. As a result, the PBRB

18   undertook its analysis and made its recommendations without the standards, criteria, and/or

19   recommendations of OMB and GSA and without OMB's supporting information, data, analyses,

20   or documentation. And because it never developed its own standards, criteria, and

21   recommendations, OMB lacked the statutorily-required standards against which to review the

22   PBRB's recommendations.

23   172.   Despite this fundamentally flawed process, OMB nonetheless approved PBRB's

24   recommendations under Section 13.

25   173.   OMB's failure to develop its own standards, criteria, and recommendations as

26   required by Section 11 of FASTA; its failure to provide its standards, criteria, and

recommendations along with its supporting information, data, analyses, and documentation to the PBRB; its failure to publish its standards, criteria, and recommendations in the Federal Register; and its failure to transmit the same to certain congressional committees specified by FASTA and to the Comptroller General of the United States, are agency actions unlawfully withheld or unreasonably delayed that should be compelled under 5 U.S.C. § 706(1).

174.    The Court should grant declaratory relief and issue a writ of mandamus requiring OMB to perform its duties under FASTA prior to any sale of the National Archives at Seattle.

**Count III**
***By All Plaintiffs against All Defendants***
**Violation of the Administrative Procedure Act, Section 706(2)—**
**Agency Action in Excess of Statutory Authority and Contrary to Law**

175.    Plaintiffs reallege and reincorporate by reference the allegations in each of the preceding paragraphs.

176.    This Court must "hold unlawful and set aside agency action" that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

177.    As set forth above, FASTA establishes certain procedural requirements that must be met during the process of making recommendations and decisions to sell federal property. These procedural requirements were not met during the process that resulted in the recommendation and decision to sell the National Archives at Seattle. OMB failed to develop and transmit to the PBRB the standards, criteria, and recommendations required by Section 11 of FASTA, or to provide the agency with the supporting information, data, analyses, and documentation. OMB also failed to publish its standards, criteria, and recommendations in the Federal Register and to transmit the same to certain congressional committees specified by FASTA and to the Comptroller General of the United States.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

178.   As a result of these procedural violations, the subsequent actions taken by Defendants to prepare for and effectuate the sale of the National Archives at Seattle are void *ab initio*. They are in excess of statutory authority under FASTA, and must be invalidated and set aside.

179.   Absent declaratory and injunctive relief vacating Defendants' recommendation to sell the National Archives at Seattle and/or prohibiting the sale from going into effect, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

180.   The Court should enjoin and vacate the agencies' actions to prepare for and effectuate the sale of the National Archives at Seattle as contrary to law and *ultra vires* under 5 U.S.C. § 706(2).

### Count IV
***By Plaintiffs Confederated Tribes of the Chehalis Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians, Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of Indians, The Klamath Tribes, Muckleshoot Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute Tribe of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Confederated Tribes of Siletz Indians, Skokomish Indian Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Tanana Chiefs Conference, Central Council of the Tlingit & Haida Indian Tribes of Alaska, and Confederated Tribes and Bands of the Yakama Nation against All Defendants***
**Violation of the Administrative Procedure Act, Section 706(2)—**
**Failure to Engage in Tribal Consultation**

181.   Plaintiffs Confederated Tribes of the Chehalis Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians, Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of Indians, The Klamath Tribes, Muckleshoot Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute Tribe of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Confederated Tribes of Siletz Indians, Skokomish Indian Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Tanana Chiefs Conference, Central

1   Council of the Tlingit & Haida Indian Tribes of Alaska, and Confederated Tribes and Bands of
2   the Yakama Nation reallege and reincorporate by reference the allegations in each of the
3   preceding paragraphs.

4        182.   Under the Administrative Procedure Act, a reviewing court "shall . . . hold
5   unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or
6   otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

7        183.   An agency must comply with its own internal policies even if those policies are
8   more rigorous than procedures required by the APA.

9        184.   Where a federal agency has established a policy requiring prior consultation or
10  coordination with affected tribal governments, and therefore created a justified expectation that
11  each affected tribal government or Alaska Native corporation will receive a meaningful
12  opportunity to express its views before policy or decisions are made, that opportunity must be
13  given.

14       185.   Defendants failed to consult or coordinate with affected tribal governments and
15  Alaska Native corporations or fully comply with OMB, GSA, PBRB, and/or NARA tribal
16  consultation policies and other federal-tribal consultation law and policy prior to recommending
17  and authorizing the sale of the facility housing the National Archives at Seattle.

18       186.   Defendants' agency actions are illegal, arbitrary, and capricious, and abuses of
19  discretion.

20       187.   Absent declaratory and injunctive relief vacating Defendants' recommendation
21  to sell the National Archives at Seattle and/or prohibiting the sale from going into effect,
22  Plaintiffs Confederated Tribes of the Chehalis Reservation, Confederated Tribes of Coos, Lower
23  Umpqua and Siuslaw Indians, Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Hoh
24  Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of Indians, The Klamath Tribes,
25  Muckleshoot Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute
26  Tribe of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Confederated

1  Tribes of Siletz Indians, Skokomish Indian Tribe, Squaxin Island Tribe, Suquamish Tribe,

2  Swinomish Indian Tribal Community, Tanana Chiefs Conference, Central Council of the Tlingit

3  & Haida Indian Tribes of Alaska, and Confederated Tribes and Bands of the Yakama Nation

4  will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

5        188.    The Court should enjoin and vacate the agencies' actions to prepare for and

6  effectuate the sale of the National Archives at Seattle under 5 U.S.C. § 706(2).

7  **VI.**     **PRAYER FOR RELIEF**

8        Wherefore, Plaintiffs pray that the Court:

9        a.    Declare that OMB, Vought, PBRB, and Bodner have unlawfully withheld or

10  unreasonably delayed the performance of their mandatory duties under FASTA;

11        b.    Issue a writ of mandamus requiring OMB, Vought, PBRB, and Bodner to perform

12  their duties under FASTA prior to any sale of the National Archives at Seattle;

13        c.    Declare that the National Archives at Seattle is ineligible for selection under

14  FASTA and therefore, the actions of Defendants to prepare for and effectuate the sale of the

15  National Archives at Seattle are in excess of statutory authority and are *ultra vires*, and that such

16  actions are vacated and set aside;

17        d.    Declare that the actions of Defendants to prepare for and effectuate the sale of the

18  National Archives at Seattle are illegal, arbitrary, and capricious, and abuses of discretion for

19  want of consultation or coordination with affected tribal governments and Alaska Native

20  corporations and violate the agencies' own tribal consultation policies, and that such actions are

21  vacated and set aside;

22        e.    Issue a preliminary and a permanent injunction prohibiting Defendants from

23  taking any further actions to effectuate the sale of the National Archives at Seattle;

24        f.    Award Plaintiffs their costs and reasonable attorneys' fees; and

25        g.    Award such other and further relief as the interests of justice may require.

26

COMPLAINT              76

1    DATED this 4th day of January 2021.

2                                                    ROBERT W. FERGUSON
                                                     Attorney General of Washington
3
                                                     *s/ Lauryn K. Fraas*
4                                                    LAURYN K. FRAAS, WSBA No. 53238

5                                                    *s/ Nathan K. Bays*
                                                     NATHAN K. BAYS, WSBA No. 43025
6
                                                     *s/ Kristin Beneski*
7                                                    KRISTIN BENESKI, WSBA No. 45478

8                                                    *s/ Spencer Coates*
                                                     SPENCER COATES, WSBA No. 49683
9                                                    Assistant Attorneys General
                                                     800 Fifth Avenue, Suite 2000
10                                                   Seattle, WA 98104
                                                     206.464.7744
11                                                   lauryn.fraas@atg.wa.gov
                                                     nathan.bays@atg.wa.gov
12                                                   kristin.beneski@atg.wa.gov
                                                     spencer.coates@atg.wa.gov
13                                                        *Attorneys for Plaintiff State of Washington*

14
                                                     ELLEN F. ROSENBLUM
15                                                   Attorney General of Oregon

16                                                   *s/ Carla A. Scott*
                                                     CARLA A. SCOTT, WSBA No. 54725
17                                                   Special Counsel to the Attorney General
                                                     Oregon Department of Justice
18                                                   1162 Court Street NE
                                                     Salem, OR 97301-4096
19                                                   503.378.6002
                                                     kaylie.klein@doj.state.or.us
20                                                       *Attorney for Plaintiff State of Oregon*

21
                                                     THE CONFEDERATED TRIBES OF THE
22                                                   CHEHALIS RESERVATION

23                                                   *s/ Harold Chesnin*
                                                     HAROLD CHESNIN, WSBA No. 398
24                                                   Office of Tribal Attorney
                                                     Confederated Tribes of the Chehalis Reservation
25                                                   420 Howanut Road
                                                     Oakville, WA 98568
26

COMPLAINT                                  77

360.529.7465
pateus@aol.com
  *Attorney for Plaintiff The Confederated Tribes
  of the Chehalis Reservation*


CONFEDERATED TRIBES OF COOS, LOWER
UMPQUA AND SIUSLAW INDIANS, and
SPOKANE TRIBE OF INDIANS

*s/ Richard K. Eichstaedt*
RICHARD K. EICHSTAEDT, WSBA No.
36487

*s/ Scott Wheat*
SCOTT WHEAT, WSBA No. 25565
Wheat Law Offices
25 West Main Avenue, Suite 320
Spokane, WA 99201
509.209.2604
rick@wheatlawoffices.com
scott@wheatlawoffices.com
  *Attorneys for Plaintiffs Confederated Tribes
  of Coos, Lower Umpqua and Siuslaw
  Indians, and Spokane Tribe of Indians*


COW CREEK BAND OF UMPQUA TRIBE OF
INDIANS

*s/ Gabriel S. Galanda*
GABRIEL S. GALANDA, WSBA No. 30331

*s/ Anthony Broadman*
ANTHONY S. BROADMAN, WSBA No. 39508

*s/ Ryan D. Dreveskracht*
RYAN D. DREVESKRACHT, WSBA No. 42593
Galanda Broadman PLLC
P.O. Box 15416
8606 35th Avenue NE, Suite L1
Seattle, WA 98115
206.557.7509
gabe@galandabroadman.com
anthony@galandabroadman.com
ryan@galandabroadman.com
  *Attorneys for Plaintiff Cow Creek Band of
  Umpqua Tribe of Indians*

COMPLAINT

78

1    DOYON, LTD., TANANA CHIEFS
     CONFERENCE, and CENTRAL COUNCIL OF
2    TLINGIT & HAIDA INDIAN TRIBES OF
     ALASKA
3
     _s/ Lloyd B. Miller_
4    LLOYD B. MILLER*

5    _s/ Richard D. Monkman_
     RICHARD D. MONKMAN, WSBA No. 35481
6    Sonosky, Chambers, Sachse, Miller &
     Monkman, LLP
7    725 East Fireweed Lane, Suite 420
     Anchorage, AK 99503
8    907.258.6377
     lloyd@sonosky.net
9    rdm@sonosky.net
         _Attorneys for Plaintiffs Doyon, Ltd., Tanana_
10       _Chiefs Conference, and Central Council of_
         _Tlingit & Haida Indian Tribes of Alaska_
11
         *_Application for pro hac vice admission_
12       _forthcoming_

13
     DUWAMISH TRIBE
14
     _s/ Bart J. Freedman_
15   BART J FREEDMAN, WSBA No. 14187

16   _s/ Benjamin A. Mayer_
     BENJAMIN A. MAYER, WSBA No. 45700
17
     _s/ Endre M. Szalay_
18   ENDRE M SZALAY, WSBA No. 53898

19   _s/ Natalie J. Reid_
     NATALIE J. REID, WSBA No. 55745
20
     _s/ Adam N. Tabor_
21   ADAM N. TABOR, WSBA No. 50912

22   _s/ Theodore J. Angelis_
     THEODORE J. ANGELIS, WSBA No. 30300
23   K&L Gates LLP
     925 Fourth Avenue, Suite 2900
24   Seattle, WA 98104
     206.370.7580
25   bart.freedman@klgates.com
     ben.mayer@klgates.com
26   endre.szalay@klgates.com

COMPLAINT                            79

1    natalie.reid@klgates.com
     adam.tabor@klgates.com
2    theo.angelis@klgates.com
         *Attorneys for the Duwamish Tribe*
3

4    CONFEDERATED TRIBES OF THE GRAND
     RONDE COMMUNITY OF OREGON
5
     *s/ Nathan Alexander*
6    NATHAN ALEXANDER, WSBA No. 37040
     Dorsey & Whitney, LLP
7    701 Fifth Avenue, Suite 6110
     Seattle, WA 98104-7043
8    206.903.8791
     alexander.nathan@dorsey.com
9        *Attorney for Plaintiff Confederated Tribes of*
         *The Grand Ronde Community of Oregon*
10

11   HOH INDIAN TRIBE, SAMISH INDIAN
     NATION, and CONFEDERATED TRIBES OF
12   SILETZ INDIANS

13   *s/ Craig J. Dorsay*
     CRAIG J. DORSAY, WSBA No. 9245
14
     *s/ Lea Ann Easton*
15   LEA ANN EASTON, WSBA No. 38685

16   *s/ Kathleen Gargan*
     KATHLEEN GARGAN, WSBA No. 56452
17   Dorsay & Easton LLP
     1737 Northeast Alberta Street, Suite 208
18   Portland, OR 97211
     503.790.9060
19   craig@dorsayindianlaw.com
     leaston@dorsayindianlaw.com
20   katie@dorsayindianlaw.com
         *Attorneys for Plaintiffs Hoh Indian Tribe,*
21       *Samish Indian Nation, and Confederated*
         *Tribes of Siletz Indians*
22

23   JAMESTOWN S'KLALLAM TRIBE

24   *s/ Lauren P. Rasmussen*
     LAUREN P. RASMUSSEN, WSBA No. 33256
25   Law Offices of Lauren P. Rasmussen, PLLC
     1904 Third Avenue, Suite 1030
26

COMPLAINT                          80              ATTORNEY GENERAL OF WASHINGTON
                                                        Complex Litigation Division
                                                        800 5th Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                           (206) 464-7744

1    Seattle, WA 98101-1170
     206.623.0900
2    lauren@rasmussen-law.com
         *Attorney for Plaintiff Jamestown S'Klallam*
3        *Tribe*

4
     KALISPEL TRIBE OF INDIANS
5
     *s/ Lorraine A. Parlange*
6    LORRAINE A. PARLANGE,
     WSBA No. 25139
7    Senior Tribal Attorney
     934 Garfield Road
8    Airway Heights, WA 99001
     509.789.7603
9    lparlange@kalispeltribe.com
         *Attorney for Plaintiff Kalispel Tribe of*
10       *Indians*

11
     THE KLAMATH TRIBES
12
     *s/ Edmund Clay Goodman*
13   EDMUND CLAY GOODMAN, WSBA No. 37347
     Hobbs Straus Dean & Walker, LLP
14   215 SW Washington Street, Suite 200
     Portland, OR 97214
15   503.242.1745
     egoodman@hobbsstraus.com
16       *Attorney for Plaintiff The Klamath Tribes*

17
     MUCKLESHOOT INDIAN TRIBE
18
     *s/ Robert L. Otsea, Jr.*
19   ROBERT L. OTSEA, JR., WSBA No. 9367

20   *s/ Mary M. Neil*
     MARY M. NEIL, WSBA No. 34348
21
     *s/ Danielle Bargala*
22   DANIELLE BARGALA, WSBA No. 52718
     39015 172nd Avenue S
23   Auburn, WA 98092
     253.939.3311
24   rob@muckleshoot.nsn.us
     mary.neil@mucklshoot.nsn.us
25   danielle.bargala@muckleshoot.nsn.us
         *Attorneys for Plaintiff Muckleshoot Indian*
26       *Tribe*

COMPLAINT                      81

NEZ PERCE TRIBE

*s/ Julie S. Kane*
JULIE S. KANE, WSBA No. 19138
Office of Legal Counsel
P.O. Box 305
Lapwai, ID 83540
208.843.7355
juliek@nezperce.org
   *Attorney for Plaintiff Nez Perce Tribe*


NOOKSACK INDIAN TRIBE

*s/ Charles N. Hurt, Jr.*
CHARLES N. HURT, JR., WSBA No. 46217
Office of Tribal Attorney
Senior Tribal Attorney
5047 Mt. Baker Hwy, P.O. Box 63
Deming, WA 98244
360.598.4158
churt@nooksack-nsn.gov
   *Attorney for Plaintiff Nooksack Indian Tribe*


PORT GAMBLE S'KLALLAM TRIBE

*s/ Rogina D. Beckwith*
ROGINA D. BECKWITH, WSBA No. 36241
Port Gamble S'Klallam Tribe Legal Department
31912 Little Boston Road NE
Kingston, WA 98346
360.297.6242
ginab@pgst.nsn.us
   *Attorney for Plaintiff Port Gamble S'Klallam
   Tribe*


PUYALLUP TRIBE OF INDIANS

*s/ Alec S. Wrolson*
ALEC S. WROLSON, WSBA No. 54076

*s/ Felecia L. Shue*
FELECEA L. SHUE, WSBA No. 49911

*s/ Lois Y. Boome*
LOIS Y. BOOME, WSBA No. 54883
3009 E. Portland Avenue
Tacoma, WA 98404
253.573.7877

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     alec.wrolson@puyalluptribe-nsn.gov
      felecia.shue@puyalluptribe-nsn.gov
2     lois.boome@puyalluptribe-nsn.gov
          *Attorneys for Plaintiff Puyallup Tribe of*
3         *Indians*

4

      THE QUILEUTE TRIBE OF THE QUILEUTE
5     RESERVATION

6     *s/ Lauren J. King*
      LAUREN J. KING, WSBA No. 40939
7     Foster Garvey, P.C.
      1111 Third Ave., Suite 3000
8     Seattle, WA 98101
      206.447.6286
9     lauren.king@foster.com
          *Attorney for Plaintiff Quileute Tribe*
10

11    QUINAULT INDIAN NATION

12    *s/ Karen Allston*
      KAREN ALLSTON, WSBA No. 25336
13
      *s/ Lori Bruner*
14    LORI BRUNER, WSBA No. 26652
      Senior Assistant Attorneys General
15    Quinault Indian Nation Office of Attorney
      General
16    P.O. Box 613
      Taholah, WA 98587
17    360.276.8211, ext. 1400
      lbruner@quinault.org
18    kallston@quinault.org
          *Attorneys for Plaintiff Quinault Indian*
19        *Nation*

20

      SKOKOMISH INDIAN TRIBE
21

22    *s/ Earle David Lees, III*
      EARLE DAVID LEES, III, WSBA No. 30017
      Director of the Skokomish Legal Department
23    Skokomish Indian Tribe
      N. 80 Tribal Center Road
24    Skokomish Nation, WA 98584
      360.877.2100
25    elees@skokomish.org
          *Attorney for Plaintiff Skokomish Indian Tribe*
26

SNOQUALMIE INDIAN TRIBE

*s/ Rob Roy Smith*
ROB ROY SMITH, WSBA No. 33798

*s/ Rachel B. Saimons*
RACHEL B. SAIMONS, WSBA No. 46553
Kilpatrick Townsend & Stockton, LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
206.467.9600
rrsmith@kilpatricktownsend.com
rsaimons@kilpatricktownsend.com
    *Attorneys for Plaintiff Snoqualmie Indian*
    *Tribe*


SQUAXIN ISLAND TRIBE

*s/ David Babcock*
DAVID BABCOCK, WSBA No. 31737
Attorney, Squaxin Island Tribe
3711 SE Old Olympic Hwy
Shelton, WA 98584
360.432.1771
    *Attorney for Plaintiff Squaxin Island Tribe*


SUQUAMISH TRIBE

*s/ James Rittenhouse Bellis*
JAMES RITTENHOUSE BELLIS,
WSBA No. 29226
Director, Office of Tribal Attorney
Suquamish Tribe
P.O. Box 498
Suquamish, WA 98392
360.394.8501
Shelton, WA 98584
360.432.1771
rbellis@suquamish.nsn.us
    *Attorney for Plaintiff Suquamish Tribe*


SWINOMISH INDIAN TRIBAL
COMMUNITY

*s/ Emily Haley*
EMILY HALEY, WSBA No. 38284
Office of the Tribal Attorney
11404 Moorage Way

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    La Conner, WA 98257
2    360.466.3163
     ehaley@swinomish.nsn.us
3        *Attorney for Plaintiff Swinomish Indian
         Tribal Community*
4
5    UPPER SKAGIT INDIAN TRIBE
6    *s/ David S. Hawkins*
     DAVID S. HAWKINS, WSBA No. 35370
7    General Counsel
     Upper Skagit Indian Tribe
8    25944 Community Plaza Way
     Sedro-Woolley, WA 98284
9    360.854.7016
     dhawkins@upperskagit.com
10       *Attorney for Plaintiff Upper Skagit Indian
         Tribe*
11
12   CONFEDERATED TRIBES AND BANDS OF
     THE YAKAMA NATION
13   *s/ Ethan Jones*
     ETHAN JONES, WSBA No. 46911
14
15   *s/ Anthony Aronica*
     ANTHONY ARONICA, WSBA No. 54725
16   Yakama Nation Office of Legal Counsel
     P.O. Box 151, 401 Fort Road
17   Toppenish, WA 98948
     509.865.5121
18   ethan@yakamanation-olc.org
     anthony@yakamanation-olc.org
19       *Attorneys for Plaintiff Confederated Tribes
         and Bands of the Yakama Nation*
20
21   AMERICAN HISTORICAL ASSOCIATION
22   *s/ Harry H. Schneider, Jr.*
     HARRY H. SCHNEIDER, JR., WSBA No. 9404
23   Perkins Coie LLP
     1201 Third Avenue, Suite 4900
     Seattle, WA 98101-3099
24   206.359.8000
     hschneider@perkinscoie.com
25
26

COMPLAINT    85

1    *s/ Alison M. Dreizen*
     ALISON M. DREIZEN*
2    Carter Ledyard & Milburn LLP
     Two Wall Street
3    New York, NY 10005
     212.238.8855
4    dreizen@clm.com
         *Attorneys for Plaintiff American Historical*
5        *Association*

6        **Application for pro hac vice admission*
         *forthcoming*
7

8    ASSOCIATION OF KING COUNTY
     HISTORICAL ORGANIZATIONS, HISTORIC
9    SEATTLE, HISTORYLINK, MUSEUM OF
     HISTORY AND INDUSTRY, and
10   WASHINGTON TRUST FOR HISTORIC
     PRESERVATION
11
     *s/ Paul J. Lawrence*
12   PAUL J. LAWRENCE, WSBA No. 13557

13   *s/ Alanna E. Peterson*
     ALANNA E. PETERSON, WSBA No. 46502
14   Pacific Law Group
     1191 2nd Avenue, Suite 2000
15   Seattle, WA 98101-3404
     206.245.1700
16   alanna.peterson@pacificalawgroup.com
     paul.lawrence@pacificalawgroup.com
17       *Attorneys for Plaintiffs Association of King*
         *County Historical Organizations, Historic*
18       *Seattle, HistoryLink, Museum of History and*
         *Industry, and Washington Trust For*
19       *Historic Preservation*

20
     CHINESE AMERICAN CITIZENS
21   ALLIANCE

22   *s/ Darin Sands*
     DARIN SANDS
23
     *s/ Heidi B. Bradley*
24   HEIDI B. BRADLEY
     Bradley Bernstein Sands
25   P.O. Box 4120, PMB 62056
     Portland, OR 97208-4120
26   503.734.2480

COMPLAINT                    86

dsands@bradleybernsteinllp.com
hbradley@bradleybernsteinllp.com
*Attorneys for Plaintiff Chinese American*
*Citizens Alliance*

OCA ASIAN PACIFIC ADVOCATES –
GREATER SEATTLE

*s/ Bernadette Connor*
BERNADETTE CONNOR, WSBA No. 45844
1800 Cooper Point Road SW, Suite 12
Olympia, WA 98502
206.552.9666
byconnor@gmail.com
*Attorney for Plaintiff OCA Asian Pacific*
*Advocates – Greater Seattle*

WING LUKE MEMORIAL FOUNDATION
d/b/a WING LUKE MUSEUM

*s/ Gloria Lung Wakayama*
GLORIA LUNG WAKAYAMA,
WSBA No. 11892
Harris & Wakayama, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
206.621.1818
glwakayama@hmwlaw.com
*Attorney for Plaintiff Wing Luke Memorial*
*Foundation d/b/a Wing Luke Museum*

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744