# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON, et al.,

      Plaintiff,

   v.

RUSSELL VOUGHT, et al.,

      Defendants,

NO.

DECLARATION OF FRANK ABE

I, Frank Abe, declare as follows:

1.  I am an independent writer, journalist, and filmmaker. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.  I have lived in Seattle for the past 45 years, and worked professionally as a senior news reporter for KIRO Newsradio 710 and communications director for both the King County Executive and the Metropolitan King County Council. During this time I also researched numerous little-known or untold stories of Japanese American incarceration in World War II, writing and producing an award-winning film for PBS, *Conscience and the Constitution* (2000), writing and editing an award-winning book for the University of Washington Press on the great Seattle novelist, *JOHN OKADA: The Life and Rediscovered Work of the Author of No-No Boy* (2018), and authoring a forthcoming graphic novel for the Wing Luke Museum of the Asian Pacific American Experience with funding from the National Park Service, *We Hereby Refuse: Japanese American Resistance to Wartime Incarceration*

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

(Chin Music Press, 2021), which features the story of Minidoka, Idaho draft resister Jim Akutsu of Seattle. I share much of my work on my website and blog at Resisters.com.

3. Characters in each of my works served time for draft resistance at the federal penitentiary at McNeil Island, Washington, and I was grateful to have a local archive where I could examine the records of the U.S. Bureau of Prisons which are housed there. The prison logs are not digitized, so it was invaluable for me to be able to personally examine the logbooks in search of the particular names I sought. It was also extremely important for me to be able to sort through the prison mug shots to pick out the ones I needed for my work and pay for the scanning of only those I needed.

4. Details from the prison logbooks and the mug shot photos appeared in my PBS documentary, in the Okada book, and in the graphic novel. An image of the logbook entry for Jim Akutsu also graced a John Okada exhibit I curated for the Washington State History Museum in Tacoma.

5. The Bureau of Prisons records I researched at the National Archives at Sand Point helped me accurately capture the story of Jim Akutsu's prison term at McNeil Island for my graphic novel, which is funded by a Japanese American Confinement Sites Grant from the National Parks Service. Congress established this grant program to preserve and interpret U.S. confinement sites where Japanese Americans were incarcerated during World War II, and my graphic novel reveals important new information to aid visitor interpretation at the NPS Minidoka National Historic Site in Idaho and the NPS Tule Lake National Monument near the Oregon-California border.

6. I first learned of the impending sale of the National Archives at Sand Point from news reports by Feliks Banel on KIRO Radio. At the time I was on a tight deadline for the graphic novel and unable to take the time to do more than share these stories on social media. When I learned of this legal action, I was glad to have the opportunity to express my outrage at this hurried and unnecessary closure, and the lack of transparency around it.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    7.    I plan several more works on the Japanese American camp resistance, and if

2  these records are moved out of the Pacific Northwest, I would find the extra expense of travel

3  and lodging necessary to dig further into these invaluable federal records to be extremely

4  burdensome.

5  I declare under penalty of perjury that the foregoing is true and correct.

6

7  DATED this 24nd day of December, 2020 at Seattle, Washington.

8

9  _____

FRANK ABE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**003**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF BRADLEY KENT ALLEN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Bradley Kent Allen, declare as follows:

1.      I am a volunteer history researcher, author, and contributor for the US Forest Service and the Snoqualmie Valley Historical Society. I make this declaration based on my personal knowledge.

2.      I have regularly volunteered for both the US Forest Service (USFS) and the Snoqualmie Valley Historical Society over the past twelve years. This has included a variety of tasks including producing a historical documentary film, writing two special purpose historical books, writing articles, and producing text and art for interpretive signs. In addition I own a small business, AditNW, and have worked in various engineering and marketing roles in the Pacific Northwest since 1992. I am a Seattle native, UW graduate, and USAF veteran.

3.      The National Archives in Seattle provide a unique research record for local historians like myself. In February 2011 I requested a large collection of unsorted material related to the Mt Baker-Snoqualmie National Forest and the Snoqualmie Valley for review. I spent an entire day going through this material looking for stories, facts, reports, and photos

DECLARATION OF BRADLEY KENT
ALLEN

1

that gave unique insight into local history. I took notes and recorded some material with digital photographs. This research would have been impossible without the local archives. I was able to review over 45 boxes of material which clearly could not have been remotely requested and reviewed. I also had the ability to get additional material. I have returned since then to review documents and photos I found during that review.

4.    The material I found during this research was critical in a number of projects over the past 9 years. These included an interpretive book used in the Granite Mountain Lookout (Historical site managed by USFS), history of Goldmyer Hotsprings detailing the relationship of the Hotsprings to USFS and US Government investigations from 1908 to 1920, and the interpretive sign program, discussed below. None of the material I collected and used was indexed or documented in any way. It included historical narratives, US government reports, old US government publications, and photographs from 1930's lookout surveys.

5.    Over the past year, I have volunteered for the US Forest Service producing text, artwork, and photos for trailhead signs and trail signs. I have produced historical and interpretive material for 19 signs, eight of which have been installed and viewed by visitors. One trail, the Camp Brown Nature Trail in the Snoqualmie Middle Fork Valley, received over 4000 visitors in just its first few months after opening. Material from the National Archives in Seattle were key to the historical accounts produced for these signs. They included photographs of the Snoqualmie Middle Fork Valley in the 1930's, historical records of the Cascade Crest and Pacific Crest Trails, and the history of Veida Morrow Metcalfe and Goldmyer Hotsprings. In 2012 I produced an interpretive book for use in the USFS's Granite Mountain Lookout. This photo and history book is used by visitors to understand the relationship of the lookout to the local territory, how it was used in fires, and the historical context of the tower. Several of the book's photographs and historical material came from the National Archives in Seattle.

DECLARATION OF BRADLEY KENT ALLEN                    2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Ave., Ste. 2000
Seattle, WA 98104-3188
206.464.7744

005

6.        Loss of the local National Archives in Seattle will be a devastating blow to local history researchers. Local stories are lost to the wind after a couple of generations frequently giving way to imagined 'histories' generated in the minds of people who lived long after the events. Historical documents, such as a 1915 US Forest Service Ranger field report on Goldmyer Hotsprings or a collection of panoramic photos from fire lookouts, are the keys to recording the actual events for future generations. Once the archives are gone from the Pacific Northwest, all of this will be left to second-order historical writings. Access to the source material is key to our research producing accurate and interesting local historical accounts.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 29 day of December, 2020 at Redmond, WA.

Bradley Kent Allen

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Ave., Ste. 2000
Seattle, WA 98104-3188
206.464.7744

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

               Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

               Defendants,

NO.

DECLARATION OF TREVOR
JAMES BOND

I, Trevor James Bond, declare as follows:

1.     I submit this declaration in support of the State of Washington's litigation challenging the sale of the Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington, which houses the National Archives at Seattle.

2.     I have compiled the information set forth below through personal knowledge as well as through University personnel who have assisted me in gathering this information from WSU. I have also familiarized myself with the litigation in order to understand its immediate impact on the University.

3.     I am the Associate Dean for Digital Initiatives and Special Collections at Washington State University (WSU or University), Washington State's land grant institution and the second largest public research university in the Pacific Northwest. I have held this position since 2015. As Associate Dean at WSU, I have responsibility for overseeing the Unit of Manuscripts, Archives, and Special Collections and I co-direct the Center for Digital

DECLARATION OF TREVOR JAMES
BOND

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

007

1 Scholarship and Curation which focuses on the ethical curation of Native American Cultural

2 Heritage. We partner with Tribal Nations in the region as well as nationally.

3     4.    I hold a Ph.D. in Public and Western History and a Masters of Library and

4 Information Science with a special focus in Archives and Preservation Management. I have 20

5 years of professional work experience in managing archives and collaborating with tribal

6 communities. I received the Washington State Historical Society's 2018 Charles Gates

7 Memorial Award for my research article, *Documenting Missionaries and Indians: The Archive*

8 *of Myron Eells.* The award recognizes the most significant achievement among all articles

9 published annually in the *Pacific Northwest Quarterly*.

10     5.    WSU was founded in 1890 as Washington's original land-grant university.

11 WSU is chartered by the state of Washington, and is governed by the Board of Regents, whose

12 members are appointed by the governor, which provides direction to the WSU President. The

13 Washington state legislature also approves annual operating and capital budgets for WSU,

14 including state funding for WSU. For the fiscal year 2020-21, the state legislature appropriated

15 over $277 million dollars to WSU. Due to COVID-19 budget reductions, the state informed

16 WSU that this amount will be reduced by at least $7M.

17     6.    I learned of the impending sale of the Seattle National Archives facility through

18 professional networks and reporting by Seattle area news outlets.

19     7.    After learning of the sale, WSU along with several other universities in the

20 Pacific Northwest sent a letter asking the federal government to reconsider its decision to sale

21 the National Archives at Seattle. A true and correct copy of that letter is attached hereto as

22 **Exhibit 1**. This letter sent on behalf of the major research libraries in Washington, Oregon,

23 and Alaska provided specific examples of how critical research would be disrupted by closing

24 the NARA facility in Seattle. The federal government did not respond to this letter.

25     8.    The announcement of the sale of the facility that houses the National Archives

26 at Seattle threatens to inflict immediate and ongoing harm on WSU, its faculty, and its students.

DECLARATION OF TREVOR JAMES
BOND

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

008

1    As a public university, access to the National Archives directly impacts our ability to support

2    faculty, graduate students, and tribal communities, all of whom use the National Archives

3    facility to conduct research for the enhancement of public knowledge, the understanding of

4    Northwest history, and for the current management and treaty rights of Indigenous

5    communities.

6        9.    Physical access to the National Archives at Seattle is critical for the

7    development of scholarship at WSU. Moving the records housed at the Seattle NARA facility

8    out of Washington will effectively eliminate WSU's access to these materials. More than 99%

9    of the materials utilized by WSU have *not* been digitized, and WSU simply does not have the

10   resources to provide the transportation and travel costs to its faculty and students who would

11   need to travel to other states for their research. Research in the NARA facility requires on-site

12   work. The archival collections are organized by record groups. Sometimes only a few

13   sentences of description will be provided for many boxes. For example, the descriptions will

14   indicate the agency and location and sometimes dates, but not the contents of the individual

15   documents within the boxes. To determine the contents of those records one must look at the

16   contents of each box and folder. This is work that simply cannot be done at a distance.

17       10.    The Archives at the Seattle NARA facility have proved critical for numerous

18   research projects undertaken at WSU. For instance, in 2018, after nearly 10 years of research,

19   WSU Professor Orlan Svingen, along with students and colleagues in the WSU public history

20   field schools, unearthed a U.S. government document from 1870 and several supporting records

21   at the National Archives at Seattle that shed new light on conflicting claims about historical use

22   and ownership of large swaths of southwestern Montana and northwestern Wyoming. The

23   records concerned the histories of Chief Tendoy and the Mixed-Band of Shoshone, Bannock,

24   and Sheep Eater people, who, in 1868, negotiated and signed a treaty that was never ratified but

25   was partially acted upon through removal of the Native Americans from their ancestral land in

26   1875. The story of the WSU historians' search and potential implications of their discoveries

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    became the subject of a new documentary movie titled "In Good Faith" by Emmy Award-

2    winning Naka Productions. These records were only unearthed because WSU historians were

3    able to scour the physical records at the National Archives at Seattle.

4          11.     In addition, WSU's Dr. Melissa Parkhurst used the student records at the

5    National Archives at Seattle extensively to chronicle the powerful uses of music in the

6    assimilation-based curriculum at Chemawa Indian School, the oldest continuously operating

7    federal boarding school. Stories from Chemawa students, 1880-2014, are documented in her

8    book, *To Win the Indian Heart: Music at Chemawa Indian School*. Over 30,000 students have

9    attended Chemawa, an institution that has intimately impacted tribal families and communities

10    across the Pacific Northwest. This project would not have been possible without access to the

11    National Archives facility at Sand Point.

12          12.     Dr. Robbie Paul, the former director of WSU's Native American Health

13    Sciences program, also did extensive research on the cultural and multigenerational effects of

14    Indian boarding schools, which became the subject of an exhibit in WSU's Manuscripts,

15    Archives and Special Collection titled "Grandfather's Trunk, Spirit of Survival: Three

16    Generations of the Paul Family's Native American Boarding School Experience." Through

17    access to boarding school records at the National Archives at Seattle, Dr. Paul pieced together

18    key details of her family's experience. Dr. Paul was then able to use those records to highlight

19    the experiences of her family in Indian boarding schools where trauma occurred and share the

20    early history of her great-great-grandfather, Chief Ut-Sin-Malikan, the first to see the loss of

21    the old Native American ways and of Nez Perce identity in his lifetime. The exhibit provided

22    a powerful tool by which to connect the broader WSU community to the lives of native people

23    and to educate visitors on the horrific former federal policy that forced tens of thousands of

24    Indian families to send their children away for years to distant boarding schools. Without

25    access to the records at the Seattle Archives facility, this exhibit at WSU's Terrell Library

26    would not have happened.

DECLARATION OF TREVOR JAMES
BOND

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**010**

13.     Moreover, while it has long been a goal to make more records accessible through digitization, digital representations cannot always replace the importance of the original documents. Some documents are important primarily because of their informational value, whereas others also have artifactual value which cannot be reproduced. Moreover, physically handling records at the archives facility—including letters, deeds, maps, photographs, and other physical objects, such as keys—and being able to review and analyze each record in connection with other related records is foundational work that our students and faculty undertake. Digitized records cannot reproduce that critical process. As result, removal of documents from Washington State—even if they are eventually digitized—will be a tremendous loss to our students and faculty who rely on those records, as well as to our partner communities, who would be further distanced from their histories.

14.     For instance, WSU's Center for Digital Scholarship and Curation (CDSC) is currently planning to digitize documents held at the NARA facility in Seattle for the Plateau Peoples' Web Portal making them easily accessible to the public. The curriculum in the Plateau Peoples' Web Portal has been created by Tribal representatives from each of the partner Tribes. The basis of the curriculum is primary source material from national and regional repositories including the Smithsonian Institution, the Library of Congress, Washington State University's Manuscripts, Archives and Special Collections, Gonzaga University Archives and Special Collections, and the Northwest Museum of Arts and Culture. The curriculum is meant to aid educators and learners in various settings both formal and informal and to help Washington State's public comply with Senate Bill 5433, which requires tribal histories be taught in every grade. Providing our educators access to these records exposes them to information on the history of the Plateau tribes throughout the inland northwest. These materials will be selected by our tribal partners and will include the work WSU faculty and students are doing with the Colville and Yakima Nations. However, this work will be cost prohibitive if the collections are moved out of state.

DECLARATION OF TREVOR JAMES
BOND

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

011

15.     Over the last two decades, I have worked closely with Plateau Indians communities in eastern Washington, Idaho, and Montana. The National Archives at Seattle holds the permanent records for the Bureau of Indians Affairs, the US Forest Services, the US Army Core of Engineers, and Treaty and Census records for 272 Federally recognized Tribes in the NW. Moving these records out of the Northwest will be detrimental for our tribal partners who rely on these records to maintain their treaty rights, manage their cultural and natural resources, and work to preserve their cultural heritage. Losing access to the documents that support all of these initiatives would be a travesty.

16.     Moreover, moving the records to other locations deprives WSU and others of the localized knowledge of the curators and archivists at the National Archives at Seattle facility. These NARA archivists engage with the broader archives community through their participation in regional professional groups such as the Northwest Archives, the Pacific Northwest Historians Guild, and the Society of American Archivists. Such a loss would further frustrate WSU's ability to find and locate the records critical to furthering its scholarship and educational missions.

17.     Finally, losing access to the records at NARA would also severely damage WSU's mission. Washington State University is a public research university committed to its land-grant heritage and tradition of service to society. Our mission is to advance knowledge through creative research and scholarship across a wide range of academic disciplines. To extend knowledge through innovative educational programs in which emerging scholars are mentored to realize their highest potential and assume roles of leadership, responsibility, and service to society. To apply knowledge through local and global engagement that will improve quality of life and enhance the economy of the state, nation, and world. The National Archives facility in Seattle houses critical records for us to understand and interpret the region, including natural resources records, which are critical for our current and future management of the state's natural resources.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2    I declare under penalty of perjury that the foregoing is true and correct.

3

4    DATED this __2__ day of _January_, 202_1_ at Pullman, WA.
                    day         month    year

5

6

7                  Trevor J. Bond

8                  Associate Dean for Digital Initiatives and Special Collections

9                  Washington State University

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

013

Exhibit 1

February 27, 2020


Russell Vought                              Emily Murphy
Acting Director                             Administrator
Office of Management and Budget             General Services Administration
725 17th Street, NW              1800 F Street, NW
Washington, DC  20503                       Washington, DC  20405


Adam Bodner                                 David Ferriero
Executive Director                          Archivist
Public Buildings Reform Board               National Archives and Records Administration
1800 F Street, NW, Room 5116                8601 Adelphi Road
Washington, DC  20405                       College Park, MD 20740

Dear Acting Director Vought, Administrator Murphy, Director Bodner, and Archivist Ferriero,

We write as the chief librarians of the largest research universities in the Pacific Northwest to express how the sale of the **Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington**, would damage our institutions and the communities and states we serve.  The sale of the center, initially proposed by the Public Buildings Reform Board and recently approved by the Office of Management and Budget, would hurt and diminish the mission and activities of our institutions.  Moreover, we are also deeply concerned by the process by which the decision to sell the facility was reached.  <u>We ask that you reconsider the decision to sell the facility until after further consultation with impacted communities to take public concerns into consideration.</u>


***<u>Loss of Access to Historical Information and Records for Students, Researchers and the Public</u>***

The federal government has been entrusted with these historical archival documents. Access is essential, particularly for those most interested in ensuring that these documents help to tell and preserve our national and regional history, for learning, and teaching.  The proposed relocation will make these documents even less accessible to scholars and the public, especially our tribal partners.

Pacific Northwest student and faculty research and scholarship will be harmed by this closure. As public universities, access to archives is essential to our ability to educate scholars and the public as well as our mission to preserve and enhance knowledge.

<u>Access to original records in their context</u> – While it has long been a goal to make more records accessible through digitization, digital representations cannot always replace the importance of the original documents. Some documents are important primarily because of their informational value, whereas others also have artifactual value which cannot be reproduced. Moreover, physically handling records and being able to understand each document in connection with other related documents will be a potential loss as those communities losing their records will be further distanced from their histories.

The concerns about the closure of the facility and the relocation of the records are not hypothetical. The following examples illustrate the real impact that would be caused by the relocation of the records.

- **University of Washington (UW)**

**Service to and utilization by UW and the public**:  The Seattle NARA facility is used on a regular basis by University of Washington students, faculty, and staff as well as the broader public in the Northwest.

Researchers of all levels have a complex of regional history available to them in the Seattle area. Individual and groups of researchers planning trips to Seattle can consult with a multitude of archival resources relating to the Pacific Northwest region including those at the University of Washington Libraries Special Collections, the Museum of History and Industry (MOHAI), the Seattle Municipal Archives, and the National Archives, just to name a few. Removal of the National Archives at Seattle will sever the National Archives and Records Administration (NARA) from this network of rich resources for Pacific Northwest research.  Researchers—local, national and international—rely on the proximity of NARA's federal records to other complementary, related collections held in these regional facilities; closing NARA would greatly limit their ability to access important historical records on a wide range of subjects.

In addition, UW librarians are contacted by researchers, students, and faculty who are often searching for primary documents and records.  The staff work with them—who are physically located in the Northwest—to determine the location of the materials that are needed to ensure that the time and resources spent going to different libraries and facilities, including the NARA facility, are minimized.  The topics of research vary, from law and civil rights to military records and family history and other areas in between.  Both UW-affiliated individuals and members of the public are referred to the NARA facility on a regular basis.  Even UW librarians use the facility for their own research, for both current and past efforts.

**Impact on Students**:  <u>More locally, most of graduate students studying U.S. history at UW make use of these archives at some point in their careers, for research papers, journal articles, or their dissertations. In addition, having substantial local archival resources has helped the university to recruit top applicants who are interested in pursuing research based in the Western United States.  Because graduate students, including those at UW, have very little travel funding, losing this major local resource would be nothing short of devastating to students' development and potential for success in the field</u>.

- **Washington State University (WSU)**

**Making Historical Documents Accessible:**  WSU's Center for Digital Scholarship and Curation (CDSC) is currently planning to digitize documents held at the NARA facility in Seattle for the <u>Plateau Peoples' Web Portal</u> making them easily accessible to the public.

The curriculum in the Plateau Peoples' Web Portal has been created by Tribal representatives from each of the partner Tribes. The basis of the curriculum is primary source material from national and regional repositories including the Smithsonian Institution, the Library of Congress, Washington State University's Manuscripts, Archives and Special Collections, Gonzaga University Archives and Special Collections and the Northwest Museum of Arts and Culture.  The curriculum is meant to aid educators and learners in various settings both formal and informal and to help Washington State's public comply with Senate Bill 5433, which requires tribal histories be taught in every grade.

Providing our educators access to these records exposes them to information on the history of the Plateau tribes throughout the inland northwest. These materials will be selected by our tribal partners and will include the work WSU faculty and students are doing with the Colville and Yakima Nations. However, this work will be cost prohibitive if the collections are moved out of state.

In addition, WSU's Dr. Melissa Parkhurst used the student records at NARA extensively to chronicle the powerful uses of music in the assimilation-based curriculum at Chemawa Indian School, the oldest continuously operating federal boarding school. Stories from Chemawa students, 1880-2014, are documented in the book, *To Win the Indian Heart: Music at Chemawa Indian School*. Over 30,000 students have attended Chemawa, an institution that has intimately impacted tribal families and communities across the west. This project would not have been possible without access to the archives at Sand Point.

**Learning from History:** The cultural and multigenerational effects of Indian boarding schools on one family's history is the subject of a new exhibit in WSU's Manuscripts, Archives and Special Collection. Dr. Robbie Paul curated the current exhibit in the WSU Libraries department of Manuscripts, Archives, and Special Collections (MASC) titled "Grandfather's Trunk, Spirit of Survival: Three Generations of the Paul Family's Native American Boarding School Experience." Through access of the public documents at NARA, Dr. Paul pieced together key details of her family's experience by consulting boarding school records in Seattle's Sand Point facility. Connecting our community to their native heritage, Dr. Paul is able to highlight the experiences of her family in Indian boarding schools where trauma occurred and share the early history of her great-great-grandfather, Chief Ut-Sin-Malikan, the first to see the loss of the old Native American ways and of Nez Perce identity in his lifetime. Highlighting these experiences are not only connecting the community to the lives of the native people, but educating on the actions of our past so they don't happen again. Without access to the NARA records, this exhibit at WSU's Terrell Library would not have happened.

- **Oregon State University (OSU)**

**Critical resource for faculty research**. Oregon State University faculty researchers in the liberal arts fields of history and anthropology have relied on the Seattle NARA facility over the past 20 years. For example, the Seattle NARA facility served as a critical resource, providing a rich trove of sources, for the writing of *American Forestry: A History of National, State, and Private Cooperation* (1985), a work focused on federal fire policy and relations between federal agencies, state governments, and private corporations in the Pacific Northwest. Among the many archives, both national and regional, providing primary source materials, the Seattle Branch was the equal of regional materials for the Southeast Region in Atlanta, the Rocky Mountain Region in Denver, and the forestry related materials in the Pacific Region offices, then in San Bruno, California.

**Relocation Impact on Research Costs and Expenses**: OSU faculty describe the Seattle NARA archivists as exemplary, with the necessary in-depth knowledge of the collections. The demonstrated knowledge of the archivists has proven essential time and again to assist visiting researchers efficiently and effectively navigate the collections to review and recover missing parts of the region's tribal histories from the 19th and 20th centuries. The archivists' deep familiarity with the facility help faculty understand how the archives are structured to help them prepare in advance and to optimize their time reviewing the collection at the facility itself. Based on faculty experiences at the Seattle NARA facility, there is a

common sentiment that the value of the Seattle facility would best be measured by the importance of regional access to the comprehensive collection of records to be accessed when needed, and the importance of knowledgeable archivists with deep familiarity of the structure and content of the collections to facilitate review and public engagement, not by the amount of time that researchers spend at the facility itself.  Relocating the facility will disrupt these essential values of the Seattle NARA facility and further challenge the cost-effective access of these important public records for understanding and communicating Northwest history.

**Impact on Students**.  Just as important, as a result of its relative proximity to campus, countless numbers of Oregon State University graduate students with very limited travel funds have made important use of the Seattle archives over the decades.

- **University of Oregon (UO)**

**Impact on Undergraduate Research:**  Undergraduate classes have conducted research on Northern Paiute History and the indigenous people of the Great Basin, which includes southeastern Oregon. In recent years, more than twenty undergraduate students have traveled to Seattle to perform research on-site, some supported with fellowships and grants, as an integral experience in their development as scholars. Their work at the NARA Seattle facility has supported their publication of peer-reviewed articles; presentations at local, regional, and national academic conferences; and completion of independent, faculty-mentored undergraduate research projects submitted as writing samples for successful graduate school applications. The loss of this regional archive will diminish opportunities for student development and learning across many disciplines. It will become prohibitively expensive for undergraduate training to include experience working with the National Archives, the most significant archive of historical materials in the nation.

**Threatening doctoral training:** The University of Oregon and the Coquille Indian Tribe developed the Southwest Oregon Research Project (SWORP) in collaboration with the Smithsonian Institution. Access to materials housed in Seattle not only documented tribal governance and the history of Oregon's Southwestern tribes but also enabled nearly twenty people to earn graduate degrees, including fourteen PhDs and six master's degree, from the University of Oregon. Access to archival materials and the ability to collaborate easily with tribal leaders was essential. Moving the materials from the region, which is already geographically isolated in terms of travel costs, will harm advanced students' access to materials, scholars, and tribes.  In an era when the public has rightly expressed concern about the increased cost of higher education, moving archival materials to two distant archives, each more than one thousand miles away, will dramatically increase research costs for those studying the history of the Pacific Northwest and the development and administration of federal policy in the region, adding to the financial burden of graduate education. About a third of current UO graduate students in history have research activities that depend upon the archives.

**University-Public Collaborations:** A faculty member has for more than twenty years worked closely with the Basque communities in Oregon, Idaho, and Nevada, sharing extensive source materials housed in Seattle. This work, and similar project to broaden public access to archival materials, will no longer be possible if the collections in Seattle are spread to archives in southern California and Missouri. The very act of moving these records to distant archives means that researchers studying the history of the Pacific Northwest will have no access to vital records for a period of years, while they are readied for shipment, shipped, unpacked, and inventoried. Thus, even ignoring the additional cost and time

involved in traveling to distant archives, for a long period of time, none of these vital records will be available at all. That means important research cannot be done, which will impact graduate students who are currently researching and writing dissertations and faculty scholars who are writing books on the history of the Pacific Northwest. At present, the archives in Seattle are vital resources for the research of nine doctoral history students at the University of Oregon, who are depending on the Seattle records center to be able to graduate and launch their careers. Moreover, a faculty research project about Oregon's public lands, which has engaged rural community members throughout the state, will be significantly delayed. Moving the archives will have a dramatic impact on the ability of these scholars to complete their research within externally imposed deadlines and thwart the research of even more scholars of the Pacific Northwest moving forward.

- **University of Alaska (UA)**

**Making Alaska records more inaccessible:** The National Archives facility in Anchorage, Alaska, was closed in 2014 and the records from that location were relocated to Seattle. This was a blow to the region and researchers interested in the history of Alaska, which was a federal territory between its purchase from Russia in 1867 and when it achieved statehood in 1959. With the pending move of materials from Seattle to California as a result of this sale, Alaska records will now be even further away from their source. Since Seattle is the repository for records created by Federal agencies in Alaska, Idaho, Oregon, and Washington, citizens from all of these states, including the students and faculty at the University of Alaska, will be impacted as they will have to travel much further to see most records since only a small percentage of these are digitized.

The removal of records from the state to a location even farther away, will make it much more challenging for Alaskan researchers to access all of the resources they need. Alaskans also express discontent with the move, which exports our own history to facilities where there are no subject specialists to assist those in need of information, making it harder to find. Locking up information in far-flung repositories is the opposite of the current trend of making archives more accessible and usable to everyone.

**Alaska records have been moved before:** We must also note that, when the decision was made in 2014 to close the Anchorage facility, NARA leadership indicated at that time that the records would be digitized, and that an effort would be made to reach out to stakeholders to prioritize records for processing. To date, no update has been provided regarding the digitization process.

If the sale of the property and the relocation of the materials do occur, the University of Alaska recommends that portions of the proceeds from the sale of the facility be used to subsidize researcher travel costs and for digitization of archival collections to make them publicly on line.

***Lack of Consultation with Stakeholders***

In addition to the negative impact the sale would have on our institutions collectively, as noted above, we are also troubled by the lack of local consultation with communities in Seattle and in the Pacific Northwest more broadly.  The PBRB's own initial submission dated October 31 states, in part, that

> "*The Board has undertaken extensive effort to work with local and state officials [emphasis added]* as well as Members of Congress for each recommended property to ensure the Board's solution and the ultimate sale meet the needs of the local community and return value to the federal government…"

Furthermore, the board's amended recommendation list from December 27 states as Step 5 of the process to developing the list of targeted facilities that the PBRB, "*Solicit[ed] input from stakeholders and public*," *[emphasis added]* including seeking municipal engagement.

As members of the stakeholder community—both in physical proximity as well as being the users of the facility—we respectfully disagree that the stakeholders were appropriately consulted.  While we acknowledge that the legislation that created the PBRB does not call for a public comment period, we believe that the stakeholders should have been engaged in a public and meaningful manner.

By contrast, the final December 27 recommendations state that, with respect to future outreach:

> *The PBRB and GSA will actively solicit input from the developer community [emphasis added]* and work with city officials to understand and clarify redevelopment plans for this site. By reducing uncertainty around future entitlement, and increasing certainty around transaction timelines, qualified developers can increase the amount paid for the property.

We further note that while the public meeting held in the Los Angeles area on July 24 was actually held at the very same Laguna Niguel facility that was targeted for sale and included representatives from the City of Laguna Niguel on the agenda, no outreach of that kind occurred in the Pacific Northwest.  As the federal records facility representing four entire states, we believe that similar outreach and consultation efforts should have taken place.

***Conclusion***

While we can appreciate the desire and need to consolidate federal facilities, for the reasons outlined above, <u>we ask that you reconsider your decision to close the Federal Archives and Records Center</u> and request that you engage in a more consultative process with the stakeholders.

Sincerely,


Lizabeth Wilson
Dean, University Libraries
University of Washington

Jay Staratt
Dean, Libraries
Washington State University


Faye A. Chadwell
Donald and Delpha Campbell University Librarian
Oregon State University

Mark Watson
Interim Dean, Libraries
University of Oregon


Karen Jensen
Director of Libraries
University of Alaska Fairbanks

Stephen Rollins
Dean, Consortium Library
University of Alaska Anchorage


Cc:     Washington Congressional Delegation
        Oregon Congressional Delegation
        Alaska Congressional Delegation

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF RYAN WAYNE BOOTH |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Ryan Wayne Booth, declare as follows:

1.      I am a history instructor at Washington State University - Vancouver. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a historian and an Upper Skagit Tribal Member.

2.      I am a PhD Candidate in the history of the US West at Washington State University. My area of study is on the US Indian Scouts, who were part of the US Army from 1866-1947. I am a Fulbright-Nehru Fellowship Alumnus (2019-2020). I earned a BA, cum laude at Loyola University Chicago (2001) and a MA at Central Washington University (2011). I worked for the National Park Service as Visitor Center Manager at North Cascades National Park (2001-2004). I also worked for the US Fish & Wildlife Service as Special Events Coordinator in Washington, DC (2004-2007). I taught history at Heritage University in Toppenish, WA (2007-2014) and at Wenatchee Valley College in Wenatchee, WA (2014-2015).

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

022

3.      As a historian, archives are the lifeblood of my profession. Without them, we simply cannot tell an adequate story about the past. I have made numerous trips to the National Archives in Washington, DC as well as Seattle. While the materials I found at main archives were useful, the ones in Seattle are far superior. Good historians rely on good stories. The best stories are often ones that can bridge the gap between the highly personal, intimate stories with much broader historical trends. The National Archives at Seattle provides those intimate and personal stories in their records. Without these records, historians cannot tell useful stories— ones that speak to the broad experience of humanity. The stories that can help us avoid mistakes of the past as well as illuminating our triumphs. The archives provide a rich well for generations of scholars to draw from. Many people mistakenly believe that history is a static thing ("Isn't it just a bunch of names and dates? What changes? It happened, so what?"). The "so what?" is the crux of history. Fifty years ago, a historian may have looked at the same archival document and came to a conclusion based on his or her time. I may come along and see it differently based on our present moment. History and the archives that feed our profession always evolve as our perspectives change over time.

4.      The records at the National Archives in Seattle provide the personal and intimate information described above. For instance, I found letters written by my great, great grandfather asking the superintendent at the Chemawa Indian School to send my great grandma home for the summer. I found postcards sent to beloved teachers at Chemawa from the trenches of World War I. The Chemawa records also included personnel files for the teachers at the school, which contained both admirable and disgusting bits of information in them. I discovered old plans for public buildings, which were never constructed, made by employees of the Works Progress Administration during the Great Depression. These records have not been digitized. The personal letters and school files will likely never be digitized since they are so highly personal. The old blueprints are so large that they filled an entire table and would not be easily deciphered on even a large desktop computer. When I made my initial request for

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744.

1    these records, I had no idea that these treasures existed. The finding aids are generally bland

2    with titles such as "BIA Chemawa Indian School, Correspondence." Only when you open up

3    the folders, can you begin to see a much richer history. Only then could a person read a letter

4    from their great great grandpa in his own handwriting.

5        5.    I used the Chemawa records to help write an article about the Native students

6    who fought in World War I. I used the information for public presentations and conference

7    papers as well. I presented my findings at Gonzaga University in Spokane and Heritage

8    University in Toppenish. My lecture has gone on to a digital format and has been used at

9    Central Washington University in Ellensburg. My experience is not uncommon for historians

10   to recycle archival information and use it in a variety of formats and venues.

11       6.    My research at NARA Seattle on New Deal programs was used by North

12   Cascades National Park (NOCA) in compiling information for future exhibits and interpretive

13   pamphlets. I specifically used Record Group 95 which includes the records of the Mt. Baker-

14   Snoqualmie National Forest. Before NOCA was founded in 1968, it was part of the Mt. Baker

15   National Forest administered by the US Forest Service (USFS). In 2003, I was the Visitor

16   Center Manager in Newhalem. We planned to use these materials in a temporary exhibit on

17   the New Deal programs in the area. The records included reports and blueprints of a proposed

18   exhibit hall/recreation center to be constructed in Newhalem as well as designs for new housing

19   for USFS employees as well as Arts and Crafts furniture designs for the aforementioned

20   houses. I also shared the information with the NOCA Cultural Resources Division.

21       7.    I learned of the sale on January 23, 2020, when Professor Steve Fountain alerted

22   all Washington State University faculty by email. The Alaska State Historical Society, of

23   which he is a member, had a robust campaign alerting their membership to the impending

24   decision on the sale of NARA Seattle. Then we all heard about it again on January 25, 2020

25   when the Seattle Times published their article about it. It would have been reasonable for

26   notification to have been sent to every history department within the Pacific Northwest Region

DECLARATION OF RYAN WAYNE                    3
BOOTH

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

024

1 of the National Archives. The lack of notice prompted a flurry of activity but after the US OMB

2 made their decision to sell and long after the public comment period had lapsed. With proper

3 notification, the AHA and other regional history societies could have prepared robust defenses

4 for keeping NARA Seattle open.

5       **8.**     The loss of the National Archives at Seattle will have a large impact on graduate

6 education at Washington State University and other institutions across the Pacific Northwest.

7 Most of my peers in the PhD program and nearly all of the MA students have used the resources

8 at the National Archives in Seattle. Travel to places like Washington, DC is often cost

9 prohibitive on a graduate student stipend. Places such as NARA Seattle become more

10 important as local repositories for these important documents. The microfilm copies of

11 materials in places like Washington, DC are also invaluable. While much of this material is

12 available online, it is sometimes hidden behind paywalls. For instance, access to military draft

13 cards and relevant information is available online, but requires a membership to a program

14 called Fold3 or through Ancestry.com, which are all subscription services. NARA Seattle

15 provides access to these resources for free, but only when you are at the physical location. The

16 closure of the Seattle location would limit future scholars in our region and severely hamper

17 our ability to tell those critical stories.

18      I declare under penalty of perjury that the foregoing is true and correct.

19

20 DATED this __28__ day of __December__ , __2020__ at __Battle Ground__ , __Washington__ .
             day        month      year       city        state

21

22

23                         RYAN WAYNE BOOTH

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**025**

1
2
3
4
5
6     **UNITED STATES DISTRICT COURT**
      **WESTERN DISTRICT OF WASHINGTON**
7
8     STATE OF WASHINGTON, et al.,          NO.

9                        Plaintiff,          DECLARATION OF CHAIR
                                             DEBBIE BOSSLEY
10         v.

11    RUSSELL VOUGHT, et al.,

12                        Defendants,

13         I, DEBBIE BOSSLEY, declare as follows:

14         1.     I serve as the Chair of the Tribal Council of the Confederated Tribes of Coos,

15    Lower Umpqua and Siuslaw Indians ("CTCLUSI"). I am over the age of 18 and competent to

16    testify. I make this declaration based on my personal knowledge.

17         2.     The Tribal Council is empowered by the Tribal Constitution to exercise all

18    legislative and executive authority of the Confederated Tribes of the Coos, Lower Umpqua

19    and Siuslaw Indians and has the right to delegate such authority as is appropriate.

20         3.     CTCLUSI is a federally recognized sovereign tribal nation headquartered in

21    Coos Bay, Oregon. CTLUSI is made up of two bands of Coos Tribes: Hanis Coos; Miluk

22    Coos; the Lower Umpqua Tribe; and the Siuslaw Tribe.

23         4.     The ancestral territory of CTCLUSI encompasses approximately 1.6 million

24    acres along the Oregon Coast, which extends from the mouth of Tenmile Creek (Lane County)

25    in the north, south to Whiskey Run Creek and Cut Creeks, with the eastern boundary running

26    north to south along the crests of the Coast Range occasionally dipping into interior valleys..

DECLARATION OF CHAIR DEBBIE          1
BOSSLEY

1      5.     The history of interaction with the United States significantly impacted
2    CTCLUSI and its people. By the mid-1850s growing numbers of European-American settlers
3    had arrived in the region. By the late summer of 1855, many CTLUSI people were rounded
4    up, imprisoned, and removed from their lands under the pretext of an unratified treaty – a treaty
5    of peace and land cession that our ancestors signed in good faith which the Senate failed to
6    ratify, and the United States Government refused to honor.

7      6.     Nearly twenty years after removal, many of those that had been held at the
8    reservation who did not die of starvation, illness or exposure returned to their homelands..
9    There were a few married to settlers who were allowed to stay near their villages over this
10   period avoiding removal. The Siuslaw Tribal lands were originally included in the boundary
11   of the Great Coast Reservation and thus they remained near their villages until a boundary
12   adjustment left them outside the reservation and homeless. Tribal families who stayed on their
13   ancestral lands had to buy lands or acquired them through the allotment process.

14     7.     In 1954, CTCLUSI was terminated by federal legislation.

15     8.     In 1984, Congress extended federal recognition to CTCLUSI.

16     9.     Since restoration, CTCLUSI has worked tirelessly to maintain its relationship
17   with its lands, resources, and distinct Tribal histories and cultures. CTCLUSI has resumed its
18   roles as stewards and caretakers of the lands and resources that were once managed by their
19   ancestors.

20     10.    The records, which include documents, photographs, and other materials, at the
21   National Archives in Seattle are important to CTCLUSI and its efforts to protect its
22   sovereignty, unique culture and protect its lands and resources.

23     11.    The Seattle Archives records that relate to CTCLUSI are extensive. They
24   include correspondence, maps, photographs, probates, social surveys based on interviews with
25   tribal members in the 1930s, enrollments, copies of tribal minutes and meetings, and other
26   accounts. A small example of the documents available at the Seattle Archives is listed below:

Box 33 Tribal Programs - General 1958-1959
        Termination - Western Oregon
        020.0 Western Oregon (File no. 1). Includes John Collier: "The Menominee of
        Wisconsin and the Klamath of Oregon Cases." 4/57
        "Memo to the Western Oregon Indian people" (re Western Oregon Judgment
        Fund payment), 1959 (3 folders)
        Western Oregon Judgment Mr. Busey [Supervisory Judgment Officer]-need for
        establishment of branch of tribal programs. 1954-1960
        WOJF- Western Oregon Judgment Fund - Tribal Affiliation (ancestors)
        Western Oregon Enrollment, 1947-1962 (2 folders)/ Letters of Payments and
        Rejections
        Southern Oregon Claims - Oregon Coast, 1947-1949
        Siletz Death List, 1910-1919

Box 34 WOJF- - Chetco Minors
        WOJF - Coquille Minors
        WOJF - Tillamook Minors
        WOJF - Tootootoney Minors
        WOJF - Umpqua-Calappoia Minors
        Minors' Funds- Referrals to California DPW
        WOJF- Guardianship Requested
        Western Oregon - Rules and Regulations and Other
        Miscellaneous Material
        Proposed withdrawal of Federal responsibility over the property and affairs of
        the Indians of Western Oregon

        12.    The records include allotment records there from the 1800s thru 1924. These
not only show where CTCLUSI members held land, but also has important family tree
information.

        13.    The records also include extensive documents related to the termination of the
Tribe that occurred in 1954. These documents form, in part, the basis of the account of the
termination and restoration of CTCLUSI in the book, Seeking Recognition, by Professor David
R.M. Beck.

        14.    Documents from the Seattle Archives were recently utilized by CTCLUSI and
its consultants to prepare a nomination to designate a large portion of Coos Bay, Oregon as a

1 Traditional Cultural Property ("TCP"), pursuant to the National Historic Preservation Act, on
2 the National Register of Historic Places.

3      15.     On November 1, 2018, CTCLUSI submitted the nomination to the Oregon State
4 Historic Preservation Office.  The proposed TCP boundary includes the expansive bay and its
5 sloughs, inlets and adjacent uplands encompassing a 26- square mile area.

6      16.     CTCLUSI's 183-page TCP nomination contained substantial information that
7 demonstrate broad patterns of ancient, historic, and current Coos tribal use of Coos Bay. The
8 application includes a discussion of contributing features such as villages, burials, ceremonial
9 sites, gathering locations, fishing and shellfish use areas and tribal buildings that connect the
10 tribal community to the Tribe's history and beliefs.

11      17.     In July 2019, the Oregon State Historic Preservation Office both supported the
12 TCP application to National Park Service and through Section 106 of the National Historic
13 Preservation Act. The Tribe expects to continue to utilize records to retain their unique identity
14 and sovereignty as mandated through federal laws and trust responsibilities.

15      18.     Some of the information utilized in support of the nomination was obtained
16 from the Seattle Archives.

17      19.     The Seattle Archives also contains records relating to the federal presence at
18 Coos Head, now a tribal property, for work of the U.S. Army Corps of Engineers and
19 subsequently the U.S. Navy's anti-submarine detection station. These materials are important
20 for present land-use planning decisions of CTCLUSI, clean-up of toxic materials, and
21 environmental assessments.

22      20.     At no time did any federal agency meet with the Tribal Council to engage in
23 government-to-government consultation to discuss the impacts of the sale of the National
24 Archives facility in Seattle, how the Tribe uses that facility, or where documents important to
25 the Tribe would be relocated.  CTCLUSI learned of the proposal through news accounts and
26 from information provided by the State of Washington.

| 1 | 21. To move the records would impose costly burdens on the tribe to mount |
| 2 | continued research into its history. Research travel costs money and takes time. Seattle is far |
| 3 | more feasible a destination than Kansas City or Riverside. |
| 4 | 22. The Tribe has not completed the process for the nomination of the TCP. |
| 5 | Similarly, other federally approved or led projects will likely require the Tribe to access records |
| 6 | held in Seattle. Moving the documents from Seattle would add significant costs, time, and |
| 7 | burden should they need to be accessed. |
| 8 | 23. Moreover, it is unclear which documents would be moved to what location, |
| 9 | whether documents relevant to CTCLUSI will remain together, and whether there is a risk that |
| 10 | documents will be damaged in the process. |
| 11 | 24. The Tribal Council opposes the closure of the Seattle facility and relocation of |
| 12 | the documents that are so vital to the history of CTCLUSI. |
| 13 | I declare under penalty of perjury that the foregoing is true and correct. |

DATED this 4th day of January 2021 at Coos Bay, Oregon.

*Debbie Bossley*

CHAIR DEBBIE BOSSLEY

030

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

                Plaintiffs,

      v.

RUSSELL VOUGHT, et al.,

                Defendants.

NO.

DECLARATION OF
JOHN A. BOWER, JR., PH.D.

I, John A. Bower, Jr., Ph.D., declare as follows:

1.     I am over 18 years of age and competent to testify in this matter. I have a bachelor's degree in History from the University of Washington; a bachelor's degree in Environmental Studies from Western Washington University, Huxley College; and a master's degree and a Ph.D. in Geography from the University of Washington. During my professional career spanning over four decades, I have been employed by the State of Washington Department of Natural Resources, the Quinault Nation, the Confederated Tribes of the Colville Reservation, the Yakama Nation, the Skagit System Cooperative, and Dr. Barbara Lane to conduct historical research. I make this declaration based on personal knowledge and expertise as a professional Historical Geographer.

2.     As a professional Historical Geographer, I have researched, collected and analyzed extensive documentation for complex litigation in Native American treaty, fishery, energy, environmental, and water rights cases—including cases related to the Skagit Nuclear Power Project, High Ross Dam, Colville Indian Reservation boundary questions, Yakama Indian

DECLARATION OF JOHN A. BOWER,
JR., PH.D.

1

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

031

1    Reservation boundary questions, and Quinault Nation treaty rights; *State of Washington,*
2    *Department of Ecology v. James J. Acquavela (Yakima County Superior Court No. 77-2-01484-*
3    *5)*, a long-term water-rights adjudication; and *U.S. v. Oregon*, which dealt with the treaty fishing
4    rights of the Wenatchi, Chelan, Methow, Entiat, and Columbia tribes under the Yakima Treaty
5    of 1855 (United State District Court for the District of Oregon (CV No. 68-513-MA)); and *U.S.*
6    *v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), an ongoing proceeding which concerns
7    tribal fishing and shellfish rights and related matters (my research pertained to *U.S. v.*
8    *Washington* sub-proceedings after *Washington v. Washington State Commercial Passenger*
9    *Fishing Vessel Association*, 443 U.S. 658 (1979). I have prepared land use and transaction
10    histories of the Quinault, Colville, and Yakama Reservations for litigation purposes. I have
11    researched legislative, congressional, and court records, and have prepared legislative histories.
12    I have also analyzed and made recommendations about the State of Washington's aquatic land
13    use authorization history for hazardous waste liability and ownership.

14        3.      From my personal experience, the National Archives and Records Center for the
15    Pacific Northwest located in Seattle (NARA-Seattle) provides access to federal records
16    necessary to establish land ownership and use rights, including navigation, forestry, and tribal
17    rights; implement federal civil works projects; and facilitate agricultural development. I have
18    personally used NARA-Seattle records for all these purposes as part of my work for the State of
19    Washington and Washington tribes.

20        4.      I have been designated an expert witness for the Washington State Department of
21    Natural Resources (DNR). For DNR, I have researched and reported on ownership questions
22    related to state-owned aquatic lands. I have acted as the aquatic resource division expert on
23    historic aquatic land laws, regulations, and policies.  I have also coordinated closely with, and
24    have provided information and recommendations to, DNR environmental site and project
25    managers, as well as division and departmental management. On behalf of DNR, I have prepared
26    reports for specific tracts of land based on federal, state, and private land ownership, utilizing

DECLARATION OF JOHN A. BOWER,          2          ATTORNEY GENERAL OF WASHINGTON
JR., PH.D.                                     Public Lands and Conservation Division
                                            1125 Washington Street SE
                                                PO Box 40100
                                          Olympia, WA 98504-0100
                                               (360) 753-6200

032

1    land use records of local entities (cities, counties, and ports), Public Utility Districts, state

2    agencies (including DNR, the Department of Fish and Wildlife, and the Secretary of State), and

3    federal agencies (including the Bonneville Power Administration, the Bureau of Indian Affairs,

4    the Federal Energy and Regulatory Commission, and the Bureau of Reclamation).

5         5.      Records maintained at NARA-Seattle were integral to all my research described

6    above. NARA-Seattle contains local federal agency and field office records managed and

7    maintained by the National Archives, and federal agency records maintained by the federal

8    records center and managed by the generating federal agency, as well as Federal District Court

9    records. These records are organized into Record Groups (RG) for each generating agency.

10   Access to records located in the records center is granted by permission of the generating agency,

11   usually by Freedom of Information requests, while records in the archives are public documents

12   open to public research.

13        6.      As part of my work, I have researched legislative, congressional, and court

14   records, and have prepared legislative histories for both the Washington State Legislature and

15   the U.S. Congress. A chronology of those efforts is as follows:

16             a.      From 1982 to 1990, I conducted archival research at NARA-Seattle for

17        numerous clients and employers, including for Dr. Barbara Lane, a leading

18        anthropologist and primary expert witness for the United States in U.S. v. Washington,

19        on fishery damage claims and shellfish treaty right claims; for the Quinault Indian Nation

20        on Treaty rights claims; and for the Confederated Tribes of the Colville Reservation on

21        reservation boundary issues, Grand Coulee Dam development impacts, reservation

22        histories, and treaty right claims. This research was focused on tribal treaty rights and

23        reservation boundary issues. The research was conducted primarily in NARA-Seattle

24        records of the local Indian Agencies (Puyallup, Skokomish, Tulalip, Taholah, and

25        Western Washington agencies), and in records of the United States Army Corps of

26

DECLARATION OF JOHN A. BOWER,          3          ATTORNEY GENERAL OF WASHINGTON
JR., PH.D.                                                 Public Lands and Conservation Division
                                                          1125 Washington Street SE
                                                          PO Box 40100
                                                          Olympia, WA 98504-0100
                                                          (360) 753-6200

Engineers, the Fish and Wildlife Service, and the Bureau of Land Management (General Land Office).

b. From 1990 to 1996, I researched NARA-Seattle records for the Yakama Indian Nation relating to Yakama treaty water rights and agricultural development, primarily in records generated by the Bureau of Indian Affairs' Portland Area Office— Irrigation Division and the Wapato Irrigation Project. As part of this research, I was asked to review files and compile documents relating to the development of the Wapato Irrigation Project, which is an agricultural irrigation project of the Bureau of Indian Affairs operated for the benefit of tribes and individual Indians, to help determine water and other rights of non-Indian fee landowners of the Yakama Indian Reservation. I was also tasked to compile documents related to the Hellroaring Irrigation Company Canal, which included records related to the location of Yakama Reservation's southwest boundary. I found these documents at NARA-Seattle in its Bureau of Land Management Royer file for the Spokane Land Office and the Yakima Indian Agency records relating to the Hellroaring Irrigation Co.

c. From 1996 to 2014, I researched numerous records found at NARA-Seattle for the Washington State DNR, including records relating to contaminated sediment proceedings under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, also known as Superfund) and Washington's Model Toxics Control Act (MTCA); water ownership issues as well as navigability questions; and natural resource issues. These records included those generated by the Corps of Engineers, the Bureau of Land Management, the General Services Administration, the War Assets Administration, and the Bureau of Yards and Docks, including real property case files and survey report files.

7. The records I obtained at NARA-Seattle were integral to my preparation of numerous reports and papers, a select few of which are listed below:

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

a.     The Pacific Northwest Power Supply System:  The Present and Future Operation of a Power Pool:  1982. Master's Thesis, University of Washington.

b.     The Hydrogeography of the Yakama Indian Nation Resource Use:  1990. Dissertation, University of Washington.

c.     Preliminary Report--Historical Analysis and Review of Thea Foss Waterway Transactions:  September 28, 1998.  The Thea Foss Waterway site is a State of Washington Waterway and a federal waterway located in Commencement Bay adjacent to the City of Tacoma.  This report was made in preparation for negotiations with the U.S. Environmental Protection Agency and addressed activities located adjacent to and upon the waterway which resulted in its contamination. This historical analysis included a land transaction history of the tidelands abutting the waterway, the development of the Northern Pacific Railroad on state-owned tidelands, the modification of the mouth of the Puyallup River, operation of the Wheeler-Osgood Lumber Mill, and the sewage discharges from the City of Tacoma's "twin 96ers" outfalls. This historical analysis relied on Corps of Engineer records located at NARA-Seattle.

d.     Draft Preliminary Report--Historical Analysis of ASARCO CERCLA Site Transactions:  November 3, 1999.

e.     Preliminary Source Control History for Tracts Abutting Middle Waterway:   May 11, 2001. Middle Waterway is a state waterway located on Commencement Bay immediately to the west of the Puyallup River.  This source control history detailed the fill history of the tracts abutting the waterway including the Simpson Pulp Mill, the shipyard located at the mouth of the waterway, and the history of waterway dredging.

f.     R.G. Haley Memorandum:  October 14, 2003.  The R.G. Haley site is located in Bellingham Bay from, and including, Alder Street to the south and the southwesterly line of Pine Street to the North, between the Burlington Northern Railway

DECLARATION OF JOHN A. BOWER, JR., PH.D.
5
ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

035

tracks and the harbor area contained in the Georgia Pacific harbor area lease. This report detailed the R.G. Haley site history, the placement of fill material and the history of improvements placed on the site. It discussed the history of the landfill, as well as the jurisdictional history of those agencies that authorized the placement of the landfill.

g.    Draft Preliminary Report Cornwall Landfill:  April 19, 2004. This report dealt with the placement of a landfill in Bellingham Bay tidelands. It discussed the history of the landfill, as well as the jurisdictional history of those agencies that authorized the placement of the landfill.

h.    Preliminary Draft Historical Report on East Waterway--Seattle:  April 28, 2005. This report was prepared as part of negotiations with the United States Environmental Protection Agency. This report focused on the tideland ownership surrounding the waterway, the jurisdictional management of the waterway by local, state, and federal agencies. It also considered the fill and development of the tidelands adjacent to the waterway, as well as possible sources of the waterway's sediment contamination.

i.    Budd Inlet—Federal Channel and State Harbor Area Designation:  June 2, 2008. This report dealt with negotiations with the Department of Ecology under MTCA related to the sources of contamination in Budd Inlet located at Olympia, Washington. As with other reports, it provided a history of waterway development, tideland fill, and industrial development associated with this site.

j.    Report on Squalicum Waterway and Tideland Historical Use:  March 13, 2007. This report was made in preparation for negotiations with the Department of Ecology and the Port of Bellingham under MTCA. Squalicum waterway is located in Bellingham Bay. This report dealt with the vacation of portions of the waterway, and the sources of contaminated sediment.

k.    Report on Whatcom Waterway:  April 2, 2007. This report was prepared for the Department of Natural Resources as part of an equitable allocation negotiation in

DECLARATION OF JOHN A. BOWER,
JR., PH.D.

6

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

036

Bellingham Bay. This report discussed the sale of tidelands; the management of waterways and harbor areas; the conflicting jurisdictional roles of local, state, and federal agencies; and the relationship of nearshore development to the existence of contaminated sediments.

l.    Preliminary Chronology:  United States Lighthouse Reserve and Federal Townsite at Port Angeles. This report was prepared for negotiations with the Department of Ecology and other parties related to the MTCA site located at Port Angeles. This report considered the development of Ediz Hook, and industrial development of adjacent tidelands.

m.    History of the Lockheed Shipyard Site:  January 27, 2010. This shipyard was located on Harbor Island, and its operation resulted in extensive contamination of West Waterway in Seattle. This history was prepared as part of negotiations and proceedings with the Environmental Protection Agency related to the Lockheed Shipyard site located on Harbor Island, Seattle. This shipyard has had an extensive history as a federal shipyard beginning in World War I as the Puget Sound Bridge and Dredge Shipyard, continuing through World War II, and was operated into the 1950s as the Lockheed Shipyard. This shipyard site is now owned by the Port of Seattle.

n.    History of Todd Shipyard, Tideland Block 404:  April 8, 2010. This federal shipyard was located on Harbor Island, Seattle, and was operated first as the Skinner and Eddy Shipyard and then as Todd Shipyards during World War II. This shipyard is still in operation.

o.    Report of the Anacortes Breakwater:  January 27, 2011. This report dealt with the history of the breakwater construction on state-owned aquatic lands, and considered its approval history.

p.    Preliminary Draft Report ASARCO:  July 6, 2012. The ASARCO site is located adjacent to Ruston, Washington on the shores of Puget Sound. This smelter, as a

DECLARATION OF JOHN A. BOWER,
JR., PH.D.

7

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

037

consequence of its operations, deposited molten slag onto state-owned aquatic lands. This report dealt with the transaction history of state-owned aquatic lands located on the site, and the history of slag disposal.

q. Draft Report: East Waterway—Everett: June 27, 2013. East Waterway - Everett is located in Port Gardner. This report was prepared as part of negotiations with the Department of Ecology regarding contaminated sediments. This report dealt with history of the federal shipyard abutting the waterway, as well as the development of the federal channel that led to the Snohomish River across extensive tidelands.

8. For the State of Washington, records located at NARA-Seattle are necessary to determine ownership and boundaries of current or former federal lands and facilities located adjacent to or upon state-owned aquatic lands, as well as those lands that have been sold by the United States. I am personally familiar with records relating to the disposal and management of federal lands located at NARA-Seattle. Those records are included in the files and documents of the Bureau of Land Management record group (RG49) which contain federal disposal records under the donation land act, the homestead acts, the mining acts and the Indian homestead acts; the Bureau of Yards and Docks record group (RG71) real property files relating to federal defense projects, many of which were located on or adjacent to state-owned aquatic lands; and the War Assets Administration record group (RG270), which contain files relating to the disposal of federal lands and other property located at ports of embarkation, federal shipyards (such as Todd and Lockheed shipyards in Seattle), air stations, and other property (such as floating dry docks) which are surplus to needs of the federal government. Other records related to state land ownership located at NARA-Seattle would include the Forest Service record group (RG95), the National Park Service record group (RG79), the Public Buildings Service record group (RG121), and the General Services Administration record group (RG269).

9. Files located at NARA-Seattle also need to be accessed by the State of Washington DNR in order to investigate federal activity affecting ownership and title to

DECLARATION OF JOHN A. BOWER, JR., PH.D.  8

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

038

submerged lands owned by the State of Washington. These include records of federal shipyards, waterways, forts, military bases, Indian reservations, and lighthouse reserves—especially those that have been abandoned. They also include civil works project records of the Corps of Engineers (RG77), including documents and files of the Corps' North Pacific Division and its Portland, Seattle, and Walla Walla District Offices relating to the construction and maintenance of federal dams (such as Chief Joseph, McNary, Snake River, and Bonneville) and federal waterways (such as Thea Foss and Whatcom Waterways); Bureau of Yards and Docks (RG71) real property files; and records of the War Assets Administration (RG270). Other records related to civil works located at NARA-Seattle would include the Records of Naval Districts and Shore Establishments (RG181); the National Resources Planning Board (RG187) for the Bonneville, Grand Coulee and Columbia Basin projects; the Federal Property Resources Service (RG291); the General Services Administration (RG269); the U.S. Army Coast Artillery Districts and Defenses (RG392); and records relating to the operation of these facilities in the General Records of the Department of the Navy (RG80). All of these types of records are regularly used by the State of Washington DNR to establish and protect the state's ownership of submerged lands.

10.     Records located at NARA-Seattle are of particular importance to DNR in conducting navigability research. The State of Washington (through DNR) and the United States Army Corps of Engineers share responsibility for the navigable waters and state-owned aquatic lands:  DNR is the land manager and the Corps of Engineers is the regulatory authority. As such, it is imperative that DNR have ready access to NARA-Seattle's Corps of Engineers records (RG77) relating to navigation, obstructions, permits, and civil works. This collection contains documents and files of the Corps of Engineers' North Pacific Division and its Portland, Seattle, and Walla Walla District Offices. These records provide critical information for management of submerged lands owned by the state including information related to the nature and extent of federally authorized activities and improvements on those state-owned lands. Continuing access

DECLARATION OF JOHN A. BOWER, JR., PH.D.                    9

ATTORNEY GENERAL OF WASHINGTON
Public Lands and Conservation Division
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

039

1    to these records is necessary for the State of Washington to fulfill its share of the responsibilities

2    for navigable waters along with the Corps of Engineers and the U.S. Coast Guard.

3    11.    In addition, the State of Washington regularly uses the Forestry and Agricultural

4    Development records located at NARA-Seattle, which are primarily found in the Forest Service

5    (RG95) collection, for the development and use of forest resources. The State of Washington

6    needs access to these records to assess federal forest practices impacts on state-owned aquatic

7    lands, as well as other State Lands.

8    12.    I have also conducted tribal research at NARA-Seattle to identify records related

9    to treaty rights such as fishing and hunting, allotment of Indian reservations, diminishment of

10   Indian reservations, sale of "surplus" lands, Indian homesteads under the Indian Homestead

11   Acts, and agricultural development on those lands. Those records are included in the agency

12   records of the Bureau of Indian Affairs (RG 75), including the Colville, Taholah, Puyallup,

13   Tulalip, Puget Sound, Western Washington Agencies, and the Portland Area Office, which

14   contain files and documents relating to off-reservation occupation, agricultural use, and

15   irrigation development; the land offices of the Bureau of Land Management (RG49), including

16   those generated by the General Land Office and the Office of the Washington Surveyor, that

17   contains original tract and plat books and survey contract files that document the disposal of

18   federal lands for Indian purposes; the District Courts of the United States file (RG21); and Fish

19   and Wildlife Service records (RG22), which contain records relating to the region's fishery

20   resources that contain stream survey records. DNR needs to access these records in order to

21   resolve conflicts among the United States, the various Indian Tribes, and the State of

22   Washington.

23   13.    While working for DNR, I visited the NARA-Seattle facility to conduct research

24   approximately once or twice a year for a several weeks at a time. The vast majority of NARA-

25   Seattle's records are un-digitized, and many are the only copies of that document. There is a vast

26   amount of local federal agency and field office records that need to be accessed for future

DECLARATION OF JOHN A. BOWER,        10        ATTORNEY GENERAL OF WASHINGTON
JR., PH.D.                                        Public Lands and Conservation Division
                                                       1125 Washington Street SE
                                                              PO Box 40100
                                                         Olympia, WA 98504-0100
                                                            (360) 753-6200

**040**

ownership, land use, natural resource conservation, and federal facility operations. This is especially important as it relates to the Corps of Engineers' management of navigable waters, the Bureau of Land Management's records related to the management and disposal of federal lands—including National Forests, National Parks, National Conservation Areas. If the NARA-Seattle facility were sold and its records moved out of the Pacific Northwest, the State of Washington would have to incur significant travel costs to access mission-critical records that used to be readily available, and the state programs discussed herein would undoubtedly suffer and be less effective in their missions if the records on which they rely could no longer be accessed here in Washington.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this __4th__ day of __JANUARY__ __202__ at __OLYMPIA__, __WA__.

           day          month     year        city         state

_JOHN A. BOWER, JR., PH.D._

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

Plaintiff,

v.

RUSSELL VOUGHT, et al.,

Defendants,

NO.

DECLARATION OF BIF
BRIGMAN

I, Bif Brigman, declare as follows:

1.      I am a member of the Minidoka Pilgrimage Planning Committee and a Seattle-area historian and genealogist. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been a member of the Minidoka Pilgrimage Planning Committee for over 14 years. The Minidoka Pilgrimage Planning Committee is an all-volunteer run committee based in Seattle, Washington. Its goal is to organize an annual trip to the former Minidoka Relocation Center in Idaho, where Japanese Americans were incarcerated for nearly three years during World War II. Today, the site continues to hold a mixture of memories colored by feelings of denial, distrust, shame, and joy. The Pilgrimage, which is attended by former incarcerees, their descendants, friends, and allies, offers an opportunity to revisit the sacred

DECLARATION OF BIF BRIGMAN                    1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

042

site and memories amidst family, friends, supporters, and National Park Service officials. The intent is to honor the first generation of Japanese Americans who suffered most under institutionalized racist laws, to provide healing for their descendants, to deliver the message of "Never Again Is Now," and to pass this legacy on to all Americans. The first Pilgrimage occurred in 2003. In 2020, due to the COVID-19 pandemic, the Committee organized a Virtual Pilgrimage offering online content and opportunities for community members to gather and engage virtually, and is planning further online programming for 2021.

3.      As a longtime Committee member, and as a local historian and genealogist, I can attest to the preciousness and vital nature of the Sand Point National Archives and its staff for our region. The connections made there, and the opportunities to share and transfer knowledge preserved in the facility's records, is immense and cannot be replaced.

Records of specific importance are those involving the Chinese Exclusion Act of 1882; as well as the records on the forced removal of Washington residents of Japanese ancestry during WWII 1941-1945 which include anti-Asian organizing by Washington state business owners 1910-1950, records of the War Relocation Authority and documents relating to early Japanese community, business and industry records including logging, railroad, hotels, domestic and fishery, in addition to community organizations and history.

Equally important are the records of mixed race couples prior to 1920 because Washington state was one of the few states in the Nation without explicit anti-misogynistic laws which enabled marriages that were outlawed elsewhere. Other vital and irreplaceable records held at Sand Point National Archives are immigration documents which include

DECLARATION OF BIF BRIGMAN                    2                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

043

passenger manifests that often give the only clue to towns and villages ancestors originally came from.

The vast majority of all of these records have not been digitized and require access in person for investigation and research.

4.    I am gravely concerned by the efforts to sell the property and move the records out of Washington State and the Pacific Northwest. This will destroy any opportunity for local elders, youth, and those who are economically disadvantaged or otherwise unable to travel to connect with these records – and with their own personal histories reflected in those records.

5.    The damage this will cause to the Chinese and Japanese American communities in the Pacific Northwest cannot be overstated. Additionally, I believe promises were made when the National Archives facility in Alaska was closed, for its records to remain in Seattle. It is deeply flawed to move these records beyond reach for so many members of Indigenous communities and People of Color who have deep personal and family connections to the records, without having consulted these communities. I first learned of the proposed closing of Sand Point in February of 2020 via news online and word of mouth. I never saw any official communications or efforts of community engagement prior to announcement of intent to sell. Because of the Regime occupying the White House in 2020, I saw 0 benefit of trying to engage with the Federal government officials. I used my time and energy organizing Washington state residents to stop this egregious act.

6.    In my own genealogical and historical research, there have been times where I have hit a dead end and was only able to find the records I needed with the help of the staff at the Sand Point facility and access to the records there. I believe we have a responsibility to not

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

only save this resource for those currently living and working in this area, but also for future generations. Moving the Sand Point facility's irreplaceable records to a different part of the country will significantly impede this goal.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this <u>31</u> day of <u>December</u>, <u>2020</u> at <u>Seattle</u>, <u>Washington</u>
      day            month     year       city            state

BIF BRIGMAN

DECLARATION OF BIF BRIGMAN

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON, et al.,

       Plaintiff,

    v.

RUSSELL VOUGHT, et al.

       Defendants.

NO.

DECLARATION OF DR. ALLYSON BROOKS

I, Allyson Brooks, declare as follows:

1.    I am the State Historic Preservation Officer (SHPO) and the Director for the Washington State Department of Archaeology and Historic Preservation (DAHP). I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as an archaeologist and historic preservation professional.

2.    I hold a doctorate in anthropology (archaeology), a Master's of Public Administration, and a M.SC in historical archaeology. I have been the State Historic Preservation Officer (SHPO) for Washington since 1999. Prior to being the SHPO I worked for the Minnesota Department of Transportation, the South Dakota historic preservation office and the United States Forest Service. I am currently on the Executive Board of Preservation Action and served multiple terms on the board of the National Conference of State Historic Preservation Officers. I served one term on the National Park Service's National Historic Landmarks committee as the SHPO representative. I have received multiple honors for my work with the Pacific NW tribes.

DECLARATION OF ALLYSON
BROOKS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

046

1    3.    As the State Historic Preservation Officer I manage all aspects of the national
2    historic preservation program in the State of Washington including listings to the National
3    Register of Historic Places and overseeing the Federal historic tax credit rehabilitation
4    program.  The latter is a historic conservation program established under Federal law and
5    implemented at the state and local level.

6    4.    The National Archives in Seattle are used in connection with multiple Federal
7    preservation/conservation programs, including developing nominations to the National
8    Register of Historic Places program (54 USC Ch. 3021), the Federal Historic Tax Credits
9    program (26 USC Sec. 47) and the Certified Local Government (CLG) program (54 USC Ch.
10   3025), as described below.

11   5.    The National Register program eligibility determination involves a detailed
12   examination of a nominated property's age, significance, and integrity.  Nominations for
13   inclusion on the National Register must document the history of the property in detail as proof
14   of its national, state or local significance.  There must also be analysis of the historic integrity
15   of the property. The National Archives is a critical repository of primary source information
16   and maps pertaining to properties in Washington, Alaska and the Pacific Northwest.  The
17   National Archives are regularly used by researchers preparing nomination forms to the
18   National Register of Historic Places. In Washington State, nomination forms are submitted to
19   a state historic preservation review board (State Advisory Council) which reviews and
20   recommends nominations to the SHPO.  After determining that nominations comply with
21   Federal standards and are properly documented, the SHPO submits nominations to the
22   National Park Service for final review and listing. Archival materials from the National
23   Archives are a critical primary source used in many National Register nominations and are
24   among the documentation relied on by the State Advisory Council and SHPO to recommend
25   and submit nominations to the National Park Service.

26

DECLARATION OF ALLYSON                2

1    6.    The Historic Tax Credit program applies only to properties that are listed on the
2    National Register.  The Federal Historic Tax Credit program promotes conservation of
3    National Register listed properties using the tax credits as a means of promoting rehabilitation
4    and therefore creating or continuing the economic viability of the historic building. The
5    Internal Revenue Code requires that the "certified historic structures" eligible for credits must
6    be either individually listed on the National Register or a significant contributing element to a
7    listed historic district. As discussed above, the Archives are used for research needed to obtain
8    National Register listing, the prerequisite for the tax credit that offsets rehabilitation costs.  For
9    instance, the National Archives in Seattle was used for research for the 2008-2009 National
10   Register historic district nomination prepared by Artifacts Consulting for the City of Seattle.
11   The placing of Magnuson Park on the National Register meant that some of the buildings in
12   the district have gone through the tax credit program turning these buildings from their original
13   uses to new uses such as affordable housing units. The listing plus the tax credits allowed the
14   buildings to be conserved for new uses as opposed to being demolished.

15       7.    The National Archives are also used by researchers in development of
16   rehabilitation plans required in order to obtain the tax credits. The Historic Tax Credit program,
17   which is administered by the National Park Service and Internal Revenue Service in
18   partnership with DAHP, requires a detailed architectural rehabilitation plan for the property.
19   This plan must be approved by both the state and the federal government.  All work must
20   comply with Secretary of the Interior standards, to accurately conserve the contributing
21   elements and architectural integrity necessary to maintaining a property's National Register
22   listing. The Archives contain records such as photographs, maps, drawings, contemporary
23   articles and accounts, surveys, and court records that contain historically accurate information
24   that can be, and routinely is, used to develop the rehabilitation/preservation plans used in the
25   Historic Tax Credit program.

26

DECLARATION OF ALLYSON                3                ATTORNEY GENERAL OF WASHINGTON
BROOKS                                                  Complex Litigation Division
                                                        800 5th Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7744

048

8.     The Federal Certified Local Government program is a historic conservation program for the built environment authorized under the National Historic Preservation Act (NHPA).   Many local historic preservation programs across the state are designated as Certified Local Governments (CLGs) under the Federal program. CLGs are so designated by the National Park Service acting through DAHP, who makes a preliminary designation under authority of the National Historic Preservation Act. CLGs implement local preservation ordinances and confer landmark status on buildings based on the authority/stipulations provided them in these ordinances.  Moving the National Archives would impede the ability of local and regional property owners to do research needed to establish local landmark status. This includes archival materials on the history of the property such as Sanborn maps, historic photographs and primary records.

9.     Moving the records from the Pacific Northwest, so they can no longer be accessed by the public or tribal preservation programs, will impede the listing of properties on the National Register of Historic Places.  As the documents are not digitized, moving the records to another state means that the public will need to have the economic means to travel to obtain the needed records, maps and or other information to complete National Register and local register nomination forms. The inability to access information crucial to the National Register will have a cascading impact to the Federal Historic Tax Credit program that is designed specifically to conserve the nation's most iconic and historic buildings. It will also impact local property tax moratorium programs, many that are managed by Certified Local Governments, that are focused on the conservation of locally designated historic structures through local landmarking, property tax relief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4 day of January , _____ at _____ 10 : 59 , AM .

_____
ALLYSON BROOKS

DECLARATION OF ALLYSON                4                ATTORNEY GENERAL OF WASHINGTON
BROOKS                                                                      Complex Litigation Division
                                                                                  800 5th Avenue, Suite 2000
                                                                                  Seattle, WA 98104-3188
                                                                                  (206) 464-7744

049

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

                Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

                Defendants,

NO.

DECLARATION OF CHARLES MICHAEL BROWN

I, Charles Michael Brown, declare as follows:

1.    I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.    I have resided in Alaska for most of my life. In the early 1970s, I worked at the State of Alaska (Alaska Historical Commission and the Division of Parks). From 1976 to 2007 I was employed by the U.S. Bureau of Land Management (BLM), Anchorage, Alaska, as a Historian and Navigable Waters Specialist. (I am now retired.)

3.    Over the years, I have researched the Alaskan records of the Bureau of Sports Fisheries, Bureau of Public Roads (and Alaska Road Commission), Bureau of Land Management, Forest Service, Alaska Railroad and Alaska Engineering Commission, and Custom Service (microfilm publication). I found the records of the old Alaska Road Commission (RG 30) especially valuable. Created in 1905, the Commission was responsible for building roads, trails, bridges, shelter cabins, and aviation fields in all Alaska, excepting the forest reserves. These unpublished records are an excellent source of information about

DECLARATION OF CHARLES MICHAEL BROWN

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**050**

various road and trail projects and economic developments in remote areas throughout the territory of Alaska, information that does not appear in the commission's annual reports. A commission representative usually visited the petitioners' mining camp or trading post and investigated whether the road or trail was really needed. The collection also includes hand-drawn maps, handwritten letters and telegrams from prospectors, miners, and traders who petitioned the commission to build a road or trail in remote areas. These documents are sometimes faded to the extent that they are hard to read on microfiche. They are best viewed in their original.

4. Early in my career as a historian with the State of Alaska, I prepared historical reports on specific themes (e.g. lighthouses in Alaska) which were used to support nominations to the National Register of Historic Places. In my career with the U.S. Bureau of Land Management (BLM), my primary duty was to research and document the physical character and historical uses of inland rivers, streams, and lakes in Alaska. Almost always, these reports were based on primary documents, including archival documents, and oral sources. The BLM relied upon the reports to determine whether the water bodies were navigable or not navigable; in other words, whether the water bodies were ever used, or susceptible to use, as highways of travel, trade, and commerce. In general, the beds of rivers, streams, and lakes are excluded from land conveyances to the State of Alaska and Alaska Native corporations.

5. From time to time, I also prepared similar reports for use in litigation involving BLM's navigability determinations, potential RS 2477 trails and roads, Alaska's Wild and Scenic Rivers, and in one case, the boundaries of an Alaska Native reserve. Since my retirement, I have worked as a historian-contractor for the U.S. Department of Justice on in a navigability case involving Mosquito Fork of the upper Fortymile River, a Wild & Scenic River. Since, I have spent most of my time working on several historical research projects of personal interest to me.

DECLARATION OF CHARLES MICHAEL BROWN

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2

051

1    6.    I first learned of the impending sale from a short article published in the
2    *Anchorage Daily News* (local newspaper). I don't recall whether or not the article advised that
3    that the public could review and comment on the proposed sale of the National Archives
4    building in Seattle, Washington. The Alaska Historical Society recently advised me that I
5    could comment on the proposed sale.

6    7.    Considering that the National Archives-Seattle and Washington, D.C. holds the
7    bulk of the federal historical records created in the Alaska's territorial years (1912-1959), it is
8    understandable why users of the records, including me, are frustrated over OMB's attempt to
9    sell the National Archives building in Seattle and move Alaska's federal records once again.
10   The Alaska records have been moved at least twice—from Seattle to Anchorage, Alaska and
11   from Anchorage to Seattle. This latter move was a surprise because former Senator Ted
12   Stevens (R-Alaska) had worked hard to obtain funds for a federal archives building in
13   Anchorage.

14   8.    Researching and writing the history of the Territory of Alaska is a monumental
15   undertaking. The task is made more difficult when these records are repeatedly scattered over
16   the United States, principally the National Archives in Washington, D.C., and the regional
17   National Archives-Seattle. Fortunately, the National Archives-Seattle was and still is a
18   valuable resource for Alaskans historians and other researchers. Unfortunately, the Alaska
19   Digitization Project is not yet completed and so one cannot peruse most documents, like those
20   of the Alaska Road Commission.

21   9.    Since retirement I have researched and completed a history on travel and
22   transportation in the Upper Yukon country for the U.S. Justice Department for litigation
23   purposes. At issue was the navigability of the Mosquito Fork, a tributary of the Fortymile
24   River (a Wild and Scenic River). The Alaska Road Commission records were valuable in
25   determining this issue.

26

DECLARATION OF CHARLES MICHAEL BROWN

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

3

052

1       10.    For the past two years, I have worked on a history of mining in the Fortymile

2 country, 1900-1914.  If these Alaska Road Commission records are moved from the State of

3 Washington, I may have to wait another year or two before the records are again open to the

4 public for research purposes.  In addition, I would be faced with greater travel cost.

5

6 I declare under penalty of perjury that the foregoing is true and correct.

7

8 DATED this _7_ day of _January_, _2021_ at _Anchorage_, _Alaska_ .
                    day             month      year           city              state

9

10                           _Charles Michael Brown_

11                           [FULL NAME]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CHARLES MICHAEL BROWN

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

4

**053**

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

STATE OF WASHINGTON, et al.,                    NO.

8
                                   Plaintiff,        DECLARATION OF BRIAN J.
9                                                    CARTER

           v.
10
RUSSELL VOUGHT, et al.,
11
                                   Defendants.
12

13          I, Brian J. Carter, declare as follows:

14          1.      I am the Executive Director of the Cultural Development Authority of King

15   County, also known as 4Culture. I am over the age of 18 and competent to testify. I make this

16   declaration based on my personal knowledge.

17          2.      Since 2018, I have served as Executive Director of 4Culture, where I lead a 30-

18   person team in funding, supporting, and advocating for culture in King County through a racial

19   equity lens. Prior to this role, I served as 4Culture's Heritage Program Director, and

20   administered grant programs designed to recognize, preserve, and explore our communities'

21   shared heritage in King County. In both roles, I supported and worked alongside cultural

22   organizations, artists, historians, preservationists, and culture bearers whose craft, scholarship,

23   or cultural identity inspires their regular and necessary use of the National Archives of Seattle.

24          3.      Chartered by King County in 2002, pursuant to RCW 35.21.730 through

25   35.21.759 and King County Ordinance 14482, 4Culture is a public corporation with four

26   program areas: Arts, Heritage, Preservation, and Public Art. It advocates for culture, provides

DECLARATION OF BRIAN J. CARTER              1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**054**

1  funding opportunities for King County arts and heritage organizations; manages public and

2  private art projects; catalyzes and convenes the cultural community around specific issues and

3  initiatives; and provides technical assistance resources. 4Culture serves over 500 cultural

4  groups and organizations and many more hundreds of cultural workers whose expertise and

5  endeavors publicly benefit communities in King County and enhance the quality of life for all

6  residents and visitors to the region.

7          4.      Many of the organizations and cultural workers 4Culture supports, especially

8  within its Heritage and Historic Preservation programs, use records held at the National

9  Archives at Seattle, as their research or work connects directly to federal preservation and

10  conservation programs the records for which are maintained there. For example, ongoing

11  preservation efforts in the Seattle area take place in two National Register listed districts that

12  are also formerly federally-owned military bases that later transferred to the City of Seattle for

13  park use. These unique places include Fort Lawton/Discovery Park and the Sand Point Naval

14  Air Station Historic District. The Sand Point Naval Air Station Historic District includes

15  multiple cultural organizations and recreational uses. The Sand Point Naval Air Station

16  Historic District also includes a recent project that benefitted from Federal Historic Tax

17  Credits: the rehabilitation of former Navy barracks to serve as affordable housing at Mercy

18  Magnuson Place. Over the years, 4Culture has funded rehabilitation, programs, and

19  interpretation at these sites, as well as other landmarks, and a throughline is their reliance on

20  the National Archives for rare and mostly undigitized records of their genesis. In addition, the

21  local historic preservation programs are Certified Local Governments (CLGs) under federal

22  historic preservation programs, binding these local historic preservation programs and their

23  practices to the National Park Service and national preservation standards. One such recent

24  local landmark nomination connecting to the National Archives is the Fircrest Chapel

25  (formerly Naval Hospital Chapel) in Shoreline.

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

DECLARATION OF BRIAN J. CARTER          2

055

5.      Because 4Culture is chartered to support the cultural work that makes King County vibrant, it seeks to protect the repositories from which artists, historians, and preservationists learn and make meaning of our past in the present. Tribes, community-based organizations, historians, and people throughout the Pacific Northwest stand to lose access to their history, and by extension themselves. I understand from newspaper reports (https://www.seattletimes.com/seattle-news/6-months-later-as-national-archives-closure-still-set-for-seattle-a-lament-were-pretty-small-fry/) that "nearly 1 million boxes of documents will at some point head from Seattle to Riverside, California, and Kansas City, Missouri." Clearly, closing the National Archives in Seattle will make it exceedingly more difficult for King County's artists, historians, preservationists and cultural organizations to maintain their connection to King County's rich cultural heritage.  As the largest public cultural funding agency in the State with a stated commitment to racial equity, we oppose this move toward cultural erasure, especially for communities whose histories are the most suppressed and least documented and interpreted.

6.      Like everyone else in the cultural sector, 4Culture first learned of the impending sale of the National Archives when it was announced in January 2020 and quickly picked up by local media. The National Archives and Records Administration did not contact 4Culture for input or provide 4Culture with the opportunity to alert the cultural community. Had 4Culture had the opportunity to comment or to advocate for wider public input, we would have done so.

7.      Culture in King County will suffer if the records housed at the National Archives facility are moved out of the region. Losing access to the millions of unique, irreplaceable, and undigitized materials will curb the cultural and educational work that organizations and researchers do unless they have extensive financial resources, resulting in deeper inequities and cultural loss. Digitization is a slow and expensive process; it will take years if not decades to complete it for the Archives, even if it were funded. Should the

DECLARATION OF BRIAN J. CARTER                    3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

056

collection go to California or Kansas, the distance will exacerbate racial inequity. Only people with the resources for travel and lodging will be able to access it. This will limit the perspectives of those who explore and interpret our nation's material history and the histories that are ultimately elevated and shared.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 30th day of December 2020, at Seattle, Washington.

_____

BRIAN J. CARTER

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ROSS ALLEN COEN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Ross Allen Coen, declare as follows:

1. I am a professional historian and editor of *Alaska History*, the peer-reviewed journal of the Alaska Historical Society. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2. I have been a Ph.D. student in History at the University of Washington since 2012, and I have taught history classes and delivered lectures at a number of institutions in the Pacific Northwest. I am the author of three books and dozens of articles on the history of the Pacific Northwest. Topics include Volunteer Park, the Alaska-Yukon-Pacific Exposition of 1909, Washington State salmon canneries, and the Japanese balloon bomb attack of World War II.

3. In researching and writing the publications listed above, I examined many federal records housed at the National Archives and Records Administration in Seattle. These records are not digitized and are available only by viewing them in person at the NARA facility. To cite one important example, in doing research for my book, *Fu-Go: The Curious*

*History of Japan's Balloon Bomb Attack on America*, I examined U.S. Forest Service records regarding the deaths of six people on National Forest lands in southern Oregon from an explosion caused by one of the downed Japanese balloon bombs. These rare, original records, which included affidavits and eyewitness reports, were available in no other repository, and without the services of NARA-Seattle I would have been unable to tell the story.

4.      Any transfer of records from the Seattle facility out of the area will negatively affect my work as a historian. I am presently researching and writing a book about salmon fisheries in the Pacific Northwest in the late 19th and early 20th centuries. My work depends on the accessibility of related federal records. For this reason, and for the sake of historical scholarship in general, I object to the proposed transfer of records.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 31st day of December, 2020 at Edmonds, Washington.

_____
Ross Allen Coen

DECLARATION OF ROSS ALLEN COEN    2    ERROR! AUTOTEXT ENTRY NOT DEFINED.

059

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ANNE-MARIE DEITERING |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Anne-Marie Deitering, declare as follows:

1.    I am the Interim Donald and Delpha Campbell University Librarian at Oregon State University ("the University"). I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a professional librarian and historian.

2.    I have served the University since 2003, most recently as Associate University Librarian for Learning Services and previously as Head of the library's Teaching and Engagement Department. I hold the Franklin A. McEdward Professorship for Undergraduate Learning Initiatives. I earned a Master of Library Science degree from Emporia State University and a Master of Arts in History from Syracuse University, as well as a Bachelor of Arts in History from the University of Pennsylvania. I was honored as the Librarian of the Year by the Oregon Library Association (2011). I have been a member of the OSU library faculty since 2006, when I was appointed as Undergraduate Services librarian. I was awarded tenure in 2011, and promoted to full Professor in 2018. I am a past President of the Oregon chapter

ATTORNEY GENERAL OF OREGON
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
503-378-6002

060

1 | of the Association of College and Research Libraries, and currently serve on the faculty of the
2 | Association of College and Research Libraries' Immersion program.

3 |       3.       Archivists identify the essential records of a society, supporting and
4 | strengthening collective memory. By organizing, protecting and preserving these records,
5 | archivists protect the rights of citizens to: analyze and interpret past events; protect their
6 | property and identity, and hold government and organizations accountable. University faculty
7 | researchers in the liberal arts fields of history and anthropology have relied on the Seattle
8 | NARA facility for over 30 years. For example, the Seattle NARA facility served as a critical
9 | resource, providing a rich trove of sources, for the writing of *American Forestry, A History of*
10 | *National, State, and Private Cooperation* (1985), a work focused on federal fire policy and
11 | relations between federal agencies, state governments, and private corporations in the Pacific
12 | Northwest. Among the many archives, both national and regional, providing primary sources
13 | materials, the Seattle Branch was the equal of holders of regional materials for the Southwest
14 | Region in Atlanta, the Rocky Mountain Region in Denver, and the forestry related materials
15 | in the Pacific Region offices, then in San Bruno, California.

16 |       4.       Some of the records housed at the National Archives at Seattle are of particular
17 | interest because the University is a land grant institution; particularly the Bureau of Indian
18 | Affairs and Bureau of Land Management records. Other records housed at the National
19 | Archives at Seattle are also relied on for University research, such as the Chinese Exclusion
20 | Act files. Because the National Archives at Seattle houses immigration records, the
21 | information was integral to the dissertation of Anthropology PhD candidate Maryanne F.
22 | Maddoux, who described how the National Archives' immigration information reveals
23 | migration patterns and culture, and "is seldom found elsewhere."[1] As a land grant institution,

24 | 

25 |     [1] https://ir.library.oregonstate.edu/concern/graduate_thesis_or_dissertations/h128nk736: An Abstract of
the Dissertation of Maryanne Maddoux for the degree of Doctor of Philosophy in Applied Anthropology
26 | presented on May 6, 2019. Title: At River's Edge: An examination of Overseas Chinese Settlements in Northern
Oregon During the Exclusion Act Era.

DECLARATION OF ANNE-MARIE           2           ATTORNEY GENERAL OF OREGON
DEITERING                                        Oregon Department of Justice
  1162 Court St NE
  Salem, OR 97301
  503-378-6002

**061**

Oregon State University researchers work closely with several government agencies, including those that regulate and protect natural resources and federal lands. Some OSU researchers participate in agency research, others examine and evaluate the impact of agency decisions. The historical records from these agencies help make this work possible. As a result of its relative proximity to the University's campuses in Oregon, countless numbers of University graduate students with very little travel funds have made important use of the Seattle archives over the decades.

5. In February 2020, the prior University librarian, Faye A. Chadwell, co-authored a detailed letter with the head librarians of the University of Washington, Washington State University, the University of Alaska at both Anchorage and Fairbanks, and the University of Oregon to urge Acting Director Vought to reconsider the decision to sell the facility. The University librarian did not receive a response.

6. University student and faculty research and scholarship will be harmed by this closure. As a public university, access to archives in person is essential to the University's ability to educate scholars and the public, as well as the University's mission to preserve and enhance knowledge. Digital representations, however, cannot always replace the importance of the original documents. Some documents are important primarily for their informational value, whereas others have value as artifacts which cannot be reproduced. Moreover, physically handling records and being able to understand each document in connection with other related documents can lead to key research breakthroughs and historical understanding. We are further concerned that Pacific Northwest communities losing proximity to their records will be further distanced from their histories.

7. University faculty describe the Seattle NARA archivists as exemplary, with the necessary in-depth knowledge of the collections. The demonstrated knowledge of the archivists has proven essential time and again to assist University researchers efficiently and effectively in navigating the collections, in particular to review and recover missing parts of

1   our region's tribal histories from the 19th and 20th centuries. The archivists' deep familiarity

2   with the facility helps researchers understand how the archives are structured, which helps with

3   advance preparation to optimize time to review the collection at the Seattle facility. Based on

4   University faculty experiences at the Seattle NARA facility, there is a common sentiment that

5   the value of the Seattle facility would best be measured by the importance of regional access

6   to the comprehensive collection of records when needed, and the importance of the

7   knowledgeable archivists with deep familiarity of the structure and content of the collections

8   to facilitate review and engagement. This is in contrast to the measurement of the amount of

9   time that researchers spend at the facility itself. Relocating the facility will disrupt these

10   essential values of the Seattle NARA facility and further challenge the cost-effective access to

11   these public records which are so important for understanding and communicating Pacific

12   Northwest history.

13

14   I declare under penalty of perjury that the foregoing is true and correct.

15

16   DATED this 5th day of January, 2021 at ___CORVALLIS___ , Oregon.
               day     month     year     city          state

17

18

19   ANNE-MARIE DEITERING

20

21

22

23

24

25

26

DECLARATION OF ANNE-MARIE
DEITERING
     4

ATTORNEY GENERAL OF OREGON
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
503-378-6002

063

1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF WASHINGTON**
7
    STATE OF WASHINGTON, et al.,              NO.
8
                        Plaintiff,            DECLARATION OF ROBERT DE
9                                             LOS ANGELES
            v.
10
    RUSSELL VOUGHT, et al.,
11
                        Defendants,
12
            I, Robert de los Angeles, declare as follows:
13
            1.      I have personal knowledge of the facts set forth in this declaration. I am over
14
    the age of 18 and competent to testify.
15
            2.      I am a member of the Snoqualmie Indian Tribe and have served as the duly-
16
    elected Chairman of the Snoqualmie Tribal Council since 2017. As Chairman, I am responsible
17
    for presiding over meetings of the Tribal Council and the General Council, representing the
18
    Tribe at official functions, and signing official contracts and other instruments of the Tribe
19
    after they are approved by the Tribal Council. Prior to serving as Chairman, I served on the
20
    Tribal Council.
21
            3.      The Snoqualmie Indian Tribe is a federally-recognized sovereign Indian tribe
22
    and signatory to the Treaty of Point Elliott of 1855 with reserved Treaty rights.
23
            4.      The Tribe's governmental offices are located at 9571 Ethan Wade Way SE,
24
    Snoqualmie, WA 98065. The Tribe operates pursuant to its Constitution as amended on June
25
26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**064**

1  24, 2006. The Snoqualmie Indian Reservation is located on lands held in trust by the United
2  States on behalf of the Tribe.

3      5.      In early 2020, I and the rest of the Snoqualmie Tribal Council learned of the
4  proposal to close the Seattle National Archives and relocate the facility outside of the Pacific
5  Northwest. The Tribe was not notified or consulted by any Federal agency or official prior to
6  the public announcement of the sale of the facility.

7      6.      The National Archives at Seattle houses a significant body of records relating
8  to the Snoqualmie Indian Tribe. The facility contains countless irreplaceable documents that
9  are of critical importance to the Tribe and expert historians that are retained by the Tribe to
10 assist with historical research. For example, the Archives contain a wealth of historical
11 information about the Snoqualmie people, including but not limited to records from the Tulalip
12 Agency (1861-1950), the Western Washington Agency of the Bureau of Indian Affairs (1950-
13 1975), and the Portland Area Office (1931-1970). The Archives also house drafts of Tribal
14 Treaties that are relevant to Snoqualmie.

15     7.      Snoqualmie regularly relies on the documents within the Archives for
16 enrollment purposes, to support certain legal endeavors (including ongoing litigation), and in
17 the Tribe's continuing effort to document its ethnohistory.

18     8.      Further, the majority of the Tribal records housed at the Seattle National
19 Archives are not digitized or otherwise available to be discovered or identified without in-
20 person research. Relocating the contents of the Archives facility from Seattle would create a
21 substantial barrier to accessing these important records.

22     9.      Closure and relocation of the Seattle National Archives would pose significant
23 challenges to Snoqualmie's ability to access critically important records, which would have a
24 profoundly negative impact on the Tribe. These records are our history, and they belong here
25 in Seattle.

26

DECLARATION OF ROBERT DE LOS          2          ATTORNEY GENERAL OF WASHINGTON
ANGELES                                             Complex Litigation Division
                                                    800 5th Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                    (206) 464-7744

065

1       I declare under penalty of perjury under the laws of the United States that the foregoing

2  is true and correct.

3

4  DATED this _4th_ day of January, 2021 at _____Snoqualmie_____, Washington.

5

6

7  ROBERT DE LOS ANGELES

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ROBERT DE LOS ANGELES      3      ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

066

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,                    NO.

               Plaintiff,            DECLARATION OF RHONDA J.
                                                FARRAR
     v.

RUSSELL VOUGHT, et al.,

               Defendants,

I, Rhonda J. Farrar, declare as follows:

1.      I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am a retiree and active as a volunteer in our community. I am an enrolled Tlingít tribal member, and daughter of a Chinese immigrant mother, whose name I found on a landed Seattle ship's log from 1923. She was only 5 years old when she and my grandmother arrived.

3.      Upon retirement in 2013 from UFCW 21, I began my search for my family historical records. My father was Tlingít and Chinese, and met and married my mother, Chinese, in Seattle where we lived.   My father, 2, had been removed from Alaska along with his sister, 4, after their Tlingít mother died. All my life I was led to believe I was fully Chinese. My father died fishing in 1965. I was 14. While in mourning, we were visited by some women from Alaska, but the full story was never shared with me. My mother kept secrets about her

DECLARATION OF RHONDA J.                    1            ATTORNEY GENERAL OF WASHINGTON
FARRAR                                                           Complex Litigation Division
                                                              800 5th Avenue, Suite 2000
                                                               Seattle, WA 98104-3188
                                                                  (206) 464-7744

**067**

1  family too. Only after her death, out of courtesy to her, did I start a serious search. Starting at
2  Seattle Public library, I was directed to the National Archives at Seattle.

3      4.     At the National Archives, I searched through decades of enrollment logs for the
4  Chemawa Indian Boarding School in Oregon. My father said he spent years at a boarding
5  school out of state. Painstaking search came up with nothing. Staff and volunteers assisted, but
6  found nothing. My focused attention caused the staff to ask me to become a volunteer with the
7  Chinese Exclusion Act (CEA) files, given my ancestry.

8      5.     I began volunteering at the National Archives in June 2014. During my twice
9  weekly 5hr. volunteer sessions we record data from each Chinese file. I came to understand
10 the hardships, cruelty, love stories, not only taking place in the U.S., but read about how life
11 was in China, and other parts of the world during tumultuous times. This is all important as
12 our shared history. Endearing photographs, ornate marriage certificates, beautifully written
13 Chinese letters, interrogation transcripts, sketches of houses and villages, passports, affidavits,
14 business inventories, price lists in menus, pamphlets of schools, report cards, enlistment,
15 employment, and incarceration records......priceless artifacts of the past.

16      6.     Papers so old, they are delicately lifted, edges straightened, or duplicated if the
17 faded worn piece isn't deemed likely to withstand more time shut away in its' folder, assigned
18 a number, category, a box, a shelf , in a cold dark atmospherically controlled room where it
19 may remain for more decades. With reverence and forlornment the thought I may be the last
20 to see the photos, the handwriting, read the story of that individual in that moment in time. But
21 I hope someone studying history, a family member searching to fill in the blanks sees that
22 every story is important and come upon clues that lead us to another path of discovery. If the
23 records move further away from those most likely to need them, this is contrary to the mission
24 statement of accessibility.

25      7.     Such a percentage of CEA files have names recorded incorrectly by U.S.
26 Immigration. Phonetically they tried, but many had multiple names as well due to marriage,

DECLARATION OF RHONDA J.           2          ATTORNEY GENERAL OF WASHINGTON
FARRAR                                            Complex Litigation Division
                                                   800 5th Avenue, Suite 2000
                                                   Seattle, WA 98104-3188
                                                   (206) 464-7744

1    aliases, childhood names, or other social norms. Impossible to locate without multiple
2    searches. Take my own father's files. In 2015, no records had been found. But assigned a box,
3    my job was just to enter names from each file onto the database we are compiling. The last file
4    seemed like a twisted up version of my father's name. I opened the file and looked. Tears came,
5    for I was staring into my father's face. He was 23, about to go volunteer in China with the
6    Chinese Air Force, and become a mechanic for the Flying Tigers. This was 2015, just before
7    Father's Day, 100 years since his birth, and 50 years since he had died. No one was able to link
8    this file to my father's known name. My discovery has been written about, and I've been asked
9    to recount the story many times. (See Seattle Times, 12/15/2018, and video, "We've got to
10   learn from that", by Daniel Beekman)

11        8.     The Tlingít tribal enrollment records from Alaska are formatted for some of the
12   years when the Alaska Native Claims Act came into being. My Aunt's 1967 enrollment
13   application is there at the Archives, along with a copy of her birth certificate and family tree
14   dating back to my great-great grandparents. Their Tlingít names and clans are also included.
15   The Seattle Times happened to be there to capture the moment of discovery. (NW section,
16   1/26/2020, "History Relocated", by Erik Lacitis)

17        9.     I was shocked when I learned the Federal Government had made plans to sell
18   the Archives building. No warning, no chance to give our input before the decision was made.
19   I sent emails to Gov. Jay Inslee, local tribal leaders, Senators John McCoy and Lisa
20   Murkowski, Rep. Adam Smith and Pramila Jayapal, educators in Washington and Alaska. I
21   spoke to reporters, reached out to my Tlingít community, friends, and Labor contacts I've
22   maintained since retiring from UFCW21 in 2013. On 1/28/2020 I submitted and received a
23   reply from emailago2@atg.wa.gov to the Government Compliance and Enforcement office in
24   Washington State, and continue receiving updates. On 2/11/2020 a number of us rallied at the
25   Archives entrance, also covered by news organizations during a closed meeting held with a
26   select number of Tribal representatives and Archive, and PBRB officials.

DECLARATION OF RHONDA J.       3       ATTORNEY GENERAL OF WASHINGTON
FARRAR                                         Complex Litigation Division
                                                   800 5th Avenue, Suite 2000
                                                   Seattle, WA 98104-3188
                                                     (206) 464-7744

**069**

1        10.     My father's file discovered in 2015 in Seattle identified a companion file with

2  additional information and possible birth record in California. I had a specific file #, so emailed

3  a request for a search. Nothing found. But weeks later, an email message about a find! An

4  archivist "on a hunch", had continued with a physical search for the misplaced file. Only due

5  to his diligence, I was able to order certified copies of the birth certificate 1915, Killisnoo,

6  Alaska. I had copies of the complete file mailed to me. My daughter and I were finally able to

7  complete our application for the Tlingít/Haida Council in Juneau for a panel review and

8  approval as enrolled Tlingít Tribal members! Yet another instance where ordering by a name

9  or even an identifying number did not come up with a find. It takes too often many months,

10  years of research, and pure luck to get to a find. Never could I have afforded the time and

11  expense to spend in a distant city. I want many more years to research and find links, and help

12  complete the cataloging of CEA files, as I turn 70 in February. As long as I'm able, I owe a

13  debt of gratitude to the National Archives for opening the door to my family history. Help us

14  keep our Seattle National Archives local so we can continue our work. The Seattle facility is

15  alive with knowledge and artifacts. We are lost without our history.

16        11.     Only a very small percent of Archival records are digitized. One CEA volunteer

17  has been at it for 20 years, just to methodically get the file names online so that others may be

18  able to locate important records. We have a dedicated 7 person volunteer group who read each

19  file, select identifying data which is entered into the database. It requires so many hours of

20  meticulous tedious sorting to prepare records to be scanned. As constant as the work continues,

21  it is doubtful even the CEA records, only a small portion of the types of documents housed in

22  Seattle, will be finished in my lifetime. That's with a crew of volunteers. Due to the nature -

23  size - condition of items, they cannot all be turned into digital form. The unique tangible

24  original documents carry so much value.

25        12.     I know my Tribal Relations, Haa Shuká, and Haa Shagóon remain alive within

26  these records. Intangibles cannot transfer to exist in a reprint. There is real value, richness in

DECLARATION OF RHONDA J.        4         ATTORNEY GENERAL OF WASHINGTON
FARRAR                                        Complex Litigation Division
                                                  800 5th Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                     (206) 464-7744

**070**

1    the touch, seeing, smelling, and hearing. Original Tribal records and treaties need to be
2    available as tribes continue to try and attain sovereignty. Words and nuances can be left out,
3    changed, or lost in transfer. I cannot imagine the Boldt Fishing Rights decision playing out
4    without our history to provide evidence.

5         13.    Research is required with any excavation, building, sale, to proceed by review
6    of geologic, historic, environmental, and legal concerns. Our recent celebration of the
7    Chittendon Locks, bridge structure, waterways and use of our Port system all started with local
8    research.

9         14.    A climber of Mt. Rainier 40 years ago visited one day while I was volunteering
10    at the National Archives. She wanted a look at and copy of the signed log page of all the
11    climbers who reached the summit on the same day she had. We were awestruck and elated
12    with her find. She got her picture taken beside the log book. We were honored to witness her
13    recollections of her climb, the beauty the summit had rewarded her with. It was there in her
14    eyes and in her words.

15         15.    As our history moves forward, we gain knowledge and compile more evidence
16    of our lives. Do not remove the records from our reach - to be divided and kept further away
17    from the very researchers, scientists, educators, Tribes, legal scholars, engineers, students, and
18    everyday people needing to confirm evidence of our existence. We learn from the richness of
19    our growth as well as the follies of our choices. We need to support a decision with a better
20    answer than removal of our roots from under us.

21    I declare under penalty of perjury that the foregoing is true and correct.

22

23    DATED this 1 day of January, 2021 at Kent, Washington.

24

25                  RHONDA J. FARRAR

26

DECLARATION OF RHONDA J.       5       ATTORNEY GENERAL OF WASHINGTON
FARRAR                            Complex Litigation Division
                                     800 5th Avenue, Suite 2000
                                     Seattle, WA 98104-3188
                                     (206) 464-7744

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ANDREW H. FISHER, PH.D. |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Dr. Andrew H. Fisher, declare as follows:

1.    I am an Associate Professor of History at the College of William & Mary in Williamsburg, Virginia. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a professional historian.

2.    I earned my B.A. (1988) in History from the University of Oregon and my Ph.D. (2003) in History from Arizona State University, which has a graduate program specializing in Native American history and the American West. My training there emphasized engagement with descendant communities and ethnohistorical methodology, broadly meaning the integration of critical theory, ethnographic study, oral history, and archival research to analyze Native American history from a more holistic perspective than that offered by conventional sources and methods. Currently, I am an associate professor of History at the College of William & Mary in Williamsburg, Virginia, where I teach undergraduate and graduate courses in American Indian history, U.S. history, environmental history, and the history of the American West. My instructional and service responsibilities within the History Department

**072**

1   include the supervision of graduate and undergraduate theses on topics in American Indian
2   history, American Studies, and modern U.S. history. I also sit on the Executive Committee of
3   the Environmental Science and Policy program, which I directed from 2012 to 2018, and on
4   the Advisory Committee for the Native Studies Minor. Since graduate school, my research and
5   scholarship have focused on the Indigenous peoples of the Pacific Northwest, and especially
6   on the history of the Yakama Nation. I now have close to 25 years of experience in the archives
7   and in the field. I have published more than 15 peer-reviewed articles on Mid-Columbia Indian
8   history and other topics in Native American history and the history of the Pacific Northwest. I
9   have also published a book, *Shadow Tribe: The Making of Columbia River Indian Identity*
10  (University of Washington Press, 2010), which won the Robert G. Athearn Prize from the
11  Western History Association for the best book on the 20th-century American West. Several of
12  my articles have also won awards from journals and professional associations, and I have
13  received research fellowships or grants from the American Philosophical Society, the Autry
14  Museum of the American West, the Charles Redd Center for the Study of the American West,
15  and the Center for Columbia River History.

16      3.      Historians rely on archives for the raw material of history. The documents held
17  in the Federal Archives and Records Center at Sand Point, and the knowledgeable archivists
18  who work there, enable scholars and other researchers to access the past attitudes and actions
19  of federal officials and the various individuals, organizations, and peoples in the Pacific
20  Northwest that have interacted with the US government. Especially in my chosen field, Native
21  American history, federal records are crucial to the work of historians because the US
22  government has overseen Indian affairs in the Pacific Northwest since the onset of American
23  colonization in the nineteenth century. The same is true for tribal researchers, attorneys, and
24  litigation support professionals who use federal records to advance their claims in court and in
25  dealings with federal agencies. I have used the records of the Seattle branch not only for
26

1  scholarly research projects, but also in depositions and reports as an expert witness for the
2  Yakama Nation.

3       4.      During the research for my dissertation and first book, between November 1999
4  and August 2006, I spent a cumulative total of several months at the Sand Point FARC. In
5  particular, I combed through the portions of Record Group 75 pertaining to the Yakima
6  Agency, the Warm Springs Agency, the Umatilla Agency, and the Portland Area Office of the
7  Bureau of Indian Affairs. My current book project also draws from Record Group 75,
8  specifically the records of the Yakima Agency and the Quinault Agency. I have also used
9  portions of Record Group 49 (General Land Office/Bureau of Land Management) and Record
10  Group 165 (War Department) in the Seattle branch of the National Archives, as well as federal
11  court records housed in the Records Center there. I would not have known about the latter if
12  not for the helpful advice of experienced archivists such as Joyce Justice and Susan Karren,
13  who had/have worked at that facility for decades and are intimately familiar with its holdings.
14  They know how these various federal agencies organized their records, how the collections
15  have been reorganized over the years, and where to focus a search in order to make the best
16  use of your time in the archives.

17       5.      That said, there is also great value in being able to sit and browse through boxes
18  and folders by hand. Many of the discoveries a historian makes in the archives are
19  serendipitous, as pieces of evidence crop up unexpectedly in folders where you would not
20  necessarily have looked for them, and you begin to develop a sense of patterns and of how
21  different parts of the collection relate to others. If you are physically present in the archives,
22  you can also go back and pull boxes you have already looked at when later discoveries shed
23  light on issues or links you had overlooked earlier. Online searches for digitized records simply
24  do not produce the same "big picture" of events—the same understanding of context and
25  connection—even if you can be reasonably confident that you are seeing everything in a given
26  collection. Some of the oversized items in the archives, such as plat books and maps, must be

1 opened up or spread out on a table for a researcher to examine them properly. In those
2 situations, and many others where questions come up, it is invaluable to have an archivist on
3 hand with the time and the knowledge to help clarify and interpret what you are seeing.

4     6.     Moreover, while working through a collection on site, individual researchers
5 can make their own, informed decisions about whether to take notes, snap digital pictures, or
6 make photocopies of particular documents, depending on their needs as well as how much time
7 and money they have to spend. Unless you know exactly what you are looking for and where
8 to find it in a given collection, it is neither effective nor financially feasible for most researchers
9 to request that large portions of the FARC's records be duplicated and sent to them remotely.
10 It would cost a fortune (not to mention consuming valuable personnel time at the National
11 Archives), and even then you would not be able to see everything in the haystack, thus
12 increasing the chances that you will miss the needles you are searching for. Especially at the
13 start of a new project, it is often the case that historians do not know precisely what they are
14 looking for, but they will know it when they see it.

15     7.     Historians depend on archives to preserve scattered pieces of the past, which
16 they retrieve, analyze, and assemble to create the narratives that we call history. In my primary
17 field, Native American history, Record Group 75 is crucial to many scholarly and community
18 research projects because the Office/Bureau of Indian Affairs has exercised immense power
19 over Native lives for more than two centuries. I could not have written my dissertation or
20 published my first book without easy access to the records stored at the Seattle FARC. Among
21 many other things, those documents detail the interactions of federal officials and Indian
22 nations in the Northwest since the mid-nineteenth century, including negotiations and
23 decisions concerning land claims, treaty rights, and tribal status. Record Group 75 also affords
24 precious glimpses of economic, social, and cultural conditions within Native communities as
25 they wrestled with the challenges posed by federal policies and non-Indian actions. Meeting
26 minutes, trial transcripts, correspondence, reports, and other documents generated or received

075

1  by the Northwest agencies of the BIA formed the core of my arguments in *Shadow Tribe* and
2  in multiple articles I have published based on that research.

3    8.    Federal records from Sand Point have also played a crucial role in my work as
4  an expert witness for the Yakama Nation. In 2019, I prepared an expert report and a rebuttal
5  report in the case of *Yakama Nation v. Klickitat County*, which involves a boundary dispute
6  and jurisdictional conflict rooted in the history of an area known as Tract D. I relied heavily
7  on council minutes, letters, maps, petitions, and survey reports from Record Group 49 and
8  Record Group 75, including documents that only exist at the Seattle branch of the National
9  Archives. These records underpin the Yakama Nation's long-standing claim that Tract D has
10 always been part of the reservation set aside for its exclusive use and occupation by the Yakama
11 Treaty of 1855. Without them, neither the Indian Claims Commission nor the trial judge would
12 likely have found in favor of the Yakama Nation, and some of the most important pieces of
13 evidence came from last-minute document pulls that only an archivist familiar with regional
14 records could have conducted effectively. Significantly, the whole issue originated with the
15 misplacement and misfiling of the original Treaty Map after federal commissioners sent it to
16 Washington, DC in 1855. It remained missing for 75 years, during which time disputed
17 boundaries and erroneous surveys allowed more than 100,000 acres of reservation land to slip
18 from the Yakama Nation's grasp. I point this out to underscore the fact that important
19 documents can indeed get lost in the shuffle when federal records are transferred and
20 reorganized, with potentially serious consequences for communities that hold a material stake
21 in the history such records preserve for our posterity.

22   9.    I learned of the proposed closure on January 16, 2020 through an article
23 on MyNorthwest.com, written by historian Feliks Banel, which a friend had posted on
24 Facebook. The article explained that the Public Buildings Reform Board (PBRB) had made
25 the decision without any significant input from affected constituencies or organizations such
26 as the American Historical Association (AHA). I was shocked to hear that the Office of

1    Management and Budget (OMB) would contemplate an action of this magnitude without first
2    giving historical professionals and the public a chance to hear the rationale and register their
3    opinions on the matter.

4          10.    Upon hearing the news, I immediately posted a message to the AHA Members
5    Forum to initiate a discussion and coordinate a response. I also sent emails to the PBRB and
6    the OMB to voice my objections to the proposed closure, which I then forwarded to my
7    congressional representative and senators to bring the issue to their attention. I never received
8    any replies from the federal government. My message to the AHA led to an invitation to
9    participate in a panel at the 2021 annual meeting (originally scheduled for Seattle in January
10   2021) concerning the proposed closure and its impact on the historical profession, but the
11   conference has been cancelled due to the COVID-19 pandemic. The panel has been
12   rescheduled for January 2022.

13         11.    As a scholar who has relied heavily on NARA-PAR branch records, I think the
14   ramifications of the proposed closure and transfer are wide-ranging and almost entirely
15   negative. Beyond the prolonged disruption to research while the records are moved and
16   reorganized (with potential for loss and misfiling of documents in the process), there would be
17   significant problems of access created by the splitting of federal records and archival materials
18   between Missouri and California, respectively. The transfer of records out of the region would
19   also significantly increase the costs of research for scholars, teachers, public historians,
20   attorneys, tribal citizens, and other constituents located in the Pacific Northwest, who are the
21   primary users of this branch. Digitization is not an acceptable solution in the short term and,
22   as explained above, does not replicate the experience of being able to examine the documents
23   on site.

24         12.    The groups most adversely affected would be those without the time and funds
25   to undertake long trips to Los Angeles and Kansas City, including many tribal researchers and
26   graduate students. My own dissertation research would have been virtually impossible to

1   complete in a timely way if I had been forced to travel to and stay in Los Angeles for weeks at
2   a stretch, at a time when I had no longer had funding from my university and had to find part-
3   time employment. Furthermore, the closure of the Seattle FARC could also cause serious loss
4   of institutional memory and local expertise if the branch archivists are laid off or refuse to
5   relocate, and the stewardship of NARA-PAR records is passed to the already overburdened
6   staffs of other facilities, who would initially be largely unfamiliar with those holdings. In my
7   experience as a researcher, the assistance and advice you receive from archivists at the National
8   Archives in Washington, DC, does not compare favorably to what you can expect at a local
9   branch.
10   I declare under penalty of perjury that the foregoing is true and correct.
11
12   DATED this 28 day of December, 2020 at Williamsburg , VA .
              day      month    year      city         state
13
14                              _Andy Fisher_
15                              ANDREW H. FISHER
16
17
18
19
20
21
22
23
24
25
26

Statement of Leonard Forsman
Chairman
The Suquamish Tribe

My recollections of using the Sand Point archives are from the early 1980s. I was hired as a researcher for the Suquamish Tribal Archives in 1981 while attending the University of Washington. This was during the development of the Suquamish Tribe's own photographic, document and oral history archive that led to the establishment of the Suquamish Museum.

I recall my early research as focusing on the boarding school experience of our elders. The United States Indian Agent forced most of our tribal children from 1900 to 1920 to attend the Tulalip Boarding School where much of their culture was stripped from them. This research was used for our interpretive museum exhibits and for a tribal history publication.

Other archives staff conducted research at Sand Point for our tribal land claims research. The collection proved invaluable to documenting the land policies of the Port Madison Indian Reservation that were part of the larger U.S. assimilation policy intended to cause the extinction of the Suquamish and other Puget Sound Tribes.

The Sand Point facility continues to be a critical resource for our Suquamish Tribal historians, biographers, genealogists, archeologists and archivists. In addition, the archives at Sandpoint continue to provide very important evidence of the Suquamish presence in its Usual and Accustomed fishing areas, and also the Tribe's trade network, our travels, our relatives, and our story.

Signature:

DocuSigned by:

_Leonard Forsman_

F19A5D9A5D7A4A4...

_____

Suquamish Tribal Chairman (2005-present)
LAAS Archaeologist/Anthropologist (1992-2003)
Suquamish Museum Director (1985-1990)
Suquamish Museum Research Assistant (1981-1984)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF RHONDA FOSTER |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Rhonda Foster, declare as follows:

1.      I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am an enrolled member of the Squaxin Island Tribe ("Squaxin"). I am also an employee of Squaxin and the Director of the Squaxin Island Tribe Cultural Resources Department. I have been director for 23 years.

3.      I and other members of the Squaxin Cultural Resource Department have accessed the records at the National Archives at Seattle on many occasions over the years. The records at the National archives at Seattle have been invaluable to Squaxin's ongoing work to preserve its culture and history.

4.      The Squaxin Cultural Resources Department anticipates applying for a Tribal Heritage Grant through the National Historic Preservation Act of 1966. The Tribal Heritage Grant is federal program aimed at conservation and preservation of tribal culture and traditions. The application process anticipates identification of important historic, cultural, and traditional

DECLARATION OF RHONDA FOSTER

SQUAXIN ISLAND LEGAL DEPARTMENT
3711 SE OLD OLYMPIC HWY
SHELTON, WA 98584
360.432.1771

**080**

1   places and resources for conservation and preservation.   Submitting a successful application
2   for such a federal program would almost certainly require one or more trips to the National
3   Archives.

4         5.      If the records at the National Archives were moved, this opportunity would
5   either be denied to Squaxin, or available only at greatly increased cost for travel and other
6   logistics.

7         I declare under penalty of perjury that the foregoing is true and correct.

9   DATED this 4th day of January 2021 at Shelton , Wash.
         day           month    year         city              state

12                                Rhonda Foster

SQUAXIN ISLAND LEGAL DEPARTMENT
3711 SE OLD OLYMPIC HWY
SHELTON, WA 98584
360.432.1771

**081**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF DONALD C. GENTRY |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Donald C. Gentry declare as follows:

1.      I am the Tribal Chairman of The Klamath Tribes. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I was first elected as Tribal Chairman in 2013, and have been serving the Tribes in that capacity since then, having been re-elected to that role in 2016 and 2019. As Chairman, I am the primary elected official of the Tribes, responsible for presiding over meetings of the Tribal Council and the General Council, overseeing Tribal administration, and being the main spokesperson for the Klamath Tribes. The General Council, comprised of all adult members of the Tribes, is the governing body of the Tribes, responsible for the overall direction of the Tribes, protection of Tribal rights, and the source of legislation and other law that governs the Tribes. The elected Tribal Council manages the day-to-day business of the Klamath Tribes, including oversight and general direction of Tribal Administration, Tribal Health, the Culture and Heritage Department, and other Tribal programs.

3.     Prior to serving as Tribal Chairman, I served a three year term as Tribal Vice Chair, and prior to that worked in a variety of capacities in the Tribes' Department of Natural Resources, whose main role is management and protection of the natural resources (water, fish, wildlife and plants) that are necessary to the exercise of the Tribes' Treaty-reserved rights.

4.     The Klamath Tribes, through its General Council and Tribal Council as well as its various departments have relied and continue to rely on access to the material in the National Archive in Seattle for general Tribal history and institutional knowledge as well as specific use for culture and heritage purposes, natural resources protection, and in the effort to restore the Tribes' federal recognition.

5.     The Klamath Tribes is a federally-recognized Indian tribe that has occupied the lands of South Central Oregon and Northern California since time immemorial. The Klamath Tribes, with a current enrollment of 5611 members, is comprised of three historical tribes: the Klamath Tribe, the Modoc Tribe, and the Yahooskin Band of Paiute Indians. The Klamath Tribes signed the Treaty of 1864 with the United States, ceding over 22 million acres of aboriginal territory and reserving approximately one million acres for a permanent homeland.

6.     In 1954, The Klamath Tribes were subjected to the ill-considered and destructive federal policy known as "termination", and for over thirty years were not recognized as an Indian tribe by the United States. As a result of termination, the Tribes' reservation was sold off, and the Tribes and Tribal members were denied the basic rights to which federally-recognized tribes are entitled, including services from the federal government for education, health care, social services, and natural resources protection.

7.     One aspect of termination involved loading the Bureau of Indian Affairs' Klamath Agency records into boxes and shipping them out to the National Archives in Seattle. Those records contain detailed and extremely important information regarding the institutions and daily lives of the Tribes and its members, particularly for the period from the signing of the Treaty to the date of termination.

1    8.    In 1986, after a decades' long effort, the Tribes succeeded in persuading

2    Congress to restore the Tribes' federal recognition.  The information contained in the National

3    Archives at Seattle was very critically important to the Tribes' successful effort at restoration.

4    That information (documents, recordings, etc.) was accessed and reviewed by Tribal leadership

5    and Tribal membership, and was relied upon to develop the case for restoring the Tribes'

6    federal recognition.

7    9.    Since restoration, the Tribes have been rebuilding their government, their

8    institutions, and their infrastructure.

9    10.    In doing so, the Tribes relied significantly and repeatedly on access to the

10   National Archives at Seattle for documents, photos, artifacts, audio recordings, and other items

11   of cultural and historical importance related to the Tribes' treaty-making, its history of federal-

12   tribal relations, and its reservation, as well as information collected from Tribal elders and

13   ancestors concerning Tribal culture, tradition and languages.  Further, that information has

14   continued to be relevant in reconstructing critical components of institutional, cultural, and

15   traditional infrastructure and knowledge necessary for the Tribes' post-restoration efforts. The

16   Tribal leadership, administration, and membership all rely on ready access to the National

17   Archives at Seattle for such information, access that will disappear if the facility and its

18   resources are moved.

19   11.    The amount of information in the Seattle Archives is overwhelming and we

20   have significant research left to do still. That information is pertinent to continuing our research

21   on and legal protection of our Tribal rights. As one key example, the Tribes have been involved

22   in a forty-plus years long effort to protect, affirm, and quantify its Treaty-reserved water rights.

23   That matter has involved repeated litigation in federal court (including two arguments up to

24   the Ninth Circuit Court of Appeals) and a decades-long state water rights adjudication (the

25   Klamath Basin Adjudication). These Treaty-reserved water rights are central to our ability to

26   hunt, fish, trap and gather on the lands of the terminated Klamath Reservation, since the water

rights support the habitat upon which fish, plant and wildlife species depend. Our staff and attorneys in these cases have spent weeks in the Archives researching historical documents related to land ownership and associated water rights. It remains critically important to the Tribes' ongoing efforts in the Klamath Basin Adjudication to continue to have access to those archival records. Moving the records would be prejudicial to the Tribes' ability to carry out such research for the future of the adjudication.

12. These records also have significant potential to help establish and verify our oral histories. Our Culture and Heritage Director Perry Chocktoot planned to go to the National Archives in Seattle in 2020 to continue research about old ceremonies to try to bring them back for our Tribal community. Due to the coronavirus outbreak, he has been unable to complete that trip. Moving the Archives would essentially prevent him or any other cultural programmers from accessing these materials due to the prohibitive costs of travel. Our way of life goes beyond just the physical world we live in and interact with, beyond our reservation, water, and natural resources. We need access to our songs and ceremonies to reconnect with our traditions, our ancestors, our way of life, and the world around us. We were forbidden from practicing many of our ceremonies in the 1800's by the federal government, and our Tribal children were sent off to boarding schools. In the boarding schools, the nuns severely and brutally punished any Native children who practiced traditional prayers, to the point where our peoples learned it was safer to hide these traditions than risk being beaten. As a result, we have lost access to many essential aspects of what it means to be Klamath, Modoc, and Yahooskin. We continue to practice prayer, but without a better understanding of what we used to practice, these prayers are more modern and assimilated — until we are able to re-establish our traditions, it is harder to properly connect with our world as our peoples had for generations. We have an opportunity to heal by having meaningful access to these resources. Taking away the Archives without any input from us is another familiar violence not unlike those inflicted in boarding schools and by assimilative policies.

13.     The Archives are very important to the Tribes' cultural restoration efforts, as we continue to need access to unique and one-of-a-kind cultural resources such as wax cylinder recordings from the late-19th and early-20th century that contain our original dances and songs. We are also aware that the Archives have videos and other literary documents depicting and describing our cultural traditions, many of which have been taken from us in the decades since our first contact with the United States. Our researchers have already discovered on these cylinders dances and singing in cadence which we believe are sweathouse or burial songs. From research into the matter, my understanding is that these wax cylinders are very delicate, and easily susceptible to damage due to mold, cracking, and degradation over time. We are concerned that the moving process could unnecessarily risk ruining these incredibly valuable and unique archival resources.

14.     Our Tribal leaders have felt slighted at the entire proposed closure process by the Archives. The Tribes should have been contacted before the decision was made to close the Archives and move our cultural patrimony, not as an afterthought. Our leaders participated in the August, 2020 consultation webinar, which was held _after_ the decision had already been made to move the National Archive in Seattle. Our expressions of concern and opposition were essentially irrelevant by that point, and our leaders felt completely ignored. We still have not received responses to our concerns. It is already difficult for our members and researchers to travel from our homelands in Southern Oregon, and moving the records to Southern California or Kansas City would effectively take away our ability to study our customs, languages, and traditions. We also remain concerned that records and artifacts may get damaged, destroyed, or lost in the move. Once these items are lost, they are lost forever. Our languages and traditions are therefore at risk of being lost forever, and our peoples deprived of them permanently. This is not a risk we will take lightly.

15.     We have learned inspiring stories of the strength and resilience of our peoples through our research and through our work with historians. These stories continue to remind

us of who we are and how we have fought assimilation and annihilation from first contact on—that is the fighting spirit of our people. Though the government has taken our shields and weapons, we will continue resisting with our words, our prayers, and our stories. We will not allow these to be taken as well. Relocating those documents, making them less accessible to the tribal people whose history the documents reveal, would be an unconscionable abuse piled onto the abuses of the past. Our members must continue to bring these traditions and documents back to our people. We share common ancestry with the people in historic photographs, and being able to connect to these ancestors is deeply emotional. All of our members have ancestors who went through this painful history and we the Klamath Tribes simply want to take back what is and always has been ours.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _28th_ day of _December 2020_ at _Klamath Falls_ _Oregon_.

_____
DONALD C. GENTRY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF QUILEUTE NATURAL RESOURCES |
| v. | DIRECTOR FRANK GEYER |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Frank Geyer, declare as follows:

1.      I am Director of Quileute Natural Resources, a department within the Quileute Tribe.  I am over the age of 18 and competent to testify.  I make this declaration based on my personal knowledge.

2.      I have worked for Quileute Natural Resources since 2002.

3.      The Quileute Tribe is a federally recognized Indian tribe and signatory tribe to the 1855 Treaty of Olympia.

4.      The Quileute Reservation is located at the mouth of the Quillayute River on the Olympic Peninsula of Western Washington, and the Tribe's ceded lands extend for hundreds of square miles, reaching the Olympic Mountains.

5.      Quileute Natural Resources oversees major endeavors of the Tribe involving its natural and cultural resources, including treaty rights litigation, historic preservation work, federal grant compliance, and compliance with federal laws—both within the Quileute Reservation and within the Tribe's ceded lands. In my work at Quileute Natural Resources, I

DECLARATION OF QUILEUTE
NATURAL RESOURCES DIRECTOR
FRANK GEYER

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

088

1    have worked on these matters and have personal knowledge of how the Quileute Tribe relies
2    upon the National Archives for various purposes.

3         6.    The Quileute Tribe has heavily relied upon, and will continue to heavily rely
4    upon, the Sand Point National Archives for numerous purposes. The Quileute Tribe has used
5    the Sand Point National Archives for research in connection with federal programs for
6    conservation, including:

7              a.   research in connection with litigation to protect the Quileute Tribe's treaty
8                   rights (funded in part by federal program dollars);

9              b.   research in connection with fulfilling its obligations under various federal
10                  grant programs directed at conservation, including an EPA-funded climate
11                  change study; and

12             c.   research necessary in order to comply with (and ensure that the United States
13                  as its trustee complies with) the conservation requirements of numerous
14                  federal laws, including but not limited to the National Historic Preservation
15                  Act and federal agency Preservation Act programs, the Archaeological
16                  Resources Protection Act, Native American Graves Protection and
17                  Repatriation Act, and the National Environmental Policy Act.

18        7.    My job requires me to be familiar with laws governing projects on Quileute
19    tribal lands or on lands where Quileute tribal resources are located. The National Historic
20    Preservation Act is a significant law that affects many of the projects the Tribe and the federal
21    government undertake in the Quileute Tribe's area of interest. Under the National Historic
22    Preservation Act, each federal agency is required to establish a "preservation program" for the
23    protection of historic property.

24        8.    Both the federal government and the Quileute Tribe have relied on the Sand
25    Point National Archives to complete the analyses required under Section 106 of the National
26    Historic Preservation Act for past projects.

DECLARATION OF QUILEUTE                    2               ATTORNEY GENERAL OF WASHINGTON
NATURAL RESOURCES DIRECTOR                                      Complex Litigation Division
FRANK GEYER                                                   800 5th Avenue, Suite 2000
                                                                Seattle, WA 98104-3188
                                                                    (206) 464-7744

089

1      9.     Archival research is necessary because Section 106 requires consideration of

2 cultural resources in the area of potential effects of a federal action. If the resource is

3 determined to be a historic property, additional work is required to comply with Section 106,

4 including consultation and mitigation alternatives. To complete this research, tribal employees

5 or contractors typically utilize the Sand Point Archives. This enables the Quileute Tribe to

6 evidence its historic use of the site and provide documentation regarding the site's significance

7 and potential archaeological contents. Federal agencies are also obligated to do the research

8 necessary to comply with applicable federal laws regarding projects on tribal land or on land

9 where cultural resources or artifacts are located.

10      10.    The Quileute Tribe's compliance with federal conservation program

11 requirements in carrying out these projects has therefore involved, and will continue to involve,

12 use of the Archives for research purposes.

13      11.    For example, in connection with a project the Tribe undertook to replace fish

14 barriers and resurface Thunder Road, the Quileute Tribe, in cooperation with the U.S.

15 Department of the Interior, Bureau of Indian Affairs, completed an Environmental Assessment

16 in 2016. A true and correct excerpt of the Environmental Assessment is attached hereto as

17 Exhibit A. Page 3-9 of Exhibit A reflects some of the typical analysis required to comply with

18 Section 106; here, the Bureau of Indian Affairs Archeologist "reviewed all documentation" to

19 determine whether cultural resources constituting historic properties would be adversely

20 affected by the implementation of the project, and the USDA was consulted to determine

21 whether significant archaeological or historic resources were known in the project area. In

22 addition to the archival research the federal government usually performs in making this

23 determination, it is the usual practice of Tribal employees and/or contractors to do independent

24 research to identify historic cultural resources that could potentially be affected by a project

25 such as this, and such research usually involves research at the Sand Point Archives.

26      12.    The Quileute Tribe frequently receives funding from federal conservation

DECLARATION OF QUILEUTE
NATURAL RESOURCES DIRECTOR
FRANK GEYER

3

**090**

1    programs for various projects in the Tribe's area of interest. For example, in 2016, the Quileute

2    Tribe used Environmental Protection Agency grant funding to commission climate change

3    research. A true and correct copy of the report is attached hereto as Exhibit B. Pages 36 and 44

4    of Exhibit B list multiple documents from the Sand Point Archives that were relied upon in

5    developing the report.

6          13.      The Quileute Tribe also received funding from a federal conservation program

7    in connection with a project to move the Tribe's reservation out of the tsunami zone (see Pub

8    L. 112-97, 126. Stat. 257). The Tribe and the Army Corps of Engineers received Tribal

9    Partnership Program funding to complete a cultural resources survey and other Section 106

10    work for this project. See Exhibit C, a true and correct excerpt of the Cultural Resources Survey

11    discussing funding sources. The Tribal Partnership Program is a federal program authorized

12    by Section 203 of the Water Resources Development Act that allows the Army Corps and

13    Indian tribes to study and determine the feasibility of water resources projects to benefit tribes

14    through various means, e.g., flood damage reduction, environmental restoration, and protection

15    and preservation of natural and cultural resources. (See

16    https://www.nws.usace.army.mil/Missions/Civil-Works/Programs-and-

17    Projects/Authorities/Tribal-Partnership-Program/.) As I stated above, it is the Tribe's usual

18    practice to research archival materials, including research at the Sand Point National Archives,

19    to comply with federal preservation programs, including Section 106 programs.

20          14.      The Quileute Tribe has also used federal programs for conservation in the form

21    of Indian Self-Determination and Education Assistance Act funding to preserve the Tribe's

22    treaty resources. For example, from 2013 through 2015, the Tribe's attorneys and expert

23    witnesses visited the Sand Point Archives multiple times to perform research and obtain crucial

24    evidence to defend the Tribe's treaty fishing rights in litigation that culminated in a 23-day

25    trial in 2015 in the Federal District Court for the Western District of Washington. Self-

26    Determination Act funds were used to pay for litigation costs. Numerous exhibits that were

DECLARATION OF QUILEUTE           4            ATTORNEY GENERAL OF WASHINGTON
NATURAL RESOURCES DIRECTOR                  Complex Litigation Division
FRANK GEYER                              800 5th Avenue, Suite 2000
                                           Seattle, WA 98104-3188
                                             (206) 464-7744

1  admitted at trial either came from the Sand Point Archives or were works that referenced

2  documents from the Sand Point Archives, including but not limited to Exhibits 3, 22, 57, 74,

3  233, 255, B100, and B309.

4        15.     In the coming decade, the Quileute Tribe intends to continue to use the Archives

5  for research in connection with federal programs for conservation, including in connection

6  with a National Park Service Tribal Heritage Grant to develop a cultural and language center

7  to protect Quileute culture, with treaty rights-related litigation, and with numerous projects

8  requiring compliance with federal preservation programs and/or funded by federal grant

9  programs for conservation.

10        16.     Based on its past experience, the Quileute Tribe anticipates that it will need

11  continual physical access to the Sand Point archival records indefinitely, or at least until all

12  such records are digitized, in order to comply with federal conservation program requirements.

13        17.     No federal agency or federal government representative contacted the Tribe in

14  connection with the federal government's decision to sell the National Archives at Seattle.

15        18.     The Quileute Tribe lacks the financial resources to access these records if they

16  are moved out of the Pacific Northwest. Thus, relocation of the Sandpoint Archive records

17  away from the Northwest will make it extremely difficult, if not impossible, for the Quileute

18  Tribe to access the records its needs for these crucial federal programs and for tribal cultural

19  preservation. This will cause irreparable damage to the Tribe, both in the form of increased

20  costs of accessing the records and in the cultural harm caused when the Tribe is unable to

21  participate in these programs due to the prohibitive cost of accessing archival records.

22  I declare under penalty of perjury that the foregoing is true and correct.

23

24  DATED this 4th day of January 2021 at La Push, Washington.

25

26  Frank Geyer

DECLARATION OF QUILEUTE         5         ATTORNEY GENERAL OF WASHINGTON
NATURAL RESOURCES DIRECTOR               Complex Litigation Division
FRANK GEYER                           800 5th Avenue, Suite 2000
                                     Seattle, WA 98104-3188
                                     (206) 464-7744

092

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

STATE OF WASHINGTON, et al.,      NO.

8

          Plaintiff,      DECLARATION OF

9

     v.      J. PENNELOPE GOFORTH

10

RUSSELL VOUGHT, et al.,

11

          Defendants,

12      I, J. Pennelope Goforth, declare as follows:

13      1.      I am an independent scholar and researcher of Alaska history. I earned a

14 Bachelor of Arts from The Evergreen State College in 1976, and a Master of Science from

15 New York University in 1996. I am over the age of 18 and competent to testify. I make this

16 declaration based on my personal knowledge.

17      2.      I am a board member of the Alaska State Historical Society and the Cook Inlet

18 Historical Society as well as a long-time member of the Pacific Northwest Historians Guild

19 and the Puget Sound Maritime Historical Society. I served as the editor for numerous Alaska

20 Department of Labor and Workforce Development publications, including *Alaska Economic*

21 *Trends*. A former journalist and photographer for Washington and Alaska fisheries

22 newspapers, I now write about the maritime history of Alaska for a variety of publications and

23 conduct research for public and private groups and individuals. As part of my research and

24 writing about the Alaska Commercial Company (Alaska's oldest business) I facilitated the

25 company donation of historical materials to both the University of Alaska Elmer E. Rasmussen

26 Library (at Fairbanks, Alaska) and the Pacific and Alaska Region National Archives and

DECLARATION OF J. Pennelope Goforth      1      ERROR! AUTOTEXT ENTRY NOT DEFINED.

**093**

1  Records Administration (then located in Anchorage, Alaska). I was listed as an independent
2  researcher on the Pacific Alaska Region NARA researchers listing online.

3        3.      Some of the historical Alaska Commercial Company documents that I
4  facilitated the return of to NARA in 2012 were U.S. Customs records kept in ACC St Michael
5  Alaska office in 1870s and 80s; these rare bound into oversize volumes chronicle the arrival
6  and departure of a variety of vessels that had to report departures and arrivals, cargos, captains,
7  tonnage, etc., to the Customs Officers. They are invaluable in pinpointing the movement of
8  vessels, and people, and goods in Alaskan waters during the early history of state. They are not
9  digitized nor copied nor saved anywhere else. When NARA moved Alaska federal records to
10 the Seattle depository, they became inaccessible from Alaska. One example of the rich history
11 of Alaska (which has been under federal purview for most of the time) and unlikely to be
12 digitized are the logbooks and ships' articles of vessels held in trust at the Seattle facility. In
13 the 1990s I spent many hours in the san Point building poring over the articles of the Steamer
14 DORA for a book I was writing. These oversized logs and original articles do not lend
15 themselves to digitization or even microfilming.  of many of the ships that made Alaska history.
16 Of interest to me in doing maritime research are the following Record Groups:   22, Fish and
17 Wildlife Service; 26, Coast Guard; 27, Weather Bureau; 29 Bureau of the Census; 36 Customs
18 Service; 41 Marine Inspection and Navigation; 56, Department of the Treasury; 79 Park
19 Service; 80, Department of the Navy; 95, Forest Service; 111, Chief Signal Officer; 126, Office
20 of Territories; 181, Naval Districts and Shore Establishments; 237, Federal Aviation
21 Administration;370, National Oceanic and Atmospheric Administration; PIM, Pribilof Island
22 Program Materials.

23       4.      As described above, I used this research to write books, respond to requests for
24 information about maritime Alaska, contribute scholarly articles to historic conferences and
25 societies, and write papers for grants. One of the projects that depended on verifiable historic
26 data was a grant from the National Endowment for Humanities through the Alaska Humanities

DECLARATION OF J. Pennelope Goforth        2        ERROR! AUTOTEXT ENTRY NOT DEFINED.

094

Forum; another grant through the Alaska Historical Commission; many articles and blog posts for the Alaska Historical Society, the Cook Inlet Historical Society and the Puget Sound Maritime Historical Society. This shipping data is unobtainable from anywhere else as only the federal government tracked marine transportation in the early years of Alaska history.

5. One example of the uses I made of NARA holdings on Alaska history was for the history of Ship Creek and the Port of Anchorage property in preparation for the centennial of Alaska, publication of material in advance of the arrival of the USS ANCHORAGE both funded in part by federal dollars. Other uses include documenting conservation of previously owned federal properties for historical renovation of preservation with state and federal funding, including ports and harbors in Dutch Harbor, Unalaska, Kodiak, Seward, Hope, Dillingham, and Naknek to name a few.

6. I first heard of the dismantling of NARA in 2014 when, without any public input, the Pacific Alaska Region facility was closed despite a great public outcry from historians, researchers, students and others who used the Anchorage facility, in person and by mail, to document Alaska history for programs and projects that required federally collected data and materials. Working with our local historical societies, school districts and congressional delegation we tried mightily but ultimately failed to keep Alaska history accessible to Alaskans and within the state. The news was barely in January of that year and by April the deal was done; Alaskans had no time to really fight this. It was a repeat of the same situation in late 2019 when I read in the Seattle newspaper that again NARA was suddenly, and without community foreknowledge or input, was closing the Sand Point NARA facility. In January of 2020, the Alaska Historical Society Advocacy Committee, which I served on, immediately went into action contacting NARA, Congressman Don Young, Senator Lisa Murkowski, Lt. Governor Kevin Meyer and many of my personal historical colleagues in Washington, Oregon and Idaho to try to find out what was going on and how we could marshal our resources to prevent another great loss of our treasured federal history. It seemed

DECLARATION OF J. Pennelope Goforth                3                ERROR! AUTOTEXT ENTRY NOT DEFINED.

095

unbelievable that with only about 12 repositories in the nation, the Pacific Northwest (with all the Alaska material) should be shut out of accessibility to such a monumental amount of historical data. The Alaska Historical Society convened a 4-state meeting of our historical societies; we all provided letters and protests to our congressional delegations who, within weeks, formed a bi-partisan bi-cameral response requesting FASTA (which made this absurd recommendation), NARA (which abdicated its mission to hold our history in trust and accessible to citizens) and the Office of Management and Budget (which approved this move with no input from anyone in the Pacific Northwest states) to 'reconsider and reverse' that decision. The Alaska Historical Society and Museums Alaska issued a joint resolution opposing the closure by March of 2020 backed up by hundreds of Alaskans; letters to editor and informational articles were written and published. We spent hours just figuring out what FASTA was and how did they come to this decision with no public input. We emailed the members of FASTA and never received any responses. Only OMB and NARA responded, and only then to our senators and congresspeople. As far I know, no individual in Alaska received any response to our requests for information. Then the pandemic struck and although opposition remained high, things seemed at a standstill until, a few days ago in late December, when I read in the Seattle media that the Washington State Attorney General was taking continued and legal action.

    7.    The harm Alaskans will suffer if the records housed at the National Archives facility are moved out of Seattle/out of the Pacific Northwest is inestimable: lack of access to our federally documented records is already a huge issue. Accessibility and cost are the two main impediments however, what is the true cost of removing access to history for thousands of students and educators? How can you put a cost on ***not knowing*** your own history? Alaskans now have to fly to Seattle and put up in a hotel to get access to data that is not digitized and available online. The digital 'revolution' was supposed to appease Alaskans when the material was moved out of our reach nearly seven years ago. Promises by NARA to digitize the bulk of

DECLARATION OF J. Pennelope Goforth          4          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**096**

the material never occurred on the scale we were led to believe would happen. While several hundred cubic feet of federal records were given to the state archives, much of this was the Alaska Railroad documentation which was held by NARA only as long as they remained in Alaska. Some court records and a few other record groups were also given to the state, but the bulk of Alaska federal history is now at Sand Point. One example of the effects of this seismic removal of access to federal records that comprise our history is the damage this will do our education system. For years, the National History Day competition, Alaska History Day administered by the Alaska Humanities Forum out of Anchorage, has been a popular statewide competition for middle and high schoolers who research and make a presentation on some theme of history. Students learn how to research and where to look for facts and data. Without NARA in Anchorage, and now the potential of no NARA in the Pacific Northwest, how can we expect to adequately provide our students with the knowledge they need to understand their own history? Funded in part through the National Endowment for the Humanities, removing this source of federal information from students undermines the educational aims of the program.  To me personally, having restored valuable maritime history to NARA only to have snatched away, ***not once but twice***, is just about a death knell to my ability to write factual Alaska maritime history. For an independent scholar like myself, already the transportation cost of research is pretty much out of reach. Flying to Seattle and staying in a cheap B&B in the U District is one thing. Flying and/or driving another few thousand miles to Southern California? That's just not within range for me or most other serious Alaskan researchers and scholars.

 I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of January, 2021 at Anchorage, Alaska.

J. Pennelope Goforth

DECLARATION OF J. Pennelope Goforth          5          ERROR! AUTOTEXT ENTRY NOT DEFINED.

097

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

              Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

              Defendants,

NO.

DECLARATION OF DAWN
GOMEZ

I, Dawn Gomez, declare as follows:

1.      I am the Chairwoman of the Hoh Tribe, a federally recognized Indian tribe. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I was elected as Tribal Chairwoman in 2019 and have served on the Tribal Council since 2016. I previously served on the Tribal Council as a Council member and Vice Chairwoman. I am responsible for representing the Tribe in all governmental and policy matters. I have been intimately involved in the Tribe's litigation in seeking treaty rights and in protecting and advancing the Tribe's sovereign status.

3.      The Hoh Tribe is organized under a tribal constitution adopted pursuant to Section 16 of the Indian Reorganization Act. The Hoh Tribe was a signatory tribe to the 1855 Treaty of Olympia. The Tribe's aboriginal territory includes the entire watershed of the Hoh River, and the ocean waters off the Olympic Peninsula of Western Washington. In our language, we are the Chalá-at: –the People of the Hoh River. After signing the treaty of

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

Olympia, we moved to a reservation at the mouth of the Hoh River. Our tribal offices are

2

located on the Hoh Reservation.

3

4.      The records present in the Sandpoint Archives have been critical to the Hoh

4

Tribe in our efforts to protect our treaty hunting and fishing rights. These records document

5

in detail the Hoh Tribe's history, existence and movement as documented by the federal

6

government in reports, correspondence, actions and decisions. The records include both local

7

Indian agent and Indian superintendent documentation as well as correspondence and

8

documentation from upper levels of the Department of Interior and other federal agencies.

9

These records have been accessed by the Hoh Tribe's Natural Resources Department to

10

assemble a history of the Hoh Tribe, and have been accessed and used by consultants

11

retained by the Tribe, including but not limited to historians, anthropologists and others

12

investigating the Tribe's history and writing reports supporting the Tribe's legal efforts.

13

The Tribe is working on establishing a tribal Historic Preservation Office and will need to

14

access records in the Sandpoint Archives as part of its development.

15

5.      In addition to supporting our legal efforts, historians working for the Hoh

16

Tribe have accessed the records at the Sandpoint Archives on the tribe. The historical

17

research has been helpful to educate our members and surrounding communities about the

18

Tribe and our interactions with early explorers, other Indian people, and federal authorities

19

among others.

20

6.      The Hoh Tribe is a small tribe and we do not have a large reservation. The

21

Tribe has limited resources available for ongoing research of our history. The Sandpoint

22

Archives have been an important resource that we can easily access with only a four- or five-

23

hour drive from Hoh River to Seattle.

24

7.      The Hoh Tribe first learned of the impending closure of the Sandpoint

25

Archive and the moving of the records located there back East in the news media and from

26

DECLARATION OF DAWN GOMEZ                    2                ATTORNEY GENERAL OF WASHINGTON
                                                                         Complex Litigation Division
                                                                         800 5th Avenue, Suite 2000
                                                                         Seattle, WA 98104-3188
                                                                         (206) 464-7744

099

1    other tribes. No federal agency or federal government representative contacted the Tribe in
2    connection with the federal government's decision to sell the National Archives at Seattle, or
3    consulted our Tribe about the negative, deleterious impact closure would have on our Tribe.

4        8.      Closure of the Sandpoint Archive will have a significant adverse impact on
5    the Hoh Tribe and its ongoing efforts to protect our treaty rights, and to protect its legal rights
6    and status from infringement by nearby tribes. Family histories and genealogies are an
7    important part of the Archives and the Tribe accesses those records to investigate applicants
8    for eligibility for tribal membership. The Hoh Tribe is a small tribe with limited economic
9    development opportunities due to our location on the Olympic Peninsula, and the Tribe lacks
10   the financial resources to access these records on a necessary basis if they are moved out of
11   the Pacific Northwest. Relocation of the Sandpoint Archive records away from the Northwest
12   United States will significantly impact the Tribe's ability to protect and advocate its legal
13   status and rights.

14       I declare under penalty of perjury that the foregoing is true and correct.

15

16   DATED   this 30 day  of  December, 2020 at  Forks, Wa
                                                    12:48pm.
17        _____.
          day         month      year          city              state
18

19
                                      _____
20                                    Dawn Gomez
21

22

23

24

25

26

DECLARATION OF DAWN GOMEZ            3            ATTORNEY GENERAL OF WASHINGTON
                                                  Complex Litigation Division
                                                  800 5th Avenue, Suite 2000
                                                  Seattle, WA 98104-3188
                                                  (206) 464-7744

**100**



# UNIVERSITY OF WASHINGTON

DEPARTMENT OF HISTORY

December 31, 2010

Attorney General of Washington
Complex Litigation Division
800 Fifth Ave, Suite 2000
Seattle, WA 98104

RE: National Archives

Dear Attorney General Robert Ferguson:

I am a professor of history at the University of Washington and I am writing to explain why the proposed closure of the National Archives and Record Center in Seattle will have a seriously detrimental impact on my research and teaching and on the needs of students and of the broader population of this region. I have been a member of the faculty at the University of Washington for twenty-seven years and much of my research and teaching focuses on the history of the Pacific Northwest. In addition, I direct the *Civil Rights and Labor History Consortium* at the University of Washington. This is a massive collection of online historical resources (articles, maps, videos, etc) largely focused on the Pacific Northwest and widely used by scholars, students, and the public.

I have used NARA collections in researching some of my academic books and articles. A number of my students, both graduate and undergraduate, have relied upon NARA collections as they researched papers, dissertations, and articles for the *Civil Rights and Labor History Consortium* projects. I am not able to account for all of the work that my students and I have done at the archives, but I believe that it involves at least seven record groups:

- RG 79: National Park Service
- RG 147: Alien and Japanese Registration Forms
- RG 26: Coast Guard Records
- RG 80: Records of the Todd Corporation
- RG 80: Labor Cost Summary
- RG 32: Records of the Shipping Board
- RG 202: National War Labor Board
- Records of Naval Intelligence

The proposed closure of NARA's Seattle location will have lasting consequences for many communities and institutions in the Pacific Northwest. The University of Washington is among them. This will damage the research capacity of the university. It will damage the ability of

students to engage in original research projects. It will damage the ability of historians like myself to discover and explore new aspects of the history of this region.

Sincerely,

James N. Gregory
Williams Family Endowed Professor of History
Professor, Department of History

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF GABRIANN HALL |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Gabriann Hall, declare as follows:

1.      I am an enrolled member of the Klamath Tribes. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have a master's degree in Interdisciplinary Studies (Ethnic Studies, Education & History) from Oregon State University as well as a Master of Arts in Teaching.

3.      I used the Seattle Archives to conduct research related to my master's degree on the Indian New Deal and its impacts on Native tribes throughout the Pacific Northwest. I research documents specific to the Indian branches of the Civilian Conservation Corps (CCC) and Works Project Administration, Indian Reorganization Act, Johnson-O'Malley Act, and Indian Arts and Crafts Act.

4.      Through my research I was able to locate a specific logging project under the Indian CCC that took place on the Klamath Reservation.  By manually flipping through documents, I was able to find that there had been an unsuccessful project related to a timber harvest on the reservation. This was not something I knew to look for so do not believe I would

1 | have found it in a specific online records search. I happened upon it by flipping through
2 | somewhat unrelated records. What took place was that an Indian CCC crew was ordered to go
3 | harvest timber on the reservation that had "beetle rot". However, there was no training of the
4 | CCC team or supervision so they incorrectly harvested healthy trees, costing the tribe money
5 | as well as leading to a clear-cut in what could have been a sustainable use logging operation.
6 | There were multiple black and white photos as exhibits to this research that upon photo coping
7 | did not turn out. This is just one example of information I do not believe I would have come
8 | across in a digital search nor am I confident that the photos could be reproduced in comparable
9 | clarity and quality. It was this specific line of research that led me to focusing on the Klamath
10 | Tribe's records. There is a power and connection in physically touching the documents that
11 | your ancestors who are no longer here have touched and that cannot be duplicated in the online
12 | environment.

13 | 5. After, learning about the CCC incident on the Klamath Reservation I was
14 | quickly distracted from my original research topic by all the boxes of information related to
15 | my Tribe. I had no clue what a powerful experience it would be to hold some of the original
16 | Klamath Tribal roll sheets in my hands. To see names I had only heard of written out or even
17 | an "X" for those who did not read or write English was a powerful experience. Even more
18 | overwhelming for me was seeing my Grandmother Marilynn Hall's handwritten Tribal Council
19 | notes from her time as Tribal Secretary. The whole time I reviewed the records, all I wanted
20 | to do was share the experience with my family members, knowing how much it would mean
21 | to them. A move of the Archives to an even more distant location would make this much less
22 | possible. Many Native people do not possess the financial means to travel a long distance to
23 | see these important records.

24 | 6. As a history teacher, I know these primary documents are instrumental in
25 | researching and writing Klamath Tribal history in compliance with Oregon Senate Bill 13
26 | Tribal History/Shared History project. It is our story and family legacy housed in these

1    archives. To us, they are not just boxes of historical records but the handwritten stories of our
2    grandmothers and other family members.

3        7.    The relocation of the Archives away from the Pacific Northwest would be
4    equivalent to someone removing a sacred photo album that has been passed down through
5    generations from one's home. It does not mean that the family photo album would not be safe,
6    but it would no longer be accessible to enjoy and share among the family. The chance to come
7    together and look at the album and hear stories and learn collectively would be lost. These
8    records hold the same value and connection that an heirloom album holds, and as Indian people
9    who have faced a direct assault on our history we rely on these connections to the past as
10   examples of perseverance and strength. These archives hold the history of our ancestors and
11   all of those who have come before us; to sever this link would be devastating.

12       Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the
13   United States of America that the foregoing is true and correct. Executed on this _28_ day of
14   _November_, _2020_ at _Bend_, _Oregon_.

                                          GABRIANN HALL

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF CECILE HANSEN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Cecile Hansen, declare as follows:

1.      I am the chairwoman of the Duwamish Tribe. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been the chairwoman of the Duwamish Tribe since 1975. As chairwoman, I am responsible for representing the interests of the Duwamish Tribe before state, local, and federal agencies. The Duwamish Tribe is the present day political organization of the dxʷdəwʔabš or "The People of the Inside," i.e., the Duwamish Tribe that is a party to the Treaty of Point Elliot, signed January 22, 1855. The Duwamish Tribe consists of over 600 members who are descendants of the original signatories to the Treaty of Point Elliott. We are a distinctive aboriginal Native American Indian group that has resided in the area of the Puget Sound since time immemorial. Washington State's largest city—Seattle—is named for Chief Si'ahl, the leader of the Duwamish Tribe and first signatory to the Treaty of Point Elliott. As such, the history of the Duwamish Tribe is enmeshed with the history of the present-day City of Seattle. Yet despite the international standing and economic success of the City of Seattle,

DECLARATION OF CECILE HANSEN          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**106**

the sacrifices and existence of its native people, the Duwamish, have long been trivialized, ignored, or overlooked.



**Chief Si'ahl**

3.     The Duwamish Tribe has fought tirelessly for over forty years to be heard and recognized. We continue to resist the erasure of our history and seek to hold the U.S. government to its treaty promises to Chief Si'ahl and to the Duwamish Tribe. We continue in our struggle to confirm the Tribe's status as a federally-recognized Indian Tribe. Direct access to physical records at the National Archives at Seattle has been, and continues to be, critical and invaluable to the Duwamish in our struggle for recognition. The National Archives contain documents relating to the early state and pre-state history for the Puget Sound area, including genealogical, anthropological, and historical studies of Washington tribes and, in particular,

1  the Duwamish Tribe. These records can be found nowhere else. I have personally visited the
2  archives seeking records on several occasions.

3    4.    The Duwamish Tribe has used records obtained from the National Archives to
4  support its petition for federal recognition. Our pursuit of federal recognition has been a
5  frustratingly complex and bureaucratic process, with successive administrations each
6  demanding a different quantum of proof of the Duwamish's existence. While we have obtained
7  some of what we need from the National Archives, as the administration changes yet again,
8  we know that we will require additional evidence presently housed in the National Archives at
9  Seattle. Records currently located in the National Archives, but not yet reviewed by the Tribe,
10  offer critical evidence to finally convince the U.S. government to recognize our existence, here
11  in the city that bears our ancestor's name. I have been informed that members of the Tribe have
12  pending requests for records from the National Archives, specifically for archived physical
13  records that have not yet been digitized. If the records are moved, we may lose forever the
14  ability to hold the U.S. government to its promises contained in the Treaty of Point Elliott.

15    5.    The federal government has never contacted the Duwamish Tribe regarding the
16  preservation of historical records evidencing the history of the Duwamish.

17    6.    No federal agency or federal governmental representative contacted the
18  Duwamish Tribe in connection with the federal government's decision to sell the National
19  Archives at Seattle.

20    7.    If the National Archives at Seattle are moved out of state, the Duwamish will
21  be harmed in our efforts to gain federal recognition and enforce the promises contained in the
22  Treaty of Point Elliott. While the Duwamish have existed since well before the arrival of white
23  settlers, our existence in fact has been insufficient to convince the federal government to honor
24  its treaty obligations. We require the documents and evidence housed at the National Archives
25  to support our claim for federal recognition. We are involved in current and ongoing litigation
26  on this issue and have limited funds with which to pursue extensive and costly research far

DECLARATION OF CECILE HANSEN                3                ERROR! AUTOTEXT ENTRY NOT DEFINED.

108

from home. The additional costs imposed by out-of-state travel to perform research would likely be more than the Duwamish Tribe could accommodate. As such, moving the National Archives to Kansas or California will create an incredible hardship for the Duwamish Tribe in its struggle for recognition, above and beyond the hardships we have already endured. Additionally, moving the National Archives will deprive Duwamish tribal members of the ability to research and preserve their own history, further accelerating the destruction of Duwamish tribal history that began well over one hundred years ago with the expulsion of the Duwamish from what is now the City of Seattle.



**Sia'b Suquardle's camp on the Duwamish River circa post-Treaty. After the signing of the Treaty of Point Elliot, Suquardle's and some 90 other longhouses would be burned to the ground and the Duwamish were forbidden to live within the city limits**

DECLARATION OF CECILE HANSEN      4      ERROR! AUTOTEXT ENTRY NOT DEFINED.

**109**

1  I declare under penalty of perjury that the foregoing is true and correct.

2

3  DATED this ___ day of __January__ 2021 at __Seattle__, __WASH__.
       day         month    year        city              state

4

5                              _Cecile Hansen_

6                              Cecile Hansen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CECILE HANSEN          5          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**110**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

              Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

              Defendants,

NO.

DECLARATION OF
ALEXANDRA HARMON

I, Alexandra Harmon, declare as follows:

1.      I am professor emerita of American Indian Studies and History at the University of Washington, Seattle. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a historian.

2.      I received a PhD degree in history from the University of Washington in 1995 and have since had a faculty position in the American Indian Studies department. I have also been an adjunct professor in the history department, where I served until recently as the depa.tment's sole mentor and dissertation director for graduate students completing a field in history of Indigenous peoples of North America. I retired from full-time teaching in 2015 and ceased to teach part time in 2018, but I continue to mentor a graduate student, participate in other professional activities, and engage in research both for possible publication and for memoranda providing historical information to the Washington chapter of the Nature Conservancy.

3. I am the author of three books and the editor of a fourth book, all of which concern American Indian history and focus wholly or in part on Indians in the Pacific Northwest. My most recent book, *Reclaiming the Reservation*, received the Western History As.ociation's Robert G. Athearn Award for the best book of 2019 about the twentieth-century American West. My first book, *Indians in the Making*, published in 1998, was the first wide-ranging scholarly history of Indian/non-Indian relations in what is now western Washington State and remains the only such book.

4. From 1972 through 1989, with a Juris Doctor degree from Yale Law School, I worked as an attorney in western Washington, and for fifteen of those years, my clients were Indians – almost exclusively tribal governments – in Washington State.

5. For me as for many historians, original documents and other items housed in public archives are the most common and often the most important sources of information about the past that we aim to describe and analyze in books, journal articles, other publications, or lectures. In all my work as a history scholar and teacher, I have relied specifically and heavily on records from the National Archives in Seattle to uncover and write accurate, little-known accounts of Indians in the Pacific Northwest, their relations with the U.S. government, and their relations with other people in the region.

6. For history graduate students, writing a book-length dissertation based on original research is a condition of earning a history PhD degree, and for those whose dissertations concern the history of Indigenous American peoples, research in National Archives is indispensable. All of my students have done at least some of that research at the National Archives branch in Seattle.

7. Furthermore, I have made valuable use of the federal archives in Seattle for my undergraduate teaching. In an introductory research methods course, I brought students to the Seattle facility, where they heard presentations by staff archivists and had an opportunity to see and touch original documents such as handwritten letters by Indians and Indian school

DECLARATION OF ALEXANDRA HARMON 2 ERROR! AUTOTEXT ENTRY NOT DEFINED.

112

records. Many were thus motivated to do research for their individual projects there, an experience that not only gave them the satisfaction of discovering and evaluating evidence available nowhere else but also developed problem-solving skills that are applicable in other realms of life.

8.      In my previous work as an attorney and for my Indian clients, federal records at the Seattle NARA facility have provided essential evidence in support of legal claims or other tribal government objectives and at times have yielded answers to questions arising in the management of tribal community resources, such as the legal status of roads or property or the history of land use and governance.

9.      For my research at the National Archives . research on which I based my PhD dissertation, three books, and parts of a manuscript history commissioned by the Confederated Tribes of the Colville Reservation – I have made especially extensive use of Record Group 75, Records of the Bureau of Indian Affairs. At the National Archives in Seattle, that record group includes the records of several local Bureau agencies and the Portland Area Office, which hold many hundreds of feet of original documents not available at any other National Archive facility, at non-federal repositories, or in alternative form such as photocopies or digitized copies.

10.      Other materials essential for my reconstruction of Indian/non-Indian relations in the Northwest have been in Record Group 21, Records of the United States Circuit Court, in microfilms of Indian Census Rolls and Inspections of Field Jurisdictions, and particularly in a microfilm of Indian Applications for Enrollment and Allotment that were unique to the western Washington region.

11.      In most cases, the thorough, careful archival research that my graduate students and I have undertaken required weeks of full-time effort to complete. Once writing or other research was underway, follow-up visits to those archives have often been necessary as well.

DECLARATION OF ALEXANDRA HARMON                    3                    ERROR! AUTOTEXT ENTRY NOT DEFINED.

113

1      12.    The University of Washington history department, like humanities programs in

2 most public universities, rarely has funds to assist either students or professors with the

3 expenses of conducting research required to earn advanced degrees or faculty tenure. External

4 sources of research funding for historians are also very scarce. Graduate students typically

5 have very limited income, and the salaries of history and American Indian Studies instructors

6 have long been among the lowest in the university faculty.

7      13.    Thus, if National Archives records for the Pacific Northwest and Alaska are

8 relocated to southern California and the Midwest, the costs of travel and lodging at those distant

9 sites will likely be a significant disincentive for PhD students and faculty at regional

10 universities to conduct extended research on the history of our Indigenous people. Those costs

11 and logistics would certainly discourage me from doing more such research.

12      14.    This potential barrier to research causes me acute concern because the body of

13 historical scholarship about the Northwest's Indigenous peoples and Indian tribes is very

14 limited – much smaller than the subject merits. The subject does deserve much more attention

15 from history scholars and from the general public because Pacific Northwest Indian tribes and

16 their members are significant players in present-day regional economic, political and

17 environmental affairs, and knowledge of their history is essential for understanding the needs,

18 expectations, resources, memories, and values they bring to their relations with non-Indians.

19      I declare under penalty of perjury that the foregoing is true and correct.

20

21 DATED this 28ᵗʰ day of _December, 2020_ at _Seattle_ , _Washington_.
                    day         month     year        city             state

22

23

24 ALEXANDRA J. HARMON

25

26

6        **UNITED STATES DISTRICT COURT**

7        **WESTERN DISTRICT OF WASHINGTON**

8    STATE OF WASHINGTON, et al.,              NO.

9                    Plaintiff,                DECLARATION OF DAVID
                                               TYLER HARRELSON
10        v.

11   RUSSELL VOUGHT, et al.,

12                    Defendants,

13       I, David Tyler Harrelson, declare as follows:

14       1.      I am the Cultural Resources Department Manager, Tribal Historic Preservation

15   Officer and a tribal member of the Confederated Tribes of the Grand Ronde Community of

16   Oregon ("Tribe"). I am over the age of 18 and competent to testify. I make this declaration

17   based on my personal knowledge.

18       2.      I have been the Cultural Resources Department Manager since 2016 and the

19   Tribal Historic Preservation Officer since 2014. As the Cultural Resources Manager and Tribal

20   Historic Preservation Officer I am responsible for oversight, planning, and direction of twenty-

21   two fulltime staff, including those in our Museum and Cultural Center who serve the Tribe and

22   greater public, our Historic Preservation Office that handles government consultation such as

23   that of Section 106 of the National Historic Preservation Act of 1966 ("NHPA"), and our

24   Cultural Education Program that provides learning opportunities for tribal members. Each of

25   these departments and programs rely on historical records   preserved and made available at

26   the National Archives at Seattle in the performance of their work. Prior to serving as the

Cultural Resources Department Manager and the Tribal Historic Preservation Officer, I was the Historic Preservation Manager, Cultural Protection Specialist, and site monitor for the Tribe.

3.     The federally recognized Confederated Tribes of the Grand Ronde Community of Oregon includes over 30 tribes and bands from western Oregon, northern California, and southwestern Washington. The Tribe currently has approximately 5,400 members. The Tribe's reservation was established by Executive Order on June 30, 1857, in partial fulfillment of seven treaties which collectively ceded nearly 14 million acres of land area across western Oregon.

4.     Among the numerous records important to the work of the Tribe's Cultural Resources Department and housed at the National Archives at Seattle, are documents such as the handwritten minutes of Tribal Council meetings in the 1930's, 1940's, and 1950's. The minutes have been invaluable to the Tribe in understanding how Tribal leadership viewed enrollment when the Tribe adopted its Constitution in the 1930's. We also found a handwritten ordinance, known today as Ordinance B, on the back of minutes from one of the Tribal Council meetings. The Tribe was unaware this Ordinance existed until it was identified at the National Archives at Seattle in 2016. The minutes and many other record sets housed there are not digitized or otherwise readily accessible. Many records are not filed or catalogued in a manner that permits discovery without in person research and analysis.

In addition to Tribal-specific records, the Tribe uses the National Archives at Seattle to access general historic materials about tribes in the Pacific Northwest. For example, the archives include numerous journals and sketch books by George Gibbs. George Gibbs held many government posts in the mid 1800's throughout the Pacific Northwest. During that time he kept journals and drew sketches of tribal material culture as well as landscapes. One of the drawings from his sketchbooks is of a canoe on the Columbia River at Oak Point. It is a unique type of canoe used by our ancestors and the sketch was only available to us through the National Archives at Seattle. We used the sketch to create a replica canoe which is a featured

item in our exhibit hall at our Tribal museum, Chachalu Museum and Cultural Center, in Grand Ronde, Oregon. During the summer the canoe is taken out on our ancestral waterways. It is important to be able to browse records in person as records may be significant for reasons unknown to archivists, which may lead to the records being misfiled or organized in a manner that while functional for archival purposes may make them inaccessible or prevent discovery by persons who need them and understand them in a cultural context not understood by an archivist. In person access allows for input and sharing of knowledge between persons deeply connected to topics and materials with the archivists and others accessing these materials.

5.      The Tribe uses records from our past like Tribal Council meeting minutes or Indian agent letters and reports to better understand our past and inform our future. Access to these records aids our own self-determination and helps ensure our community and our ancestors' legacies are sustained.

6.      The Cultural Resources Department has often used information and materials housed at National Archives at Seattle for the review of off-reservation federal undertakings through Section 106 of the NHPA and National Environmental Protection Act of 1970 ("NEPA"). Early cartographic maps of our peoples' homelands often denote village sites and trails which can help contribute to understanding the potential for archaeological items that must be addressed. Further we have performed research at National Archives at Seattle to inform our own planning efforts on the Grand Ronde Indian Reservation in association with Section 110 of NHPA. One such research project was the Grand Ronde Land Tenure project completed between 2016 and 2019. This effort sought to document land ownership, historic maps, and cultural association (if applicable) within the bounds of the historic Grand Ronde Reservation from creation in 1857 to termination of the federal government's recognition of the Tribe in 1956.

7.      No federal agency or federal government representative contacted the Tribe in connection with the federal government's decision to sell the National Archives at Seattle. Our

Tribe first learned of the impending sale of the building which houses the National Archives at Seattle through a newspaper article that was shared broadly on tribal social media forums.

8.    On January 24, 2019, after learning of the impending sale of the National Archives at Seattle, our Tribe sent a letter addressed to Mick Mulvaney at the Office of Management and the Budget 725 17th Street NW Washington, DC 20503 *RE: Proposed Closure of the Seattle branch of the National Archives and Records Administration*. This correspondence was sent by mail as well and copied to David S. Ferriero, AOUTUS and Bryan Mercier, BIA NW Regional Director.

8.    The Tribe's January 24, 2019, letter, to which the Tribe has received no response, stated the following:

*Our Tribe would be directly adversely impacted by this closure and at no time has our Tribe been consulted in an ongoing and meaningful way regarding the potential closure and subsequent relocation of the archives.*

*The collections held in the Seattle facility are comprised of the largest collected archives documenting the history of the federal administration of Native American populations in Oregon, Washington and Alaska. These archives include the majority of the Bureau of Indian Affairs (BIA) records, the Portland Area Office (PAO) records, and medical records documenting the work of the Indian Health Services (IHS). Contained within these record groups are photographs of long gone places, letters written by Tribal members ancestors, school records from the Indian Boarding Schools, birth and death records,  lists of names of Tribal school children, veterans, workers, men and women; documentary proof of the existence of individual Tribal people. Most of the records have not been digitized so research can only be completed on site.*

*The Confederated Tribes of Grand Ronde and its contractors have utilized and continue to utilize these records for research in preparation for engagement with the United States Government during the normal course of regular Government to Government consultation, as do many of the U.S. Agency offices who work with our*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Tribe and others. Should the records be removed to a more remote state with a period of interruption of access to complete the relocation process, the United States Government would be creating an adverse effect to our Tribe. Further, accessibility to these records is a part of fulfilling the Federal Governments Trust responsibilities toward the Confederated Tribes of Grand Ronde and other Tribes.*

*This proposed action to relocate the Tribe's history is reminiscent of historic traumas inflicted on the tribal peoples that comprise the Confederated Tribes of Grand Ronde themselves.  These traumas inflicted by the United States Government began with the forced relocation and removal of tribes and bands to the Grand Ronde reservation, continued through the enforced placement of tribal members onto allotments that led to the subsequent action of selling off tribal lands as surplus and finally ending with the Termination of the Grand Ronde Tribe in 1954.   Only by accessing these records and reclaiming the historic truth of their existence and sovereign right to be recognized were some of the injustices of the past rectified through Restoration of our Tribe in 1983. Having access to these records has been crucial for the Tribe to provide for the continuation of its sovereign rights and government operations.*

*The Confederated Tribes of Grand Ronde requests Consultation on the proposed closure of the Seattle branch of the National Archives and Records Administration. Our expectation is that the United States Government fulfill its Trust obligations and engage in meaningful and ongoing consultation at the highest level prior to any implementation of plans regarding the relocation of these invaluable archives.*

9.      The Tribe's staff and members will be negatively impacted if the records housed at the National Archives at Seattle facility are moved out of the Pacific Northwest. A move would increase travel costs for gaining access to materials in person and in some cases prevent access due to lack of funds to access the materials. The movement of the archives poses a risk to the document filing and associations that have come to be understood by our community in accessing materials relevant to us. The Tribe is aware of the lack of timeliness in the digitization of records that have been moved, such as with the case of the closure of the

archives facility in Alaska and the relocation of these materials to Seattle. The promise of digitization is not reassuring, as the volume of material makes the likelihood of its completion doubtful. Moreover, as explained above, digitization is unlikely to allow the same level of accessibility and identification of records. In addition we are concerned that the logistics of moving the archives poses an unnecessary risk to them through exposure and degradation of the materials caused by transport and processing. Transport and reprocessing could cause permanent harm and decrease the lifespan of the archives.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 29th day of December, 2020 at Dundee, Oregon.
              day            month      year    city    state

_David Tyler Harrelson_

David Tyler Harrelson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF STEPHEN HAYCOX |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Stephen Haycox, declare as follows:

1.      I am a Professor Emeritus of History at the University of Alaska Anchorage. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I taught history at the University of Alaska Anchorage fulltime for 40 years, and carried out research in the Pacific Northwest NARA branch in Seattle from 1968 to the present, working in various record groups containing Alaska-related materials. I have published several score professional articles based on that research and five books, including a narrative history of Alaska (*Alaska, An American Colony* [University of Washington Press, 2002; 2nd edition 2020]).

3.      Looking in my personal files I find that I have worked with records in at least a dozen record groups, including RG126, Office of Territories, RG21, District Courts, RG115, BuReclamation and RE123, Ct of Claims. But the most important groups I have consulted for my work are RG75, BIA, RG48, SecInterior and RG95, USFS. In RG75 I have reviewed

DECLARATION OF STEPHEN HAYCOX          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**121**

1  records of the work of the Bureau of Education in Alaska. This agency provided all Native

2  services in Alaska before the transfer of its work to the BIA in 1931. This was a unique

3  circumstance: the BIA refused to offer Native services in Alaska when first requested in 1885

4  (there were indigenous in Alaska who were not Indians), so the Commissioner of Education

5  took on that responsibility, with which he charged the BuEd, which had no other operations

6  division. BuEd provided not just education services but also medical, orphanages (after the

7  1919 flu epidemic) cooperative stores, and a marketing outlet in Seattle for Native artists.

8  These records are only in the PacNW NARA branch. In RG49 are IRA constitutions which

9  were drafted after the separate IRA was written for Alaska in 1936, known as the Alaska

10 Reorganization Act. This is also unique.  No other indigenous group in the U.S. had a separate

11 act passed by Congress for them. It was necessitated because most Alaska groups were not

12 organized by tribe but by village. Also in RG48 are records of educational grants made to

13 Alaska Natives under the ARA, and of loans made to Native fishermen for boats and fishing

14 gear.  In RG95 are reports from Chief Forester B. Frank Heintzleman (later Governor of

15 Alaska) on Congress's passage of the 1947 Tongass Timber Act which dealt with the granting

16 of timber lease sales in the Tongass National Forest and with Tlingit-Haida land claims within

17 that forest, at 15 million acres, the largest national forest in the U.S. Also there are reports on

18 the environmental character of both Glacier Bay, withdrawn as a national monument in 1925,

19 and on Admiralty Island, which was recommended for withdrawal as a national monument to

20 protect its unique population of large brown bears, and for future recreational use. There are

21 many other aspects of these record groups which have been essential to my understanding of

22 how developments in Alaska's past have shaped its present.

23      4.  I utilized all of the materials in these record groups to write my history of

24 Alaska, first published in 2002, the second edition published in 2020.  For example, in RG95

25 is correspondence between Heintzleman and Territorial Governor Ernest Gruening and Alaska

26 Delegate to Congress "Bob" Bartlett regarding the timber lease sales and the potential for

DECLARATION OF STEPHEN HAYCOX          2          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**122**

establishing pulp mills on the forest to advance Alaska's economy, a career-long campaign by Heintzleman, threatened by Tlingit-Haida land claims. In RG75 is correspondence between the Director of the BIA office in Juneau and the headquarters office in Washington, D.C. regarding the role of the Alaska Native Brotherhood in advocating for Alaska Native rights. Also there are employment records of Alaska Natives who worked for the BIA. I used court files in RG21 to reconstruct some aspects of the Tlingit-Haida land claims suit, which was decided in favor of the Natives in the U.S. Court of Federal Claims in 1959. There is much correspondence in RG 126 dealing with Alaska statehood, granted by Congress in 1958. These are but a few of the examples of records which were fundamental to both professional articles I have published, and my narrative history of Alaska.

5. I first learned of the impending sale of the PacNW NARA facility from members of the Alaska Historical Society, and from an aide to Alaska U.S. Senator Lisa Murkowski. I wrote then both to Senator Murkowski and to Archivist David Ferriero. I also signed a letter from the Alaska Historical Society.

6. It is difficult enough for researchers such as myself who are resident in Alaska to travel to Seattle and bear the expense of lodging and meals in order to consult records. Even if the records are digitized, there is no substitute for being able while using records to be able to access other records referenced in the material one is consulting, or which come to mind because of discoveries made in the material one is consulting. To have the Alaska records scattered to California and Missouri will only complicate such research, undoubtedly often taking it beyond reach. I have little confidence that all relevant records will be soon digitized, if ever. Moving and dissipating the PacNW NARA branch materials will work more than a hardship on research; in many instances it will kill it.

I declare under penalty of perjury that the foregoing is true and correct.

DECLARATION OF STEPHEN HAYCOX 3 ERROR! AUTOTEXT ENTRY NOT DEFINED.

123

DATED this 28th day of December, 2020 at Anchorage, Alaska.

STEPHEN W. HAYCOX

DECLARATION OF STEPHEN HAYCOX        4        ERROR! AUTOTEXT ENTRY NOT DEFINED.

124

3

4

5

6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7 | STATE OF WASHINGTON, et al.,

NO.

8 | Plaintiff,

DECLARATION OF KATHLEEN
SHAYE HILL

9 | v.

10 | RUSSELL VOUGHT, et al.,

11 | Defendants,

12     I, Kathleen Shaye Hill, declare as follows:

13     1.     I am an enrolled member of the Klamath Tribes, and have served the Tribes in

14 a variety of capacities over the years, including being part of the team seeking restoration of

15 federal recognition. I was also elected to serve on the Executive Committee and the Tribal

16 Council. I am over the age of 18 and competent to testify. I make this declaration based on

17 my personal knowledge.

18     2.     As a Klamath-Modoc woman who has spent countless hours researching tribal

19 documents in the National Archives in Seattle over a span of 35 years, I can attest to their

20 value for individual tribal members, tribal families, tribal governments, and other historians

21 who value original primary documents. This is certainly true for the Klamath Tribes, whose

22 federal recognition was unilaterally terminated in 1954. One aspect of termination

23 implementation involved loading the Bureau of Indian Affairs' Klamath Agency records into

24 boxes and shipping them out to the National Archives in Seattle. The National Archives staff

25 had just organized those records into an accessible system when I first visited the Archives in

26 1984. My initial archival project was based on a request by Klamath Tribes Chairman

DECLARATION OF KATHLEEN     1
SHAYE HILL

Charles E. Kimbol, Sr. He asked me to identify signatories for rushed tribal allotment sales conducted as part of the termination process. It is worth noting that the only signature in the whole Tribe that I would recognize — my father's unique signature — had been forged. That experience piqued my interest and led me to begin independently researching the "how's" and "why's" of Klamath termination—in the contemporaneous words of some of those who were there at the time.

3.      I was subsequently asked to join the Klamath Tribes Restoration Committee. When a Committee meeting with then-Senator Mark Hatfield revealed that even he was misinformed about Klamath termination, I was asked to write up some of the archival research I had compiled. The Klamath Tribes used that document to inform tribal members, members of the general public, and members of Congress about some realities that had been overshadowed by the inflammatory reporting of uninformed media and anti-Indian sources.

4.      Over the years, I have had numerous opportunities to share our documented history with tribal members, including younger generations, tribal employees and others who are interested. More recently, my husband and I had an opportunity to collaborate with William H. Rodgers, Jr., a University of Washington professor of law. Professor Rodgers spent countless hours in the National Archives in Seattle doing research about the Columbia River Tribes, revealing a rich socio-legal history involving a number of both Native and non-Native unsung heroes. That documented history is captured in our book, *The Si'lailo Way: Indians, Salmon and Law on the Columbia River*.

5.      A great deal has been invested in the destruction of tribes. There was a tremendous investment in killing our people, taking our land, breaking up our families, destroying our languages, and attempting to assimilate us. The documents in the archives on Sand Point Way reveal truths— both positive and negative—about our individual and tribal histories, and the relationship between the federal government and the tribes of Alaska and the Pacific Northwest. Relocating those documents, making them less accessible to the tribal

DECLARATION OF KATHLEEN        2
SHAYE HILL

1 | people whose history the documents reveal, would be an unconscionable abuse piled onto the
2 | abuses of the past.
3 |     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the
4 | United States of America that the foregoing is true and correct. Executed on this 24th day of
5 | December, 2020 at Chiloquin, OR.
6 |
7 | Kathleen Shaye Hill
8 | KATHLEEN SHAYE HILL
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |

DECLARATION OF KATHLEEN
SHAYE HILL

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF KEN HOUSE |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Ken House, declare as follows:

1.      I am a retired Senior Archivist at the National Archives at Seattle. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      Until I retired in 2017, I worked as a Senior Archivist at the National Archives at Seattle from 2010-2017. Prior to that, I worked as an archivist at the Weyerhaeuser Company Archives for eight years and earlier at the Oregon Historical Society for two years. In addition, I worked as the State Records Manager and State Records Center Manager for the State of Washington Archives and Records Management agency for twelve years. In total, I worked as a professional archivist and records manager for 30 years. I graduated from Western Washington University with a Bachelor's Degree in History and with a dual Master's Degree in History and Archival Management. I am aware of the history and operations of the National Archives from training, readings, direct experience and because I wrote my Master's Thesis

on aspects of the creation and development of the National Archives (NARA). While doing this academic work I traveled to do research at the National Archives in Washington DC and at a Presidential Library operated by NARA. Consequently, I have experience as a research customer of NARA archival services in multiple locations. I know the challenges and opportunities researchers face in accessing the historical records of the United States government in NARA custody and the procedures followed by NARA archival staff in Seattle and elsewhere.

3. In my capacity as a Senior Archivist at the National Archives at Seattle, my primary responsibilities included assisting researchers and receiving, preserving and making available newly received archival records transferred from the adjacent Federal Records Center. I also routinely worked to make records already in NARA custody more accessible. Most researchers—my customers—contacted me by telephone or email and often followed up with an in-person visit to do research. Others simply walked in. It was not uncommon for my co-workers and myself to individually have a backlog of fifty to one hundred research requests at a time and for professional staff vacancies to go unfilled for months or a year or more. I believe this was typical within the National Archives system.

4. In the time I worked at National Archives at Seattle, funding was never adequate to meet the demand from our researcher customers. For example, we were not able to create complete indexes or finding aids that would allow researchers to order records from us remotely or for our staff to do comprehensive scanning and duplication of the records in our custody that would allow researchers to access the record's content online. This meant researchers very often needed to visit the facility in Seattle and review our holdings in

person. I have no reason to believe that NARA funding or staffing will improve in the future to significantly change this situation. The physical storage location of the NARA archival records impacts citizen access as result. Based on conversations with researchers, I would estimate that between a third and one half of the research requests I worked on related to the lives of citizens and the government today and were not genealogical in nature or just historical research for the sake of history.

5.     The files held at the National Archives at Seattle are the legal proof of the actions taken by the local and regional offices of over 100 federal agencies such as the District Courts, Forest Service, Court of Engineers, Bureau of Indian Affairs, Park Service, Immigration and Naturalization and branches of the military operating in the Pacific Northwest and Alaska. The records cover up to 150 years of local federal government history. The National Archives at Seattle has custody of more than fifty thousand cubic feet of these documents, files, photographs, plans, and other forms of records created in Washington, Idaho, Oregon and Alaska States. The regional system of local archival branches of NARA was specifically to house and provide access to the records created by local offices of the federal government near the area where those offices operate and near the citizens impacted by those offices, officials and their decisions. The system exists to provide regional access and regional federal government accountability. The NARA regional branches place the only remaining copies of the historical record of the actions of the nearby offices of the federal government in the reach of any citizen in the region, regardless of their means.

6.     In terms of assisting researchers and the impact of relocating the records at the National Archives at Seattle, I believe the work of an archivist and the process of providing

access to archival records at institutions such as NARA is not well understood by the general public. The most common question I received about the records at NARA was, "Isn't it all on microfilm or scanned or will be soon?" or "Isn't all indexed?" The answer is "No." I believe there is a misconception that an archivist can somehow locate information and provide it to researchers quickly and with certainty. Based on this misconception, the location of the original records appears immaterial because the archivist can retrieve information, have it scanned or copied, and sent to the researcher on demand. This is not true in many, if not most, cases. This is especially not true in cases in which the outcome of the research has important, and often complex, legal, financial and personal impact on citizens. In most cases there is no clear and simple path to locate the needed information held within NARA. This is a result of the nature of archives themselves and financial reality. It was common for researchers doing more complicated research to be in the research room in Seattle for a week or more reviewing a hundred or more boxes of files and documents and then returning for additional research. It was common for them to make hundreds or thousands of copies while there.

7.     Relocating the records outside of the Pacific Northwest will impact almost every Pacific Northwest researcher in a negative way including their time, finances, and ultimately their ability to access the records they need at all. During my time working at the National Archives, I worked with a number of researchers who were homeless, including veterans, and some who were living in their cars in the NARA parking lot while doing research. Most of these were attempting to establish their right to benefits or redress harms done to them by the federal government, their tribe, or others.

8. When archival records reach the end of their legally mandated retention period in a Seattle Federal Records Center, or a federal office, they are transferred to the National Archives at Seattle for safekeeping and public access. I annually received hundreds of boxes of files from the Federal Records Center. These were typically hard copy paper records and the only copy of the document in existence or in an archive. I accessioned the records, meaning that NARA took formal legal ownership of the records, preventing the federal agency that created them from retrieving, altering or destroying them at some time in the future. Accessioning also allows direct researcher access to the records without having to receive approval from the agency of origin or to visit an agency office or multiple offices. When records are accessioned, the boxes of files come organized and identified exactly as they were left by the agency personnel who created and worked with them. They are kept in the order in which they are received. Maintaining original order is a fundamental archival principle and is the only way archivists can deal with the massive amount of diverse information they receive. In most cases there is no index or finding aid received with the boxes when transferred. Indeed, it is rare that archivists at the National Archives at Seattle, or NARA staff anywhere, have the time to create a finding aid. It can often take decades for this to be done, if ever. The finding aids that are created may only be on the general office or box level, not at the file level and almost never at the document level.

9. To provide an example of records organization and disorganization common at the National Archives at Seattle, some of the most important and frequently requested are from the local offices of the Bureau of Indian Affairs (BIA). In Western Washington alone, there have been multiple reorganizations of BIA functions and offices over the

decades. Consequently records of Tulalip Reservation, for example, are in boxes from the Tulalip Indian Agency as well as the BIA's former Portland Area Office, Western Washington Office, Everett Office, Puyallup Agency and other offices of the local BIA system. They are filed and labeled in ways that worked for the BIA office staff, but often this is not clear or useful now. To locate a specific piece of information regarding the Tulalip means knowing which, or all, of these groups of boxes received from BIA offices to check and can take hours or days. Archivists at the National Archives are allowed no more than one hour per reference request to assist a researcher. About half of this time is typically taken providing them with general orientation information. NARA archivists are instructed by their managers to "do reference, not research." This means to guide and assist the researcher, but not do their research work for them. For example, while I could locate a single student file from the BIA Chemawa Indian School in an hour, I could never answer a more complex request in that time from almost any agency's records. In another example, the criminal and civil cases heard by the local District Courts are only indexed by the name of the plaintiff and defendant in the hand written, or typed, docket books created by the Clerks of each Court. As a result, no one can ask an archivist for a list of court cases related to racial discrimination, for example, using this access system and get an answer. There are no subject indexes created for Court case files unless by a very small group of highly motivated volunteers. In yet another District Court example, federal land condemnation cases are only entered in the docket books in this format: "U.S. v. 103.63 acres of land". No more information besides date is given. These land case files were frequently requested for current litigation. In short, knowing which case file a researcher needs cannot be determined in an hour typically. Ultimately, a researcher doing

any level of complex or important research beyond the most superficial in BIA, Court and other agency records has to come to the location at which the records are held or hire a professional researcher at an hourly rate to do the work for them.

10.     In my position as a Senior Archivist, I assisted a wide array of individual researchers and groups of researchers who visited the National Archives at Seattle facility. Tribal members, researchers working for the local tribes and tribal employees would frequently visit the National Archives at Seattle. I would assist them in retrieving tribal records, maps, and other legally important records. This research could relate to land ownership, treaty rights, tribal recognition, the rights of individual tribal members, and BIA and other government agency accountably. As one example of this research during my time at the National Archives at Seattle, there was an ongoing effort on the part of some regional tribes to reduce the number of their enrolled members or audit their member's eligibility to be a member. This could lead to disenrollment of a member or members of the tribe. The dis-enrolled family would lose access to their tribal identity and sometimes life or death matters such as health care or housing. Sometimes these were people with little apparent financial means. They came to the National Archives at Seattle to find evidence to reverse the tribe's decision if possible and I worked with them. Finding records in BIA files about their ancestors to prove their right to tribal membership was complicated, indirect, roundabout and required direct access to the records through an onsite visit. Remote access would simply not give the answer, short of potentially paying to have thousands of pages of records to be copied. And at the risk of not finding anything.

11.     Other types of regular visitors included historians, professional researchers working on environmental disputes such as superfund sites, genealogists, students, and lawyers. National Parks and Forest Service records were also popular. We would get visitors, for instance, who would want to obtain a copy of a record containing a family member's name in the Mt. Rainier summit register or the records of their relative's death on the Mountain in the Park fatality files. Others were studying land conservation issues such abuse of Forest Service grazing rights over the decades and its impact on the land or their legal right to live on Forest Service land. One University of Washington graduate student researcher working for the Klamath Tribe found records at the National Archives at Seattle of early BIA timber surveys showing the composition of the old growth Klamath Reservation forest. She used these to assist the Tribe in plans to recreate original forest species distribution on tribal lands. No archivist on staff realized we had the records or recognized their significance until she did in person research. Furthermore, the Seattle office holds the records of the Termination of the Klamath Tribe and other Tribes in the 1950s and its impact on tribal members, their land holdings and land uses including access to natural resources. These files, and other BIA files, are important to local tribal members and their descendant's because of the depth with which the BIA involved itself in the daily life of individuals and permanently recorded details of long term legal and personal importance. The seventy thousand, or so, Chinese Exclusion Act case files covering about 1890-1940 were also frequently used by individuals looking for information about their family history and immigration experience. These files were the only source of this type of information and provide a record of the immigration discrimination over decades in great detail. The Exclusion Act files provide another example of almost

**135**

insurmountable remote access issues because they are filed by INS file number only with no index. A group of dedicated volunteers is creating an index that will take a decade or more to complete. The likelihood that such a group would go to an out-of-state location and do this work is remote.

12.     I also would assist employees of federal agencies with their official research, such as the Forest Service, Corps of Engineers, District Courts, Indian Affairs, Federal Highway Administration, Military, Park Services and others. They needed to do research on their agencies' own records or other agencies' records for current business and legal purposes. In one example, a Fish and Wildlife employee was trying to establish the size and types of salmon runs destroyed by the construction of several private power generation dams on the Klamath River in the early 1900s. He was working on dam removal efforts and salmon restoration. Unique BIA records from the Klamath Indian Agency gave him an answer, the only answer he could find, but were very difficult to locate within Indian Agent correspondence, BIA office subject files, some photos, other file groups and in District Court testimony. While the specific example is unique, the type of research was not uncommon at Seattle while I worked there. In another example of assisting federal employees, annually I worked with a team of researchers from the Army Corps of Engineers who came to Seattle looking for evidence of munitions lost by the military from planes, ships or by other means in the 20th Century in the Pacific Northwest. In one case they found records of a bomb accidently dropped from a dock during World War II in downtown Seattle. The dock area is now used by cruise ships. The number of lost munitions seemed to be substantial as indicated by their frequent visits. In an example of the difficulty in locating these records, the Navy Department

over many decades used a filing system that only identified files by a code number and filed the records annually under this system. Locating anything regarding munitions, shipping or loss mandated an in person visit. Hanford Reservation records were also accessed by various federal and state agencies studying contamination and other issues. Forest Service historians and other agency staff came to do research on recreation and conservation issues while I worked there as did staff of less known agencies and Park Service employees.

13. During my time working at the NARA Seattle facility, I saw and participated in various types of physical conservation of historical records of various formats to ensure long term access and preservation. One type of record's conservation involves the acceptance of records from the Seattle Federal Records Center into the Archives section of the building under conditions designed to conserve and protect the record. The Records Center area has temperature and security controls, but no air conditioning or humidity regulation to preserve paper media. High temperatures and unregulated humidity are some of the most significant factors shortening the life of paper records. Once a federal record is deemed an archival and reaches the end of its legal retention in Records Center custody, it is moved from the Federal Record Center into the adjacent archival vault space. Archival records are stored there in special conditions to ensure document's longevity. The archival storage space is climate controlled, temperature and relative humidity is regulated, the windowless, secure, concrete vaults protect records from theft, and various types of damage including fire, insect, water and fading. There are fire sprinklers and heat, smoke and water sensors monitored 24 hours a day. Records theft and destruction is also limited because researchers are only allowed access to original documents in a very controlled research room space with security cameras under the

direct supervision of a NARA staff person at all times. In a form of more active, hands on, conservation undertaken at the National Archives at Seattle, archival documents are placed in special acid neutral file folders and stored in special archival quality boxes to stop deterioration. Further only NARA staff can enter the records storage space. There are cipher locks on the doors, security cameras and alarm systems to deter theft. Highly valuable files and documents are stored in fireproof file cabinets that can only be accessed by two employees observing each other and tracking their access. In sum, there are numerous conservation actions taken by NARA staff to prolong access to archival documents over time by preserving the record and its content.

14.     In almost every case, the millions and millions of pages of files at the National Archives at Seattle are the only copy in existence. If lost, they cannot be replaced or recreated. One threat to the records is transportation by truck, train or ship to another location. The movement of over fifty thousand cubic feet of these records in hundreds of truck loads to another location risks the loss of at least some of them by misadventure such as a truck fire or collision.

15.     The NARA Seattle facility also assisted in the conservation of records through its digitization work. Although most records at the NARA Seattle facility have not been digitized, some have been. After the NARA facility in Alaska was closed a few years ago, Alaska federal archival records were sent back to the NARA Seattle facility, where they had previously been located. As part of this move, NARA hired four staff and purchased overhead and flatbed scanners in order to begin scanning and digitizing Alaska records. This was part of a promise to the Alaska congressional delegation and was unique as far as I know within the

NARA system where only a very limited amount of digitization is funded and ongoing. While it is a slow and laborious process, the digitization of archival records ensures that documents are preserved. It also expands the life of an archival document because once a document has been digitized it needs to be handled much less.

16.     While digitization can be powerful conservation tool, I also observed the difficulties associated with the digitization of archival records. First, before a document can even be scanned, all fasteners must be removed by hand in a careful manner to avoid damaging the document. Then all scanning of documents, every item in a file—from small notes to huge maps and plans—is done one at a time. The use of sheet feeders is never allowed because they may tear or destroy a document. Scans must then be proofed by another staff person to make sure they are legible and no pages are missing. Any document with personally identifiable or business, student or health information like Social Security numbers cannot be scanned or the information must be carefully redacted from the image. And the individually scanned documents must then be organized in virtual files and provided context and metadata so they can be identified, found and retrieved. For example, the information includes which agency created the file, when, for what purpose, what is the file title if any, what it related to and so forth. And the files then have to be placed in an online catalog that can be searched. It is an onerous, slow and time-consuming process. There are billions and billions of pages of records within the National Archives system overall. Only a minute number has been microfilmed or scanned. In my opinion, this work will likely never be completed and at current levels of funding it will take decades to make a real public access difference.

17.     One example I recall, involved Bureau of Land Management land transaction files from Alaska – files documenting the sale of federal land to others. These included over 900 boxes of records that are frequently accessed by the agency' the land owners and others including the State of Alaska. Because those documents are frequently requested they were prioritized for digitization by our manager. But once we began preparing those materials for scanning, we realized they were filled with Social Security numbers, addresses, and other personal identification and financial privacy information. To make those documents publicly available, required—in addition to the steps discussed above—looking at each page to identify any protected information; making a hard copy; blacking out or redacting the information; and then scanning the copy; or otherwise redacting the document after it was scanned by deleting and/or covering parts of pages. In the end, the decision was not to scan them. It simply was not practical from a staff time perspective and there was a possibility that private information might be overlooked and released.

18.     Other forms of conservation were coordinated with other NARA facilities. Once each year, we would send an important document at the NARA Seattle facility that was in need of repair to the NARA Conservation Lab in Maryland. The document would then be repaired or stabilized and returned to the NARA Seattle facility. This too ensured the long-term conservation of NARA Seattle's most important documents.

19.     I have heard it said that relocation of the Seattle records will not be a problem to researchers because they can order copies or scans or that all records will be digital, sometime. This is simply not true, in my experience, as indicated by the examples above and by the discussion of the difficulties facing researchers due to the organization of archival

records, limited NARA funding and staffing, and the lack of effective indexes. Relocating the records at the National Archives at Seattle to an area remote from the federal offices that created them, places a burden on the researcher who will now be required to pay for copies, if they can identify the records to be copied at all from a distance; otherwise they will have to travel out of state or will have to hire a researcher to work for them. Relocation also places a burden on citizens of the Pacific Northwest attempting to keep their government accountable and to learn, protect their interests, redress wrongs, or inform future citizens about the federal government's actions in their Pacific Northwest home.

20. In addition, the local and regional community would be impacted by the closure of the National Archives at Seattle. Middle and High School students participating in the annual History Day competition are required to do research including primary historical documents (instead of secondary sources such as history books) and come to the National Archives at Seattle to do this. NARA archivists volunteer as History Day judges on the local and regional level. Local college and graduate level students are also provided valuable internships at the National Archives at Seattle to learn archival practices. This opportunity would no longer be available if the Seattle facility is closed. History and archival related meetings and trainings are regularly hosted and held at the National Archives at Seattle facility. Staff speak at local conferences and meetings. They also carry out outreach activities in the region and local community of many kinds related to the federal governments, it history and its archives.

21. Staff also consult with staff at local offices of the federal government on archival issues of all types and make sites visits. During my time as an archivist I visited a number of federal facilities including the National Oceanic and Atmospheric Administration, the Bankruptcy Court, various District Courts and others. NARA staff assist in response to

1   regional records related disasters and emergencies that occur due to floods, fires and the like.
2   They provide training to federal office staff on records creation, preservation and disaster
3   prevention. The National Archives at Seattle has a small display space with changing exhibits
4   on the history of the federal government and archives in the Pacific Northwest.
5   I declare under penalty of perjury that the foregoing is true and correct.
6
7   DATED this 2ND day of JANUARY, 2021 at OLYMPIA, WASHINGTON
           day        month      year        city              state
8
9
10  Ken House
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
7

STATE OF WASHINGTON, et al., | NO.
8
9         Plaintiff, | DECLARATION OF JUSTINE
JAMES, JR.
10    v.

11 RUSSELL VOUGHT, et al.,
12         Defendants,

13    I, Justine James, Jr., declare as follows:

14
15    1.    I am an enrolled member of the Quinault Indian Nation ("Nation"). I am over
the age of 18 and competent to testify. I make this declaration based on my personal
16
17 knowledge.

18    2.    The Nation is a federally-recognized Indian tribe and sovereign government. It
19 is governed by a Constitution (1975) and code of laws. The Nation is a signatory to the Treaty
20 of Olympia (1856) whereby it reserved the right to take fish at its usual and accustomed fishing
21 grounds, among other rights. In that Treaty, the Quinault people also reserved a homeland, the
22
23 Quinault Indian Reservation located on the west coast of Washington. Prior to its Constitution
being ratified in 1975, the Quinault people adopted Bylaws of the Tribal Council of the Indians
24
25 of the Quinault Indian Reservation in 1922.

26

DECLARATION OF       1          ATTORNEY GENERAL OF WASHINGTON
JUSTINE JAMES, JR.                    COMPLEX LITIGATION DIVISION
                                   800 5TH AVENUE, SUITE 2000
                                   SEATTLE, WA 98104-3188
                                   (206) 464-7744

3.     I currently serve as the Cultural Resource Specialist for the Nation. I have

worked for the Nation for since 1991. As a Cultural Resource Specialist for the Nation, my

work has focused on reviewing state forest practice applications for logging within the

Nation's adjudicated usual and accustomed Treaty fishing areas for potential impacts to Treaty

fishing resources under the Washington State's Timber, Fish and Wildlife (TFW) program. I

also review off-Reservation development projects in the context of the State Environmental

Policy Act and the National Environmental Policy Act for impacts to the Nation's historic and

cultural resources. Additionally, I serve as the Nation's consulting party under Section 106 of

the National Historic Preservation Act. As part of my position, and my personal interest, I have

studied and reviewed historic Quinault documents for decades and am familiar with the history

and culture of the Quinault Nation and the Quinault people.

4.     In the early 2000s I spent a week reviewing documents that I requested

pertaining to the Quinault Nation and the Quinault Reservation at the National Archives at

Seattle. I reviewed these records as part of my role assisting in the drafting and review of the

Watershed Analysis Cultural Module regarding the Bureau of Indian Affairs management of

Quinault Indian Reservation. At the end of that week, I still had not been able to go through

all the materials available at the National Archives because the collection of Quinault records

was so vast. I recall seeing documents that included:

•     Bureau of Indian Affairs records circa 1905-1939

•     Microfiche of Census information – I noticed most local tribes, but didn't have the time

to check to any extent, these went back to the 1800s.

•     Newspaper articles and photographs, etc.

DECLARATION OF                                  2                    ATTORNEY GENERAL OF WASHINGTON
JUSTINE JAMES, JR.                                                      COMPLEX LITIGATION DIVISION
                                                                        800 5ᵀᴴ AVENUE, SUITE 2000
                                                                        SEATTLE, WA 98104-3188
                                                                        (206) 464-7744

144

I was only allowed to use a pencil and notebook to record information about these records. I am not sure if copies were available then, although I did not have the funds to pay for copies at that time.

5. The National Archives at Seattle is an important repository for research and contains important, valuable, cherished and treasured documents. The Nation is comprised of treaty tribal groups that fall under the umbrella of the Quinault Indian Nation to which the United States has trust responsibilities. The archives hold irreplaceable primary records concerning those tribal groups and the creation of the Quinault Indian Reservation, such as the application of the Dawes Act in Washington State, the Halbert Case (determining the status of allotments on the Quinault Indian Reservation), the Indian Reorganization Act, the termination policies, Executive Orders, and supplementary regulations, policies and laws. The records in the National Archives facility are critical evidence of the enormous impacts to the tribal citizenship, enrollment, land ownership and property rights that may affect Quinault tribal members and also inheritors who need to research the genealogy and census records.

6. As the Cultural Resource Specialist for the Nation and enrolled Quinault tribal member, it is critically important to me to have access to the archival materials within the Nation Archives at Seattle. The records contain cultural and historical information indispensable and irreplaceable for the historical and ethnographic reconstruction of the relationship between the United States Federal Government and the Quinault Indian Nation. The archives contain records that pertain to multitudinous local, state, and federal regulations and congressional policies that have occurred since the inception of the Quinault Indian Reservation. Access to these records provides a historical timeline for the developmental

DECLARATION OF
JUSTINE JAMES, JR.

3

ATTORNEY GENERAL OF WASHINGTON
COMPLEX LITIGATION DIVISION
800 5TH AVENUE, SUITE 2000
SEATTLE, WA 98104-3188
(206) 464-7744

145

1  policies that have been thrust upon the Nation. These archival materials enhance historical
2  research and the materials that may be used to protect, as well as strengthen the exercise of the
3  rights and responsibilities of the Quinault Indian Nation and Tribal Sovereignty. With a local
4  archival facility the simple act of remembrance and being able to access documentation and
5
6  dealings is a valuable tool for historical research. A local facility for all historical Pacific
7  Northwest activities allows me and other representatives of the Quinault Indian Nation the
8  opportunity to review historical actions and perspectives of what has transpired over these
9  many years since interaction with non-tribal people began.

10      7.      I first learned of the federal government's interest to sell the National Archives
11  at Seattle on January 16, 2020, when I read about it in a KIRO radio news article. I alerted the
12  Nation's Office of Attorney General. Our attorneys alerted the Northwest Indian Fisheries
13
14  Commission ("NWIFC"), of which the Nation is a member, because of concerns about the
15  status of treaty-related records housed at the National Archives in Seattle. The NWIFC held
16  several meetings with representatives of its member tribes beginning in February 2020, and
17  which I and other Nation representatives periodically attended.

18      8.      The Nation sent a letter opposing the sale of the National Archives at Seattle to
19  Russ Voight, Acting Director of Office of Management and Budget dated February 5, 2020,
20
21  which is attached as Exhibit 1 to this Declaration, opposing the closure and sale of the National
22  Archives at Seattle and requesting government-to-government consultation pursuant to
23  Executive Order 13175.

24      9.      The Nation requires unfettered access to these records moving the facility is a
25  disingenuous action that restricts this access, both temporally and physically. Moving records
26

DECLARATION OF                              4                ATTORNEY GENERAL OF WASHINGTON
JUSTINE JAMES, JR.                                          COMPLEX LITIGATION DIVISION
                                                            800 5TH AVENUE, SUITE 2000
                                                            SEATTLE, WA 98104-3188
                                                            (206) 464-7744

**146**

1 | exposes them to the possibility of damage and misplacement. Moving the National Archives
2 | at Seattle to a different facility would impose an unacceptable obstruction of access to these
3 | records for an undetermined amount of time. Moving these records out of the local geographic
4 | 
5 | area would impose and inexcusable hardship on local tribes to travel for access to this
6 | important information. This loss of access will hinder and handicap the Nation's ability to
7 | respond to cultural stewardship issues throughout the Quinault Indian Nation ceded lands in
8 | the Westside of the Olympic Peninsula and Southwest Washington. The closing and relocation
9 | of the National Archives at Seattle would create undue stress on Quinault tribal finances and
10 | raise budget concerns. A distant location creates potentially insurmountable accessibility
11 | issues as it could possibly create undue stress on the already limited tribal budgets. Staff time
12 | 
13 | and travel would become stressing issues.
14 | 
15 | I declare under penalty of perjury that the foregoing is true and correct.
16 | 
17 | DATED this __4th__ day of __January, 2021__ at __Taholah__, Washington.
18 |          day         month     year    city      state
19 | 
20 |                          Justine James, Jr.
21 | 
22 | 
23 | 
24 | 
25 | 
26 | 

DECLARATION OF
JUSTINE JAMES, JR.

5

EXHIBIT 1 TO DECLARATION OF JUSTINE JAMES, JR.



# Quinault Indian Nation

POST OFFICE BOX 189 □ TAHOLAH, WASHINGTON 98587 □ TELEPHONE (360) 276 - 8211

February 5, 2020

Russ Vought
Acting Director
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

RE: Opposition to Closure of the Sand Point Federal Archives and Records Center

Dear:

I am writing to express our opposition to closure of the Federal Archives and Records Center at 6125 Sand Point Way NE, Seattle, WA. This issue of great significance to the tribes of Washington, Alaska, Idaho, and Oregon. Under a recently enacted statute, the Federal Assets Sale and Transfer Act of 2016 ("FASTA"), the National Archives this facility is being recommended for closure and sale, with the archived documents to be transferred to two separate locations far from the Pacific Northwest. Under FASTA's expedited timelines, the recommendation for sale is on a fast track. The impacts from the transfer of the archived materials on the 272 federally-recognized tribes in the Pacific Northwest and Alaska will be profound and irreparable. What's more, this decision has been made without following the government-to-government consultation requirements of Executive Order 13175. *The Office of Management and Budget ("OMB") can and should reject the proposed closure and transfer of the Sand Point Archive.*

The National Archives maintains the Federal Archives and Records Center at 6125 Sand Point Way NE, Seattle, WA. The Sand Point Archive contains historical records from all federal agencies, including the Department of Interior, the Bureau of Indian Affairs, the Indian Health Service, and various other agencies that have had dealings with Indian tribes. Among the many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, and Tribal leaders during treaty negotiations in the mid-19[th] Century, as well as original drafts of the treaties themselves. The facility also houses critical and hard-to-reproduce historical information related to the area tribes. Moreover, the Anchorage archives were closed in 2014, and all the information related to Alaska tribes has now been moved to the Sand Point Archive facility. Tribal leaders, tribal cultural resources staff,

**148**

tribal historians and others regularly make use of the Sand Point Archive to carry out research and recover their tribe's history.

FASTA was enacted in 2016 to facilitate and expedite the sale of high value federal properties. The process involves a review and recommendation by a board appointed under FASTA, the Public Buildings Reform Board ("PBRB"), which is in the midst of a six year demonstration project. The PBRB identifies its mission as identifying specific Federal properties for disposal in a manner that will "obtain the highest and best value for the taxpayer" and accomplish the goal of "facilitating and expediting the sale or disposal of unneeded Federal civilian real properties." Pursuant to that mission, the PBRB issued a report in late December recommending the sale of 12 federal properties around the country, including the Sand Point Archive. As we understand, the OMB identified concerns with the proposed Sand Point Archive sale recommendation in an earlier iteration.

If the Sand Point Archive facility is sold, the archived materials will have to be moved. The materials will be split up, with records going to Kansas City and archival materials going to Riverside, CA, although the PBRB also acknowledges that the Riverside facility is not ready to take on the voluminous materials. As a result, those archived materials will have to be moved to some as-yet unknown facility for an undetermined amount of time. Splitting up these materials and moving them to Kansas City and to Riverside is damaging enough, making it cost-prohibitive for many of the Northwest and Alaska tribes to access these critical historical materials. Nonetheless, the area's tribes were never consulted as required under Section 5(a) of E.O. 13175 despite the clear "tribal implications" of this move.

We request your urgent assistance in stopping this ill-considered and ultimately damaging closure and transfer of the Sand Point facility and its documents. Under the FASTA process, the OMB must make its decision to approve or deny the sale within days. If OMB gives the green light, the sale process then gets fast-tracked under FASTA's guidelines. Doing so without having consulted with the area tribes is improper and the process must be halted and analyzed correctly.

Respectfully,

Fawn R. Sharp, President
Quinault Indian Nation

Cc    Senator Maria Cantwell
      Senator Patty Murray
      Representative Derek Kilmer

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| STATE OF WASHINGTON, et al., | NO. |
| | |
| Plaintiff, | DECLARATION OF JEREMY JOHNSON, THPO COW CREEK BAND OF UMPQUA TRIBE OF INDIANS |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Jeremy Johnson, declare as follows:

1.      I am an archaeologist, the Cultural Resources Program Manager, and Tribal Historic Preservation Officer (THPO) for the Cow Creek Band of Umpqua Tribe of Indians, signatory to the 1853 Treaty with the Umpqua - Cow Creek Band (10 Stat. 1027).

2.      I am over the age of 18 and competent to testify. I make this Declaration based on my personal knowledge.  As the THPO, I am the Tribal official responsible for information related to the Tribe's current and previous management of cultural resources, preservation efforts, archaeological research, and anthropological work.

3.      I earned a Master's Degree in Applied Anthropology from Boise State University in 2015 and have worked for the Tribe since 2016.

4.      The Tribe has extensively researched and utilized historical records on file with the U.S. National Archives and Records Administration (NARA) since at least 1980.

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**150**

5. The Tribe has planned future research trips at NARA in connection with the Tribe's lands and activities in and around its ancestral territory, which includes, but is not limited to, the Umpqua River watershed upstream from Scottsburg, Oregon, and the northern slope of the Rogue River watershed upstream from Agness, Oregon. 25 U.S.C. § 712e.

6. Moving and dispersing these collections would create a significant barrier to the Tribe's further research and therefore the Tribe's agricultural, forestry, land restoration, historical, and archaeological efforts.

7. NARA contains records of significant value to the Tribe's past and future.

8. The value of maintaining physical records at NARA is that, to my knowledge, not all archives have been digitized and made available outside of the NARA Seattle facility. Using the online catalog shows only what has been processed, not what could potentially be missing. We simply do not know the full extent of what NARA holds.

9. Records related to Cow Creek at NARA are important as they are primary resources and firsthand accounts that describe history and culture prior to attempted removal, and original legal documents that detail the Tribe's legal fights; another aspect of the Tribe's history.

10. On behalf of the Tribe, from 1980-2015 Professor Stephen Dow Beckham, Pamplin Professor of History, Emeritus, Lewis & Clark College, used NARA extensively as part of the restoration of the Tribe, protection of its resources, and re-establishing the Tribal land base, including for forestry and agricultural activity. He accessed the following records:

Portland Area Office Director's Records:

Box 3 023 Proposed Legislation, 1951-1953

039 Other Departments & Establishments, 1951-1952

051 Reports, Annual, 1951-1953

064 Councils, Acts of Tribal Councils, 1951-1952

067 Business Committees, 1951-1952

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

2

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

151

Conference, Area Directors, 1950-1954

Box 4 071 Conferences--Meetings, 1951-1953

Division of Program, Field Trip Report, Portland Area, 6/19-29/52; G. Warren Spaulding (concerning withdrawal) Congressional Record- "Abolish Indian Bureau" 9/10/51; Summary of data prepared in answer to Commissioner's memo 8/5/52 (preparedness of Indian tribes, bands....to dispense with services specially provided through the BIA);  Memo of 4/23/53 - Withdrawal from federal supervision Western Oregon Termination, 1954-1955

130 General - Long Range and Withdrawal, 1952-1955

Proposed Withdrawal - Western Oregon, 12/53

130 Grand Ronde-Siletz - Western Oregon - Long Range and Withdrawal, 1953-1954

Drafts of proposed bills for termination - Grand Ronde-Siletz and Western Oregon

160.0 Commissioner Emmons' Trip to Portland, Oct. 1953

Oregon Law and Order Legislation

306 Removal of Restrictions, 1951-1952

308.1 Settlement of Allotted Lands, 1951-1952

320 Leasing of Lands, 1951-1952


Boxes 11-14

Area Director and Assistant Area Director: Correspondence - By Agency, 1951-1953:

Box 11 General – All Agencies

Bonneville Lieu Sites, 1952-1953


Box 12 Grand Ronde-Siletz, 1952-1954

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**152**

PAO 07: RECORDS OF THE ASSISTANT AREA DIRECTOR RELATED TO THE TERMINATION OF WESTERN OREGON TRIBES, 1954-1960

FOLDER LIST: Boxes 33-39

Box 33 Tribal Programs - General 1958-1959

Termination - Western Oregon

020.0 Western Oregon (File no. 1). Includes John Collier: "The Menominee of Wisconsin and the Klamath of Oregon Cases," 4/57

"Memo to the Western Oregon Indian people" (re Western Oregon Judgment Fund payment), 1959 (3 folders)

Western Oregon Judgment Mr. Busey [Supervisory Judgment Officer]-need for establishment of branch of tribal programs. 1954-1960

WOJF- Western Oregon Judgment Fund - Tribal Affiliation (ancestors)

Western Oregon Enrollment, 1947-1962 (2 folders)/ Letters of Payments and Rejections

Southern Oregon Claims - Oregon Coast, 1947-1949

Siletz Death List, 1910-1919


Box 34 WOJF- - Chetco Minors

WOJF - Coquille Minors

WOJF - Tillamook Minors

WOJF - Tootootoney Minors

WOJF - Umpqua-Calappoia Minors

Minors' Funds- Referrals to California DPW

WOJF- Guardianship Requested

Western Oregon - Rules and Regulations and Other

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**153**

Miscellaneous Material

Proposed withdrawal of Federal responsibility over the property and affairs of the Indians of Western Oregon


Box 35 Action Steps and Budget for Western Oregon Readjustment Act

Action Steps for Distribution of WOJF

Alsea and Rogue River vs U.S., 1946-1960

Grand Ronde Approved Roll, Constitution & By-laws

Grand Ronde - Rogue River, 1949-1953

Grand Ronde - Reconnaissance Survey (showing Tribal affiliation), 1936

Confederated Tribes of the Grand Ronde Community, Tribal Tracts No. 1, 2, 3, and 4


Box 36 Map Tribal Distribution

Grand Ronde-Siletz Land Assignments - General

Grand Ronde - Notices received re not listed on final roll

Grand Ronde - Tillamook Claim, 1949-1954

Final Roll of the Confederated Tribes of the Grand Ronde Community and Relinquishments

Grand Ronde - Siletz - Administration, 1956-1958.

Grand Ronde - Miscellaneous, 1949-1954

Census Roll of Confederated Tribes of Grand Ronde Community, 1955

Proposed Tract and Escrow Agreement

Census-Grand Ronde (showing tribal affiliation), 1953

Grand Ronde Final Roll - Relinquishments

Appeals for Membership - Grand Ronde

Final Roll for confederated Tribes of Siletz

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**154**

1    Siletz-Grand Ronde Termination, Official Final Roll, Proclamation 1956

2    Final Rolls for Grand Ronde, Siletz, Klamath

3    Western Oregon Judgment - Social Worker

4

5    Box 37 Siletz Judgment - General, 1952-1964 (2 folders)

6    Siletz Tribe - Constitution and By-Laws, 1948-1950

7    Siletz Annuity Roll and Miscellaneous Files, ca. 1921-30

8    Enrollment - Siletz (Final Roll), 1954-1957

9    Material Pertinent to Siletz Per Capita Final Payment

10   Minors Enrollment

11   Address Changes

12   Umpqua-Calappoia Minors Paid

13   Custody Cases - Payment of

14

15   Box 38 Plans - Minors Funds (WOJF & Siletz Judgments)

16   Western Oregon Judgment Fund - Miscellaneous Files

17

18   Box 39 Coos Bay Community Building, Empire, Oregon (photos), 1941

19   Indian Claims Commission - Grand Ronde, Willamette Valley, Umpqua, Calappoia,

20   and Molalla Indians, 1952

21   Western Oregon Judgment - General, 1962-1964

22   Letters on Judgment Appeals, 1958

23   Western Oregon Probates, 1956

24

25   PAO 08:  INDIVIDUAL CASE FILES, UNALLOTTED GRAND RONDE, SILETZ,

26   PUBLIC DOMAIN, AND FOURTH SECTION, ca. 1915-1956

DECLARATION OF JEREMY              6          **Galanda Broadman PLLC**
JOHNSON, THPO COW CREEK BAND                  8606 35th Avenue NE, Ste. L1
OF UMPQUA TRIBE OF INDIANS                    Mailing: P.O. Box 15146
                                              Seattle, WA 98115
                                              (206) 557-7509

**155**

13 linear feet

Arranged alphabetically by surname of individual (except Box 71, which contains unarranged appeals from decisions denying eligibility for Grand Ronde and Siletz final rolls.). Individual case files for Western Oregon Indians not allotted land but holding right as Grand Ronde, Siletz, Public Domain, and Fourth Section Indians. "Fourth Section" refers to Section 4 of the 1887 General Allotment Act.

These case files, formerly maintained by the Grand Ronde-Siletz Indian Agency, contain correspondence and documentation of income from inheritance, timber sales, annuity funds; family information such as birth, death, marriage and divorce records; copies of the section of Public Law 715 authorizing preparation of final rolls of those eligible to share in the Western Oregon and Siletz Judgment funds. Box 71 contains appeals from decisions denying eligibility for Grand Ronde and Siletz final rolls.

11. These materials are among those that the Tribe, through Professor Beckham, has used in Seattle. These materials are not all available in any other format or location.

12. The Tribe has also relied on records at NARA related to U.S. Forest Service interactions with Cow Creek Indians at their special use areas: South Umpqua Falls, Old Tom's Prairie, and the Huckleberry Patch, located within the Umpqua National Forest.

I declare under penalty of perjury on this 4 day of January 2021 that the foregoing is true and correct.

_____
Jeremy Johnson
Cow Creek Tribal THPO

DECLARATION OF JEREMY
JOHNSON, THPO COW CREEK BAND
OF UMPQUA TRIBE OF INDIANS

7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**156**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ROBERT KENTTA |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Robert Kentta, declare as follows:

1.      I am an enrolled member of the Confederated Tribes of Siletz Indians ("Siletz Tribe").  I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been an elected member of the Siletz Tribal Council since 2005. I currently hold the Officer position on Tribal Council as Treasurer. In addition, I am a tribal employee of the Siletz Tribe, and have been an employee of the Tribe since about 1990. I currently hold the position as Director of the Cultural Resources Department and have held that position for nearly 30 years.  As Cultural Resources Director, I am responsible in relevant part for obtaining and maintaining the Tribe's historical records, and I am the lead advisor for the Tribe on historical and genealogical issues.  The Siletz Tribe is comprised of numerous – more than 28 - tribes and bands of Indians that were all removed to the Siletz Coast Reservation established by Executive Order in 1855 and confederated together there under ratified Treaty

DECLARATION OF ROBERT KENTTA          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

157

1   agreement, and by the federal government actions into what became known as the federally-
2   recognized Confederated Tribes of Siletz Indians.

3       3.      The Siletz Tribe has a long and complex history that makes access to records at
4   the National Archives in Seattle critical to the Tribe. The Siletz Tribe is comprised of tribes
5   and bands from seven ratified Indian treaties and numerous unratified treaties who were all
6   moved by the federal government to the Siletz Coast Reservation established by Executive
7   Order and confederated together there. The Siletz Coast Reservation was reduced by different
8   illegal federal actions over time until little tribal land was left, and the Tribe was terminated
9   by the federal government in 1956 under the 1954 Western Oregon Indians Termination Act,
10  and the Siletz Tribe's members dispersed throughout western Oregon and beyond. The Tribe
11  struggled through 23 years of termination to achieve restoration as a federally-recognized tribe,
12  through federal legislation in 1977. The Tribe has worked since Restoration to achieve full
13  status as a federally-recognized tribe, including rebuilding a tribal trust land base and securing
14  funding for federal programs and services.

15      4.      The National Archives in Seattle contain comprehensive federal records of the
16  migration of all the various tribes and bands that were moved to the Siletz Coast Reservation
17  and who make up the Confederated Siletz Tribe. In addition, the Archives contain
18  comprehensive records of the individuals and their families who became part of the Siletz
19  Tribe. The Siletz Tribe has spent well over $1 million to find and assemble at the Archives in
20  Seattle the history of all these component tribes and bands and individuals, and to try to create
21  a comprehensible and comprehensive history of the Siletz Tribe and its members. This massive
22  effort is ongoing. These federal records are not organized by individual ancestral tribe or band
23  and there is often overlap in the records about different tribes, bands and individuals, so
24  assembling the history of each specific tribe and band and its inclusion in the Confederated
25  Siletz Tribe has taken hundreds of hours of research and investigation at the National Archives.
26  In addition, one of the Tribe's patrons, Professor Charles F. Wilkinson, who assisted the Siletz

DECLARATION OF ROBERT KENTTA          2          ERROR! AUTOTEXT ENTRY NOT DEFINED.

158

Tribe in its Restoration efforts in the 1970s, wrote a comprehensive history of the Confederated Tribes of Siletz Indians in the 2000's and relied heavily on the records available at the Seattle National Archives.

5. Physical access to the records at the National Archives in Seattle is critical to the ongoing effort of assembling the Siletz Tribe's history. These records are extensive and scattered throughout the record groups maintained at the Archives, in no easily accessible format. Many are hand written in faded script, so deciphering takes additional time. Records regarding the different Siletz tribes and bands, who are from throughout western Oregon, northern California and southwest Washington, are in different boxes and under different offices and agencies. Research and investigation of the Siletz Tribe's history often involves going back and forth between different groups of records to cross-reference obscure and brief references to a particular incident, area of subject matter or tribe and band. It would be impossible to complete the research that needs to be done by the Siletz Tribe, if these records were moved to the eastern U.S. The barriers would be many, especially the various costs and time. At the present time tribal staffers make periodic trips to the Seattle National Archives to answer specific research questions or research individuals.

6. The Siletz Tribe is involved in multiple legal proceedings where the Tribe needs to document its connection and successorship to specific tribes and bands or individuals, and consistent access to the records at the Seattle National Archives is critical to being able to establish and provide this documentation. In addition, the Siletz Tribe is subject to numerous claims by other tribes, groups or individuals to be the real representatives of and successors to tribes, bands and individuals who make up the Siletz Tribe, and consistent access to the records at the Seattle National Archives facility (NW Regional Branch of NARA) is critical to the Siletz Tribe's efforts to counter and defend against these attacks on the Siletz Tribe's sovereignty and identity.

DECLARATION OF ROBERT KENTTA 3 ERROR! AUTOTEXT ENTRY NOT DEFINED.

**159**

7.    The Siletz Tribe has previously submitted comments objecting to the impending sale and closure of the National Archives at Seattle. The Siletz Tribe learned of this proposed closure, sale and relocation of our records through the media, not from the federal government or in government-to-government consultation. That occurrence in itself is a failure to carry out the Federal Trust Responsibility to our and all other NW Tribes. There still has not been adequate communication, or ability to express our many concerns, necessitating this action.

8.    The Siletz Tribe will suffer indescribable harm if the NW Regional Branch of National Archives in Seattle is closed and its records moved back East, or anywhere outside of the Pacific NW Region. Those records will no longer be easily accessible to the Tribe, and it will be impossible to conduct research within our own Tribal records held there, and access those records for inquiries involving individual ancestors of Siletz Tribal members. The Siletz Tribe has a limited resource base and limited financial resources, and it will be an extraordinary financial hardship for the Tribe to have to travel back East, with plane fare, lodging and meals, every time it needs to access this Archive material, which is not available online. In addition, it is often necessary to examine the actual original physical documents, which more often than one would think have additional writing or information on the back that is not copied when records are digitized. There is no adequate substitute for physical access to the original documents. Impeding this access will obstruct and interfere with the Siletz Tribe's legal efforts to protect its sovereignty, history, legal interests and cultural identity.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 25th day of December, 2020 at _____Siletz_____, __Oregon_____.
               day        month     year          city         state

Robert Kentta

DECLARATION OF ROBERT KENTTA    4    ERROR! AUTOTEXT ENTRY NOT DEFINED.

160

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
9                             AT SEATTLE

10   STATE OF WASHINGTON, *et al.*,          Case No.

11                 Plaintiff,                DECLARATION OF
                                             TALLIS  KING GEORGE
12                 vs.

13   RUSSELL VOUGHT, *et al.*,

14                 Defendants.

15          I, TALLIS KING GEORGE declare as follows:

16          1.      I am a tribal attorney for the Puyallup Tribe of Indians. I am over the age of

17   18 and competent to testify. I make this declaration based on my personal knowledge.

18          2.      I have served as a Puyallup tribal attorney for child support for over thirteen

19   years; representing the Tribe's interests in tribal court and related duties. However, my

20   passion and calling outside of work, is conducting research to honor and reclaim tribal history.

21   When I began work with the Puyallup Tribe, tribal member and historian Judy Wright,

22   became my mentor, friend and history partner. Judy had spent at least thirty years researching

23   Puyallup tribal history and building a first class tribal history repository. Most of this work

DECLARATION OF TALLIS  KING GEORGE – PAGE 1

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

161

was done before computer assisted research, requiring many trips to the National Archives at Seattle, also known as the Sandpoint Archives. Judy Wright scoured museums and libraries, copying historical documents and transcribing those that were difficult to read. She mentored a generation of tribal member-researchers who now work in the Tribe's Historic Preservation department and in the Puyallup Tribe Language Program.

3.       Prior to serving as a tribal attorney for the Puyallup Tribe I was the first in-house counsel for the Port Gamble S'Klallam Tribe of Indians. I worked for the Port Gamble S'Klallams for a total of nineteen years. I organized a team of tribal and academic researchers who established the Port Gamble S'Klallam history library and archives. My motivation was twofold. First, I knew I could not be an effective attorney for the Tribe without a full understanding of the Tribe's legal and cultural history. Second, I quickly learned that the Tribe's history – its language recordings, song recordings, early membership records, constitutional development records, and elders' testimonies speaking to lifeways and treaty rights – all this and more – had been scattered across the globe. I dedicated myself to repatriating these materials to the Tribe and organizing the materials so individual tribal members could access all the information available on their family's history and so the Tribe could write a definitive history of itself – which it did.

I have practiced tribal law exclusively, for over forty years including eight years writing tribal laws for the fourteen tribes of the Northwest Intertribal Court System.

4.       The Puyallup Tribe of Indians is a federally recognized tribe located near Tacoma, Washington and is a party to the Medicine Creek Treaty with the United States which was ratified in 1855. The Tribe has over 5,000 tribal citizens.

5.       The building that houses the National Archives at Seattle appears on approach as an unremarkable, utilitarian structure. The word "archives," from the view of law firms, businesses and courts, tends to conjure an image of a records storage facility for "dead files." I view the National Archives at Seattle as a vibrant, special collection *library*. That library is

DECLARATION OF TALLIS  KING GEORGE – PAGE 2

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

**162**

staffed by expert archivists who have worked with those specific records for decades and are essential to locating records whose cataloguing system confounds even experienced researchers.

A visit to the National Archives in Washington D.C. inspires awe in every visitor, as the permanent home of the original Declaration of Independence, Constitution of the United States, and Bill of Rights. A visit to the National Archives at Seattle, for native people whose ancestral historical and cultural records are housed there, fills a deep cultural yearning to know, honor and understand the lives and sacrifices of their ancestors. This unique and precious collection includes irreplaceable records that came from this area, that are by and about the native people of this area descendants – held in trust for them and protected by the United States.

6.    The Indian tribes I have worked for, are the original owners and continue to be the primary stewards of the land and resources that are now referred to as western Washington. While every Tribe is culturally unique, their cultural foundation rests on their respect, reverence and a personal relationship with nature. Conservation, through wise management and based on thousands of years of cumulative observation and communication with nature, was long the unwritten tribal law, is now written tribal law and includes formal legal structures for resource co-management among tribes, state government and the federal government. I am speaking to this based on my first hand experience writing laws at the direction of fifteen tribes in areas ranging from hunting, to fishing, to environmental protection and many others.

The tribes' status as this country's first conservationists makes it quite fitting that the Bureau of Indian Affairs – the federal agency whose mission is enhancement of the quality of life, promotion of economic opportunity, and carrying out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives, - is under the

DECLARATION OF TALLIS  KING GEORGE – PAGE 3

LAW OFFICE
PUYALLUP TRIBE
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

163

1  United States Department of Interior. The Department of the Interior is the preeminent

2  conservation department in the federal government. Its mission states:

3      The Department of the Interior (DOI) conserves and manages the Nation's natural

4      resources and cultural heritage for the benefit and enjoyment of the American people,

5      provides scientific and other information about natural resources and natural hazards

6      to address societal challenges and create opportunities for the American people, and

7      honors the Nation's trust responsibilities or special commitments to American Indians,

8      Alaska Natives, and affiliated island communities to help them prosper.

9  The federal records management structure for the Department of Interior mirrors the

10 organizational structure of the department, which in turn mirrors the records that are kept at

11 the National Archives, including the National Archives at Seattle. The Department of Interior

12 employs federal records officers at each of its bureaus and offices, including the:

13      Bureau of Indian Affairs,

14      Bureau of Land Management,

15      Bureau of Reclamation,

16      Bureau of Trust Funds Administration,

17      National Park Service,

18      United States Fish and Wildlife Service,

19      United States Geological Survey,

20      Bureau of Ocean Energy Management,

21      Bureau of Safety and Environmental Enforcement,

22      Indian Arts and Crafts Board,

23

DECLARATION OF TALLIS KING GEORGE – PAGE 4

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

**164**

1    Office of Surface Mining,

2    Reclamation and Enforcement,

3    Office of the Secretary,

4    Office of the Inspector General and

5    Office of the Solicitor.

6  The majority of the records I have accessed at the National Archives at Seattle for the benefit

7  of the Puyallup Tribe of Indians, are catalogued in Record Group 75, records of the Bureau of

8  Indian Affairs. When I research tribal records at the National Archives at Seattle, I am

9  researching records generated by the top conservation department of the federal government

10 which, in turn,  documents the lives of the original conservations of this swatixʷtəd, this

11 sacred land.

12          7.      Open any illustrated book on United States history or local lore and you are

13 likely to find one or more iconic sepia photographs of tribal citizens. The captions typically

14 read something like, "Indian, circa 1870." All of my tribal history work focuses on learning

15 the names, families, extended families, longhouse sites, villages, and the illustrious

16 contributions of people who were intentionally erased and are grossly misrepresented in

17 accounts of non-native history. Native history can be thought of as a priceless porcelain vase

18 that was smashed to pieces and we are left scrambling on the floor to find the pieces and

19 carefully glue them together. I will share a few of my own sagas, in which the documents

20 from the National Archives at Seattle provided the vital piece that "cracked the code" on a

21 tribal history mystery, enabling the return of precious cultural knowledge to the descendants

22 and their tribes. The examples that follow, rely primarily on an irreplaceable group of records

23

DECLARATION OF TALLIS  KING GEORGE – PAGE 5

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

165

that was transferred from the Bureau of Indian Affairs, Portland Area Office to the National Archives at Seattle, around 2010 - hundreds of federal probate and heirship files, for individual Indians who owned land held in trust for them by the United States. The records include the name of the deceased, tribal affiliation, allotment number, probate number, fees paid, heirs, and claims against the estate. Of greatest interest, they also contain affidavits and transcripts of testimony before the federal hearing examiners, from heirs and other witnesses. They are an unfathomably rich source of tribal genealogy.

       8.    <u>Example #1 Barney Quass Probate</u>. Barney Quass, a Snoqualmie man, passed away leaving no children, parents or siblings. Relatives from both sides of the Cascade mountains testified at the probate hearing, regarding who should inherit Barney's trust allotment. Their testimony was duly transcribed by a court reporter. Among the transcripts was an affidavit, dated June 14, 1912 and handwritten on Reinig Brothers stationery – the general store in Snoqualmie, Washington. Otto Reinig prepared and notarized the affidavit. Watson Martin, son of the affiant, translated.

> Martin Enias (Indian) about 100 years of age being by me first duly sworn upon oath deposes and says that after Barney Quass's father died, Barney Quass and his mother lived with my wife and I for about 12 years when Barney Quass's mother died and I buried her on the White River, Wash. That there are no near relations living that I have any knowledge of.

Martin Enias signed the affidavit with his thumbprint. A true and correct copy of the affidavit, maintained in the National Archives at Seattle, is attached as Exhibit A hereto. I knew of Martin Enias (Eneas) because years earlier, I purchased a headstone for Martin and his wife Madeline and had it set, as part of the family's ceremony, at the old Indian cemetery at

DECLARATION OF TALLIS KING GEORGE – PAGE 6

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

Cashmere, Washington. Madeline Eneas was the daughter of Skadewa, the renowned chief of the upper Snoqualmie Tribe. The late Katherine Joseph, a Sauk Suiattle tribal elder, had brought me to visit her great grandparents' unmarked graves a few years earlier, surrounded by an apple orchard. Afterwards she quietly said, "Thank you for bringing me to this place." Katherine and I worked together for two years to sort Martin and Madeline Eneas' genealogy to include it on the headstone, so descendants would never forget.

Thanks to the Barney Quass probate, we learned that Barney Quass's mother, Wycash, was the *sister* of Skadewa, so she was Madeline Eneas' paternal aunt. That explained why Barney and his mother went to live with Martin and Madeline Eneas. The Martin Eneas affidavit led to our understanding that Martin Eneas, a Wenatchi Indian, allotted on the Wenatchee river, had traveled all the way to Muckleshoot, probably by buckboard, to bury his wife's aunt alongside her brother, on the White River.

Martin Eneas' arduous trip, across an unpaved Snoqualmie pass, to bury his wife's aunt on the White River near Auburn, Washington, was astounding by itself but there is more to this story. My husband, as a wee boy riding through the reservation in the back of his uncle's car was told by his aunt, "You have a chief buried up there. Don't ever forget it." Over seventy-five years later, we learned through his aunt's mother's diary, that the chief she was referring to was Skadewa. As a result of our research and my husband's advocacy, the tribe acquired the land to protect the little cemetery. The Old Ones buried there have descendants today at the Puyallup, Muckleshoot, Snoqualmie, Tulalip and Sauk Suiattle tribes. Because of the National Archives and their skillful archivists, we can now place headstones for Skadewa and Wycash. The families can finally perform the ceremonial duties attendant to this knowledge and in so doing, bring together the branches of this family once again.

9.    Example #2 Young Man's Ascent of Mount Rainier. While working with the late Puyallup tribal historian Judy Wright in 2011, I arranged for a research visit to the National Archives at Seattle. Patty McNamee and Ken House, archivists at NAS, assisted me

DECLARATION OF TALLIS  KING GEORGE – PAGE 7

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

in locating a number of probates for Puyallup tribal ancestors, including that of Joe Young (1862-1930). Joe Young allowed a trusted non-native historian, Arthur Ballard, to transcribe the compelling story of Joe's great, great, great, great grandfather's ascent of Mt. Rainier, for the purpose of receiving his spirit power. A second version of this story was told to Arthur Ballard by Puyallup tribal elder, Tom Milroy (1835-1929) who, like Joe Young, was an Upper Puyallup Indian. Tom Milroy emphasized the truth of the story, "This story is not a sx̌ʷiʔyab (myth). The man in this story was a real person." The epic events described in the story took place before "contact;" long before non-Indians shattered the Puyallup's way of life.

Over the course of the next eight years, I gathered and sorted genealogical fragments, trying to chart the direct line of descent from the young man who found his spirit power to the hundreds of descendants he has today. I learned that Joe Young's mother, Susan, had a half-brother named Charlie Ashue. Charlie Ashue was also a direct descendant of the young man. Charlie Ashue's six times great granddaughter is Marlene Spencer Simla, a Yakama Nation elder, historian, artist and warrior descendant. Marlene agreed to illustrate the two stories with exquisite full page watercolors. The back cover contains the family tree, tracing the lineal descent of the young man.

The book is at the printer and will be my gift to the descendants, most of whom are Puyallup tribal citizens. My hope is that children and adults will read it and draw in their innate courage, strength and endurance; gifts from their ancestor.

10.     Example #3 Minter Village Monograph. I wanted to work with Puyallup tribal historian, Judy Wright, long before I had the privilege of coming to work for the Puyallup Tribe. Our time together was always too short. When cancer was about to claim her, she let me know in her kind and subtle way, that I needed to finish some work for her. That is what it is like to work with elders; a race against time. The Minter Monograph fulfilled one promise I made to her: the creation of a cultural map of the last chief's longhouse at the Puyallup village of Minter, near Purdy, Washington. I remember Judy's delight when we figured out

DECLARATION OF TALLIS KING GEORGE – PAGE 8

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

that she was a sixth generation direct descendant of Minter's woman chief, tciałtsa. Only later did I realize that she must have already known, but she practiced the old teaching of high class Indians, to be humble of your status and accomplishments.

The Minter Monograph contains biographies of the residents of tciałtsa's longhouse and their blood ties to Chief Leschi and other warriors of the First Treaty War of 1855-1856. A family tree is included, so the hundreds of Puyallup descendants from Minter village can understand their ties to that place and to each other. Knowing your ancestral village is a prized knowledge for native people, information that is mostly lost today. The monograph relies on many sources including those found at the National Archives at Seattle. (Example: NAS RG 75 Bureau of Indian Affairs, Tulalip Indian Agency, Records of the Tribal Operations Branch 1912-1950 Decimal File, Puyallup, Box 4.)

Skokomish historian Frank Allen said of the Minters, "They were a small people, but they had a strong power, a strong little tribe." I added at the conclusion of the Minter Monograph:

That strength carried them through the treaty betrayal, internment during the first treaty war, destruction of their homes, removal to the reservation, allotment of the reservation, forced sale of the allotments, decades long delay in settlement of their claims and every conceivable form of assault on their existence including outright homicide, by those who believed that they had the right to have something that didn't belong to them. Yet, at least ten branches of this strong little tribe not only have survived, their descendants, along with the other strong branches that form the Puyallup Tribe, have secured the Tribe's future.

11. _Example #4 Honoring the Warriors of the First Treaty War._ Five years ago, I had an epiphany that we _have_ to erect a monument to honor the warriors of our First Treaty War of 1855-1856. We live on the King George allotment where my husband was born in a cabin without running water, just over a mile from his ancestral village of ʔilalqo or Forks

_Law Office_
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

village. We are about four miles from the village that Chief Leschi and his Nisqually warriors used as a base camp during the war. The five month long war is the only time in U.S. history, that I am aware of, where tribes went to war to get their land back and were successful. Over 25,000 acres of tribal land were returned to the Nisqually, Puyallup and Muckleshoot tribes as a direct result of the war.

Proper honoring of the warriors would require us to: 1) identify as many of the warriors as we could, 2) identify and locate their direct descendants so we could properly thank them, 3) piece together how the warrior families were related to each other, 4) set a spiritual table to honor each warrior 5) host a potlatch for the descendants, and 6) tell the truth about the extraordinary allied victory to reclaim our land by writing the script for a film we commissioned and by writing a book of warrior biographies to be presented to the descendants at the potlatch.

Nineteen months later, the monument was dedicated, bearing the names of 49 Nisqually, Muckleshoot, Puyallup, Upper Snoqualmie, Wenatchi, Palouse, pcwa'nwapam and Squaxin warriors. Many of the warriors' names had never been published. The inscription on the monument reads, "All that we are and All that we have, We owe to the warriors of our First Treaty War."

The biggest challenge, among many, was researching and writing the warrior biographies, with their intricate lineages. The National Archives at Seattle gave key assistance in locating probate files, as well as documents related to the Puyallup payment of 1929. Those records include a list of Puyallups who passed away during the period 1909 until 1929, giving us vital information about the warriors who survived the war and their descendants. Without the expert work of the NAS archivists, we would surely have never located those records, as this July 24, 2014 e.mail from NAS archivist Patty McNamee illustrates, "There is a change in where it was originally located and should have been part of the Tulalip Agency originally. We will be pulling 3 boxes of General Records of the Tribal Operations Branch." The

DECLARATION OF TALLIS KING GEORGE – PAGE 10

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

monument never would have been possible without access to the historic documents maintained by the National Archives at Seattle. Photographs of the front and back of the monument are attached as Exhibits B and C hereto.

12.     What are the benefits for tribes and tribal citizens of reclaiming tribal history in this way? Let me give a few illustrations.

We prepared a 16 foot long family tree showing how all 49 warriors were related as extended family, through blood and marriage, which was displayed at the potlatch. As the descendants approached the tree to find their ancestors, I witnessed strangers putting their arms around each other, now recognizing each other as relatives, reunited after 160 years of federal Indian policies had blown up their family ties.

The Puyallup Tribe Historic Preservation Department hosted the first- ever tribal history seminar, inviting descendants and staff from the Squaxin, Muckleshoot and Nisqually tribes to visit and learn together about the First Treaty War. The seminar relied on the research from the warrior honoring.

Puyallup tribal elder Ramona Bennett descends from the warrior Iyakama who sacrificed his life in the First Treaty war. Ramona distinguished herself as a leader during the Puyallup Tribe's Second Treaty War that culminated in the Boldt decision. Ramona still carries the stories of the rape and murder of her great aunt during the land-grab era when non-natives used lethal means to take Puyallup tribal land. Ramona told me she that it was the first time she had seen confirmation of the truth of her family's oral history; that she felt validated by the work.

In my child support practice, I have occasion to visit with tribal members about their warrior ancestors and share stories and documents with them. One parent with a history of contempt for non-payment of child support brought his father into the office, "I want you to tell my Dad the story of our warrior. I don't want to get a single thing wrong." This parent is now a reliable payor.

DECLARATION OF TALLIS  KING GEORGE – PAGE 11

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

Chief Leschi, who worked for peace throughout the war and was lynched for a killing we now know that he did not commit, prophesized the value of this work soon before his death:

> Whatever the future holds, do not forget who you are. Teach your children, teach your children's children. Teach them the pride of a great people...A time will come again when they will celebrate together with joy. When that happens, my spirit will be there with you.

13.     I first learned of the proposed sale of the National Archives at Seattle when a close relative sent me a link to Seattle radio station KIRO's website, dated January 15, 2020. The headline in the "MYNorthwest" section read, "Federal panel recommends closure and sale of Seattle National Archives facility." I notified the Puyallup Tribe, through its law office, on January 22, 2020.

14.     On January 23, 2020, I e.mailed a letter to then Acting OMB Director Russell Vought at the Public Buildings Reform Board e.mail address, under the signature of my husband, Gilbert King George, an 82 year old Muckleshoot tribal elder and historian. The e.mail stated, in part,

> I am writing to ask that the Federal Archives and Records Center at Sandpoint in
>
> Seattle, Washington be removed from the Public Buildings Reform Board's High
>
> Value Asset list. I understand that this may mean the Public Buildings Reform Board's
>
> list would need to be disapproved and resubmitted, but this should result in a very
>
> minor delay under the FASTA process.
>
> The  Sandpoint property is a vital and vibrant repository for irreplaceable federal
>
> resources of historical, cultural and genealogical value. PBRB's recommendation for
>
> the sale of the Sandpoint site fails to make a comprehensive and safe plan for these

DECLARATION OF TALLIS  KING GEORGE – PAGE 12

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

172

priceless materials. The Board's report calls for removal of the archival materials to Riverside, California, far from the American People who most rely on Sandpoint's resources. At the same time, the report admits that the facility in Riverside, California is not equipped to accept these national treasures at this time, so it suggests a "temporary" storage facility would be needed.

The report does not address the cost to the taxpayers of the relocation of these sensitive federal documents, the temporary storage, or the cost to make the Riverside facility capable of receiving the documents.

I ask that you disapprove the Public Buildings Reform Board's recommendations of December 27, 2020 and suggest that the Sandpoint site be omitted from the list.

15.     No reply or acknowledgement of any kind to our January 23, 2020 e.mail was received from Mr. Vought or from any member or staff of the Public Buildings Reform Board.

16.     My husband and I mentor four native students who are part of our research team. Of course, none of us has had an opportunity to access the materials at the National Archives at Seattle for nearly a year due to the CoVid pandemic and if the sale is allowed to proceed, we will not be able to access the materials indefinitely. My husband will be 83 years old, this spring. It is not an exaggeration to say that moving the materials to Riverside, California will effectively end his ability to access these materials. Our students will miss their chance to discover their histories with their trusted elder to guide and interpret the work. Our elders often say, "There is no promise for tomorrow."

I have seen no comprehensive, safe plan for these priceless materials. The Board's report calls for removal of the archival materials to southern California, yet the report admits that the facility there is not equipped to accept these national treasures at this time, so it suggests a "temporary" storage facility would be needed. There has been no discussion of

DECLARATION OF TALLIS  KING GEORGE – PAGE 13

*Law Office*
**Puyallup Tribe**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

173

1    how long the storage period would last, the costs of moving these fragile, irreplaceable

2    documents, the cost of storage for an indefinite time and the cost of construction at the new

3    site. Add to that, the loss of the archivists who know the materials best and the frightful

4    challenge of organizing the materials without them, at the new site.

       This is unacceptable. The United States has legal obligations, both to the Tribes and

5    to these irreplaceable materials, that are not met by this hasty and poorly planned decision.

6    I declare under penalty of perjury that the foregoing is true and correct.

7

8    DATED this 1st day of January, 2021, Muckleshoot Indian Reservation at Auburn, Washington.

9

10    
       TALLIS KING GEORGE

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF TALLIS KING GEORGE – PAGE 14

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

**174**

# Exhibit A

TO

DECLARATION OF TALLIS KING GEORGE

ISO PUYALLUP TRIBE OF INDIANS

REPRODUCED AT THE NATIONAL ARCHIVES

OTTO REINIG
MANAGER

OTTO REINIG
NOTARY PUBLIC



## Reinig Brothers
### GENERAL MERCHANDISE

LOCAL AND LONG DISTANCE PHONE

SNOQUALMIE, WASH. 6, 4 1912

Martin Enias (Indian) about 100 years
or more of age being by me first
duly sworn upon oath deposes and
says that after Barney Quass's father
died, Barney Quass and his mother lived
with my wife and I for about 12 years
when Barney Quass's mother died and
I buried her on the White River. Wash.
That there is no near relatives living
that I have any knowledge off.

His Thumb
mark

Martin
Enias

Subscribed and sworn to before me
this 14 day June 1912

Otto Reinig

Notary Public in and for the State of Wash-
ington, residing at Snoqualmie, Washington.

# Exhibit B

TO

DECLARATION OF TALLIS KING GEORGE

ISO PUYALLUP TRIBE OF INDIANS



# All That We Are - All That We Have
## We Owe to the Warriors of our First Treaty War 1855 - 1856

Kamiakin   Leschi

Kitsap   Owhi

Quilquilton   Qualchan

Kanasket

Tuwapati

Yukshannot   Eneas   Puyuyukh   Hinuk   Skeenewough   Quiemuth
Tcitlәmtam   Pashniki   Pahowatish   Mowitch Man   Lokout
Spәkidәb   Quatskadib   Peter Martin   Charlie Sheadshut   Diakud
Becidol   John Tkwa yi tid   Charlie Martin   Samuel McShell   Skwai kai
Louis Nelson   Kawә sa i dәxw   So wa hai ad   Batstakub   Iyakama   Sikh al khut   Stahi
Thlipash   Yetakh   Sam P'yelo   Luplupton   Dick Jackson
Tom Smartlowit

Hoptowit

Tyee Dick

Paul Ashue Weyallup

Klowout

Sasticum   Luke

Wahelut

Honoring all whose names are unknown to us but
whose sacrifice will never be forgotten.

# Exhibit C

TO

DECLARATION OF TALLIS KING GEORGE

ISO PUYALLUP TRIBE OF INDIANS



Commemorating the 160th Anniversary of the Allied Victory
First Treaty War 1855-1856

We honor and thank the extended family of warriors,
Whose courage and strength secured the return of our Nisqually, Puyallup and Muckleshoot land.
Many sacrificed their lives and all suffered immeasurable hardship.

"Whatever the future holds, do not forget who you are.
Teach your children, teach your children's children.
Teach them the pride of a great people...
A time will come again when they will celebrate together with joy.
When that happens, my spirit will be there with you."
-Chief Leschi

Dedicated August 6, 2016
Henry King George Allotment, Muckleshoot Reservation
Gilbert and Tallis King George

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF MATTHEW WILLIAM KLINGLE |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Matthew William Klingle, declare as follows:

1.      I am associate professor of history and environmental studies (joint appointment) at Bowdoin College in Brunswick, Maine. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a scholarly historian with more than three decades of research at several National Archives branches, including the National Archives at Seattle.

2.      I earned a PhD in history from the University of Washington in 2001, where I studied early and modern North American history, western North American history, environmental history, modern Latin American history, and the history of science and technology. I have written on the environmental history of Seattle from the mid-19th century to the early-21st century, urban design and planning history in Seattle and West Coast Cities, the history of salmon management in the postwar urban Puget Sound region, and the history of Asian Americans and immigration to Washington State. While in graduate school, I was also the inaugural Mary Ann and John D. Mangels Fellow in Public History, where I served as

DECLARATION OF MATTHEW
WILLIAM KLINGLE

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   a visiting historian at the Museum of History and Industry (MOHAI) from 1994-1996, playing

2   a major role in designing the exhibit, "Salmon Stakes: People, Nature, and Technology," at

3   MOHAI's prior location in Seattle's Montlake neighborhood. I have also written on the history

4   of medicine and public health, environmental justice, and outdoor recreation and consumer

5   culture. My first book, based on my doctoral dissertation, *Emerald City: An Environmental*

6   *History of Seattle* (Yale University Press, 2007), received the biennial 2009 Ray Allen

7   Billington Prize from the Organization of American Historians. I was also an expert witness in

8   the matter of *King County v. The Travelers Indemnity Co., et. al.* (W.D. Wash. Ongoing),

9   writing on the development and operation of sewerage systems designed and built by the

10  Municipality of Metropolitan Seattle (now King County) and their effects on the waters and

11  sediments of the Lower Duwamish Waterway from c. 1955-1985. I am currently writing an

12  environmental and social history of the modern diabetes epidemic from the late-19th century

13  to the present day. I have taught at Bowdoin College since 2001, where I teach courses in

14  environmental, North American, and urban history plus the history of medicine and public

15  health. I have received fellowships and awards from the Andrew W. Mellon Foundation,

16  National Endowment for the Humanities (twice), American Council of Learned Societies, U.S.

17  Environmental Protection Agency, National Science Foundation, and American Philosophical

18  Society among other organizations. I have served on the board of directors for the Urban

19  History Association and the editorial board for *Environmental History*, the scholarly, peer-

20  reviewed journal of the American Society for Environmental History.

21          3.      Historical scholarship depends absolutely upon archival collections. Archives

22  are repositories of individual papers, institutional records, government documents, and other

23  often rare or even irreplaceable materials and ephemera vital to research by professional

24  historians and teaching our university and college students. Historians often call such materials

25  "primary documents" because they are the foundational building blocks that we use to recreate

26  and understand the past. Some of these materials are housed at university or college libraries,

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   local historical societies, private or public museums or foundations, or state and municipal

2   archives. But the many branches of the National Archives are among the most important of all

3   repositories for primary documents. Few if any scholars specializing in any aspect of United

4   States history or the history of the territories that eventually became the United States can do

5   their professional work without using the collections of the National Archives. All of my

6   professional work since graduate school has relied upon access to the main and regional

7   branches of the National Archives, notably the branch in Seattle. My doctoral dissertation and

8   first book relied extensively upon records at the Seattle branch. For my current work on the

9   environmental and social history of diabetes and chronic disease, I have used collections at

10   National Archives branches in Atlanta, Georgia; College Park, Maryland; Riverside,

11   California; Seattle, Washington; and Washington, D.C.

12         4.      Among the materials I have used at the National Archives at Seattle include

13   Record Group 77: United States Army Corps of Engineers, which I used in my doctoral

14   dissertation and *Emerald City*, my first book, to analyze large-scale infrastructure changes to

15   the waters and coastal lands surrounding present-day Seattle and its environs. These documents

16   were vital to understanding the hydrology and topography of Seattle prior to the city's meteoric

17   growth in the early twentieth century. Correspondence, maps, and reports in this collection

18   also detailed the decisions and consequences of constructing the Lake Washington Ship Canal

19   and the Lower Duwamish Waterway, notably the effects of both projects on future salmon

20   spawning habitat and the resulting challenges facing recreational anglers, commercial fishers,

21   and Native American harvesters. Many of these materials remain undigitized because they are

22   too fragile or too large (such as many rare oversized maps) to be converted easily. For my work

23   on the "Salmon Stakes" historical museum exhibit at MOHAI, I used materials from Record

24   Group 22: U.S. Fish and Wildlife Service and Record Group 85: Immigration and

25   Naturalization Service to find valuable details about the role the federal government played in

26   salmon harvesting and management in the late-19th and early-20th century, and how such efforts

DECLARATION OF MATTHEW
WILLIAM KLINGLE

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

183

1   affected immigration policies governing migrant laborers from China, Japan, and the U.S.-
2   occupied Philippines before World War II. I also used several record groups from the National
3   Archives at Seattle to write two curriculum projects for Washington state secondary school
4   teachers, sponsored by the University of Washington's Center for the Study of the Pacific
5   Northwest. One curriculum project, "A History Bursting with Telling: Asian Americans in
6   Washington State," used materials from Record Group 85 to depict the many challenges
7   immigrants faced in applying for jobs, undergoing naturalization proceedings, and facing
8   discriminatory laws and policies. Questionnaires, interviews, and petitions from these records
9   give students personal, often poignant insights into the history of Asian immigration to
10  Washington state and how Asian immigrants later became American citizens.

11          5.      The records held at the National Archives at Seattle are regularly used by
12  scholars, policymakers, attorneys, and general citizens to research and document the historical
13  patterns of tribal governance, environmental policies and management, and the consequences
14  of political and fiscal decisions for communities in the Pacific Northwest and Alaska. Tribes
15  in particular rely on the materials housed on site to answer questions about treaty relations,
16  assess Native American Graves Protection and Repatriation Act (NAGPRA) claims, land and
17  water disputes with and between tribal jurisdictions, and government to government relations
18  (state and federal with tribes). Historians working on regional environmental issues have
19  access in one place to a wide array of archived federal documents detailing the history of land,
20  timber, mineral, and fishery management. Regional branches of the National Archives reduce
21  the need for travel to different sites, which is costly and time consuming and also erodes the
22  ability of researchers to consult many different federal record groups at once. The National
23  Archives at Seattle are also critical for the ongoing work of federal officials charged with
24  managing agricultural, recreational, and conservation programs in the Pacific Northwest and
25  Alaska. Numerous federal agencies and the citizens dependent upon their work and expertise—
26  from the National Park Service to the Soil Conservation Service to the U.S. Fish and Wildlife

DECLARATION OF MATTHEW        4
WILLIAM KLINGLE

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

184

Service—all depend upon the regional branches of the National Archives to protect, preserve, and promote documents vital to their history and functioning. And no single branch of the National Archives serves a larger, more far flung geographical area than the National Archives at Seattle. Many of the records at the National Archives at Seattle were integrated into my published scholarly work, curriculum materials, and museum exhibits as detailed in the preceding section.

6.     I first learned by word of mouth and social media about the proposed closure and sale of the National Archives at Seattle on January 23, 2020. That same day, I sent numerous emails and messages to colleagues including scholarly historians, archivists, and librarians. I also contacted my U.S. Senators and Congressional Representative. The news came as a surprise to me and my colleagues. Given the importance of National Archive branches to historians, legal professionals, and federal employees, everyone I spoke to was blindsided by the decision and the complete lack of prior notification. Professional historians in particular were dismayed at the devastating effects the proposed closure would have for their scholarship and teaching.

7.     Soon after hearing about the proposed closure and sale of the National Archives at Seattle, I also contacted my U.S. Senators and U.S. Congressional Representative. I also sent emails to the Federal Public Buildings Reform Board and The Archivist of the United States on January 23, 2020, but received no response from either office whatsoever.

8.     The most immediate harm of closing and moving the records from the National Archives at Seattle will be difficulties of visiting distant repositories in southern California or Kansas City. For scholars based in the Pacific Northwest, the move will demand more time for travel, plus the associated costs for lodging and transportation. These costs will be even greater for undergraduate and graduate students looking to use the collections currently housed in Seattle, many of whom have neither dedicated time nor sufficient resources to conduct research over long periods and at great expense. The cascading effects of the move will likely be borne

DECLARATION OF MATTHEW
WILLIAM KLINGLE                                              5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**185**

1  by already financially-strapped universities and colleges, federal financial aid programs, and

2  grantmaking agencies. The move will be even more devastating for Native American and

3  Alaskan Native citizens in Washington, Oregon, Idaho and Alaska. For Alaskan Natives in

4  particular, who already have had to travel to Seattle to consult federal records since the 2016

5  closure of the National Archives branch in Anchorage, shuttering the Seattle branch will add

6  further insult to major injury. Finally, archives are more than collections of documents and

7  records; they are repositories of expertise and institutional memory. Losing the career staff and

8  many unpaid volunteers who operate and maintain the National Archives at Seattle will mean

9  losing partners who help scholarly historians, legal professionals, federal officials and general

10  citizens interested in their nation's past from doing effective, important research.

11  I declare under penalty of perjury that the foregoing is true and correct.

12

13  DATED this 28th day of December, 2020 at Brunswick, Maine.

14

15

16  _____
   MATTHEW WILLIAM KLINGLE

17

18

19

20

21

22

23

24

25

26

DECLARATION OF MATTHEW          6
WILLIAM KLINGLE

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

STATE OF WASHINGTON, et al.,      NO.

8

                Plaintiff,      DECLARATION OF CHARLENE
9      KRISE

    v.

10

RUSSELL VOUGHT, et al.,

11

              Defendants,

12

I, Charlene Krise, declare as follows:

13

1.     I am the Vice-Chairwoman of the Squaxin Island Tribe. I am over the age of

14

18 and competent to testify. I make this declaration based on my personal knowledge.

15

2.     I have been the Vice-Chairwoman of the Squaxin Island Tribe, on this election

16

cycle, since 2018. I have previously served as a member of the Squaxin Island Tribal Council

17

on numerous occasions.

18

3.     I am the Executive Director of the Squaxin Island Museum Library and

19

Research Center (MLRC) located on the Squaxin Island Reservation. As Executive Director,

20

I am responsible for operation of the MLRC including management of its collection, and

21

direction of research conducted by and in connection with the MLRC.

22

4.     The Squaxin Island Tribe ("Squaxin") is a federally recognized Tribe located

23

in Kamilche, Mason County, Washington. Squaxin is a signatory to the 1854 Treaty of

24

Medicine Creek.

25

26

DECLARATION OF CHARLENE KRISE

SQUAXIN ISLAND LEGAL DEPARTMENT
3711 SE OLD OLYMPIC HWY
SHELTON, WA 98584
360.432.1771

1       5.      In the 1950s and 1960s, Squaxin used the documents at the National Archives

2   at Sand Point to research its political continuity in a battle to prevent termination of the Tribe.

3   From the 1960s and 1970s to the present, Squaxin has used the documents at the National

4   Archives at Sand Point to document its reserved fishing rights under the Treaty of Medicine

5   Creek.  Beginning in the 1970s, Squaxin has used the documents at the National Archives at

6   Sand Point to conduct genealogical research to assist the Tribe's support for national Indian

7   Child Welfare legislation.    Were the records stored at the National Archives at Seattle moved

8   out of the region or state, Squaxin and Squaxin members would, practically speaking, no longer

9   have access to those records and Squaxin would be irreparably harmed.

10       6.      No federal agency or federal government representative contacted the Tribe in

11   connection with the federal government's decision to sell the National Archives at Seattle.

12       7.      If the records housed at the National Archives facility are moved out of

13   Seattle/out of the Pacific Northwest, it will become practically impossible for the Squaxin

14   government and Squaxin peoples to access the documents housed there.  This will limit the

15   Tribe's abilities to protect its tribal and individual legal interests, with respect to treaty hunting,

16   gathering, and fishing rights; water rights; land ownership; genealogy, and more.  If the

17   documents are moved, the Tribe and individual members will be forced to incur significant

18   cost to continue to protect these legal interests.  Moving the records out of the Pacific

19   Northwest will also cause cultural harm to the Tribe and individual members by dramatically

20   limiting access to cultural and historical research resources.

21       I declare under penalty of perjury that the foregoing is true and correct.

22

23   DATED this 4 day of January , 2021 at Shelton , WA .
            day     month     year      city      state

24

25                     Charlene Krise

26                     Charlene Krise

SQUAXIN ISLAND LEGAL DEPARTMENT
3711 SE OLD OLYMPIC HWY
SHELTON, WA 98584
360.432.1771

**188**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

                Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

                Defendants,

NO.

DECLARATION OF MICHAEL P. KUCHER

I, Michael P. Kucher, declare as follows:

1.    I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.    I am an Associate Professor of History at the University of Washington, Tacoma, (UW or University), Washington State's largest public research university. I have held this position since January 1997. As an Associate Professor of History at UW, I have responsibility for teaching undergraduate students environmental history, history of technology, Pacific Northwest history, and historical methods, especially the use of libraries and archives to perform historical research.

3.    I hold a Ph.D. (2000) in History from the University of Delaware. From 2017-2019 I held the position of Division Chair for Social and Historical Studies at the University of Washington, Tacoma. My prior research has been supported grants from both the National Science Foundation and the National Endowment for the Humanities. I currently

DECLARATION OF MICHAEL P. KUCHER

1

ERROR: AUTOTEXT ENTRY NOT DEFINED.

**189**

1    have a book proposal with another UW author under review by the University of Virginia on
2    the Architecture of Seattle for the series, Buildings of the United States.

3        4.    The National Archives at Seattle houses many records that are critical to my
4    work. To name just a few examples:  Record Group 77 (RG 77) contains Correspondence
5    Relating to Specific Harbor Defense Projects, 1905 – 1930 in eleven legal boxes.  Among
6    these records are those pertaining to Fort Lawton, Seattle.  None of these records has been
7    digitized.  RG 71, Records of the Bureau of Yards and Docks, 1784 - 1963 consists of
8    memorandums, correspondence, telegrams, reports, maps, and drawings related to the siting
9    and building of the Sand Point Naval Air Station in Seattle.  Records such as these are
10   essential for my research, which includes the federal role in shaping Seattle's architecture.

11       5.    I teach three classes at the University of Washington, Tacoma, in which
12   students have performed research at the NARA Sand Point. Ecological History (TESC 426)
13   in which students ground their understanding of conservation and human impacts on the
14   environment in case studies of human actions in the greater Puget Sound region.  Many of
15   these actions—such as the digging of the Ship Canal in Seattle or the Dredging of the
16   Duwamish River or the Construction of the Mt. Rainier National Park—involve federal
17   projects whose documents are at NARA Sand Point. I also teach Pacific Northwest History
18   in which students do a research project that can involve accessing records at NARA.  Finally,
19   I teach History Methods (TEST 380) where students gain hands-on experience identifying,
20   locating, and inspecting primary source documents at the NARA.  Whereas some records
21   such as the Donation Land Claims contained in the BLM RG 49 have been digitized, it is
22   often difficult to discern details in digital versions that are readily apparent in the originals.

23       6.    My students have also used the National Archives to research the Montlake
24   Cut; Fort Lawton; Traditional Ecological Knowledge of the people of the Puyallup Nation;
25   the Ballard Ship Canal; and disappearing glaciers on Mount Rainier, to name a few
26   examples.

1       7.      A former undergraduate student of mine at UW is now doing a Ph.D. in agricultural history at the Iowa State University, Ames, on the agriculture of the Hudson's Bay Company farm in Cowlitz Co. WA, and will be using NARA records to determine what impact Kanaka (Hawaiian) workers may have had on British and American agricultural practices. He will need to use the records of the Cowlitz Indian Tribe at the NARA Seattle facility.

8.      Other research I have done at the NARA Seattle facility involved use of the Donation Land Claims and General Land Office Records in Oregon and Washington Territory, especially the hand drawn Cadastral Survey Plats (maps) and accompanying manuscript written descriptions to determine contact-era land use, vegetation, and water resources in order to study the impact of European settlement and agriculture and forestry as part of a larger project on the ecological history of the Salish Sea Watershed. Although some of these records have been digitized, many have not.

9.      I first learned of the proposal to move the records in the press, either the *Seattle Times* or the KUOW radio station some time within the past year.

10.     If the NARA Seattle facility closes, it will be much harder for me to complete research on recreation or architecture in the region's National Parks or city parks such as Magnuson Park at Sand Point, and depending on funding for out-of-state travel, it may be impossible for me to complete such research. Students who can currently reach NARA by public transportation could not perform this research at all. As reported in The Guardian today (30 December 2020),[1] only 1% - 3% of the NARA documents have been digitized to day. That means at least 97% of the sources students may need would not be available. The potential harms are both short-term, as in difficulty completing a student project as well as long-term, less research over time concerning conservation and recreation in the region,

---

[1] https://www.theguardian.com/us-news/2020/dec/30/seattle-national-archives-indigenous-people-property-sale

1    which will mean a less-qualified work force, especially those students seeking jobs in
2    government. Research at NARA is the very best sort of "Civics" education a student can
3    obtain because performing it requires the acquisition of an intimate knowledge of how the
4    government works. It would be a substantial loss to myself, my colleagues, and my UW
5    students to lose access to the incredible records at the Seattle Archives facility.

6

7    I declare under penalty of perjury that the foregoing is true and correct.

8

9    DATED this 4th day of January, 2021 at Seattle, WA.

                                        _____
                                        Michael P. Kucher

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF CATHERINE LEE |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

8
9
10
11
12
13

I, Catherine Lee, declare as follows:

14

1.     I am the President of the Chinese American Citizens Alliance of Seattle (C.A.C.A. Seattle). I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

15
16
17

2.     I have served as President of the C.A.C.A Seattle since 2019, and have been a member since 2014. As President, I am responsible for presiding over all meetings, appointing members of various committees, and representing C.A.C.A. Seattle at events and on legal documents.  Prior to serving as President, I served as Vice-President and Treasurer.

18
19
20
21

3.     C.A.C.A. Seattle is the Seattle chapter of one of the oldest civil rights organizations in the country. An important part of C.A.C.A. Seattle's mission is to educate the public about the history and contributions of Chinese Americans in the Pacific Northwest.

22
23
24

4.     A critical part of that history is the Chinese Exclusion Act and its impact on local communities. The National Archives at Seattle holds many of the most important records about the implementation and impact of the Chinese Exclusion Act on the region. C.A.C.A.

25
26

BRADLEY BERNSTEIN SANDS LLP
113 CHERRY ST, PMB 62056
SEATTLE, WASHINGTON 98104-2205

Seattle and its members rely on those records to not just research and understand the impact of the Chinese Exclusion Act on their own families, but also to educate the Pacific Northwest community about the Act and its impact on the region as a whole.

5.     The records are central to our organization's efforts to add the Chinese Exclusion Act studies to the Washington State K-12 curriculum. This discriminatory time in history is not yet required studies in Washington State. A group of leaders from C.A.C.A. Seattle has worked on developing educational modules for teachers, and used research at the National Archives at Seattle for this purpose. If the records at the Archives were relocated, this important work would be seriously hampered due to inaccessibility.

6.     Many of our members' families, and those of the Chinese American community, have lived in the Seattle area for generations. Their families were significantly impacted by the Chinese Exclusion Act. Records related to their families' livelihoods and travel are stored in Seattle's National Archives. Since at least 2014, volunteers at the National Archives at Seattle had assisted C.A.C.A. Seattle in conducting training sessions for members to locate and find records housed at National related to their own families.

7.     Some of the Archives volunteers are members of C.A.C.A. Seattle who have contributed countless hours for over a decade to an effort to index files regarding the Chinese Exclusion Act.  The volunteers review individual files to identify pages that need extra attention for long term preservation. They then read the contents to glean information necessary to index the file and enter the data into a database with the goal of the Archives providing a searchable public record of the many thousands of files. The volunteer effort to finish indexing the Chinese Exclusion Act files in Seattle is not close to being finished. There are still thousands of files to review. If the Chinese Exclusion Act records were moved elsewhere, this effort to preserve and index the Chinese Exclusion Act files is at serious risk of never being completed.

8.     I have personal experience in discovering family records at the Archives. I learned that my great-aunt entered America in 1928 through Seattle to study medicine. All her records were right here, and my family was not even aware of it until I learned about the richness of resources about Chinese American history available at the Archives. It is a thrill to be able to see her actual handwriting and to learn so many more details about her life.

9.     In another example, one of our organization's members was born at the end of the U.S. Chinese Exclusion Act and in the middle of the Canadian Chinese Exclusion Act. Since her father was Chinese American and her mother was Chinese Canadian, her family was separated for 5 years by these "twin exclusion acts". Her story has been recovered and retold through research in the archives. Without access to these files locally, families such as hers would find it difficult if not impossible to find funds to travel to find their own histories that began and continue on in the Northwest.

10.     Another member had three generations of her father's family who immigrated to the United States under the Chinese Exclusion Act between 1873 and 1940. They each settled in Ellensburg, WA. This member was able to review the arrival records for each of them. Her grandfather had never met his father, who had returned to the U.S. before he was born. The family had no photo of the family patriarch until our member found his Chinese Exclusion Act file from the 1902-1904 trip where her grandfather was conceived. It was particularly meaningful to her that not only were file contents over 100 years old, but also the knowledge that her great-grandfather probably touched the photo and other papers in the file. These rare physical records are not the type that can be recreated in an electronic database. This member has also located files of other family members and of other Chinese men who lived and worked in Ellensburg in the early 1900s. The physical files housed at the Archives have provided detail and depth to our members' understanding of the contributions of Chinese pioneers to Central Washington growth and history.

1    11.    In 2018, our organization hosted a commemoration of the 75th anniversary of
2    the repeal of the Chinese Exclusion Act at the Wing Luke Museum. Our members used the
3    resources at the Archives to curate information for the event. At the event, Archives volunteers
4    provided valuable insight into available family records regarding the impact of the Chinese
5    Exclusion Act on our community.

6    12.    Members also utilize records, including oral histories, housed at the Archives
7    at Seattle to create art and to tell the stories of both the racial discrimination faced by Chinese
8    American citizens in the Pacific Northwest and the myriad ways that Chinese Americans
9    helped to create and build the city that Seattle is today.

10    13.    For example, one of our members is a professional artist, whose art has been
11    based on the oral histories of Chinese Americans dating back to before the 1850's. Her artwork
12    focuses on social justice, and specifically that which pertains to the Chinese American
13    experience. Her artwork is based on years of research, including oral histories housed at the
14    Archives that document and trace racial discrimination against the Chinese that continues to
15    echo through current times. The histories found in the archives helps Chinese Americans make
16    a case against the racial discrimination we are still experiencing here in the NW today.

17    14.    Relocation of the National Archives at Seattle would frustrate the mission of
18    C.A.C.A. Seattle by depriving of it of access to many of the most critical historical documents
19    surrounding the history of Chinese Americans in the Pacific Northwest. It would also require
20    a diversion of resources by forcing C.A.C.A. Seattle members to travel or avail itself of more
21    expensive research options to continue to build out and teach the public about that history.

22    15.    C.A.C.A. Seattle did not learn of the impending sale of the National Archives
23    at Seattle until January 2020.  If our organization had been given the opportunity to comment
24    on the proposed sale earlier, we would have been able to provide information about the vital
25    role that the National Archives at Seattle plays in our organization's work, including by

26

15.     C.A.C.A. Seattle did not learn of the impending sale of the National Archives at Seattle until January 2020.  If our organization had been given the opportunity to comment on the proposed sale earlier, we would have been able to provide information about the vital role that the National Archives at Seattle plays in our organization's work, including by preserving and providing physical access to files regarding the Chinese Exclusion Act and its impact on our community.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this _____ th day of January , 2021 at ___Mercer Island___ , __WA__ .
                                                 city                    state

_____
Catherine Lee

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF EMILY MANSFIELD |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Emily Mansfield, declare as follows:

1.      I am an ethnohistorian and retired member of the Washington State Bar Association, having worked for the Port Gamble S'Klallam Tribe ("Tribe")—a signatory to the 1855 Point No Point Treaty with the United States—from 1992 to 2013. I also worked for the Jamestown S'Klallam Tribe, which is also a Point No Point Treaty signatory, between 1976 and 1978. I am over the age of 18 and competent to testify. I make this Declaration based on my personal knowledge.

2.      I received my Juris Doctor degree from the University of Washington in 1976. From 1976 to 2011, I was a member in good standing with the Washington State Bar Association. I have conducted ethnohistorical research for Western Washington tribal governments, including for the Jamestown S'Klallam Tribe from 1976 to 1978 and the Port Gamble S'Klallam, Muckleshoot, and Puyallup Tribes since 1992. I served as a Tribal

DECLARATION OF EMILY
MANSFIELD                                   1                    **Galanda Broadman PLLC**
                                                                 8606 35th Avenue NE, Ste. L1
                                                                 Mailing: P.O. Box 15146
                                                                 Seattle, WA 98115
                                                                 (206) 557-7509

**198**

Attorney or ethnohistorian for the Port Gamble S'Klallam Tribe from 1992 to 2013. I have extensively researched and utilized historical records on file with the U.S. National Archives and Records Administration (NARA) since at least 1976.

3.     Between 1976 and 1978, while a staff attorney for Evergreen Legal Services Native American Unit, I represented the Jamestown S'Klallam Tribe in its petition to the federal government for acknowledgement of federal recognition. In order for the Tribe to document its existence and historic relationship with the federal government, I conducted ethnohistorical research at the National Archives facility in Seattle, primarily in Record Group 75, visiting the archives at least four times. The historical records I located, retrieved, and inventoried from that facility were instrumental in the Jamestown S'Klallam Tribe receiving federal recognition.

4.     Starting in 1992, I worked to help the Port Gamble S'Klallam Tribe obtain federal Clean Water Act Treatment as a State (TAS) status from the U.S. Environmental Protection Agency, chiefly in order to protect and conserve Port Gamble Bay's natural and cultural resources. Port Gamble Bay is a historic village site of the S'Klallam Peoples. The Tribe's current Reservation adjoins the Bay. From 1992 to 1995, I conducted ethnohistorical research at the current National Archives facility at Seattle to support the Tribe's federal TAS efforts.

5.     I distinctly recall locating, retrieving, and inventorying historic records from Record Group 75 at the National Archives facility at Seattle, specifically federal records that emanated from the Tulalip, Puyallup and Western Washington Indian agencies in the late 1800s through the mid-1900s as well as records from the General Land Office in Bureau of Land Management RG 49. Those records included original correspondence from federal Indian agents and S'Klallam peoples and federal S'Klallam enrollment applications and records and payment records. I recall original records from the General Land Office showing that

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

S'Klallam peoples were deeded homesteads along Port Gamble Bay, Quilcene Bay, and the Hood Canal, and from the Puyallup agency showing that the Tribe attempted to buy land along Port Gamble Bay from William Talbott and Andrew Pope (who founded a mill there that later became the town of Port Gamble). I also recall poignant original correspondence in Puyallup Agency records from teachers at the former Port Gamble Day School regarding the tutelage of S'Klallam children and daily life in the early 1900s. Some of the original land records are included in bound leather books, which NARA archivist Joyce Justice was always so kind to help me locate at Sand Point; she was an incredible resource to Western Washington Indigenous peoples. These historic records are invaluable to the S'Klallam People and their history and heritage; they are of unexpressible importance to the Tribe.

6. I spent at least four full days conducting ethnohistorical research at the National Archives facility at Seattle in connection with the Tribe's federal TAS program efforts. For that work I was paid by the Tribe with U.S. Department of the Interior program funds for Natural Resources and Cultural Resources conservation and research. My research at the Seattle facility was instrumental in the Tribe obtaining TAS status from EPA in 1995 to help the federal government preserve and conserve Port Gamble Bay.

7. From 1995 to 1997, I worked for the Tribe under a contract with the incomparable Dr. Barbara Lane, a longtime anthropologist for Western Washington Indigenous peoples. My work was pursuant to a U.S. Department of Health and Human Services, Administration for Native Americans (ANA) grant on behalf of the Point No Point Treaty Council that was intended to preserve Treaty habitat and species throughout the Kitsap and Olympia Peninsulas and along the Hood Canal. I again conducted ethnohistorical research at the current National Archives facility at Seattle. I again located, retrieved, and inventoried historic records from Record Group 75 at that facility, including S'Klallam Tribal records from the early to mid 1900s that show S'Klallam efforts to regulate Treaty hunting of deer and elk.

DECLARATION OF EMILY
MANSFIELD
3
Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

200

I spent at least two or three full days conducting that research at the National Archives facility at Seattle.

8.      By the late 1990s, I helped the Tribe create their own archives of historical records obtained in significant part from the National Archives facility at Seattle. Those records informed two books published by the Tribe about S'Klallam history. The first book is Native Peoples of the Olympic Peninsula: Who We Are, the second edition of which was published in 2015. That book was written and published with U.S. National Parks funds and supported by federal employees with the Olympic National Park. The second book is The Strong People: A History of the Port Gamble S'Klallam Tribe, which was published by the Tribe in 2012.

9.      If the historical records currently stored and preserved at the National Archives facility at Seattle are moved, Tribes, Tribal members, and Tribal representatives will lose access to their historical roots. The local availability of these records is critical to the Tribes' documentation of their histories and the scope of their Treaty rights as well as to researching future projects related to conservation of Treaty-protected resources and other matters. Performing thorough ethnohistorical research requires hands-on examination of every potentially relevant file and document. This cannot be done online or by requesting documents from a distance. Online collections are not complete and a researcher using primary source material often does not know exactly what documents exist in order to ask for them. One must look for the records oneself, thoroughly and extensively. Just as exercise of Treaty fishing, hunting, and gathering rights is dependent upon conserving those resources, their exercise is also dependent upon accessing the documents which provide evidence of their existence.

DECLARATION OF EMILY MANSFIELD                4                **Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**201**

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    DATED this 31st day of December, 2020 at _Bainbridge Island_____, WA.

4

5

6                                              EMILY MANSFIELD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF EMILY                    5            Galanda Broadman PLLC
MANSFIELD                                            8606 35th Avenue NE, Ste. L1
                                                     Mailing: P.O. Box 15146
                                                     Seattle, WA 98115
                                                     (206) 557-7509

8    UNITED STATES DISTRICT COURT
9    WESTERN DISTRICT OF WASHINGTON
     AT SEATTLE

10   STATE OF WASHINGTON, *et al.*,        Case No.

11              Plaintiff,                 DECLARATION OF CHARLENE
                                           MARGARET MATHESON
12         vs.

13   RUSSELL VOUGHT, *et al.*,

14              Defendants.

15        I, Charlene Margaret Matheson, declare as follows:

16        1.      I am enrolled in the Puyallup Tribe of Indians, the tribe of my father.  My

17   mother was enrolled in the Coeur d'Alene Tribe, as are many of my siblings and other

18   family.   We also share ancestry from the Aleut (Alutiiq), Kootenai, Upper Skagit,

19   Duammish and Skokomish tribes.   I am employed in the Planning and Land Use

20   Department at the Puyallup Tribe.  I have also worked in the Realty Office of the Puyallup

21   Tribe and at the tribe's health clinic, Puyallup Tribal Health Authority. I am over the age of

     18 and competent to testify. I make this declaration based on my personal knowledge.

22

23

DECLARATION OF CHARLENE MARGARET
MATHESON – PAGE 1

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

2. I have been employed as a Special Projects Land Use Planner since 2008. As Special Projects Planner, I am responsible for receiving, reviewing, and sharing land use notifications from governmental entities which have developed on our ancestral lands, including: the State of Washington, Pierce County, the Cities of Tacoma, Fife, Puyallup, Federal Way, Milton and Edgewood, Washington. Notifications of land use activities that raise concern are discussed as a team comprised of the Land Use team, Legal staff, Natural Resources staff, Historical Preservation staff and, together a decision is made regarding whether the issue raises to a level of concern for the Puyallup Tribal Council. We also participate as a team of staff from the above stated departments to develop and propose a Comprehensive Land Use Plan to our Tribal Council. Our responsibilities rely on our knowledge of the legal and cultural history of non-Indian aggression and taking of our lands, the division of our peoples into the tribes that are recognized by the Federal Government today, the lands the tribes were required to inhabit in order to end the non-Indian aggression against the Indian peoples, and for our peoples to preserve (and in many modern-day cases, relearn) the cultural customs and traditions practiced and taught by our ancestors.

3. My assignments also include working to provide for burial space as our limited land base and current cemeteries approach their capacity. This task has required knowledge of our people's traditional burial places which were closed due to the expanding population of the growing jurisdictions that have located themselves on our lands, how those lands were lost to the tribe, and the repatriation of the ancestors who were interred in those areas. Currently, we are developing plans to locate a cemetery on land that was given to the Catholic Church for an Indian Boarding School at the turn of the 20th century. The tribe was able to reacquire title to 22 acres by occupying the St. George Boarding School site and then obtaining a court finding to award title of the property back to the Puyallup

DECLARATION OF CHARLENE MARGARET
MATHESON – PAGE 2

Omm

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

Tribe. The team at the Puyallup Tribe relied on information on the changes in ownership in part through research at the National Archives.

4.  Prior to serving as Special Projects Land Use Planner, I was employed in the Puyallup Tribe's Realty Department. That department must thoroughly research the history of ownership and title to the lands of the Tribe and of the individual members who seek to place their lands into protected Trust Lands Status. The Realty department is responsible for identifying lands for acquisition, as the Puyallup Tribe works to purchase back our reservation lands one parcel at a time.

5.  I am also on the Puyallup Tribe's Enrollment Committee. Information regarding ancestry and bloodlines is used to determine who is eligible to be enrolled in the Puyallup Tribe of Indians.

6.  The Puyallup Tribe of Indians, a federally recognized tribe, has always occupied the lands that currently define the boundaries of our reservation. The reservation lands include the entire City of Fife, and parts of the cities of Tacoma, Puyallup, Milton, Edgewood and Federal Way and Pierce County, Washington. The treaty of Medicine Creek divided various tribal groups into three separate tribes, and ordered that the Indians move their homes to one of the three reservations and were identified as the Puyallup Tribe, the Muckleshoot Tribe and the Squaxin Island Tribe.

7.  I learned that the Federal Government intends to sell the National Archives site at Seattle from a breaking news alert on my cell phone. I learned from a local news channel that all the documents of Northwestern and Alaskan tribes would be relocated to a site so distant that most northwestern tribal peoples will not be able to travel.

8.  My department, along with the Historical Preservation Office are the official recipients of intergovernmental land use notifications and we did not receive an official notification from the US Government of the intent to sell the property and relocate the precious records. After several co-workers discussed hearing the news reports of the

DECLARATION OF CHARLENE MARGARET
MATHESON – PAGE 3

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

intended sale, we were able to verify that the news report was accurate, and that, despite overwhelming objection, that the intent to sell and relocate the archives remains true.

9.      I have spoken with numerous citizens, tribal and non-Indian about the harm that this move will cause. Most citizens, particularly the elderly, will never be able to journey to a location out of the northwest in order to witness the history of the items housed at the Seattle location. To do so would be cost prohibitive for many, and many of the living elders who have memories or family stories about the history housed in the National Archives will be unable to travel due to health restrictions. Beyond the harm that will be caused against the tribal departments, the stories that are passed down from one generation to the next will be lost over time. Families, such as mine, that have lost family members will not be able to research records and make important discoveries about their families by viewing records at the National Archives.

10.     The National Archives helped me with a wonderful find in 2019. My father took our family history very seriously. He spent much of his adult lifetime tracing our family genealogy. He was never able to trace information regarding his father's family, even seeking assistance from the Mormon Church's comprehensive genealogy program. My paternal grandfather, Charles A. Matheson, an Aleut (Alutiiq) Alaskan Native, passed when my father was two years old. In 2019, I was contacted by a woman who hired an investigator to assist her with identifying her birth parents. The investigator informed her that her grandmother and my grandfather were in the same orphanage on Woody Island, Alaska at the same time. She was able to acquire census records, photographs, personal correspondence and journal entries from the caretaker of the orphans. The records of the orphanage were lost in a fire and hence, my father's attempts to learn more about his Alaskan heritage hit a dead end.

11.     The research of the investigator included acquiring records from the National Archives at Sandpoint in Seattle, Washington. The findings included information

DECLARATION OF CHARLENE MARGARET
MATHESON – PAGE 4

LAW OFFICE
PUYALLUP TRIBE
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

1   that my grandfather was terminated from care at the orphanage at the age of 17 and shipped

2   to the Cushman Trade School on the Puyallup Reservation where he met my grandmother. I

3   had every intention of visiting the National Archives in hopes of learning more about the

4   generations of my Matheson family prior to my grandfather's birth, and the possible

5   whereabouts of his three siblings who are listed on orphanage record, when the office was

6   closed due to Covid in spring of 2019. And, of course, during these pandemic months, I

7   learned from a news release on my cell phone that the US Government intended to sell the

  property and move all of our records out of the northwestern United States.

8

9   I declare under penalty of perjury that the foregoing is true and correct.

10   DATED this 4th day of January, 2021 at Tacoma, Washington.

11

12   CHARLENE MARGARET MATHESON

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF CHARLENE MARGARET
MATHESON – PAGE 5

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**
     **WESTERN DISTRICT OF WASHINGTON**
8

9    STATE OF WASHINGTON, et al.,

10                      Plaintiffs,               NO. 2:21-cv-00002-JCC

11          v.                                    DECLARATION OF MARIE
                                                  MCCAFFREY
12   RUSSELL VOUGHT, in his capacity as
     Acting Director of the OFFICE OF
13   MANAGEMENT AND BUDGET;
     DAVID S. FERRIERO, in his capacity as
14   Archivist of the NATIONAL
     ARCHIVES AND RECORDS
15   ADMINISTRATION; ADAM BODNER,
     in his capacity as Executive Director of
16   the PUBLIC BUILDINGS REFORM
     BOARD; EMILY MURPHY, in her
17   capacity as the Administrator of the
     GENERAL SERVICES
18   ADMINISTRATION; NATIONAL
     ARCHIVES AND RECORDS
19   ADMINISTRATION; OFFICE OF
     MANAGEMENT AND BUDGET;
20   PUBLIC BUILDINGS REFORM
     BOARD; and GENERAL SERVICES
21   ADMINISTRATION, agencies of the
     United States,
22
                      Defendants.
23

24          I, Marie McCaffrey, declare as follows:

25          1.      I am the Executive Director of HistoryLink. I am over the age of 18, competent

26   to testify, and make this declaration based on my personal knowledge.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

**208**

2.    HistoryLink is a 501(c)(3) not-for-profit corporation established in 1997 to pioneer innovative approaches to historical research, education, and publishing. Its primary public service activity is production of HistoryLink.org, the free online encyclopedia of Washington state history and the nation's first original encyclopedia of community history created expressly for the Internet. HistoryLink.org includes more than 8,000 articles about the history of our state.

3.    I have been Executive Director of HistoryLink for 14 years. As Executive Director, I am responsible for managing HistoryLink.org and HistoryLink's other projects and programs, among other responsibilities. Prior to serving as Executive Director, I was co-founder of HistoryLink in 1997 and designed and co-published numerous books about Washington history.

4.    The National Archives and Records Administration's Seattle facility (the "Archives") is a key resource for the development of HistoryLink articles, books, tours, and curriculum materials. Our freelance writers have accessed the records there to learn about the history of federal facilities such as Hanford Nuclear Works, Sand Point Naval Air Station, the Hiram Chittenden Locks, and Lake Washington Ship Canal, significant events such as the passage of the Donation Land Law, the 1962 World's Fair, and the Pig War incident in the San Juan Islands, and biographies of significant people who have shaped the state's history, among many other topics.

5.    Our writers also rely on access to Army Corps of Engineers, Department of Defense, Atomic Energy Commission, Federal Highway Administration, and other federal

DECLARATION OF MARIE
MCCAFFREY                                    2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

209

agency records to develop articles about the history of federal facilities and programs in Washington state.

6.     Some of HistoryLink's programs and projects are funded by or otherwise related to federal programs. For example, HistoryLink is partnering with the Washington State Historical Society and others to produce an in-depth history of Washington state agriculture, which is partially funded by a United States Department of Agriculture Specialty Crop Block Grant. This project will require research into a wide range of federal programs related to irrigation, soil conservation, transportation, and educational programs, which will require research at the Archives.

7.     As another example, HistoryLink.org articles, including those developed through research at the Archives, are also widely cited in nominations for the National Register of Historic Places and in Historic American Buildings Surveys and Historic American Engineering Records, all of which are National Park Service programs.

8.     If the records housed at the National Archives' Seattle facility are moved out of the Pacific Northwest, HistoryLink would be severely hindered in its efforts to tell the stories of Washington's people, places, and significant events. Local access is important because the majority of the records at the Archives are not digitized.

9.     One of the primary obstacles HistoryLink would face would be the expense involved in accessing records housed outside the region. We survive, like most non-profits, by carefully stewarding our resources and doing our work as efficiently as possible. Currently, our writers can search and utilize the critical resources housed at the Archives because they can access the Archives easily and over multiple visits. Effective research requires ample time to

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

look through files to discover what information is available. If the records at the Archives are moved out of the region, the travel expenses will become prohibitive for HistoryLink and its freelance writers. As a result, our writers' ability to write thoroughly researched, balanced articles about Washington history would be compromised.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of January, 2021, at Seattle, Washington.

_____
Marie McCaffrey

DECLARATION OF MARIE
MCCAFFREY

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

211

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF LINDA L. NASH |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Linda L. Nash, declare as follows:

1.      I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am Professor of History at UW (UW or University), Washington State's largest public research university. I have held a faculty position at this university since September 1999, rising from Acting Assistant Professor to full Professor.  As Professor at UW, I have responsibility for teaching graduate and undergraduate students, conducting and publishing historical research, and undertaking various administrative duties.

3.      I hold a Ph.D. in History from the University of Washington. I have published a multiple award-winning book and articles in leading historical journals. I have received national fellowships from the National Library of Medicine and the National Endowment of the Humanities for my work, and I am recognized as a leading scholar in U.S. Environmental History.

DECLARATION OF LINDA L. NASH          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**212**

4.      I learned of the sale of the National Archives facility in Seattle (NARA-Seattle) through an email circulated to faculty in the University of Washington Department of History in late January of 2020, which requested input on how the closure of NARA-Seattle might affect the University of Washington. At that time, I wrote a brief letter to Aaron Hoard, Deputy Director, Regional & Community Relations, noting what I thought some of the negative impacts of closure would be to myself, my students, and the Department of History.

5.      The harms that moving the Archives out of Seattle are several. First, faculty and students at the University will lose convenient access to a rich set of archival resources that document the region's history which will, in turn, impede our ability to conduct research.  To gain access to these records will require considerable additional time and financial resources for travel.  This will impede both faculty and student productivity. Several award-winning publications by University of Washington faculty have made use of these archives over the years; examples include Richard White, *The Organic Machine: The Remaking of the Columbia River* (New York : Farrar, Straus and Giroux, 2013); Alexandra Harmon, *Indians in the Making: Ethnic Relations and Indian Identities around Puget Sound* (Berkeley : University of California Press, 2000, ©1998); Alexandra Harmon, *Reclaiming the Reservation: Histories of Indian Sovereignty Suppressed and Renewed* (Seattle: Center for Study of the Pacific Northwest : University of Washington Press, [2019] ©2019);  and John Findlay, *Magic Lands Western Cityscapes and American Culture After 1940* (Berkeley, Calif.: University of California Press, 1993).

6.      As an American environmental historian, NARA-Seattle holds several record groups that both I and my students have used for our research. Both graduate and undergraduate students in history make use of these materials. In particular the regional records of the Forest Service, the Bureau of Land Management, the Bureau of Reclamation, the National Park Service, the Bonneville Power Administration, the Bureau of Indian Affairs, the Fish and Wildlife Service all contain material relevant to the regional environment and its uses over

DECLARATION OF LINDA L. NASH            2            **ERROR! AUTOTEXT ENTRY NOT DEFINED.**

**213**

time. All of these agency records are not currently digitized and must be consulted in person at NARA-Seattle.

7.      I am currently finishing a book, "Americans in Arid Lands: Engineers and the Materials of Modern Empire," that is under contract to Oxford University Press. One of the foci of this book is the Bureau of Reclamation's Columbia Basin Project in Washington State. To tell this part of my story, I have relied on records at NARA-Seattle, particularly the records of the Colville Reservation. I also consulted records of the U.S. Forest Service at NARA-Seattle when preparing my article, "The Changing Experience of Nature: Historical Encounters with A Northwest River," published in the *Journal of American History* in March of 2000.

8.      Graduate students in History who have used the NARA-Seattle archives for research and whose work I have overseen or reviewed include Christine Avery (history of San Juan Islands), Frederick Brown (histories of Lemhi Pass and Glacier Lake National Monument), Ross Coen (Alaskan fisheries), Devon McCurdy (Bonneville Power Administration), Patrick Lozar (indigenous histories of the Upper Columbia), Eleanor Mahoney (Ebeys Landing), Nathan Roberts (Puyallup Reservation), Rachel Taylor (Bonneville Power Administration), and Jennifer Smith (Colville Reservation). Other graduate students at the University of Washington that I am aware of who have used the materials at NARA-Seattle include David Louter (*Windshield Wilderness : Cars, Roads, and Nature in Washington's National Parks* [Seattle : University of Washington Press, [2010], 2006]); Theodore Catton (*Wonderland : an administrative history of Mount Rainier National Park* [Seattle, Wash. : National Park Service, Cultural Resources Program, 1996]); and Kathryn Utter (Columbia Basin Project).

9.      From 2001 to 2003, I was the Principal Investigator for a grant funded by the U.S. National Park Service (NPS) to research the history of San Juan Island, Washington. The purpose of this study was to provide historical information that could guide NPS's management

DECLARATION OF LINDA L. NASH          3          ERROR! AUTOTEXT ENTRY NOT DEFINED.

214

of San Juan Island National Park. The research for this project was done by my graduate student at the time, Christine Avery, who made use of materials at NARA-Seattle. Her research was eventually published as Christy Avery, *San Juan Island National Park: An Environmental History* (Washington, DC: U.S. National Park Service, Pacific West Regional Office, 2016).

10. Additionally, the ability of faculty to travel to access these resources is limited by teaching schedules as well as personal constraints. Graduate students rarely have sufficient funds available for travel and thus will be prevented from conducting some types of research. Undergraduate students will not be able to make any use of these materials if they are located out of the Seattle area. If the Archives do close or relocate, it will likely prohibit me from gathering additional material for my current project and will disrupt my future plans to write an additional article on the Colville Reservation. Secondly, the closure of the Archives will impede faculty's ability to teach students methods of archival research and will make it more difficult for students to gain necessary skills in the field of History. Thirdly, the loss of the Archives will inhibit the University's ability to attract and recruit promising students who want to research regional history. Access to archival materials is a key consideration for prospective graduate students considering where to pursue their studies, and the University of Washington's own archival holdings are limited compared to many other universities; thus, the records at NARA-Seattle are especially important to our program.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of January, 2021 at ___Seattle___, WA.


Linda L Nash
Digitally signed by Linda L Nash
Date: 2021.01.04 15:42:09 -08'00'

LINDA NASH

DECLARATION OF LINDA L. NASH          4          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**215**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

Plaintiff,

v.

RUSSELL VOUGHT, et al.,

Defendants.

NO.

DECLARATION OF PATRICIA
HACKETT NICOLA

I, PATRICIA HACKETT NICOLA, declare as follows:

1.      I am Patricia Hackett Nicola, Certified Genealogist, public historian, genealogist, and author. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am a certified genealogist and public historian. My research focus is records from the Pacific Northwest and the Chinese Exclusion Act files. I am a national speaker and author. I have written many articles and given many presentations on records that I have researched at the National Archives at Seattle. For the last five years I have written a blog about the Chinese Exclusion Act files.

3.      I use U.S. District court files from the Seattle National Archives facility for research material for articles and lectures. One 1890s court case involved a Native American woman and her fight for her inheritance from her Caucasian pioneer father. The file contained testimony from many early Seattle settlers. For the last twenty years, I have been assisting in indexing of the Chinese Exclusion Act case files, as a volunteer, at the National

2

1   Archives at Seattle. These original records start in the 1890s and continue for many years
2   after the Act was repealed in 1943. There are over 50,000 of these case files and they are not
3   digitized. Because there are so many similar Chinese names it is extremely important that
4   other meta data is added to the index to enable researchers to search the files efficiently. I
5   spoke to the director of the Family History Library in Salt Lake City. He said it will take
6   many years to digitize all the records at the Seattle National Archives facility. As far as I
7   know the Seattle facility does not have the budget, equipment, or personnel to complete the
8   digitization process.
9       4.      I think it is important for people to access records on their ancestors. The
10  exclusion period (1882-1943) was a difficult and painful time for the Chinese. Seeing what
11  their ancestors sustained to survive and thrive in this country, can be a healing experience for
12  the descendants. These files are often used by researchers and those with a familial
13  connection to the files. The Chinese Exclusion Act records give biographical and cultural
14  information and usually contain at least one photograph. It can be difficult to find a specific
15  person in the index of the Chinese Exclusion Act case files because there are so many
16  Chinese with the same surnames and many of the names sound similar. Although the records
17  are now indexed by name and file number, it is extremely helpful to add more meta data to
18  the index. For example, there are hundreds of people with the surname Chin. To find the
19  correct Chin that one is searching for, it helps to have more information about him. We
20  indexing volunteers are sifting through the files and adding information such as, date and
21  place of birth, date and place of arrival, place of residence, occupation, citizenship status, etc.
22  Five years ago, I started writing a blog on the Chinese Exclusion Act files to let people know
23  what kind of information is available in the files and tell them how to find the files. I have
24  received letters from people telling me how they had never seen a photo of their ancestor
25  before reading about him in the blog. Here are a couple of examples of letters I received:
26  "…You featured my grandfather Arthur Chin (Chin Suey Tin) on July 2, 2017… There is

DECLARATION OF PATRICIA                    2          ATTORNEY GENERAL OF WASHINGTON
HACKETT NICOLA                                              Complex Litigation Division
                                                          800 5th Avenue, Suite 2000
                                                            Seattle, WA 98104-3188
                                                               (206) 464-7744

217

1  information in the article that I had no idea existed or things that happened to him." "After

2  reading your blog, I was so emotional. I had no idea this happened to my grandfather, I shed

3  a few tears and had a difficult time sleeping last night. I shared your blog with family

4  members, and they were equally surprised."

5       5.     I first learned of the impending sale in mid-January, shortly after the

6  employees learned about it on January 13. Everyone was in shock. I wrote an opinion piece

7  that was published in the Seattle Times on January 24. I also wrote to my Congresspeople,

8  posted on my blog, social media, and to many genealogy and Chinese organizations.

9  https://www.seattletimes.com/opinion/dont-move-the-national-archives-at-seattle-where-the-

10  past-is-very-much-alive-and-relevant-to-the-present/

11       6.     It is hard to quantify the harm that will be done by moving these records out

12  of the Pacific Northwest. The Native Americans will probably  suffer the most. When their

13  records were moved from Alaska, they were promised they would stay in Seattle. Another

14  broken promise… It is unconscionable. It is hard to imagine all the students, future writers

15  and researchers who will not have access to these records. It will be an expensive endeavor to

16  do research. I have written three historical articles this year from my research at the

17  Archives. (to be published in 2021). If the records are moved, I will not have access to this

18  rich resource of historical material, and it will be difficult and extremely expensive to

19  continue my research and writing. I have applied for the speakers bureau for Humanities

20  Washington. My topic is the Chinese Exclusion files. It is a topic that is only superficially

21  taught in schools, if at all. If I am chosen to talk about these records, I will be telling my

22  audience about records that will soon no longer be available to them.  I would like to

23  continue my research and writing using the records at the National Archives at Seattle but

24  cannot if the records are moved many miles away.

25

26  I declare under penalty of perjury that the foregoing is true and correct.

DECLARATION OF PATRICIA       2      ATTORNEY GENERAL OF WASHINGTON
HACKETT NICOLA                    Complex Litigation Division
                                        800 5th Avenue, Suite 2000
                                        Seattle, WA 98104-3188
                                        (206) 464-7744

218

DATED this 3 1 day of December 2020 at Seattle , WA .
               day         month     year         city          state

PATRICIA HACKETT NICOLA

DECLARATION OF PATRICIA
HACKETT NICOLA

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

219

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF RAY MICHAEL NICOLA |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Ray Michael Nicola, declare as follows:

1.      I am a citizen of the State of Washington, City of Seattle. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am a retired public health physician whose grandfather (father's father) traveled from the Middle East (Lebanon) in the late 1800's to Port Townsend, Washington State.

3.      In researching my family history, I became aware that my grandfather's application for citizenship was likely stored at the National Archives facility in Seattle. By traveling to the NARA Seattle facility in 2003, I was able to view the actual application document. I was surprised at the strong emotional reaction I had to viewing and touching this piece of paper. My eyes teared, my throat constricted, and I felt proud of and grateful to my grandfather's journey to become a U.S. citizen. His difficult life circumstances and extraordinary efforts to better his situation are taken for granted by us today.

DECLARATION OF RAY MICHAEL
NICOLA                                    I            ERROR! AUTOTEXT ENTRY NOT DEFINED.

**220**

1      4.     I first learned about the sale of the National Archives facility from my wife, a

2    volunteer at NARA Seattle.

3      5.     If federal records of my family's activities and experiences are not available in

4    person, it will keep people like me from fully understanding and appreciating the people and

5    culture of blood relatives and of people who went before them. It will deprive them of a full

6    understanding of who they are since much of our individual self-image is based on our

7    understanding of personal history.

8    I declare under penalty of perjury that the foregoing is true and correct.

9

10   DATED this 31st day of December, 2020 at _____Seattle_____, __Washington__.

              day        month      year           city         state

11

12

13                         Ray Michael Nicola

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF TAMIKO FIONA NIMURA |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Tamiko Fiona Nimura, declare as follows:

1.     I am an Asian American freelance writer and public historian. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.     Over the last six years, I have conducted extensive research and published writing about the histories of communities of color in the Pacific Northwest. I have a Ph.D. in English, with training in American ethnic studies, from the University of Washington in Seattle. My first book was a biography and oral history of retired Washington State Senator Rosa Franklin for the Washington State Legislative Oral History Program. My second book is a co-written graphic novel, including the history of Japanese Americans from Seattle, is entitled *We Hereby Refuse: Japanese American Acts of Wartime Resistance* (forthcoming, Wing Luke Asian Museum and Chin Music Press, 2021). My public history work includes Japanese American agricultural history on Vashon Island for the Washington Trust for Historic Preservation, as well as several encyclopedia articles for HistoryLink.org about Japanese Americans in Fife and Tacoma. I worked with Artifacts Inc., in order to do mitigation work

DECLARATION OF TAMIKO NIMURA                    1

1    about the Lorenz Hotel for the City of Tacoma Historic Preservation Office. For several years
2    I have organized Japanese American Days of Remembrance for the City of Tacoma, partnering
3    with the Washington State Historical Society, and will be a consultant with them for their
4    Japanese American Remembrance Gallery opening in 2021.

5         3.      If there is one thing that I have learned in doing this research, it is that there is
6    so much more to uncover in this history. From the Chinese expulsion in Tacoma to the mass
7    incarceration of Japanese Americans to the African American military families of our state
8    (like Senator Franklin's), there are many more stories that need to be documented, researched,
9    and told. I noticed that the records leading to the Chinese Exclusion Act (in which Tacoma's
10    Chinese expulsion played an important role) are some of the most frequently requested from
11    the Seattle National Archives facility. The story of that Act and Washington State's role in it
12    is still a vital and lesser known story for students of American history in our state. Based on
13    the work of a former employee at the Archives, I believe that some of the federal court records
14    of several Japanese American wartime resisters, such as Minoru Yasui, Hajime (Jim) Akutsu
15    and Gordon Hirabayashi, also reside in the Seattle facility. As a researcher, I can also attest
16    that the ability to browse physical archival records, as opposed to requesting records, is
17    unparalleled. My ability to go through the 14 archival boxes of Senator Franklin's
18    correspondence and files from the Washington State Legislature, for example, gave me several
19    important documents which yielded insights into her long and distinguished 20-year career in
20    Olympia. A printed e-mail to a community college student yielded insight into her approach to
21    education; a thank-you letter from a Tacoma union told of her relationship with labor and her
22    significant contribution to creating a trauma care center in Tacoma which lasts to this day. One
23    of the deep pleasures of archival research, in fact, is finding what you did not expect to find.
24    Requesting copies of a folder or a box would have been a gamble, expensive in terms of staffing
25    time and my own expenses. I have found that archives do not speak without significant
26

DECLARATION OF TAMIKO NIMURA      2      ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

223

1   curation and access, and even finding aids and indexes will only go so far. The human ability
2   to search them is crucial.

3       4.     I first learned of the impeding sale of the National Archives at Seattle from a
4   journalist at Seattle's *International Examiner*. I directed him to contacts in the community and
5   signed petitions protesting the closure of the facility. I also learned about the potential closure
6   from contacts at the Washington State Historical Society and from HistoryLink.org.

7       5.     Moreover, as a researcher still uncovering Japanese American history in
8   Tacoma, I should note that there are now Japanese American descendants doing genealogical
9   work whose families moved away from the Pacific Northwest. I anticipate more of these
10   research inquiries with the passing of the Nisei (second) generation, as Japanese Americans
11   seek to retrace their family histories through cities like Tacoma, Seattle, Bainbridge Island,
12   and Fife. It is already difficult to direct them to the WRA records at the facility in Maryland. I
13   have been in contact with several such families from Tacoma, and their genealogical work is
14   an important component of recovering much of Tacoma's lesser-known Japanese American
15   history.

16       6.     I declare under penalty of perjury that the foregoing is true and correct.

18   DATED this 30 day of December,   2020 at         Tacoma, Washington.
                day        month      year          city           state

21                          TAMIKO NIMURA

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

224

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF FRANK NORRIS |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Frank Norris, declare as follows:

1.      I am a Ph.D. historian, recently (2019) retired from the National Park Service. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I lived for 24 years in Alaska and worked during most of that period as a historian in the NPS's Alaska Regional Office in Anchorage. As a research historian, I have written or co-written several full-length histories of Alaska national park units (Denali, Klondike Gold Rush, Katmai, Aniakchak, Kenai Fjords and Lake Clark); have assisted in a legal effort pertaining to the legal ownership of Glacier Bay; and have also written articles that were published in *Alaska History*, *Pacific Northwest Quarterly*, *Journal of the West*, and other peer-reviewed historical journals. Most of the full-length histories noted above are either historic resource studies or administrative histories, but also included is a commercially-published history of the Chilkoot Trail, an iconic Klondike Gold Rush trail near Skagway. Work on the Klondike Gold Rush and Katmai projects, both of which were

1  undertaken in 1990-1991, took place at the Sand Point NARA facility, because this was prior

2  to the opening of NARA's Alaska Branch in Anchorage. I also undertook research at

3  NARA's Sand Point facility as part of several historical and geographical projects during the

4  late 1980s, while I was a Ph.D. student at the nearby University of Washington. Finally, I

5  spent five days in November-December 2019 at the Sand Point NARA facility undertaking

6  historical research pertaining to the Chicken (Alaska) area's roads and trails.

7          3.        I have scrutinized information in several record groups – all in paper form –

8  while researching at the Sand Point NARA facility. In several instances, I have investigated

9  records in Record Group 30 (Alaska Road Commission) detailing roads in the Eagle District,

10 the Kantishna District, the Seward area, the Skagway and Dyea areas, and the Naknek area. I

11 have also looked through various portions of RG 22 (U.S. Fish and Wildlife Service and its

12 predecessor agencies) in search of handwritten data, sent to and from Alaska field offices,

13 pertaining to fish canneries and fish-trap locations. I have gathered valuable information

14 about both homesteads and "trade and manufacturing sites" while canvassing RG 49 (Bureau

15 of Land Management) records, and have gained subsistence-related information from RG 75

16 (Bureau of Indian Affairs) records. Each of these research efforts typically involves combing

17 through extensive correspondence files of typed or handwritten memos and reports, often

18 with duplicate carbons, to which are attached handwritten notes on small sheets of paper or

19 index cards. So far as I am aware, this does not appear to be the type of research that is

20 conducive to "remotely requesting copies of documents sight unseen." Several examples of

21 useful documents, all gleaned from a visit to the NARA Sand Point facility in the fall of

22 2019, are attached.

23         4.        The above-described records are key pieces of information that describe how

24 and why federal officials in Alaska have managed federal lands and properties. While

25 published federal-agency reports give a broad, general overview of federal activities, these

26 primary documents are key – and irreplaceable – because these are the first-order building

blocks from which federal policies are formulated and implemented. These records, moreover, are truly unique, and they are located nowhere else. Situated in Seattle – often described as the economic capital of Alaska – these key records are just one plane flight away from most Alaskan researchers. But if these records are removed to St. Louis, the San Francisco Bay area, or some other more remote facility, they will be effectively and tragically out of reach – both logistically and economically – to most Alaska researchers.

5. The records housed at the National Archives at Seattle are used for an absolute necessity for research in connection with many federal programs for agricultural, recreational, or conservation purposes. As noted in response #2 and #3, above, historians from the National Park Service (a conservation agency in the U.S. Department of the Interior) heavily rely on these records in order to understand what activities have taken place upon NPS lands, and how the resources have been managed. This historian, moreover, is well aware that other Alaska conservation-agency historians – from the Bureau of Land Management, the U.S. Fish and Wildlife Service, the former Minerals Management Service, the U.S. Army Corps of Engineers, and other entities – have also relied on the record-group files that are housed at the NARA Sand Point facility.

6. This researcher first learned of the impending sale of the National Archives at Seattle from NARA staff during a visit to the Sand Point facility in early December 2019. Soon after, I contacted colleagues in the Alaska historical community, who were likewise aware of the potential sale. At their suggestion, I emailed a letter (on January 23, 2020) to the Public Buildings Review Board, which is attached. I did not receive a response to this email.

7. At noted in response #4 (above), it is my opinion that moving the Alaska records away from the NARA Sand Point facility will effectively put these records out of reach to all but the most well-financed researchers. Most Alaska historians, who are located in either Anchorage, Fairbanks, or Juneau, can take a single, fairly inexpensive nonstop flight to Seattle and thus have ready access to the remarkable Alaska holdings in the Sand Point

1  facility. Very few Alaska historians, however, can weather the time and expense to fly to St.
2  Louis or the San Francisco bay area, the proposed destinations for these records. If this
3  proposal is implemented, therefore, chances are good that these Alaska records, tragically,
4  will simply lie fallow and will not get much use.

5

6  I declare under penalty of perjury that the foregoing is true and correct.

7  DATED this 29th day of December, 2020 at Santa Fe, New Mexico.
8

9
10
11  FRANK NORRIS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

---------- Forwarded message ---------
From: **Frank and Candy Norris** <candynfrank@gmail.com>
Date: Thu, Jan 23, 2020 at 10:46 PM
Subject: National Archives in Seattle - letter of concern
To: <fastainfo@pbrb.gov>

To the Public Buildings Review Board:

I am a career historian with the National Park Service, and I'm writing to you to express my deep concern with a recently-aired proposal to shutter the National Archives and Records Administration (NARA) facility along Sand Point Way in Seattle, Washington.

During my 38 years working for the National Park Service - many of those in that agency's Anchorage office - I have visited the Sand Point NARA facility and used their records on numerous occasions - first during the 1980s, and most recently for two days last month (December 2019). Prior to the opening of the Anchorage NARA facility during the mid-1990s, and also since that facility's closure several years ago, Alaska researchers have considered the Sand Point NARA facility to be an oft-used lifeline - with records that play a huge role in telling Alaska's history, given the strong role that federal agencies have played in Alaska's growth and development.

As you know, Alaska historians and other researchers were very disappointed, several years ago, with the decision to move Alaska's federal historical records from Anchorage back to the Seattle area. For these same reasons, it would be tragic indeed if Seattle's NARA facility were to close, forcing Alaska researchers to go even farther afield in order to access the state's historical records.

Thank you for considering these comments.

Sincerely,
Dr. Frank Norris

1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF WASHINGTON**
7
   STATE OF WASHINGTON, et al.,                    NO.
8
                       Plaintiff,                   DECLARATION OF LISA A.
9                                                   OBERG
          v.
10
   RUSSELL VOUGHT, et al.,
11
                       Defendants,
12
          I, Lisa A. Oberg, declare as follows:
13
          1.     I am the president of the Pacific Northwest Historians Guild (hereafter "the
14
   Guild"). I am over the age of 18 and competent to testify. I make this declaration based on
15
   my personal knowledge.
16
          2.     The Guild is an organization of over 100 scholars and researchers engaged in
17
   the study and dissemination of regional history. Many of our members are individuals with
18
   limited financial resources or members of non-profit organizations with similar financial
19
   constraints. Founded in November 1980, the Guild seeks to increase the opportunities and
20
   means for research, writing, and publication of Pacific Northwest history; encourage the
21
   collection, preservation, and presentation of historical materials, and promote communication
22
   among regional historians. Critical to the Guild's efforts to support and elevate research on
23
   topics relating to Pacific Northwest history, is the ready access to unique materials for
24
   researchers, ranging from enthusiast amateurs to a wide range of students, including
25
   individuals conducting research on behalf of government agencies at every level.
26

DECLARATION OF LISA A. OBERG                         James M. Rupp, Attorney
                                                     4103 – 42nd Ave NE
Page 1                                               Seattle WA 98105
                                                     Tel: (206) 697-8173

1    3.    I have been President of the Guild since June of 2020. I was previously Vice

2    President and have served on the Guild's Board of Trustees since 2018. As President, I am

3    responsible for the administration and coordination of the Guild's activities, including its

4    relationship with the National Archives at Seattle, in supporting and highlighting quality

5    research, and providing a forum for sharing that research. I am a librarian by profession and I

6    am currently Associate Director, and History of Science and Medicine Curator, for Special

7    Collections in the University of Washington Libraries.

8    4.    The National Archives at Seattle has a significant number of administrative-

9    related documents that have been archived pending eventual destruction, but of critical

10   importance to regional historical research are the additional 60,000 cubic feet of records

11   representing permanent archival records (hereafter "the Archival Records"). Archival

12   Records used by members of the Guild have included, but are not limited to, records

13   concerning: environmental, recreation and conservation purposes relating to federal

14   programs; the internment of Japanese during World War Two; development of the Lake

15   Washington Ship Canal and the Hiram M. Chittenden Locks; details about the Washington

16   Alaska Communication and Telegraph System; chains of title to historical properties;

17   regional military history, including Coast Defense fortifications on Puget Sound and the

18   Columbia River; regional history related to the Chinese Exclusion Act of 1882; and Native

19   American tribal histories, treaties, and records relating to the displacement of Pacific

20   Northwest tribal groups and Alaska Natives.

21   5.    The Archival Records within the holdings of the National Archives at Seattle

22   represent the earliest territorial history of the Pacific Northwest and Alaska. These records

23   are not only used by scholars and researchers, but also play an important role in the

24   development of future researchers and historians. The opportunity to do research at

25   universities in Seattle and throughout the region, together with materials available at the

26

DECLARATION OF LISA A. OBERG

Page 2

James M. Rupp, Attorney
4103 – 42nd Ave NE
Seattle WA 98105
Tel: (206) 697-8173

**231**

1 National Archives at Seattle, is an invaluable combination for doctoral history students, and
2 those engaged in other disciplines where research skills and resources are essential.

3      6.     The Archival Records used by Guild members also include records of several
4 Federal agencies with responsibility for the management of Federal lands located in
5 Washington, Oregon, Idaho, and Alaska. These agencies include the US Fish and Wildlife
6 Service, Bureau of Land Management, Bureau of Indian Affairs, US Army of Corp of
7 Engineers, US Forest Service, National Park Service, and the National Resources
8 Conservation Service. Records of these agencies and related US District Court records are
9 essential to our members' efforts to research actions taken on federal lands which impact
10 environmental and conservation efforts. For example, US Fish and Wildfire records include
11 management plans and wetland inventories, Bureau of Indian Affairs records include records
12 relating to agricultural extension projects, and Bureau of Land Management include records
13 relating to range improvement projects. Most of the records of these agencies have not been
14 digitized and are only available to researchers in the original paper format.

15      7.     The Board of Trustees of the Guild, along with many Guild members, first
16 learned of the impending sale of the archive facility when it was reported by local news
17 sources beginning January 17, 2020, and have followed development in subsequent news
18 coverage and community discussions. The Guild board was deeply troubled about that
19 decision and promptly sent a letter of concern to David Ferriero, Archivist of the United
20 States, calling for the decision to be reconsidered. Mr. Ferriero has not responded to that
21 letter, a copy of which is attached hereto as Appendix A. Copies of that letter were sent to the
22 offices of Senators Maria Cantwell and Patty Murray, and to Representative Pramila Jayapal.
23 Representative Jayapal's response is attached hereto as Appendix B.

24      8.     The Guild is aware of the fact that the government proposes to mollify those
25 opposed to the sale of the archive facility by suggesting that archived records of historical
26

DECLARATION OF LISA A. OBERG

Page 3

James M. Rupp, Attorney
4103 – 42nd Ave NE
Seattle WA 98105
Tel: (206) 697-8173

significance will be digitized. We believe that proposed "solution" is, at best, disingenuous. First, it would be many years before the materials (60,000 cubic feet) could be digitized. Of more importance is the government's failure to recognize the important intrinsic value to researchers of having local and up-close visual access to original documents. In addition, the hardship and harm to quality research resulting from the removal of archival records to another region is incalculable. The Pacific Northwest is a very large geographic region and many researchers are challenged to incur the expense of travelling to Seattle from within the region. To further move records further from researchers compounds an already constrained environment for access to historical records.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this ___ day of January, 2021 at Seattle, Washington

LISA A. OBERG

DECLARATION OF LISA A. OBERG

Page 4

James M. Rupp, Attorney
4103 – 42nd Ave NE
Seattle WA 98105
Tel: (206) 697-8173

1
2
3
4
5
6
7
8          **APPENDIX A**
9              **TO**
10   **DECLARATION OF LISA A. OBERG**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DECLARATION OF LISA A. OBERG

James M. Rupp, Attorney
4103 – 42nd Ave NE
Seattle WA 98105
Tel: (206) 697-8173



PACIFIC NORTHWEST
HISTORIANS GUILD

12 February 2020

David Ferriero, Archivist
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740

Mr. Ferriero:

The Pacific Northwest Historians Guild is a large group of scholars, teachers, students, and others interested in the preservation, development, and dissemination of Pacific Northwest history. As such, we are writing to express our objections to the proposed closure of the regional branch of the National Archives located in Seattle, Washington. Of utmost importance is that the 60,000 cubic feet representing the permanent archival records currently housed at the facility remain in the Pacific Northwest.

Access to these records is essential for researchers exploring important events in our region's history including Chinese exclusion, immigration to the Pacific Northwest, tribal records, Japanese American incarceration, and more. It is essential that these records remain close to similar records maintained in this region, which provide researchers with critical insight into numerous areas of study, including understanding the role of the federal government in relation to local jurisdictions in order to understand the impact and significance of historical events and how they affect us today.

We understand the facility will be sold and the current site redeveloped. We are advocating for the lease or purchase of a smaller facility in the Pacific Northwest (Idaho, Oregon or Washington) to house the permanent archival collections or collocating those materials with another regional federal agency.

It seems unlikely that in the timeframe proposed for the closure of the facility (2024) digitization of these records would be completed. While we are supportive of any digitization efforts, as historians there are also many situations where an examination of the original material is invaluable. In addition, there are important privacy considerations, particularly regarding records relating to the Bureau of Indian Affairs, which must be preserved.

While we understand the need to consolidate federal facilities, we ask that you reconsider your decision to relocate the permanent archival records and request that a new location in the Pacific Northwest be identified for those records.

Sincerely yours,

Nicole Robert, President
On behalf of the Pacific Northwest Historians Guild Board

cc: The Honorable Patty Murray, the Honorable Maria Cantwell and the Honorable Pramila Jayapal

**235**



PACIFIC NORTHWEST
HISTORIANS GUILD

The Honorable Patty Murray
154 Russell Senate Office Building
United States Senate
Washington, DC 20510

The Honorable Pramila Jayapal
1510 Longworth House Office Building
United States House of Representatives
Washington, DC 20515

The Honorable Maria Cantwell
511 Hart Senate Office Building
United States Senate
Washington, DC 20510

cc: The Honorable Patty Murray, the Honorable Maria Cantwell and the Honorable Pramila Jayapal

1
2
3
4
5
6
7
8                              **APPENDIX B**
9                                    **TO**
10                **DECLARATION OF LISA A. OBERG**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DECLARATION OF LISA A. OBERG

James M. Rupp, Attorney
4103 – 42nd Ave NE
Seattle WA 98105
Tel: (206) 697-8173

**PRAMILA JAYAPAL**
7TH DISTRICT, WASHINGTON

⚬ **HOUSE COMMITTEE ON THE JUDICIARY**
VICE CHAIR, SUBCOMMITTEE ON
IMMIGRATION AND CITIZENSHIP

MEMBER, SUBCOMMITTEE ON ANTITRUST,
COMMERCIAL, AND ADMINISTRATIVE LAW

**HOUSE COMMITTEE ON THE BUDGET**

**HOUSE COMMITTEE ON EDUCATION
AND LABOR**
MEMBER, SUBCOMMITTEE ON
HIGHER EDUCATION AND WORKFORCE INVESTMENT

MEMBER, SUBCOMMITTEE ON WORKFORCE PROTECTIONS

1510 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3106

1904 3RD AVENUE
SUITE 510
SEATTLE, WA 98101
(206) 674-0040

## Congress of the United States
### House of Representatives
### Washington, DC 20515-4707

Nicole Robert
PO Box 85457
Seattle, WA 98145-1457

May 28, 2020

Dear Nicole,

Thank you for contacting me to express your opposition to the Office of Management and
Budget's (OMB) decision to sell the Sand Point archives facility in Seattle. Serving as your
representative in Congress is a tremendous privilege. Each and every letter, email, postcard and
call I receive makes a difference. I want you to know that I deeply value your input, and I'm glad
we agree on protecting this facility. I apologize for the delay in responding to you on this
important issue.

Like you, I am deeply disappointed by OMB's decision to sell the National Archives and
Records Administration Federal Archives and Records Center in Seattle without engaging state
and local officials and affected communities as required by law. As you know, the Public
Buildings Reform Board (PBRB) is legally required to solicit critical local input when it
considers closing federal government facilities that serve the public. However, PBRB failed to
engage state and local officials as well as Native American tribes, who have documents
important to sovereignty and history located at the Sand Point building, in the recommendation
process.

That is why I was proud to sign a bipartisan, bicameral letter to OMB Acting Director Russ
Vought expressing concerns about PBRB's recommendation to close the National Archives
facility in Seattle and underscoring the flaws in the process and proposal to move the facility. I
was deeply disappointed that OMB failed to heed this Congressional requests to reject PBRB's
recommendation to sell this treasured facility. OMB should never have approved selling Seattle's
archives facility without consulting state and local officials as well as impacted communities as
the law requires. Please know that I will continue to follow this matter, and encourage greater
oversight and accountability over PBRB decisions.

Again, thank you for getting in touch with me about this important issue. If you have further
questions or concerns, please do not hesitate to call us at 202-225-3106. Also, please sign up for

my e-mail newsletter at jayapal.house.gov/contact/newsletter, join us on Facebook at facebook.com/RepJayapal, on Twitter at twitter.com/RepJayapal and on Instagram, at instagram.com/RepJayapal to be the first to know about my work in Washington's 7th District and in DC.

Sincerely,

PRAMILA JAYAPAL
Member of Congress

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ANN OSTENDORF |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Ann Ostendorf, declare as follows:

1.      I am a Professor of History at Gonzaga University. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a historian.

2.      From the perspective of my professional work as an American historian, the value of keeping the National Archives in Seattle cannot be overstated. I teach and research on Native American history, histories of immigration, as well as the histories of race, ethnicity and nationalism in the United States.  I have published books and articles in diverse outlets related to this expertise.  For example, my monograph *Sounds American: National Identity and the Music Cultures of the Lower Mississippi River Valley, 1800-1860* is part of a book series on early American regionalisms. As such, I know firsthand through my research how significant it is for the documents related to the history of a region to remain accessible within the region itself. In addition, my current work on the histories of diverse Gypsy/Roma people, published in *the Journal of Gypsy Studies*, *Critical Romani Studies*, and *Early American*

DECLARATION OF ANN OSTENDORF                    1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Studies*, relies on the local resources of the community studies within which I work. Finally, as a recent Fulbright Award winner stationed in Japan, and can speak with authority to say that my knowledge of and commitment to local history, specifically Japanese American history and culture in the Pacific Northwest, is what allowed for my selection to this honorable award.

3.      Virtually all the scholarly work I do is dependent upon archives. Without these institutions, we have no evidence left from the past.  As a result, we either live with fictions about our pasts, or lose any connection with where we came from. The result sees us living in a state of amnesia.  Just as a person with amnesia loses all sense of independence and the ability to form meaningful relationships, so too will a nation devolve into ignorance, dependency and crisis without a true past reality from which to build.  The archives are the sources of our knowledge about the past.  Without these, we are no more than a person who lacks experiences and contexts from which to make our decisions and judgments. The prospect is terrifying. As evidenced many times throughout history, when new regimes attempt to replace old regimes they often resort to the destruction of historical records. I hope our own nation has not (yet) come to this.

4.      Some of the most significant work that we do as historians comes about from surprises stashed away in the archives themselves.  By removing the National Archives from Seattle, the ability to uncover the regional past by the people of the region becomes infinitely more difficult and removes one of these most meaning ways of doing history.

5.      In my own work, archives have been and continue to be crucial.  Within them I have discovered immigration records, land grants, trial records, among so many other sources that have been crucial for me to write about the historical actors and events that make up my own work.  Simply put, without archives, there would be no historians.

6.      Removing the National Archives from Seattle with harm my work as a historian, as well as the ability of those in our region to have direct access to their own history. There is little chance I will fly across the country just to uncover some local stories.  However,

DECLARATION OF ANN OSTENDORF                    2                    ATTORNEY GENERAL OF WASHINGTON
                                                                    Complex Litigation Division
                                                                    800 5th Avenue, Suite 2000
                                                                    Seattle, WA 98104-3188
                                                                    (206) 464-7744

241

I am in Seattle regularly and can easily pop in to examine any item of possible relevance to my own research. If moved, this will just not happen. I, and so many other regional scholars, will just stop doing local history. Our history then will become degraded in relation to other region's productivity. Graduate students will write fewer dissertations on local topics, leading to fewer books and other pieces of scholarship. It will be much less easy to commemorate and preserve historic sites. All this eventually trickles down to a public less educated about its own history. But beyond scholarship, it is the individual citizens of the region who will truly lose out. Our past is what holds us together. Without that we are irreplicable separated and fractured. In addition, on a personal level, people use these archives for family histories and tribal histories. Genealogy is often cited as one of the most popular hobbies in the United States. This productive and educational past time will be much more difficult to participate in for many in our region. In addition, certain records held at the Seattle National Archives almost certainly include those that tribes would need to document their very existence. Without access to this, the government is enacting another hardship on regional tribes on top of so many that have come before.

7. Thank you so much for considering these perspectives. I truly look forward to visiting the Seattle National Archives for both my professional work, but also my personal edification, for many years to come.


I declare under penalty of perjury that the foregoing is true and correct.

DATED this 18th day of December, 2020 at Spokane, Washington.


_____
ANN OSTENDORF

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
7

8 STATE OF WASHINGTON, et al.,           NO.

Plaintiff,           DECLARATION OF ROBERT
9                                                 BRUCE PARHAM

10    v.

11 RUSSELL VOUGHT, et al.,

Defendants.
12

13          I, Robert Bruce Parham, declare as follows:

14          1.      In 2011, I retired as Director of the National Archives at Anchorage after 22

15 years of federal service with the National Archives & Records Administration (NARA),

16 working in the NARA facilities located in Anchorage, Alaska, and the National Personnel

17 Records Center in St. Louis, Missouri. I received a BA in History from Western State College,

18 Gunnison, CO, an MA in Library Science with an emphasis in archives-manuscripts

19 administration from the University of Wisconsin-Madison, and an MA in History from the

20 University of Colorado-Boulder. I also hold a Certified Archivist certificate (emeritus) from

21 the Academy of Certified Archivists. I am a member of the Society of American Archivists,

22 Northwest Archivists, Cook Inlet Historical Society, Alaska Historical Society, Western

23 History Association, and the Alaska State Historical Records Advisory Board. I also currently

24 serve on the boards of the Cook Inlet Historical Society. I make this declaration based upon

25 my personal knowledge and in my personal capacity.

26

2.     I am very familiar with the Alaska federal records that were shipped to Seattle in 2014 when the NARA at Anchorage was closed. Over the years since that closure, I have also visited and undertaken research at the National Archives at Seattle. Based upon my work and my research since my retirement I am familiar with the NARA collections in Seattle, and most familiar with the portion of those collections which once were housed in Anchorage, as well as large cubic footages of Alaska temporary and pre-archival records in the Federal Records Center--Seattle. The pre-archival records are permanent records which still legally belong to the creating or originating Federal agency. Collectively, I will refer to all of these records as the "Alaska NARA records."

3.     The Alaska NARA records span the late 19th century into the 21st Century. They document the activities of nearly every federal agency, board and other entity which did work concerning any aspect of Alaska, from more than 50 federal agencies. The Alaska NARA records (especially those from the Bureau of Indian Affairs and the U.S. Fish and Wildlife Service and their predecessor agencies) are of special relevance to the affairs of Alaska Native peoples. In Alaska, these two federal agencies have had an impact on virtually every phase of tribal development and individual Native life including education, health, land ownership, financial affairs, employment, subsistence use, and legal rights.

4.     In general, Alaska NARA records are also important to other Alaskans from all walks of life. In addition to Native peoples, fishermen, scientists, lawyers, engineers, real estate agents, historians, genealogists, government employees (federal, state and local), environmentalists, students, veterans, scholars, genealogists, historians, students or anyone who needs historical information created or received by the federal government explore these records. Alaska NARA records are important to individuals far removed from the history profession. There has been a pervasive Federal presence in Alaska beginning with the Alaska Purchase Treaty of 1867 and continuing through the District (1884-1912) and Territorial (1912-1958), and Statehood (1959-.) periods. The Federal government is the largest landowner

1    in Alaska, covering nearly two-thirds of the total land area (222 million acres), including

2    national parks, wildlife refuges, national forests, military installations, and the National

3    Petroleum Reserve on the North Slope.  Alaskans and Federal and State agencies rely on

4    NARA for documentation to settle land issues, such as land claims and disputes, state and

5    Native land selections, and navigability through federally-owned lands and waters.

6    Documentation from the two national forests in Alaska and correspondence from the Arctic

7    National Wildlife Refuge are still very important to today.  The National Marine Fisheries

8    Service (NMFS) with its fisheries regulations impacts fish stocks as much as fishing families.

9    Alaska is relatively a young state.  This means the bulk of the records pertaining to the State's

10   history are federal records.

11        5.     Over the years I have presented a number of papers on matters of interest to

12   Alaska Native peoples, drawn from my research into the Alaska NARA records. These include:

13   Documenting People of Color and Other Minorities:  Alaska's Native Records at the National

14   Archives—Pacific Alaska Region (Anchorage), Northwest Archivists Conference, Missoula,

15   MT (May 1999) (attached as Exhibit A); The Records of the Pribilof Islands Program, 1868-

16   1984, presented at the 25th Anniversary Celebration of Autonomy from the Federal

17   Government, St. Paul, Pribilof Islands, Alaska (2008); and Records Relating to Alaska Natives

18   and Other Native Americans at the National Archives at Anchorage, 1886 to 1980s, Alaska

19   Native Libraries, Archives and Museums Summit, Anchorage, Alaska (April 2011).

20        6.     The portion of the Alaska NARA records previously housed in Anchorage

21   constituted about 19,500 cubic feet of pre-archival and archival records and some 7,000 rolls

22   of NARA microfilm publications from Federal agencies. Archival and pre-archival records are

23   of legal interest in cases involving events, such as Alaska Native fishing rights, adoptions,

24   tribal enrollments, environmental contamination of the public domain or affected Native land,

25   Indian trust fund accounts, and any other matter under Federal jurisdiction. After the closure

26   of the National Archives at Anchorage in 2014, the cubic footages of pre-archival and archival

1     records sent to Seattle was reduced to about 16,450 cubic feet, accounting for the legal and

2     physical transfers of 1,800 cubic feet of Federal territorial court records (1884-1960) and 1,250

3     cubic feet of Alaska Railroad records to the Alaska State Archives, Juneau.

4         7.      Alaska NARA records are used by Alaska Natives to prove or protect their legal

5     or civil rights to citizenship, property, education, employment benefits, veterans' status,

6     subsistence rights, or genealogy. Alaska NARA records are also researched by local Alaska

7     Native communities and Tribes in connection with (a) U.S. Fish and Wildlife Service and other

8     federal agencies records documenting environmental pollutants and their impact on

9     community health; (b) fishing and other subsistence activities; (c) requests for federal

10     recognition of their tribal status; and (d) for previously unrecognized Alaska tribes researching

11     essential evidence or documentary proof to establish their claims for recognition from the U.S.

12     Bureau of Indian Affairs as a Federally-recognized tribe.

13         8.      Federal or state employees, environmental scientists, or subcontractors from the

14     U.S. Bureau of Indian Affairs, U.S. Bureau of Land Management, the Office of the Solicitor

15     of the U.S. Department of the Interior, the U.S. Department of Justice, U.S. Army Corps of

16     Engineers, Alaska Department of Law, Alaska Department of Natural Resources, the Alaska

17     Department of Transportation and Public Facilities have all sought materials from the Alaska

18     NARA collection for such purposes as to establish Federal, state, or local responsibility for

19     environmental contamination; confirm land title; RS 2477 rights-of-way; or to identify and

20     clean up hazardous substances, pollutants, unexploded ordnance, discarded military munitions,

21     and the locations of environmentally hazardous wastes at Formerly Used Military Sites

22     (FUDS). Researchers from individual villages have used the facility in Anchorage to obtain

23     ready access to Federal archival records about their village (or a cluster of villages) in

24     connection with records documenting the Federal government's involvement in their daily

25     lives. For example, a local resident from Galena conducted research at the NARA at Anchorage

26     office, seeking site plot plans for the former Galena Air Force Station (a FUDS Site) now

known as the Galena Airport.  According to the U.S. Army Corps of Engineers Alaska District website (https://www.poa.usace.army.mil/Missions/Environmental-Services/), there are currently more than 500 sites that are eligible for the FUDS program for the entire state.  Under the Native American Lands Environmental Mitigation Program (NALEMP), some 229 Federally-recognized tribes have been impacted by past military activity on more than 600 former military sites.  Under NALEMP, the Corps reported on its website that it had entered into 30 active cooperative agreements with the impacted tribes.  Commonly, large cubic footages of undigitized records from multi-record groups such as the Records of Naval Districts and Shore Establishments (RG 181, 1,305 cu. ft.), War Assets Administration (RG 270, 50 cu. ft.), and RG 77 (Office of the Chief of Engineers, 300 cu. ft.) from the pre-World War II, World War II, and Cold War periods were used by government researchers, state employees, contract environmental researchers, Alaska Native researchers, anthropologists, and other researchers for the above purposes.

9.      The Alaska NARA collection includes village subsistence case files, and hunting, fishing and fur farming correspondence and statistics among the records of the Alaska Reindeer Service. Over the years when I worked for NARA, a steady flow of anthropologists, biologists, and researchers from several Federal and state agencies used General Subject Correspondence, 1933-1963, and the records of the Alaska Reindeer Service to obtain baseline statistics on Native subsistence (hunting, fishing, gathering, and other subsistence activities). Both series contain annual surveys on the garden and Native food activities for virtually every village in Alaska. These include annual surveys containing agricultural, hunting, and fishing statistics used by the U.S. Fish and Wildlife Service and to the U.S. Bureau of Indian Affairs to determine fishing and hunting regulations, monitor Alaska Native harvesting of fish and game, and plan for economic development programs.

10.     The records of the U.S. Fish and Wildlife Service in the National Archives include those of several predecessors, including the Bureau of Fisheries and the Bureau of

Biological Survey. These agencies were merged in 1940 to create the Fish and Wildlife Service, which in 1956 was organized into two bureaus, the Bureau of Commercial Fisheries and the Bureau of Sport Fisheries and Wildlife. Since 1968, the U.S. Fish and Wildlife Service and its predecessors have been responsible for enforcing regulations relating to customs, commerce, and navigation; conduct scientific research on the Northern fur seal; and regulate the Alaskan fishery and fur seal industries. The U.S. Treasury Department and Bureau of Fisheries records, which are held by the National Archives in College Park, MD, have been reproduced as National Archives Microfilm Publication M720, <u>Alaska File of the Secretary of the Treasury, 1868-1903</u>. These and later records of the Division of Alaska Fisheries (or the Alaska Division of the Bureau of Fisheries) contain information about the fishing rights of Alaska Natives, areas set aside for their use, and illegal seal hunting and fishing by Natives. When I worked for NARA these records were actively used to carry out the U.S. Fish and Wildlife Service's conservation programs in Alaska.

11.     Attached to this Declaration as Exhibit B is a list that I prepared in March 2014 titled <u>Unofficial List of Records Series Having High Reference Value at NARA at Anchorage</u>. Attached to this Declaration as Exhibit C is a list that I prepared in December 2020 titled <u>Selected Records Series Descriptions Relating to Alaska Natives from the National Archives Catalog (https://catalog.archives.gov/advancedsearch): Records Held by the National Archives at Seattle</u>. Attached to this Declaration as Exhibit D is a list that I prepared in December 2020 titled <u>Selected Records Series Descriptions Relating to Conservation in the National Archives Catalog (https://catalog.archives.gov/advancedsearch): Records Held by the National Archives at Seattle</u>. As these lists reflect, the Alaska NARA collection includes (among other records) records pertaining to the U.S. Fish & Wildlife Service; the EXXON VALDEZ oil spill; the Pribilof Islands; the Arctic National Wildlife Refuge; the Bering Sea; Indian lands; the Alaska Native Claims Settlement Act; the Trans-Alaska Pipeline; Alaska Native allotments; land and mining claims; water resources studies in southeast Alaska; mineral surveys; reindeer herding

1  activities; agricultural, hunting and fishing statistics used as baseline data for subsistence data;

2  an oil spill in Bethel, Alaska; the Alaska National Interest Lands Conservation Act; natural

3  resource damage assessments; conservation plans; hazardous waste and environmental clean-

4  up activities; endangered species; Arctic organic pollutants; natural resource conservation

5  activities; cultural resource studies; the Civilian Conservation Corps; the National Oceanic

6  Atmospheric Administration; the National Marine Fisheries Service; and the Bureau of Ocean

7  Energy Management. To varying degrees, all of these records support research in connection

8  with federal agency programs concerning conservation activities in Alaska.

9       12.    Attached to this Declaration as Exhibit E is a list that I prepared in December

10  2020 titled Selected Records Series Descriptions Relating to Recreational and Agricultural

11  Activities from the National Archives Catalog (https://catalog.archives.gov/advancedsearch)

12  Records Held by the National Archives at Seattle. To varying degrees, all of these records

13  support research in connection with federal agency programs concerning agriculture or

14  recreation activities in Alaska.

15       I declare under penalty of perjury that the foregoing is true and correct.

17  Executed this 3rd day of January 2021 at Anchorage, Alaska.

                                                Robert Bruce Parham

# EXHIBIT A

# DOCUMENTING PEOPLE OF COLOR AND OTHER MINORITIES: ALASKA NATIVE RECORDS AT THE NATIONAL ARCHIVES--PACIFIC ALASKA REGION (ANCHORAGE)[1]

by R. Bruce Parham, Archivist
National Archives--Pacific Alaska Region (Anchorage)

*Abstract:* There are many kinds of textual and non-textual records that exist on Alaska Natives at the National Archives--Pacific Alaska Region in Anchorage. This paper will concentrate on the record series that are most frequently used by two researcher groups--the Alaska Native community and academic researchers, especially anthropologists. Both groups often use Federal population censuses on microfilm, special censuses, school records, tribal enrollment records, and townsite trustee files. The Alaska Native community uses records to establish and protect their rights as American citizens. Anthropologists and other textual researchers go beyond these records and use administrative correspondence, research surveys, microfilmed records, and non-textual records relating to specific Native communities to research topics as varied as subsistence, tribal sovereignty, or Native history and culture. In particular, records from the Bureau of Indian Affairs and the U.S. Fish and Wildlife Service, will be discussed due to the impact these two Federal agencies have had on Alaska Natives.

Unlike non-Federal manuscript repositories, regional records facilities of the National Archives and Records Administration (NARA) do not face the same problems surrounding how to collect and document minority groups. The collecting strategies are quite different, as approved Federal agency records retention schedules identify temporary or permanent records and establish time frames when records should be transferred to NARA. Although the records transfer process is not automatic, it does work as Federal agencies usually have a records management system in place. In agency field offices, there are records officers and records liaisons that work with NARA to ensure the periodic transfer of permanent records that are no longer needed for official business.

Given these differences, I will take a look at the kinds of historical documentation that exists on Alaska Natives at the National Archives--Pacific Alaska Region in Anchorage. To the uninitiated, working with Federal Government records can be intimidating and many researchers often do not know what records they want, so they must be interviewed in order to be helped. In addition, staff correspond with researchers to provide information about the records and, in some cases, identify specific kinds of records. Records in NARA's regional records facilities are not arranged according to subject, but are kept in numbered record groups (abbreviated RG) established for the Federal agencies that created or received them. Just in Anchorage, there are over 17,000 cubic feet of pre-archival and archival records and some 75,000 rolls of NARA microfilm publications from over forty Federal agencies. In Anchorage, our office also operates a

---

[1]Delivered on May 21, 1999 at the 1999 Northwest Archivists Annual Meeting in Missoula, MT.

records center for pre-archival records, which are permanent records which still legally belong to the creating or originating agency. Archival and pre-archival records are of legal interest in cases involving events, such as Indian fishing rights, adoptions, tribal enrollments, environmental contamination of the public domain or affected Native land, Indian trust fund accounts, and any other matter under Federal jurisdiction.

Every week, the staff of the Anchorage office of the National Archives--Pacific Alaska Region gets repeated telephone calls, research visits, and letters from individuals in the Alaska Native community who are trying to prove or protect their legal or civil rights to citizenship, property, education, employment benefits, veterans' status, or genealogy. City managers of predominately Native communities, like the Pribilof Aleut Communities of St. Paul and St. George Islands, hire "Lower 48" environmental scientists and historians to use the Fish and Wildlife Service fisheries agent files (RG 22) to document environmental pollutants and their impact on Native community health issues. Native bands, like the Kenaitze from Kenai Peninsula and anthropologists representing unrecognized Native entities use the rich information found in Federal records in Anchorage to establish "tribal sovereignty", apply for fishing rights, and gain eligibility for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes. In 1995, there were 227 Federally recognized Native villages, community and cooperative associations, tribal governments, tribes, and Indian corporations in Alaska.[2]

And Alaska Natives are not the only ones who use the holdings of the Pacific Alaska Region (Anchorage) to obtain information on various issues. There are also Federal or state employees, environmental scientists, or subcontractors from the Bureau of Indian Affairs, Bureau of Land Management, the Office of the Solicitor of the Department of the Interior, the Department of Justice, Alaska Department of Law, Alaska Department of Natural Resources, the Alaska Department of Transportation and Public Facilities and so on who also call or visit our office. They often seek to find on short notice any letters, reports, minutes, photographs, cartographic records, or other documents which might establish Federal, state, or local responsibility for environmental contamination, confirm land title, or RS 2477 rights-of-way access across Federal lands. The National Archives--Pacific Alaska Region (Anchorage) also handles telephone calls or letters from congressional offices who represent constituents who are trying to obtain a passport, social security benefits, a civil service pension, or gain a delayed certificate of birth.

In serving the Native community in Alaska, our office serves five major groups:

(1) Aleuts--live along the Aleutian Islands and the Alaska Peninsula, including the Pribilof Islands.

---

[2]U.S., Bureau of Indian Affairs, *Federally Recognized Native Entities of Alaska.* In *Federal Register*, Nov. 13, 1996, pp. 58211-58216). Available: http://wwwartnatam. com/alaska.html.

(2)   Inupiats [Northern Eskimos]--means "the people" in the Inupiat language, are divided into four main units: the interior north Alaska coast people, Kotzebue Sound people, and the Bering Straits people. The largest coastal communities are Barrow, Point Hope, and Wales.

(3)   Yup'ik [Southern Eskimos]--speakers of the Yup'ik language, live in southeast Alaska in communities stretching from the Prince William Sound on the north Pacific coast to St. Lawrence Island in the central Bering Sea (St. Lawrence Island, Nunivak Island, Yukon-Kuskokwim Delta, Bristol Bay, Alaska Peninsula, Kodiak Archipelago, and Prince William Sound). Yup'ik is divided into three major mutually incomprehensible languages: Siberian Yup'ik, Central Yu'pik, and Alutiq.

(4)   Athabaskan Indians--occupy Interior Alaska, between the Brooks Range on the north and the Alaska Range in the south. There are 12 recognized separate Athabaskan languages.

(5)   Tlinghit-Haida Indians [Southeast Coastal Indians]--live in southeast Alaska. Included among the Southeast Coastal Indians are the Tsimshian Indians of Metlakatla who migrated to Annette Island near Ketchikan in 1887 from British Columbia.

Total Native population: 85,698 (1990).[3]

In Alaska, the Bureau of Indian Affairs and the U.S. Fish and Wildlife Service are the two Federal agencies have had an impact on virtually every phase of tribal development and individual Native life including education, health, land ownership, financial affairs, employment, and legal rights. The BIA's administration in Alaska was late in developing and unique in that with one exception, Alaska Natives were not placed on reservations and education was the initial impetus. The Alaska Division of the Office of Education was established in 1885 under an act which directed the Secretary of the Interior to provide education for the children of Alaska. The Division consisted of a section in the central office in Washington, DC and a field office in Seattle, Washington.

By March 14, 1931, when the Secretary of the Interior transferred the Alaska Division from the Office of Education to the Bureau of Indian Affairs, the Division's activities had expanded beyond education and medical care into the field of economic assistance, necessitated by the depletion of the seal herds and whale fisheries. In 1933, the new Alaska Indian Service, headquartered in Juneau, replaced the Alaska Division. The Alaska Indian Service had five divisions: the Alaska Native School Service, Alaska Medical Service, and the Credit, Welfare, and Construction Divisions. The Alaska Native School Service operated a system of day, special, and vocational boarding schools. The Alaska Medical Service grew to encompass a system of clinics and hospitals scattered throughout the territory. The Credit Division provided financing for the Alaska Native Cooperative Association (ANICA), a central buying consortium for Native stores.

---

[3]Steve J. Langdon, *The Native Peoples of Alaska* (Anchorage: Greatland Graphics, 1993), passim.

Parham Exhibit A Page 3 of 12

In 1939, a revolving credit fund began to economically support the fishing industry in southeastern Alaska and Native cooperative stores in the other parts of the territory. The Native stores were operated in the villages as the main source of food, clothing, and other supplies and also were used as clearing houses for furs, ivory, and Native crafts. The Welfare Division provided financial assistance to Native families, orphaned children, physically challenged persons, and other qualified persons. The Construction Division supervised a maintenance and repair program and handled major construction projects. In a 1956 reorganization of the Bureau of Indian Affairs, regional (area) offices, each of which serves a single Indian tribe or small group of tribes. In 1984, the Bureau turned over most of its responsibilities for educating Alaska Natives to the State of Alaska.

The records of the Bureau of Indian Affairs contain the largest collection of records (over 1,000 cubic feet) relating to Alaska Natives and were created by the Juneau Area Office starting in 1931 (although some files date back as far as 1887). There are records from BIA regional offices in Anchorage, Bethel, Fairbanks, Ketchikan, Kotzebue, Nome, the Southeast Agency in Juneau and for the Seattle (WA) Support Center. The bulk of the BIA records in Anchorage cover the period from 1933 to 1983. They include general subject correspondence (1933-63), budget and accounting records (1916-74), Native store records (1939-64), Facilities Management Office Files (1964-84), employment assistance case files (1957-73), welfare case files (1931-70), educational program decimal files (ca. 1920-68), records of the Seattle Support Center (1920-84) and the Alaska Reindeer Service (1901-74), and student case files from Mount Edgecumbe School, Wrangell Institute, and the Eklutna Industrial School (1924-83).

Our office most frequently can meet the research needs of most of the Alaska Native community by providing access to a half dozen common record types from the Records of the Bureau of Indian Affairs (RG 75). There are many records at the National Archives--Pacific Alaska Region (Anchorage) that can be used to protect the legal rights of Alaska's Natives or be used for genealogical research. These records include Bureau of the Census Federal population censuses for Alaska (1900-1920), special BIA censuses, school records, tribal enrollment records, and the RG 49 Bureau of Land Management's townsite trustee files (1902-95). Sometimes, records in one record group can be linked to those in another. For example, an entry from the Alaskan Village Census Rolls in RG 75 showing an Athabaskan resident from Fort Yukon can be linked to a deed found in BLM's townsite trustee files.

A good example of a search is the family of Charles Brower (1863-1945), an Arctic trader known as the "King of the Arctic," and the author of *Fifty Years Below Zero* (1942). Brower was born in New York City but spent sixty years of his life in the Arctic, and became friends with explorers, whalers, missionaries, or anyone who needed his help. Brower was the first non-Native to live year-round with the Inupiat on the Arctic coast. A shrewd trader, he first came to Point Barrow in 1884-85 and worked in the whaling and fur trading business and other enterprises, including reindeer herding. Brower's firm, the Cape Smithe Whaling and Trading Company, is still owned today by the Brower Family, who eventually controlled a number of trading posts across Northern Alaska. Brower married twice, to Toctoo (d. 1902) and, afterwards to,

Asianggataq. By 1977, Brower's descendants numbered over 100 grandchildren and over 150 great-grandchildren.[4]

## 1900-1920 ALASKA FEDERAL POPULATION CENSUSES

As a general rule, persons conducting research on Alaska Natives start with the 1900-1920 Alaska Federal population schedules (T623-625). The 1900-1920 general population schedule for Charles Brower's family lists name, age, sex, marital status, occupation, relationship to head of household, birthplace, father's birthplace, mother's birthplace, and other information.

## ALASKAN VILLAGE CENSUS ROLLS, 1912-72 (P2286)

There is also a special census of various Alaska Natives, the *Alaskan Village Census Rolls, 1912-72* (P2286), with the bulk dating from 1934 to 1972. Known as the "village census rolls," they were taken by the Bureau's teachers, physicians, nurses, or other agents. From 1912 to 1972, the Natives were periodically enumerated in one of the 328 villages, towns, or cities where they lived--just like the general population. The census rolls are arranged alphabetically by village and then chronologically by family surname. Although the format and content of the rolls varies, they include the village name, date taken, family's surname, dates of birth or age, place of birth, sex, race, degree of Native blood, marital status, education (highest grade attended), occupation, relationship to head of family, special skills (such as plumbing, ivory carving, or midwifery) and remarks. The remarks category often show personal information on education, housing, source of income, and family living conditions. Some rolls give additional information such as size and value of the household's dwelling, total property value (such as household equipment, furniture, personal effects, boats, nets, traps, livestock, dogs, and foxes); cash income; and information on the kinds of Native foods at home.

For many older Natives, the village census rolls are the only extant documentation of their dates of birth, birthplace, their familial relationships, or percentage of Native blood they have for Alaska's five distinct Native groups. Although fascinating for anthropologists and other researchers, the village census rolls often serve as essential evidence to protect the rights and interests of the people they concern. For example, the daughter of an elderly man in Chignik Lake, located at the end of the Alaska Peninsula, contacted our office as a last hope. He was dying of cancer but had no personal records to prove his eligibility for veterans' burial benefits. A few months ago, a Wrangell resident had been an orphan, finally learned of his correct date and place of birth after sixty years. He had never received a birth certificate or a driver's license. In these cases, and numerous other ones, the Pacific Alaska Region staff found the entries, provided certified copies, and the affected persons gained their rightful benefits. There are also special Aleut census rolls, ca. 1870-1966, which may be found among the Pribilof Islands Program Records, 1870-1993 (RG 22).

---

[4]Charles D. Brower, *Fifty Years Below Zero: A Lifetime of Adventure in the Far North* (reprint ed.,Fairbanks: University of Alaska Press, 1994): xi-xv.

## TLINGHIT-HAIDA ENROLLMENT FILES

In addition to the Alaska Village Census Rolls, there are Tlinghit-Haida tribal enrollment files (RG 75) which document membership and include vital statistics covering the period from the 1890s to 1972 (192 boxes). For example, the file for George Barrett from Yakutat contains his application for enrollment listing his date of birth, place of birth, sex, degree of Indian blood, original clan and village, enrollment number and certification. Other documents include a delayed certificate of birth, affidavits, and school correspondence.[5] In addition, there are ten boxes of tribal enrollment files for Canadian-born Tlinghit-Haida Indians. The pre-archival enrollment files for Alaska's other Native groups (575 cubic feet) are closed to researchers because they are still legally-owned by the BIA and are not yet eligible for legal transfer to NARA. Reference access to these restricted files is controlled by the BIA.

## SCHOOL RECORDS

Most periodic reports on education and schools for Alaska Natives from 1885 to 1924 were not preserved, but information was abstracted from them. These records of the Alaska Division of the Bureau of Indian Affairs (RG 75) for 1885-1940 are located at the National Archives Building in Washington, DC. These records contain much information about communities, schools, and students for the period 1912-40. In 1997, NARA began a five-year project to microfilm the twenty-five records series of the Alaska Division of the BIA, starting with the most heavily used group, the *Statistical Records and Reports of the Alaska Division of the Bureau of Indian Affairs, 1912-1941* (M1854, 12 rolls). Two other microfilm publications have since been completed, *Letters Sent by the Office of Education, Alaska Division, Records of the Bureau of Indian Affairs, 1877-1908* (M1971, 32 rolls) and *Indexes to General Correspondence of the Office of Education, Bureau of Indian Affairs, 1910-1930* (M2043, 2 rolls).

In Anchorage, one of the most active series of records are the student case files for Mount Edgecumbe Boarding School. Located near Sitka, Mount Edgecumbe attracted large numbers of students from virtually every village in Alaska. Mount Edgecumbe was opened near Sitka in 1941 and closed as a BIA-operated boarding school in 1983, and is now operated by the State of Alaska. In many instances, the NARA Anchorage staff can determine if the researcher attended this school or the other boarding schools for the right time period, and locate the student's file which contains an application for admission, transcripts, and related documents. Often there is a photograph of the student and correspondence with family members. Using the Brower Family of Barrow as a typical case, the names of thirty family members are listed on the school rolls for Mount Edgecumbe. The Pacific Alaska Region (Anchorage) receives requests for transcripts for such varying reasons as entry into a Native regional corporation's job training program, application to the University of Alaska Fairbanks, entry to a truck driving school in Casper, Wyoming, or employment with Alaska Airlines.

---

[5]File for "Barrett, George T.," Tlinghit-Haida Tribal Enrollments, 1890s-1976; Juneau Area Office (Juneau, AK); Records of the Bureau of Indian Affairs, Record Group 75; National Archives--Pacific Alaska Region, Anchorage, AK.

Parham Exhibit A Page 6 of 12

The Pacific Alaska Region (Anchorage) also has some records from Eklutna Industrial School (1924-45), Wrangell Institute (1932-45), and for a few of the 102 BIA day schools that operated in Alaska. The quarterly and annual school reports (806.1), which are found in the Education Program Decimal Files, ca. 1938-68 (51 archives boxes), give information about individual pupils and other information for many of these BIA day schools. The school reports include the same kinds of information found on the Mount Edgecumbe school census rolls--name, age or date of birth, tribe and degree of Indian blood, and name of parent or guardian.[6]

There is an *Historical Album of Bureau of Education-Bureau of Indian Affairs Schools in Alaska, 1924-31* (P2010, 1 roll), which is the only early concise pictorial record of Alaska Native schools within the context of Native community life in over one hundred villages and towns. Included in the album is basic data on each school, including construction, furniture, repairs, teacher's remarks, local village censuses, and narrative histories. Other photographs concern mostly BIA schools, hospitals, and clinics, 1938-71 (ca. 6,000 images), located in 175 villages and towns, and cities. There is a separate collection of Juneau Area Office Facilities Management Office Files, ca. 1964-84 (RG 75). They include correspondence, reports, photographs, and blueprints relating to the construction and repair of school buildings, heating and power plants, sewerage and water systems, and other structures in ninety-eight Native villages.

### TOWNSITE TRUSTEE FILES
The records of the Bureau of Land Management (RG 49) include the Townsite Trustee Files, 1902-1992, which are frequently used to settle disputes over land ownership to village or town lots scattered across Alaska. These files relating to over 120 closed presidential, railroad, and trustee townsites. Many of the townsite files pertain to the issue of restricted and unrestricted Native deeds under two separate Federal acts for tracts set aside for Alaska Natives. Townsite files include deeds, lot and block files, map files, historical files, tract books, and other records.

### OTHER RECORDS
The records of the Alaska Reindeer Service and its successors, 1901-74 (29 linear feet), in RG 75 include general correspondence, earmark registration case files, general case files for associations and districts; apprentice contracts; general information files; reindeer herd case files; monthly herd reports; village subsistence case files; hunting, fishing and fur farming correspondence and statistics; marking and counting reports; and the papers of Lawrence J. Palmer (1920-45), a senior biologist who specialized in reindeer research with the Bureau of Biological Survey, the Fish and Wildlife Service, and the Alaska Reindeer Service.

---

[6]For example, Permanent School Census Card for Alfred Brower, May 16, 1974, School Census Rolls, 1941-83, Mount Edgecumbe Boarding School (Sitka, AK), and "Annual School Census Report," Barrow Day School, July 18, 1941, Education Program Decimal Files, ca. 1938-68, Juneau Area Office (Juneau, AK); Records of the Bureau of Indian Affairs, Record Group 75; National Archives--Pacific Alaska Region, Anchorage, AK.

Parham Exhibit A Page 7 of 12

In Anchorage, there are records for the Alaska Resupply Program, 1920-84 (107 cu. ft.), which includes program correspondence files, history files, ships' plans, trip reports, and logbooks of the U.S. S. *Boxer* and the U.S.M.S. *North Star* I, II, and III. The Alaska Resupply Program began in 1922 when the Bureau of Education acquired the U.S.S. *Boxer* from the Navy to deliver personnel and supplies to Bureau stations, schools, and hospitals. In 1932, the program was transferred to the Bureau of Indian Affairs and expanded to provide transportation services to Alaska Natives along the coastal areas of Alaska which were without service by commercial ocean carriers. The objective of the program was that, through the delivery of cargo and fuel, the Natives would be able to improve their standard of living. A resupply network, including the Seattle Support Center, a large terminal facility in Seattle, and one or two vessels was put into place. In 1932, the first U.S.M.S. *North Star* replaced the *Boxer* and, in turn, was replaced by the *North Star II*, and *III*. In 1984, service was terminated on the *North Star III* and, afterwards, the maritime resupply program continued under commercial contract and on military sea lift.

The General Subject Correspondence, 1933-63 (109 archives boxes), includes correspondence, reports, tribal council records, vital statistics, and other records pertaining to all aspects of administration and operation of schools, census and enrollment rolls, construction and highway projects; and economic and rural development, including the arts and crafts, Native cooperative stores (908), fishing and fish traps (920), and the operation of Native fish canneries (909) throughout southeastern Alaska from 1920 to 1950. There are credit operation files regarding the BIA's efforts to make revolving loans to individual Natives, Native organizations such as community and cooperative associations, or to entire villages. These loans were often the only source of credit available for the purchase of fishing boats or to support home financing, education, small businesses like totem pole manufacturing, or corporate enterprises such as salmon canneries.

Among the highlights are the 1945 post-war planning surveys (431) of 91 individual villages, in which the BIA requested the village planning council to outline their Federally-funded post-war projects to improve rural social, economic, and health conditions. Each survey requested information on the village's location, description, climate, topography, soil conditions, transportation, basic information [population, Native homes, economic status; water and fire protection system; health status; morbidity; government and non-government services offered; heath; law and order; economic development].

In a typical survey, the survey forms for Diomede described the top of the island as "relatively flat, boulder strewn tundra," with the sides almost barren rock sloping steeply into the sea, with no tillable ground, and no trees. Transportation off the island was by ocean-going vessels, with no docking facilities, with lighterage by skin boat "when all of the Natives are at home." Since there was no local post office, the Natives had to bring their mail from Nome, or otherwise depend on "casual boats and planes" that frequented the island eight times a year. The residents, totaling 108 in number, had a Native-owned cooperative store, but no community bathhouse, shop, or laundry. Over half of the islanders dressed in reindeer, seal, or egrek skins and used grass for insoles. Hunting and ivory carving were the two main occupations for both

men and women. There was a high illiteracy rate, with half of the adults never attending school, 60 percent unable to read or write, and 32 percent of the adults unable to understand the English language.

A steady flow of anthropologists, biologists, and researchers from several Federal and state agencies have used General Subject Correspondence, 1933-63, and the records of the Alaska Reindeer Service to obtain baseline statistics on Native subsistence. Both series contain annual surveys on the garden and Native food activities for virtually every village in Alaska. There are annual surveys contain agricultural, hunting, and fishing statistics, which were used by U.S. Fish and Wildlife Service and to the BIA to determine fishing and hunting regulations, monitor Native harvesting of fish and game, and to plan for economic development programs.[7] The Agricultural, Hunting, and Fishing Statistics, 1934-72, in the Alaska Reindeer Service files, are more complete and cover a longer period. [8]

The records of the Fish and Wildlife Service in the National Archives include those of several predecessors, the Bureau of Fisheries and the Bureau of Biological Survey. They were merged in 1940 to create the Fish and Wildlife Service, which in 1956 was organized into two bureaus, the Bureau of Commercial Fisheries and the Bureau of Sport Fisheries and Wildlife. Since 1968, the U.S. Fish and Wildlife Service and its predecessors have been responsible for enforcing regulations relating to customs, commerce, and navigation; conduct scientific research on the fur seal; and regulate the Alaskan fishery and fur seal industries. The Treasury Department and Bureau of Fisheries records, which are held by the National Archives in College Park, MD, have been reproduced as M720, *Alaska File of the Secretary of the Treasury, 1868-1903*. These and later records of the Division of Alaska Fisheries (or the Alaska Division of the Bureau of Fisheries) contain information about the fishing rights of Alaska Natives, areas set aside for their use, and illegal seal hunting and fishing by Natives.

With the purchase of Alaska in 1867, the United States acquired the Russians' sealing program in the Pribilof Islands, the summer breeding ground of the northern fur seal. As it had for the Russians, the harvesting of seal hides became a proven commercial venture. The American era in Pribilof seal harvesting began in 1870 and continued for 112 years, to 1984, providing Federal revenues of over $184 million dollars, *not adjusted for inflation*. The Pribilof Islands fur sealing program was the most tightly-managed, longest running government program in the history of the Republic. Long before the rise of the salmon industry, the gold rushes, or

---

[7]"920 Hunting, Fishing, and Trapping Statistics, 1950," General Subject Correspondence, 1933-54, Juneau Area Office (Juneau, Alaska); Records of the Bureau of Indian Affairs, Record Group 75; National Archives--Pacific Alaska Region, Anchorage, AK.

[8]920 Agricultural, Hunting, and Fishing Statistics and Hunting, Fishing, and Fur Farming, 1934-72, Records of the Alaska Reindeer Service, Juneau Area Office (Juneau, AK); Records of the Bureau of Indian Affairs, Record Group 75; National Archives--Pacific Alaska Region, Anchorage, AK.

Prudhoe Bay oil and the Alaska pipeline, the commercial value of the seal harvest had been the focus of the Federal government's interest in Alaska. Beginning in 1910, the Federal Government took over direct administration of the Pribilof Islands from a contractor because of complaints about the treatment of the Aleut islanders, concern over the depletion of the seal herds, and for other reasons. The Bureau of Fisheries assumed direct management of both the sealing harvest and the islands, including responsibility for the health and welfare of the Aleuts, providing schools, medical service, food, fuel, clothing, and living quarters, and overseeing Native community life. In the 1970s, with the environmental movement, massive seal hunting by the Federal Government came to be seen in a different light. The last commercial harvest took place in 1982. In 1984, the National Marine Fisheries Service ended direct administration of the Pribilof Islands, although it maintains a scientific research station on St. Paul.

In Anchorage, the Pribilof Islands Program Files, 1870-1993, relate to programs to conserve and utilize the fur seals of the Pribilof Islands, and carrying out the responsibilities of the National Marine Fisheries Service with the Aleut residents. There are approximately 150 cubic feet of a rather diverse group of records--administrative correspondence, annual reports, logbooks, census rolls, photographs, maps, property inventories, fur seal and harvesting records, and other items. There is information on medical and dental service, including reports on the water supply, sewage, and sanitary facilities, education, housing, food supply, the use of alcohol, Native bank accounts, travel, and natural resources. These records also detail the forced removal of the entire Aleut population (1942-45) from the Pribilof Islands to unsanitary and inadequate internment camps in southeast Alaska, where more than 10% of the 800 evacuees died of disease and malnutrition. In particular, the records relating to the economic life of the Islands, particularly employment, earnings, and living conditions, have been used to protect the rights and interests of these American citizens. For example, when the fisheries agents paid the Native workgangs canteen wages, they unknowingly made them employees of the Federal Government. Wages paid to the sealing crews listed in these files are usually the only surviving evidence to support the claims of Aleuts who seek pensions under the Civil Service Reform Act of 1883.

In a typical case, an abstract of Native earnings on St. George Island for "Alexander Galanin" shows that he worked on the 1940 sealing harvest and, among other duties, prepared 300 sealskins for shipment, earning a total of $225.00 during the summer of 1940. This is a paltry sum for a summer of work in a sealing plant but it qualified Alexander for a government pension five decades later. Since the establishment of the National Archives in Anchorage, an increasing number of Pribilovians like Alexander have used these records to document their servitude for benefits and rights that most citizens take for granted. There are other records on the sealing harvest, daily seal kill records, tallies of skins shipped and of meat and by-products, letters from Outsiders asking (and usually being denied) permission to land, scientific studies, and comments and observations made by the fisheries agents.[9]

---

[9]Thomas E. Wiltsey, "Protecting Alaska's Native Population--With Federal Records," *The Record*, v. 1, no. 3 (January 1995): 17-18; and "1940 Native Earnings [St. George Island, Alaska]; Pribilof Islands Program Records, 1923-69; Records of the U.S. Fish and Wildlife

Of special interest are the Pribilof Islands Logbooks, 1870-1961, which are available on microfilm, of the fur seal industry there. The logbooks were created by the resident Federal agent. There are daily narrative accounts of island activities oriented toward the seal harvest but they include a vast amount of information about the islands and Native community life. Earlier this year, samples of the logbooks and selected photographs of the Pribilof Islands were placed on the National Archives Information Locator (NAIL) database on the NARA homepage on the Internet.

The records of the Indian Arts and Crafts Board, 1935-83 (RG 435), for the Alaska Field Office in Juneau document Federal efforts to promote authentic Native arts and crafts in Nome, Juneau, Sitka, and Anchorage. The records document such special projects as the Sitka Demonstration Workshop and the Shugnak Jade Project.

Our office also has one gift collection of personal papers, the Sir Henry S. Wellcome Collection, 1856-1936 (105 linear feet), that was donated in 1961 by the Trustees of the Wellcome estate. The Wellcome Collection relates to the Tsimshian Indians and the Reverend William Duncan, who guided them from the time they lived in British Columbia until well after they migrated to Annette Island, Alaska in 1887. It was at this time that Sir Henry Wellcome, a weathy American-born British philanthropist and drug manufacturer (Burroughs-Wellcome Co.), became interested in the Metlakatla situation. In 1891, Congress set aside Annette Island as an Indian Reserve. Trouble within the settlement occurred as a result of two contesting factions: Duncan's rule as pastor, magistrate, and commercial leader and the U.S. Government's actions to support Metlakatlans who sought improved school conditions. Eventually Wellcome supported Duncan's cause and financed a program to gather documentation in support of the missionary. This collection resulted from these efforts.

The Wellcome Collection is a particularly rich source of ethnographic data, accompanied by over 2,000 photographs on the Tshimshians of Alaska and British Columbia, that are now available on NAIL on the NARA Homepage. There are photographic prints (including studio portraits), litographs, postal cards, and glass plate negatives. These image pertain to numerous subjects in both Metlakatla settlements in Alaska and British Columbia (including interior and exterior views of houses, churches, and other structures); totem art of the Pacific Northwest Indians tribes; and views of President Warren G. Harding's 1923 visit to Alaska.

There are many other Federal records that include information about Alaska Natives and other Native Americans at the National Archives--Pacific Alaska Region (Anchorage), several other NARA regional records facilities, and at National Archives repositories located in the Washington, DC area. The type of records which exist and their content varies between each of the Federal agencies, and there are often gaps in chronological coverage. Further information about these records can be found in several guides: (1) Edward E. Hill's *Guide to Records in the National Archives of the United States Relating to American Indians* (1981); (2) George S.

---

Service, Record Group 22; National Archives--Pacific Alaska Region, Anchorage, AK.

Ulibarri's *Documenting Alaskan History: Guide to Federal Archives Relating to Alaska* (1982); Loretto Dennis Szucs's and Sandra Hargreaves Luebking's *The Archives: A Guide to National Archives Field Branches* (1988); and *Guide to Federal Records in the National Archives of the United States*, Three Volumes (1995).

# EXHIBIT B

| Record Group | Agency | Records Series Title & Dates | Linear Ft. | Cubic Ft. | NARA Identification # | Usage |
|---|---|---|---|---|---|---|
| 18 | AAF | Aerial Photographs of Attu Island, September 18-28, 1942. 1 box. | 1 | | 4707527 | **High/Public** |
| 21 | USDC | District of Alaska. Civil Case Files, 1884-1900. 50 boxes. | | 25 | | **High/Public** |
| 21 | USDC | District of Alaska. Civil Dockets, 1884-1890. 1 box. | 1 | | 655631 | **High/Public** |
| 21 | USDC | District of Alaska. First Diviison. Ketchikan. Civil Case Files, 1911-1955. 109 boxes. | | 55 | | **High/Public** |
| 21 | USDC | District of Alaska. First Diviison. Ketchikan. Civil Dockets, 1910-1936, and 1946-1960. | | | | **High/Public** |
| 21 | USDC | District of Alaska. First Division. Ketchikan. Civil and Criminal Journals, 1917-1960. | | | | **High/Public** |
| 21 | USDC | District of Alaska. First Division at Sitka and Juneau. Civil Case Files, 1901-1959. 366 boxes. | | 183 | | **High/Public** |
| 21 | USDC | District of Alaska. First Division. Juneau. Records of the Clerk of Court, including Correspondence, 1917-1954. 23 boxes. | | 12 | | **High/Public** |
| 21 | USDC | District Court. First Division. Juneau. Coroner's Inquest Reports, 1900-1959. 5 boxes. | | 6 | | **High/Public** |
| 21 | USDC | District of Alaska. First Division. Court Journals, 1955-1959. 1 box. | | 2 | | **High/Public** |
| 21 | USDC | District of Alaska. First Division. Petitions and Licenses to Practice Medicine and Surgery, 1900-1913. 1 box. | | 1 | | **High/Public** |
| 21 | USDC | District of Alaska. First Division. Skagway. Civil Case Files | | | | **High/Public** |

| 21 USDC | District of Alaska.  First Division.  Sulzer. Journal, 1908-1914.  1 box. | 2 | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Valdez.  Civil Case Files, 1901-1902.  2 boxes. | 1 | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Valdez.  Civil Registers, 1902-1909.  4 boxes. | 6 | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Valdez.  Court Journals, 1901-1909. | 2 | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Valdez.  Mixed Judgment Docket, 1905-1909 (with Cordova and Seward). | | **High/Public** |
| 21 USDC | District of Alaska.  Second Division.  Nome. Civil Criminal, Admiralty, and Bankruptcy Cases, 1900-1960. | | **Note:  These records have been microfilmed as National Archives Microfilm Publications M1966-1969 (Admirality, Bankrupcy, Civil and Criminal Cases, 1900-1960) between 1994-2004. Original case files from 1900 to 1934 suffered fire damage from 1934 Nome fire and are very fragile after undergoing conservation treatment.** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage (includes files from Cordova, Kodiak, Seward, and Valdez interfiled with cases from Anchorage).  Civil Case Files, 1915-1960.  951 boxes. | 476 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Court Journals, 1916-1960.  9 boxes. | 14 | **High/Public** |

| | | | |
|---|---|---|---|
| 21 USDC | District of Alaska.  Third Division.  Civil Registers and Dockets, 1915-1960.  21 boxes. | 6 | **High/Public** |
| 21 USDC | District of Alaska.  Third Divison.  Domestic Corporation Cases, 1908-1959.  30 boxes. | 15 | **High/Public** |
| 21 USDC | District of Alaska.  Third Divison.  Foreign Corporation Cases, 1905-1958.  Box numbers not available. | 15 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova.  Mixed Civil, Criminal, and Bankruptcy Case Files, 1911-1943.  32 boxes. | 16 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova.  Civil Registers and Dockets, 1910-1938.  3 boxes. | 3 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova.  Court Journals, 1910-1940.  5 boxes. | 8 | **High/Public** |
| 21 USDC | District of Alaska.  Third Divison.  Cordova.  Mixed Judgment Docket, 1905-1940 (with Seward and Cordova). | | **High/Public** |
| 21 USDC | District of Alaska at Eagle and Fairbanks.  Civil Case Files, 1900-1909. | | **High/Public** |
| 21 USDC | District of Alaska.   Third Division.  Seward.  Mixed Civil, Criminal, and Bankruptcy Case Files, 1911-1943. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Seward.  Civil Registers and Dockets, 1911-1927.  1 box. | 2 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Seward.  Court Journals, 1911-1940.  6 boxes. | 8 | **High/Public** |

| | | | |
|---|---|---|---|
| 21 USDC | District of Alaska.  Third Division.  Seward. Mixed Judgment Docket, 1905-1940 (with Cordova and Valdez). | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Valdez.  Civil Case Files, 1909-1939.  50 boxes. | 25 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Valdez.  Civil Registers and Dockets, 1909-1929.  4 boxes. | 6 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Valdez.  Court Journals, 1909-1940.  19 boxes. | 6 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Mixed Judgment Docket, 1909-1940 (with Cordova and Seward). | | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Fairbanks. Civil Case Files, 1900-1960.  448 boxes. | 224 | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Fairbanks. Court Journal, 1923-1959 (Bethel, Eagle, McGrath, and Wiseman only). | | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Fairbanks. Oaths of Appointment, 1905-1958.  7 boxes. | 4 | |
| 21 USDC | District of Alaska.  Fourth Division.  Iditarod. Civil Cases and Exhibits, 1911-1924.  31 boxes. | 15 | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Ruby.  Civil Cases, 1913-1920. | | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Ketchikan. Office of the U.S. Commissioner.  Probate Registers, Dockets, Journals, and Indexes, 1901-1960. | | **High/Public** |

| | | | |
|---|---|---|---|
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Office of the U.S. Commissioner.  Civil Dockets, 1910-1960.  9 boxes. | 9 | High/Public |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Office of the U.S. Commissioner.  Civil Case Files, 1923-1948. | | High/Public |
| 21 USDC | Disrict of Alaska.  Criminal Case Files, 1884-1900.  24 boxes. | 12 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Ketchikan. Criminal Case Files, 1909-1955.  47 boxes. | 24 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Ketchikan. Civil and Criminal Journal, 1917-1955.  8 boxes. | 12 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Juneau. Criminal Case Files, 1900-1960.  91 boxes. | 46 | |
| 21 USDC | District of Alaska.  First Division.  Criminal Docket, 1926-1927.  1 box. | 3 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Juneau.  Court Journal (Criminal Cases), 1955-1959.  1 box. | 3 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Skagway. Criminal Case Files, 1901-1909.  7 boxes. | 4 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Skagway. Judgment Dockets, 1900-1918.  1 box. | 2 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Tenakee. Criminal Journal, 1914-1937.  1 box. | 2 | High/Public |
| 21 USDC | District of Alaska.  First Division.  Office of the U.S. Commissioner.  Juneau.  Criminal Case Files, 1913-1955.  55 boxes. | 28 | High/Public |

| | | | |
|---|---|---|---|
| 21 USDC | District of Alaska.  First Division.  Office of the U.S. Commissioner.  Ketchikan.  Criminal Case Files, 1929-1959. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Criminal Case Files, 1902-1960 (includes Valdez, Cordova, and Seward).  254 boxes. | 127 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Criminal Dockets and Registers, 1908-1955.  7 boxes. | 8 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Court Journals, 1916-1960. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division. Cordova. Mixed Civil, Criminal, and Bankruptcy Case Files, 1911-1943. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova. Criminal Case Files, 1902-1960 (includes Anchorage, Valdez, and Seward). | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova. Court Journals, 1910-1940. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Cordova. Judgment Docket, 1905-1940 (includes Seward and Valdez).  1 box. | 2 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Eagle City and Fairbanks.  Criminal Cases, 1900-1960. | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Seward. Mixed Civil, Criminal, and Bankrutpy Case Files, 1902-1960 (includes Anchorage, Cordova, and Valdez). | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Seward. Criminal Case Files, 1902-1960 (includes Anchorage, Cordova, and Valdez). | | **High/Public** |

| | | | |
|---|---|---|---|
| 21 USDC | District of Alaska.  Third Division.  Cordova. Court Journals, 1911-1940. | | **High/Public** |
| 21 USDC | District of Alaska.   Third Division.  Cordova. Judgment Docket, 1905-1940 (includes Cordova and Valdez). | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Valdez. Criminal Case Files, 1902-1960 (includes Anchorage, Cordova, and Seward). | | **High/Public** |
| 21 USDC | District of Alaska.  First Division.  Valdez. Criminal Docket, 1902-1908.  1 box. | 2 | |
| 21 USDC | District of Alaska.  Third Division.  Valdez. Criminal Docket, 1902-1960.  19 boxes. | 20 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Valdez.  Court Journals, 1901-1940 (includes Cordova and Seward). | | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Office of the U.S. Commissioner.  Criminal Case Files, 1923-1946.  10 boxes. | 5 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Anchorage. Office of the U.S. Commissioner.  Criminal Dockets and Registers, 1910-1960.  26 boxes. | 38 | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Eagle and Fairbanks.  Criminal Case Files, 1909-1959.  91 boxes. | 46 | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Iditarod. Criminal Case Files, 1911-1924.  5 boxes. | 3 | **High/Public** |
| 21 USDC | District of Alaska.  Fourth Division.  Ruby. Criminal Case Files, 1912-1917.  4 boxes. | 2 | **High/Public** |
| 21 USDC | District of Alaska.  Third Division.  Declarations of Intention, 1903-1991. | | **High/Public** |

| | | | | | |
|---|---|---|---|---|---|
| 21 USDC | District of Alaska. Third Division. Petitions for Naturalization, 1903-1991. | | | | **High/Public** |
| 22 USFWS | Pribilof Islands Logbooks, 1870-1961 | 10 | | 297024 | **High/Public** |
| 22 USFWS | Pribilof Islands Logbooks, 1870-1961 (Z13 Agency-produced microfilm not for sale by NARA) | | | | **High/Public** |
| 22 USFWS | Pribilof Islands Program Material , 1919 - 1974 | 10 | | 6922192 | Low (Higher if ditigized) |
| 22 USFWS | Subject and Decimal Correspondence of the Pribilof Islands Program, 1923-1969 | 27 | | 2842763 | **High/Public** |
| 22 F&WS | Correspondence Relating to the Establishment of the Arctic National Wildlife Refuge, 1957-1962 | 1 | | 1656099 | **High/Public** |
| 22 USFWS | Pribilof Islands Photographs, ca. 1890-ca. 1970 | 3 | | 297055 | **High/Public** |
| 22 USFWS | Exxon Valdez Oil Spill Correspondence, ca. 1989-2001 (U.S. Fish and Wildlife Service. Alaska Regional Office, Anchorage). 289 boxes. | | 98 | | **Low Use (Potential High Historical/Legal Value. Periodic high use by Alaska and Outside legal firms dealing with cases involving the long-term effects of oil spill on Prince William Sound.** |
| 26 USCG | Bering Sea Patrol Records, 1926-1940 | 23 | | 297161 | **High/Public** |
| 26 USCG | Maps and Charts, 1915-1940 (Bering Sea Patrol) | 1 | | 6713284 | **High/Public** |
| 26 USCG | Charts from the U.S. Revenue Cutter Manning, 1909-1910 | 1 | | 6706722 | Low (Higher if ditigized) |
| 26 USCG | Documentation Relating to the M/V Selendang Ayu Cleanup, 2004-2005 | 4 | | 6740926 | **High (potential)** |
| 26 USCG | Unit Logs, 1968-1990 | 92 | | 6293282 | **High-by USCG&Veterans** |
| 26 USGC | Vessel Inspection Files, 1974-1980 | 7 | | 6756394 | **High-by USCG** |

| | | | |
|---|---|---|---|
| 30 | BPR | Program Planning and Research Correspondence, 1905-1959 (Alaska Road Commission). 42 boxes. | 16 |

**High/Public/State & Federal Agencies/Environmental Researchers.** Contains extensive docmentation on historic transportation routes and the development and use of historic trails, roads, and highways throughout Alaska. This was the basic primary source used by State of Alaska's Dept. of Transportation's Revised Statute 2477 Project in its published reports to document rights-of-way on naviagable waters on federal lands throughout Alaska.

| | | | |
|---|---|---|---|
| 30 | BPR | Project Correspondence, 1916-1959 (Alaska Road Commission). 92 boxes. | 32 |

**High/Public/State & Federal Agencies/Environmental Researchers.**

| | | | | | |
|---|---|---|---|---|---|
| 30 | BPR | Construction Project Drawings and Tracings, 1922-1958. 31 boxes and 18 rolled bundles. | | | Low Use. On surface, this seems to be a digitization candidate. These are an interim set of drawings. According to former Alaska State Archivist John Kenney, the ARC transferred its final version of construction drawings to the Alaska Dept. of Highways and they are now in the State Archives (Juneau). |
| 36 | USCS | Records of Entrances and Clearances of Vessels in Foreign Trade, 1883-1901 and 1916-1953 (Sitka) | | | **High/Public** |
| 36 | USCS | Records of Entrances and Clearances of Vessels in Coastwide Trade, 1867-1901, 1926-1944 (Sitka) | | | **High/Public** |
| 36 | USCS | Records of Entrances and Clearances of Vessels/Coastwise & Aircraft in Foreign Trade, 1945-1949 (Sitka) | | | **High/Public** |
| 36 | USCS | Records Relating to Bills of Sale [of Licensed Vessels, 20 Tons or Less], 1927-1937 (Sitka) | | | Low (Higher if digitized) |
| 36 | USCS | Certificates of Admeasurement, 1953-1957 (Sitka) | | | Low (Higher if digitized) |
| 36 | USCS | Wreck Reports, 1873-1891 (Sitka) | | | **High/Public** |
| 36 | USCS | Dead Vessel Files, 1920-1966 (Juneau) | 44 | 2190329 | **High/Public** |

| | | | |
|---|---|---|---|
| 36 | USCS | Record of Bills of Sale of Enrolled Vessels, 1903-1936 (Juneau) (v. 2-8, 16-23) [Alternativje title: Record of Bills of Sale of Vessels] | Low (Higher if digitized) |
| 36 | USCS | Record of Entrances and Clearances of Vessels Involved in the Foreign Trade, 1901-1952 (Juneau) v. 11-16, 18-19 (includes Mixed Ports) | High/Public |
| 36 | USCS | Record of Entrances and Clearances of Vessels Involved in the Coastal Trade, 1901-1909 (Juneau) 2 volumes | High/Public |
| 36 | USCS | Copies of Bills of Sale of Licensed Vessels, 20 Tons or Less, 1901-1936 (Juneau) v. 3-24 | Low (Higher if digitized) |
| 36 | USCS | Record of Special Clearances of Vessels Involved in the Coastal Trade, 1908-1948 (Juneau).  v. 9-10 | High/Public |
| 36 | USCS | General Index of Conveyances of Vessels, 1873-1934 (Juneau) | Low (Higher if digitized) |
| 36 | USCS | Record of Mortgages on Registered or Enrolled Vessels/Licensed Vessels, 20 Tons of Less [Alternate Title:  Record of Mortgages on Licensed Vessels, 1905-1947 (Mixed Ports)  v. 2-15 | Low (Higher if digitized) |
| 36 | USCS | Record of Miscellaneous Conveyances of Vessels, 1916-1943 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Record of Tonnage Admeasurement, 1901-1915 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Record of Marshal's Sale of Vessels, 1926-1932 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | General Index of Conveyances of Vessels, 1926-1949 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Record of Entrances and Clearances of Vessels Engaged in Foreign Trade, 1919-1934 (Mixed Ports) | High/Public |

| | | | |
|---|---|---|---|
| 36 | USCS | Record of Entrances and Clearances of Vessels Involved in the Coastal Trade, 1910-1935 (Mixed Ports) 6 volumes | **High/Public** |
| 36 | USCS | Copies of Certificates of Enrollment/Record of Consolidated Enrollment and Licenses, 1895-1938, and 1941 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Copies of Licenses of Enrolled Vessels, 1902-1911 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Consolidated Certificate of Enrollments and Licenses, 1911-1914 and 1938-1947 (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Record of Bills of Sale for Enrolled Vessels, 1917-1936. | Low (Higher if digitized) |
| 36 | USCS | Bills of Sale of Licensed Vessels, 20 Tons or Less, 1926-1947 (Mixed Ports).  9 volumes. | Low (Higher if ditized) |
| 36 | USCS | Copies of Licenses of Vessels 20 tons or less, 1898-1907 (Mixed Ports) [OPA:  Licenses Issued to Vessels under 20 Tons, 1898-1907] v. 5-41 | Low (Higher if digitized) |
| 36 | USCS | Mixed Volume - License and Enrollments under 20 Tons, 1952-1954 | Low (Higher if digitized) |
| 36 | USCS | Certicates of Registry, 1902-1964 (Mixed Ports) (Volumes 3-23) | Low (Higher if digitized) |

| | | | |
|---|---|---|---|
| 36 | USCS | Abstracts of Titles Received [OPA: Abstracts and Certificates of Title, 1927-1949) (Mixed Ports) | Low (Higher if digitized) |
| 36 | USCS | Abstract & Certificate of Record of Title, 1925-1949 (Ketchikan) | Low (Higher if digitized) |
| 36 | USCS | Record of Entrances and Clearances of Vessels Involved in the Coastal Trade, 1938-1953 (Taku inlet) | Low (Higher if digitized) |
| 36 | USCS | Record of Entrances and Clearances of Vessels Involved in the Coastal Trade, 1904-1946 (Ketchikan). V. 22a-34 + 2 vols. | **High/Public** |
| 36 | USCS | Record of Entrances and Clearances Involved in the Foreign Trade, 1898-1952 (Ketchikan) | **High/Public** |
| 36 | USCS | Copies of Licenses of Enrolled Vessels, 1893-1901 (Mary's Island) | Low (Higher if digitized) |
| 36 | USCS | Copies of Licenses of Enrolled Vessels, 20 Tons or Less, 1893-1908 (Ketchikan) | Low (Higher if digitized) |
| 36 | USCS | Copies of Licenses of Enrolled Vessels, 1896-1911 (Ketchikan) 2 volumes. | Low (Higher if digitized) |
| 36 | USCS | Record of Licensed Vessels, 1907-1914 (Ketchikan) | Low (Higher if ditized) |
| 36 | USCS | Record of Mortgages on Registered or Enrolled Vessels/Licensed Vessels, 20 Tons of Less, 1912-1918 (Ketchikan) | Low (Higher if digitized) |
| 36 | USCS | Record of Miscellaneous Conveyances of Vessels, 1924-1928 (Ketchikan) | Low (Higher if digitized) |
| 36 | USCS | Record of Consolidated Enrollments and Licenses, 1912-1914 (Ketchikan) | Low (Higher if digitized) |
| 36 | USCS | Register of Collections [OPA: Certificates of Registry, 1916-1920 (Ketchikan) | Low (Higher if ditized) |
| 36 | USCS | Record of Entrances and Clearances, 1916-1934 (Nome) | **High/Public** |

| 36 | USCS | Record of Bills of Sale of Registered Vessels under 20 Tons, 1915-1936 (Petersburg) | Low (Higher if digitized) |
|---|---|---|---|
| 36 | USCS | Records of Bills of Sale of Registered Vessels, 1916-1937 (Petersburg) | Low (Higher if ditized) |
| 36 | USCS | Record of Mortgages on Licensed Vessels under 20 Tons, 1926-1942 (Petersburg) | Low (Higher if ditized) |
| 36 | USCS | Record of Entrances and Clearances, 1923-1937 (Seward) | **High/Public** |
| 36 | USCS | Mortgages of Licensed Vessels of 20 Tons or Less, 1923-1937 (Seward) | Low (Higher if ditized) |
| 36 | USCS | Record of Bills of Sale of Enrolled Vessels, 1924-1937 (Seward) | Low (Higher if ditized) |
| 36 | USCS | Index to Conveyances, 1908-1946 (Cordova-Seward) | Low (Higher if ditized) |
| 36 | USCS | Record of Miscellaneous Conveyances of Vessels, 1923-1937 (Seward) | Low (Higher if ditized) |
| 36 | USCS | Record of Entrances and Clearances of Vessels in Foreign Trade, 1943-1945, 1962-1964 (Skagway) | **High/Public** |
| 36 | USCS | Record of Bills of Sale of Vessels, 1916-1941 (Skagway) | Low (Higher if ditized) |
| 36 | USCS | Record of Mortages on Licensed Vessels under 20 Tons, 1922-1953 (Skagway) | Low (Higher if ditized) |
| 36 | USCS | Record of Bills of Sale of Licenses Vessels under 20 Tons, 1939-1950 (Skagway) | Low (Higher if ditized) |
| 36 | USCS | Oaths on Registry and Ownership of Vessels, 1906-1939 (No port/subport listed) | Low (Higher if ditized) |
| 36 | USCS | Oaths on Registry and Ownership of Vessels, 1919-1936 (No port/subport listed) | Low (Higher if ditized) |

| | | | | | |
|---|---|---|---|---|---|
| 36 | USCS | Record of Mortgages on Licensed Vessels under 20 Tons, 1917-1931 (Custom Houses) Provenance needs to be checked | | | Low (Higher if ditized) |
| 36 | USCS | Record of Entrances and Clearances in Foreign Trade, 1919-1934 (Custom Houses) Provenance needs to be checked | | | Low (Higher if ditized) |
| 36 | USCS | General Index of Conveyances of Vessels, 1932-1948 (Unknown Subport of Entry) | | | Low (Higher if ditized) |
| 36 | USCS | Coastwise Entrances and Clearences, 1885-1935 (Wrangell) | | | High/Public |
| 36 | USCS | License of Enrolled Vessels, 1898-1911 (Wrangell) | | | Low (Higher if ditized) |
| 36 | USCS | Record of Bills of Sale of Registered Vessels, 1935-1936 (Wrangell) | | | Low (Higher if ditized) |
| 36 | USCS | Record of Bills of Sale of Licenses Vessels under 20 Tons, 1935-1936 (Wrangell) | | | Low (Higher if ditized) |
| 36 | USCS | Wreck Reports, 1875-1891 (Wrangell/Juneau) | 1 | 5635202 | High/Public |
| 36 | USCS | Record of Miscellaneous Conveyances and Licenses of Merchant Vessels, 1930-1934 (Wrangell) | | | |
| 48 | DOI | Alaska Native Claims Settlement Act (ANCSA) Case Files, 1977-1987 (Office of the Solicitor) | 1 | 6423698 | High-by DOI for Public View |
| 48 | DOI | Litigation Files, 1957-1991 (Office of the Solicitor) | | | High-by DOI |
| 48 | DOI | Indian Land Administration Files, 1971-1991 | | | High/Public |
| 48 | DOI | Alaska Native Claims Settlement Act (ANCSA) Case Files, 1972-1990 (Office of the Solicitor) | 25 | 605152 | High/Public |
| 49 | BLM | Right of Way Case Files, 1968-1985 | 15 | 6423832 | High-by BLM for Public View |
| 49 | BLM | Serialized and Non-serialized Terminated Rights-of-Way, 1968-1976 | 2 | 6423658 | High-by BLM for Public View |

| | | | | |
|---|---|---|---|---|
| 49 BLM | Terminated Rights-of-Way License, Permit or Easement Files, 1981 - 1985 | | 6423722 | **High-by BLM for Public View** |
| 49 BLM | Terminated Rights-of-Way Files, 1980 | 1 | 6423698 | **High-by BLM for Public View** |
| 49 BLM | Closed Serialized Land Entry Applications, 1968-1 | 5 | 4416181 | **High-by BLM for Public View** |
| 49 BLM | Terminated Right of Way Licenses, 1968-1985 | 9 | 6397164 | **High-by BLM for Public View** |
| 49 BLM | Townsite Survey Field Notes, 1910 (Fairbanks Land Office) | 1 | 4706545 | Low (Higher if ditigized) |
| 49 BLM | Field Notes, 1910 (Fairbanks) | 1 | 5647390 | Low (Higher if ditigized) |
| 49 BLM | Register Books, 1885-1902 (Sitka Land Office) | 3 | 5647398 | Low (Higher if ditigized) |
| 49 BLM | Land Office Register Books, 1902-1919 (Juneau Land Office) | 5 | 5558239 | Low (Higher if ditigized) |
| 49 BLM | Administrative Townsite Books, ca 1905-1922 | 2 | 5557856 | **High-BLM for Public View** |
| 49 BLM | Alaska Townsite Deed Books, 1906-1975 | 16 | 5404594 | **High-Public/BLM** |
| 49 BLM | Land Office Register Books, 1898-1902 (GLO, Office of the Surveyor General) | 2 | 5559721 | Low (Higher if ditigized) |
| 49 BLM | Townsite Tract Books, 1906-1962 | 4 | 5509900 | Low (Higher if ditigized) |
| 49 BLM | Coal Survey Plats, 1905-1911 | 2 | 5647411 | Low (Higher if ditigized) |

| | | | | | |
|---|---|---|---|---|---|
| 49 | BLM | Serialized Land Entry Files that were Canceled, Relinquished, or Rejected, ca. 1885-1969 (Very Active Files for Archival Loan to Originating/Creating Agency) | 386 | 607087 | **Very High-by BLM (public adjudication in land claims; land disputes; State of Alaska and Native land selections, etc. from federal lands, etc.). Emergency reference service: one hour or less. Files are either copied and/or loaned to BLM Office three blocks from NARA Anchorage office to be used by Alaskans, especially traveling from rural areas. Loan activity: weekly.** |
| 49 | BLM | Register of Homestead Receipts and Fur Farm Rentals, 1899-1931 | 1 | 647249 | Low (Higher if ditigized). |
| 49 | BLM | Trans-Alaska Pipeline System (TAPS) Photographs, 1969-1983 | 43 | 2251156 | Low (Higher if ditigized) |
| 49 | BLM | Right of Way Case Files, 1923-1982 | 16 | 3859196 | **High-by BLM** |
| 49 | BLM | Patented Land Entry Case Files, 1968-1980 (Fairbanks District Office) | 33 | 4076549 | Low (Higher if ditigized) |
| 49 | BLM | Land Entry Application Case Files, 1968-1977 (Anchorage Area) | 6 | 4477414 | **High-BLM** |
| 49 | BLM | Contest Case Files Relating to Alaska Native Rights, ca. 1965-1972 | 3 | 4478008 | Low(Higher if ditigized) |
| 49 | BLM | Contest Files, 1968-1975 | 1 | 4483062 | Low(Higher if ditigized) |
| 49 | BLM | Right-of-Way Case Files, 1968-1983 | 2 | 4488953 | **High-BLM** |
| 49 | BLM | Case Files Relating to Grazing, 1928-1986 | 4 | 4489053 | Low (Higher if ditigized) |
| 49 | BLM | Adverse Claim Case Files, 1974-1979 (Fairbanks District Office) | 5 | 490705 | Low (Higher if ditigized) |
| 49 | BLM | Memorandums of Understanding, 1983-1995 | 1 | 4492513 | Low (Higher if ditigized) |

| | | | | | |
|---|---|---|---|---|---|
| 49 | BLM | Patented Land Entry Case Files, 1966-1979 (Alaska State Office, Anchorage) | 68 | 4498952 | Low (Higher if ditigized) |
| 49 | BLM | Resource Management Plan Files, 1986-1996 (Re-opening of A-J Mine) | 3 | 4504909 | Low (Higher if ditigized) |
| 49 | BLM | Patented Native Allotment Case Files, 1929-1969 (Alaska State Office, Anchorage) | 4 | 4521799 | **High-BLM (Public View for adjudiction of land claims, disputes etc.)** |
| 49 | BLM | Patented Mineral Case Files, 1889-1908 (Southeast Alaska) | 2 | 4526529 | Low (Higher if ditigized) |
| 49 | BLM | Rejected Native Allotment Case Files, 1923-1967 | 4 | 4527123 | **High-BLM (public adjudication in land claims, etc.)** |
| 49 | BLM | Nenana Town Lot Sale Forfeiture Case Files, 1916-1928 | 4 | 4546077 | Low (Higher if ditigized) |
| 49 | BLM | Right-of-Way Application Case Files, 1916-1931 (CR & NWRR) | 1 | 4571127 | Low (Higher if ditigized) |
| 49 | BLM | Patent Case Files, 1915-1950 (Fairbanks Land Office) | 5 | 4566010 | **High-BLM** |
| 49 | BLM | Right-of-Way Case Files Related to the Copper River & Northwestern Railroad, 1916-1931 (Anchorage Land Office) | 2 | 4662506 | Low (Higher if ditigized) |
| 49 | BLM | Patent Registers, 1958-1964 (Anchorage Land Office) | 1 | 4700614 | Low (Higher if ditigized) |
| 49 | BLM | Cadastral Survey Field Notes, 1920-1976 (Alaska State Office, Anchorage) | 14 | 4706077 | **High-BLM/Public** |
| 49 | BLM | Field Notes Relating to Mineral Surveys, 1899-1970 (Anchorage Land Office) | 1 | 4706891 | Low (Higher if ditigized) |
| 49 | BLM | Field Notes Relating to Coal Surveys, ca. 1907 (Fairbanks Land Office) | 1 | 4706890 | Low (Higher if ditigized) |
| 49 | BLM | Withdrawn or Rejected Publc Lands Applications, 1975-1979 (State of Alaska public lands selections) | 1 | 4711985 | **High-BLM** |
| 49 | BLM | Contest Case Files, 1974-1979 (Alaska State Office, Anchorage) | 2 | 4713089 | Low-BLM |

| | | | | | |
|---|---|---|---|---|---|
| 49 | BLM | Land Entry Application Case Files, 1976-1979 (Fairbanks District Office) | 5 | 4713168 | High-BLM |
| 49 | BLM | Closed Right-of-Way Case Files, 1970-1984 (Fairbanks District Office) | 2 | 4713565 | High-BLM |
| 49 | BLM | Serialized Right-of-Way Case Files, 1959-1985 (Fairbanks District Office) | 6 | 4713601 | High-BLM |
| 49 | BLM | Closed Land Entry Case Files, 1978-1980 | 17 | 4734537 | High-BLM |
| 49 | BLM | Letters Received by the Surveyor General, 1884-1921 | 29 | 4735455 | Low (Higher if ditigized) |
| 49 | BLM | Contest Dockets, 1908-1954 (Anchorage Land Office) (Public Land disputes at Anchorage, Juneau, Nome, and Valdez) | 1 | 4739418 | Low (Higher if ditigized) |
| 49 | BLM | Land and Mining Claims Files, 1968-1977 (Alaska State Office, Anchorage) | 26 | 4757262 | Low (Higher if ditigized) |
| 49 | BLM | Non-Patent Native Allotment Case Files, 1964-1976 | 1 | 4757223 | High-BLM (public adjudication in land claims, etc.) |
| 49 | BLM | Land and Mining Claimsj Files, 1968-1977 (Alaska State Office, Anchorage) (Fairbanks Area) | 14 | 4557272 | Low-Higher if digitized |
| 49 | BLM | Water Resources Study Files, 1972-1980 (for Southcentral Alaska) | 8 | 4862392 | Low (Higher if digitized) |
| 49 | BLM | Closed Land Entry Case Files, 1963-1966 (Alaska State Office, Anchorage) | 2 | 4928260 | High-BLM |
| 49 | BLM | Cadastral Survey Plats, 1897-1976 | 5 | 4943001 | High-BLM/Public |
| 49 | BLM | Land Office Tract Books, 1914-1962 (Anchorage Land Office) | 4 | 5511579 | HighBLM/Public |
| 49 | BLM | Mineral Surveys, 1885-1983 (Survey plats of mineral claims, excludes Southeastern Alaska) | 1 | | Low (Higher if ditigized) |
| 49 | WPA | Records of the Mananuska Colonization Project, 1935-1942 | 37 | 6923483 | High |

| | | | | |
|---|---|---|---|---|
| 75 BIA | Village Census Rolls, 1912 (Bulk: 1934-1972) (Juneau Area Office). 58 boxes. | | | **High/Public/Proof of date, place of birth, degree of Native Blood, for over 400 Native villages in Alaska. Proof for obtaining U.S. passports, Alaska Permanent Dividend Fund checks, Veterans burial beneftis, social security benefits, Certificates of Degree of Indian or Alaska Native Blood, obtaining tribal recognition, etc.** |
| 75 BIA | National Archives Preservation Microfilm P2286, Alaska Village Census Rolls, 1912 (bulk: 1934-1972)-1972. 66 rolls. Finding Aid. | | | **Same as above** |
| 75 BIA | Village Census Rolls, 1912 (Bulk: 1934-1972)-1972. Screened Reference Set (43 boxes) | | | **Reference copies screened for FOIA 6 (b) privacy restrictions. This set was used for public reference and to make photocopies to avoid using fragile original set of records.** |
| 75 BIA | Historical Albums of Bureau of Education-Bureau of Indian Affairs Schools in Alaska, 1924-1931. (Juneau Area Office) | 1 | | **High/Public** |
| 75 BIA | General Subject Correspondence, 1933-1963. (Juneau Area Office). 108 boxes. In OPA as: Decimal Files, 1933-1963 | 46 | 626283 | **High/Public** |

| | | | |
|---|---|---|---|
| 75 BIA | Mission Correspondence, ca. 1935-1947 (Juneau Area Office). 3 boxes. | 1 | **High/Public (Boxes 1-2 contain photographs of U.S.S. Boxer and M/V North Star III relating to BIA's Resupply Program operated by its Seattle Support Center).** |
| 75 BIA | Mission Correspondence, 1967. Juneau Area Office. Box 7. | 1 | Low (Higher if digitized). Contains photographs of Chena Tanana Flood (1967) and Tyonek photo story (1968). |
| 75 BIA | Still Picture Photograph Files, 1950-1971 (Juneau Area Office). 5 boxes. | 2 | **High/Public** |
| 75 BIA | Education [Decimal Files], 1912-1977 (Juneau Area Office). 69 boxes. | | High/Public. Early date (1912) is misleading, as bulk of records are probably from 1940s and later. |
| 75 BIA | Village School Land Transaction Files, 1894-1999 (Juneau Area Office). 31 boxes. | 10 | **High/Public. Record set of BIA's legal documentation on former BIA school sites throughout Alaska. Prior to transfer to NARA, a reference photocopy set was made for the BIA's official use at their Juneau office.** |

| | | | | |
|---|---|---|---|---|
| 75 BIA | Personnel Lists, 1918-1964 (Juneau Area Office). 2 boxes. | 1 | | <span style="color:red">Low (Higher if digitized). Lists Bureau of Education and BIA teachers employed in Alaska from 1918-1964.</span> |
| 75 BIA | Real Property Reports, 1955-1968 (Juneau Area Office). 2 boxes. | 1 | 2805987 | <span style="color:red">Low (Higher if ditigized)</span> |
| 75 BIA | Tribal Enrollments, ca. 1890s-1976 (Juneau Area Office). 225 boxes. | | | <span style="color:red">Low (Note: Central Council of the Tlingit-Haida Indian Tribes of Alaska (Juneau) has a reference photocopy set used for tribal enrollments of its members). The BIA loaned these records for copying prior to the transfer of the records to NARA.</span> |
| 75 BIA | Mission Correspondence. Village Census, ca. 1969-1974 (Bethel Indian Agency) 3 boxes. | 1 | | <span style="color:red">**High/Public. Note: Usage same as Village Census Rolls, 1912 [bulk: 1934-1972]-1972.**</span> |
| 75 BIA | Tribal Census Files, ca. 1940-1968. (Bethel Indian Agency). 5 boxes. | 2 | | <span style="color:red">**High/Public. Note: Usage same as Village Census Rolls, 1912 [bulk: 1934-1972]-1972.**</span> |
| 75 BIA | Administrative Correspondence, 1947-1961 (Bethel Indian Agency). 4 boxes. | 2 | | <span style="color:red">**High/Public**</span> |
| 75 BIA | Education Program Decimal Files, 1945-1960 (Bethel Agency). 7 boxes. | 2 | | <span style="color:red">**High/Public**</span> |
| 75 BIA | Mission Correspondence, 1960-1973 (Bethel Indian Agency) 52 boxes. | | | <span style="color:red">**High/Public**</span> |

| | | | | |
|---|---|---|---|---|
| 75 BIA | Alaska Native Village Censuses, 1946-1971 (Fairbanks Agency). 3 boxes. | 2 | | **High/Public. Microfilmed on National Archives Preservation Microfilm P2258, Alaska Village Census Rolls 1912 [bulk: 1934-1972]-1972..** |
| 75 BIA | Mount Edgecumbe (Boarding/High) School. Yearbooks, 1947-1983 (Box labels: Publication Record Set, 1947-1983). 6 boxes. | 3 | 626973 | **High/Public** |
| 75 BIA | Mount Edgecumbe (Boarding/High) School (Juneau Area Office). School Census Cards, 1941-1983 [Formerly: School Census Rolls]. 25 boxes. | 11 | 626965 | **High/Public. Indexes to Mount Edgecumbe Boarding/High School's Individual Student Case Files, 1983. Used to verify high school graduation for purposes of employment, attend trade or vocational schools, admission to colleges/universities, etc.** |
| 75 BIA | Mount Edgecumbe (Boarding/High) School (Juneau Area Office). Individual Student Case Files, 1941-1983. 241 boxes. | 80 | | **High/Mount Edgecumbe High School attendees, graduates, and staff; referrals from BIA/U.S. DOI Office of the Special Trustee for American Indians (Juneau/Anchorage).** |
| 75 BIA | Mount Edgecumbe (Boarding/High) School (Juneau Area Office). Administrative Correspondence, 1968-1975. 21 boxes. | 10 | 632548 | **High/Public. Individual files were screened by NARA staff for privacy restrictions. The entire records series has not been screened.** |

| | | | |
|---|---|---|---|
| 75 BIA | Wrangell Institute (Juneau Area Office). Student Files, ca. 1932-1975. 64 boxes. | 22 | **High/Attendees and graduates of Wrangell Institute** |
| 75 BIA | File of Sheldon Jackson on Alaskan School Matters, 1886-1889 (Alaska Division of the Bureau of Indian Affairs). 1 box. | 1 | **Public/High** |
| 75 BIA | Photographs of Schools, Hospitals, and Clinics, 1938-1950 (Juneau Area Office). 40 boxes. | 15 | **High/Public** |
| 75 BIA | Education Program Decimal Files, 1936-1968 (Juneau Area Office). 62 boxes. | | **High/Public** |
| 75 BIA | Decimal Files Relating to Social Services, 1940-1969 (Juneau Area Office). 25 boxes. | 9 | **High/Public** |
| 75 BIA | Field Agent Reports on Schools, 1935-1967 (Juneau Area Office). 1 box. | 1 | **High/Public** |
| 75 BIA | Annual Reports of Reindeer Herds, ca. 1908-1932. Alaska Reindeer Service (Juneau Area Office). 2 boxes. | 1 | **High/Public** |
| 75 BIA | Decimal Correspondence. Alaska Reindeer Service (Juneau Area Office). 30 boxes. | 12 | **High/Public** |
| 75 BIA | Circulars Relating to Reindeer Herding in Alaska. Alaska Reindeer Service (Juneau Area Office). 1 box. | 1 | **High/Public** |
| 75 BIA | Reindeer Program Correspondence, 1914-1945. Alaska Reindeer Service (Juneau Area Office). 1 box. | 1 | **High/Public** |
| 75 BIA | Historical Files, 1929-1948. Alaska Reindeer Service (Juneau Area Office). 1 box. | 1 | **High/Public** |
| 75 BIA | Correspondence Relating to Sales, 1934-1953. Alaska Reindeer Service (Juneau Area Office). 1 box. | 1 | **High/Public** |

| | | | | | |
|---|---|---|---|---|---|
| 75 | BIA | Correspondence Relating to Reindeer Meat, 1937-1943.  Alaska Reindeer Service (Juneau Area Office).  1 box. | 1 | 2789137 | **High/Public** |
| 75 | BIA | General Case Files.  Alaska Reindeer Service (Juneau Area Office).  20 boxes. | 7 | | **High/Public** |
| 75 | BIA | Monthly Herd Reports.  Alaska Reindeer Service (Juneau Area Office).  2 boxes. | 1 | | **High/Public** |
| 75 | BIA | Monthly Herd Reports.  Togiak-Weber-Wilson.  Execution of the Act of September 1, 1937.  Alaska Reindeer Service (Juneau Area Office).  1 box. | 1 | | **High/Public** |
| 75 | BIA | Correspondence Relating to Reindeer Brands and Earmarks, 1923-1940 (Alaska Reindeer Service (Juneau Area Office).  1 box. | | 2789526 | **High/Public** |
| 75 | BIA | Correspondence Relating to Declarations of Reindeer Ownership in Alaska, 1937-1941.  Alaska Reindeer Service (Juneau Area Office).  2 boxes. | 1 | | **High/Public** |
| 75 | BIA | Agricultural, Hunting, and Fishing Statistics.  Juneau Area Office.  4 boxes. | 2 | | **High/Public.  Consists of statistical surveys throughout rural Alaska, ca. 1930s and later.  Used by state and local government entities as baseline data source  for subsistence data; used by academic researchers and other users.  Additional surveys are found in RG 75 General Correspondence, 1933-1963.** |

| | | | | | |
|---|---|---|---|---|---|
| 75 | BIA | Correspondence of Lawrence J. Palmer, 1920-1945.  Alaska Reindeer Service (Juneau Area Office). 5 boxes. | 2 | 2794621 | **High/Public** |
| 75 | BIA | Nunivak Development Project Files, 1955-1970. Alaska Reindeer Service.  5 boxes. | 2 | | **High/Public** |
| 75 | BIA | Administrative Correspondence Relating to the Sale of Reindeer and Reindeer Products, 1940. Alaska Native Service (Juneau Area Office).  1 box. | 1 | | **High/Public** |
| 75 | BIA | Administrative Correspondence, 1934-1953. Alaska Reindeer Service (Juneau Area Office).  1 box. | 1 | | **High/Public** |
| 75 | BIA | Program Correspondence Files, 1947-1966 [Originally:  Program Correspondence Files, 1920-1966].  Juneau Area Office (Seattle Support Center).  4 boxes. | 2 | | **High/Public** |
| 75 | BIA | Log Books of the U.S.S. Boxer and North Star [originally filed with:  Program Correspondence Files, 1920-1966.  3 boxes. | 1 | | **High/Public** |
| 75 | BIA | Historical Albums of Bureau of Education-Bureau of Indian Affairs Schools in Alaska, Historical Files, 1929-1948.  Alaska Reindeer Service (Juneau Area Office).  1 box. | 2 | | **High/Public** |
| 77 | USACOE | As-Built Engineering Drawings, 1940-1945, and 1960s (ca. 8,573 items) | | | **High/Public/Federal Agencies/Environmental Researchers** |

| | | | | | |
|---|---|---|---|---|---|
| 77 | USACOE | Aperture Cards to As-Built Engineering Drawings, 1940-1945, and 1960s (Nos. 1-8,653 cards). Serves as reference set to original drawings. | | | High/Public/Federal Agencies/Environmental Researchers. When transferred to NARA, one set of aperature cards was sent with the original drawings. The second set of aperture cards remained with the originatnig/creating agency's local records manager at USACOE Alaska District (JBER). |
| 77 | USACOE | Construction Project Photographs, 1950-1985 (U.S. Army Corps of Engineers, Alaska District). 40 boxes. | 18 | 5150368 | High/Public/Federal Agencies/Environmental Researchers. |
| 77 | USACOE | Installation Historical Files, 1915-1973 (U.S. Army Corps of Engineers, Alaska District). 47 boxes. | 15 | | High/Public/Environmental Researchers |
| 80 | | Records of the Navy Alaska Coal Commission, 1920-1922. | 2 | | High/Public |
| 95 | USFS | Correspondence Relating to Civilian Conservation Corps Activities, 1937-1942 | 1 | 596832 | High/Public |
| 95 | USFS | Correspondence Relating to Creation of National Forests in Alaska, 1903-1911 | 1 | 1145486 | High/Public |
| 95 | USFS | Historical Photograph Files, 1906-1994 | 5 | | High/Public |
| 95 | USFS | Case Files Relating to Timber Sales, 1911-1940s (Chugach/Tongass NFs) | 16 | | High/Public |
| 95 | USFS | Correspondence Relating to Spruce Log Program, 1942-1944 | 1 | 1079832 | Low (Higher if ditigized) |
| 95 | USFS | Decimal Correspondence 1908-1976 (Region 10, Juneau) | | 113478 | High/Public/Environmental Researchers/USFS |

| | | | | | |
|---|---|---|---|---|---|
| 95 | USFS | Central Classified Files, 1909-1976 [Subject Correspondence, Region 10 (Juneau), 1908-1976] | 58 | 1137914 | High/Environmental Researchers |
| 95 | USFS | Decimal Correspondence, Chugach National Forest, 1919-1989 | | | High/Public/Environmental Researchers/USFS |
| 95 | USFS | Decimal Correspondence, Tongass National Forest, 1960-1984 | | | High/Public/Federal Agencies/Enviromental Researchers |
| 95 | USFS | Historical Files, 1915-1968 | | 1145964 | High/Pubic |
| 95 | USFS | Land Case Files, Region 10 (Alaska Region), 1903-1996 | | | High/Environmental Researchers/USFS |
| 95 | USFS | Ranger Diaries, 1908-1965 (Chugach NF/Tongass NF) | 19 | 840215 | High/USFS/Environmental Researchers |
| 95 | USFS | Subject Correspondence, Chugach National Forest, 1909-1959 | | | High/Environmental Researchers |
| 95 | USFS | Land Case Files, Chugach National Forest, 1909-1990 | | | High/USFS/Environmental Researchers |
| 95 | USFS | Land Case Files, Tongass National Forest, 1960-1974 | | | High/Environmental Researchers |
| 95 | USFS | Subject Correspondence, Tongass National Forest, ca. 1933-1959 | | | High/Environmental Reseachers |
| 111 | USASC | U.S. Army Signal Corps. Alaska Communications System. General Correspondence, 1909-1939. | | | High/Public |
| 237 | FAA | Photographs of Federal Aviation Administrations Stations in Alaska, ca. 1940s-ca. 1980s. 3 boxes. | 1 | 1752366 | High/Public |
| 237 | FAA | FAA Photographs, ca. 1960s-ca. 1980s. Unprocessed. Ca. 30 boxes. | | | Low (Potentially Higher if digitized) |
| 322 | ARR | Engineering Drawings, 1900-1977 (1-5,004, with gaps) (18 map cabinet drawers) | | | High/Public |
| 322 | ARR | Unnumbered Drawings | 3 | | High/Publc |
| 322 | ARR | Tanana River Bridge, 1920-1921 (blueline drawings, 24 sheets) 1 Archival Map Tube | 1 | | High/Public |

| | | | | |
|---|---|---|---|---|
| 322 ARR | General Files of the Alaska Railroad, 1915-1921 | 2 | 5730 | High/Public |
| 322 ARR | Decimal Files of the Alaska Railroad, 1914-1923 | 5 | | High/Puglic |
| 322 ARR | Decimal Files, 1924-1956 | | | High/Public |
| 342 | U.S. Air Force Commands, Activities, and Organizations.  Alaska Communications System.  Records of the Alaska Communications System, 1902-1962.  See also RG 111 (U.S. Army Signal Corps). | | | High/Public |
| 370 PIM | Pribilof Islands Program Material , 1919 - 1974 | 10 | 6922192 | High |
| 370 | Records of the Pribilof Islands Program, 1870-1985. | 139 | | High/Academic/NOAA Researchers. Consists of 21 separate series of daily logbooks, censuses, maps, property inventories, administrative correspondence, time books, seal harvesting records, agents' annual reports, annual reports of sealing operations, subject and decimal correspondence, St. Paul Telegrams (Govt. & Commercial), Miscellaneous Reports, Letterpress Correspondence (1888-1910), photographs, publications, and other related materials. |

| | | | |
|---|---|---|---|
| | DMG | Sir Henry S. Wellcome Collection, ca. 1856-1936.  298 boxes. | 120 | <span style="color:red">**High/Academic Researchers.** Consists of 18 separate records series of textual and non-textual materials relating to the Tsimsian Indians of Metlakatla, BC and Metlakatla, Alaska.  Most frequently used:  (1) A-L File, ca. 1856-1936 (27 cf); and (2) Index to A-L File, n.d. (30 cf).</span> |
| None | DMG | Photographs of the Inhabitants of Metlakatla, British Columbia and Metlakatla, Alaska, ca. 1856 - 1936.  Sir Henry S. Wellcome Collection, ca. 1856-1936.  943 items. | 297169 | <span style="color:red">**High/Public/Academic Researchers.**  This series in the Wellcome Collection has been digitized on the NARA website.</span> |

# EXHIBIT C

# Selected Records Series Descriptions Relating to Alaska Natives from the National Archives Catalog
(https://catalog.archives.gov/advancedsearch

## Records Held by the National Archives at Seattle
### (Seattle, WA)

December 30, 2020

| Record Group | Creating Agency, Office or Bureau | Records Series Title | Dates | National Archives Identifier | National Archives Catalog Full Catalog Record | City/ Geographic Area |
|---|---|---|---|---|---|---|
| 018 | Army Air Forces | Aerial Photographs of Attu Island | 9/18/1942--9/28/1942 | 4707527 | https://catalog.archives.gov/id/4707527 | Attu |
| 022 | U.S. Fish and Wildlife Service. Bureau of Commercial Fisheries. Region 1 (Pacific). Pribilof Islands Program. | Census, Birth, Death, and Marriage Records of the Pribilof Islands | 1877-1956 | 5730881 | https://catalog.archives.gov/id/5730881 | Pribilof Islands |
| 022 | U.S. Fish and Wildlife Service. Bureau of Fisheries. Division of Alaska Fisheries. Pribilof Islands Program. | Pribilof Islands Glass Plate Negatives | 1913-1921 | 2555605 | https://catalog.archives.gov/id/2555605 | Pribilof Islands |
| 022 | U.S. Fish and Wildlife Service. Bureau of Commercial Fisheries. Region 1 (Pacific). Pribilof Islands Program. | Pribilof Islands Logbooks | 1870-1961 | 297024 | https://catalog.archives.gov/id/297024 | Pribilof Islands |
| Pribilof Islands Program Materials Collection | Aleut Community of St. Paul. Alaska. | Pribilof Islands Program Material | 1919-1974 | 6922192 | https://catalog.archives.gov/id/6922192 | Pribilof Islands |

| 022 | U.S. Fish and Wildlife Service. Pribilof Islands Program. | Pribilof Islands Photographs | ca. 1890-ca. 1970 | 297055 | https://catalog.archives.gov/id/297055 | Pribilof Islands |
|---|---|---|---|---|---|---|
| 022 | U.S. Fish and Wildlife Service. Division of Alaska Fisheries. Pribilof Islands Program. | Subject and Decimal Files | 1923-1945 | 2842763 | https://catalog.archives.gov/id/2842763 | Pribilof Islands |
| 048 | Dept. of the Interior. Office of the Regional Solicitor, Alaska. | Alaska Native Claims Appeals Board Case Files | 1972-1990 | 605152 | https://catalog.archives.gov/id/605152 | |
| 048 | Dept. of the Interior. Office of the Regional Solicitor, Alaska. | Alaska Native Claims Settlement Act Case Files | 1977-1987 | 6741088 | https://catalog.archives.gov/id/6741088 | |
| 048 | Dept. of the Interior. Office of the Regional Solicitor, Alaska. | Indian Land Administration Case Files | 1971-1991 | 610816 | https://catalog.archives.gov/id/610816 | |
| 048 | Dept. of the Interior. Office of the Regional Solicitor, Alaska. | Litigation Case Files | 1999-2000 | 6882671 | https://catalog.archives.gov/id/6882671 | Bethel Oil Spill |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. Office of the Townsite Trustee. | Alaska Townsite Deed Books | 1906-1975 | 5404594 | https://catalog.archives.gov/id/5404594 | |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. | Non-Patented Native Allotment Case Files | 1964-1976 | 4757223 | https://catalog.archives.gov/id/4757223 | |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. | Patented Native Allotment Case Files | 1920-1969 | 4521799 | https://catalog.archives.gov/id/4521799 | |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. | Rejected Native Allotment Case Files | 1923-1967 | 527123 | https://catalog.archives.gov/id/4527123 | |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. Office of the | Townsite Tract Books | 1906-1962 | 509900 | https://catalog.archives.gov/id/5509900 | |

| | | Townsite Trustee. | | | | |
|---|---|---|---|---|---|---|
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. Office of the Townsite Trustee. | Townsite Trustee Files | ca. 1905-1995 | 6457726 | https://catalog.archives.gov/id/26457726 | |
| 049 | Bureau of Land Management. Fairbanks District Office. | Case Files Relating to Grazing | 1928-1976 | 4489053 | https://catalog.archives.gov/id/4489053 | |
| 049 | Bureau of Land Management. Fairbanks District Office. | Contest Case Files Relating to Native Alaskan Rights | ca. 1965 - 1972 | 4478008 | https://catalog.archives.gov/id/4478008 | |
| 049 | General Land Office. Fairbanks Land Office. | Nenana Town Lot Sale Forfeiture Case Files | 1916-1928 | 4546077 | https://catalog.archives.gov/id/4546077 | Native Village of Nenana |
| 056 | Dept. of Commerce and Labor. Bureau of Fisheries. | Government Agents' Records Pertaining to the Pribilof Islands | 1885- ca. 1906 | 2629271 | https://catalog.archives.gov/id/2629271 | |
| 057 | U.S. Geological Survey. Geologic Division. Branch of Alaskan Geology. | Project Chariot Files | 1958-1963 | 642639 | https://catalog.archives.gov/id/642639 | |
| 075 | Dept. of the Interior. Bureau of Education. | Files of Sheldon Jackson Relating to Schools in Alaska | 1886-1889 | 2990361 | https://catalog.archives.gov/id/2990361 | The correspondence and reports concern supplies, buildings, and students of schools at Afognak, Anvik, Haines, Klawack, Killisnoo, and Tuxican. |
| 075 | Dept. of the Interior. Office of Education. | Album of United States Public Schools in Alaska | 1924-1931 | 1183051 | https://catalog.archives.gov/id/1183051 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. | Correspondence of the Alaska Native Industries Cooperative | 1953-1956 | 2887105 | https://catalog.archives.gov/id/2887105 | |
| 075 | Bureau of Indian Affairs. Bethel Area Office. | Administrative Correspondence | 1947-1961 | 2933641 | https://catalog.archives.gov/id/2933641 | Bethel |
| 075 | Bureau of Indian Affairs. Bethel Area Office. | Administrative Correspondence | 1955-1973 | 649532 | https://catalog.archives.gov/id/649532 | |

| 075 | Bureau of Indian Affairs. Bethel Area Office. | Mission Correspondence | 1955-1972 | 2669488 | https://catalog.archives.gov/id/2669488 | |
|-----|-----|-----|-----|-----|-----|-----|
| 075 | Bureau of Indian Affairs. Alaska Native Service. Bethel Area Office. | Mission Correspondence Relating to Mekoryuk, Alaska | 1931-1953 | 2648213 | https://catalog.archives.gov/id/2648213 | Mekoryuk |
| 075 | Bureau of Indian Affairs. Bethel Area Office. | Village Census Rolls | 1966-1968 | 2655229 | https://catalog.archives.gov/id/2655229 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. Fairbanks Agency. | Village Census Rolls | 1946-1971 | 2945552 | https://catalog.archives.gov/id/2945552 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. | Native Store Supply Accounts | 1942-1945 | 2989241 | https://catalog.archives.gov/id/2989241 | Villages represented in this series are: Noatak, Noorvik, Nunapitchuk, Perryville, Pilot Point, Pilot Station, Point Hope, Point Lay, Savoonga, Shaktoolik, Shishmaref, Stebbins, Tanana Crossing (Tanacross), Tananak, Tanunuk, Tetlin, Venetie, Wales, Wainwright, White Mountain, and Yakatat. |
| 075 | Bureau of Indian Affairs. Alaska Native Service. | Financial Files Relating to Native Stores | 1941-1955 | 2749585 | https://catalog.archives.gov/id/2749585 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. | Individual Indian Account Paid Invoice Files | 1941-1955 | 2945650 | https://catalog.archives.gov/id/2945650 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. | Individual Indian Accounts Ledger Control Files | 1949-1951 | 2988325 | https://catalog.archives.gov/id/2988325 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Administrative Files Relating to Employment Assistance | 1957-1971 | 628668 | https://catalog.archives.gov/id/628668 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Agricultural, Hunting, and Fishing Statistics | 1935-1972 | 632046 | https://catalog.archives.gov/id/632046 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Annual and Quarterly School Reports | 1938-1964 | 1801238 | https://catalog.archives.gov/id/1801238 | |

| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Cash Receipt Registers | 1952-1961 | 3027219 | https://catalog.archives.gov/id/3027219 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Credit Operations Files | 1964-1972 | 2945992 | https://catalog.archives.gov/id/2945992 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Decimal Files | 1933-1963 | 626283 | https://catalog.archives.gov/id/626283 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Decimal Files Relating to Social Services | 1940-1969 | 2817396 | https://catalog.archives.gov/id/2817396 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Education Decimal Files | 1934-1972 | 2284292 | https://catalog.archives.gov/id/2284292 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Employment Assistance Case Files | 1957-1975 | 623530 | https://catalog.archives.gov/id/623530 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Estate Heirship Case Files | 1948-1964 | 2800795 | https://catalog.archives.gov/id/2800795 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Facilities Management Office Correspondence | 1957-1975 | 2839289 | https://catalog.archives.gov/id/2839289 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Field Agent Reports on Schools | 1935-1967 | 2812545 | https://catalog.archives.gov/id/2812545 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Housing Improvement Program Files | 1953-1975 | 2839241 | https://catalog.archives.gov/id/2839241 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Individual Indian Money Accounts Case Files | 1949-1976 | 2825173 | https://catalog.archives.gov/id/2825173 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Individual Indian Money Account Ledger Sheets | 1943-1964 | 2953623 | https://catalog.archives.gov/id/2953623 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Individual Indian Money Accounts Ledgers and Collection Vouchers | 1942-1974 | 2825178 | https://catalog.archives.gov/id/2825178 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Individual Indian Money Mixed Files | 1939-1952 | 2945725 | https://catalog.archives.gov/id/2945725 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Individual Indian Probate Case Files | 1984-1990 | 4700164 | https://catalog.archives.gov/id/4700164 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Interior Board of Appeal Case File | 1985-1985 | 4699276 | https://catalog.archives.gov/id/4699276 | |
| 075 | Bureau of Indian Affairs.  Juneau Area Office. | Land Transaction Files Relating to Schools in the | 1894-1999 | 626999 | https://catalog.archives.gov/id/626999 | |

| | | Territory and State of Alaska | | | | |
|---|---|---|---|---|---|---|
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Mission Correspondence | 1935-1968 | 2734706 | https://catalog.archives.gov/id/2734706 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Mixed Accounting Records | 1928-1961 | 641272 | https://catalog.archives.gov/id/641272 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Photographs of Schools, Hospitals, and Clinics | 1938-1977 | 5722986 | https://catalog.archives.gov/id/5722986 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Program Correspondence Files | 1947-1966 | 2846972 | https://catalog.archives.gov/id/2846972 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Real Property Reports | 1955-1968 | 2805987 | https://catalog.archives.gov/id/2805987 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Records Relating to the Design and Construction of Schools, Hospitals and Other Structures | 1938-1960 | 5888720 | https://catalog.archives.gov/id/5888720 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | [School] Newspapers | 1960-1970 | 1870939 | https://catalog.archives.gov/id/1870939 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Store Reports | 1963-1964 | 27567277 | https://catalog.archives.gov/id/2756727 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Student Grant, Loan, and Scholarship Case Files | 1951-1961 | 2800794 | https://catalog.archives.gov/id/2800794 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Tribal Enrollment Case Files [Tlingit-Haida Indians] | 1960-1970 | 627502 | https://catalog.archives.gov/id/627502 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Trust Administration Case Files Relating to the Hoonah War Authority | 1940-1984 | 4667559 | https://catalog.archives.gov/id/4667559 | Hoonah |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Village Census Rolls | 1935-1972 | 628296 | https://catalog.archives.gov/id/628296 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Alaska Village Census Rolls | 1966-1968 | 2655229 | https://catalog.archives.gov/id/2655229 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Welfare Case Files | 1931-1963 | 627695 | https://catalog.archives.gov/id/627695 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Individual Student Files [Goodnews Bay Day School] | 1951-1962 | 2805131 | https://catalog.archives.gov/id/2803201 | Goodnews Bay |

| | | | | | | |
|---|---|---|---|---|---|---|
| 075 | Bureau of Indian Affairs. Juneau Area Office. Mount Edgecumbe Boarding School. | Administrative Correspondence Files | 1968-1975 | 632548 | https://catalog.archives.gov/id/632548 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Mount Edgecumbe Boarding School. | Closure Files | 1957-1983 | 77820285 | https://catalog.archives.gov/id/77820285 | Sitka |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Mount Edgecumbe Boarding School. | School Census Cards | 1941-1983 | 626965 | https://catalog.archives.gov/id/626965 | Sitka |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Mount Edgecumbe Boarding School. | Student Case Files | 1941-1983 | 623682 | https://catalog.archives.gov/id/623682 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Mount Edgecumbe Boarding School. | Mount Edgecumbe Yearbooks | 1947-1983 | 626793 | https://catalog.archives.gov/id/626793 | Sitka |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Wrangell Institute. | Student Case Files | 1933-1975 | 627581 | https://catalog.archives.gov/id/627581 | Wrangell |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. Alaska Resupply Program. *North Star III* (ship). | Alaska Resupply Program. Administrative Files | 1946-1984 | 611322 | https://catalog.archives.gov/id/611322 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. Alaska | Alaska Resupply Program. Drawings | 1946-1984 | 611016 | https://catalog.archives.gov/id/611016 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. | Alaska Resupply Program. Logbooks [North Star & Boxer] | 1925-1960 | 630954 | https://catalog.archives.gov/id/630954 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Alaska Resupply Program. Logbooks | 1946-1984 | 610971 | https://catalog.archives.gov/id/610971 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Seattle Support Center. Alaska Resupply Program. *North Star III* (ship). | | | | | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. Alaska Resupply Program. *North Star III* (ship) | Alaska Resupply Program. Manifest and Permit Files | 1946-1984 | 611353 | https://catalog.archives.gov/id/611353 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. Alaska Resupply Program. | Alaska Resupply Center. Master's Files | 1946-1984 | 610159 | https://catalog.archives.gov/id/610159 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Seattle Support Center. Alaska Resupply Program. *North Star III* (ship) | Alaska Resupply Center. Trip Reports | 1946-1984 | 610820 | https://catalog.archives.gov/id/610820 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. Branch of Land Operations. Area Land Operations. Alaska Reindeer Service. | Administrative Correspondence | 1934-1953 | 2791270 | https://catalog.archives.gov/id/2791270 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and Grazing. Alaska Reindeer Service. | Administrative Correspondence Relating to the Sale of Reindeer and Reindeer Products | 1940-1940 | 279446 | https://catalog.archives.gov/id/2794746 | |
| 075 | Dept. of the Interior. Office of the Territorial Governor. U.S. Reindeer Service. Alaska Reindeer Service. | Annual Reports of Reindeer Herds | 1908-1932 | 2790811 | https://catalog.archives.gov/id/2790811 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and | Circulars Relating to Reindeer Herding in Alaska | 1933-1943 | 2789186 | https://catalog.archives.gov/id/2789186 | |

| 075 | Grazing. Alaska Reindeer Service. | | | | | |
|-----|-----------------------------------|---|---|---|---|---|
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and Grazing. Alaska Reindeer Service. | Correspondence of Lawrence J. Palmer | 1920-1945 | 2794621 | https://catalog.archives.gov/id/2794621 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Alaska Reindeer Service. | Correspondence Relating to Declarations of Ownership of Reindeer in Alaska | 1937-1943 | 2794524 | https://catalog.archives.gov/id/2794524 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and Grazing. Alaska Reindeer Service. | Correspondence Relating to Reindeer Brands and Earmarks | 1923-1940 | 2789526 | https://catalog.archives.gov/id/2789526 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. Branch of Land Operations. Area Land Operations. Alaska Reindeer Service. | Correspondence Relating to Reindeer Herds in Alaska | 1911-1960 | 631598 | https://catalog.archives.gov/id/631598 | |
| 075 | Office of Indian Affairs. Alaska Native Service. Alaska Reindeer Service. | Correspondence Relating to Reindeer Meat | 1937-1943 | 2789137 | https://catalog.archives.gov/id/2789137 | |
| 075 | Bureau of Indian Affairs. Juneau Area Office. Alaska Reindeer Service. | Correspondence Relating to Sales | 1934-1953 | 2789161 | https://catalog.archives.gov/id/2789161 | |
| 075 | Bureau of Indian Affairs. Alaska Native Service. Branch of Land Operations. Area Land Operations. Alaska Reindeer Service. | Decimal Correspondence | 1901-1974 | 628886 | https://catalog.archives.gov/id/628886 | |
| 075 | Bureau of Education. U.S. Reindeer Service. | Financial Ledgers | 1915-1925 | 2825034 | https://catalog.archives.gov/id/2825034 | |
| 075 | Bureau of Education. U.S. Reindeer Service. | Historical Files of the General Superintendent of the Alaska Reindeer Service | 1893-1922 | 74859535 | https://catalog.archives.gov/id/74859535 | |

| 075 | Bureau of Indian Affairs. Juneau Area Office. Alaska Reindeer Service. | Historical Files | 1929-1948 | 2790532 | https://catalog.archives.gov/id/2790532 | Barrow Holy Cross |
|---|---|---|---|---|---|---|
| 075 | Bureau of Indian Affairs. Alaska Native Service. Branch of Land Operations. Area Land Operations. Alaska Reindeer Service. | Monthly Herd Reports | 1937-1968 | 631118 | https://catalog.archives.gov/id/631118 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and Grazing. Alaska Reindeer Service. | Nunivak Development Project Files | 1955-1970 | 2794759 | https://catalog.archives.gov/id/2794759 | |
| 075 | Office of Indian Affairs. Alaska Indian Service. Division of Forestry and Grazing. Alaska Reindeer Service. | Reindeer Program Correspondence | 1914-1945 | 2790793 | https://catalog.archives.gov/id/2790793 | |
| 090 | Dept. of Health, Education, and Welfare. Public Health Service. Indian Health Service. Juneau Native Hospital. | Administrative Files | 1944-1958 | 656873 | https://catalog.archives.gov/id/656873 | |
| 090 | Dept. of Health, Education, and Welfare. Public Health Service. Indian Health Service. Arctic Health Research Center. | Director's Files | 1949-1983 | 634110 | https://catalog.archives.gov/id/634110 | |
| 090 | Dept. of Health, Education, and Welfare. Public Health Service. | History Files | 1949-1971 | 657234 | https://catalog.archives.gov/id/657234 | |
| 095 | U.S. Forest Service. Region 10. | Correspondence Relating to Civilian Conservation Corps (CCC) Activities | 1937-1942 | 596832 | https://catalog.archives.gov/id/596832 | Southeast Alaska |
| 298 | Dept. of Defense. Dept. of the Navy. Office of Naval Research. Naval Arctic | Genealogical Census of Eskimos at Point Barrow, Alaska | 1947-1981 | 4872674 | https://catalog.archives.gov/search?q=Barrow%20families&f.oldScope=(des | Point Barrow |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Research Laboratory. | | | | criptions%20or %20online)&f. level=series&f. locationIds=26 &SearchType= advanced | |
| 370 | National Oceanic and Atmospheric Administration | Administrative Records Relating to the Fishing and Fur Industries in the Pribilof Islands | 1913-1985 | 2839291 | https://catalog. archives.gov/id /2839291 | |
| 370 | Dept. of the Interior.  U.S. Fish and Wildlife Service.  Branch of Alaska Fisheries. | Annual Reports | 1925-1959 | 2775205 | https://catalog. archives.gov/id /2775205 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Subject and Decimal Files | 1966-1992 | 100463691 | https://catalog. archives.gov/id /100463691 | |
| 435 | Indian Arts and Crafts Board | Alaska Field Office Correspondence | 1935-1983 | 605073 | https://catalog. archives.gov/id /605073 | |
| 513 | Indian Health Service.  Alaska Area Native Health Service. | Alaska Area Native Health Service Manual and Transmittal Notices | 1959-1986 | 3651543 | https://catalog. archives.gov/id /3651543 | |
| 513 | Indian Health Service.  Alaska Area Native Health Service. | Circulars | 1962-1988 | 4717771 | https://catalog. archives.gov/id /4717771 | |
| 513 | Indian Health Service.  Alaska Area Native Health Service. | Decimal Files | 1947-1979 | 656542 | https://catalog. archives.gov/id /656542 | |
| 513 | Dept. of Health and Human Services.  Indian Health Service. Alaska Area Native Health Service. | Engineering Reports | 1964-1989 | 4718549 | https://catalog. archives.gov/id /4718549 | |
| 513 | Dept. of Health and Human Services.  Indian Health Service. Alaska Area Native Health Service. | Supporting Documents for Final Reports on Alaska Native Villages | 1980-1993 | 28592235 | https://catalog. archives.gov/id /28592235 | |

# EXHIBIT D

**Selected Records Series Descriptions Relating to
Conservation in the National Archives Catalog
(https://catalog.archives.gov/advancedsearch**

**Records Held by the National Archives at Seattle
(Seattle, WA)**

January 1, 2021

| Record Group | Creating Agency, Office or Bureau | Records Series Title | Dates | National Archives Identifier | National Archives Catalog Full Catalog Record | City/ Geographic Area |
|---|---|---|---|---|---|---|
| 022 | U.S. Fish and Wildlife Service. Bureau of Commercial Fisheries. Region 1 (Pacific) | Blueprints, Drawings, and Maps | 1913-1952 | 75857360 | https://catalog.archives.gov/id/75857360 | Sea Islands National Historic Landmark District |
| 022 | U.S. Fish and Wildlife Service. Region 7. | Correspondence Relating to the Arctic National Wildlife Refuge | 1957-1962 | 1656099 | https://catalog.archives.gov/id/1656099 | Arctic National Wildlife Refuge |
| 022 | U.S. Fish and Wildlife Service. Alaska Regional Office. Anchorage. | Exxon Valdez Oil Spill Correspondence | 1989-1991 | 596645 | https://catalog.archives.gov/id/596645 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Regional Office. Anchorage. | Maps Related to the Alaska National Interest Lands Conservation Act | ca. 1970-ca. 1980 | 2194652 | https://catalog.archives.gov/id/2194652 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Regional Office. Anchorage. | Natural Resource Damage Assessment Studies | 1989-1992 | 76605971 | https://catalog.archives.gov/id/76605971 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Briefing Statement Files | 1984-1998 | 4685560 | https://catalog.archives.gov/id/4685560 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. | Conservation Plans | 1993-1998 | 4693288 | https://catalog.archives.gov/id/4693288 | |

| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | | | | | |
|-----|-----|-----|-----|-----|-----|-----|
| | Fisheries and Ecological Services. Anchorage Field Office. | | | | | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Correspondence and Contracts Relating to Hazardous Waste Cleanup on Amchitka Island, Alaska | 1992-1998 | 4697017 | https://catalog.archives.gov/id/4697017 | Amchitka Island |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Endangered Species Delisting Files | 1975-2000 | 5681090 | https://catalog.archives.gov/id/5681090 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Endangered Species Listing Petition Files | 1994-1997 | 5681094 | https://catalog.archives.gov/id/5681094 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Endangered Species Recovery Plans | 1982-2008 | 5681099 | https://catalog.archives.gov/id/5681099 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Environmental Cleanup Files Relating to Eagle River Flats, Alaska | 1980-1998 | 4684504 | https://catalog.archives.gov/id/4684504 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Files Relating to Persistent Organic Pollutants in the Arctic | 1993-2004 | 4449172 | https://catalog.archives.gov/id/4449172 | |
| 022 | U.S. Fish and Wildlife Service. Alaska Region. Fisheries and Ecological Services. Anchorage Field Office. | Records of Working Groups and Task Forces | 1983-1995 | 4685694 | https://catalog.archives.gov/id/4685694 | |

| 022 | U.S. Fish and Wildlife Service. Alaska Region. Anchorage Field Office. | Research Reports | 1988-2007 | 46897111 | https://catalog.archives.gov/id/4689711 | |
|---|---|---|---|---|---|---|
| 022 | U.S. Fish and Wildlife Service. Alaska Regional Office. Kenai National Wildlife Refuge. | General Correspondence | 1987-1995 | 4841787 | https://catalog.archives.gov/id/4841787 | |
| 077 | U.S. Army Corps of Engineers. Alaska District. | Conservation of Natural Resources Files | 1935-1978 | 4862392 | https://catalog.archives.gov/id/4862392 | |
| 079 | National Park Service. Alaska Regional Office. Anchorage. | Correspondence Related to Trails | 1974-1981 | 3887744 | https://catalog.archives.gov/id/3887744 | |
| 079 | National Park Service. Alaska Regional Office. Anchorage. | Cultural Resource Studies | 1964-1983 | 6789310 | https://catalog.archives.gov/id/6789310 | |
| 079 | National Park Service. Alaska Regional Office. Anchorage. | SEAL-611, Subject Files [Alaska Task Force General Files] | 1952-1984 | 2268065 | https://catalog.archives.gov/id/2268065 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Correspondence Relating to Civilian Conservation Corps (CCC) Activities | ca. 1937-ca. 1942 | 596832 | https://catalog.archives.gov/id/596832 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Correspondence Relating to Works Progress Administration | 1939-1940 | 1112204 | https://catalog.archives.gov/id/1112204 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Historical Photograph Files | 1906-1994 | 2184520 | https://catalog.archives.gov/id/2184520 | |
| 187 | Natural Resources Planning Board. Region 10 (Alaska). | Files Related to Resource Planning | 1941-1943 | 783921 | https://catalog.archives.gov/id/783921 | |
| 370 | Dept. of the Interior. U.S. Fish and Wildlife Service. Bureau of Commercial Fisheries. | Administrative Records Relating to the Fishing and Fur Industries in the Pribilof Islands | 1913-1985 | 2839291 | https://catalog.archives.gov/id/2839291 | Includes "a list of people [Aleuts] interned at the Funter Bay Evacuee Camp [during World War II]." |
| 370 | National Oceanic and Atmospheric Administration. | Administrative Files [Pribilof Islands Fur Seal Program] | 1960-1990 | 75857341 | https://catalog.archives.gov/id/75857341 | |

| 370 | National Marine Fisheries Service. | | | | | |
|---|---|---|---|---|---|---|
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. | Northern Fur Seal Management and Operational Files | 1911-1999 | 118571982 | https://catalog.archives.gov/id/118571982 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. | Publications Relating to the Pribilof Islands [Pribilof Islands Fur Sealing Program] | 1956-1986 | 118571395 | https://catalog.archives.gov/id/118571395 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Reports [Pribilof Islands Fur Seal Program] | 1914-1992 | 75857322 | https://catalog.archives.gov/id/75857322 | |
| 370 | Dept. of the Interior. U.S. Fish and Wildlife Service. Bureau of Commercial Fisheries. | Annual Reports | 1925-1959 | 2775205 | https://catalog.archives.gov/id/2775205 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Consultation Files | 1978-1983 | 4728364 | https://catalog.archives.gov/id/4728364 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Fisheries Management Plan Files | 1961-1992 | 4509773 | https://catalog.archives.gov/id/4509773 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Subject and Decimal Files | 1966-1992 | 100463691 | https://catalog.archives.gov/id/100463691 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Tagging Data Files | 1967-1972 | 4730993 | https://catalog.archives.gov/id/4730993 | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. | Data Survey Files | 1920-1980 | 2194742 | https://catalog.archives.gov/id/2194742 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Auke Bay Laboratory. | | | | | |
| 370 | National Oceanic and Atmospheric Administration. National Marine Fisheries Service. Alaska Region. Auke Bay Laboratory. | Project Case Files and Research Data | 1907-1994 | 2194504 | https://catalog.archives.gov/id/2194504 | |
| 589 | Dept. of the Interior. Bureau of Ocean Energy Management. | Final Environmental Studies Reports | ca. 1978-2012 | 37596049 | https://catalog.archives.gov/id/37596049 | |

# EXHIBIT E

# Selected Records Series Descriptions Relating to Recreational and Agricultural Activities from the National Archives Catalog
(**https://catalog.archives.gov/advancedsearch**)

## Records Held by the National Archives at Seattle
## (Seattle, WA)

January 1, 2021

| Record Group | Creating Agency, Office or Bureau | Records Series Title | Dates | National Archives Identifier | National Archives Catalog Full Catalog Record | City/ Geographic Area |
|---|---|---|---|---|---|---|
| 004 | U.S. Food Administration. Alaska State Food Administration. | Correspondence Files | 1917-1919 | 1126387 | https://catalog.archives.gov/id/1126387 | |
| 022 | U.S. Fish and Wildlife Service. Branch of Alaska Fisheries. | Historical Files for the Lake Hood Land and Seaport Base Project | 1948-1950 | 4449168 | https://catalog.archives.gov/id/4449168 | |
| 030 | Dept. of Commerce. Bureau of Public Roads. Alaska Road Commission. | Project Correspondence | 1916-1959 | 606338 | https://catalog.archives.gov/id/606338 | |
| 049 | Bureau of Land Management. Alaska State Office. Anchorage. | Water Resources Study Files | 1972-1980 | 4862392 | https://catalog.archives.gov/id/4862392 | Southcentral Alaska |
| 075 | Bureau of Indian Affairs. Juneau Area Office. | Agricultural, Hunting, and Fishing Statistics | 1935-1972 | 632046 | https://catalog.archives.gov/id/632046 | |
| 077 | U.S. Army Corps of Engineers. Alaska District. | Permit Files | 1914-ca. 1960 | 654570 | https://catalog.archives.gov/id/654570 | |
| 079 | Dept. of the Interior. Heritage Conservation and Recreation Service. | Land Planning Group Files | 1971-1979 | 3983788 | https://catalog.archives.gov/id/3983788 | |
| 079 | Dept. of the Interior. Heritage Conservation and | Mission Correspondence | 1974-1980 | 3965506 | https://catalog.archives.gov/id/3965506 | |

| 095 | | Recreation Service. | | | | |
|---|---|---|---|---|---|---|
| 095 | Dept. of Agriculture. U.S. Forest Service. Region 10 (Alaska Region). | Administrative Files Relating to the Alaska Spruce Log Program | 1942-1944 | 079832 | https://catalog.archives.gov/id/1079832 | |
| 095 | Dept. of Agriculture. U.S. Forest Service. Region 10 (Alaska Region). | Case Files Relating to Timber Sales | 1911-1970 | 112073 | https://catalog.archives.gov/id/1112073 | |
| 095 | Dept. of Agriculture. U.S. Forest Service. Office of the Forester. | Correspondence Relating to the Creation of National Forests in Alaska | 1903-1911 | 145486 | https://catalog.archives.gov/id/1145486 | |
| 095 | Dept. of Agriculture. U.S. Forest Service. Region 10 (Alaska Region). | Decimal Files | 1944-1974 | 1137478 | https://catalog.archives.gov/id/1137478 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Decimal Files Relating to Timber Management | 1959-1962 | 1112183 | https://catalog.archives.gov/id/1112183 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Historical Files | 1915-1968 | 1145964 | https://catalog.archives.gov/id/1145964 | |
| 095 | Dept. of Agriculture. Forest Service. Region 10 (Alaska Region). | Land Case Files | 1907-1989 | 875682 | https://catalog.archives.gov/id/875682 | |
| 095 | Dept. of Agriculture. Forest Service. Chugach National Forest. | Land Use Case Files | 1970-2003 | 2353576 | https://catalog.archives.gov/id/2353576 | Chugach National Forest |
| 095 | Dept. of Agriculture. Forest Service. Tongass National Forest. | Land Classification Reports | 1924-1933 | 2642196 | https://catalog.archives.gov/id/2642196 | Tongass National Forest |
| 095 | Dept. of Agriculture. Forest Service. Tongass National Forest. | Maps of the Tongass National Forest | 1969-1969 | 2642297 | https://catalog.archives.gov/id/2642297 | Tongass National Forest |
| 095 | Dept. of Agriculture. Forest Service. | Ranger Diaries | 1908-1965 | 840215 | https://catalog.archives.gov/id/840215 | Chugach and Tongass National Forests |

| | Region 10 (Alaska Region). | | | | | |
|---|---|---|---|---|---|---|
| 164 | Georgeson, C. C. (Charles Christian) | Letters Received by Charles Christian Georgeson | 1902-1909 | 2641870 | https://catalog.archives.gov/id/https://catalog.archives.gov/id/2641870 | Sitka |
| 164 | Georgeson, C. C. (Charles Christian) | Letters Sent by Charles Christian Georgeson | 1891-1920 | 2641777 | https://catalog.archives.gov/id/2641777 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Kodiak | Annual Reports | 1907-1927 | 2445485 | https://catalog.archives.gov/id/2445485 | Kodiak |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Kodiak | Copies of Letters Sent | 1916-1924 | 2108836 | https://catalog.archives.gov/id/2108836 | Kodiak |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Kodiak | Correspondence | 1915-1919 | 2109515 | https://catalog.archives.gov/id/2109515 | Kodiak |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Kodiak | Letters Received | 1907-1924 | 2108825 | https://catalog.archives.gov/id/2108825 | Kodiak |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Matanuska | Correspondence | 1917-1932 | 2121117 | https://catalog.archives.gov/id/2121117 | Matanuska |
| 164 | Dept. of Agriculture. Office of Experiment Stations. | Copies of Letters Sent | 1917-1922 | 2111784 | https://catalog.archives.gov/id/2111784 | Matanuska |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Agricultural Experiment Station, Matanuska | | | | | |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Rampart | Administrative Files | 1910-1926 | 2165767 | https://catalog. archives.gov/id /2165767 | Rampart |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Rampart | Copies of Letters Sent | 1922-1925 | 654570 | https://catalog. archives.gov/id /654570 | Rampart |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Rampart | Letters Received | 1906-1924 | 2165764 | https://catalog. archives.gov/id /2165764 | Rampart |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Rampart | Letters Received from the Alaska Headquarters | 1904-1925 | 2165765 | https://catalog. archives.gov/id /2165765 | Rampart |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Administrative Correspondence | 1927-1930 | 2581420 | https://catalog. archives.gov/id /2581420 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Administrative Files | 1898-1932 | 2103183 | https://catalog. archives.gov/id /2103183 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment | Administrative Letters Received from Substations | 1900-1908 | 1937190 | https://catalog. archives.gov/id /1937190 | Sitka |

| 164 | | | | | | |
|---|---|---|---|---|---|---|
| | Stations. Agricultural Experiment Station, Sitka | | | | | |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Copies of Letters Sent | 1898-1927 | 2022337 | https://catalog.archives.gov/id/2022337 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Copies of Letters Sent | 1929-1932 | 2030429 | https://catalog.archives.gov/id/2030429 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Correspondence with the Agricultural Experiment Stations at Fairbanks and Matanuska | 1907-1932 | 2107175 | https://catalog.archives.gov/id/2107175 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Correspondence with the Chief of Insular Stations | 1926-1932 | 2034136 | https://catalog.archives.gov/id/2034136 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Kodiak | Correspondence Concerning Cattle | 1917-1924 | 2079671 | https://catalog.archives.gov/id/2079671 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Correspondence Relating to Horticulture in Alaska | 1906-1931 | 2107213 | https://catalog.archives.gov/id/2107213 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment | Journal and Time Book | | 2071579 | https://catalog.archives.gov/id/2071579 | Sitka |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Stations. Agricultural Experiment Station, Sitka | | | | | |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Letters Received | 1900-1927 | 1994876 | https://catalog. archives.gov/id /1994876 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Letters Received | 1908-1925 | 2012051 | https://catalog. archives.gov/id /2012051 | Sitka |
| 164 | Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Letters Received from the Department of Agriculture | 1900-1927 | 1893400 | https://catalog. archives.gov/id /1893400 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Letters Received from Other Federal Agencies | 1909-1919 | 1917540 | https://catalog. archives.gov/id /1917540 | Sitka |
| 164 | Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Letters Received from Substations | 1908-1927 | 1956088 | https://catalog. archives.gov/id /1956088 | Sitka |
| 164 | Dept. of Agriculture. Office of Experiment Stations. Agricultural Experiment Station, Sitka | Notebooks | | 2084071 | https://catalog. archives.gov/id /2084071 | Sitka |
| 220 | Federal Field Committee for Development Planning in Alaska | Subject Files | 1964-1971 | 596835 | https://catalog. archives.gov/id /596835 | |

| 378 | Economic Development Administration. Seattle (Western) Region. | Drawings Related to the Economic Development Administration in Alaska | 1965-1971 | 3029317 | https://catalog.archives.gov/id/3029317 | |
|-----|----------------------------------------------------------------|----------------------------------------------------------------------|-----------|---------|------------------------------------------|---|
| 378 | Economic Development Administration. Seattle (Western) Region. | Project Case Files | 1965-1971 | 1122393 | https://catalog.archives.gov/id/1122393 | |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| STATE OF WASHINGTON, et al., | NO. 2:21-cv-00002 |
|---|---|
| Plaintiffs, | DECLARATION OF RICHARD J. (CHALYEE ÉESH) PETERSON |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

Richard J. (Chalyee Éesh) Peterson declares as follows:

1.    I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.    I am the President of the Central Council of Tlingit and Haida Indian Tribes of Alaska ("Tlingit & Haida"). I am Tlingit from the Kaagwaataan Clan, an enrolled Tribal citizen of Tlingit & Haida, and a Tribal citizen of the Organized Village of Kasaan. My Tlingit name is Chalyee Éesh.

3.    Tlingit & Haida is the largest federally-recognized Tribe in Alaska. We are one of two regional Tribes in Alaska. Tlingit and Haida was recognized by the United States as a Tribal government pursuant to Section 8 of the Act of June 19, 1935 (49 Stat. 388), as amended by the Act of August 19, 1965 (79 Stat. 543), and the Tlingit and Haida Status Clarification Act (Public Law 103-454, Title II, 108 Stat. 4792). Our Tribal headquarters are in Juneau, Alaska.

DECLARATION OF RICHARD J.                    1
(CHALYEE ÉESH) PETERSON

4.      We have 32,051 enrolled Tribal citizens. Our Tribal citizens are also members of their ancestral Tribal communities, the federally-recognized Alaska Native Villages and local Tribes throughout Southeast Alaska. More than 6,000 of our Tribal citizens currently live in Seattle, the Puget Sound Region, and other places in Washington State.

5.      The Haida and Tlingit people have lived on our aboriginal lands since time immemorial. The Tlingit people call our aboriginal homelands Lingit Aaní, the great land and waters now known as Southeast Alaska. We were here when the Spanish, the British, the Russians, and finally the Americans appeared on our shores. We are still here. We have survived epidemics, wars and cultural onslaughts and we remain here, a vibrant and growing people. We are the original occupants of Lingit Aaní and we remain the steadfast guardians and caretakers of the sacred and wonderous lands and waters of Southeast Alaska.

6.      Southeast Alaska is a maritime archipelago over 500 miles long, stretching from Yakutat in the north to Saxman in the south. The National Archives at Seattle contain the single most important collection of documents regarding this, our ancestral territory, and about our Tlingit and Haida peoples. These documents are an invaluable resource for our Tribe and our Tribal citizens. We use them constantly.

7.      Since 1867, when the United States "bought" Alaska from Russia, we have had extensive, on-going, and extremely well-documented interactions with the United States Government. From 1867 until 1959, Alaska was administered as a federal Territory. All governmental records relating to Southeast Alaska's Tribes and Tribal members were federal— everything from archeological records to deeds and birth, death and marriage records. The

National Archives at Seattle contain those records. They are absolutely irreplaceable historical, genealogical, cultural, anthropological, and judicial records for our Tribe and Tribal members.

8.      It is important to understand that, even now, after Alaska Statehood and the passage of the Alaska Native Claims Settlement Act, 95% of the land and almost all the waters in Southeast Alaska are controlled and managed by the United States for agricultural (forestry), conservation, recreational, and fisheries purposes. The federal lands include the Tongass National Forest, at nearly 17 million acres. They include the National Conservation System Units of Glacier Bay National Park, 3.2 million acres, Admiralty Island National Monument, nearly 1 million acres, and the Misty Fjords National Monument, over 2.3 million acres. Located throughout these federal lands are past and current Native village sites, ancient places sacred to our peoples, and important seasonal hunting, fishing and gathering sites. We regularly use and visit these places.

9.      Additionally, there are over 12,000 acres of Alaska Native Allotments in Southeast Alaska, an acreage that could increase if our Vietnam Veterans were able to select allotments within the Tongass, our homelands, through the recently adopted Alaska Native Veteran Program. Our Tribal Realty and Forestry Trust Program manages the allotments through Indian Self-Determination and Educational Assistance Act agreements with the Bureau of Indian Affairs. Tlingit & Haida has an Agreement with the United States Forest Service to document and implement the Indigenous Guardians Program, which has the purpose of connecting community-led stewardship of the Tongass and to catalyze practices and approaches that support indigenous stewardship, indigenous technical knowledge, conservation science, and natural resource management.

10.     The vast expanses of land and waters in Southeast Alaska are not empty.   Our Tribe, our Tribal citizens, and people more recently arrived in Southeast Alaska live in and actively use these lands and waters on a constant and continual basis.   The current and future uses, development, and conservation of these lands and waters are always in flux and constantly present issues for our Tribe and our Tribal citizens.

11.     We need ready access to the National Archive records to address how the federal, State, and Tribal governments are managing Lingit Aaní.   The lands and waters of Southeast Alaska are our lifeblood.   Our role as guardians and caretakers is critical for our present generations and equally so for our future generations.   Our ancestors took care of Lingit Aaní for us, and we will take care of it for our children, our grandchildren, and theirs.

12.     Among the many documents and records that our Tribe uses, routinely and regularly, in the National Archives at Seattle are:

    a.   Native Allotment files;

    b.   Native Townsite Files and Tract Books;

    c.   Tongass National Forest historical records;

    d.   Subsistence hunting, fishing, and gathering records;

    e.   Traditional place name historical records;

    f.   Archeological records;

    g.   Alaska Native Claims Settlement Act records concerning sacred sites, village sites, and traditional use sites;

    h.   Southeast Alaska forest management records;

i.   Fisheries records, including historical records and current management records;

j.   Many of Tlingit & Haida Central Council's own historical records;

k.   Tribal enrollment records for Tlingit and Haida and the other federally-recognized Tribes in Southeast Alaska;

l.   Census records;

m.   Vital records – birth, death, marriage records;

n.   Declarations of citizenship;

o.   Deed books;

p.   Vessel licensing records;

q.   Certificates of Naturalization;

r.   Historical photographs and recordings;

s.   Military service records of tribal members, including enlistment and muster rolls, draft cards, and discharge records;

t.   Territorial and Russian government records; and

u.   Russian – American Company records and log books.

13.   Moving these National Archive records in Seattle to Kansas City, Missouri, or Riverside, California, would substantially and irreparably injure our Tribe's ability to access these critically important documents.  Our Southeast Alaska staff and Tribal citizens are able to travel to Seattle easily and relatively inexpensively.  Other Tribal citizens live in Seattle and around Puget Sound and have ready access to the National Archives.  Indeed, some Tribal

members even live in the Sand Point neighborhood, very close to the current Seattle National Archive facility itself.

14.     We are committed to doing whatever we can to keep these important records where they can be accessed and used by our Tribe and our Tribal citizens. To that end, our Tribal General Assembly on October 1, 2020, passed the attached Resolution TA 20-17, "Opposition to the Closure of Seattle National Archives and Records Administration Facility."

15.     The Central Council of Tlingit & Haida Indians of Alaska respectfully requests that this Honorable Court enjoin the proposed sale of the National Archives property in Seattle.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this _04_ day of ___January___, _2021_ at ___Juneau___, Alaska.


Richard J. (Chalyee  Éesh) Peterson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON, et al.,

                Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

                Defendants,

NO.

DECLARATION OF CHAIRMAN
HARRY PICKERNELL, SR

I, Harry Pickernell, Sr, declare as follows:

1.      I am Chairman of the Confederated Tribes of the Chehalis Reservation, a federally recognized Indian tribe ("Tribe"). I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been Chairman of the Tribe for approximately four (4) years and I served as Vice Chairman before that. As the highest elected official in the Tribe, I am responsible for overseeing the health, safety and welfare of the members of the Tribe and the residents of the Chehalis Reservation. I preside over the Business Committee, which is the equivalent of other tribes' tribal councils. I also ensure that the culture and history of the Tribe is preserved and supported, including the operations of the Tribe's Historic Preservation Department and the activities of anthropologists retained to assist the Tribe in gathering historical, language, and cultural information about the life of the Tribe since time immemorial. Prior to the present day, the Tribe developed a dictionary of its language and is currently gathering information, stories, interviews and other resources to produce a comprehensive examination of the Tribe's

1   history, language, pre and post contact activities, religion, etc in order to preserve that
2   information for the future generations. The Federal Archives have been and will be in the
3   future an essential source of materials for preserving the understanding of the Tribe and the
4   Tribe's culture.

5       3.      The Tribe has always been a fishing tribe located at the confluence of the
6   Chehalis and Black Rivers. The Tribe's Reservation was created in 1864 by Executive Order
7   and, as its name indicates, was the Reservation for Upper and Lower Chehalis tribes and bands,
8   and Cowlitz, Satsop, Wynoochee and Qualiokwah bands and tribes resident in what became
9   Southwest Washington. The Tribe has over 900 members, over 40% of whom are under the
10  age of 18, which puts a special burden on the Tribal Government to find and preserve the
11  information about the Tribe's past and culture.

12      4.      The Federal Archives in Seattle contain substantial documents relating to the
13  tribes and bands listed in paragraph 3 above. Those include duplicates of documents, which
14  are far more than copies, ledgers, records, payroll information, photos, and important
15  documents relating to the both the Tribe's culture and also the interaction between the Tribe
16  and the United States government. I am informed by the Tribe's anthropologists that many of
17  these documents are originals and not digitized and has been and continue to be important to
18  advancing the Tribe's understanding of its past. The Tribe's anthropologists have used
19  archived reports, letters, photographs, ledgers, receipts, documents relating to cemetery and
20  genealogical records, and Indian arts and crafts correspondence. Moreover, when the Tribe
21  sought to advance its claim to rights in its aboriginal territory and its off Reservation fishing
22  rights before various federal tribunals, the documents which reside in Seattle and the ability to
23  examine those documents first hand was vital to the Tribe's presentations. If the valuable
24  documents contained at the Federal Archives in Seattle are shipped to some remote location
25  where they may or may not be accessible and the hidden gems may never be found, the Tribe
26  will suffer a great loss and damage.

DECLARATION OF HARRY                    2          ERROR! AUTOTEXT ENTRY NOT DEFINED.
PICKERNELL, SR.

327

1     5.    As stated above, the Tribe used archival records when it appeared before the

2    Indian Claims Commission; used archival records from Seattle when it sought federal court

3    affirmation of its off Reservation fishing rights; will use archival records in its Atlas project

4    described above; and uses archival information in its interaction with the State of Washington

5    concerning hunting, fishing and gathering.

6     6.    The Tribe is engaged in two forms of conservation activities: a) conservation

7    relating to low escapement returns of Spring Chinook and Steelhead and b) conservation for

8    habitat restoration involving lands within the Chehalis Homeland. Each such activity may be

9    assisted by records at the Federal Archives, which will require first hand research and which

10    could not be accomplished if the Archives move from Seattle.

11     7.    Since the United States and its agencies are under an Executive Order requiring

12    consultation on matters affecting tribes, Executive Order 13175, I was shocked to only learn

13    recently that the United States was attempting to sell the Archive site in Seattle and move the

14    Tribe's archives away. As a result, this will constitute the first demand from the Tribe to

15    perform the United States' trust responsibility under the Executive Order and consult on this

16    with the Tribe before taking any further action.

17     8.    As stated above, the Tribe only learned about the proposal to sell the building

18    and move the Seattle Archives when the Attorney General for the State of Washington and not

19    the United States brought this matter to the Tribe's attention.

20     9.    The Tribe is constantly confronted with problems or outside actions that

21    threaten its sovereignty, its culture, its way of life. An immediate example relates to a proposal

22    to build a dam on the Chehalis River, which would directly impact many aspects of the Tribe's

23    and its members lives. What relevant documents do the Federal Archives contain that would

24    help protect the Tribe from such an incursion. If the building is sold and the Federal Archives

25    are shipped away, the Tribe would suffer a damage in being unable to bring such records to

26    bear, a damage that would strike at the heart of the Tribe's identity, culture and its members

DECLARATION OF HARRY        3        ERROR! AUTOTEXT ENTRY NOT DEFINED.
PICKERNELL, SR.

328

religions. It would also hinder the Tribe's anticipated legal actions to challenge the creation of a dam that would damage the Tribe's fish habitat and conservation programs and would inundate religious and cultural sites. The removal of archived records would simply create direct damage for which no mitigation would ever compensate.

10.     I declare under penalty of perjury that the foregoing is true and correct.

DATED this 23rd day of December, 2020 at the Chehalis Reservation in the State of Washington.

_____
Harry Pickernell, Sr

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF ANNETTE PIERRE |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Annette Pierre, declare as follows:

1.     I am an enrolled member of the Kalispel Tribe of Indians ("Kalispel Tribe") and a historian of the Kalispel Tribe. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.     I have been the Tribal Historic Resource Program Manager since 2017. My Bachelor's degree in Ethnic Studies is from Washington State University and I obtained my Master's degree in Library and Information Science from the University of Washington in 2015. In my current position, I am responsible for researching tribal documents at the National Archives in Seattle and disseminating the information to our tribal government and tribal members. Prior to serving in my current position, I was a graduate student in the Master of Library and Information Science (MLIS) Program at the University of Washington.

3.     The Kalispel Tribe is a federally recognized Indian tribe with its Reservation land base located in Eastern Washington; the Tribe's ancestorial land stretches into Canada, Idaho and Montana.

4.      The National Archives at Seattle houses documents which are invaluable to the Kalispel Tribe and the Tribe utilizes these archives extensively.  Specifically, this facility holds thousands of the Kalispel Tribe's documents including, but not limited to photographs, ethnographies, reports, minutes, maps, correspondence, notes from our language, birth records, death records, land records, school records, leases of Indian lands, statistical reports, and a plethora of other important information. These documents continue to be an important resource that the Tribe needs access to. The Indigenous knowledge recorded in these documents is priceless.

5.      In my position I routinely need access to these valuable historic documents and having these documents located in Washington State, where they can be readily and easily accessed, is important.

6.      These records fill important gaps and help support historic governance issues. At the National Archives at Seattle, I have found Tribal Council resolutions that were previously lost. I have also found Industrial Survey Reports from 1929; through these reports we were able to see photographs of our elders, as well as snippets from their lives. I have found Indian Census Rolls that the Tribe has used for enrollment purposes. I've found prayers, hymns, and stories in our language. These are just a few of the many documents located in this facility that are priceless to our Tribe.

7.      To my knowledge, no federal agency or federal government representative contacted the Kalispel Tribe in connection with the federal government's decision to sell the National Archives at Seattle.  My first knowledge of the sale was through the media.

8.      The Kalispel Tribe will suffer if these records are moved out of Seattle/Pacific Northwest. There will be loss of family histories, school records, resolutions, land records, marriage records, and many others. There will be cultural harm with loss of records that are important to our cultural preservation. There will be financial harm, costs associated with travel to obtain records not located in Seattle. Even worse, there will be total loss of access for those

who cannot afford to travel. There will be an undue burden placed on tribes and tribal people to access these documents. Moving these documents also poses a risk of irreparable damage and risk for loss of items during transit to any proposed facility. The myriad of tribal documents at the National Archives Seattle has helped fill voids in our Tribe's history and continue to be an important resource that we need access to. These records tell stories of our resilience. The voices of our ancestors speak to us through these archives, their words continue to resonate with us today.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this  30  day of  Decembe r   , 202  at  Seattle            ,  Wa            .
       day           month       year          city           state

ANNETTE PIERRE

ERROR! AUTOTEXT ENTRY NOT DEFINED.789-7600

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF RICHARD REICH |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Richard Reich, declare as follows:

1.      I am an attorney employed part time as a Senior Legal Counsel in the Office of the Tribal Attorney of the Muckleshoot Indian Tribe. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been employed in my current position since late 2001, full time until May of 2018, and now part time. As a Senior Legal Counsel, I am responsible for providing legal advice and representation to the Muckleshoot Tribe on a wide range of issues including treaty rights, tribal recognition, and tribal jurisdiction, all of which are informed by the historical record of the United States' dealings with the Muckleshoot people. Important and unique portions of this historical record are housed at the National Archive repository at Sand Point in Seattle. Prior to serving as Senior Legal Counsel for the Muckleshoot Indian Tribe, I served as the Reservation Attorney for the Quinault Indian Nation for over eighteen years from 1982 to late 2001 and as Tribal Attorney for the Muckleshoot Indian Tribe from March 1978 to 1982. In my prior positions with the Quinault Nation and Muckleshoot Tribe I was also

DECLARATION OF RICHARD REICH          1          OFFICE OF THE TRIBAL ATTORNEY
MUCKLESHOOT INDIAN TRIBE
39015 172ND AVENUE SE
AUBURN, WA 98092
(253) 939-3311

333

1  responsible for providing tribal government officers with legal advice and assistance on similar
2  issues.

3       3.     During my tenure as counsel for the two tribes, I have represented the
4  Muckleshoot Indian Tribe and the Quinault Indian Nation in *United States v. Washington*, No.
5  C70-9213 and other litigation and administrative proceedings involving treaty rights,
6  jurisdictional, and tribal recognition issues.  In connection with that litigation and other work
7  for the two tribes I have personally engaged in research at the National Archives repository in
8  Seattle, and have employed or otherwise worked with researchers reviewing historical
9  documents relating to the tribes at the Seattle repository.

10      4.     The Muckleshoot Indian Tribe is a federally recognized Indian Tribe whose
11 membership is composed of descendants of the Duwamish and Upper Puyallup people who
12 inhabited Central Puget Sound.  Its tribal government is based on the Muckleshoot Indian
13 Reservation in King County, Washington.  It is a successor in interest to tribes and bands of
14 Indians party to the Treaties of Medicine Creek, 10 Stat. 1132, and the Treaty of Point Elliott,
15 12 Stat. 927.

16      5.     The Quinault Indian Nation is a federally recognized tribe composed of
17 descendants of the Quinault, Queets, Hoh, Quileute, Chehalis, Chinook, and Cowlitz people
18 who inhabited the Olympic Peninsula and Southwest Washington.  Its tribal government is
19 based in the village of Taholah on the Quinault Indian Reservation in Grays Harbor County,
20 Washington.  It is a successor in interest to the tribes and bands that were party to the Treaty
21 with the Quinault, also known as the Treaty of Olympia. 12 Stat. 971.

22      6.     The National Archives repository at Seattle contains significant historical
23 records of the United States dealings with Tribes located in Washington including the
24 Muckleshoot Indian Tribe and Quinault Indian Nation.  Many of these records are poorly
25 indexed, have never been digitized, and are not available elsewhere.   Because these records
26

DECLARATION OF RICHARD REICH            2            OFFICE OF THE TRIBAL ATTORNEY
                                                          MUCKLESHOOT INDIAN TRIBE
                                                           39015 172ND AVENUE SE
                                                             AUBURN, WA 98092
                                                               (253) 939-3311

1  are not digitized and are poorly indexed, the ability to physically access the records to review
2  them is critical.

3        7.      Attached hereto as Exhibit A is an example of the unique and historically
4  important records that can be found browsing through the physical records available at the
5  National Archives in Seattle. Exhibit A is a true and correct copy of a May 3, 1855 letter
6  written by Governor and Superintendent of Indian Affairs Isaac I. Stevens to Indian Agent Col.
7  Michael T. Simmons (with a typewritten transcription) providing Simmons with instructions
8  on the negotiation of the Treaty with the Quinault or the Treaty of Olympia, 12 Stat. 971,
9  following the failed Grays Harbor Treaty Council with the Chehalis, Chinook, Cowlitz and
10  Quinault. The letter is particularly important because no minutes have ever been located for
11  the Treaty with the Quinault which Simmons negotiated at Taholah with the Quinault and
12  Quileute in 1855. The letter directs Simmons to conclude a treaty with the Quinault and
13  Quileute and explains that Stevens intended to negotiate a separate treaty with the Chehalis,
14  Chinook, and Cowlitz in Olympia upon his return from treaty councils in Eastern Washington.
15  The letter sheds light on the relationship of the three latter groups to the Treaty with the
16  Quinault which was one of the principal issues litigated in consolidated proceedings in *United*
17  *States v. Washington*, No. 9213 Subproceeding 83-3 and *Chehalis v. Washington*, No. 83-
18  117(T), 18 F.Supp.3d 1172, 1180 – 1203 (W.D. Wash. 1992). Exhibit A was admitted into
19  evidence in that case as Exhibit USA-M-60 to address the relationship of the three Southwest
20  Washington groups to the Treaty with the Quinault. *See, Id.* FF 43-44, 18 F.Supp.3d at 1188.

21        8.      The original May 3, 1885 letter from Stevens to Simmons was located by
22  researchers physically browsing through unindexed Puget Sound Indian Agency records held
23  at the National Archives in Seattle, and presumably remains there today. It is an irreplaceable
24  part of the history of the relationship between Washington Tribes and the United States that is
25  only available at the National Archives in Seattle and could only be located by physically
26  accessing the records there. Relocation of the records held at the National Archives repository

DECLARATION OF RICHARD REICH      3      OFFICE OF THE TRIBAL ATTORNEY
MUCKLESHOOT INDIAN TRIBE
39015 172ND AVENUE SE
AUBURN, WA 98092
(253) 939-3311

335

in Seattle would significantly impair the ability of Washington Tribes to locate and access records like the May 3, 1855 letter from Stevens to Simmons that are critical to understanding the United States relationship to Washington Tribes.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4th day of January, 2021 at Bellevue, Washington.

Richard Reich

OFFICE OF THE TRIBAL ATTORNEY
MUCKLESHOOT INDIAN TRIBE
39015 172ND AVENUE SE
AUBURN, WA 98092
(253) 939-3311

336

Office Supdt. Ind. Affairs.
Olympia W.T. May 3d 1855.

I herewith give instruction for negociating Treaties with the remaining Tribes of your district.

The programme of the Treaty herewith enclosed is precisely like that of the Grey's Harbor Council, with the exception that the reservations are left entirely to the discretion of the President, and provision is made for the coming in of the several Tribes at different times. You will inform the Qui-nai-ults and Que-ley-yuts that they will remain in their country for the present, the upper Chehalis that they may be incorporated with one of the Tribes at the Head of the Sound should they desire it, and the Cowlitz Indians that they may be joined with the Upper Chehalis. The Chinooks, Shoalwater Bay and Lower Chehalis may be informed that their reservation will be selected so as to provide them with fishery & potatoe grounds.

You will just get the signatures of the Qui-nai-ults and Que-lay-yuts, and the remaining Tribes will be treated with in Olympia. There must be no retreat or departure from the lines established at Grey's Harbor, and it is of the utmost exigence that excepting the Qui-ni-ults and Qui-lay-yuts, the overtures should (?) their chiefs and Head men coming (?) purpose. Mr. Shaw by monthly visits (?) management will I think be able to (?) frame of mind and in the course of time bring about the result. In all these (?) you are requested to advise with Hon. C. H. Mason (?) of the Territory, and in my absence the Acting Governor.

(?)
Isaac I Stevens
Governor

Col. M. T. Simmons
(?) Agent
Puget Sound District

Transcription of original handwritten letter with some words supplied (guessed at) by Barbara Lane. Other missing words are not supplied and are indicated by (?) in the above transcription.

Original letter found at National Archives (Sand Point regional depository, Seattle), RG 75, Records of the Puget Sound Agency, Box 1.

CAUSE 9213 - Sub #83-3

DEFENDANT
EXHIBIT
NO. USA-M-60

ADMITTED OCT 1 5 1990

Exhibt A Declaration of Richard Reich    Page 1

Offic Sup.dt Ind. Affairs.
Olympia W.T. May 3d. 1855.

I herewith give instructions for negociating treaties
relative to Tribes & your district.

The scheme of the treaty herewith enclosed is precisely
that of the Puget Sound Council, with the excep=
the reservations are left entirely to the discretion
relied, and provision is made for the coming in
several Tribes at different times. You will inform the
⬤ult and Quee-Ley-gats that they will remain in
country for the present, the upper Chehalis that they
incorporated with one of the Tribes at the Head
and should they desire it, and the Cowlitz Ia=
that they may be joined with the upper Chehalis. The
in, Shoalwater Bay and Lower Chehalis may
warned that their reservation will be selected so as
unite them with fishery & potatoe grounds.

in will first get the signatures of the Quee-ni-ults and
Ley-gats, and the remaining Tribes will be treated with
inferior. There must be no retreat or departure from the
it established at Puget Harbor, and it is of the utmost
; science that excepting the Quee-ni-ults and

Exhibt A Declaration of Richard Reich    Page 2

338

Qui-lay-yats, the continuous [illegible] their chiefs and Head men coming purpose. Mr. Shaw by monthly visits [illegible] management will I think be able to peace of mind and in the cause bring about this result. In all this are requested to advise with Hon. C. H. Ma[illegible] Secy. Terry of the Territory, and in my absence of the Acting Governor.

Yours [illegible]

Col. M. T. Simmons

Special Agent

Respt. Sent [illegible]

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF JOSHUA LEONARD REID |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

8
9
10
11
12

I, Joshua Leonard Reid, declare as follows:

1.      I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am the John Calhoun Smith Memorial Endowed Associate Professor of History at UW (UW or University), Washington State's largest public research university. Additionally, I am an associate professor in the American Indian Studies Department and director of the Center for the Study of the Pacific Northwest. I have held this position as an associate professor since fall quarter 2015; I was appointed to the CSPN directorship September 16, 2018, and the endowed professorship on July 1, 2019. As an associate professor in history and American Indian studies at the UW, I have responsibility for teaching four courses annually in topics on American Indian & Indigenous history, environmental history, history of the North American West, and other topics. Additionally, I guide graduate students and advanced undergraduate students in their own research—I also conduct substantial research and regularly publish—on these topics.

DECLARATION OF JOSHUA LEONARD        1
REID

3.     My expertise as a researcher and Indigenous historian comes from over seventeen years of graduate and professional work. I received my Ph.D. in History, with a Designated Emphasis in Native American Studies, from the University of California, Davis, in 2009; an M.A. in History from UC Davis in 2005; and a B.A. in Political Science and Studies in the Environment from Yale University in 1994. My primary field in graduate school was American Indian history, with an emphasis in the North American West and environmental history, and my dissertation focused on the Makah Nation's historical relationship with the ocean. From 2009-2015 I was an assistant professor in the History Department at the University of Massachusetts, Boston, where I also founded and directed that institution's Native American and Indigenous Studies program. Since 2015, I have been at the University of Washington as a tenured associate professor in both the History and American Indian Studies Departments. I have taught a range of classes at the undergraduate and graduate levels in American Indian history, environmental history, U.S. history, and the North American West, along with a study abroad to Aotearoa New Zealand. I am currently advising four Ph.D. students.

My service commitments demonstrate that my colleagues both at the University of Washington and beyond value my intellectual contributions to the disciplines of History and American Indian Studies. In addition to directing the Center for the Study of the Pacific Northwest, I currently serve on the Board of Directors for the National Council for History Education, and serve as a steering committee member for the D'Arcy McNickle Center for American Indian and Indigenous Studies at the Newberry Library in Chicago, IL. Additionally, I am a co-editor of the Henry Roe Cloud Series on American Indians and Modernity for Yale University Press. I also edit the Emil and Kathleen Sick Series on Western History and Biography with the University of Washington Press and serve on the editorial advisory board of the *Pacific Northwest Quarterly*. Over the years I have occupied leadership roles in the American Historical Association (council member 2013-2016, program committee chair for

AHA 2020) and the Western History Association (nominating committee 2015-2017, Sally and Ken Owens Book Award, program committee co-chair for WHA 2019, distinguished speaker) and served on prize committees for a number of professional groups. I am regularly asked to speak at conferences and at universities in the United States and abroad, to review manuscripts and textbooks for publication, and to contribute to curriculum both locally and nationally, most recently for the National Humanities Center and the Smithsonian.

My research and publications have received a number of recognitions and awards over the years. Major sources of competitive fellowships and grants for my research have come from universities, the Ford Foundation, the Gates Foundation, and the American Philosophical Society. Most notably, my first book, *The Sea Is My Country: The Maritime World of the Makahs* (Yale University Press, 2015) won numerous awards and acknowledgements from the Western History Association, Organization of American Historians, American Society for Ethnohistory, and the North American Society for Oceanic History. I have received favorable reviews for *The Sea Is My Country* in the major academic journals in my fields.

Additionally, I am an expert witness for the Makah Nation, an American Indian community at the most northwestern point of the contiguous United States. I composed a nearly 200-page report for the Makah, which details the historical importance of hunting whales, a customary practice that tribal negotiators reserved for themselves and their defendants in the 1855 Treaty of Neah Bay. Still ongoing, this work is being done to help the tribal nation petition for a waiver to the Marine Mammal Protection Act so that they can exercise their reserved treaty rights without interference from the federal government.

4.    The archival records housed at the National Archives at Seattle have been critical to my past and ongoing research. While working on my dissertation and *The Sea Is My Country*, I conducted substantial research at the Seattle NARA branch, accumulating months of time spread out across years, poring over documents. During the first summer of intensive research (July-September 2004), I accessed dozens of archival boxes worth of material. I spent

the first week of research just going through the physical copies of relevant finding aids, identifying documents I wanted to see. As I perused the boxes and file folder, I found new documents that had escaped my notice during the first review of the finding aids. This is how research works—when physically locating one item, you come across other proximate records that are sometimes even more important.

Overall, I ended up taking notes from over 500 pages of documents spread across fifteen boxes of material from the Taholah Indian Agency (Record Group 75, Bureau of Indian Affairs) during the first summer of research. Material accessed included correspondence relating to Indian fishing rights, 1931-45 (Boxes 554-557); decimal files on Makah hunting and fishing (Boxes 89, 170), pelagic sealing (Boxes 71, 171), reservation inspections (Boxes 102 & 103), and other maritime issues (Box 111); reservation superintendents' daily files (Boxes 558, 560, & 561); and others. Additionally, I relied on several key rolls of microfilm, such as the Alanson Wesley Smith microfilm (three rolls) and reports of field jurisdiction inspections (one roll), only available at this branch or in the main branch in Washington, D.C. As I finished the dissertation and revised it for publication (2008-2013), I made a few more visits to the Seattle branch for follow-up research, going back to some documents to double-check quotations and notes or to pursue new interpretive threads. Handwritten or typed, the documents included letters from Makahs written to the federal government; minutes from tribal council meetings; photographs of Makahs, their fishing vessels, and the reservation; letters from federal agents, teachers, and inspectors; maps with marginalia; and field notes. With the exception of the microfilm reels, these documents exist nowhere else; nor are they digitized.

Additionally, I drew from these documents when composing my expert witness report and testimony for the Makah Nation's efforts at exercising their treaty rights through a petition for a waiver to the Marine Mammal Protection Act. I specifically filed Office of Indian Affairs inspection reports (1884, 1896, 1929, and 1932) and reports and memoranda on sealing among

1  the exhibits I enclosed with my report in 2019. This case is ongoing, and I will undoubtedly

2  need to reference more documents from the Seattle NARA facility for this.

3      I am also working on a new research project about the Makah Nation's engagement

4  with the Olympic Coast National Marine Sanctuary. The 45 boxes of records of the Makah

5  Tribal Council (1930-1970)—not digitized and only available at the Seattle NARA facility—

6  are critical to this research. I began working with this collection during the late spring and

7  summer of 2019; I had intended to return to these records this last summer, but the pandemic

8  closure has prevented me from returning to this research for now. This project is part of a larger

9  initiative on Indigenous peoples, protected spaces of nature, and conservation that the Center

10  for the Pacific Northwest is doing in collaboration with University of New Mexico's Center,

11  Southwest and Southern Methodist University's Clements Center for Southwest Studies, York

12  University (Toronto), University of Helsinki, and numerous tribal nations. As planned, this

13  overall initiative will result in multiple symposia held in the United States and internationally,

14  two edited collections of original research done in collaboration with tribal nations, and

15  conservation and partnership capacity building among Indigenous communities and national

16  parks and similar protected spaces of nature.

17      Overall, I would assess my dependence on the unique archival records at the Seattle

18  NARA facility as quite high. More importantly, the research I do is in service to federally

19  recognized tribal nations and relates importantly to issues of conservation, natural resource

20  use, and treaty rights. My career literally depends on having regular access to these archival

21  records.

22      5.    My research at the Seattle NARA branch has contributed to 7 of my

23  publications and reports. These include:

24  • "Makah Whaling: History, Culture, and Continued Relevance Today," expert witness

25      report for the Makah Nation's waiver application to the National Oceanic and

26      Atmospheric Administration (May 2019).

- *The Sea Is My Country: The Maritime World of the Makahs* (New Haven: Yale University Press, 2015). This book won an Honorable Mention for the Frederick Jackson Turner Prize (2016) from the Organization of American Historians; an Honorable Mention for the John Lyman Book Award in US Maritime History (2016) from the North American Society for Oceanic History; the Caughey Western History Prize, John C. Ewers Award, and Sally and Ken Owens Award (all 2016) from the Western History Association; and the Erminie Wheeler-Voeglin Book Award (2016) from the American Society for Ethnohistory.

- "From 'Fishing Together' to 'To Fish in Common With': Makah Marine Waters and the Making of the Settler Commons in Washington Territory," *Journal of the West* 56.4 (Fall 2017): 48-56.

- "Indigenous-Anglo Interactions over Pacific Marine Space: Makahs, Maori, and the British Empire in the Pacific," in *Facing Empire: Indigenous Experiences of Empire in a Revolutionary Age*, eds. Kate Fullagar and Michael A. McDonnell (Baltimore: Johns Hopkins University Press, 2018).

- "Articulating a Traditional Future: Makah Sealers and Whalers, 1880-1999," in *Tribal Worlds*, eds. Brian Hosmer and Larry Nesper (Albany: State University of New York Press, 2013), 163-184.

- "Marine Tenure of the Makah," in *Indigenous Knowledge and the Environment in Africa and North America*, eds. David Gordon and Shepard Krech (Columbus: Ohio University Press, 2012), 243-258.

- "Indigenous Maritime Geographies of the Pacific Northwest," in *Routledge Handbook to North American Indigenous Modernities and Modernisms*, eds. Kirby Brown, Alana Sayers, and Stephen Ross (in progress).

6.    I have taught research-oriented classes and independent studies that have involved undergraduate students conducting research at the Seattle branch of NARA. During

the Fall 2015 quarter, I taught the "Colloquium in History," a required course for history majors. I focused the topic on the Indigenous Pacific Northwest, and I had several students pursue topics that brought them into the regional branch of the archives. I even scheduled a field trip there to introduce students to the archives and archivists, showing them how to use finding aids to locate necessary archival documents. If the archives were relocated outside of Seattle, I would be unable to do these types of field trips and hands-on training for students. During the Spring 2020 quarter, I taught this research colloquium again, this time focusing on US federal Indian policy. I had planned to take them to the regional archives so that they could conduct research there, but the pandemic shutdown meant that I had to cancel not just this research field trip but the entire research component of this course, which depended on access to this particular archival institution.

I have also guided students through research-based independent studies and honors projects in which they have conducted original research in the regional NARA. During the 2018-19 academic year, one undergraduate in American Indian Studies conducted a three-quarter intensive research project on the Quinault Nation's efforts to conserve and manage their forestry and fishery resources in the second half of the twentieth century, precisely at the time that the federal government sought to liquidate these people's natural resources. She drew heavily from the archival records related to forestry leases on tribal lands. That same academic year, another student completed her honor's research thesis on the Suquamish Nation's successful efforts to maintain their cultural history in the late-twentieth century. She, too, used the regional NARA archives to delve into Suquamish history over the last century. Both women, students of color, accessed non-digitized records only available at the Sand Point facility. Most importantly, both women are headed to graduate school, in part due to the enjoyable and ground-breaking research they were able to conduct at this archive. This branch of the federal archives is key to guiding students through research projects related to regional tribal nations, especially on issues related to environmental management and conservation.

7.      I currently advise four PhD students in the History graduate program at the UW. One of them has used the regional NARA archives at Sand Point to begin working on her dissertation research. Her project investigates the Muckleshoot Nation's early economic development efforts in the twentieth century. Critical, non-digitized records for her dissertation are only available at the Sand Point facility. With the recent pandemic shutdowns, she has been unable to access these records that she needs in order to move forward on her dissertation. A second student who is completing his MA and preparing to move on for his PhD needs to access a range of records at the regional federal archives, particularly those related to local Indigenous activism in Puget Sound. Because of the pandemic shutdown, he has not even had a chance to review the finding aids or meet with archivists in order to identify the files he needs to review.

Much like the research I conducted, both of these students depend on having access to physical copies of non-digitized records and browsing through related files near the ones they pulled. This is how this level of in-depth research is done. If this regional NARA facility is closed, I will be unable to train graduate students at using valuable federal records on topics related to tribal nations in the Pacific Northwest—they simply will not be able to adequately pursue these kinds of topics.

8.      I first learned of the impending sale of the National Archives at Seattle on January 14, 2020, when I received an email announcement about it from the Pacific Northwest Historians Guild. At that point I began reaching out to my contacts at various tribal nations to see what they had heard about the December 27, 2019, Public Buildings Reform Board (PBRB) recommendation for the expedited closure and sale of the archives facility at Sand Point. They, too, had just heard the news. About a week later, news of this recommendation was circulating across campus. As Director of the Center for the Study of the Pacific Northwest, I reached out to a colleague who directs the Center for American Indian and Indigenous Studies at the UW, and we drafted a letter recommending that the PBRB reconsider and reverse their

recommendation. I sent this letter to Adam Bodner, the Executive Director of the PBRB, on January 25. Copies of this letter were also sent to key people at NARA, including David Ferriero, Archivist, Debra Wall, Deputy Archivist, Erica Pearson, Director, and Gary Stern, General Counsel; White House staff, including Tyler Fish, Sr. Policy Advisor & Tribal Liaison, Jennifer Bradley Lichter, Deputy Assistant to the President for Domestic Policy & Deputy Director; people at the GSA, such as Emily (Webster) Murphy, Administrator, and Daniel W. Mathews, Commissioner; Russell T. Vought, Acting Director of OMB; and the offices of members of Washington State's congressional delegation, including Rep. Denny Heck, Rep. Pramila Jayapal, Rep. Derek Kilmer, and Senator Patty Murray. Bodner did not bother to reply. However, I received replies from Brendan Woodbury (Heck's office), Mindi Lindquist (Murray's office), the Public and Media Communications Office of NARA, and David Ferriero. I have attached a copy of the letter I sent to the PBRB, along with Ferriero's reply. Around this time, I also alerted staff at the American Historical Association about the recommended closure. I have also communicated with reporters working on these stories. Most recently, I was consulted for and quoted in Hallie Golden's " 'Our history is contained there': loss of archives threatens Native American tribes," *The Guardian*, December 30, 2020 (https://www.theguardian.com/us-news/2020/dec/30/seattle-national-archives-indigenous-people-property-sale).

9.	In my previous responses, I have already signaled a number of harms that I will suffer professionally, along with harms to the UW's academic programs, if the records housed at the Sand Point NARA facility are moved out of Seattle/out of the Pacific Northwest. For me professionally, this will make my current and future research more burdensome. I will need to dedicate weeks of work away from home in order to conduct research that I can normally fit into my usual schedule as a professor at the UW. Not only will this be a burden on my time, but it will also incur financial costs. To spend several weeks at an archive facility in another city will involve spending money on flights, rental cars, hotel accommodations, and meals out.

All told, a two-week research trip, for example, could cost several thousand dollars; if the archives remain in Seattle, it costs nothing for me. In order to cover these costs, I will need to dedicate time to applying for research grants in order to finance these research trips. (And let's consider the time I have spent drafting this declaration; I think Bodner and the PBRB owe me a sizable check—please let me know where I can send the invoice.) All told, moving the archives out of Seattle will cost me personally. After completing the research I am already committed to finishing, I would likely not pursue research topics that would require heavy use of the documents if they are moved away from Seattle.

Moving the records away from the facility in Seattle would also harm undergraduate and graduate students at the UW. I would not be able to train new generations of researchers to use federal records. If the regional branch of the archives is closed, current graduate students will have a hard time completing their dissertations, without incurring substantial financial costs, as outlined above. Future graduate students will be less likely to pursue topics related to local tribal nations and environmental issues without access to these records. Additionally, potential graduate students will look at graduate programs elsewhere instead of coming to the UW, where they have ready access to a critical archival institution, i.e., the one at Sand Point. Moreover, the kinds of graduate students who work in these records are often Native students doing research on their own tribal nations or related Indigenous peoples. So, not only will the loss of the archives create undue hardship for our students, but it will also make it harder for us to diversify the academy, one of the critical missions of what we do as educators at the UW.

While these harms all seem quite severe, I worry most about the harms caused to the Pacific Northwest and Alaska's tribal nations. They reference the archives heavily to protect their treaty rights and natural resources in court, to petition the federal government for federal recognition, and to conduct important genealogical work to register for tribal membership. Their history is literally housed at this branch of the federal archives here in Seattle. Unlike academic researchers, they do not have access to competitive and hard-to-secure research funds

to finance lengthy trips outside the region in order to do this necessary work. Moving the archives and these records outside Seattle or the Pacific Northwest is a direct violation of their treaty rights and a violation of the federal government's trust responsibilities to tribal nations. As best as I can tell, not a single tribal nation was consulted in this decision.

10.     The irony of this situation is not lost on historians. While the PBRB's decision to close and sell the regional branch of the federal archives is breathtakingly shortsighted, it comes as no surprise that this has occurred during the time of an administration that rejects expert knowledge and confuses the removal of monuments of white supremacy and racism with the erasure of history. By removing the federal archives from Seattle and the Pacific Northwest, the federal government is actively taking the anti-democratic step of making the people's history inaccessible to the people. It violates the basic standards of access and preservation, the crux of what it means to be an archive. This pending sale must be stopped, and the federal government must invest in keeping this archival facility in the Pacific Northwest, if not Seattle specifically.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 31st day of __December__, _2020_ at _____Seattle_____, ___Washington___.
                     day           month      year        city           state

_____
Joshua Leonard Reid

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, *et al.*, | Case No. |
| Plaintiff, | DECLARATION OF BRANDON CHRISTOPHER REYNON |
| vs. | |
| RUSSELL VOUGHT, *et al.*, | |
| Defendants. | |

I, Brandon C. Reynon, declare as follows:

1.      I am the Tribal Historic Preservation Officer (THPO)/Assistant Director for the Puyallup Tribe of Indians Historic Preservation Department, and an enrolled member of the Puyallup Tribe of Indians.  I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been the THPO for 8 years. As THPO, I am responsible for responsible for overseeing all the preservation and cultural resource protection for the Puyallup Tribe. Many of the aspects of my job duties include overseeing the protection,

DECLARATION OF BRANDON C. REYNON – PAGE 1

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

preservation and acquisition of archival materials related to the Puyallup Tribe. A majority of the information in our Tribal Archives is copies obtained over many years by our late Tribal Historian Judy Wright. She spent many years in the National Archives in Seattle combing thru the archives and all the information related to our Tribe. Today we preserve those copies. As technology has changed and copy machines are able to provide higher quality copies, we will need to repeat Ms. Wrights work. Prior to serving as THPO, I was the Archive Technician from 2008-2012. I spent much of my time archiving tribal documents that were obtained from the National Archives.

3.     The Puyallup Tribe of Indians located on the Puyallup Tribe Reservation in Tacoma, Washington is a Federally Recognized Tribe. Since time immemorial, our homelands ranged from Three Tree Point to the North, down to the Nisqually River to the South, West to Hood Canal, and East to the tops of the Cascade Mountain Range. The Puyallup Tribe is one of the three reservations formed from the Medicine Creek Treaty of 1854, and Fox Island Council of 1856. We have maintained a Tribal Government well before the arrival of non-native settlers, and we maintain that Sovereignty today. The Tribe consists of over 5,500 members located mostly in Washington State.

4.     One of the most important records for the Puyallup Tribe housed at the National Archives are the documents related to Cushman Boarding School. These documents are specific to not only the Puyallup Tribe, but also all 29 Tribes of Washington State, and many Tribes from Alaska, Vancouver, BC, Canada, Idaho, Montana, Oregon, and Northern California. Children from these states and provinces were sent to Cushman Boarding School as part of the Tribal genocide conducted by the United States Government from 1888-1921. It also houses the medical records of Cushman Hospital. Cushman Hospital was a medical facility established by the U.S. Government and housed patients who supposedly had Tuberculosis (TB). Records from the National Archives show that not all the patients (men, women, and children) had TB, but were kept there to be tested as

DECLARATION OF BRANDON C. REYNON – PAGE 2

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

352

human subject for such things as vaccines, and sterilization method experiments. These rare documents are un-digitized and are only found at the National Archives in Seattle. These documents are extremely important to stay here where the people they affected can access them when they require it for family and tribal history research. Some of these documents contain the handwriting of tribal members and their stories in their voice. Simply making a copy and digitizing it for research will not allow the descendants of these Tribal members access to their personal history and family survival story. The connection to these documents cannot be measured and cannot be felt over a computer screen. Access to these sensitive, one of kind documents are essential to the historical trauma of the Puyallup people.

5.      Federal Programs such as the Army Corp of Engineers, U.S. Transit Administration, National Park Service, and Department of Defense all require information obtained from the National Archives to build our Tribal Archives. This information is used in obeying the National Historic Preservation Act requirements for cultural resource protections. We use this information along with our own Tribal historical knowledge to form the necessary responses to protect our sacred sites and archaeological area.

6.      The Puyallup Tribe's Historic Preservation Department first learned of the decision to sell the Seattle National Archives facility from Tallis King George, a historian that we have close connections with and who visits the Seattle facility regularly. This individual came in for an office visit to inform us of the sale near the end of January 2020.

7.      No Government official had communication, notification, and most importantly, no consultation occurred with the Puyallup Tribe Chairman or Council, cultural resource protection staff, or archival staff regarding the potential closure and sale of the Seattle National Archives.

8.      Representatives of the Puyallup Tribe of Indians, along with several other Tribes of the Washington met with National Archives staff in February of 2020. In this

DECLARATION OF BRANDON C. REYNON – PAGE 3

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

**353**

meeting, we voiced our frustration that no consultation was done with the Tribes regarding the closure and sale of the Archives facility and relocation of the documents to other states. In this meeting we voiced our objection and offered to work with other Tribes to find a more suitable location in Washington. We also voiced the connection to the documents and that digitized access is insufficient for Tribes. Our connection to the records is personal and spiritual. We felt like our concerns were ignored, and taken out of formality, rather than with serious consideration.

9. National Archives location in Seattle houses records of the Puyallup Tribe that are invaluable and irreplaceable. In addition to what I stated above regarding the Cushman records, other important records located here include historic documents that contain family histories, probate documents, written correspondence letters, census records, maps, and microfilm that are of great value to our community. Removing these histories from those people who it matters most to will likely mean a loss of access to these records. Although the National Archives is promising to digitize the records to make them more accessible, we know that the number of staff needed and time it will take to fulfill this obligation creates a hardship and could take more than a decade to complete. The records housed in this facility assist with establishing enrollment for members, are used for the enforcement of our treaty rights. Other important documents housed here are the important ones that originally recorded our culturally significant sites such as archaeological sites, Traditional Cultural Properties. These sites are protected under the NHPA. Without access to the archives locally, our staff will no longer have the opportunity to visit the National Archives and conduct research on behalf of the Puyallup Tribe and just as important our membership, who find their family history located in Seattle at this facility. The records they can see after our research provides them a spiritual and cultural connection. Other important records found are maps. The original map of the Puyallup and Muckleshoot reservations from 1856 shows private land claims and important sites that corroborate our

DECLARATION OF BRANDON C. REYNON – PAGE 4

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

oral histories and claims of the boundaries that we originally agreed to in 1854 during the negotiations of the Medicine Creek Treaty. Since that Treaty Council and the other meetings following it, our boundaries have constantly been disputed. Having such physical records near us, only help with legal claims. Another important record collection that Tribal researchers seek are the census records. These have highly valuable cultural meaning as many of these records list Indian names of our ancestors. We hold cultural naming ceremonies and having access to these names helps us to continue this practice and carry on the names of our people so they can be remembered. Without these records we'd be unable to continue this research and ceremony.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4TH day of JANUARY , 2021 at GRAHAM, WA .
              day         month      year        city         state

BRANDON C. REYNON

DECLARATION OF BRANDON C. REYNON – PAGE 5

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF PROF. BRETT RUSHFORTH |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Brett Rushforth declare as follows:

1.     I am an Associate Professor at the University of Oregon and serve as Department Head for the Department of History in the University's College of Arts and Sciences. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and based on my experience as Department Head where I have become very familiar with the research interests of our 29 faculty and the intellectual pursuits of our approximately 30 graduate students and 300 undergraduate students who have declared a major or a minor in History at the University of Oregon.

2.     I hold a PhD in history from the University of California, Davis (2003). Before arriving at the University of Oregon, I taught for ten years at the College of William and Mary in Williamsburg, Virginia. I have been Department Head of the University of Oregon's History Department since June 2018. I am a historian of comparative slavery and colonialism, specializing in Native American and West African experiences in the French colonies from the 1500s to 1800s. In 2012, I published *Bonds of Alliance: Indigenous and Atlantic Slaveries in*

DECLARATION OF PROF. BRETT
RUSHFORTH

1

ATTORNEY GENERAL OF OREGON
OREGON DEPARTMENT OF JUSTICE
1162 COURT STREET NE
SALEM, OR 97301
(503) 378-6002

*New France*, which won four national and international awards, including the Merle Curti Award from the Organization of American Historians for the best book in American social history. I have also published on the history of Native American nations in the Pacific Northwest.

3.     As one of only two comprehensive research university members of the Association of American Universities in the Pacific Northwest, the University of Oregon takes great care and pride in the quality and quantity of the research we produce and we take very seriously our role as a research institution in the Pacific Northwest. A number of the scholars on our faculty specialize in discoveries relating to the unique history of this region, especially as it relates to our nation's use and misuse of federal land, as well as the rich history of the diverse number of Native American tribes in the region. We offer courses on the history of the Pacific Northwest and adjacent regions to more than 300 undergraduate students per year. Approximately half of our graduate students conduct research on subjects that draw upon resources housed at the NARA facility in Seattle and a substantial number of our graduate students focus on the history of the Pacific Northwest, studying the region's public lands, environmental history, rural history, and Native American history. Faculty and graduate students have received national grants for these studies, including PhD candidate Hayley Brazier, who was recently awarded a National Science Foundation grant to study Oregon's historical use of oceanic resources. Current University of Oregon graduate students are pursuing research in the areas that are fundamentally dependent on materials housed in the NARA Seattle facility, including research into Federal Indian policy and the history of PNW tribes and Alaska Natives, the history of the Pacific Ocean, the history of U.S.-Russian relations, PNW environmental politics, and immigration history in the PNW. Faculty around the university have made substantial contributions to our body of research concerning the Pacific Northwest, its lands and its people, including scholars who contribute to the

DECLARATION OF PROF. BRETT
RUSHFORTH

2

ATTORNEY GENERAL OF OREGON
OREGON DEPARTMENT OF JUSTICE
1162 COURT STREET NE
SALEM, OR 97301
(503) 378-6002

1  preservation of Native American languages and those who have made seminal contributions
2  to our understanding of the history of Oregon's Native American tribes.

3      4.    Records that are currently housed at the National Archives in Seattle are critical
4  to the work of many scholars in the University of Oregon's History Department, including
5  faculty, graduates and undergraduates. I estimate that at least five of our faculty and a third of
6  our graduate students are engaged in research that relies on materials housed at the NARA
7  Seattle facility. While I understand there is a proposal ultimately to digitize the materials
8  housed in the NARA Seattle facility, my experience as a scholar has taught me that digital
9  images cannot replace access to primary materials if one is to truly interpret the lessons of our
10 past.

11     5.    Here is an example of where a digital image of a primary resource simply
12 cannot suffice, as experienced by a colleague, Professor Marsha Weisiger, researching
13 information relating to the Bureau of Indian Affairs. In her research, notations on the back of
14 a photograph that had been examined before only in a digital format revealed the specific
15 location of where the photo was taken. That allowed her to physically visit the point where the
16 photo was taken, making it possible to definitively debunk an (unintentional) false narrative
17 by the Bureau of Indian Affairs that guided and legitimated a conservation program that
18 impoverished the Navajo Nation. It proved to be a pivot point in her multiple award-winning
19 book, _Dreaming of Sheep in Navajo Country._ . It was at the NARA photo archives in College
20 Park, Maryland, that she found this information, which helped transform her understanding of
21 events. My experience as a scholar is similar; there is very often no substitute for the
22 information one gleans from an original source and it is just not possible for digitization to
23 capture all that must be understood from original material.

24     6.    Most digitizing projects pay attention only to the front of the documents,
25 without clearly recording marginalia or the back of the documents. They also often skip
26 repeated copies of documents, which might include scribblings or information regarding drafts

DECLARATION OF PROF. BRETT                    3                 ATTORNEY GENERAL OF OREGON
RUSHFORTH                                                        OREGON DEPARTMENT OF JUSTICE
                                                                     1162 COURT STREET NE
                                                                        SALEM, OR 97301
                                                                        (503) 378-6002

1   or multiple recipients. For example, even had an archivist digitized the back of the photo
2   Professor Wiesiger found so helpful, it is likely they would not have matched them up in a way
3   that would have unequivocally debunked the false narrative. (How would she definitively
4   know it was not the back of the previous or following photo?) There are often little notes
5   attached to federal documents like that, which may prove important but may not appear so to
6   the archivist. Penciled information and erasures are often too light to read on a digital copy, as
7   well, but clearly visible on the original. Often, too, the people charged with digitizing are not
8   sufficiently careful that all pages are clearly legible. Finally, digitizing is time-consuming and
9   thus costly. Many collections (for example, most of those associated with the Works Progress
10  Administration (WPA)) have never been processed, much less digitized, making digitized
11  collections of federal records extremely incomplete. So, effectively, closing the Seattle facility,
12  even with the promise of digitization of its contents, will make the Seattle NARA's documents
13  inaccessible to PNW historians for years to come, and even if digitization is completed at some
14  point in the future, it cannot substitute for the tangible historic record.

15         7.      Another example of the importance of the NARA materials to our scholars is
16  the Southwest Oregon Research Project (SWORP), a project developed by the University of
17  Oregon and the Coquille Indian Tribe, in collaboration with the Smithsonian Institution. Our
18  scholars' access to materials housed in Seattle not only documented tribal governance and the
19  history of Oregon's Southwestern tribes, but also enabled nearly twenty people to earn
20  graduate degrees at the University of Oregon, including fourteen PhDs and six master's
21  degrees. Access to archival materials and the ability to collaborate easily with tribal leaders
22  was essential, and the relative geographic proximity of these materials to the tribes and our
23  scholars was critical to this work. Moreover, History Professor Steven Beda's research project
24  about forestry and natural resource use by timber workers on Oregon's public lands has
25  engaged rural community members throughout the state, rooted in materials in Seattle's
26  NARA, the removal of which will cause significant delays and can have meaningful impacts

DECLARATION OF PROF. BRETT
RUSHFORTH

4

ATTORNEY GENERAL OF OREGON
OREGON DEPARTMENT OF JUSTICE
1162 COURT STREET NE
SALEM, OR 97301
(503) 378-6002

359

1  on very current debates over current land- and public-policy. We in the Northwest are
2  constantly debating how to use and manage our public lands. Many of the records contained
3  at Seattle's NARA branch contain the history of past land management decisions, which are
4  crucial for developing informed future land management policies. Put differently, the closure
5  of Seattle NARA would not just be a loss to scholars and students. It would also be a loss for
6  the region and anyone who cares about the past, present, and future of our public lands.
7  Moving the archives will have a dramatic impact on the ability of these scholars to complete
8  their research within externally imposed deadlines and thwart the research of even more
9  scholars of the Pacific Northwest moving forward.

10      8.     Further examples of the importance of ready access to NARA materials can be
11  found in our undergraduate program. Undergraduate classes have conducted research on
12  Northern Paiute History and the Indigenous people of the Great Basin, which includes
13  southeastern Oregon. In recent years, more than twenty undergraduate students have traveled
14  to Seattle to perform research on-site, some supported with fellowships and grants, as an
15  integral experience in their development as scholars. Their work at the NARA Seattle facility
16  has supported their publication of peer-reviewed articles; presentations at local, regional, and
17  national academic conferences; and completion of independent, faculty-mentored
18  undergraduate research projects submitted as writing samples for successful graduate school
19  applications. Moving the archives will have a dramatic impact on the ability of these scholars
20  to complete their research within externally imposed deadlines and thwart the research of even
21  more scholars of the Pacific Northwest moving forward.

22      9.     Ready access to materials housed in NARA's Seattle facility has been
23  instrumental in allowing our faculty insight into land management issues that help shape
24  current policy. For example, while serving as an expert witness on a case involving Oregon's
25  Board of Forestry (*Linn County v. State of Oregon*), one of our faculty consulted research that
26  he had previously conducted at the Bureau of Land Management Records at NARA-Seattle.

DECLARATION OF PROF. BRETT          5          ATTORNEY GENERAL OF OREGON
RUSHFORTH                                          OREGON DEPARTMENT OF JUSTICE
                                                   1162 COURT STREET NE
                                                   SALEM, OR 97301
                                                   (503) 378-6002

1  As this case is still in the appeals process and may require additional research, moving the
2  records has the potential to disrupt research crucial to the State of Oregon and the management
3  of its state forests. Beyond this specific case, NARA-Seattle contains many records pertinent
4  to public lands in the Northwest. Moving these records not only threatens our scholarly
5  research, but also our ability to offer research-informed opinions on contemporary legal and
6  policy matters.

7      10.    In February 2020, the Dean of Libraries for the University of Oregon co-signed
8  a letter to numerous federal agencies involved in the proposal to move the NARA Seattle
9  archives. In that letter, we, along with colleagues at universities in Oregon, Washington, and
10  Alaska, described the harms that would result to our institutions and our scholars by the
11  proposed move. To my knowledge, the University of Oregon received no response to this
12  letter.

13      11.    The loss of this regional archive will diminish opportunities for undergraduate
14  student research and learning across many disciplines. It will become prohibitively expensive
15  for undergraduate training to include experience working with the National Archives, the most
16  significant archive of historical materials in the nation. Furthermore, as explained in paragraph
17  7, the archives housed in Seattle were critical for the doctorial work of University of Oregon
18  students and the Coquille Indian Tribe, specifically for completion of the Southwest Oregon
19  Research Project (SWORP). Moving the materials from the region, which is already
20  geographically isolated in terms of travel costs, will harm advanced students' access to
21  materials, scholars, and tribes. In an era when the public has rightly expressed concern about
22  the increased cost of higher education, moving archival materials to two distant archives, each
23  more than one thousand miles away, will dramatically increase research costs for those
24  studying the history of the Pacific Northwest and the development and administration of
25  federal policy in the region, adding to the financial burden of graduate education. About a third
26  of current UO graduate students in history have research activities that depend upon the

DECLARATION OF PROF. BRETT           6          ATTORNEY GENERAL OF OREGON
RUSHFORTH                                         OREGON DEPARTMENT OF JUSTICE
                                                  1162 COURT STREET NE
                                                  SALEM, OR 97301
                                                  (503) 378-6002

1 archives in Seattle. Additionally, a faculty member, Kevin Hatfield, has for more than twenty
2 years worked closely with the Basque communities in Oregon, Idaho, and Nevada, sharing
3 extensive source materials housed in Seattle. This work, and a similar project to broaden public
4 access to archival materials, will no longer be possible if the collections in Seattle are spread
5 to archives in southern California and Missouri. The very act of moving these records to distant
6 archives means that researchers studying the history of the Pacific Northwest will have no
7 access to vital records for a period of years, while they are readied for shipment, shipped,
8 unpacked, and inventoried. Thus, even ignoring the additional cost and time involved in
9 traveling to distant archives, for a long period of time, none of these vital records will be
10 available at all. That means important research cannot be done, which will impact graduate
11 students who are currently researching and writing dissertations and faculty scholars who are
12 writing books on the history of the Pacific Northwest.

13

14 I declare under penalty of perjury that the foregoing is true and correct.

15

16 DATED this 5TH day of JANUARY , 2021 at EUGENE , Oregon
     day        month        year        city

17

18 _____

19 Brett Rushforth, Ph.D

20

21

22

23

24

25

26

DECLARATION OF PROF. BRETT          7          ATTORNEY GENERAL OF OREGON
RUSHFORTH                                       OREGON DEPARTMENT OF JUSTICE
                                                1162 COURT STREET NE
                                                SALEM, OR 97301
                                                (503) 378-6002

362

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF DELANO SALUSKIN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Delano Saluskin, declare as follows:

1. I am an enrolled member of the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation"), and currently serve as Chairman of the Yakama Nation Tribal Council. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2. I have been Tribal Council Chairman for one year, and have served as a Yakama Nation Tribal Council Member for nine years. As Tribal Council Chairman, I am responsible alongside my fellow elected officials for asserting and defending the Treaty with the Yakamas of June 9, 1855, 12 Stat. 951 ("Treaty of 1855"), and all Yakama Nation laws developed thereunder. These efforts often require that Yakama Nation staff under my direction access to the National Archives at Seattle to research the Yakama Nation's records stored there.

3. The Yakama Nation is a sovereign, federally-recognized Native Nation pursuant to our inherent sovereignty and the rights reserved in the Treaty of 1855. In the Treaty of 1855, our ancestors reserved the 1.4 million acre Yakama Reservation in what is now central

DECLARATION OF DELANO SALUSKIN - 1

YAKAMA NATION
OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Phone (509) 865-7268

363

1     Washington State for our exclusive use and benefit. The Yakama Nation's Governmental

2     Headquarters are located within the Yakama Reservation, where our Government serves more

3     than 11,000 enrolled Yakama Members.

4         4.     The National Archives at Seattle houses a collection of Yakama Indian Agency

5     records directly relevant to the Yakama Nation, including but not limited to the Yakama

6     Nation's Tribal Council and General Council meetings from the 1940's through the 1960's

7     that is both essential to the Yakama Nation's history and currently undigitized. These records

8     include motions, resolutions, and minutes, which constitute many of the laws and supporting

9     legislative histories that remain in legal effect throughout our Yakama Territory today.

10        5.     The Yakama Nation uses records maintained at the National Archives at Seattle

11     to assert and defend its inherent sovereign and Treaty reserved rights. For example, the

12     Yakama Nation researched and relied on Yakama Indian Agency records from Record Group

13     75 located at the National Archives at Seattle to support our recent federal litigation against a

14     local jurisdiction who challenged the location of the Yakama Reservation's boundaries. *See*

15     *Confederated Tribes and Bands of the Yakama Nation v. Klickitat County, et al.*, Nos. 19-

16     35807, 19-35821 (9th Cir. argued Nov. 20, 2020).

17        6.     This is not the first time that the Yakama Nation has disputed the National

18     Archives And Records Administration's ("NARA") improper handling of the Yakama

19     Nation's records. The Yakama Nation continues to request that NARA protect and preserve

20     the Yakama Nation's Treaty Map, which was drawn by Washington Territorial Governor Isaac

21     Stevens at the 1855 Walla Walla Treaty Council to show our ancestors the scope of their

22     Treaty-reserved lands. This record is extremely significant as one of the few original records

23     remaining from the Walla Walla Treaty Council. The Treaty Map was transferred back to

24     Washington D.C. along with the Treaty of 1855 and promptly lost in the United States' records

25     until 1930. NARA now refuses to return the Treaty Map to its rightful and protected place in

26

DECLARATION OF DELANO SALUSKIN - 2

**YAKAMA NATION**
**OFFICE OF LEGAL COUNSEL**
**P.O. Box 150 / 401 Fort Road**
**Toppenish, WA 98948**
**Phone (509) 865-7268**

**364**

1 the Yakama Nation's Treaty File; instead leaving it out for public circulation at the National

2 Archives at College Park, MD.

3       7.     The Yakama Nation first learned that the United States was selling the National

4 Archives at Seattle from Dr. Andrew Fisher, ethnohistorian and professor at William and Mary

5 College in Virginia. The Yakama Nation was not consulted on the sale pursuant to Executive

6 Order 13175 or the United States' trust responsibilities under the Treaty of 1855 prior to

7 learning of the proposed sale from Dr. Fisher. On January 24, 2020, the Yakama Nation

8 notified the United States by letter of our objections to the National Archives at Seattle sale,

9 and demanded consultation. To date, the United States has refused to consult on a government-

10 to-government basis with the Yakama Nation concerning this proposed sale.

11       8.     A true and correct copy of the Yakama Nation's January 24, 2020 letter sent to

12 the United States Office of Management and Budget, United States Public Buildings Reform

13 Board, and NARA is attached as Exhibit A.

14       9.     The Yakama Nation will be extremely prejudiced if the National Archives at

15 Seattle is sold and the Yakama Nation's records are relocated outside the Pacific Northwest.

16 Many of the Yakama Nation's foundational resolutions, and the records related thereto, are

17 stored at the National Archives at Seattle. The Yakama Nation will have to decide whether to

18 expend significant resources to digitize the entirety of NARA's Yakama Nation-related

19 collection, or expend significant resources for travel and lodging every time the Yakama

20 Nation needs to access its records. This will injure our ability to effectively assert and defend

21 our Treaty-reserved rights. Enrolled Yakama Members researching their ancestors and their

22 lands will have to overcome significant financial hurdles to access their records into the future.

23 Given the United States' significant record management failures in the past, we are concerned

24 that the transfer of these records will result in further misplaced Yakama Nation documents

25 that may never be found again. This sale should never have been authorized without the United

26

DECLARATION OF DELANO SALUSKIN - 3

YAKAMA NATION
OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Phone (509) 865-7268

1    States first consulting with the Yakama Nation about the significant injury this decision will

2    cause to our Members and our Government.

3

4    I declare under penalty of perjury that the foregoing is true and correct.

5

6    DATED this 22nd day of December, 2020 at Toppenish, Yakama Reservation.

7

8

9                                    Delano Saluskin, Chairman
                                     Yakama Nation Tribal Council

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF DELANO SALUSKIN - 4

# EXHIBIT A



Confederated Tribes and Bands
of the Yakama Nation

Established by the
Treaty of June 9, 1855

January 24, 2020

<u>Sent via Electronic Mail</u>

To: Office of Management and Budget
c/o Mick Mulvaney
john.m.mulvaney@omb.eop.gov

To: Public Buildings Reform Board, GSA
c/o Angela Styles, Board Member
angela.styles@pbrb.gov
fastainfo@pbrb.gov

To: National Archives
c/o David S. Ferriero, Archivist
david.ferriero@nara.gov

Re: CONSULTATION DEMAND – PROPOSED SALE OF THE SEATTLE BRANCH OF THE NATIONAL
ARCHIVES AND RECORDS ADMINISTRATION

To Whom It May Concern:

I write at the direction of the Yakama Nation Tribal Council Executive Committee
for the Confederated Tribes and Bands of the Yakama Nation to oppose to proposed closure
and sale of the Seattle Branch of the National Archives and Records Administration
("Seattle Branch"). The Seattle Branch holds a treasure trove of irreplaceable historical
information relating to the Yakama Nation. This 73-year old archive and records center
was created here in the Pacific Northwest to make vital historic information more
accessible for the people who were most likely to use them. The archives quietly and
without fanfare are a critical part of the Northwest historical repository for Native peoples,
giving them direct access to critical government documents regarding their history.

Without question, the Seattle Branch is an invaluable resource for Native peoples of
the Pacific Northwest. So the news that the Public Buildings Reform Board, a federal
advisory committee that has been in existence for less than year, has identified the
National Archives at Seattle as "High Value Asset" that should be sold to the highest bidder
through an expedited sale and disposal process, is a disturbing revelation. Even more
disturbing is that this determination was made in late December 2019 without following
the government-to-government tribal consultation requirements of Executive Order 13175
despite the clear "tribal implications" of this decision.[1]

---

[1] *See* Exec. Order No. 13,175, 65 Fed. Reg. 67,249 (Nov. 9, 2000) (Consultation and Coordination with Indian
Tribal Governments) (requiring federal agencies to establish an accountable process to ensure meaningful and

The Yakama Nation regularly makes use of the National Archives at Seattle to carry out research of their history. If the National Archives at Seattle is sold, the archived materials will have to be moved. The materials will be split up, with records going to Kansas City, MO and Riverside, CA. Splitting up these records and archived materials will be a profound impediment to the Yakama Nation's historical work, increasing the time, labor, and costs necessary to access these critical records. The integrity of this vast collection, along with its ecosystem of archivists and librarians, which helps make the National Archives at Seattle an invaluable resource for the Yakama Nation, will be lost.

The federal government is looking to cash in on the property the archives sit on. But if it does so, it does it at the expense of access, preservation and protection of materials unique to the Yakama Nation. **The United States must engage in government-to government consultation before any final decision is made.** Moving forward without having consulted with the Yakama Nation is improper and the process must be halted and analyzed correctly. Until such time, we request you suspend this damaging and not-fully-considered sale and transfer.

Please respond to this request for government-to-government consultation in writing, with a courtesy copies to Mr. Ethan Jones, Lead Attorney for the Yakama Nation Office of Legal Counsel, at P.O. Box 150, Toppenish, WA 98948 and electronically at ethan@yakamanation-olc.org.

Respectfully,

*Virgil Lewis Sr.*

VIRGIL LEWIS, SR., CHAIRMAN
YAKAMA NATION TRIBAL COUNCIL

---

timely input by tribal officials in the development of regulatory policies that have tribal implications. Policies with tribal implications are ones that have substantial direct effects on one or more Indian tribes, on the relationship between the federal government and Indian tribes, or on the distribution of power and responsibilities between the federal government and Indian tribes.)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF VETA R. SCHLIMGEN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Veta R. Schlimgen, declare as follows:

1.    I am a professional historian with the rank of Associate Professor who teaches at Gonzaga University. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a historian.

2.    I am an expert in the history of the United States in the 20th century, particularly in the areas of U.S. expansion and empire, U.S. citizenship and constitutionalism, racial and ethnic relations (especially Asian American and Pacific Islander American), and the Pacific world. My research is on Filipinas/os in the U.S. West, and I am the author of "The Invention of 'Noncitizen American Nationality' and the Meanings of Colonial Subjecthood in the United States" (*Pacific Historical Review*) and "Filipino Students, Racial Formation, and the Consequences of Exclusion" (*Pacific Northwest Quarterly*). I hold a Doctor of Philosophy degree in History from the University of Oregon. I received the 2010 W. Turrentine Jackson

Award from the American Historical Association's Pacific Coast Branch for the best dissertation on 20th-century western history. In addition to Gonzaga University, I have worked as a historian and educator at the University of California, Riverside, California State University, Fullerton, and as the Director of the Brea Museum and Heritage Center in Brea, California.

3.     I have done extensive archival research on the West Coast, and the NARA Seattle branch has been crucial to my research. Indeed, part of the appeal of my job at Gonzaga is because of its geographic proximity to the Seattle archives. The many documents at NARA-Seattle provide rare details that help historians communicate the stories of migrants and immigrants from the Pacific region to the Pacific Northwest and Alaska. This includes people whose origins are in Oceania (ranging from the Marshall Islands and Micronesia to Guam and Samoa) and in Asia, from Korea to Indonesia. Historians like me need the NARA archives in Seattle to build and understand multi-directional histories. These histories explain the impact of U.S. expansion into the Pacific and its influence there as well as the origins of our regional diversity. Histories of Asian Americans highlight the unique dynamics of the Pacific Northwest when compared to California. And all these histories relied on NARA-Seattle sources.

4.     Specifically, I have used immigration case files on individuals who migrated from the Philippines and materials on Filipino who worked in Alaska and moved through the port at Seattle. These documents are significant because they reveal the terms of U.S. colonialism (and colonial policy) in the Philippines. For example, a few case files show that part-Chinese Filipinos were barred from entering the mainland U.S. (because the U.S. implemented Chinese exclusion laws in its Pacific colonies). Other documents provide insight into the Cold-War campaign of the Seattle Immigration inspector who worked to try to exclude Filipinos returning from Alaska. The value of these records on-site (and in physical rather than digital form) is that I happened upon source materials among case files. On-site archives provide greater access to the wealth of material in the NARA collection.

DECLARATION OF VETA R. SCHLIMGEN                    2                    ERROR! AUTOTEXT ENTRY NOT DEFINED.

371

5. I have used—and plan to continue to use—NARA Seattle materials to reconstruct the history of migration between the Asian Pacific, Oceania, and the western United States. The Seattle NARA records provide a unique portrait of Filipina/o migration to the U.S., one that is distinct from the stories told by the records at the NARA San Bruno location. Pacific Northwest migrants had a different background and purpose than California migrants, something demonstrated by the Seattle NARA records. I have documented these distinctions in journal articles I published, including a Summer 2020 article in the *Pacific Historical Review*.

6. These records are important to the work that historians do and to contemporary understandings of our region and national communities. They detail the terms of U.S. imperialism in the Pacific and, particularly, in the Philippines, as well as the on-going relationship the U.S. has with former colonies and dependent regions. I used NARA Seattle materials to understand the implementation of imperial law and the impact of this law on the Philippines and on Filipino communities in the Northwest.

7. The failure to notify any of my professional organizations, including the American Historical Association and the Society for Historians of American Foreign Relations, suggests a real lack of awareness of the significance of the Seattle NARA archives to the work of historians and the significance of this history to the region and the nation.

8. Removal of the NARA Seattle records will create obstacles to access. Specifically, I planned to use the archives, which are easier to access regularly in Seattle (I live in Spokane, about 300 miles away). Removal of the archives creates barriers to access and a greater financial burden to conduct research because of the need to travel beyond the Pacific Northwest.

9. Removal of this regional archives works against the purpose of the National Archives system by restricting access and creating geographic obstacles to free and open access to these records.

DECLARATION OF VETA R. SCHLIMGEN        3        ERROR! AUTOTEXT ENTRY NOT DEFINED.

372

I declare under penalty of perjury that the foregoing is true and correct.

DATED this fourth day of January, 2021, at Spokane, Washington.

*Veta Schlimgen*
Veta R. Schlimgen

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| STATE OF WASHINGTON, et al., | NO. 2:21-cv-00002 |
|---|---|
| Plaintiffs, | DECLARATION OF AARON M. SCHUTT |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Aaron M. Schutt, declare as follows:

1.      I am President and Chief Executive Officer of Doyon, Limited (Doyon), the Alaska Native regional corporation for Interior Alaska. I am also an enrolled Tribal member of the Native Village of Tanana. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been President and CEO of Doyon since 2011 and have worked at the company since 2006. Prior to my time at Doyon, I was a practicing attorney licensed in Alaska. I primarily represented Tribes and Alaska Native corporations.

3.      Doyon is headquartered in Fairbanks, Alaska. Doyon owns 12.5 million acres of land in Alaska that it received pursuant to the Alaska Native Claims Settlement Act (ANCSA) of 1971. Doyon has over 20,000 Alaska Native shareholders. As President and CEO, I am responsible for overseeing the business operations of the company, our shareholder records and relations, and land management, among other things. Each of these Doyon functions uses the records at the National Archives at Seattle periodically.

DECLARATION OF AARON M.          1
SCHUTT

1       4.       Doyon's Alaska Native shareholders live across the United States. On
2   December 17, 2020 Doyon's shareholder information system records indicate that we have
3   20,349 shareholders. The following are the locations of those shareholders:

4           • 3,663 rural Interior Alaska villages within the Doyon region;

5           • 5,494 Fairbanks and Fairbanks North Star Borough;

6           • 5,698 within Alaska, but outside of Interior Alaska; and,

7           • 5,494 outside of Alaska, including each of the forty-nine other states.

8   There are 1,476 Doyon shareholders living in the Pacific Northwest states of Washington,
9   Oregon and Idaho, including 1,056 Doyon shareholders living in Washington, 309 in Oregon,
10  and 111 in Idaho.

11      5.       The National Archives at Seattle houses many records important to Doyon and
12  to its individual shareholders. The National Archives at Seattle house some original ANCSA
13  records, pre-statehood Alaska land records, Alaska Census records, Bureau of Indian Affairs
14  (BIA) records for Alaska, and litigation records for the Federal District Court for the District
15  of Alaska. Many of these records are unique, rare, un-digitized, and otherwise unavailable
16  elsewhere. It is very important that Doyon's staff can browse physical records as opposed to
17  remotely requesting copies of documents sight unseen.

18      6.       Many of our Alaska Native shareholders have Certificates of Indian Blood
19  (CIBs) that are inaccurate or incomplete. Doyon uses CIBs for several purposes related to
20  shareholder status. The BIA issues CIBs to Alaska Natives based on its records. The BIA
21  records for Alaska are housed at the National Archives in Seattle. Many of our shareholder
22  records detailing shareholders' Alaska Native blood quantum are based upon original BIA
23  records from the 1970s and earlier. In 1992 and 2007, Doyon, pursuant to ANCSA began
24  enrolling descendants, born after 1971, of original shareholders. In order to receive these Class
25  C shares, a descendant must be at least one-quarter Alaska Native. It is critical for Doyon and
26  its shareholders to be able to access BIA records to help correct incomplete or inaccurate CIBs

1  that affect descendants' ability to enroll to Doyon and for voting status of other shareholders.

2  I have had to correct my own Doyon shareholder records related to my Alaska Native blood

3  quantum, that was based on my BIA CIB. I made this correction to ensure my Doyon

4  shareholder file is accurate for my children and future grandchildren.

5         7.     Doyon also uses the records stored at the National Archives at Seattle to help

6  protect the subsistence and conservation interests of its Alaska Native shareholders. ANCSA

7  extinguished aboriginal hunting and fishing rights for Alaska Natives throughout Alaska.

8  ANCSA, 43 U.S.C. §1603(b). The Alaska National Interest Land Conservation Act of 1980

9  (ANILCA) recognized a subsistence preference for rural Alaskans, including Alaska Natives

10  engaged in hunting, fishing and other subsistence uses on federal public lands included in

11  federal conservation system units. ANILCA, P.L. 96-487, Title VIII.  These records are

12  important as there is a now forty-year history of litigation in state and federal courts to protect

13  Alaska Native subsistence rights in these conservation system units.  The Seattle archives

14  facility is therefore used in connection with Federal programs for conservation purposes,

15  namely the Federal subsistence program in Alaska, including research in connection with that

16  program.

17         8.     I have also personally used the National Archives at Seattle in my professional

18  work. In 2016, I wrote an article published in the Alaska Law Review titled *ANCSA Section*

19  *7(i): $40 Million Per Word and Counting*, 33 Alaska L. Rev. 229 (2016). The article addressed

20  the long history of litigation in the 1970s and early 1980s around the revenue sharing provision

21  of ANCSA called Section 7(i). The records for the Federal District Court for the District of

22  Alaska are housed at the National Archives in Seattle. I used a number of those records in my

23  research and writing of the law review article.

24         9.     In 2017, I co-authored an article published in the Alaska Law Review titled *The*

25  *Grand Compromise: The ANCSA Section 7(i) Settlement Agreement*, 34 Alaska L. Rev. 201

26  (2017). The article addressed the settlement agreement that ended the long history of litigation

1  in the 1970s and early 1980s about ANCSA Section 7(i). The records for the Federal District
2  Court for the District of Alaska are housed at the National Archives in Seattle. I used a number
3  of those records in my research and writing of the law review article.

4      10.    Doyon learned from public media reports about the plan to relocate the records
5  of the National Archives stored in Seattle. In 2014, Doyon learned from public media reports
6  about the decision to close the Anchorage, Alaska National Archives facility and move all of
7  the Alaska records to the National Archives at Seattle.

8      11.    No federal agency or federal government representative contacted Doyon in
9  connection with the federal government's decision to sell the National Archives at Seattle. The
10  federal government has an obligation to consult with Doyon, as an Alaska Native corporation
11  for federal actions that impact an Alaska Native corporation, its lands or shareholders. It also
12  had this obligation in 2014 when it closed the Anchorage, Alaska facility and failed to uphold
13  its obligation.

15      I declare under penalty of perjury that the foregoing is true and correct.

17      DATED this _4_ day of _January_ , _2021_ at Anchorage, Alaska.

19                                        _Aaron M. Schutt_
20                                        Aaron M. Schutt

6 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

8 STATE OF WASHINGTON, et al.,          NO.

9                    Plaintiff,          DECLARATION OF WILLIAM E.
                                          SIMEONE
10         v.

11 RUSSELL VOUGHT, et al.,

12                    Defendants.

13      I, William E. Simeone, declare as follows:

14      1.      I am over the age of 18 and competent to testify. I make this declaration based

15 on my personal knowledge.

16      2.      I am an anthropologist who contracts with Alaska Native Corporations and

17 government agencies to research and write about the history and culture of Alaska Native

18 people.

19      3.       When there was a branch of the National Archives in Anchorage I frequently

20 used a variety of records including U.S. census data, reports from the Bureau of Indian Affairs,

21 letters and reports from the U.S. Fish and Wildlife Service, letters and reports from the U.S.

22 Department of Interior Department of Education, letters and reports from U.S. Department of

23 the Army, and letters and reports in the Congressional Record. These records provided

24 information and details about Alaska history and Alaska Native communities not available

25 anywhere else.  Moving the records out of Alaska made it more difficult for me to access

26 necessary data that enriched my research. Moving the archives out of Seattle and

1  storing the information in warehouses will make it impossible to access information that is

2  crucial to understanding Alaska Native history.

3        I declare under penalty of perjury that the foregoing is true and correct.

4  DATED this 30th day of December 2020 at Carbondale, Illinois.

5

6  William E. Simeone

7  William E. Simeone

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:21-cv-00002 |
| Plaintiffs, | DECLARATION OF POLLACK SIMON JR. |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Pollack Simon Jr., declare as follows:

1.     I am the Chief and Chairman of Dena' Nena Henash, known in English as the Tanana Chiefs Conference (TCC). I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.     TCC is an intertribal organization comprised of the thirty-seven federally recognized Alaska Native Tribes and five Alaska Native communities in the Interior Alaska Region.[1] TCC itself is an Indian Tribe under the Indian Self-Determination and Education Assistance Act. *See* 25 U.S.C. § 5381(b).

---

[1] The federally recognized Tribes located in the Tanana Chiefs Conference region are as follows: Alatna Village, Allakaket Village, Anvik Village, Arctic Village, Beaver Village, Birch Creek Tribe, Chalkyitsik Village, Circle Native Community, Evansville Village (aka Bettles Field), Galena Village (aka Louden Village), Healy Lake Village, Holy Cross Village, Hughes Village, Huslia Village, Koyukuk Native Village, Manley Hot Springs Village, McGrath Native Village, Native Village of Eagle, Native Village of Fort Yukon, Native Village of Minto, Native Village of Ruby, Native Village of Stevens, Native Village of Tanacross, Native Village of Tanana, Native Village of Tetlin, Native Village of Venetie Tribal Government, Nenana Native Association, Nikolai Village, Northway Village, Nulato Village, Organized Village of Grayling (a.k.a. Holikachuk), Rampart Village, Shageluk Native Village, Takotna Village, Telida Village,

3.     I am an enrolled Tribal member of the Allakaket Village, a federally recognized Tribe and one of TCC's member Tribes.

4.     TCC was formed in 1915, shortly after the Klondike and Alaska Gold Rushes, to negotiate with the United States Government, to protect our Alaska Native land rights, to fight for Tribal self-determination, and to encourage Alaska Native unity.  TCC has a long history of dealing with the United States Government, dating back to our earliest days. Because of our long history of dealings with the United States, many irreplaceable, important, historically and culturally significant federal documents relating to TCC and to our member Tribes are stored in the National Archives' Seattle facility.

5.     I have been the Chief and Chairman of TCC since October of 2020 and previously served as a TCC Executive Board Member and its Secretary / Treasurer. As Chief and Chairman, I am responsible for the general supervision, management, and control of the day-to-day operations of the programs, services, and activities of TCC in accordance with the policy and direction of the TCC Board of Directors.

6.     TCC is based in Fairbanks, Alaska.  TCC's vast Interior Alaska Region covers an area of 235,000 square miles, which is equal to 37% of the entire State of Alaska and is just slightly smaller than the size of the State of Texas.

7.     TCC is a signatory to the Alaska Tribal Health Compact with the United States Secretary of Health and Human Services, and carries out federal programs for Alaska Natives, American Indians, and other eligible individuals, through funding agreements with the Indian Health Service and the Bureau of Indian Affairs, as authorized by, *inter alia*, the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601 *et seq.*, P.L. 94-437, as amended, and Titles IV and V of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301 *et seq.*,

Village of Dot Lake, and Village of Kaltag.  Indian Entities Recognized by and Eligible To Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5466-67 (Jan. 30, 2020).

P.L. 93-638, as amended ("ISDEAA").  Pursuant to ISDEAA, TCC operates the Chief Andrew Isaac Health Center, a state-of-the-art regional health clinic in Fairbanks, Alaska, and provides health services in village clinics throughout most of the interior region. TCC provides a wide range of health care and social services in a way that balances traditional Athabascan and Alaska Native values with modern demands to the forty-two Alaskan communities in the Interior Region. TCC began in 1915 at a meeting of the Traditional Chiefs of the Athabascan Tribes of the Alaska Interior. At that time, the Traditional Chiefs of the Tanana Athabascan Tribes met with United States District Court Judge James Wickersham to negotiate over land, employment, education, conservation, health care and management of hunting and fishing resources in the Interior Region.  TCC subsequently incorporated as a nonprofit corporation "[t]o secure the Alaska Native people of the region of the Tanana Chiefs Conference the rights and benefits to which they are entitled under the laws of the United States and the State of Alaska," "[t]o promote the common welfare of the Natives of Alaska and their physical, economic, and social well-being," "[t]o seek an equitable adjustment and settlement of Native affairs and the land claims of the Native people of said region," and "[t]o promote good government," among other purposes. TCC is "the historic successor to the Tanana Chiefs Conference, the traditional consultative and governing assembly of the Athapascan people of Interior Alaska, from time immemorial, and shall have all of the rights, duties, powers, and privileges of this historic assembly."

8.     The National Archives at Seattle houses many irreplaceable records critically important to TCC, to its member Alaska Native Villages and Tribes, and to all our individual Tribal citizens in the Interior Region. The National Archives at Seattle house original Alaska Native Claims Settlement Act (ANCSA) records, pre-Statehood Alaska land records, Alaska Census records, Bureau of Indian Affairs (BIA) records for Alaska, and records of the United States District Court for the District of Alaska. Many of these records are unique, exceedingly rare, un-digitized, and unavailable elsewhere. It is absolutely critical that TCC's member

tribes, Tribal citizens and TCC's staff are able to review the original, physical documents and records at the Archives, as opposed to remotely requesting copies of documents sight unseen.

9.     The Alaska Native Claims Settlement Act, Alaska National Interest Lands Conservation Act, and pre-Statehood Alaska land records in the Archives are particularly important to TCC and Tribal citizens as those records relate to Alaska Native allotments, and applications for Alaska Native allotments.

10.    Briefly, in 1906, Congress passed the Alaska Native Allotment Act. It authorized individual Alaska Natives a homestead of up to 160 acres of land. In 1956, the Native Allotment Act was amended to require Native allotment applicants to provide proof of continuous use and occupancy of the land for five years. With the passage of ANCSA, the Native Allotment Act was repealed on December 18, 1971. However, all applications pending on or before December 18, 1971, with any agency of the Department of the Interior were allowed to be processed under the 1906 Act as amended.

11.    TCC has a Native allotment program that helps our Tribal citizens with pending Native allotment applications. Even though it has been just over forty-nine years since the passage of ANCSA and the repeal of the Native Allotment Act, many original and reconstructed Native allotment applicants and their heirs are still fighting for title to the land they used, applied for, and rightfully deserve.

12.    Given the passage of time between the filing of a Native Allotment application (prior to December 18, 1971) and today, proving continuous use and occupancy can be extremely difficult. Many Native allotment applicants must go through an administrative hearing process to prove continuous use and occupancy of the lands they applied for. These allotment hearings can take years, even decades, from start to finish.  Witnesses pass away, applicants' memories fade, and documents are lost as each administrative process continues along.

13.     ANCSA and pre-statehood records located at the National Archives at Seattle hold critical evidence that Tribal citizens can use to prove use and occupancy for their Native allotment applications. Moving the Archives' location from Seattle, a direct flight from Fairbanks or Anchorage, Alaska, will effectively make access impossible for Tribal citizens. Most Native allotment applicants do not have the means, whether it be health or financial, to travel further than Seattle to search these records or pay someone to travel further to search these records.

14.     The Archive's records also contain information that help settle land disputes between Native allotment owners and local, regional, and statewide government agencies. One example is when the State of Alaska wants to authorize a public trail through a Native allotment for recreational use and there is disagreement over whether the trail was used, and for what purpose, during the period Alaska was a Territory. In a recent United Stated District Court case involving that issue, the documentary evidence needed included federal records related to the use of specific trails during the early 1900's. These sorts of records are often found in the Archives and nowhere else.

15.     Another example is when federal and State conservation priorities impinge on Native allotment owners' rights and impinge on the subsistence hunting and fishing rights of Tribal members. Moving the National Archives from Seattle to Kansas City or Riverside will cause needless expense and make it difficult—and insurmountable for many Tribal members—to do the research necessary to resolve these disputes and to present evidence to the Courts.

16.     Furthermore, under the FAST Act, exempt properties include properties used for research in connection with federal programs for agricultural, recreational or conservation purposes. Section 3(5)(B)(viii). The National Archives at Seattle is used for research in connection with federal conservation programs in Alaska.

17.     This research includes materials collected by the Federal Field Committee for Development Planning in Alaska, which produced the seminal 1968 report which documented

1 (among other things) federally-owned areas of Alaska used by Alaska Natives for hunting,

2 fishing and other subsistence activities. The 1968 Report provided much of the factual basis

3 for both the 1971 Alaska Native Claims Settlement Act and Title VIII of the 1980 Alaska

4 National Interest Lands Conservation Act (ANILCA).

5 18. ANILCA, in particular, set aside massive federal conservation system units

6 across Alaska and through Title VIII reserved for Alaska Natives and other rural Alaska

7 residents a preferential right to engage in subsistence activities (including hunting and fishing)

8 in those conservation system units under a federal subsistence conservation program operated

9 jointly by the Department of the Interior and the Department of Agriculture. The Title VIII

10 regime operates principally though the Federal Subsistence Board, ten regional advisory

11 councils, and numerous local advisory committees, and council and committee records are

12 maintained in the National Archives at Seattle.

13 19. TCC participates regularly and actively in championing the subsistence rights

14 of its member Tribes before the Board and the regional councils, and in providing support for

15 its tribal governments in proceedings before those bodies. The National Archives at Seattle is

16 therefore integral to research in connection with federal conservation programs in Alaska.

17 20. TCC first learned about the Government's intent to relocate the Seattle National

18 Archive records in early December, 2020. No federal agency or federal government

19 representative contacted TCC about this decision or engaged in an effective, meaningful Tribal

20 consultation with TCC or any of its member Alaska Native Villages and federally recognized

21 Tribes about this decision.

22 ///

23 ///

24 ///

25 ///

26 ///

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4ᵗʰ day of January 2021 at Fairbanks, Alaska.


Pollack Simon Jr.
Tanana Chiefs Conference
Chief / Chairman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| STATE OF WASHINGTON, et al., | NO. |
|---|---|
| Plaintiff, | DECLARATION OF CHARLES W. SMYTHE |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, CHARLES W. SMYTHE, declare as follows:

1.      I am Director of the Culture and History Department at Sealaska Heritage Institute.  I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am a Ph.D. cultural anthropologist with extensive experience conducting ethnographic and ethnohistorical research (including archival research) in Southeast Alaska.  I served as a research administrator from 1979-82, designing and overseeing sociocultural impact studies in Alaska rural communities for the Bureau of Land Management. From 1982-1994, I was an independent research scholar during which I conducted anthropological and historical research in Southeast Alaska and other regions of the state, except for several years when I oversaw a $685,000 research project for the State of Alaska on the impacts of the Exxon *Valdez* oil spill on Alaska's oiled communities.  From 1994-2000, I was an anthropologist with the National Museum of Natural History, Smithsonian Institution, and from 2001 to 2013, I was the Ethnography Program Manager for the Northeast Region, National Park Service,

DECLARATION OF CHARLES W. SMYTHE        1        ERROR! AUTOTEXT ENTRY NOT DEFINED.

387

designing and overseeing ethnographic and ethnohistorical research projects in that region. During this time I served as a research consultant to SHI conducting archival and ethnographic research for a complex repatriation claim. I returned to Alaska in 2013 and have worked at SHI in my current position since that time.

3.     The attached list (AFN Letter) identifies the scope of NARA records held in Seattle that are important to me for research purposes. In particular, I have used records pertaining to the Native histories of Southeast Alaskan communities of Ketchikan, Wrangell, Petersburg, Tenakee and Haines including the following types: census, Native Townsite records from the General Land Office (now the Bureau of Land Management), records of the disposition of townsite lots held in trust by the Bureau of American Indian Affairs, records of Indian allotments, records (letters and reports of school officials) of the Bureau of Education pertaining to issues affecting Native populations in these communities, records of recommended or proposed reservations of tidelands for the exclusive use of Natives under the Organic Act of 1884, trials pertaining to such reserved lands, relevant newspaper records from 1867 to the 1960s, records relating to the Alaska Native Brotherhood and Sisterhood (the oldest Native organization in continuing operation in the US), records relating to civil rights (voting rights, the elimination of the dual school system, etc.) of the Alaska Territory that remained under federal control until 1959. These types of records are unique and do not exist in any other repository. For example, I attempted to track down records of tidelands reserves proposed for Ketchikan and Juneau at the National Archives in Washington, D.C., and was only able to discover a single entry for the Ketchikan Reserve in the original handwritten ledger book of all Indian reserves from throughout the United States – no other records apparently exist at the national level. The ability to browse physical records is essential for such research, for only through this technique is it possible to identify and/or follow-up suggestions and indications of further sources based on what has been discovered in the course of research, such as tracking

DECLARATION OF CHARLES W. SMYTHE          2          ERROR! AUTOTEXT ENTRY NOT DEFINED.

388

down sequential letters on the same topic within a specific agency using the name of the specific office or author.

4.     In Alaska, such historical research is often needed by agencies seeking information necessary for decision-making regarding the use or allocation of natural resources or to document the cultural and religious significance of cultural properties eligible for listing in the National Register. The historical research described above (#3) was carried out by myself as part of a Congressionally-mandated study sponsored by the USDA Forest Service and the DOI Bureau of Land Management and Bureau of Indian Affairs to examine why five communities in Southeast Alaska --- Haines, Ketchikan, Petersburg, Tenakee and Wrangell --- had been denied eligibility to form village or urban corporations under terms of the 1971 Alaska Native Claims Settlement Act. [Report entitled, A Study of Five Southeast Alaska Communities by the Institute of Social and Economic Research, University of Alaska-Anchorage, 1994).

5.     Another area in which federal agency records can be of high value for research and documentation purposes is the collection and analysis of cultural and historical data related to sites of cultural and religious significance to Southeast AK Native people that may be affected by federal undertaking or that may be eligible for listing in the National Register of Historical Places under Sections 106 and 110, respectively, of the National Historic Preservation Act, as amended (NHPA).  President Worl and I have independently gathered and utilized such documents in the conduct of research and documentation of the historical and cultural significance of historic sites and burial places in Southeast Alaska.  While our efforts have often utilized such documents acquired directly from federal agencies, these documents are the types of records that are retained by the federal archives.  This includes, for example, records of federal land transactions involving sites of cultural and historical significance, the documentation of such sites for purposes of protection and preservation, the identification and documentation of burial sites and petroglyphs, the documentation of the dimensions of

DECLARATION OF CHARLES W. SMYTHE     3     ERROR! AUTOTEXT ENTRY NOT DEFINED.

389

historical and cultural significance of cultural sites and landscapes, etc.  In Alaska, such activities are often regular and ongoing components of the responsibilities of federal land management agencies such as the DOI Bureau of Land Management,  National Park Service, Fish and Wildlife Service, and USDA Forest Service.  Historical documents are often brought into SHI's tribal consultations with these agencies regarding the identification, documentation, preservation treatment, and discussions of the historical and cultural significance of sites that may be eligible for listing in the National Register (Section 110) or may be subject to impacts from a federal undertaking (Section 106) (or that may be the subject of a violation of the Archeological Resources Protection Act).  Such documents may be presented by SHI or the federal agency during consultations, and in themselves become part of the consultation record. Often federal agencies have conducted their own investigation of such places, while in other instances SHI has done so.  For example, SHI recently succeeded in listing a traditional cultural property in Auke Bay (located in Juneau) in the National Register that utilized federal land records that identified and documented federal recognition of traditional uses of a tract of land that was practiced at the time the land was acquired by the National Park Service shortly after statehood, which was memorialized in the deed of transfer in the form of an easement. Similarly, records of a Bureau of Land Management survey that identified the presence of Indian graves on the sites were also important (see National Register of Historic Places Registration Form for *X'unáxi* (Indian Point/Auke Cape).

   6. One of my colleagues who has worked for years through the University of Washington and Portland State University has used the Seattle NARA facility on projects to document the cultural, religious, and historical significance of park resources for the National Park Service.  Such information is necessary for the design and implementation of appropriate management procedures for park resources significant to traditionally-associated peoples.  He reports that he has used the archives extensively for his research for Indian tribes and NPS units over the years through the multi-agency Cooperative Ecosystem Studies Unit (CESU)

DECLARATION OF CHARLES W. SMYTHE   4   ERROR! AUTOTEXT ENTRY NOT DEFINED.

**390**

system, including for studies with small and previously under-documented parks such as Ebey's Landing, Lewis and Clark NHP, John Day Fossil Beds, and others.

       7.  SHI President Dr. Rosita Worl was first informed on the impending closure and sale of the Seattle archives facility by the regional Indian tribe of Southeast Alaska, the Central Council of the Tlingit and Haida Indian Tribes of Alaska, via email dated Jan. 24, 2020. She received a link to an article published on a web site, MyNorthwest: https://mynorthwest.com/1670992/seattle-national-archives-closure-recommendation/?fbclid=IwAR1v5RbXKCwLctzrbya-fJJvnRFy0cRJcOiQi5xGmJc3WQx5GIMefqVA7DQ

This was extremely alarming to us for many reasons, and we wrote a letter objecting to the proposed closure to Russel T. Vought, Acting Director, Office of Management and Budget (attached). We also notified our Congressional delegation of our concerns. Subsequently, we learned that the Central Council followed suit with letters to the National Archives and the Alaska Congressional delegation, and also that the Alaska Historical Society was also fighting against this action.

Our letter came six years after the NARA repository in Anchorage, AK, was slated to be closed. At that time, we were informed that a portion of the records would be scanned for use by Alaskan researchers and were invited to submit a list of such records that were of high value to Alaska Native tribes and organizations. At that time, SHI President Worl was in discussion with Ms. Julie Kitka, President of the Alaska Federation of Natives (a statewide Alaska Native advocacy organization), about this issue. Dr. Worl supported the AFN effort to urge our senior Senator Murkowski to oppose the proposal, and along with other entities we provided to AFN a list of the NARA records that were of highest value for purposes of digitization. In July of 2014, Sen. Murkowski wrote to the United States Archivist urging him to stop the action and shared Ms. Kitka's letter with him (see attached letter with list of highly valued records). To

DECLARATION OF CHARLES W. SMYTHE      5       ERROR! AUTOTEXT ENTRY NOT DEFINED.

391

1  my knowledge, we have not received a response to any of these letters. The promise to digitize

2  prioritized archival records likewise has not materialized.

3      8.    By transferring the national archival collection relating to the Pacific Northwest

4  to some distant locale in the United States, and in addition by dividing it into two collections

5  as proposed, this action violates a trust responsibility of the federal government to house and

6  make available its records in the region to which they apply. It will mean that the collection

7  will be unavailable for many of the very people whom it is expected to serve, who will not be

8  able to afford travel-related costs to visit and view the collection. This will deny them access

9  to highly valued materials through which they can recover their histories and further, to learn

10  about and educate others about this history, and deny opportunities to researchers and scholars

11  to develop understanding of the history and use such understandings to contribute to public

12  knowledge and respond to the needs of state and federal agencies to incorporate such history

13  into their decision-making affecting the people of the United States.  This is important to all

14  peoples, but is especially important to those groups such as Native Americans whose histories

15  are underrepresented in many arenas and which SHI, for one, seeks to redress through its

16  cultural and historical research and publications on Southeast Alaska Native cultures.

17      9.    For an example, one of my employees worked at the Tulalip Tribes' Hibulb

18  Cultural Center from 2014-2017.  During this time period, she along with Hibulb Cultural

19  Center staff utilized the NARA in Seattle.  As Assistant Curator at Tulalip, she was responsible

20  for conducting background research and researching thematic content related to exhibits along

21  with the Senior Curator.  This exhibit research required utilizing outside resources such as the

22  archives and library.  The Hibulb Cultural Center had a small archive with material on the

23  Tulalip Indian Fair, but curatorial staff felt that they needed to find some additional information

24  on the fair and NARA would have this information available. In 2016-17, she went to NARA

25  three times with Hibulb Cultural Center staff to conduct preliminary research for the upcoming

26  exhibit on the Tulalip Indian Fair 1915-1927. At NARA she requested information on the

DECLARATION OF CHARLES W. SMYTHE    6    ERROR! AUTOTEXT ENTRY NOT DEFINED.

392

1  Tulalip Indian Fair from the early 1900s. This included viewing archival documents in the
2  form of historic photographs, pamphlets, a roster of attendees and events from the Indian Fair,
3  information on the cost of livestock and handicrafts, newspapers from the era, and letters from
4  the organizers of the Tulalip Indian Fair. This additional information enhanced some of the
5  other material on the Tulalip Indian Fair from Hibulb Cultural Center's library and archives at
6  Tulalip.  The information gathered at NARA was utilized for the exhibit that was placed on
7  information panels, object labels, and other exhibit related content. This enhanced the exhibit
8  and provided background information from the 1900s which could not easily be obtainable
9  from online resources.

11  I declare under penalty of perjury that the foregoing is true and correct.

13  DATED this 31st day of December, 2020, at Juneau, Alaska.

*Chuck Smythe*
CHARLES W. SMYTHE



Feb. 4, 2020

Russel T. Vought
Acting Director
Office of Management and Budget
725 17th Street, NW
Washington, D.C. 20503

Dear Mr. Russel T. Vought,

I am writing to express my deepest dismay and consternation about the decision to close the National Archives and Records Administration (NARA) Federal Archives and Records Center in Seattle, Washington. This facility houses invaluable records of vital importance to the Native communities in Alaska, and removing these records to California and Missouri will have a severe detrimental impact on these communities.

Already, Alaska's records were removed from the state after the closure of the NARA center in Anchorage in 2014. With the removal of archival records to Riverside, California, Alaskan materials will be far out of reach for Alaskan researchers, students, attorneys, government agencies, and the general public. By moving the records even further from Alaska, NARA is creating significant hardship for members of the public to see and use the materials as is their right. Only a tiny fraction of the materials have been digitized, despite promises to prioritize digitization when the facility in Anchorage closed. Indigenous records are particularly impacted by this move. The records of a community document the history and culture of that community, making them absolutely vital for cultural revitalization, repatriation, and personal or family research. The records held at the Seattle NARA facility are incredibly important to Native communities. Staff at Sealaska Heritage routinely refers researchers to the Seattle NARA facilities to conduct further studies for genealogy, scholarly work, and more with the extensive resources held in Seattle. Moving the records to California and Missouri will cause unacceptable hardship.

NARA's mission statement reads: "Our mission is to provide public access to Federal Government records in our custody and control. Public access to government records strengthens democracy by allowing Americans to claim their rights of citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government." By closing the Seattle facility and restricting the access of Alaska Natives and all citizens of Alaska to their own records, NARA is turning its back on the

very mission of the institution. A branch facility must be available in the Pacific Northwest to serve researchers in the Pacific Northwest and Alaska.

Additionally, this decision comes with no warning. No public input was requested before the decision was reached to close the primary access point to thousands of federal records that are not available elsewhere. The decision to close this facility must be rescinded until input from stakeholders and the public can be sought. This decision does not take into account the negative impacts this closure will have on the Native communities in Alaska, and their voices must be heard.

To rectify this grave error, the Office of Management and Budget (OMB) must reject the recommendation of the Public Buildings Reform Board (PBRB) to close the NARA facility in Seattle, Washington. Public input must be sought before any further action is taken, and Native communities must be a part of the conversation.


Sincerely,

Rosita Worl
President


CC:

Senator Lisa Murkowski
522 Hart Senate Office Building
Washington, DC 20510

Senator Dan Sullivan
702 Hart Senate Office Building
Washington, DC 20510

Congressman Don Young
Office of Congressman Don Young
2314 Rayburn House Office Building
Washington, DC 20515



**LISA MURKOWSKI**
ALASKA

COMMITTEES:
ENERGY AND NATURAL RESOURCES
Ranking Member

APPROPRIATIONS

HEALTH, EDUCATION, LABOR,
AND PENSIONS

INDIAN AFFAIRS

**United States Senate**

WASHINGTON, DC 20510-0203
(202) 224-6665
(202) 224-5301 FAX

July 10, 2014

510 L Street, Suite 600
Anchorage, AK 99501-1956
(907) 271-3735

101 12th Avenue, Room 329
Fairbanks, AK 99701-6278
(907) 456-0233

800 Glacier Avenue, Suite 101
Juneau, AK 99801
(907) 586-7277

805 Frontage Road, Suite 105
Kenai, AK 99611-9104
(907) 283-5808

1900 First Avenue, Suite 225
Ketchikan, AK 99901-6059
(907) 225-6880

851 East Westpoint Drive, Suite 307
Wasilla, AK 99654-7142
(907) 376-7665

The Honorable David Ferriero
Archivist of the United States
National Archives and Records Administration
8061 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

Enclosed is a letter from Julie Kitka, President of the Alaska Federation of Natives (AFN), regarding the closure of the National Archives and Records Administration (NARA) facility in Anchorage, Alaska and the digitization of important record groups currently housed there. AFN is Alaska's largest statewide Native organization representing 151 federally-recognized tribes, 134 village corporations, 12 regional corporations, and 12 regional nonprofit and tribal consortia. Ms. Kitka's letter lists a number of record groups that are important to Alaska's Native peoples and asks that these records be included as high priority for digitization.

I understand that the period for the public to comment on digitization priorities officially ended on June 30th, and that your staff may have already identified some of the record groups listed by AFN as high priority. Nevertheless, given that your agency is required to consult with tribes on a government-to-government basis, and to consult with Alaska Native corporations and consortia, I believe it is important for you and your staff to review the entire list prepared by AFN and understand the importance of all of these records to Alaska's Native peoples. The expense and difficulty involved in travelling from rural Alaska to Seattle cannot be overstated. Yet, many of these records contain information that is important to the history and culture of Native Alaskans and the sovereignty of their tribal governments. Digitization will enable this information to be readily available to all those who rely on it.

I therefore encourage you, as NARA begins the digitization process and works toward developing a full digitization plan and timeline, to give full and serious consideration to the enclosed list. I look forward to hearing from you about this important matter.

Sincerely,

Lisa Murkowski
United States Senator

cc:    Julie Kitka, President, Alaska Federation of Natives
       Gloria O'Neill, President/CEO, Cook Inlet Tribal Council
       Dr. Rosita Worl, President, Sealaska Heritage Institute

Enclosure



ALASKA FEDERATION
OF NATIVES

July 11, 2014

Sent Via Electronic Mail
The Honorable Lisa Murkowski
United States Senate
709 Senate Hart Office Building
Washington, D.C. 20510
Megan_Alvanna-
Stimpfle@murkowski.senate.gov

The Honorable Mark Begich
United States Senate
111 Senate Russell Office Building
Washington, DC 20510
Andrea_Sanders@begich.senate.gov

The Honorable Don Young
United State House of Representatives
2314 Rayburn House Office Building
Washington, D.C. 20510
Alex.Ortiz@mail.house.gov

Re: National Archives and Records Administration; Anchorage Facility Closure

Dear Senators Murkowski and Begich and Congressman Young:

I write on behalf of the Alaska Federation of Natives (AFN), the largest statewide Native organization in Alaska, to express our grave disappointment with the National Archives and Records Administration (NARA) decision to permanently close its Anchorage facility and to transfer millions of pages of records vital to the Alaska Native community to its Seattle facility.

I further write regarding NARA's intent to digitize its Alaska records—from Seattle—so that they may be readily accessible to all Alaskans via the Internet. AFN unequivocally supports this pronouncement. However, we request your assistance in urging the agency to designate the following Alaska Native records as a "high priority," and digitize them straight away for immediate availability:

| RECORD GROUP/COLLECTION NO. | TITLE |
|---|---|
| RG 75 | Alaska Village Census (all volumes) |
| RG 435 | Indian Arts and Crafts Board |
| RG 75 | Alaska Reindeer Service, 1901-1974 |
| RG 22; 370 | Pribilof Island Materials, 1872-1970 |
| RG 18 | Aerial Photos of Attu Island |

| | |
|---|---|
| RG 48 | Alaska Native Claims Settlement Act, 1972-1990 |
| RG 95 | Correspondence Relating to CCC Activities, 1937-1942 |
| RG 95 | Correspondence Relating to Creating of National Forests in Alaska, 1903-191 |
| RG 21 | Civil Case Files, 1884, Sitka |
| RG 21 | Civil Case Files, 1900, Juneau |
| RG 21 | Civil Case Files (New Series), 1960, Juneau |
| RG 48 | Alaska Native Claims Settlement Act, 1977-1987, Office of Secretary of Interior |
| RG 48 | Alaska Native Claims Settlement Act, 1990, Office of the Solicitor |
| RG 48 | Appeal Case Files, 1971, Office of the Solicitor |
| RG 48 | Claim Case Files, 1970-1995, Office of the Solicitor |
| RG 48 | Claim Files, 1993-1989, Office of the Solicitor |
| RG 48 | Indian Land Administration Files, 1990, Office of the Solicitor |
| RG 49 | Rejected Native Allotment Case Files, 1923-1967, Bureau of Land Management |
| RG 49 | Selected Townsite Trustee Deeds, Deed Books and Tract Books |
| RG 49 | Native Assertion of Rights Contest Files, 1965-1972, Fairbanks District Office |
| RG 57 | Project Chariot Files, 1958-1963, USGS |
| RG 75 | Alaska Reindeer Service (all) |
| RG 75 | Bureau of Indian Affairs (all) |
| RG 79 | Cultural Resource Studies, 1964-1983, Alaska Regional Office |
| RG 79 | Subject Files [Cultural Resource Studies], 1964-1984, National Park Service |
| RG 79 | Cultural Resource Studies and Research, 1964-1990 |
| RG 90 | History Files, Alaska Native Health Service |
| RG 95 | Land Case Files, 1903-1989, Forest Service Region 10 |
| RG 95 | Historical Photograph Files, 1908-1994, Forest Service |
| RG 95; 10 | Correspondence Relating to Civilian Conservation Corps Activities, 1937-1942 |
| RG 95; 10 | Correspondence Relating to the Creation of National Forests in Alaska, 1903-1911, Forest Service |

RG 220          Subject Files, 1964-1971, Federal Field Committee
RG 370          Copy Negatives (Black & White), 1925-1959,
                    Commercial Fisheries

      Thank you in advance for your careful consideration of AFN's request. If you have any questions or comments about this letter, please contact me directly.

                Sincerely,
                ALASKA FEDERATION OF NATIVES

                Julie E. Kitka

                Julie E. Kitka
                President

Cc:     William A. Mayer, Executive-Research Services, NARA
        Gloria O'Neill, President/CEO, Cook Inlet Tribal Council
        Dr. Rosita Worl, President, SeaAlaska Heritage Institute

December 28, 2020

Dear Office of the Attorney General:

Formerly known as the Organization of Chinese Americans, OCA Asian Pacific Advocates was founded in 1973 with a vision of uniting Chinese Americans across the United States into one representative voice. Today, OCA has transformed into a national organization dedicated to advancing the social, political, and economic well-being of Asian Pacific Americans in the United States. OCA is nonprofit, non-partisan organization representing over 10,000 people nationally, including affiliates, college affiliates, and general membership.

The Greater Seattle Chapter ("OCA-GS") was formed in 1995 as an affiliate of the national OCA organization. Since its inception, OCA-GS has served the Greater Seattle Chinese and Asian American and Pacific Islander American community as well as other communities in the Pacific Northwest. It is recognized in the local community for its advocacy of civil and voting rights as well as its sponsorship of community activities and events.

The National Archives facility located in Seattle, Washington is fundamental to our community's conservation and educational efforts relating to immigrant and Native/Indigenous ancestry and history. These Archives house critical information that must remain accessible to the communities, specifically the Northwest communities, since it holds our histories. For our members and the communities we serve, the Archives provide a critical source of information in the following ways:

- The Archives have been used as an educational resource for our local college and university faculty who rely on access to the Archives for research and classroom teaching purposes.
- For our Asian and Native/Indigenous communities, the Archives are a critical tool to be used to learn more about their history. Through these public records, we can connect generations through their life experiences. In fact, two of OCA-GS's former past Presidents have relied on these Archives to write and publish their books, which have historical significance to our community and state.
- Many of our members, including the current OCA-GS President, are descendants and/or relatives of Japanese, Filipino, and Chinese veterans of World War II. We used the Archives to gather information to support the efforts to award the Congressional Gold Medal to our veterans.
- The Archives are critical partners in the conservation of our community's history. The Archives' numerous government documents include court records, documents from the Bureau of Indian Affairs, military records, genealogical records, and immigration records as well. Of particular

PRESIDENT
Connie So

VICE PRESIDENT
Bruce Huang

SECRETARY
Alyssa Au

TREASURER
Chi Saeteurn

BOARD MEMBERS
AT LARGE
Amy Huang
Frank Irigon
Kendall Kosai
Willon Lew
Travis Quezon
Jacqueline Wu
Terry Yaplee
John Yasutake

Founded in 1973 as the Organization of Chinese Americans, OCA is a national organization dedicated to the social, political, and economic well-being of Asian Pacific Americans in the United States.

OCA NATIONAL CENTER | 1322 18th St NW Washington DC 20036
T 202 223 5500 | F 202 296 0540 | www.ocanational.org | oca@ocanational.org

400

interest to OCA-GS are the Chinese Exclusion Act files that cover not only Washington, Oregon, Idaho, and Alaska from the 1850s to 1980s, but also include Chinese who entered the U.S. through any of these states but settled or visited elsewhere in the U.S. Volunteers have carefully created one of the best NARA indices of these files. One notable person in their files was Soong Mei Ling Soong, also known as Madame Chiang Kai-shek, who, in 1937, was named along with her husband as *Time's* "Man and Wife of the Year."

Most Chinese Americans left few records of their lives and history prior to 1950, but the Archive's record of the exclusion files document families, marriages, lifestyles, occupations, businesses, land ownership, religion, food, medicine, travels to and from China, networking, organizations, and other information that otherwise cannot be obtained. John Jung's 2020 publication of "In Search of Chinese Immigrants" and Trish Hackett Nicola's September 16, 2020 lecture posted on the Legacy website demonstrates the versatility and usefulness of the Chinese Exclusion Act files.

Moving the files to NARA Riverside or Missouri would be a great loss to scholars and American citizens of Asian and Pacific Islander ancestry, many of whom have played an important role in the development of the United States, such as former Washington Governor Gary Locke and numerous other political, judicial, and economic leaders. It would be a disservice to the general population in their ability to conveniently utilize these documents to learn about their history.

We look forward to working with the Attorney General's Office in their efforts to save the Archives facility in Seattle from closure.

Sincerely,

Connie So
President
OCA Asian Pacific Advocates, Greater Seattle Chapter

1

2

3

4

5

6          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF WASHINGTON**
7

8      STATE OF WASHINGTON, et al.,              NO.

9                        Plaintiff,               DECLARATION OF GARY C.
                                                  STEIN, PH.D.
10         v.

11     RUSSELL VOUGHT, et al.,

                        Defendants,
12

        I, Gary C. Stein, declare as follows:
13

14      1.      I am a retired historian. I am over the age of 18 and competent to testify. I make

       this declaration based on my personal knowledge.
15

16      2.      I received my Ph.D. from the University of New Mexico in 1975. My major

       field was History of the American West with a specialization in Native American History. In
17
       my 45-year career I worked primarily as a research historian, rather than a teaching historian.
18
       My first such position was with the Cooperative Park Studies Unit (CPSU, a National Park
19
       Service funded project) on a project to identify Alaska Native historic sites that were eligible
20
       for selection by the 12 Alaska Native Regional Corporations under Section 14(h)(1) of the
21
       Alaska Native Claims Settlement Act of 1971. I then worked for the Alaska Department of
22
       Natural Resources in Anchorage on a project to identify the historic uses of Alaska's navigable
23
       rivers, lakes, and streams. Finally, I worked for the Bureau of Indian Affairs' Branch of
24
       Acknowledgement and Research in Washington, DC, researching the history of Native
25
       American groups seeking acknowledgement as federally recognized Indian tribes. In my
26

DECLARATION OF GARY C. STEIN          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

402

1 retirement I continue to write and publish on Alaska History, utilizing research materials that
2 I have identified over more than 40 years, much of which is now housed at the Seattle Federal
3 Records Center.

4     3.     The first time I conducted research at the Seattle Federal Records Center was
5 in 1972, when I was with the CPSU in Fairbanks. The records center was helpful in gathering
6 information relating to the identification of historic sites throughout the Aleutian Islands,
7 which led to the publication of my *Cultural Resources of the Aleutian Region*. 2 Vols.
8 Anthropology & Historic Preservation, Cooperative Park Studies Unit, University of Alaska-
9 Fairbanks, *Occasional Papers No. 6*, 1977, as part of the broader 14(h)(1) project. I was also
10 able to do some personal research about the Japanese removal of the Native population of Attu
11 Island to Japan as prisoners of war during World War II. This research, primarily in manuscript
12 records of the Bureau of Indian Affairs, Governor of Alaska Papers, and Fish & Wildlife
13 Service records, led to my presenting a paper—"Uprooted: Native Casualties of the Aleutian
14 Campaign of World War II"—at the Western Historical Association's annual meeting in 1976.
15 It was the first historic study of the removal of the Attuans to Japan.

16     4.     The next time I conducted research at the Federal Records Center in Seattle was
17 in 1991, when I assisted a colleague from the Bureau of Indian Affairs in his research on one
18 of the Native groups in Washington State that was petitioning for recognition as an Indian
19 tribe. We looked at a host of manuscript materials dealing with Native history in the state from
20 the 19th century through the 20th.

21     5.     There are thousands of pages of rare, one-of-a-kind, undigitized documents at
22 the Federal Records Center in Seattle. It is highly unlikely that funding will be available any
23 time soon to properly go about digitizing these records. This will have a stifling effect on
24 research whether its by scholars studying a specific topic in Pacific Northwest history,
25 attorneys or their clients researching the ins-and-outs of specific legal questions, or individuals
26 simply interested in family or local history. Native tribes, especially, and their members will

DECLARATION OF GARY C. STEIN     2     ERROR! AUTOTEXT ENTRY NOT DEFINED.

403

1 have a difficult time identifying records that have gone to California or Missouri that might be
2 pertinent to their research.

3 6. As noted above (item 2) I continue to write about Alaska's history in my
4 retirement. Many of the research materials that I still carry around with me are copies of
5 manuscripts that are now located at the Seattle Federal records Center. This is particularly true
6 because some of these documents were once held by the National Archives Pacific-Alaska
7 Region in Anchorage. That records center was an important place to do research (2 to 3 times
8 a week) when I returned briefly to Alaska in 2012-14. I was able to finish researching the book
9 I was working on relating to the Alaskan activities of the U.S. Revenue-Cutter Service (a
10 predecessor of the U.S. Coast Guard). Documents relating to those activities were found in a
11 wide range of record groups, from Coast Guard records themselves, Bureau of Indian Affairs
12 records, Federal District Court documents, Pribilof Island logbooks held in National Oceanic
13 and Atmospheric Administration records, and many others. One specific thing I noticed was
14 that manuscript records I had once seen at the U.S. Coast Guard Academy Library in New
15 London, Connecticut, had at some point been transferred to the Anchorage records center.
16 These are invaluable documents for Pacific Northwest and Alaska history. Moving them from
17 Anchorage to Seattle was outrageous in itself. Throwing them further away from legitimate
18 researchers is worse.

19 7. I first learned of the impending sale of the National Archives facility in Seattle
20 from colleagues in Alaska in January 2020. It was certainly a shock to hear that this was
21 happening. Now, with another projected moved of these records within only seven years, the
22 types of researchers able to access needed records will be further limited. As Alaska's
23 Congressional Representative, Don Young, wrote to David Ferriero, Archivist of the United
24 States, on February 19, 2020, "When the National Archives in Anchorage, Alaska, closed in
25 2014, about 20,000 cubic feet of pre-archival and permanent archival records were shipped
26

1  from Anchorage to Seattle. NARA promised the residents of Alaska that the records would at

2  least stay in the Pacific Northwest." It is time to keep that promise.

3      8.     Those of us who write the history of the Pacific Northwest were waiting

4  patiently for the promised digitization of records that had been removed from Alaska in 2014.

5  Now we are afraid that the process will not go forward for a lifetime.

6

7  I declare under penalty of perjury that the foregoing is true and correct.

8  DATED this _29th_ day of ___December, 2020_ at St. Louis, Missouri.
        day              month      year

9

10

11                              Gary Carl Stein, Ph.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF GARY C. STEIN          4          ERROR! AUTOTEXT ENTRY NOT DEFINED.

405

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF JULIE K. STEIN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Julie K Stein, declare as follows:

1.      I am the Executive Director of the Burke Museum, Washington State Museum of Natural History and Culture, which is fiscally managed by the University of Washington. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and information collected in in my capacity as the Executive Director of the Burke Museum.

2.      I have been a professor at the University of Washington (UW) for 40 years, and Executive Director of the Burke Museum for 15 years. As Executive Director, I am responsible for the staff, budgets, and facility of the Burke Museum, including providing access to the descendants of the people who made the objects we hold in trust. Prior to serving as Executive Director of the Burke Museum, I was Divisional Dean of Research, Computing, and Facilities, College of Arts and Sciences, University of Washington, and Curator of Archaeology at the Burke Museum, and Professor of Anthropology.

DECLARATION OF JULIE K. STEIN          1          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**406**

3.     The Burke Museum was founded in 1885 by the Young Naturalists, a group of curious teenagers inspired by seeing Seattle transform before their eyes. For 135 years, the Burke Museum has built upon this legacy, collecting objects that help us understand how the Northwest has grown and changed. The designation of Washington State Museum ensures that this collection would be a public resource for generations. The Burke Museum cares for and shares natural and cultural collections so all people can learn, be inspired, generate knowledge, feel joy, and heal.

4.     The Burke Museum is a public museum that helps researchers, students, families, advocates, and the general public to gain information about the objects we have, which includes helping them access the archival information that resides in the National Archives facility in Seattle. We help them get started and direct them to the resources they need. Most of our cultural and natural objects are from the Northwest region, and are directly tied to the National Archives.

5.     We learned in February of 2020 from Senator Maria Cantwell, and via an article in the Seattle Times, of a planned sale and closure of the National Archives facility in Seattle.

6.     Closure of the National Archives facility in Seattle would seriously hamper the ability of the Burke Museum's affiliated faculty and research associates to conduct research on, among many subject areas, including local tribal land, allotment, conservation, and related histories. Access to the National Archives directly impacts our ability to support not only our own mission but our faculty, graduate students, and tribal partners, all of whom regularly use the National Archives facility to conduct research for the enhancement of public knowledge, the understanding of Northwest history, and for understanding the history and rights of Indigenous communities.

7.     Closing the Seattle National Archives facility and moving the records outside of Seattle would have a devastating impact on the Burke Museum's research efforts in connection with Native American Tribes. For instance, several members of the Burke

DECLARATION OF JULIE K. STEIN          2          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**407**

Museum's Native American Advisory Board (NAAB) use the Seattle Archives for research on boarding schools, food sovereignty, fishing rights, public education curriculum development, and language repatriation and renaming of important landmarks. This research is often implemented into museum exhibits on display at the Burke Museum.

8. Moreover, a number of Burke Museum staff and NAAB members have used the Seattle Archives for numerous heritage preservation workshops/trainings for collections care and disaster recovery. Their space, staff and resources are beneficial to all cultural institutions in our area. They are charter members of the Seattle Heritage Emergency Response Network (SHERN) and instrumental in building a regional emergency response network and supply cache. They are valued partners in preservation and disaster preparedness.

9. Additionally, K. Tsianina Lomawaima, the Burke Museum's former Adjunct Curator of Anthropology, conducts research and teaches classes on Native nations and federal Indian policy, particularly the federal Indian school system. To do so, she regularly used access to records at Sand Point for her own research and to train Native students in the methods of historiography and to introduce them to records critical to the histories of their communities in the Pacific Northwest. The records pertinent to American Indian Native nations housed in the NARA Regional Records Center at Sand Point are invaluable resources for the Native peoples of the states and region served. These records are not replicated – but rather are complemented – by the records in Washington, DC. Whereas the DC archives house records from the offices and perspective of the BIA Central Office, the regional centers, including the Seattle facility, house records from the local federal Indian agencies (reservations, villages, schools, hospitals, and such). The information that is available relatively close to hand to Native researchers is critically important and simply irreplaceable. Although generated and archived by the federal bureaucracy these records contain abundant documentation of Native lives, voices, and experiences – such as school records, Tribal Council minutes, correspondence, photographs, maps, and much, much more. Washington state alone is home to 29 federally recognized tribes

DECLARATION OF JULIE K. STEIN          3          ERROR! AUTOTEXT ENTRY NOT DEFINED.

408

(with many located in the Puget Sound area or within a day's travel of Sand Point); add in Alaska, Oregon, and Idaho and documentation central to the histories and experiences of hundreds of Native Nations and Alaska Native villages are at stake.

10. Removing the physical records contained at the National Archives in Seattle from the Northwest would also effectively deprive many of the Burke's tribal partners from being able to access these records at all. For instance, the Burke Museum and the Seattle Archives already serve as an information database for NAAB member Nisqually tribe, who currently do not have the archival resources or facilities built for such a use. Having local, physical access to the records at the Seattle facility is critical for many Nisqually kids who want to learn about their heritage. These children might not be able to travel to Kansas or California to conduct their research. Additionally, NAAB member Suquamish tribe regularly uses the Seattle facility's collection of records regarding tribal fishing rights.

11. Finally, for decades, the Burke Museum has been host to researchers who have traveled to Seattle from across Alaska and Washington specifically to do research at the Seattle National Archives facility. Due to travel costs, these trips are combined with research scheduled at the Burke Museum in Seattle. The research at the Seattle facility has been focused on Indian land claims, treaty rights, boarding schools, and notes from Indian agents, as well as research on Japanese internment camps. It would be an excessive hardship if these archives were moved, and, for many in the Pacific Northwest, would effectively cut off access to these crucial historical public documents.

DECLARATION OF JULIE K. STEIN          4          ERROR! AUTOTEXT ENTRY NOT DEFINED.

**409**

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    DATED this   6    day of    January , 2021 at Seattle, Washington.

4

5

6    _____

7    Julie K. Stein
     Executive Director
8    Burke Museum, Washington State Museum of
     Natural History and Culture
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JULIE K. STEIN                    5          ERROR! AUTOTEXT ENTRY NOT DEFINED.

410

1
2
3
4
5
6                              UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
7                                      AT SEATTLE

8    STATE OF WASHINGTON, *et al*.,          Case No.

9                 Plaintiff,                 DECLARATION OF
                                             SAMUEL J. STILTNER
10                vs.

11   RUSSELL VOUGHT, *et al*.,

12                Defendants.

13

14        SAMUEL J. STILTNER, under penalty of perjury, declares as set forth below:

15        1.  I am a member of the Puyallup Tribe of Indians, one of the co-plaintiffs herein. I

16   was admitted to the Washington State Bar in 1977. Most of my career has been devoted to

17   the representation of sovereign tribal governments, but I have engaged in general practice as

18   well. I have been employed as the lead Fisheries Attorney of the Law Office of the Puyallup

19   Tribe since 2004. I began serving as the Director of the Law Office in 2013. I am 68 years of

20   age, competent to testify herein, and I make this declaration based on personal knowledge.

21        2.  The Puyallup Tribe is a federally recognized sovereign tribal government and a

22   party to the Medicine Creek Treaty of 1854, which was ratified and proclaimed in 1855. The

23   Tribe today has over 5,500 tribal citizens and is headquartered in Tacoma on the Puyallup

DECLARATION OF SAMUEL J. STILTNER – PAGE 1

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

411

1    Indian Reservation.

2        3.  Our Law Office serves as the in-house legal department of our tribal government.

3    We provide legal advice and representation to our tribal government and to all of its

4    departments, commissions and entities, and we report directly to the Puyallup Tribal Council,

5    which is the elected governing body of the Puyallup Tribe.

6                    **Tribal uses of the National Archives at Seattle in connection with**
                     **federal programs for agricultural, recreational, or conservation purposes,**
7                    **including research in connection with the programs.**

8        4.  The treaty tribes in Washington State use and rely upon the National Archives at

9    Seattle for historical evidence in support of their fishing rights, and to prove the locations of

10   their usual and accustomed fishing areas at treaty times. The tribes focus on those areas to

11   conserve and protect fish habitat and to enhance fisheries through the construction,

12   maintenance, and operation of salmon hatcheries. In most if not all cases their work is

13   supported by federal program funding; the most common statutory authority is Pub. L. 93-

14   638, which authorizes contracts awarded by the Department of the Interior under Title I of

15   the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301 *et seq*.

16   (hereinafter "ISDEAA"). These contracts are also used for the conservation and preservation

17   of other historical, cultural, and archeological assets, locations and values. This funding is an

18   exercise of the United States' trust responsibility to tribes.

19       5.  The Puyallup Tribe administers and performs federal programs, functions, services,

20   and activities under ISDEAA contracts. Our Law Office reviews all grant and funding

21   contracts before they are submitted to the Puyallup Tribal Council for approval and execution;

22   frequently, we assist in their preparation and negotiation. Our duties also include legal

23   guidance and review with respect to contract performance and compliance. My personal role

DECLARATION OF SAMUEL J. STILTNER – PAGE 2

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

1   is supervisory as well as direct, especially in Treaty fisheries matters.

2       6. An example of research at the National Archives building in Seattle to fulfill the

3   Puyallup Tribe's contractual obligations to the Department of the Interior under a "638

4   contract,", *i.e.*, a contract under the ISDEAA, is provided by the Declaration of Jeffrey Paul

5   Thomas, dated January 4, 2021, and submitted in this action (hereinafter "Jeff Thomas

6   Declaration"). Mr. Thomas is the Director of the Puyallup Tribe Timber, Fish, and Wildlife

7   (TFW) Program, which is a component of the Puyallup Tribal Fisheries Department.

8       7. Director Thomas's TFW Program is funded by an ISDEAA Title I contract. Our

9   office assisted with its preparation and negotiation, and we performed a full review of the

10  contract, as well as an FY 2020 modification, before they were submitted to the Puyallup

11  Tribal Council for review and execution. An excerpt from the contract documents, maintained

12  on file in our Law Office, which details some of the Tribe's contractual duties that are relevant

13  to this action, is the Scope of Work for the FY 2020 modification. A copy of the excerpt is

14  attached as Exhibit A hereto. One of the contractual duties undertaken by the Tribe in the FY

15  20 TFW contract modification required prioritizing the "potential of advancing the Tenalcut

16  (White) River crossing and prairies through the local, state and/or national historic register

17  nomination process – as a historically significant battlefield (or being associated with

18  significant persons, or being an archeological district)." (See Exhibit A hereto, last page,

19  where highlighted.) Director Thomas's declaration shows that in order to perform this

20  contractual duty for the Department of the Interior, it was necessary to review records that are

21  available only at the National Archives at Seattle.

22      8. In ¶¶ 5, 6, 9, and 10 of his declaration, Director Thomas provides testimony

23  concerning records he reviewed at the National Archives in Seattle concerning the military

DECLARATION OF SAMUEL J. STILTNER – PAGE 3

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

**413**

field actions and command reporting records of US Army troops produced during and after the Puget Sound Indian War. The records he reviewed included the correspondence between the local Indian Agent/Superintendent of the Puyallup Indian Agency and the Commissioner of Indian Affairs in Washington D.C., and significantly, the local correspondence between the US Army and the Washington Territorial Militia. These records, available only at the National Archives in Seattle, specify "the strategies, actions, and/or decisions they were making to subjugate the Puyallup Indians; and include the specifically-detailed day-to-day descriptions of the culture, the dynamics, the individuals, and/or the socio-political trends characterizing the early Puyallup tribal community membership and their government too." See Jeff Thomas Declaration at page 2, ¶ 4, lines 17 - 20.

**Loss of Puyallup Indian land through forced allotment and forced sale, discovered in the correspondence of the Puyallup Indian Agency and the records of the Puyallup Indian Land Commission maintained at the National Archives at Seattle.**

9. The loss of the Puyallup Tribe's land began in 1854 with the Medicine Creek Treaty, which ceded thousands of square miles of land to the United States. By 1904, most of what was left was owned by non-Indians and by business corporations owned by non-Indians. Learning the detailed steps and methods employed to accomplish this massive transfer of land required years of historical investigation by many members of our Tribe, and later by others with special backgrounds who were employed to help, under the direction of the Puyallup Tribal Council. Little was known about that period in our history because of the language barrier of that era. I have direct personal knowledge of some of that investigation, because when I was a college student in 1971-1972, I was one of those who were sent by our Tribal Council to the National Archives building in Seattle to review records and bring back copies.

10. I reviewed records of the Puyallup Indian agent/superintendent including

DECLARATION OF SAMUEL J. STILTNER – PAGE 4

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

correspondence to and from the Commissioner of Indian Affairs in Washington, D.C. Additionally, I reviewed records of the Puyallup Indian Land Commission, which was created and funded by a special act of Congress in 1893, later known as the Puyallup Allotment Act, designed specifically to break up our land and facilitate its sale to non-Indians. These records were contained in Records Group 75 of the Department of the Interior. The records also included correspondence with local officials and Tacoma business elites as well as transactional and auction records. The local records would not exist in any other location.

11.   The records enabled the Tribe to learn that the land acquisition process was dominated in a variety of ways by local business interests including the Northern Pacific Railroad, the publisher of a downtown Tacoma newspaper, the head of the local Chamber of Commerce, the president of a local real estate firm, and a timber company. Five individuals served as a kind of "pool" of guardians that were used to sell the land, because the Commission always chose one of the same five people, and they were all non-Indians. Often they sold the allotments on the very day after being appointed. Land was allotted to children with living parents, then one of the five non-Indian guardians was appointed for the child, and the guardian sold the child's land. These are examples of how the Puyallup Tribe lost its land, just from the time period of the records I was assigned to review. Land titles and other historical records for that time period and others were also reviewed by other researchers there and in other locations. I summarize the materials I reviewed to show that important information would never have been discovered if it had not been conserved by the Department of the Interior in Records Group 75 maintained at what was then called the National Archives and Records Center in Seattle (better known within our Tribe at that time as the "Sand Point Archives").

DECLARATION OF SAMUEL J. STILTNER – PAGE 5

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

**Lack of notice and denial of consultation.**

12. None of the defendant agencies contacted or provided notice to the Puyallup Tribe before deciding to sell the National Archives building in Seattle.

13. The Puyallup Tribal Council wrote to OMB, objecting to sale of the National Archives building in Seattle, and requesting government-to-government consultation. See Letter of Hon. David Z. Bean to then-Acting Director Russell Vought, Office of Management and Budget, emailed January 24, 2020. A true and correct copy of the letter is attached hereto as Exhibit B. No response to the letter was ever received.

14. The Northwest Indian Fisheries Commission, on behalf of its member tribes, including the Puyallup Tribe, wrote to OMB on January 28, 2020, with copies going to the Public Buildings Reform Board, the General Services Administration, and the National Archives and Records Administration, expressing concerns and requesting that the National Archives building in Seattle not be sold. None of the agencies with decision-making roles under the Federal Assets Sale and Transfer Act (FASTA) ever responded in any way to the letter.

I certify under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct. SIGNED this 5th day of January, 2021, at Tacoma, Puyallup Indian Reservation, Washington.

_____
Samuel J. Stiltner

DECLARATION OF SAMUEL J. STILTNER – PAGE 6

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

# Exhibit A

TO

DECLARATION OF SAMUEL J. STILTNER

ISO PUYALLUP TRIBE OF INDIANS

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | 1. CONTRACT ID CODE | PAGE | OF PAGES |
|---|---|---|---|
| | | 1 | 7 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| 0010 | See Block 16C | 0020209443 | |

| 6. ISSUED BY | CODE | A12 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | A12 |
|---|---|---|---|---|---|
| BIA NWRO 00012<br>911 NE 11TH AVENUE<br>Contracting Office<br>Portland OR 97232 | | | DOI, BIA NWRO<br>911 NE 11TH AVENUE<br>Contracting Office<br>Portland OR 97232 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|
| PUYALLUP TRIBE OF INDIANS<br>Attn: ATTN GOVERNMENT POC<br>3009 E PORTLAND AVE<br>TACOMA WA 98404-4926 | | | 9B. DATED *(SEE ITEM 11)* |
| | | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>A19AV00973 |
| CODE 0070297424 | FACILITY CODE | | 10B. DATED *(SEE ITEM 13)*<br>09/09/2019 |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA *(If required)* | | |
|---|---|---|
| 01 | Net Increase: | $123,502.00 |

## 13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |
| X | P.L. 93-638 Indian Self Determination and Education Assistance Act |

E. IMPORTANT: Contractor ☐ is not. ☒ is required to sign this document and return __1__ copies to the issuing office.

## 14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

CFDA Number:  15.034
DUNS Number:  146765938
- Single Agreement -
REASON FOR MODIFICAION:

(1) To provide One-time FY 2020 Timber, Fish and Wildlife (TFW) Project funds in the amount of $ 123,502.00. These funds are to be utilized in accordance to the attached Statement of Work and Budget. These funds will not result in an increase to the base in subsequent years.

All other terms and conditions remain unchanged.
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* |
|---|---|---|
| | | Kristine Whittaker  BIA-2019-L1-000117 |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| _____<br>*(Signature of person authorized to sign)* | | *Kristine Whittaker* | 2020.09.19<br>15:21:49 -07'00' |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

NAME OF OFFEROR OR CONTRACTOR
PUYALLUP TRIBE OF INDIANS

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Delivery Location Code: 0009817912 BIA P10 PUYALLUP TRIBE OF INDIANS 3009 E. PORTLAND AVENUE TACOMA WA 98404-4926 US | | | | |
| | Account Assignm: K G/L Account: 6100.252I0 Business Area: A000 Commitment Item: 252I00 Cost Center: AAPP10115T Functional Area: A0N311313.999900 Fund: 201A2100DD Fund Center: AAPP10115T PR Acct Assign: 01 Period of Performance: 10/01/2018 to 09/30/2023 | | | | |
| 00620 | MOD 10: ONE-TIME TFW Supplement Obligated Amount: $123,502.00 | | | | 123,502.00 |
| | -- AWARD SUMMARY -- | | | | |
| | MOD 9  $   85,385.00 MOD 10 $  123,502.00 | | | | |
| | TOTAL  $5,687,941.00 | | | | |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

March 25, 2020

Mr. Rudy Peone, Fisheries Biologist
DOI, Bureau of Indian Affairs
Northwest Regional Office
911 N.E. 11ᵗʰ Avenue
Portland, Oregon 97232-4169

RE: Puyallup Tribal FY-2020 "TFW Supplemental" Funds BIA Grant Proposal

Dear Sir,

The Puyallup tribal application for FY-2020 "Timber, Fish and Wildlife (TFW) Supplemental" funds is enclosed for your consideration, as instructed. The application package consists of: 1) a Puyallup tribal FY-2020 "TFW Supplemental" Activities Scope of Work, 2) an FY-2020 proposed budget (based upon a $123,502), and 3) a Puyallup tribal resolution specific to the FY-2020 "TFW Supplemental" grant funds application.

The package also includes a copy of the FY-2019 annual report for tribal TFW Supplemental (Forests and Fish Report) implementation activities conducted during FY2019, along with a cover letter specifically introducing the Puyallup tribal FY-2019 "TFW Supplemental" Activities Annual Report.

The Puyallup tribal FY-2020 scope of work describes that TFW Supplemental (Forests and Fish Report) implementation efforts will emphasize activities involving the following categories of work: forestry projects assessment and mitigation, forestry projects compliance, forest-based fisheries research, and forestry planning.

The BIA typically provides the Puyallup Tribe with TFW Supplemental (Forests and Fish Report) implementation funds under the P.L. 93-638 Annual Funding Agreement.

Please let me know if you have any questions or need further information.

Sincerely,

Jeffrey P. Thomas

Jeffrey P. Thomas, Senior Fisheries Biologist
Timber, Fish & Wildlife Program
Puyallup Tribe of Indians
6824 Pioneer Way West
Puyallup, WA 98371
(253) 680-5565/office; Jeffrey.Thomas@Puyalluptribe-nsn.gov

*Enclosures:* 1) Puyallup Tribe of Indians/FY-2020 BIA "TFW Supplemental" Funds Grant Proposal (including budget); 2) Puyallup Tribal Council Resolution No. 2 0 2 0 .

Bureau of Indian Affairs "TFW Supplemental" Grant Proposal
Puyallup Tribe of Indians FY-2020 "TFW Supplemental" Activities Scope of Work (03-13-20)

## PUYALLUP TRIBE OF INDIANS
## FISHERIES DIVISION

### FY-2020 "TFW SUPPLEMENTAL" ACTIVITIES
### Scope of Work
### (March 20, 2020)

## FORESTRY PROJECTS & TREATY RESOURCE PROTECTION

- **Forestry Projects Assessment & Mitigation**
  Review local forestry projects to both identify and fulfill their Timber/Fish/Wildlife Agreement fisheries, or other treaty resource assessment or mitigation needs.

- **Statewide Forestry Assessment/Mitigation Improvements**
  Monitor/respond to statewide forest practices assessment, process, or mitigation improvement actions - e.g. tribal scientist's coalition management proposals, forestry alternate plan rules or guidance, state Forest Practices Board adaptive management program implementation, etc.

## FORESTRY COMPLIANCE & TREATY RESOURCE PROTECTION

- **Forestry Projects Compliance Monitoring Activity**
  Promote or fulfill forestry compliance monitoring needs and responses, highlighting local tribal fisheries, or other treaty resource concerns.

## FORESTRY RESEARCH & TREATY RESOURCE PROTECTION

- **ACES 2020 International Conference: Convene Workshop & Organized Sessions**

  Research and highlight key concepts, tools and methods to use to recognize and/or accommodate local tribal integrated natural and cultural resource values, and ecosystem service-based tribal wellbeing goals. Organize and convene a preconference workshop and complementing mid-conference panel session for the ACES (A Community on Ecosystem Services) 2020 International Conference to spotlight baseline program, planning and enforcement concepts to use for protecting cultural ecosystem services. ACES International Conferences are held by the US Geological Survey and other pertinent federal natural resource-based service agencies, on a biennial basis.

- **T/F/W 2020 Cultural Resource Protection Leadership Negotiations**
  Monitor and participate in the WDNR-based TFW 2020 Cultural Resource Protection Negotiations as the TFW Program representative of the Puyallup Tribe. Puyallup TFW efforts will focus upon ensuring that the concepts and messages emerging from the negotiations are properly contextualized as to their merits in terms of the existing TFW tribal cultural resources risk assessment/protections system, and ensuring that all TFW tribal caucus needs and concerns are fully addressed via any 2020 TFW cultural resources protection negotiated provisions.

1

* **Puyallup Watershed Forests Stewardship Strategies Development**
  Promote culturally-recommended stewardship strategies within all of the forests in the
  Puyallup watershed, and upon the lands managed as industrial forests in particular. The
  need to use mutually reinforcing management system concepts, and the need to integrate
  local Timber, Fish and Wildlife implementation approaches for private forests with those
  being used by other federal, state or local entities within the Puyallup watershed will be
  advanced.

* **Local Forest Protection Research & Education**
  Promote/fulfill forest-related fisheries habitat or populations' research needs, especially
  involving local forestry corrective action or local fisheries resource mitigation concerns.
  Propose, implement and evaluate a tribal community cultural sovereignty curriculum
  focused upon the integrated natural and cultural resource protection concepts employed
  during Puyallup Tribal Timber, Fish & Wildlife (TFW) Program work.

* **Other Treaty Resources Research**
  Promote non-fish treaty needs via researching methods for integrating Puyallup tribal
  values into all treaty resource management, and working to enhance the current cultural
  resource protection system that TFW officials use to fulfill Puyallup tribal TFW cultural
  resource protection goals. The potential of advancing the Tenalcut (White) River crossing
  and prairies through the local, state and/or national historic register nomination process –
  as a historically-significant battlefield (or being associated with significant persons, or
  being an archaeological district) - will be prioritized for FY-2020 work, too.

## FORESTRY PLANNING & TREATY RESOURCE PROTECTION

* **Local Forestry Planning Entities and Activities**
  Represent tribal fisheries concerns related to the differing TFW cooperators whom are
  responsible for local forest planning, and the possible local forest planning decisions they
  might undertake.

* **FFR Implementation Planning Entities**
  Address tribal fisheries concerns regarding the statewide Forests and Fish Report (FFR)
  implementation planning entities and their specific FFR implementation efforts, mostly
  highlighting direct participation upon both the T/F/W Cultural Resources Roundtable, as
  well as the FFR Small Forest Landowners Advisory Committee.

* Statewide FFR Implementation Planning Entities – includes:
  FFR Tribal Scientists Coalition (incl. Tribal FFR Policy Workgroup)
  FFR Small Forest Landowners Advisory Committee [member]
  TFW Cultural Resources Roundtable [co-chair]
  FFR Research Committee & FFR Research Scientific Advisory Groups
  TFW Policy Group
  Washington State Forest Practices Boards or Agencies - Forest Practices Board, WDNR, WDOE, WDFW, DAHP, etc.
※※※◊※◊※◊※※※※◊※◊※※◊※◊※※※※◊※※※◊※◊◊※◊※◊◊※◊※◊※※◊◊※◊◊※◊※◊◊※◊◊◊※◊◊※◊※※※◊※◊◊※◊◊※◊◊※◊

# Exhibit B

TO

DECLARATION OF SAMUEL J. STILTNER

ISO PUYALLUP TRIBE OF INDIANS



**Puyallup Tribe of Indians**

Russell T. Vought
Acting Director
Office of Management and Budget
Executive Office of the President
1650 Pennsylvania Avenue, N.W.
Washington, D.C. 20503
Via Email: Russell.t.vought@omb.eop.gov

Dear Acting Director Vought:

As Chairman of the Puyallup Tribe I write to oppose Public Buildings Reform Board's recommendation to close and sell the National Archives and Records Administration's Sand Point Archive Center located in Seattle, Washington. We strongly urge the Office of Management Budget to reject this proposal.

The Sand Point Center is very important to the 272 federally-recognized tribes in the Pacific Northwest (Washington, Oregon and Idaho) and Alaska. Our Tribe relies on the Sand Point Center for access to critical historical documents. Among the many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, the Tribal leaders during treaty negotiations in the mid-19th Century, as well as original drafts of the treaties themselves. Importantly, this Office houses critical documents associated with litigation that document the Tribe's effort to protect our treaty rights and territory.

If the Sand Point Center is closed, all of its archived materials will need to be moved. We understand that records will be sent all the way to Kansas City, Missouri and other archived materials will be sent to Riverside, California. Obviously, such new locations will make it much harder for our Tribe and those in the Pacific Northwest and Alaska to access these historically important and culturally significant archived records and materials. A sale of the Sand Point Center will undoubtedly have an impact on tribes. In fact, it will be a profound, negative and irreparable impact. Yet, the Public Building Reform Board, the National Archives and Records Administration, the Office of Management and Budget, nor any other federal agency has engaged in government-to-government tribal consultation as required by Executive Order 13175. Worse, the federal agencies did not even alert Tribes about the proposed sale.

We call on you to reject the sale of the Sand Point Center. You can simply remove it from the list of proposed properties. At the very least, we ask you to delay any further steps toward selling the Sand Point Center until you engage in tribal consultation.

Sincerely,

David Z. Bean
Chairman

**From:** Kathryn Wray
**Sent:** Friday, January 24, 2020 3:08 PM
**To:** Russell.t.Vought@omg.eop.gov
**Cc:** Mary J. Pavel <MPAVEL@SONOSKY.COM>
**Subject:** Letter from the Puyallup Tribe of Indians

Mr. Vought,

Please find attached a letter from David Bean, Chairman of the Puyallup Tribe of Indians regarding the Sand Point Archive Center in Seattle, Washington.

If you have any difficulties opening the attachment, please let me know.

Kind regards,


Kathryn Wray

Kathryn C. Wray, RP
Registered Paralegal
Sonosky, Chambers, Sachse,
    Endreson & Perry LLP
1425 K. Street, NW, Suite 600
Washington, D.C. 20005
P. 202.682.0240 (ext. 677)
F. 202.682.0249D. 202.312.1677
kwray@sonosky.com

* * * * * * * * * * * * * * * * * * * * * * * * * N O T I C E * * * * * * * * * * * * * * * * * * * * * * * * *
This message is intended solely for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee, you are hereby notified that any use, distribution or copying of this message is strictly prohibited. If you received this message in error, please notify us by reply e-mail or by telephone (call us collect at (202) 682-0240) and immediately delete this message and any and all of its attachments.

**From:** Kathryn Wray
**Sent:** Friday, January 24, 2020 3:19 PM
**To:** russell.t.vought@omb.eop.gov
**Cc:** Mary Pavel

**Subject:** Letter from the Puyallup Tribe of Indians

Mr. Vought,

Please find attached a letter from David Bean, Chairman of the Puyallup Tribe of Indians regarding the Sand Point Archive Center in Seattle, Washington.

If you have any difficulties opening the attachment, please let me know.

Kind regards,

Kathryn Wray

Kathryn C. Wray, RP
Registered Paralegal
Sonosky, Chambers, Sachse,
Endreson & Perry LLP
1425 K. Street, NW, Suite 600
Washington, D.C. 20005
P. 202.682.0240 (ext. 677)
F. 202.682.0249D. 202.312.1677
kwray@sonosky.com

* * * * * * * * * * * * * * * * * * * * * * * * * N O T I C E * * * * * * * * * * * * * * * * * * * * * * * * * *
This message is intended solely for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee, you are hereby notified that any use, distribution or copying of this message is strictly prohibited. If you received this message in error, please notify us by reply e-mail or by telephone (call us collect at (202) 682-0240) and immediately delete this message and any and all of its attachments.

# Exhibit C

TO

DECLARATION OF SAMUEL J. STILTNER

ISO PUYALLUP TRIBE OF INDIANS



# Northwest Indian Fisheries Commission

6730 Martin Way E., Olympia, Washington 98516-5540

Phone (360) 438-1180          www.nwifc.org          FAX # 753-8659

January 28, 2020

Russell T. Vought
Acting Director
Office of Management and Budget
The White House
725 – 17th Street, NW
Washington, DC 20503

Re:    Opposition of Proposed Closure and Sale of Pacific Northwest Regional Archives (National
       Archives & Records Administration), Seattle, WA

Dear Acting Director Vought:

We would like to inform you of our concerns with the proposed closure and sale of the PNW
Regional Archives in Seattle, Washington.  These comments are offered in opposition of the
recommendation of the Public Buildings Reform Board (PBRB) to the Office of Management and
Budget (OMB) that the Federal Archives and Records Center (FARC), in Seattle should be sold to
generate revenue for the federal government.  Our concerns are submitted on behalf of our
member tribes of the Northwest Indian Fisheries Commission (NWIFC).[1]  Unfortunately, we were
only recently informed of this proposal.  There was no notice or consultation with our member
tribes who are directly affected by this proposal.

The National Archives maintains the FARC in Seattle, Washington.  The FARC contains historical
records from all federal agencies that have operated in the Pacific Northwest, many of which date
back to the exploration and pre-date the formation of Oregon Territory and Washington Territory.
Such historical information is extremely valuable to all citizens of the United States, especially to
our member tribes.

Under a recently enacted statute, the Federal Assets Sale and Transfer Act of 2016 (FASTA), the
FARC is being recommended for closure and sale, with the archived documents transferred to two
separate locations far from the Pacific Northwest.  Your assistance in preventing the closure of the
facility and transfer of these priceless historical records is urgently requested.

The purpose of FASTA is to maximize utilization of federal facilities.  This includes the sale of "high
value" assets of the United States to provide revenue, expedite the sale of "unneeded" federal
properties, and reduce governmental energy consumption, among other purposes.

---

[1] The NWIFC member tribes are party to *United States v. Washington*, 384 F. Supp. 312, aff'd, 520 F.2d 676,
(commonly known as the Boldt Decision) and include: the Lummi, Nooksack, Swinomish, Upper Skagit, Sauk-
Suiattle, Stillaguamish, Tulalip, Muckleshoot, Puyallup, Nisqually, Squaxin Island, Skokomish, Suquamish, Port
Gamble S'Klallam, Jamestown S'Klallam, Lower Elwha Klallam, Makah, Quileute, Hoh, and Quinault.

We can assure you that the FARC is not "unneeded." Rather, it is utilized daily by innumerable state, federal, and scholarly members of the public performing the historical research necessary to shed light on many current national issues. The information held therein was relied upon heavily by Washington State, United States, and tribal officials—and by the late Honorable United States District Judge George H. Boldt in achieving the landmark resolution of *United States v. Washington*. The records continue to be utilized by anthropologists, scientists, and historians to identify historic events and locations of importance to the nation.

The archival records are of extreme importance to our member tribes, as they document the culture, traditions, and lifestyles of the original inhabitants of the Pacific Northwest and have been instrumental in achieving just interpretations of treaties between such tribes and the United States. As you know, according to the United States Constitution, those treaties are the Supreme Law of the Land. We fail to see how the closure of this facility furthers the purposes of the Act.

It is noteworthy that the FASTA exempts from sale property used in connection with research by federal programs for agricultural, recreational, or conservation purposes and for purposes used in connection with river, harbor, flood control, reclamation, or power projects. Governmental programs routinely rely upon information housed in the FARC when planning, siting, and determining the appropriateness of the development of such facilities. The information has been used by our member tribes in the defense of the treaty-reserved rights and for historic information on their culture and history. Its importance is not "unneeded." Tribes believe that keeping FARC open to the tribes is part of the fiduciary obligation in the preservation of said rights.

Please join us in recommending to the General Services Administration, the Public Buildings and Reform Board established under the Act, and the Office of Management and Budget that this property not be sold or alternatively, that the records not be transferred to sites outside the region. Doing so will place these records outside the reach of tribal members and their government officials who need them most. Thank you for your consideration.

Sincerely,

Lorraine Loomis
Chairperson

cc: Honorable Patty Murray, U.S. Senate
Honorable Maria Cantwell, U.S. Senate
Honorable Peter Defazio, Ranking Member, U.S. House of Representatives, Committee on
Transportation and Infrastructure

Honorable Debra Haaland, Member, U.S. House of Representatives, Committee on Oversight & Government Reform
Honorable Derek Kilmer, Member, U.S. House of Representatives, Committee on Appropriations
Tyler Fish, Senior Policy Advisor & Tribal Liaison, White House Office of Intergovernmental Affairs
Jennifer Bradley Lichter, Deputy Assistant to the President for Domestic Policy and Deputy Director, White House Domestic Policy Council
Adam Bodner, Executive Director, Public Buildings Reform Board, Executive Office of the President
David Ferriero, Archivist of the United States, National Archives Records Administration
Debra Wall, Deputy Archivist, National Archives Records Administration
Erica Pearson, Director, National Archives Records Administration
Gary Stern, General Counsel, National Archives Records Administration
Emily (Webster) Murphy, Administrator, General Services Administration
Daniel W. "Dan" Mathews, Commissioner, Public Buildings Service, Office of the Administrator, General Services Administration
Rogina Steiner, Staff Attorney, Port Gamble S'Klallam Tribe
NWIFC Tribal Chairs
NWIFC Commissioners

DocuSign Envelope ID: F90E096E-4E8B-494F-B776-B4151AF2674B

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

STATE OF WASHINGTON, et al.,      NO.

8
            Plaintiff,      DECLARATION OF THOMAS

9
STRONG, VICE-CHAIRMAN OF
    v.      THE SKOKOMISH INDIAN

10
TRIBE
RUSSELL VOUGHT, et al.,

11

            Defendants,
12

I, Thomas Strong as Vice-Chairman of the Skokomish Indian Tribe, declare as follows:

13
14
     1.      I am an enrolled member of the Skokomish Indian Tribe. I am over the age of
18 and competent to testify. I make this declaration based on my personal knowledge.

15
16
     2.      I have been the Vice-Chairman of the Skokomish Indian Tribe for the past two
years. I have been a member of the Skokomish Tribal Council for over fourteen years.

17
18
     3.      As the Vice-Chairman and a Tribal Council Member, I am responsible for
19
ensuring the integrity of our enrollment roll for our tribe. This requires the use of the census
20
records housed at the National Archives in Seattle. Prior to serving as the Vice-Chairman for
21
the Skokomish Indian Tribe, I was a cultural resources technician and enrollment officer for the
22
Skokomish Indian Tribe. This required me to perform the administrative function of maintaining
23
and verifying the data utilized to confirm, or deny, membership into the Tribe. This work relies
24
directly upon the census records we collected during our research at the National Archives. This
25
also required extensive work in the archives over a number of months, and on an ongoing basis.
26

DECLARATION OF THOMAS STRONG,    1    ATTORNEY GENERAL OF WASHINGTON
VICE-CHAIRMAN OF THE    COMPLEX LITIGATION DIVISION
SKOKOMISH INDIAN TRIBE    800 5TH AVENUE, SUITE 2000
SEATTLE, WA 98104-3188
(206) 464-7744

**432**

DocuSign Envelope ID: F90E096E-4E8B-494F-B776-B4151AF2674B

1       4.     As the Vice-Chairman and a Tribal Council Member, I am also responsible for

2  defending the Tribe's territory and Treaty rights to hunt, gather, and fish. The National Archives

3  in Seattle is key to this defense, giving tribal staff and consultants timely access to critical

4  reference materials.

5       5.     The Skokomish Indian Tribe is an Indian tribe with a governing body duly

6  recognized by the Secretary of the Interior. *Indian Entities Recognized and Eligible to Receive*

7  *Services from the United States Bureau of Indian Affairs*, 85 Fed. Reg. 5462 (January 30,

8  2020). The Tribe is re-organized under the Indian Reorganization Act of June 18, 1934. 48

9  Stat. 984, 987, 25 U.S.C. § 5123; *Theodore H. Haas, Ten Years of Tribal Government under*

10  *I.R.A.* (1947). The Tribe operates under its Constitution and by-laws first adopted on April 2,

11  1938, and approved by the Secretary of the Interior May 3, 1938, amended January 15, 1980,

12  as approved by the Secretary of the Interior March 17, 1980. *Id*.; Skokomish Const. The Tribe,

13  as the successor in interest to the Skokomish and Twana people, is a signatory to the Treaty of

14  Point No Point of January 26, 1855 and retains reserved Treaty rights. 12 Stat. 933 (Ratified

15  Mar. 8, 1859 and Proclaimed Apr. 29, 1859); *United States v. Washington*, 384 F. Supp. 312,

16  376-377 at Finding Nos. 133-134 (W.D. Wash. 1974).

17       6.     The Tribe is located within the Hood Canal drainage area of the State of

18  Washington. *Id*. The Skokomish's Reservation is defined by an Executive Order and later

19  Proclamations. *Exec. Order of President Ulysses S. Grant* (February 25, 1874). The

20  Reservation is comprised of only a few thousand acres of land and the vast majority of the core

21  Reservation located along the Skokomish River is undevelopable wetlands. The lack of

22  developable land has hampered Tribe's economic and other infrastructural development. As

23  such, the Tribe has limited financial resources to conduct research (directly or through

24  consultants) and having the National Archives in Seattle has lessened that financial burden.

25

26

DECLARATION OF THOMAS STRONG,
VICE-CHAIRMAN OF THE
SKOKOMISH INDIAN TRIBE

2

ATTORNEY GENERAL OF WASHINGTON
COMPLEX LITIGATION DIVISION
800 5TH AVENUE, SUITE 2000
SEATTLE, WA 98104-3188
(206) 464-7744

**433**

DocuSign Envelope ID: F90E096E-4E8B-494F-B776-B4151AF2674B

1     7.    As of December 28, 2020, there are 781 enrolled members of the Skokomish

2 Indian Tribe. A significant number of these members, if not the majority, live in the State of

3 Washington within a few hours travel to the National Archives facility in Seattle.

4     8.    For more than a century, the Tribe and its members suffered at the hands of

5 agents implementing policies of the United States which sought to strip away Skokomish's

6 language, culture, and heritage. Despite having been subject to this adversity to this day the

7 Tribe and its members' cultural identity remains strong, in part due to the ability to rediscover

8 lost knowledge preserved at the National Archives facility in Seattle. The closure of this

9 facility would undoubtedly inflict a most grievous injury upon the Tribe and its members and

10 once again cut off Skokomish's connection to the past.

11     9.    The Tribe relies on this critical facility, for amongst other things to: maintain

12 its enrollment roll; secure and preserve its territory and Treaty rights to hunt, gather, and fish;

13 and maintain cultural knowledge.

14     10.    To fund its primary mission, which is the effective governance of the

15 Skokomish people and resources, in 1995 the Tribe entered into a Compact of Self-Governance

16 with the United States of America. The Tribe has also entered in other various agreements with

17 federal agencies and obtained numerous federal grants (e.g., Pacific Coastal Salmon Recovery

18 Fund with NOAA Fisheries, Performance Partnership Grant with EPA, Capacity Grant with

19 EPA, Pacific Salmon Treaty, Mass Marking Grant, Hatchery Cyclical Maintenance Fund with

20 BIA). The National Archives in Seattle is an invaluable and essential research tool to fulfill the

21 obligations under the Compact, various agreements, and grants.

22     11.    In addition, a significant number of members rely on the fisheries to support

23 themselves and their families. In light of poor fishery run returns, declining global markets,

24 and COVID-19 restrictions, money is scarce. As such, the members would face undue

25 financial harm if they were prevented from travelling to a local facility to conduct their own

26

DECLARATION OF THOMAS STRONG,    3    ATTORNEY GENERAL OF WASHINGTON
VICE-CHAIRMAN OF THE    COMPLEX LITIGATION DIVISION
SKOKOMISH INDIAN TRIBE    800 5TH AVENUE, SUITE 2000
SEATTLE, WA 98104-3188
(206) 464-7744

**434**

DocuSign Envelope ID: F90E096E-4E8B-494F-B776-B4151AF2674B

1  research into their families' histories, their homeland, their Treaty, and their traditional ways

2  of life.

3      12.   Lastly, the Tribe was not meaningfully consulted regarding the closure and sale

4  of the National Archives in Seattle, nor the intended means of preservation of irreplaceable

5  records or other significant documents/items maintained at that facility.  The Tribe has not

6  been given any meaningful opportunity for input into this deplorable process.  The Tribe fears

7  that critical pieces of its history and history of the Pacific Northwest will be lost forever if this

8  closure and sale is not immediately stopped.

9

10  I declare under penalty of perjury that the foregoing is true and correct.

11

12  SIGNED AND DATED this 4th day of January, 2021 at Skokomish Nation, Washington.

13

14  DocuSigned by:
    Tom Strong
    290CEA49297A496
    Thomas Strong, Vice-Chairman

15  Skokomish Tribal Council

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF THOMAS STRONG,          4
VICE-CHAIRMAN OF THE
SKOKOMISH INDIAN TRIBE

ATTORNEY GENERAL OF WASHINGTON
COMPLEX LITIGATION DIVISION
800 5TH AVENUE, SUITE 2000
SEATTLE, WA 98104-3188
(206) 464-7744

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF PORT GAMBLE S'KLALLAM TRIBAL CHAIRMAN JEROMY SULLIVAN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Jeromy Sullivan, declare as follows:

1.     I am the Chairman of the Port Gamble S'Klallam Tribal Council. The Port Gamble S'Klallam Tribe ("Tribe") is a signatory to the 1855 Point No Point Treaty with the United States. I am over the age of 18 and competent to testify. I make this Declaration based on my personal knowledge.

2.     I have served on the Port Gamble S'Klallam Tribal Council since 2005 and served as Tribal Chairman since 2009. Prior to my service on the Tribal Council, I was a Point No Point Treaty shellfish (geoduck) harvester for 25 years. I am now serving my sixth consecutive term as Tribal Chairman. As Chairman, I help oversee all of the Tribe's programs, including our Natural Resources Program. I also serve on the Washington State Salmon

DECLARATION OF PORT GAMBLE        1        Galanda Broadman PLLC
S'KLALLAM TRIBAL CHAIRMAN                  8606 35th Avenue NE, Ste. L1
JEROMY SULLIVAN                            Mailing: P.O. Box 15146
                                           Seattle, WA 98115
                                           (206) 557-7509

1  Recovery Board, Hood Canal Coordinating Council, Point No Point Treaty Council, and

2  Kitsap Forest and Bay Coalition.

3      3.     The Tribe is federally recognized pursuant to the 1855 Point No Point Treaty

4  and was organized in 1939 pursuant to the federal Indian Reorganization Act of 1934, which

5  was enacted in part to "conserve and develop Indian lands and resources." We occupy a 1,700

6  acre Port Gamble S'Klallam Reservation on the Kitsap Peninsula, Kitsap County,

7
8  Washington—100% of which is held in federal trust status. Approximately two-thirds of our

9  over 1,300 enrolled PGST members live on our Reservation. Since time immemorial the Tribe

10  has been using and conserving natural and cultural resources that include all portions of the

11
    Kitsap and Olympic Peninsulas and various Western Washington islands; the waters of the
12
13  Puget Sound, Hood Canal, Straits of Juan de Fuca, Port Gamble Bay; local rivers, tributaries,

14  and lakes; finfish and shellfish fisheries; game and wildlife habitat; and wetlands, forests,

15  plants, and Indigenous medicines. To this day, a great many of our S'Klallam People's lives

16  depend upon subsistence fishing, hunting, and gathering. Tribal conservation of our historic

17
    lands and waters, plants, forests, finfish and shellfish and all variety of animal species, is
18
19  central to the conservation of S'Klallam existence as a distinct people, with a distinct culture.

20      4.     For at least the last several decades, the Tribe has used the National Archives

21  facility in Sand Point, Seattle, Washington for historical research to underpin our conservation

22  efforts. The Tribe and Port Gamble S'Klallam members have used and continue to use the

23  National Archives at Seattle for research that confirms S'Klallam oral histories; documents

24  S'Klallam genealogy; and confirms Tribal Treaty fishing, hunting, and other rights, S'Klallam

25  Indigenous land occupancy and natural and cultural resource use and conservation, and

26

DECLARATION OF PORT GAMBLE            2        Galanda Broadman PLLC
S'KLALLAM TRIBAL CHAIRMAN                      8606 35th Avenue NE, Ste. L1
JEROMY SULLIVAN                                Mailing: P.O. Box 15146
                                               Seattle, WA 98115
                                               (206) 557-7509

S'Klallam interactions and relations with other tribal governments and federally appointed agents. The Tribe has also used and continues to use the National Archives at Seattle for research in connection with federal natural and cultural resource conservation programs, as detailed below.

5.     The Tribe's federal natural and cultural resource conservation programs and research efforts are conducted through our Natural Resources Department. The mission of Natural Resources is to sustainably manage, protect, enhance, conserve, and restore culturally-relevant species, landscapes, and seascapes integral to the unique identity of our S'Klallam People. While the Tribe has undertaken these conservation efforts since time immemorial, the United States—as our Trustee under the Point No Point Treaty—has delegated certain federal conservation duties to the Tribe pursuant to numerous funding agreements and arrangements in modern times. Most notably, the Tribe has carried out federal conservation program and research functions, primarily through federal "638" and self-governance funding agreements with the U.S. Department of the Interior over the last several decades.

6.     Pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA) of 1975, originally enacted as P.L. 93-638, the United States delegated to the Tribe traditional federal program responsibilities, including the protection of "natural resources" and "cultural resources." Interior Department self-governance dollars fund the operation of the Natural Resources Department. Attached as **Exhibit A** is a true and correct copy of the Tribe's Multi-Year Funding Agreement for FY 2017 – 2021 with the Interior Department. Section 2 of that federal funding agreement indicates that the Tribe has "assumed responsibility for implementation of the programs" identified in the agreement, including programs for the

DECLARATION OF PORT GAMBLE                    3
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

438

preservation of "Natural Resources" and "Cultural Resources." According to Section 4 of that federal funding agreement the Interior Department has not "retained" "[a]ny program, service, function, or activity" that the United States traditionally performed for the Tribe in the realms of "Natural Resources" or "Cultural Resources" preservation, including research. Instead, the Tribe has assumed federal tribal program responsibility for natural and cultural resource protection over our Reservation lands, our Treaty ceded lands and usual and accustomed fishing areas on the Kitsap and Olympic Peninsulas, and along the waters of the Puget Sound, Hood Canal, Straits of Juan de Fuca, and Port Gamble Bay. Tribal Natural Resources Department staff routinely use records obtained by the Tribe from the National Archives at Seattle in connection with these federal conservation and research efforts.

7.      Since at least 2015, the Tribe has received federal Cooperative Landscape Conservation—Climate Adaption funding from the Interior Department as part of our self-governance funding agreement. Attached as **Exhibit B** is a true and correct copy of the Cooperative Landscape Conservation—Climate Adaption Amendment to the Tribe's Multi-Year with the Interior Department. The Tribe has used those federal program dollars to conduct a climate change impact assessment within our usual and accustomed Treaty fishing areas. In particular, the Tribe has researched on behalf of the United States the causes of high temperatures and low oxygen levels in Western Washington rivers and streams that threaten salmon species. Attached as **Exhibit C** is a true and correct copy of related Rights Protection Implementation Climate Change contract award from the Interior Department in 2015. Through the Northwest Indian Fisheries Commission, the Tribe has received additional monies from the Interior Department under a 2018 contract for "Modeling Elk Response to Ecological

DECLARATION OF PORT GAMBLE
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

4

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

439

Changes in Warming Climate." Attached as **Exhibit D** is a true and correct copy of that federal funding agreement. Most recently, the Tribe received federal program dollars to research and study the risk to tribal shellfish resources from accelerating bluff erosion. Attached as **Exhibit E** is a true and correct copy of that federal Grant and Cooperative Agreement for fiscal year 2020. Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with all of these federal climate change-related conservation program and research efforts.

8.      For many years, the Tribe has also received self-governance funding from the Interior Department for forestry management on the Kitsap and Olympic Peninsulas. Attached as **Exhibit F** is a true and correct copy of a Timber, Fish and Wildlife (TFW) Supplemental funding award for fiscal year 2020. With federal TFW dollars, Tribal Natural Resources Department staff research and study impacts to wetlands and salmon streams caused by certain logging projects on the Kitsap and Olympic Peninsulas. Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with such federal forestry and habitat conservation efforts.

9.      The Tribe has also entered into various other funding agreements with the United States for finfish and shellfish conservation and research. For example, since 2014 the National Oceanic and Atmospheric Administration (NOAA) and the Interior Department have funded the Tribe's research efforts to restore and conserve habitat for Endangered Species Act (ESA)-listed species steelhead and salmon (chinook and chum), along the Hood Canal Bridge. NOAA has also funded the Tribe's Hood Canal ocean acidification research studies since 2014, which explore why such finfish species are dying. The Department of Health and Human

DECLARATION OF PORT GAMBLE
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

5

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Services, Administration for Native Americans (ANA) has funded the Tribe's new aquaculture program. The U.S. Navy has funded Tribal shellfish conservation efforts, including seeding beaches along the Hood Canal and Kitsap and Olympic Peninsulas. Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with such federal finfish and shellfish conservation efforts.

10.    On or about January 23, 2020, I first learned that the National Archives at Seattle was proposed for sale by the United States. I did not hear this news from any federal agency or official. I learned the news from a local reporter. Despite the importance of the records stored by the National Archives and Records Administration (NARA) in Sand Point, Seattle to S'Klallam Peoples, the Port Gamble S'Klallam Tribe was not notified or consulted before the federal government made the decision to sell the National Archives facility in Seattle.

11.    That same day I wrote OMB Acting Director Russel Vought is the Acting Director Defendant Vought to express opposition to the decision to sell the National Archives at Seattle:

> The Sand Point Center is very important to the 272 federally-recognized tribes in the Pacific Northwest (Washington, Oregon and Idaho) and Alaska. Ours is merely one of them. . . . [O]ur Tribe relies upon the Sand Point Center for access to critical historical documents. Among many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, and Tribal leaders during treaty negotiations in the mid-19th Century, as well as original drafts of the treaties themselves. The facility also houses critical and hard-to-reproduce historical information related to the area tribes.
>
> If the Sand Point Center is closed, all of its archival materials will need to be moved. We understand the records will be sent all the way to Kansas City, Missouri and other archived materials will be sent to Riverside, California. Obviously, such new locations will make it much harder for our Tribe and those in the Pacific Northwest and Alaska to access these

DECLARATION OF PORT GAMBLE
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

6

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

historically important and culturally significant archived records and materials. A sale of the Sand Point Center will undoubtedly have an impact on tribes. In fact, it will be a profound, negative and irreparable impact. Yet the Public Buildings Reform Board, the National Archives and Records Administration, the Office of Management and Budget, nor any other federal agency has engaged in government-to-government consultation as required by Executive Order 13175. Worse, the federal agencies did not even alert Tribes about the proposed sale. We learned about it through a news source.

Attached as **Exhibit G** is a true and correct copy of my January 23, 2020, letter to Director Vought.

12.     On January 31, 2020, NARA Deputy Archivist Debra Steidel Wall responded to my and Chairman Allen's January 23, 2020, letter. Referring to the Port Gamble S'Klallam and Jamestown S'Klallam Tribes as "stakeholders" and "customer groups," rather than governments, Deputy Wall promised a "meeting as part of [NARA's] outreach." Deputy Wall failed to acknowledge or respond to our demand for federal/tribal consultation pursuant to Executive Order 13175. Attached as **Exhibit H** is a true and correct copy of a Deputy Wall's January 31, 2020, letter.

13.     On or about February 6, 2020, I learned that NARA was holding a meeting at the National Archives at Seattle to discuss the sale of that facility, on February 11, 2020. The Tribe heard about the meeting from others, but not from any federal agency or official. We were told that NARA would only allow 40 people to attend the meeting and only three tribal representatives were permitted to address NARA officials with concerns about the proposed sale of the National Archives facility in Sand Point.

14.     Despite only learning of the meeting three business days prior to it, I attended the meeting that NARA held at the National Archives at Seattle on February 11, 2020. It was not a consultation. Only NARA staff were present. To my knowledge nobody in attendance at

DECLARATION OF PORT GAMBLE
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

442

the meeting represented the Office of Management and Budget (OMB), General Services Administration (GSA), or Public Buildings Reform Board (PBRB). NARA officials told us the decision to sell the National Archives facility in Sand Point was "final," but said they *then* wanted to start the federal tribal consultation process to discuss how to mitigate the effects of the sale. NARA officials made clear the sale would not be reversed, explaining "We can't change policy." The absence of federal policymakers at the meeting with authority over the decision to close the facility and move the records to two distant facilities underscored that it was not and could not be considered a consultation with the tribes affected by the decision.

15.    I advised NARA officials that the meeting was not a consultation and that the federal government had violated Executive Order 13175 by not consulting with the Tribe or other affected tribal governments before any decision was made to sell the National Archives facility in Sand Point. Other tribal leaders in attendance expressed the same view to NARA officials. We asked that the sale process be halted to allow for federal/tribal consultation and coordination.

16.    On February 24, 2020, I wrote Deputy Wall and NARA Chief Operating Officer William "Jay" Bosanko in follow up to the meeting: "The Port Gamble S'Klallam Tribe isn't necessarily concerned about retaining the brick and mortar facility, we are primarily concerned with ensuring the collections maintained by the National Archives Records Administration at the Sand Point facility, remain accessible in the Pacific Northwest."

17.    That same day I received a letter from GSA Associate Administrator Jeffrey Post, which completely ignored our request for federal tribal consultation and GSA's obligation to consult with the Port Gamble S'Klallam Tribe. Mr. Post simply advised the Tribe

DECLARATION OF PORT GAMBLE            8
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

that GSA was moving forward with the sale. Attached as **Exhibit I** is a true and correct copy of a Mr. Post's January 31, 2020, letter. This was the last word we have received from any federal agency regarding the proposed sale.

18.     To this day, OMB, GSA, PBRB, and NARA have never consulted with the Port Gamble S'Klallam Tribe regarding the sale of the National Archives facility in Sand Point.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of January, 2021 at Kingston WA.


JEROMY SULLIVAN
Chairman
Port Gamble S'Klallam Tribal Council

DECLARATION OF PORT GAMBLE
S'KLALLAM TRIBAL CHAIRMAN
JEROMY SULLIVAN

9

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

444

# EXHIBIT A



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

NOV 2 1 2016

The Honorable Jeromy Sullivan
Chairman
Port Gamble S'Klallam Tribe
31912 Little Boston Rd
Kingston, Washington 98346

Dear Chairman Sullivan:

I am enclosing for your information and use a signed original of the 2017-2021 Multi-Year Funding Agreement between the Port Gamble S'Klallam Tribe and the United States of America, Department of the Interior.

Please do not hesitate to contact Shaunna McCovey, Compact Negotiator of the Northwest Field Office, should you have any questions. She may be reached by phone at (360) 699-1015 or by email at Shaunna.McCovey@BIA.gov.

Sincerely,

Sharee M. Freeman
Director
Office of Self Governance

Enclosure

**MULTI-YEAR FUNDING AGREEMENT FOR FY 2017 - 2021**

**BETWEEN**

**THE PORT GAMBLE BAND OF S'KLALLAM INDIANS**

**AND**

**THE UNITED STATES OF AMERICA**

**Section 1**

**Negotiated Agreement** - Pursuant to Title IV of P.L. 93-638 as amended, the Port Gamble Band of S'Klallam Indians (herein referred to as Tribe), and the United States of America, through the Secretary of the Interior (herein referred to as the Secretary) have negotiated the following Agreement for the assumption of responsibilities by the Tribe for the various programs, services, functions, and activities (PSFAs) as specified in this Agreement. This Agreement includes programs which are funded by or flow through the Bureau of Indian Affairs (herein referred to as BIA) for the benefit of the Tribe.

**Section 2**

**Programs, Services, Functions, and Activities Assumed By the Tribe** - The Tribe agrees to assume responsibility for the implementation of the programs identified in the attached REPROGRAMMING REQUEST for which funds are transferred to the Tribe. The Tribe's Budget Categories listed below specify the programs for which program responsibilities are assumed. The Tribe has broad authority to consolidate and redesign the programs and to reallocate funding between programs without further approval from the Secretary unless otherwise indicated in this Agreement.

    A. Tribal Government

            1. Judicial, Legislative, Executive and Operations Units, including Administration, Human Resources, Accounting, Financial Services, Public Works and Utilities, Planning, Public Safety, Court Services, Legal Services, Cultural Resources, Children and Family Services, Higher Education and Employment Services, Health Services, Early Childhood, Natural Resources, and Proprietary Enterprises.

**Section 3**

**Special Projects or Earmarked Programs, Services, Functions, and Activities** - The Tribe is not authorized to redesign or to reallocate funds provided through this Agreement for PSFAs which are subject to special restrictions imposed by statute or

which are awarded to the Tribe based on a competition or a special identified need. The amounts identified for these Special Projects or Earmarked PSFAs are the best estimates at the time of negotiation and are subject to adjustment based on actual award, selection of project, or distribution methodology used by the Secretary, provided self-governance Tribes, other Tribes, and BIA agencies are treated similarly. Non-recurring PSFA funds are provided on a one-time basis for this year only. The BIA's Reprogramming documents and OSG's Authority to Obligate (ATO) award documents will identify funds that are awarded on a one-time-only basis and are not guaranteed to be funded in subsequent fiscal year(s). The following programs which meet this criteria are included in this Agreement:

Child Care Development Funds (P.L. 102-477).
Temporary Assistance for Needy Families (P.L. 102-477).S

Other funds not identified in this section may be separately negotiated and included in this Agreement as provided for in Section 8.

## Section 4

**Programs, Services, Functions, and Activities Retained by the BIA** – Any program, service, function, or activity not listed as transferred to the Tribe shall be assumed to be a retained function of the Secretary. In addition, the services related to any inherently federal functions provided by the Secretary will be available to self-governance Tribes on the same basis as other Tribes. In cases where there are shared responsibilities between the Tribe and the BIA, the respective roles of the parties will be specified in footnotes to the reprogramming requests.

1.      Nothing in the Compact, Agreement or attached REPROGRAMMING REQUEST is intended to diminish the operation of the Point no Point Treaty Council or the Northwest Intertribal Fish Commission.

## Section 5

**Amount of Funds** - Subject only to Congressional action and the terms of this Agreement, the Secretary shall make available to the Tribe the funds identified in the attached REPROGRAMMING REQUEST fiscal year ~~2017.~~ *for each PF*

## Section 6

**Contract Support Costs** – Subject to applicable federal laws, the Tribe is eligible for Contract Support Costs funding on the same basis as Tribes which contract with the BIA under P.L. 93-638. Contract Support Costs funding shall be calculated in accordance with the BIA's Contract Support Costs policy. An amount shall be added to this Agreement at the point when there is clear guidance from the BIA concerning the amount available.

## Section 7

**Payment** - Payment to the Tribe shall be made by the most advantageous means available. The Tribe chooses to receive all funding possible on an annual lump sum basis. Other funds will be transferred to the Tribe as soon as possible after the amounts due are known and deliverable.

Base funding under continuing resolutions will be paid to the Tribe by January 1 or within 30 business days from the date the Office of Management and Budget (OMB) apportions the appropriations, whichever is later, or, when applicable, by January 1 or within 30 business days after the date OMB approves an operating plan for the PSFAs in the Funding Agreement, whichever is later.

## Section 8

**Amendment or Modification of this Agreement** - Except as otherwise provided in this Agreement, the Compact, or by law, any modifications to this Agreement shall be in the form of a written amendment signed by the Tribe and the Director, OSG. It is recognized that during negotiations, there may be errors in calculations or other mistakes which may need to be renegotiated. Both parties agree to take corrective action when such errors are identified.

## Section 9

**No Reduction in Programs, Services, Functions or Activities to Other Tribes** - In accordance with 25 U.S.C. § 458ff (a), nothing in this Agreement shall be construed to limit or reduce in any way services, contracts or funds that any other Indian tribe or tribal organization is eligible to receive under 25 U.S.C. § 450f or any other applicable Federal law.

## Section 10

**Subject to Availability of Funds** - All amounts identified in this Agreement are subject to Congressional action on appropriations and will be adjusted accordingly. Notification to the Tribe of such adjustments will occur as soon as practicable following the action. The Tribe shall be eligible for new PSFAs and shall be advised of available funding for such PSFAs on the same basis as other tribes when the Assistant Secretary or other delegated official makes a decision that additional funds are available.

## Section 11

**Establishment of Self-Governance Base Budget** - The Tribe elects to establish and maintain a self-governance base budget for its operations under self-governance pursuant to 25 C.F.R. § 1000.105. This consists of the actual amounts of recurring funding which have been base transferred from BIA budget accounts to the self-governance budget accounts. Adjustments to base budgets will be done in accordance

with 25 C.F.R. § 1000.109. Non-recurring funds and any other one-time funding are not eligible to be included as part of the Tribe's base budget.

**Section 12**

**Title I Provisions** - The Tribe chooses to include the following provisions from Title I of P.L. 93-638 in accordance with P.L. 104-109, 25 U.S.C § 458cc(l) in this agreement.

    Section 105(l)(1 and 2).
    Section 106(b) through (i)), (j), (k)(1 through 12), and (m)(1 and 2).
    Section 108(c) Section 1(b)(9 and 11) and Section 8 of P.L. 93-638.

At the Tribe's option, the parties shall add or delete provisions of Title I, by amendment, and any time during the course of this agreement.

**Section 13**

**Conflict Between Provisions of this Agreement and the Compact** - To the extent that provisions in this Agreement conflict with the Compact, this Agreement shall apply.

**Section 14**

**Proposed Effective Date** - The proposed effective date of this Agreement will be 90 days following the submission of the signed Agreement to the Congress and to the other Tribes served by the BIA Agency Office. The proposed effective date is January 1. The successor Agreement shall be controlled by 25 CFR § 1000.90. This Agreement shall remain in effect until the date the agreement ends. In subsequent years, the parties shall negotiate an amendment incorporating the annual REPROGRAMMING REQUEST(s) into the Multi-Year Funding Agreement by October 1 of each year.

**Section 15**

**Training** - Prior to being granted access to DOI automated trust information technology systems, Tribal employees must successfully complete BIA trust automated technology systems training, the costs of which will be met by the BIA.

**Section 16**

**Employee Security** – The Department and the Tribe mutually agree that for 2017 none of the Tribe's employees or employees of its contractors will have access to DOI automated information technology systems or DOI Trust Records in any electronic data or hardcopy format.

**Section 17**

**Real Estate Appraisal Services** – The Tribe and the Office of the Special Trustee for

American Indians (OST) are negotiating a Memorandum of Understanding (MOU) for the Real Estate Appraisal Services Program. This program will be governed by the terms of this MOU, which will be attached and fully incorporated into the funding agreement.

## Section 18

**Trust Records Management** – The Tribe and the Secretary agree to the following:

The Tribe agrees to:

(a) preserve, protect and manage all fiduciary Trust Records, created and/or maintained by the Tribes during their management of trust programs in their Title IV agreements. (A fiduciary Trust Record is/was any document that reflects the existence of an Indian trust asset and is/was used in the management of an Indian trust asset. An Indian trust asset refers to lands, natural resources, monies or other assets held in trust at a particular time by the Federal Government for a Tribe Alaska natives that are or were at a particular time restricted against alienation, for individual Indians. Management includes actions that influence, affect, govern, or control an Indian trust asset. The following are examples not considered to be fiduciary Trust Records: general administrative, personnel or travel records; education records; law enforcement records; health records; law making unrelated to Indian trust assets; tribal council resolutions and laws unrelated to Indian trust assets; and tribal elections.)

(b) make available to the Secretary all fiduciary Trust Records maintained by the Tribe provided that the Secretary gives reasonable oral or written advance request to the Tribe Access shall include visual inspection and at the expense of the Secretary the production of copies (as agreed upon between the parties) and shall not include the removal of the records without tribal approval; and

(c) store and permanently retain all inactive fiduciary Trust Records at the Tribe or allow such records to be removed and stored at the American Indian Records Repository (AIRR) in Lenexa, Kansas at no cost to the Tribe.

The Secretary agrees to:

(a) allow the Tribe to determine what records it creates to implement the trust program assumed under its Title IV Agreement, except that the Tribe must create and maintain the information required by statute and regulation. No additional record keeping requirements are required by this Agreement.

(b) store all inactive fiduciary Trust Records at AIRR at no cost to the Tribe when the Tribe no longer wishes to keep the records. Further, the Tribe will retain legal custody and determine access to these records and such records

shall not be treated as Federal records for purposes of chapter 5 of Title 5 of the United States Code unless expressly agreed to by the Tribe;

(c) create and manage a single tribal storage and retrieval system for all fiduciary Trust Records stored at AIRR (No records will be accepted at AIRR until such a retrieval system exists); and

(d) provide technical assistance for Tribes in preserving, protecting and managing their fiduciary Trust Records from available funds appropriated for this purpose.

## Section 19

**Single Audit Copies --** In addition to the required copy to the Federal Audit Clearing House, the Tribe is required by 25 U.S.C. § 450c(f) to provide two copies of the audit financial statements and single audit report to the Office of Internal Evaluation and Assessment, DOI, 12220 Sunrise Valley Drive, Reston, VA 20191 phone 703-390-6578, fax 703-390-6325 or e-mail an electronic copy to OIEA@BIA.GOV.

## Section 20

**Motor Vehicle Operation Policy --** The Tribe certifies that it will self-administer a motor vehicle operation policy that promotes the safe and prudent operation of motor vehicles while performing duties to implement the terms of the Agreement. The Tribe's policy is either comparable or superior to the May 3, 2006 Motor Vehicle Operation Policy for the BIA issued by the Associate Deputy Secretary. The Tribe's policy includes compliance with Executive Order 13513 prohibiting texting while driving.

## Section 21

**Reporting Requests --** The Tribe agrees to provide applicable data and information to the BIA Northwest Regional Office pursuant to the Government Performance and Results Act of 1993 (P.L. 103-62). Before providing such information, the Tribe will work with its respective Regional Office GPRA Coordinator to determine applicable data and information needed to meet the requirements pursuant to the Act.

## Section 22

**Indian Employment Training and Related Services Demonstration Project --** To the extent this Agreement includes Indian Employment Training and Related Services Demonstration Project funds pursuant to P.L. 102-477, the Tribe agrees that:

i. Such funds will be administered in accordance with the Tribe's approved P.L. 102-477 Plan, including compliance with existing P.L. 102-477 reporting requirements for such funds.

ii.      All applicable statutory requirements governing the various integrated programs must be met. The Tribe agrees to abide by all applicable federal regulations published in the Federal Register. Only those federal regulations for which waivers have been specifically requested and formally approved will be considered waived.

iii.     No program funds under this demonstration project shall be reprogrammed for other tribal functions that are not included in the Tribe's approved P.L. 102-477 Plan. The Tribe has the authority to integrate the program services in its approved P.L. 102-477 Plan into a single, coordinated, and comprehensive program. Within that framework the Tribe has the authority to commingle and reallocate funds to meet program objectives, unless commingling and reallocation is expressly prohibited by law (see P.L. 102-477 and legislation related to funding origin.)

Advance funding for programs funded through this funding Agreement that are derived from non-DOI agencies as a result of their inclusion in the Tribe's P.L. 102-477 plan is to be transferred to the Tribe based on the funding year inherent in those funds and as soon as those funds are available for transfer.

## Section 23

**Programs Involving Contact With Children** – As mandated by the Indian Child Protection and Family Violence Prevention Act (P.L. 101-630), prior to being authorized to perform services, functions and activities that involve regular contact with or control over Indian children, Tribal program staff and volunteers must be favorably screened and a final favorable suitability determination issued. Minimum standards of character must be established and implemented in accordance with 25 CFR Part 63.

PORT GAMBLE BAND OF S'KLALLAM INDIANS

BY: _____     DATE: _10 · 11 · 2016_
Tribal Chairman

UNITED STATES OF AMERICA

BY _____   DATE: ___NOV 2 1 2016___
Director, Office of Self Governance

Tribe: PORT GAMBLE S'KLALLAM TRIBE
BIA Tribal Organization Code: P10113
OSG Tribal Compact Code: OSGT113
BIA Area Office: P00100 - NORTHWEST REGION
BIA Agency Office: P10100 - PUGET SOUND

| Line Item | Program Title | Cost Code | Info Tribal Share | A OSG Cumulative Base | B OSG Shortfall Base | C OSG Shortfall Request | D BIA Reprogram Request | E=A+B+C+D Total AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 10 | Child Care Development Fund (Mandatory) - NON TPA | 95400 | 0 | 0 | 0 | 0 | 29,383 | 29,383 | 1 |
| 11 | Temporary Asst for Needy Families (TANF) - NON TPA | 95500 | 0 | 0 | 0 | 0 | 643,135 | 643,135 | 1 |
| 13 | Child Care Development Fund (Discretionary) - NON TPA | 95800 | 0 | 0 | 0 | 0 | 53,258 | 53,258 | 1 |
| 15 | Technical Training - NON TPA | A3080 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 20 | Departmental Billings - NON TPA | A3340 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 23 | Trust Management Improvement Project (UTB) - NON TPA | A3A00 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 24 | Assistant Secretary Support - NON TPA | A5000 | 0 | 44,430 | 0 | 0 | 0 | 44,430 | 2 |
| 26 | Administrative Services (Central) - NON TPA | A5200 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 27 | Administrative Services - NON TPA | A5220 | 0 | 17,866 | 2,514 | 0 | 0 | 20,380 | |
| 28 | Information Resources Technology - NON TPA | A5240 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 32 | Executive Direction (Regional) - NON TPA | A6000 | 0 | 4,432 | 0 | 0 | 0 | 4,432 | |
| 34 | Admin Svcs (Regional-Safety) - NON TPA | A6110 | 0 | 205 | 190 | 0 | 0 | 395 | |
| 35 | Executive Direction - TPA/Agency | A9010 | 0 | 0 | 7,877 | 0 | 0 | 7,877 | |
| 38 | Administrative Services - TPA/Agency | A9120 | 0 | 0 | 17,958 | 0 | 0 | 17,958 | |
| 45 | Job Placement and Training - TPA/Agency | C9035 | 0 | 1,040 | 0 | 0 | 0 | 1,040 | |
| 46 | Job Placement and Training - TPA/Region | C9035 | 0 | 537 | 0 | 0 | 0 | 537 | |
| 47 | Job Placement and Training - TPA/Tribal | C9035 | 0 | 7,899 | 0 | 0 | 0 | 7,899 | |
| 48 | Economic Development - TPA/Agency | C9110 | 0 | 4,193 | 0 | 0 | 0 | 4,193 | |
| 53 | Road Maintenance - TPA/Tribal | C9250 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 58 | Education Line Officers - NON TPA | E5030 | 0 | 1,061 | 0 | 0 | 0 | 1,061 | |
| 60 | Johnson O'Malley - TPA/Region | E9040 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 61 | Johnson O'Malley - TPA/Tribal | E9040 | 0 | 17,000 | 0 | 0 | 0 | 17,000 | |
| 65 | Tribal Scholarships - TPA/Tribal | E9310 | 0 | 32,091 | 0 | 0 | 0 | 32,091 | |
| 66 | Tribal Adult Education - TPA/Tribal | E9320 | 0 | 3,950 | 0 | 0 | 0 | 3,950 | |
| 73 | Social Services - NON TPA | H5010 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 74 | Housing Development - NON TPA | H5030 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 75 | Social Services - NON TPA | H6010 | 0 | 3,663 | 0 | 0 | 0 | 3,663 | |
| 76 | Housing Development - NON TPA | H6030 | 0 | 7,531 | 0 | 0 | 0 | 7,531 | |
| 77 | Social Services - TPA/Agency | H9010 | 0 | 5,629 | 8,682 | 0 | 2,158 | 16,469 | 3 |

Tribe: PORT GAMBLE S'KLALLAM TRIBE
BIA Tribal Organization Code: P10113
OSG Tribal Compact Code: OSGT113
BIA Area Office: P00100 - NORTHWEST REGION
BIA Agency Office: P10100 - PUGET SOUND

| Line Item | Program Title | Cost Code | Info Tribal Share | A OSG Cumulative Base | B OSG Shortfall Base | C OSG Shortfall Request | D BIA Reprogram Request | E=A+B+C+D Total AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 83 | Indian Child Welfare Act - TPA/Tribal | H9220 | 0 | 55,000 | 0 | 0 | 11,844 | 66,844 | 3 |
| 84 | Housing Improvement Program - TPA/Tribal | H9370 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 86 | Criminal Investigations/Police Service - NON TPA | J3000 | 0 | 0 | 0 | 0 | 236,451 | 236,451 | 5 |
| 90 | Law Enforcement Projects - NON TPA | J3300 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 93 | Criminal Inv. and Police Serv. - P.L. 110-293 - NON TPA | J3710 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 100 | Tribal Courts Programs - TPA/Region | J9080 | 0 | 32,080 | 0 | 0 | 0 | 32,080 | |
| 101 | Tribal Courts Programs - TPA/Tribal | J9080 | 0 | 28,906 | 0 | 0 | 0 | 28,906 | |
| 104 | Rts Protection Implementation - NON TPA | N3110 | 0 | 0 | 0 | 0 | 283,451 | 283,451 | 6 |
| 105 | Western Washington (Boldt) - NON TPA | N3111 | 0 | 343,205 | 0 | 0 | 0 | 343,205 | |
| 106 | Wash State Timber-Fish-Wldlfe - NON TPA | N3113 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 109 | US/Canada Pacific Salmon Treaty - NON TPA | N3116 | 0 | 0 | 0 | 0 | 212,021 | 212,021 | 7 |
| 111 | Tribal Mgmt/Development Prgm - NON TPA | N3210 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 112 | Cooperative Landscape Conservation - NON TPA | N3300 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 113 | Water Mngmt, Plan&Pre-Dvlpmnt - NON TPA | N3420 | 0 | 8,000 | 0 | 0 | 0 | 8,000 | |
| 116 | Forestry - NON TPA | N3E00 | 0 | 10,302 | 0 | 0 | 0 | 10,302 | |
| 117 | Forestry Development - NON TPA | N3E10 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 122 | Fish Hatchery Operations (UTB) - NON TPA | N3F11 | 0 | 101,333 | 0 | 0 | 0 | 101,333 | 9 |
| 123 | Fish Hatchery Maintenance (UTB) - NON TPA | N3F12 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 125 | Natural Resources, General (UTB) - NON TPA | N5A10 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 128 | Forestry (UTB) - NON TPA | N6A30 | 0 | 29 | 757 | 0 | 0 | 786 | |
| 129 | Forest Marketing Assistance (UTB) - NON TPA | N6A31 | 0 | 22 | 1,060 | 0 | 0 | 1,082 | |
| 131 | Wildlife and Parks (UTB) - NON TPA | N6A50 | 0 | 3,736 | 0 | 0 | 0 | 3,736 | |
| 134 | Natural Resources (UTB) - TPA/Region | N9A05 | 0 | 20 | 926 | 0 | 0 | 946 | |
| 135 | Natural Resources (UTB) - TPA/Tribal | N9A05 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 138 | Agriculture Program (UTB) - TPA/Agency | N9B10 | 0 | 1,822 | 0 | 0 | 0 | 1,822 | |
| 139 | Forestry Program (UTB) - TPA/Agency | N9C30 | 0 | 13,620 | 0 | 0 | 0 | 13,620 | |
| 140 | Forestry Program (UTB) - TPA/Region | N9C30 | 0 | 322 | 8,544 | 0 | 0 | 8,866 | |
| 141 | Forestry Program (UTB) - TPA/Tribal | N9C30 | 0 | 1,975 | 0 | 0 | 0 | 1,975 | |
| 142 | Water Resources Program (UTB) - TPA/Agency | N9D40 | 0 | 876 | 0 | 0 | 0 | 876 | |

Tribe: PORT GAMBLE S'KLALLAM TRIBE
BIA Tribal Organization Code: P10113
OSG Tribal Compact Code: OSGT113
BIA Area Office: P00100 - NORTHWEST REGION
BIA Agency Office: P10100 - PUGET SOUND

| Line Item | Program Title | Cost Code | Info Tribal Share | A OSG Cumulative Base | B OSG Shortfall Base | C OSG Shortfall Request | D BIA Reprogram Request | E=A+B+C+D Total AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 143 | Water Resources Program (UTB) - TPA/Region | N9D40 | 0 | 0 | 1,029 | 0 | 0 | 1,029 | |
| 146 | Wildlife & Parks Program (UTB) - TPA/Region | N9E50 | 0 | 6,086 | 0 | 0 | 0 | 6,086 | |
| 149 | Minerals & Mining Program (UTB) - TPA/Region | N9F60 | 0 | 0 | 1,789 | 0 | 0 | 1,789 | |
| 152 | Litigation Support - NON TPA | R3210 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 160 | Trust Services (UTB) - NON TPA | R5C10 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 161 | Real Estate Services (UTB) - NON TPA | R5C40 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 166 | Real Estate Services (UTB) - NON TPA | R6C40 | 0 | 80 | 3,261 | 0 | 0 | 3,341 | |
| 172 | Rights Protection - TPA/Agency | R9120 | 0 | 2,725 | 0 | 0 | 0 | 2,725 | |
| 176 | Trust Services (UTB) - TPA/Region | R9A10 | 0 | 1,512 | 0 | 0 | 0 | 1,512 | |
| 181 | Real Estate Services Program (UTB) - TPA/Agency | R9C70 | 0 | 6,794 | 0 | 0 | 0 | 6,794 | |
| 185 | Real Estate Appraisals (Moved to OST) - TPA/Region | R9C80 | 0 | 689 | 0 | 0 | 0 | 689 | 10 |
| 188 | Environmental Quality Program (UTB) - TPA/Region | R9D40 | 0 | 39 | 1,586 | 0 | 0 | 1,625 | |
| 194 | All Other Aid to Tribal Government - NON TPA | T6020 | 0 | 3,169 | 0 | 0 | 0 | 3,169 | |
| 198 | Other Aid to Tribal Government - TPA/Agency | T9020 | 0 | 8,302 | 0 | 0 | 0 | 8,302 | |
| 198 | Other Aid to Tribal Government - TPA/Tribal | T9020 | 0 | 18,162 | 0 | 0 | 0 | 18,162 | |
| 202 | Self-Governance Compacts - TPA/Tribal | T9240 | 0 | -299,996 | 0 | 0 | 0 | -299,996 | 11 |
| 204 | Contract Support - TPA/Region | T9370 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| 205 | Indian Self Determination Fund - TPA/Region | T9475 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 209 | TPA General Increase - TPA/Tribal | T9901 | 0 | 204,259 | 0 | 0 | 0 | 204,259 | |
| 210 | 638 Pay Costs - TPA/Tribal | T9902 | 0 | 369,537 | 0 | 0 | 0 | 369,537 | |
| 211 | Retirement Adjustment - TPA/Tribal | T9903 | 0 | 5,600 | 0 | 0 | 0 | 5,600 | |
| | Report Total | | 0 | 1,079,733 | 56,173 | 0 | 1,471,701 | 2,607,607 | |

AUTHORIZED FINANCIAL OFFICERS

_(signature)_

Bureau of Indian Affairs – Regional Office

_(signature)_

Tribe

_(signature)_

Office of Self Governance

Footnotes

1 Funding for this line item shall be provided by OSG to the Port Gamble S'Klallam Tribe when it is transferred by HHS or DOL pursuant to an approved P.L. 102-477 Plan for inclusion in the Tribe's Self-Governance funding agreement. The amount included is a funding estimate. The actual amount will be based upon funding levels provided by HHS/DOL.

2 Central Office - The Tribe reserves its right to additional Central Office Pooled Overhead shares if made available.

3 The Tribe requests that amount identified in Column D is transferred into the Self-Governance TPA Base Budget as soon as possible.

4 Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.

5 Any new eligible Law Enforcement program funding will be determined and added to the funding agreement based on a determination by BIA OJS. The Tribe agrees to provide monthly uniform crime data reports pursuant to 25 CFR § 12.41. The monthly reports are due by the 5th of each month and shall be submitted to the BIA District Office in the Tribe's area.

6 The amount identified is the best estimate at the time of negotiation and is subject to adjustment based on actual award, selection of project, or distribution methodology used by the BIA provided Self-Governance Tribes, other Tribes, and BIA agencies are treated similarly. Funding for non-recurring Programs, Services, Functions, and Activities can only be provided on a one-time-only basis for this year and are not guaranteed to be funded in subsequent years.

7 US/Canada Pacific Salmon - This amount is an estimate and is subject to change pending distribution, actual award or selection of project. Funding for non-recurring PSFAs can only be provided on a one-time-only basis for this year. The Tribe estimates it should receive non-recurring Pacific Salmon Treaty funding in the amount of $56,773, Shellfish Enhancement of $22,015, and Forest and Fish of $95,098. Historic note: US/Canada Salmon - $104,581 was the Tribe's share before removal of NWIFC funds - 1/20 of Pacific Salmon Treaty funds ($2,091,627).

8 The amount provided is based on actual award, selection of project, or distribution methodology used by the BIA provided Self-Governance Tribes, other Tribes, and BIA agencies are treated similarly. Funding for non-recurring Programs, Services, Functions, and Activities can only be provided on a one-time-only basis for this year and are not guaranteed to be funded in subsequent years.

9 The amount identified is the best estimate at the time of negotiation and is subject to adjustment based on actual award, selection of project, or distribution methodology used by the BIA provided Self-Governance Tribes, other Tribes, and BIA agencies are treated similarly.

10 The Tribe and the Office of the Special Trustee for American Indians (OST) are negotiating a Memorandum of Understanding (MOU) for the Real Estate Appraisal Services Program. This program will be governed by the terms of this MOU, which will be attached and fully incorporated into the funding agreement.

11 Compacts - This reflects the cumulative direct funding reductions since our 1995 AFA.

12 Subject to applicable federal laws, the Tribe is eligible for Contract Support Costs funding on the same basis as Tribes which contract with the BIA under P.L. 93-638. Contract Support Costs funding shall be added to this Agreement as it becomes available.

# EXHIBIT B



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

*Paul*
*Renee*

MAR 1 ? 2015

The Honorable Jeromy Sullivan
Chairman
Port Gamble S'Klallam Tribe
31912 Little Boston Rd
Kingston, Washington 98346

Dear Chairman Sullivan:

I am enclosing for your information and use a signed original of Amendment #4 to the 2012-2016 Multi-Year Funding Agreement between the Port Gamble S'Klallam Tribe and the United States of America, Department of the Interior.

Please do not hesitate to contact Gordon Smith, Compact Negotiator of the Northwest Field Office should you have any questions. He can be reached by phone at (360) 699-1010 or by email at Gordon.Smith@BIA.gov.

Sincerely,

Sharee M. Freeman
Director
Office of Self Governance

Enclosure

**4ᵗʰ AMENDMENT TO THE 2012 – 2016 MULTI YEAR FUNDING AGREEMENT BETWEEN**

**THE PORT GAMBLE BAND OF S'KLALLAM INDIANS**

**AND**

**THE UNITED STATES OF AMERICA**

**DEPARMENT OF THE INTERIOR**

The Port Gamble Band of S'Klallam Indians ("Tribe") and the Secretary of the Department of the Interior agree to amend the Self-Governance FY 2012-2016 Multi-Year Funding Agreement ("Agreement") to add the following PSFA to Section 7 – Special Earmarked Programs, Services and Functions:

- Cooperative Landscape Conservation – Climate Adaptation

In accordance with Section 7 the funds are non-recurring, are not eligible to be base transferred, and can only be provided on a one-time basis for this year.

Payment of Climate Adaptation funding is hereby authorized in the respective project amount of $100,000 to the Tribe.

The Tribe agrees to use the funds in accordance with the respective approved Climate Adaptation proposals. Approval of respective project modifications will be coordinated with the Regional Climate Change Point-of-Contact.

The Tribe agrees to provide the BIA Regional Climate Change Point-of-Contact with quarterly progress reports for the respective awarded Climate Adaptation projects within ten days of the end of each quarter.

This amendment shall be effective upon the signature of both parties. All other provisions of this Agreement remain the same.


By: _____          By: _____

Chairman                                    Director, Office of Self Governance
Port Gamble Band of S'Klallam Indians

Date: _03-04-2015_                          Date: MAR 1 2 2015 _____

Submitted by email to: climate-adaptation-grant-submission@bia.gov

## U.S. Department of the Interior, Bureau of Indian Affairs (BIA)

*2014 Tribal Cooperative Landscape Conservation Grant Program*

### COVER PAGE

TO:     Sean J. Hart
            BIA Climate Change Coordinator
            1849 C St. NW, MIB 4635
            Washington D.C. 20240

FOR:    PROGRAM ANNOUNCEMENT of Federal Funding
            FY14 USDOI-BIA 2nd Round: Climate Adaptation Proposals

FROM:



**PORT GAMBLE S'KLALLAM TRIBE**
**NATURAL RESOURCES DEPARTMENT**
31912 Little Boston Rd. NE – Kingston, WA 98346

CONTACT: Paul McCollum, Director, Natural Resources Department
                Telephone: 360 297-6237, E-mail: paulm@pgst.nsn.us

Closing Date: April 30, 2014



The Port Gamble
S'KLALLAM TRIBE

**U.S. Department of the Interior, Bureau of Indian Affairs (BIA)**
**2014 Tribal Cooperative Landscape Conservation Grant Program**

Applicant: <u>Port Gamble S'Klallam Tribe</u>

Table of Content

| ATTACHMENT ITEM | Page/s |
|---|---|
| Table of Content page ............................................................... | p. 0 of 23 |
| Attachment 3 CATEGORY #2 ............................................................. | 1 |
| Project Summary...................................................................... | 1 |
| Proposal Narrative/Program Timeline/Team Qualifications.................. | 1-12 |
| Project Budget & Narrative........................................................ | 13 |
| Priority Ranking Factors Statement............................................... | 14 |
| Attachment Cover Page............................................................... | 14 |
| Tribal Resolution Supporting and Approving BIA Application.............. | Attachment -1 |
| Area-Location Map of Vicinity..................................................... | A-2 |
| Washington State -Port Gamble S'Klallam Reservation.................... | A-3 |
| Storm Surge and Sea Level Rise Models (2050-2100)........................ | A-4 |
| Washington State Tribal Reservations and Ceded Areas ................... | A-5 |
| Nature Conservancy Maps – Ecoregions & Marine Cost Parameters...... | A-6-7 |

We believe our grant proposal is consistent with the spirit and intent of the BIA-Tribal Adaptation
Program and thank you for the opportunity to apply for these funds.



The Port Gamble
S'KLALLAM TRIBE

**U.S. Department of the Interior, Bureau of Indian Affairs (BIA)**
**2014 Tribal Cooperative Landscape Conservation Grant Program**

### ATTACHMENT 3
### Proposal Format (Optional)

*Tribe/ Fiscal Year/Category:* | PORT GAMBLE S'KLALLAM TRIBE/2014/CATEGORY 2 |

## PROJECT IDENTIFICATION INFORMATION

*Project Title: Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment and Web-Based Tribal Government Adaptation Planning Tool Development*

*Tribe/Tribal Entity:* Port Gamble S'Klallam Tribe Natural Resources and Government Services

*Point of Contact:* Paul McCollum, Natural Resources Director, 360-297-6237 paulm@pgst.nsn.us

*Category (check):*

_____Training Program ☑ Adaptation Planning _____Climate Adaptation Travel
_____Coastal Regional Planning Body Participation, Capacity Building & Management Planning

*Tribes or Tribal Programs Benefitting:* Port Gamble S'Klallam Tribe Multiple Programs, Jamestown S'Klallam Tribe (JST), Hood Canal Coordinating Council (HCCC), Puget Sound Partnership (PSP), Point No Point Treaty Council (PNPTC), and shared with 17 Tribes participating in the University of Washington's Climate Change Impacts Group.

*Project Summary (1-2 sentences):* This project will build off existing data and framework to conduct a climate change vulnerability assessment, develop an adaptation plan for the tribal community tailored to the needs of the Tribe, build capacity and technical support skills of staff and tribal members through trainings, conferences, and workshops. The tribal project team and partners will also work with its consultant team to develop and be trained in the use of a *beta* web-based "Tribal Government Adaptation Planning Tool" capable of rapid climate exposure analysis. This tool will serve *multiple tribes* to help inform planning decisions and actions needed to protect or enhance tribal resources in this region with similar weather patterns, cultural/economic resources, vulnerabilities, and resilience concerns.

*Total Requested Funding Share of the BIA:* $100,000

In-kind support of a total of $40,000 of staff time will be leverage provided by project partners though not a part of this discrete budget; In addition there will be leverage of participation, training and technical expertise estimated at $16,000 from the Hood Canal Coordinating Council (HCCC), **$16,000** from the Point No Point Treaty Council (PNPTC), **$8000** Puget Sound Partnership (PSP), and an undetermined amount from the University of Washington's Climate Change Impacts Group.

*Proposal Narrative:*

**Assessment of needs**: Climate change based global warming has raised sea level about 8 inches since 1880, and the rate of rise is accelerating. Scientists expect 20 to 80 more inches this century, a lot depending upon how much more heat-trapping pollution humanity puts into the sky. This study makes mid-range projections of 1-8 inches by 2030, and 4-19 inches by 2050,


The Port Gamble
S'KLALLAM TRIBE

PORT GAMBLE S'KLALLAM TRIBE
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment
and Web-Based Tribal Government Adaptation Planning Tool Development*

depending upon location across the contiguous 48 states. (Sea level rise, storms & global warming's threat to the US coast, A Climate Central Report, Strauss et. al. March 14, 2012).

In 2009 the Center for Biological Diversity filed a lawsuit challenging Washington's prior water-quality assessment for failing to declare coastal waters impaired by ocean acidification. As a result of a settlement of that lawsuit, the U.S. Environmental Protection Agency directed all states to consider ocean acidification as a threat to water quality under the Clean Water Act. The Center has also urged Washington to develop new water-quality standards aimed at detecting ocean acidification.

Each day the world's oceans absorb 22 million tons of carbon dioxide from the atmosphere, most of which comes from burning fossil fuels (primarily energy production and transportation) and cutting down forests. $CO2$ reacts with seawater, causing it to become more acidic; as a result the oceans have become about 30 percent more acidic since preindustrial times. Ocean acidification strips seawater of the materials that marine animals — such as corals, plankton and shellfish — use to build their shells and skeletons, which can have repercussions up the entire marine food web. Earlier this year, the Center for Biological Diversity called on the EPA to develop a national plan to address ocean acidification.

There are 1,234 tribal members (Sept. 2012) —50% reside on the reservation which covers more than 1,300 acres with ~2.5 miles of shoreline. Tribal Members are reliant upon the Nearshore ecosystems for subsistence shellfish harvesting. The global climate is changing; sea levels are rising; the amount of sea level rise is not spread equally across the earth.

For the PGST and other Puget Sound region tribes; salmon populations are important cultural and economic resources. Assessing vulnerabilities and resilience of concern to both Tribal and state managers is crucial to determining actions to protect or enhance these resources during these times of limited funding. Climate change will have significant potential impacts to the Tribe's collective wildlife, subsistence and economic shellfish and finfish resources as well as their associated critical habitats. Likely Impacts to our local salmon populations include warmer temperatures; lower oxygen levels; increased marine hypoxic events; increases in disease and pathogens; ability to enter and or navigate in natal streams and rivers; and more intense winter and spring flooding events.

Some of the major concerns among the PGST tribal leadership and other Northwest tribes include:

1.     Impacts to our local salmon populations from warmer temperatures, lower oxygen levels, increased marine hypoxic events, increases in disease and pathogens, ability to enter and or navigate in natal streams and rivers and more intense winter and spring flooding events.



2.     Ocean Acidification impacts to vulnerable shellfish species as well as finfish dependent on impacted larval shellfish prey.

3.     Sea level rise is likely to become a significant concern over the next few decades both for nominal continuous rise and short term, abrupt events.


Sea Level Rise (SLR) projections for the Puget Sound basin include many factors that are local and global in scale. 100-year storm surges could add an additional 38 inches to current sea level, using a recent example when 38 inches were added to the high projections for both 2050 and 2100 to demonstrate how storms will add to projected inundation values.

In a 2013 analyses funded by the PGST, the environmental consulting firm of RIDOLFI used local projections to spatially model SLR, assisting to create an understanding of how the rise will impact the Port Gamble S'Klallam Tribal Reservation. Three SLR scenarios were generated for the years 2050 and 2100 in the Puget Sound Basin (Mote et al, 2008) as follows:

| Source: Mote et al., 2008 PUGET SOUND SEA LEVEL RISE(INCHES) | | |
|---|---|---|
| | **Year 2050** | **Year 2100** |
| **Low** | ~3 | ~6 |
| **Medium** | ~6 | ~13 |
| **High** | ~22 | ~50 |

High SLR Projections for 2050 and 2100 depicted in the following models on reservation lands:

 

Therefore, the *Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment and Web-Based Tribal Government Adaptation Planning Tool Development* will focus on project assessments to inform planning department decisions, housing, economic development, legal framework, and government policy with a special focus on projected impacts to fish (especially salmon) and shellfish (especially crab, shrimp and clams) on 20, 60, 100, and 200 year scales to determine the vulnerability and resilience of fish populations for Tribes in the Puget Sound region.

The Port Gamble
S'KLALLAM TRIBE

PORT GAMBLE S'KLALLAM TRIBE
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment
and Web-Based Tribal Government Adaptation Planning Tool Development*

**Objectives** of this project are primarily to build off of existing data from a 2013 EPA-funded project for Tribes to develop climate change impact assessments, focus on finalizing the framework to conduct a climate change vulnerability assessment, and develop an adaptation plan for the tribal community tailored to the needs of Tribes. PGST staff and members will attend trainings, conferences, and workshops to build capacity and gain technical support skills while working with its consultant team to develop a web-based tool capable of rapid climate exposure assessments for key areas of concern.

The first phase of the project will conduct a case study using existing data to assess the vulnerability and resilience of selected anadromous fish (salmon) populations for Tribes. The project team will work with scientists and managers to identify existing data and information related to several of the concerns that would be broadly useful for natural resource management planning in the Northwest and identify where data and information exist, their formats, and the most efficient and effective ways to make it available for use.

The *Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment* will address effects of the changes in the hydrologic regime on anadromous fish and have a dynamic team working on finalizing the framework. The assessment will incorporate existing climate information into "line management activities" and use joint support for partner-initiated projects - Climate Change Adaptation for Subsistence/Cultural Resources.

The second phase and scope of work will develop a pilot beta version of the "*Web-Based Tribal Government Adaptation Planning Tool*" similar to the "*Seattle Climate Impacts Planning Tool*" the consultant team of *Adaptation International* (AI) developed for that urban area. However, this tool would be capable of filtering through and summarizing the climate impact projections specific to species such as salmon, shellfish, other wildlife, and additional resources important to the PGST and our Puget Sound/Hood Canal region tribes within the tribal U&A we share. The tool would allow our PGST planning staff, regional tribal leadership, local governments, as well as EPA and other agencies to forecast the effect and the future for these priority species early in the planning process. Using key climate impacts project parameters would help inform capital improvement planning decisions, government policies, and where new housing would be built or relocated. The PGST would partner with JST and other Northwest tribes in this and future work to that end.

Project objectives also support the national strategy of Strengthening State, Tribal, and International Partnerships through collaboration and focus on increasing tribal capacity to establish and implement environmental programs while ensuring that our national programs are as effective in Indian country as they are throughout the rest of the nation. And, to obtain commitment from other federal agencies to work together with tribes to address climate changes in the Northwest Region with effective and meaningful initiatives. This process will include all or part of the following action objectives:

- Identify one or more locations where data and information on anadromous fish populations exist and climate conditions have been projected, and where there is a management entity seeking a vulnerability assessment to support conservation and management planning.


The Port Gamble
S'KLALLAM TRIBE

**PORT GAMBLE S'KLALLAM TRIBE**
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment
and Web-Based Tribal Government Adaptation Planning Tool Development*

- Convene information providers and tool-makers with managers to provide review, demonstration, and instruction in the application of vulnerability assessment tools for a selected case study.

- Continue ongoing work and build on past work to integrate existing and new cross-boundary data and information using data discovery and management platforms.

- Facilitate collaborative efforts (e.g. standing work groups or discipline groups) to share information and data, evaluate the quality of the data, and facilitate integration of the information into projects.

- Where management-relevant data gaps have been identified, work across departments, tribal leadership, and with partners to facilitate filling the gaps.

- Identify and share examples of how various data and information types have been used or develop and implement case studies on the use of various types of data related to climate stressors and landscape effects.

- Assess vulnerabilities of selected key ecosystems, habitats, species, and/or best practices in a targeted location.

- Scientists leading the effort will work with managers to identify key ecosystems, habitats and/or species of interest (cross-walk selections with habitats or species identified as being of high value or of concern by Tribes and First Nations) where they are focusing management actions and have concerns related to climate change impacts.

- If appropriate, once vulnerabilities have been assessed, the scientists will work with participating managers to develop adaptation and mitigation strategies that can inform decision making beyond the selected geographic area.

**Methodology, Work Plan, Timeline and milestones per task:**

*Time Line:* Work will begin September 1, 2014 and continue 18 months until February 28, 2016.

**Task 1: Kick-off Meeting and Stakeholder Interviews - Months 1-2**
- Initial project conference call
- Information gathering stakeholder interviews

**Task 2: Rapid Climate Science and Local Data Review and Analysis - Months 2-4**
- Review and summary of existing climate assessment information for PGST and partners
- Technical document summarizing high level potential climate exposures

**Task 3: Select components for Detailed Assessment - Months 4-6**
- In-person meetings with key Tribal staff, decision makers, other stakeholders & partners
- List of selected critical resources of concern for detailed assessment
- Initial identification of decision support needs for on-line resource/tool (Scoping of tool)
- Summary of additional areas of concern for future work

**Task 4: Detailed analysis and Mapping for Key Climate Exposures - Months 6-7**
- Detailed analysis of climate related exposure for critical resources of concern
- Maps of key climate exposures (GIS based or other)

 The Port Gamble S'KLALLAM TRIBE

PORT GAMBLE S'KLALLAM TRIBE
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment
and Web-Based Tribal Government Adaptation Planning Tool Development*

**Task 5: Initial proposal and framing of on-line tool to support consideration of climate impacts in Tribal Natural resource and other planning efforts. - Months 8-9**
- Conceptual framework for on-line tool

**Task 6: Initial Assessment of Sensitivity, Adaptive Capacity, and Vulnerability - Workshop - Months 9-10**
- Preliminary sensitivity and adaptive capacity rankings for each critical resources of concern
- Preliminary vulnerability assessment and matrix for each critical resource of concern
- Initial review and comments on tool framework by key stakeholders & partners

**Task 7: Refine Climate Vulnerabilities and Develop Adaptation Strategies - Month 11**
- Refining and validating initial vulnerabilities by reviewing results of climate exposure analysis, adaptation capacity and sensitivity, and vulnerability
- Finalized vulnerability rankings
- Initial list of potential adaptation strategies

**Task 8: Develop beta version of climate support tool - Months 11-12**
Initial creation of beta version of the tool
- Review and comment by key Tribal representatives, stakeholders, & partners.

**Task 9: Refinement and prioritization of Adaptation Strategies, Tool Testing - Workshop - Months 13-14**
- Summary and refinement of adaptation strategies
- Qualitative assessment of climate mitigation value of proposed strategies
- Hands on testing of tool in a workshop format.

**Task 10: Draft Report on Climate Vulnerability and Adaptation Plan - Month 15**
- Draft report on climate vulnerability and adaptation strategies

**Task 11: Design of education and outreach summaries - Months 15-16**
- Development of outreach summary materials for broader community engagement around finding
- Iterative refinement process of summaries

**Task 12: Refinement of tool and completion of pilot tool - Month 17**
Final programing and refinement of tool based on user testing

**Task 13: Final Report, Presentation of Findings, Distribution of tool – Months 17-18**
- Final report on climate vulnerability and adaptation strategies
- PowerPoint presentation on climate impacts and adaptation strategies
- Presentations of findings
- Packaging and distribution of tool.

**Ongoing Months 1-18:** Meet with working groups 2x per year and council meetings quarterly.


The Port Gamble S'KLALLAM TRIBE

PORT GAMBLE S'KLALLAM TRIBE
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment
and Web-Based Tribal Government Adaptation Planning Tool Development*

- Reporting will begin in first quarter of award and be evaluated 2x per year. Progress that substantially meets the schedule will be accepted and reported in quarterly reports to BIA. Progress that substantially does not meet the schedule will trigger an audit to determine the cause(s) of the delay and corrective actions. Corrective actions will be implemented by the project manager and monitored by the PGST's NR Director. All progress will be evaluated monthly and if any problems or changes occur, these will be evaluated by the project director and adaptive management discussed with grant manager.

## Project Team/Individuals and Qualifications:

**Paul McCollum, PGST's Natural Resources Director, will devote 4% FTE** towards administration and management of this project, oversight of all project components, and rely on his designated project manager, support staff, and administrative agents to manage the contracts, conduct invoicing, create and submit reports. He holds a BS in Marine Biology (Columbia Pacific University, CA) & AS in Biology (College of the Siskiyous, CA). He supervises all department program managers and staff, including shellfish, habitat, hatchery, water resources, enforcement and environmental program managers and staff. Mr. McCollum has extensive experience in managing all aspects of project management, grants administration, and has the expertise to see this projects objectives to a successful completion.

**Roma Call, PGST's Environmental Coordinator, serving as the Project Director, will devote 5% FTE** towards general overall project support, monitoring, and facilitating internal team communication and strategy regarding cleanup and restoration in Port Gamble Bay and potential impacts to tribal members. Ms. Call reviews and comments on local project proposals regarding potential impacts to tribal treaty rights and the environment, including multiple Navy project proposals. She participates in strategic planning for negotiation of tribal mitigation, and will coordinate with internal team and external stakeholders regarding land acquisition, conservation strategies, and funding. She holds a Master in Public Administration (MPA) from the Univ. of Washington and a BA in Psychology from Purdue. Additionally, Ms. Call participates in regional policy meetings as representative of the tribe, including Hood Canal In-Lieu-Fee program, Rayonier NRD Trustee Council, and others.

**Abigail Welch, PGST's Finfish Manager and EN data specialist, will devote 1% FTE** for technical support purposes and to coordinate data management needs. She holds a B.S degree from Western Washington University in Environmental Science with a minor in Geology. She has successfully installed a 2.0 node and currently uses WQX to submit data to EPA. Ms. Welch also participated in the development and testing of the Northwest Indian Fisheries Commission's (NWIFC) JMX data flow, which is now in full production. She serves on the steering and testing committee for the Nearshore Environmental Data Exchange the NWIFC.

**Dave Fuller, Hydrogeologist/Water Resources Manager (since 1991), will devote 1% FTE** as leverage to this project for technical support and to coordinate area Tribes involvement. Mr. Fuller is frequently called on for technical expertise on Tribal, state and regional water has written, managed and executed environmental grants for the PGST's Natural Resources Department and, prior to that, the Suquamish Tribe. He has expertise in groundwater resources and protection, Tribal surface water quality standards, surface water and wetlands monitoring and management, wellhead and drinking water protection and toxic landfill cleanup. Mr. Fuller is frequently called on for technical expertise on Tribal, state and regional water resources and

**469**


The Port Gamble
S'KLALLAM TRIBE

PORT GAMBLE S'KLALLAM TRIBE
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment and Web-Based Tribal Government Adaptation Planning Tool Development*

watershed councils. He represented Western Washington Tribes on the Washington State Hydraulic Continuity (the link between groundwater and surface water) Technical Advisory Committee. He represents the NTWC on the National Water Quality Monitoring Council, the State Tribal Climate Change Council, and the Subcommittee on Ground Water for the Advisory Committee on Water Information (ACWI). Dave is licensed as a geologist and hydrogeologist in Washington and is licensed as a geologist in California, worked for the California Department of Water Resources, Geological Survey and two counties in Minnesota.

**Josh Wisniewski, PGST Historic Preservation Officer will devote 2% FTE** as leverage to this project and is responsible for completing all cultural resource assessments on the Reservation. All restoration activities will be cleared through his office prior to ground disturbing activities. Mr. Wisniewski has worked for the tribe since 2010, he holds a PhD in Anthropology, specializing in archeology and cultural anthropology of the northwest coast. His education and professional experience meet Secretary of the Interior Requirements to serve as a Tribal Historic Preservation Officer (THPO) and he has provided formal NEPA cultural resource assessments and determinations for many past and recent projects on the reservation and performed field work in both Alaska and Washington.

**Joe Sparr, Planning Director will devote 1% FTE leverage** for land use planning support and permitting management. Mr. Sparr has served as the Planning Director for the PGST since 2006 and responsible for gaining the assistance and expertise of other tribal departments and local jurisdictions as needed. He will ensure the project team and Tribal Council are kept abreast of the restoration and any issues that might emerge that require their input.

**Dallas DeGuire, Executive Director of Tribal Administration,** has well established financial resources to manage this projects finance. Mr. DeGuire and his staff will **devote 5% FTE** leverage towards administration. Proper accounting, audit, and performance procedures are in place for ensuring that project performance is met and the Tribe agrees to maintain and make available upon request all books, records, documents and other evidence pertaining to the costs and expenses relating to this project to the extent and in such detail as will properly reflect all direct costs of labor, materials, equipment, supplies, contracts, services and other expenses for which reimbursement is claimed or payment is made under the provisions of this agreement.

**Port Gamble S'Klallam Health Clinic** Director Ed Fox and his staff will work with the project team to provide outreach and education on health concerns, food safety, and work closely with the education team to ensure project goals are met. The Health clinic includes the following a full complement of staff: Clinic Coordinator, Primary Care Provider, Physician's Assistant, Pediatrician, MDs, MPH, Medical Director, Licensed Nutritionist, Medical Assistant, Referral Coordinator, Medical Assistant, and Registered Nurses.

## PARTNER SUPPORT:

**Hood Canal Coordinating Council** (HCCC), a consortium of tribal and local governments within the watershed, has been collaborating on regional policy and projects together since 1985. The HCCC will partner in this project devoting 1% FTE. PGST staff members in turn provide technical input and support in HCCC projects, this includes: the multi-stakeholder Hood Canal Salmon Sanctuary working to secure conservation easements for sensitive riparian environments, and estuarine restoration efforts.





**Adaptation International** (AI) is a firm that focuses on helping communities, organizations, and businesses prepare for the impacts of climate change. AI specialize in bridging the gap between climate change science and community action by conducting climate vulnerability assessments and helping develop the tools and strategies necessary to respond to a changing climate. AI is currently working with the **Jamestown S'Klallam Tribe** on the Olympic Peninsula in Washington State to conduct a climate change vulnerability assessment and develop an adaptation plan for the tribal community. They are collaborating with Washington Sea Grant on the project and tailoring the project to the needs of the Tribe through the use of a rapid climate exposure assessment process and the selection of key areas of concern. The first phase of the study has been completed and includes: maps of locally specific relative sea level rise scenarios; assessment of climate related vulnerabilities of key infrastructure and cultural assets; and some prioritized adaptation strategies to increase resilience.

AI previously worked with Cascadia Consulting Group to develop a Climate Impacts Planning Tool for the **City of Seattle**. This tool filters through and summarizes the regional climate impact projections in three key areas: temperature, precipitation, and sea level rise. A few key project parameters (type of project, project location, and project lifespan) allow capital improvement project managers to identify key climate impacts early in the planning process. This tool represents a solid first step at mainstreaming adaptation planning. **AI Team bios:**



**Alexander (Sascha) Petersen:** Sascha has been working specifically on climate change for more than seven years. He is a Lead Author for the Great Plains Region of the forthcoming National Climate Assessment (2013) and has worked with both climate scientists and municipal governments. His focus is on bridging the gaps between climate change science, policy, and action. He has lead AI projects with the Jamestown S'Klallam Tribe, Tucson, and Seattle.

As a research scientist with Climate Impacts Group at the University of Washington, NOAA's first Regional Integrated Sciences and Assessments (RISA) programs, he helped develop regionally specific projections for sea-level rise in Washington State. He then used these predictions to develop an interdisciplinary understanding of coastal climate impacts and worked directly with the City of Seattle and King County to evaluate policy response options and adaptation strategies. Sascha led the City of Austin's adaptation efforts through his participation in a Climate Resilient Communities advisory group for ICLEI: Local Governments for Sustainability and support of Centers for Disease Control and Prevention project to assess the local health impacts of climate change. He also served on the Climate and Energy Technical Advisory Committee for ICLEI's Star Community Index, helped lay the foundation for the development of a Community Climate Action Plan, and completed municipal and community wide greenhouse gas emissions inventories.

Sascha has a Bachelor's degree in physics from Pomona College and a Master's degree focusing on climate change science and policy from the University of Washington. Prior to working on climate change, he trained astronauts at the Johnson Space Center. He may be reached directly via email: Sascha@adaptationinternational.com

  
 The Port Gamble S'KLALLAM TRIBE

**PORT GAMBLE S'KLALLAM TRIBE**
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment*
*and Web-Based Tribal Government Adaptation Planning Tool Development*

 **Liz Rohlich:** Liz is a Clinical Nurse Specialist with Master's degree in Nursing and a Bachelor's degree in economics from the University of Texas in Austin. She has worked in a small town clinical setting in Homer, Alaska and a large level-one trauma hospital in Austin, Texas. As a Peace Corps volunteer, she delivered vaccinations to communities in rural Bolivia, which sometimes required riding for hours down a dirt road in a Jeep that served as the mobile medical clinic. With experience working as a health care provider in different parts of the world, she focuses on how climate change will affect human health; particularly low-income and underserved communities likely to be vulnerable to climate change.

 **Jacob Bell:** Jake has been involved in the Climate Change field since 2007 with a focus on the human health impacts of climate change. He currently provides project consulting on climate change public health research in Alaska Native Villages. He was previously on staff with the Center for Climate and Health at the Alaska Native Tribal Health Consortium in Anchorage, Alaska. This work involved development of community climate change/health impact scenarios, monitoring of climate-sensitive health outcomes, and local collaboration for relevant adaptation interventions. Previous experiences include climate change health research at the Environmental Defense Fund (EDF) in Washington, D.C. and at the London School of Hygiene and Tropical Medicine. Jake holds a degree in Psychology from Pomona College and a Master's degree in Global Health with a focus in environmental health from Trinity College, Dublin.

 **Missy Stults:** Missy is a Science Research Fellow at the University of Michigan working on development of the Adaptation Chapter for the U.S. National Climate Assessment. In this role, she is working with leading climate adaptation and mitigation experts to identify major themes and trends in national climate adaptation efforts for distillation into the 2013 National Climate Assessment. Before joining the University of Michigan, she was the national Climate Director for ICLEI-Local Governments for Sustainability where she worked with over 600 local governments to advance their climate mitigation, climate adaptation, and sustainability efforts. Missy received her Bachelor's degree in Science from the University of New England in Marine Biology and Environmental Science and her Master's degree from Columbia University in Climate and Society. Missy is currently enrolled at the University of Michigan to pursue her doctoral degree in urban adaptation.

 **Jamie Parks:** Jamie is a community transportation expert, with experience in multimodal transportation planning, pedestrian and bicycle safety, project prioritization, and performance measurement. Jamie has worked with dozens of clients throughout the country to develop transportation projects and policies that reduce greenhouse gas emissions, increase equity, and make cost-effective use of limited resources. His work ranges from neighborhood-level planning efforts to developing national resource documents, such as the *NACTO Urban Bikeway Design Guide* and *TCRP Report 153: Guidebook for Access to Public Transportation Stations*. Jamie is an effective communicator and provides his clients with a well-rounded perspective based on his involvement in a wide variety and geographic diversity of projects. Jamie has Bachelor's degrees in History and Mathematics from Johns Hopkins


The Port Gamble
S'KLALLAM TRIBE

**PORT GAMBLE S'KLALLAM TRIBE**
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment*
*and Web-Based Tribal Government Adaptation Planning Tool Development*

University, and a Master's degree in Transportation Engineering from Northwestern University. He is an avid cyclist and pedestrian, and has lived car-free since 2003.

## RELEVANT PROJECT EXPERIENCE:

### Seattle Climate Impacts Planning Tool



AI worked with Cascadia Consulting Group to develop a Climate Impacts Planning Tool for the City of Seattle. This tool filters through and summarizes the regional climate impact projections in three key areas: temperature, precipitation, and sea level rise. A few key project parameters (type of project, project location, and project lifespan) allow capital improvement project managers to identify key climate impacts early in the planning process. This tool represents a solid first step at mainstreaming adaptation planning. With support from USAID, Cascadia is now piloting use of the tool to support climate planning in Vietnam.

### Sea Level Rise Projections for Washington

Developing climate science information that can be used to make decisions is critical in addressing climate change. With the Climate Impacts Group at the University of Washington, Sascha helped develop regional sea level rise projections for Washington State. He also used high resolution LiDAR (Light Detection And Ranging) data to create geographic information system (GIS) based inundation maps for selected municipalities. Mapping low, medium, and high relative sea level rise scenarios provided a basis for the City of Seattle and King County to




Highly populated coastal areas throughout Puget Sound, Washington, are vulnerable to sea-level rise. The maps show regions of Olympia and Harbor Island (both located in Puget Sound) that are likely to be lost to sea-level rise by the end of this century based on moderate and high estimates.


evaluate and consider sea level rise response options. The maps were cited in the <u>Global Climate Change Impacts on the U.S. (2009)</u> report by the United States Global Climate Change Research Program.

## Tools to Support Adaptation



Decision-support and planning tools provide the climate impact information clients need, when they need it. <u>AI have created a cloud based tool that allows users to search and share adaptation strategies.</u> AI also help communities and businesses develop the software and support systems necessary to "ask the climate question" and mainstream climate change planning into their everyday actions.

## Tucson Climate Action Plan

| Temperature | | | | IMPORTANT | MOST IMPORTANT |
|---|---|---|---|---|---|
| **SINGLE DAY EVENTS** | | | | | |
| Daily maximum exceeding: | | °F | (e.g. 110°F) | | |
| Daily minimum below: | | °F | (e.g. 20°F) | | |
| **HEAT WAVES** | | | | | |
| ___ : consecutive days above a daily maximum of: | | °F | (e.g. 110°F) | | |
| **COLD SNAPS** | | | | | |
| ___ : consecutive "freeze" days | | (Daily min ≤ 32°F) | | | |
| 2 : consecutive "hard freeze" days | | (Daily min ≤ 28°F) | | X | |
| **OTHER (WRITE IN YOUR OWN BELOW)** | | | | | |

AI is supporting the development of Tucson's Climate Mitigation and Adaptation Plan, working in partnership with <u>Cascadia Consulting Group</u> and the <u>Stockholm Environmental Institute (SEI)</u>. The project team has completed a climate vulnerability assessment based on a new approach of using community defined critical thresholds to customize climate projections. We are currently wrapping up the project and assisting in the evaluation and prioritization of adaptation strategies. We are excited to help Tucson reduce greenhouse gas emissions and become a more climate resilient community.

The Port Gamble S'KLALLAM TRIBE

**PORT GAMBLE S'KLALLAM TRIBE**
*Hood Canal Fish and Wildlife Resources Climate Change Impact Vulnerability Assessment and Web-Based Tribal Government Adaptation Planning Tool Development*

**Budget & Narrative:** Exclusive of leveraging funds by partners as described above.

| TASK # | Task Description | Personnel | Fringe Benefits | Travel | Equipment | Supplies | Contractual | Totals |
|---|---|---|---|---|---|---|---|---|
| Task 1 | Kick-off Meetings and Stakeholder Interviews | | | $ 3,000 | | | $ 3,500 | $ 6,500 |
| Task 2 | Rapid Climate Science & Local Data Review & Analysis | | | | | | $ 3,000 | $ 3,000 |
| Task 3 | Select Components for Detailed Assessment | | | | | | $ 6,000 | $ 6,000 |
| Task4 | Detailed Analysis & Mapping for Key Climate Exposures | | | $ 5,000 | | $ 1,000 | $ 8,500 | $ 14,500 |
| Task5 | Initial proposal & framing of online tool | | | | | | $ 4,000 | $ 4,000 |
| Task6 | Initial Assessment of Sensitivity, Adaptive Capacity, & Vulnerability-Workshop | | | $ 1,000 | | $ 1,000 | $ 6,000 | $ 8,000 |
| Task 7 | Refine Climate Vulnerabilities & Develop Adaptation Strategies | | | | | | $ '4,000 | $ 4,000 |
| Task 8 | Develop Beta version of climate support tool | | | | | | $ 15,000 | $ 15,000 |
| Task 9 | Refinement & prioritization of Adaptation Strategies, Tool Testing---Workshop | | | $ 1,000 | | | $ 6,000 | $ 7,000 |
| Task 10 | Draft Report on Climate Vulnerability & Adaptation Plan | | | | | $ 1,000 | $ 4,500 | $ 5,500 |
| Task 11 | Design of Education & Outreach Summaries | | | $ 2,000 | | $ 1,000 | $ 3,500 | $ 6,500 |
| Task 12 | Refinement of tool & completion of pilot tool | | | | | | $ 9,000 | $ 9,000 |
| Task 13 | Final report, presentation of findings, distribution of tool | | | $ 3,000 | | $ 1,000 | $ 7,000 | $ 11,000 |
| | **Project Totals** | 0 | 0 | $15,000 | $ - | $ 5,000 | $80,000 | $ 100,000 |

Federal procurement procedures will be followed in hiring and managing this contract work. All contracts will undergo a legal review, either based on templates that have been reviewed in the past by an attorney, or new ones, reviewed by an attorney.

Travel for up to four staff members and four will be conducted in government vehicles using a federally approved GSA mileage rate per mile, ferry service at $18 per vehicle each way and round trip passenger only fares, currently $8 per trip. Costs include workshop fees and cost of taxi service when necessary to accommodate individuals.

Supplies will include postage, paper, office supplies, printing costs of workshop materials, flyers, media storage, and other materials used in the production and distribution of project deliverables.



**HIGHLIGHT ANY PRIORITY RANKING FACTORS:**

This Category 2 project addresses priority ranking factors including 1) serves multiple tribes; 2) leverages funds through applicant and partnering contributions and builds off of past projects; 3) builds tribal capacity and improves technical support skills as described in the narrative; 4) includes other departments, support agencies (housing, health, social services) and tribal leadership who support the activities and goals expressed in this proposal.

# ATTACHMENTS

1. Tribal Resolution Supporting this Proposal and Project Objectives

2. Project Location Maps

3. Bibliography & Excerpted Portions of References/Studies/Plans

4. Other support documentation

**476**

THE                    )

PORT GAMBLE            )

S'KLALLAM              )

TRIBAL COUNCIL         )

OF THE                 )

PORT GAMBLE            )

S'KLALLAM TRIBE        )

---

I.

WHEREAS, the Port Gamble S'Klallam Tribe entered into the Treaty of Point No Point with the United States of America on January 26, 1855, reserving sovereign and aboriginal rights in perpetuity; and

II.

WHEREAS, the Port Gamble S'Klallam Reservation was proclaimed on June 16, 1938 to be an Indian reservation, held in trust by the federal government "...for the benefit and use of the Port Gamble Band of Clallam Indians...", under the provisions of Section 5 of the Indian Reorganization Act, the purchase of which was paid in full by Tribe; and

III.

WHEREAS, the Port Gamble S'Klallam Tribe's General Council delegated the Tribe's authority to apply for federal, state or private grants to the Tribal Council under Article IV, Section 3 H of the Constitution of the Port Gamble S'Klallam Tribe, approved by the Secretary of Interior on July 24, 2007, AMENDED BY CERTIFIED ELECTION ON JULY 8, 2013; and

IV.

WHEREAS, the Tribal Council supports programs that protect Port Gamble Bay and tributaries while enhancing its Natural Resources, and because rapidly changing climatic conditions are already impacting tribes and climate change impacts are being discovered on an ever increasing scale; the Natural Resources Department has collaborated with the Jamestown S'Klallam Tribe, Pacific Northwest Tribal Climate Change Network, the University of Washington's Climate Change Impacts Group, the Point No Point Treaty Council, and the Oregon Climate Change Research Institute at OSU (OCCRI) to develop an Impact Assessment and Vulnerability Analysis to promote a better understanding of climate change and its impacts on ecosystem health; and

**V.**

WHEREAS, the Natural Resources Department would receive funding from the Bureau of Indian Affairs (BIA) under "CATEGORY 2 Development of tribal government climate adaptation plans, vulnerability assessments or data analysis" to draft the "Climate Change Impact Assessment and Vulnerability Analysis for the Port Gamble Tribe" that will continue the collaborative efforts with the aforementioned consortia; and

**VI.**

WHEREAS, the Bureau of Indian Affairs (BIA) supports projects that help and support tribes plan for adapting to climate change and for coastal management planning; and

**VII.**

WHEREAS, the Bureau of Indian Affairs (BIA) supports projects carried out by federally recognized tribes,

**VIII.**

NOW THEREFORE BE IT RESOLVED, that the Port Gamble S'Klallam Tribal Council authorizes and supports the submission of this grant application to the Bureau of Indian Affairs (BIA) in support of the President's 2013 Climate Action Plan for the "Climate Change Impact Assessment and Vulnerability Analysis for the Port Gamble Tribe" project.

**CERTIFICATION**

WE HEREBY CERTIFY that on this date there was a regular meeting held of the Port Gamble S'Klallam Tribal Council on the Port Gamble S'Klallam Indian Reservation, at which time a quorum was present;

WE FURTHER CERTIFY, that the above numbered resolution, was at said meeting, introduced, evaluated, and was passed by a vote of _4_ FOR, _0_ AGAINST _0_ ABSTAIN dated this _22nd_ day of April, 2014.

_____
Jeromy Sullivan
Chairperson

Attest:
Council Member



Port Gamble S'Klallam Tribe Boundary and Location

Kitsap County

State of Washington

Port Gamble S'Klallam Tribe Reservation

Hood Canal

Port Gamble Bay

The Port Gamble S'KLALLAM TRIBE



Port Gamble S'Klallam Tribal Reservation Location

WASHINGTON

Bellingham

Seattle

Spokane

Port Gamble
S'Klallam

0          2,000 Feet

0    25    50                    100 Miles

Created: 7/2013  Data: ESRI, WA ECOLOGY, WSDOT

# Storm Surge and SLR

Three Sea Level Rise Projections and Storm Surge for the years 2050 and 2100





## Washington State
## Tribal Reservations and Draft Treaty Ceded Areas

GIS Technical Services
04.01.99
tribal.ceded.r

Treaty Information: http://www.wa.gov.wa/government.tribes/default.htm



Map 4.5: Stepwise Analysis for Building Initial Seascapes

Georgia Basin and Puget Trough

**Stepwise Analysis***

～ Shoreline Habitat Representation

Forage Fish Spawning Grounds

Intertidal Rockfish and Reefs

Seabirds and Marine Mammals

All Data plus Invertebrates

Ecoregion boundary

*Stepwise analysis was based on data quality and coverage of different taxon groups. This formed the basis for building initial seascapes.

1 inch equals 17 miles

The Nature Conservancy



**Marine cost values\***

1 - 138 (Low)

139 - 438 (Medium)

439 - 663 (High)

Ecoregion boundary

*Marine costs (impacts) included public and private wildlands and tidelands, protected areas, fisheries closure, ferry, commercial shipping routes, and shoreline costs. Costs were averaged per hexagon.*

Georgia Basin and Puget Trough

**Map 4.3: Marine Cost Parameters and Values**

1 inch equals 17 miles

0    8.5    17 Miles

0    13    26    39 Kilometers

The Nature Conservancy

# EXHIBIT C



United States Department of the Interior
Bureau of Indian Affairs
Northwest Regional Office
911 NE 11th Avenue
Portland, Oregon 97232-4169

**JUL 1 0 2015**

In Reply Refer To:
Division of Natural Resources
RPI CLIMATE CHANGE-PORT GAMBLE

The Honorable Jeromy C. Sullivan
Port Gamble S'Klallam Tribe
31912 Little Boston Road, Northeast
Kingston, Washington 98346-9700

Dear Chairman Sullivan:

The Port Gamble S'Klallam Tribe (Tribe) is awarded **$69,536** for the Rights Protection Implementation (RPI) Climate Change proposal entitled "Analysis of High Temperature, Extreme Flows and Hypoxic Impacts to Adult and Juvenile Salmon in Hood Canal and Admiralty Inlet, Washington."

These funds are being transferred to the Office of Self-Governance and will be added to the Tribe's Self-Governance compact.

Be advised that RPI Climate Change funds are currently available only for Fiscal Year 2015. We are unable to say whether these funds will be available in future years.

Please contact Rick Cook Fishery Biologist, in the Northwest Regional Office at (503) 872-2878, with any comments or questions.

Sincerely,

Northwest Regional Director

# EXHIBIT D



**United States Department of the Interior**
**BUREAU OF INDIAN AFFAIRS**
Northwest Regional Office
911 NE 11th Avenue
Portland, Oregon 97232-4169
JUL 1 8 2018

In Reply Refer to
NATURAL RESOURCES
FY 2018 TWF SUPPLEMENTAL
PORT GAMBLE S'KLALLAM

The Honorable Jeromy C. Sullivan
Port Gamble S'Klallam Tribe
31912 Little Boston Road, Northeast
Kingston, Washington 98346-9700

Dear Chairman Sullivan:

Please be advised the Port Gamble Tribe (Tribe) is awarded **$122,940** for a proposal submitted during the Fiscal Year 2018 (FY18) Timber, Fish and Wildlife Supplemental (TFW) funding proposal process.

These funds are being transferred to the Office of Self-Governance and will be added to the Tribe's Self-Governance compact.

Due to the increase in base funds for this fiscal year please submit an updated budget, and if necessary an updated statement of work, within 30 days of receipt of this letter.

Be further advised that TWF funds are currently available only for FY18. We are unable to say whether these funds will be available in future years.

Please contact Rudy Peone, Fishery Biologist, in the Northwest Regional Office, at (503) 872-2878, or rudy.peone@bia.gov with any comments or questions.

Sincerely,

Tammie Poitra
ACTING Northwest Regional Director

cc: Office of Self Governance, Vancouver, Washington



United States Department of the Interior
**BUREAU OF INDIAN AFFAIRS**
Northwest Regional Office
911 NE 11ᵗʰ Avenue
Portland, Oregon 97232-4169

In Reply Refer To:
NATURAL RESOURCES
FY 2018 Round 2 HM Award
PORT GAMBLE

JUL 1 7 2018

The Honorable Jeromy C. Sullivan
Port Gamble S'Klallam Tribe
31912 Little Boston Road Northeast
Kingston, Washington 98346

Dear Chairman Sullivan:

Please be advised the Port Gamble S'Klallam Tribe has been awarded **$45,302**
for project proposal(s) submitted during the Fiscal Year 2018 Hatchery Maintenance
Fund proposal process. The specific project(s) funded, as well as the award amounts,
are detailed below:

| Facility | Project Description | Award Amount |
|---|---|---|
| Little Boston Fish Hatchery | Purchase custom aluminum dividers. | $1,762 |
| Little Boston Fish Hatchery | Purchase Jet Boat Motor and Controls. | $14,340 |
| Little Boston Fish Hatchery | Purchase custom aluminum chute for Broodstock. | $6,000 |
| Little Boston Fish Hatchery | Purchase raft for fish transfer and net removal. | $16,000 |
| Little Boston Fish Hatchery | Purchase Aluminum Welder. | $7,200 |
| **TOTAL** | | **$ 45,302** |

These funds are being transferred to the Office of Self-Governance and will be added to the Port Gamble S'Klallam Tribe's Self-Governance compact.

Please contact Rudy Peone, Fishery Biologist, in the Northwest Regional Office at (503) 872-2878 or rudy.peone@bia.gov with any comments or questions.

Sincerely,

ACTING

Northwest Regional Director

Tammie Poitra

cc: Superintendent, Puget Sound Agency
    Office of Self Governance, Vancouver, Washington

# EXHIBIT E

# Grant and Cooperative Agreement

**CHOOSE ONE**
- [ ] COOPERATIVE AGREEMENT
- [X] GRANT

**CHOOSE ONE:**
- [ ] EDUCATION
- [ ] FACILITIES
- [ ] RESEARCH
- [ ] SDCR
- [ ] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER A19AP00205 | 2 SUPPLEMENT NUMBER | 3 EFFECTIVE DATE 08/21/2019 | 4 COMPLETION DATE |
|---|---|---|---|

**5 ISSUED TO**
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
PORT GAMBLE S'KLALLAM TRIBE
Attn: ATTN GOVERNMENT POC
31912 LITTLE BOSTON RD NE
KINGSTON WA 98346-9700

**6 ISSUED BY** BIA CENTRAL 00016
Mailing Address: 12220 Sunrise Valley Drive
Contracting Office
Reston VA 20191

**7. TAXPAYER IDENTIFICATION NO. (TIN)**

**8 COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO**
37DK1

**9 PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR (Name & Phone)**
Paul Mccollum
paulm@pgst.nsn.us

**10 RESEARCH, PROJECT OR PROGRAM TITLE**
Ocean and Coastal Management and Planning

**11. PURPOSE**
This project will conduct shellfish and substrate surveys to assess the risk to tribal shel[l] resources from accelerating bluff erosion.

**12. PERIOD OF PERFORMANCE (Approximately)**
08/01/2019 through 12/31/2020

| 13A. | AWARD HISTORY | 13B | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $150,000.00 | THIS ACTION | $150,000.00 |
| CASH SHARE | $0.00 | TOTAL | $150,000.00 |
| NON-CASH SHARE | $0.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| TOTAL | $150,000.00 | | |

**14 ACCOUNTING AND APPROPRIATION DATA**
01

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| 0020190728 | | | |

**15 POINTS OF CONTACT**

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | | | | |
| PAYMENTS | | | | |

**16 THIS AWARD IS MADE UNDER THE AUTHORITY OF**
25 USC Sec.2/ the Snyder Act/25 USC Sec 13/as amended/PL 115-31/2019 Consolidated Appropriations Act

**17. APPLICABLE STATEMENT(S), IF CHECKED**
- [ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
- [ ] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

**18. APPLICABLE ENCLOSURE(S), IF CHECKED**
- [ ] PROVISIONS
- [ ] SPECIAL CONDITIONS
- [X] REQUIRED PUBLICATIONS AND REPORTS

**UNITED STATES OF AMERICA**

**COOPERATIVE AGREEMENT RECIPIENT**

| CONTRACTING/GRANT OFFICER Nancy Sloanhoffer | DATE 08/21/2019 | AUTHORIZED REPRESENTATIVE | DATE 9-23-19 |
|---|---|---|---|

⊔ Consider in the contract process whether firms competing for larger contracts intend to subcontract with Indian owned businesses;

⊐ Encourage contracting with consortiums of Indian owned businesses when a contract is too large for one of these firms to handle individually; and

⊔ Use the services and assistance, as appropriate, of such organizations as the Small Business Development Agency in the solicitation and utilization of Indian owned.

**APPROVED BY:**

_____     _15 AUG 19_____
Office of Trust Services                                          Date

_____     _9-23-2019_____
Port Gamble S'Klallam Tribe                                 Date

_____     _8/22/19_____
Grant Officer, Bureau of Indian Affairs                   Date

# EXHIBIT F



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Northwest Regional Office
911 Northeast 11th Avenue
Portland, Oregon 97232

The Honorable Jeromy C. Sullivan
Port Gamble S'Klallam Tribe
31912 Little Boston Road, Northeast
Kingston, Washington 98346-9700

Dear Chairman Sullivan:

Please be advised the Port Gamble S'Klallam Tribe is awarded **$123,502** for a proposal submitted during the Fiscal Year 2020 (FY20) Timber, Fish and Wildlife Supplemental funding proposal process.

These funds are being transferred to the Office of Self-Governance and will be added to the Tribe's Self-Governance compact.

Please be further advised that the Timber, Fish and Wildlife Supplemental funds are currently available only for FY20. We are unable to say whether these funds will be available in future years.

Please feel free to contact Mr. Rudy Peone, Natural Resource Officer, in the Northwest Regional Office, telephone (503) 872-2878, with any comments or questions.

Sincerely,

Bryan Mercier,
Northwest Regional Director

cc:    Office of Self Governance, Vancouver, Washington

# EXHIBIT G



**nəxʷqíyt nəxʷsʔáyəm̓**
**PORT GAMBLE S'KLALLAM TRIBE**

January 23, 2020

Russell T. Vought
Acting Director
Office of Management and Budget
Executive Office of the President
1650 Pennsylvania Avenue, NW
Washington, D.C. 20503
Via email: Russell.t.vought@omb.eop.gov

Dear Acting Director Vought:

On behalf of the Port Gamble S'Klallam Tribe, it has only recently come to our attention that the Office of Management is reviewing a recommendation from the Public Buildings Reform Board to close and sell the National Archives and Records Administration's Sand Point Archive Center located in Seattle, Washington pursuant to the Federal Assets Sale and Transfer Act of 2016. We adamantly oppose the closure of the Center.

The Sand Point Center is very important to the 272 federally-recognized tribes in the Pacific Northwest (Washington, Oregon and Idaho) and Alaska. Ours is merely one of them. However, our Tribe relies on the Sand Point Center for access to critical historical documents. Among the many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, and Tribal leaders during treaty negotiations in the mid-19th Century, as well as original drafts of the treaties themselves. The facility also houses critical and hard-to-reproduce historical information related to the area tribes.

If the Sand Point Center is closed, all of its archived materials will be need to moved. We understand that records will be sent all the way to Kansas City, Missouri and other archived materials will be sent to Riverside, California. Obviously, such new locations will make it much harder for our Tribe and those in the Pacific Northwest and Alaska to access these historically important and culturally significant archived records and materials. A sale of the Sand Point Center will undoubtedly have an impact on tribes. In fact, it will be a profound, negative and irreparable impact. Yet, the Public Buildings Reform Board, the National Archives and Records Administration, the Office of Management and Budget, nor any other federal agency has engaged in government-to-government tribal consultation as required Executive Order 13175. Worse, the federal agencies did not even alert Tribes about the proposed sale. We learned about it through a news source. It is our understanding that our fellow Tribes are only learning about it now as well.

31912 Little Boston Road NE Kingston, WA 98346
P: 360-297-2646 | F:360-297-7097
Email: info@pgst.nsn.us | web: www.pgst.nsn.us

We call on you to reject the sale of the Sand Point Center. You can simply remove it from the list of proposed properties. At the very least, we ask you to delay any further steps toward selling the Sand Point Center until you engage in tribal consultation.

Sincerely,

Jeremy Sullivan·
Chairman

Michelle Williams, Chief of Staff, OMB
Lois Altoft, Assistant to the Director, OMB
Tyler Fish, Senior Policy & Tribal Liaison, White House Office of Intergovernmental Affairs
Jennifer Lichter, Deputy Assistant to the President for Domestic Policy, Domestic Policy Director
Adam Bodner, Public Buildings Reform Board
David Ferriero, Archivist of the United States, National Archives Records Administration

# EXHIBIT H



NATIONAL
ARCHIVES

31 January 2020

Jeromy Sullivan
Chairman
Port Gamble S'Klallam Tribe
31912 Little Boston Road Northeast
Kingston, Washington 98346

Dear Mr. Sullivan:

Thank you for your recent letter expressing concern about the status of the National
Archives and Records Administration (NARA) facility in the Sand Point neighborhood of
Seattle.

This facility was recommended for sale by the Public Buildings Reform Board (PBRB)
and approved for sale by the Office of Management and Budget (OMB) through the
authorities and process established in the Federal Asset Sales and Transfer Act of 2016,
as amended (FASTA). The facility is owned by the General Services Administration
(GSA).

NARA does not have a specific date for the closure. We expect the entire process of
sale to take approximately 18 months. We have requested to stay in the building for an
additional three years following the sale.

We are not taking any immediate actions that will impact our customers. We will
continue to offer all services and maintain our current operating hours for the
immediate future.

The Sand Point facility is over 70 years old and requires an estimated $30 million to $50
million in renovations to support our continued safe occupancy. We have explored
moving to alternative locations in the Seattle area, but we have not found a
replacement facility that provides appropriate storage space for our holdings.

NARA wants to engage with our stakeholders to discuss the closure's impact. It is
important that we hear directly from you about ways that NARA can continue to support
researchers and other customers in the Seattle area and the Pacific Northwest.

NATIONAL ARCHIVES and
RECORDS ADMINISTRATION

700 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20408-0001
www.archives.gov

You will receive information regarding ways to provide input. We are exploring holding a meeting as part of our outreach, and you will receive an invitation as soon as we can confirm the date and time.

We recognize that the closure of our facility will have an impact on researchers, Federal agencies, and other customer groups. We will communicate with you as well as our other stakeholders when we have more information and as we develop plans for the future. When we eventually close our physical presence in Seattle, we will continue to provide public access to our archival records. Some of our most popular records have been digitized and are available online, and members of the public can request copies of any available archival record (digital or analog) by email, telephone, or in writing. These records will also be available for in-person access in the research room at their new location. We will be looking to expand our digitization efforts to make more records available free of charge and regardless of location.

Thank you again for your letter and your belief in the importance of the National Archives and Records Administration and access to Federal records we provide.

Sincerely,

DEBRA STEIDEL WALL
Deputy Archivist of the United States

# EXHIBIT I



February 24, 2020

Mr. Jeromy Sullivan
Chairman, Port Gamble S'Klallam Tribe
31912 Little Boston Road NE
Kingston, WA 98346

Dear Mr. Sullivan:

Thank you for your letter to Administrator Emily W. Murphy regarding the National Archives and Records Administration (NARA) facility at Sand Point in Seattle, Washington. Your inquiry has been referred to me for response.

The Public Buildings Reform Board (PBRB), which was created under the Federal Assets Sale and Transfer Act of 2016 (FASTA) and is a separate entity from the U.S. General Services Administration (GSA), identified this property for disposition in accordance with FASTA. The defined role of GSA in the FASTA disposition process is to execute the disposal transaction of identified properties. GSA is currently working with NARA to complete the necessary due diligence to provide a report of excess within 60 days of January 24, 2020, as FASTA requires. Upon receipt of the necessary information from NARA, GSA will develop and coordinate a public sale strategy. Updated information will be posted at disposal.gsa.gov.

For questions regarding the relocation of NARA's mission, please contact:

Executive Secretariat
National Archives and Records Administration
execsec@nara.gov
(202) 357-5496

For questions regarding PBRB's identification of properties for disposition, please contact:

Adam Bodner
Executive Director
Public Buildings Reform Board
adam.bodner@pbrb.gov
(202) 714-9060

If you have any additional questions or concerns, please contact me at (202) 501-0563.

Sincerely,

Jeffrey A. Post
Associate Administrator

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF MICHAEL SEAN SULLIVAN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Michael Sean Sullivan, declare as follows:

1.      I am a public historian, university lecturer, and cultural resource professional. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I have been practicing and teaching Historic Preservation methodology in the Pacific Northwest for over 30 years and have been a leader in local and federal preservation issues, policies and projects since completing a Masters degree at Western Washington University and post graduate studies at the University of Washington. Since founding Artifacts Consulting, a historic preservation studio, in 1997, I have instituted a personal and company focus on preservation policy directed at architectural conservation treatments, investment tax credit strategies, and historic resources regulatory compliance. I have been directly involved in applications and approval of more than $500 million in tax incentive leveraged rehabilitation projects and have advocated for historic preservation efforts at virtually every level of activity from world heritage site issues to local landmark campaigns. I also served as the Conservator

for the Washington State Capitol Campus for more than a decade. In addition, I have directed the preparation of nominations to the National Register of Historic Places, Historic Structure Reports, and restoration plans for important National Historic Landmarks such as the Ernest Hemingway House in Ketchum Idaho, the Panama Hotel and King Street Station in Seattle Washington, and hundreds of historic buildings and sites in the Pacific Northwest. I was also project manager for the assessment of damage to historic buildings and sites following the Nisqually Earthquake on behalf of the Washington State Legislature and am currently engaged in earthquake preparedness policy development in Washington State.

3.     I have been widely published on such varied themes as Japanese American history in the Pacific Northwest, Pacific maritime history, and Puget Sound regional settlement and history with an emphasis on the Tacoma area. I have taught courses on Pacific Northwest History and Tacoma history at the University of Washington Tacoma for more than 20 years and write and edit TacomaHistory.live, a website on south sound historical topics. I wrote the introduction to the new edition of *Puget's Sound, a Narrative of Early Tacoma and the Southern Sound,* published by the University of Washington Press in 2018. I have also written articles in Columbia: The Magazine of Northwest History, Fall 2018, and Discover Nikkei, an on-line journal of Japanese migrants and their descendants (*Tacoma Nihonmachi, ca. 1920* and *Gone To Market in Tacoma, WA*), http://www.discovernikkei.org/en/.

4.   In 2017, I was appointed by Governor Inslee to the Washington State Advisory Council on Historic Preservation. In addition, I serve as chairman of the Board of Directors and Executive Committee for HistoryLink, an on-line encyclopedia of Washington State History, and am Past President of the Washington Trust for Historic Preservation. I also serve as an Advisor from Washington State to the National Trust for Historic Preservation. In 2012, I was elected to the Advisors Executive Committee of the National Trust for Historic Preservation. I am an affiliate faculty member at the University of Washington Tacoma and am an associate at the Center for the Study of Community and Society at UW Tacoma.

5.      I am a regular user of the National Archives Center at Sand Point and rely on the records and archival materials for historical information and background for the documentation and nomination of historic places in the Pacific Northwest. I am also routinely involved in identifying and documenting potential historic and cultural resources in conjunction with the Federal Environmental Protection Act and State environmental laws as they apply to publicly funded transportation, recreation, and educational projects, which requires Seattle Archives research. In addition, I have and continue to use the Seattle Archives in connection with nominations to the National Register of Historical Places.

6.      Listing on the National Register of Historic Places is the Federal process of recognizing and conserving places, buildings, objects and sites that are recognized as contributing to the history and story of the American people. In addition to the recognized cultural value that comes with National Register listing, Federal, State and local environmental protection laws and processes cite National Register listing or eligibility as a condition for protection or mitigation treatment.

7.      Listing on the National Register of Historic Places is also a prerequisite for receiving Federal Rehabilitation Tax Credits for investment and costs associated with the rehabilitation and restoration of historic commercial buildings and properties.

8.      Buildings and sites are nominated for listing on the National Register of Historic Places with a package of written and photographic documents submitted to the National Park Service and the Keeper of the National Register after review by each State's Governor and State Historic Preservation Officer. The nomination package includes a rigorous statement of significance, a physical description narrative, ownership and location data and a portfolio of historic and current photographs, and cartographic materials. The creation of a property's nomination package generally requires extensive use of the National Archives facility. Indeed, in conjunction with my colleagues at Artifacts Inc., we have used the Seattle

1  Archives to provide supporting documentation of several hundred historic sites and places in

2  the Pacific Northwest and Alaska.

3      9.    Among the varied materials at the National Archives at Seattle I have particular

4  interest and professional need for are property records, Government Land Office ledgers and

5  maps, immigration and census records, Federal court files, tax and assessment documents,

6  military records, treaties, tribal relations records and Native American policy materials and

7  related documents, biographical materials, railroad/land grant records, coastal survey logs and

8  charts, photographic and cartographic materials and early documents related to federal lands,

9  parks and maritime locales.

10     10.   I have worked on several National and Local Register of Historic Places

11 nominations and cultural resource assessments that have drawn heavily on the National

12 Archives in Seattle including the Sand Point Naval Air Station (historic district), Panama Hotel

13 Building (National Landmark related to Japanese American internment), M.V. Western Flyer

14 (fishing/scientific vessel), Port Gamble (National Landmark district, Kitsap County), several

15 United States Post Office Buildings, George Pickett House/San Juan National Park (San Juan

16 Island/Bellingham), Ernest Hemingway House (Ketchum ID), Veterans Hospitals at American

17 Lake, Seattle and Fort Walla Walla, and shoreline and waterfront properties related to the

18 newly created Federal Maritime Heritage Area in Washington State. My research from the

19 Archives helped to establish that these properties qualified for inclusion on the National

20 Register of Historic Places.

21     11.   Over the last few years, I also have used the National Archives in Seattle to

22 document historic places associated with Latino people in the Yakima Valley and greater Puget

23 Sound area as well as places associated with African American history in the Pacific

24 Northwest. This work has been funded by the National Park Service and the Washington State

25 Office of Archaeology and Historic Preservation in an effort to increase the listing of properties

26

on the National Register of Historic Places, which reflect untold or under represented American people and stories.

12. Closure of the National Archives facility in Seattle came as startling news to my colleagues and I as cultural resource professionals, public historians, and educators. Only a small fraction of the archival materials at NARA have been copied or digitally scanned for access other than in person. While archival material at most other public record depositories in the area (University of Washington Digital Library, Washington State Historical Society, Seattle, Tacoma Public Library, Washington State Archives, HistoryLink), are being made accessible through digital formats advanced by local high tech industries' capacity and resources, the Federal Archive materials at the NARA facility are almost entirely unique, unhandled and uncopied. They are only broadly cataloged, which means that research involves the pursuit of inquiry on a page by page, document by document basis. The potential loss of the millions of records in the NARA collection would be devastating for local historians like myself. The removal of the entire body of archival materials would severely degrade both our access and the possibility of information discovery related to threatened and unrealized historic and cultural resources.

13. Simply put, the closure of the NARA facility and the removal of the Federal Archives from the Pacific Northwest will have a profound negative impact on my professional work and the efforts of others to recognize and preserve our country's historic places and story. The Pacific Northwest and Alaska are not recognized equally with other regions of the country in sites and locales listed on the National Register of Historic Places. The Federal Archives are an indispensable source of historical information needed to document and nominate the region's historic places. The removal of the Federal archival materials at Seattle NARA, with their concentration on Alaska and the Pacific Northwest, would greatly complicate the work of historians and cultural resource researchers and dilute the records into larger collections which are themselves poorly cataloged and largely unscheduled for digital access. For

professional historians and educators like myself, the need to travel and spend more time in research represents a significant additional expense and loss. For students and citizen researchers it simply takes the Federal records out of reach entirely. More importantly, the results of relocating the Federal archives delays or prevents the research and documentation needed to identify and protect historic places in the Pacific Northwest and the important stories that go with them.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 30th day of December, 2020 at Tacoma, Washington.

Michael Sean Sullivan

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, *et al*., | Case No. |
| Plaintiff, | DECLARATION OF AMBER NICOLE TAYLOR |
| vs. | |
| RUSSELL VOUGHT, *et al*., | |
| Defendants. | |

I, Amber N. Taylor, declare as follows:

1.     I am the Collections Management Lead for the Puyallup Tribe of Indians, Historic Preservation Department and a Puyallup Tribal Member. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.     I have been the Collections Management Lead for approximately 2 years and have worked in the department for 4.5 years. As the Collections Management Lead, my duties consist of acquiring, preserving, and making accessible to the Puyallup Tribe, its Membership and the Community, records of on-going value in any format which reflect the cultural, social, economic and political history of the Puyallup Tribe. I work directly with Puyallup Tribal

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 1

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

Members, Employees, and the Community by assisting with research requests, genealogy, and artifact donations. It is also my responsibility to obtain documents of historical value from outside sources to add to and enrich our collections. Prior to serving as the Collections Management Lead, I was an Archive Technician for 2 years at the Puyallup Tribe. My duties in this position consisted of accessioning, cataloging, digitizing, and preserving records of on-going value in any format to enhance historical knowledge.

3.      The Puyallup Tribe is a Federally Recognized Tribe made up of roughly 5500 members. The Puyallup Tribe is located in Pierce County, Washington, and many of the Tribe's members live and reside on or near the reservation. The Puyallup Tribe was established in 1854 when the Medicine Creek Treaty was signed and later ratified. We have a very rich history and a great connection to the Pacific Northwest and surrounding areas because of our long history in the region.

4.      The Puyallup Tribe has a large amount of important records that are held at the National Archives in Seattle. These records are the basis for which enrollment is established, reservation boundaries have been determined, treaty rights and laws are protected and upheld, and historical and genealogical research has been fulfilled. Some of the most-used records include the Allotment documents that establish who was allotted land and where. These documents also establish genealogical connections within families. All of the Cushman hospital and Boarding School records are housed at National Archives in Seattle. We get requests from community members and out-of-state requests pertaining to Cushman often. All of the records from the Puyallup/Seattle Indian Agency and the Portland Area Indian Agency are held at the Seattle location. These are incredibly valuable and help establish agricultural, industrial, and financial documentation pertaining to the Pacific Northwest Tribes, including the Puyallup Tribe. All of the Puyallup Indian Land Commission records which include the status of Puyallup Indian lands, including the sale of these lands are highly valuable to us and irreplaceable. These records include original, hand-drawn maps of the

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 2

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

reservation and important historical connections to our ancestors. Viewing these records in-person has a great effect on our connection to the records themselves. Having the ability to be in the presence of original historical documents pertaining to our people and who we are today as a Tribe is highly important as this connection impacts our culture, our rights as a Tribe and the closeness we feel to our ancestors. In my current position at the Puyallup Tribe, I work with very old, very poor photocopies from the 1960s and 1970s created from some of the records from National Archives in Seattle; the emotions and connection when viewing these photocopies are in no way the same as viewing the originals, there's more of a disconnect and my fear is that the records will not share the same connection to the land and people that they do now if they are simply relocated and digitized. These records will not be visited by the people who treasure them most if they are relocated out of state. This decision will make it impossible to view the records in-person for most of our community and membership because it will create a financial hardship.

5.      In my position, I typically don't assist with federal programs, occasionally I get requests from the Puyallup Tribe's Fisheries Department for any information and documentation pertaining to use of the waterways for conservation. More specifically, Hylebos Creek, Commencement Bay, and the Puyallup River. When fulfilling these requests, the records at National Archives Seattle are included in my research and are used for legal purposes by the department requesting them.

6.      When I began working in the Puyallup Tribe's Historic Preservation Department, I sat down with my grandmother Ramona Bennett who is a Puyallup Tribal Elder and former Council Chairwoman. Ms. Ramona Bennett shared some of her experience with me regarding the National Archives while she was in office. Judy Wright was working in a museum position within the tribe and was copying as many records at the Seattle National Archives facility as she could out of fear that somehow they might be destroyed. It would not be realistic to copy everything of importance. But if the National Archives facility in Seattle

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 3

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

is sold, and the records are shipped off to warehouses in distant locations, our fears that important records maps and objects will be destroyed seem likely to come true.

7.    The Puyallup Tribe's Historic Preservation Department first learned of the decision to sell the Seattle National Archives facility from Tallis King George, a historian that we have close connections with and who visits the Seattle facility regularly. This individual came in for an office visit to inform us of the sale near the end of January 2020.

8.    Our department was never contacted by anyone connected to any federal agency or any representative connected to the federal government's decision to sell the National Archives facility in Seattle, WA. It wasn't until after the decisions had been made to sell the facility that we were invited to attend a meeting with federal representatives and the Tribes on February 11, 2020 held at the National Archives in Seattle.

9.    The only input that my department has had was at the meeting held on Feb. 11, 2020 in which we were able to ask questions from the National Archives Representatives. The response was that the building was going away and there are no other alternative options for the records. This is where I learned there is no review process and the government's decision, without consultation of the Tribes and community, was final.

10.    The National Archives location in Seattle houses records that the Puyallup Tribe deems as priceless. These records include irreplaceable historic documents including family histories, probate documents, written correspondence letters, census records, maps, and microfilm that are of great value to our community. If these records are relocated there's the high possibility that we will lose access to these records for a long period of time. Although the National Archives is promising to digitize the records to make them more accessible, we know that the amount of staff needed and time it will take to fulfill this obligation creates a hardship and could take more than a decade to complete. The records housed in this facility assist with establishing enrollment for members, are used for the enforcement of our treaty rights, and have been important in terms of culturally significant

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 4

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

515

sites and usual and accustomed areas within our reservation and the Puget Sound region. Without access to the archives locally, our staff will no longer have the opportunity to visit the National Archives and conduct research on behalf of the Puyallup Tribe. Many of our members find their family history located in Seattle at this facility and without access to these records locally they will no longer have the opportunity to seek out these records. Additional hardships include not having the capability to view these records in-person. There's a spiritual and cultural connection to these records for our people and the other communities that access them. The last time I visited the Seattle National Archives facility I found a record that listed the sale of my ancestors, the Jacksons' land. A photo of that portion of the record is attached as Exhibit A. My aunt 4x's removed, Jennie Jackson, of these ancestors, was murdered for her land because it was a highly sought after location. I feel a connection to this document, a large-bound records book. This is just one example of a record that holds individual value to me. There are thousands of similar documents that have personal meaning for those who research here. We also found an original map of the Puyallup and Muckleshoot reservations from 1856 that shows private land claims and important sites. A photo of that map is included as Exhibit B. Our boundaries have been disputed for decades and records such as this help with legal claims. Another important record collection that Tribal researchers seek are the census records. These have highly valuable cultural meaning as many of these records list Indian names of our ancestors. We hold cultural naming ceremonies and having access to these names helps us to continue this practice and carry on the names of our people so they can be remembered. Without these records we'd be unable to continue this research and ceremony.

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 5

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

1    I declare under penalty of perjury that the foregoing is true and correct.

2    DATED this 4th day of January, 2021 at Graham, Washington.

3

4

5                                *Amber N. Taylor*
                            AMBER NICOLE TAYLOR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF AMBER NICOLE TAYLOR – PAGE 6

*Law Office*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

517

# Exhibit A

TO

DECLARATION OF AMBER NICOLE TAYLOR

ISO PUYALLUP TRIBE OF INDIANS

# HEIRS

June 10-1909.

**Original Allottees.**
- George Jackson - Husband - $1/6 + 1/6 \frac{a}{c} = 1/3$ II. c.
- Louisa Jackson - Wife - $1/6 + 1/6 \frac{a}{c} = 1/3 + 1/9 c = 4/9$ II. d.
- Francis - Son - - - $1/6$ II. a.
- Mary - Dau. - - - $1/6$ II. e.
- Lucy - Dau. - - - $1/6 + 1/18 c = 2/9 + 1/9 d. = 1/3$
- Jennie - Dau. - - - $1/6 + 1/18 c = 2/9 + 1/9 d. = 1/3$ II. e.

**Born after Allotment.**
- Katherine - Dau. - - - $1/18 c + 1/9 d. = 1/6$ Wife of John McKinney -
- Leila - Died 6/4/12 - Dau. - - - $1/18 c + 1/9 d. = 1/6$ Minor. 15 yrs. No guardian.

**Illeg. daughter of Jennie Jackson**
- Blanche Davis - - - - - - - - - $1/3 e$ Minor. John McKinney. Guardian.

*On*
*J.*
*J.*
*J.*
*J.*

*change of title - see schedule*

# RETAINED

| Sec. | T. | R. | ALLOTTEES | | HEIRS |
|------|-----|-----|-----------|---|-------|
| | | | George Jackson (and Heir) | | |
| 2 | 2 0 | 3 E | Louisa Jackson (and Heir) | | |
| 2 | 2 0 | 3 E | Jennie Jackson | | |
| | | | Lucy Jackson | | |
| | | | George Jackson - Louisa Jackson (heir) | | |
| 2 | 2 0 | 3 | Jennie Jackson - Lucy Jackson. | | |

# Exhibit B

TO

DECLARATION OF AMBER NICOLE TAYLOR

ISO PUYALLUP TRIBE OF INDIANS



MAP
OF THE SURVEY OF THE
PUYALLUP AND MUCKLESHOOT
INDIAN RESERVATIONS
WASHINGTON TERRITORY
ALSO
showing Position of Private Land Claims
by order of Gov. I. I. Stevens, Supt Ind. Affs.
1856

Scale = 1 mile to an inch

Approved
Office Supt Ind. Affairs
Olympia W. T. Dec 5. 75
Isaac I. Stevens
Gov & Supt

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF JOSEPH EVANS TAYLOR III |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants. | |

I, Joseph Evans Taylor III, declare as follows:

1.     I am a professor of history at Simon Fraser University. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a scholarly historian for more than three decades, much of which has been spent conducting research at federal archives including NARA's regional archive in Seattle.

2.     I received a PhD in History from the University of Washington in 1996. I studied early and modern North American history, western North American history, environmental history, and colonial Latin American history. I have written widely on the fisheries and history of salmon management, Pacific Northwest Indian treaties as they related to salmon management, western North American recreation and environmental gentrification, and the history of transfer payments for federal lands in the western United States. I am currently writing a history of congressional conservation policies regarding federal lands since 1785, and a biography of the Colorado congressman who authored the Taylor Grazing Act, which in 1934 organized the remaining public lands in the American West for grazing

conservation. My major publications include *Making Salmon: An Environmental History of the Northwest Fisheries Crisis* (Seattle 1999—George Perkins Marsh Prize for Best Book in Environmental History, Choice Award; Oscar Winther Prize and Theodore C. Blegen Award for related essay); *Pilgrims of the Vertical: Yosemite Rock Climbers and Nature at Risk* (Cambridge 2010—National Outdoor Book Prize); *Persistent Callings: Seasons of Work and Play on the Oregon Coast* (Corvallis 2019); and "Follow The Money: A Spatial History of In-Lieu Programs for Western Federal Lands" (Stanford, ongoing web-based mapping project). I was also an expert witness in *Washington v. United States* 584 U.S. ___ (2018), writing on the history of salmon ecology and attitudes regarding salmon runs in 1854-1855. I taught environmental and western history at Iowa State University from 1996 to 2003, and the same at Simon Fraser University since 2004. I have also been an affiliated researcher at Stanford University's Center for Spatial and Textual Analysis since 2010.

3.     Like other scholarly historians, a crucial part of my research involves examining what are called "primary documents," that is texts created contemporaneous to the events I study. These may include correspondence, reports, and other file materials produced by contemporaries, officers, and agencies, plus legislative and administrative materials produced in the field or in Washington, DC. These are sometimes located at small regional museums, history societies, and university archives, but the main depositories for my research have been the main and branch campuses of the National Archives and Records Administration. Across my career I have spent more than a year of my life in the Downtown and College Park (II) National Archives buildings and the Archives Unit of the Library of Congress. In fact, a photo of my younger self is still on display in the basement of Archives II to illustrate the features of the building. The other key resource for my research has been NARA's regional facilities, including five presidential libraries and the regional archives in Seattle and San Bruno. I began researching at the Seattle Branch archive in 1991 while working on my M.A. thesis at the University of Oregon on the aboriginal salmon fisheries, and I

DECLARATION OF JOSEPH EVANS TAYLOR III                    2                    ERROR! AUTOTEXT ENTRY NOT DEFINED.

523

continued this research after matriculating at the University of Washington in 1992 while working on a broader history of scientific salmon management. I have returned to the facility periodically for research as an expert witness in a tribal treaty case, and to map transfer payments to western counties because of natural resource activities on federal lands. Since my grad student days, however, I have guided other students in their research at Seattle's NARA facility, first with undergraduate research papers that taught research skills and the confidence to work in archival materials, and later when my own grad students at Simon Fraser University needed to examine federal primary documents housed at NARA's Seattle Branch.

4.    Among the materials that I have examined at NARA's Seattle Branch are Office of Indian Affairs and Army correspondence related to the negotiation of treaties in Oregon and Washington territories, and the management of nineteenth-century reservations regarding salmon fisheries, spiritual practices, and land claims. I have used the facility to review Bureau of Census records on local population and economic development for a history of the Nestucca River watershed on the Oregon coast, plus genealogical records that helped to flesh out family histories and labor patterns within the valley from 1880 to the 1940. The collection of U.S. Bureau of Fisheries materials at the Seattle Branch was important for tracing scientific research on salmon and ocean conditions, and federal fish cultural activities and research from the 1890s to the 1960s for *Making Salmon*. My more recent visits have reviewed Department of Interior and Bureau of Land Management records regarding logging, revenues, and transfer payments related to the Oregon & California Railroad grant lands (O&C Lands) for the "Follow the Money" mapping project. Other visits were to work in Geological Survey cadastral survey materials and Army correspondence during the territorial period in western Washington Territory for a report to the court in the *Washington v. United States* litigation. Each collection was a crucial resource for capturing the details and contexts of past events. Some records are now digitized or microfilmed, but the vast majority of the DOI, BLM, and USBF materials are only in paper and available nowhere but the Seattle Branch.

DECLARATION OF JOSEPH EVANS TAYLOR III            3            ERROR! AUTOTEXT ENTRY NOT DEFINED.

524

5.      The records contained at NARA's Seattle Branch are used to document the historical patterns of management of tribes, environmental management, and fiscal policies and consequences in the Pacific Northwest and Alaska. Tribes rely on the materials housed on site to study treaty relations, NAGPRA claims, land disputes, and government to government relations. Historians working on regional environmental issues have access in one place to a wide array of archived federal materials on land, timber, mineral, and fishery management. The regional archives minimizes the need to travel to many different sites, which is costly and time consuming but also undermines the ability to make connections across disparate, often seemingly unrelated files and collections. In the case of the materials related to the O&C Lands, accessing all the records at one site enabled me to see adjacent receipts and reports in context, giving me a much clearer sense of what federal administrators and managers were working on at the time. It also showed exactly when in the early 1940s the DOI finally compensated counties in western Oregon for tax bases lost in 1916. Similarly, the cadastral survey records contained information that allowed me to identify relevant Army correspondence also located at the Seattle Branch. The connections would have taken longer and been less obvious if I had tried to do this research remotely through digital portals. This is why archivists are also a crucial resource. Their knowledge of collections and even individual boxes and files makes research far more efficient. To give one example, while working through the DOI records on transfer payments, an archivist steered me to a box in a parallel series containing a graphical text, produced by the DOI in the mid-1940s, to illustrate growing O&C timber harvest revenue and the amounts of back taxes finally paid to western Oregon counties. The cadastral records information was included in my expert witness testimony for *Washington v. United States*, and the O&C timber harvest and payment information was incorporated into the Follow the Money maps and will be part of a chapter in the congressional conservation book that I am presently writing.

6.  I first learned by word of mouth about the proposed closure and sale of NARA's Seattle Branch on 23 January 2020. That same day I sent an email alert to the executive director of the American Society for Environmental History, the premier scholarly organization affiliated with the field of environmental history. The news came as a surprise to all of us. Given the importance of NARA's branch archives to historians and legal professionals, I and everyone I spoke expressed surprise that NARA had not notified us sooner that they were contemplating this closure. I and everyone I spoke with regarded it as having a potentially devastating effect on the ability to conduct timely and effective research on a wide range of topics.

7.  The most immediate impact of closing and moving the records from NARA's regional archive in Seattle will be the added expense and time required to travel to more distant depositories in California or Kansas City. This will require greater periods of time and finances, because it will impose greater travel and housing costs to accomplish what can now be done by a two-hour drive on off days from teaching and committee work during the school year. The impediments pose even greater challenges for graduate and undergraduate students at my and other universities in the Pacific Northwest. Students possess neither my resources nor supported research time, so completing research components of the education process will put greater pressure on granting institutions, including federal programs, to support a wider range of students traveling much longer distances and for longer periods to accomplish what can now be done within the region for relatively less imposition on researchers. It will be an even greater hindrance for historically impoverished groups such as First Nations and Indian scholars, and, since the closure of NARA's Alaska branch, this is even more true of Indigenous scholars and researchers in the far north. A less obvious but equally devastating loss will be the dissipation of the NARA Seattle Branch's archival staff, and with them the loss of the institutional memory that makes archivists significant partners in historical research.

DECLARATION OF JOSEPH EVANS TAYLOR III                    5                    ERROR! AUTOTEXT ENTRY NOT DEFINED.

526

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 28th day of December, 2020 at Burnaby, British Columbia.
           day               month    year      city         state

Joseph Evans Taylor III

1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT
9                       WESTERN DISTRICT OF WASHINGTON
                                AT SEATTLE

10   STATE OF WASHINGTON, *et al.*,              Case No.

11                   Plaintiff,                  DECLARATION OF JEFFREY PAUL
                                                 THOMAS
12              vs.

13   RUSSELL VOUGHT, *et al.*,

14                   Defendants.

15        I, Jeffrey Paul Thomas, declare as follows:

16        1.    I am the director of the Puyallup Tribal Timber, Fish & Wildlife (TFW)

17   Program. I am over the age of 18 and competent to testify. I make this declaration based on

18   my personal knowledge.

19        2.    I have been the tribal Timber, Fish & Wildlife biologist within the Puyallup

20   Tribal Fisheries Department since August 22nd, 1989. As director of the Puyallup Tribal

     TFW Program, I am responsible for implementing the US v. Washington-based 1987
21
     Timber/Fish/Wildlife Agreement on behalf of the Puyallup Tribe – and fulfilling the official
22
     T/F/W goals of protecting the forest, water, fisheries, wildlife, archaeological and cultural
23

DECLARATION OF JEFFREY PAUL THOMAS – PAGE 1

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

528

resources associated with the non-federal forests upon the Puyallup tribal ancestral lands in particular. This work focuses upon protecting and restoring all of the treaty resources guaranteed within the Medicine Creek Treaty (and the US vs. Washington/Boldt decision - and 1987 T/F/W Agreement in particular) which are significant to the local cultural wellbeing of the Puyallup Tribe. The TFW Program is entirely funded by the Department of the Interior under an ISDEAA 638 contract. Prior to serving as Puyallup Tribal TFW Program director, I was a dedicated premed student, as well as professional senior fisheries biologist for various PNW intertribal organizations and tribes.

3.    The Puyallup Tribe of Indians is an official party to the Medicine Creek Treaty of 1854, whose official reservation is situated upon the lower Puyallup River and Commencement Bay (neighboring Tacoma, Washington), and as such is a federally-recognized Tribe.

4.    The National Archives records featuring the military field actions, and/or command reporting records of US Army troops produced during and after the Puget Sound Indian War - and the original Puyallup Indian Reservation US Indian Agent-Superintendent-Commissioner administrative correspondence records for the earliest and/or formulative eras of the early Puyallup Indian Reservation - are particularly important to the Puyallup Tribe. Examples here include the original/ongoing correspondence exchanged between the US Army and the Washington Territorial Militia personnel specifying the strategies, actions, and/or decisions they were making to subjugate the Puyallup Indians; and include the specifically-detailed day-to-day descriptions of the culture, the dynamics, the individuals, and/or the socio-political trends characterizing the early Puyallup tribal community membership and their government too.

5.    These records are vital to the existing and future Puyallup Tribe being able to accurately and authentically describe the social, political, and ecological environments which were prevalent during treaty times - and for the first two to three generations of the

DECLARATION OF JEFFREY PAUL THOMAS – PAGE 2

LAW OFFICE
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

Tribe following right after - and are thus incredibly meaningful reference information which has never been fully accessible to the Puyallup Tribe (even now, despite state laws pinpointing the need for and value of compiling and sharing this irreplaceable local tribal history and culture information). This particular type of information is irreplaceable in terms of producing and supporting local environmental assessment spatial and temporal socio-ecological trends information (e.g. involving food sovereignty, subsistence management, environmental justice, and/or local ecocultural restoration goals, etc.) too.

6.     The Puyallup Tribal Timber, Fish & Wildlife Program uses these records to fulfill the forest, water, fisheries, wildlife, archaeological and cultural resource agricultural protection, cultural access, and recreational conservation goals of the Puyallup tribal communities (of both the current and future generations). These unique records contain irreplaceable details memorializing the Tribes' earliest efforts to protect its' tribal members from being egregiously detached from their traditional homelands, and struggling to maintain their traditional cultural areas and subsistence lifestyles, and then maintaining their ever-important land-based spiritual duties, cultural identities, stewardship practices, and tribal governments.

7.     I learned of the impending sale of the National Archives at Seattle through a national news story.

8.     I was not informed of this impending sale through any federal agency, or federal employee, in any way.

9.     Losing any further access to these already limited-access historical records most surely undermines the Puyallup Tribes' abilities to establish and enforce its' original treaty rights, and will harm the Tribe's individual members abilities to access records involving past Puyallup tribal ancestors, and will cause a serious loss of access to personal/family histories (such as school records, etc.) too. It will impose serious financial harm upon the Tribe (e.g., costs of having to travel to obtain records not located in Seattle,

DECLARATION OF JEFFREY PAUL THOMAS – PAGE 3

LAW OFFICE
PUYALLUP TRIBE
3009 PORTLAND AVENUE
TACOMA, WA 98404
(253) 573-7877

and/or loss of access for those who cannot afford to travel), and will impose a very serious cultural harm (e.g., loss of access to records important to Puyallup tribal cultural preservation) upon the Puyallup tribal community of both today and beyond, as well.

10.     The Puyallup Tribal Timber, Fish & Wildlife Program recognizes the National Archives in Seattle as being the most significant repository of Puyallup tribal historical information existing anywhere within Washington State – where records that are not available anywhere else might be found – and considers the National Archives as having an inherent trust responsibility to the Puyallup Tribe to ensure that the records memorializing their unfortunate woeful dilemmas and ever-persisting community, cultural, and spiritual strengths are always protected (and available to the Tribe) for all time, as well.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4 day of January, 2021 at Puyallup, Washington.

JEFFREY PAUL THOMAS

DECLARATION OF JEFFREY PAUL THOMAS – PAGE 4

*LAW OFFICE*
**PUYALLUP TRIBE**
3009 PORTLAND AVENUE
TACOMA, WA  98404
(253) 573-7877

531

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF COLL-PETER ETHAN THRUSH |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Coll-Peter Ethan Thrush, declare as follows:

1.      I am a professor of history and faculty associate in critical Indigenous studies at the University of British Columbia in Vancouver. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a professional historian, based on a quarter-century of scholarly research at archives including NARA in Seattle.

2.      I received a PhD in History from the University of Washington in 2002, where I studied the history of the American West, Native American/Indigenous history, environmental history, and cultural landscape studies. My work has focused primarily on Indigenous histories in urban places, most notably the city of Seattle. My first book, *Native Seattle: Histories from the Crossing-Over Place* (University of Washington Press, 2007, second edition in 2017), won the 2008 Washington State Book Award for history and was based on my doctoral dissertation research, including time spent at the Seattle branch of the National Archives. It has also facilitated widespread conversations about the city's past and

what its present should look like. While my second book, *Indigenous London: Native Travelers at the Heart of Empire* (Yale University Press, 2016), did not use materials from NARA, I have maintained a profile as a senior scholar in the history of the Pacific Northwest and have advised many graduate students working on the region and its past and present. My current research, in its very early stages, focuses on the history of shipwrecks on the northwest coast of North America and the ways in which it reflects large patterns of colonization and environmental change beginning in the late 18th century. Lastly, from 2002 to 2005 I was a research historian employed by the Muckleshoot Indian Tribe in my hometown of Auburn, Washington. There, I wrote a tribal history of the upper Green River watershed, a project in which NARA played a key role.

3. One of the central practices of any working historian, from undergraduate university students up to senior scholars such as myself, involves making sense of the past voices and experiences of individuals, groups, and organizations. We do this by analyzing sources created during or soon after the historical events with which we are interested; we call these "primary" documents. In my practice, I spend a great deal of time with collections from small local and regional museums and historical societies, university archives, and state and federal archives such as NARA. NARA is a critical resource for anyone interested in some of the most fundamental questions relating to both the past and present of the region. For example, no study of Indigenous or environmental history in the Pacific Northwest, whether by tribes, professional historians, or the general public can be conducted without significant use of federal archives. In a region where federally-recognized tribes have played a central role in legal conflicts and collaborations, the closure of Seattle's NARA branch will be a profound loss with enormous ramifications for a wide range of people. In terms of my own work specifically, the writing of *Native Seattle* would have been virtually impossible without access to NARA at Sand Point: as a graduate student, I did not have the resources to travel further

DECLARATION OF COLL-PETER
ETHAN THRUSH

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

afield to access vital information for my research. In the years since its publication, *Native Seattle* has helped change popular discourses about Indigenous and urban history and the ongoing legacies of colonialism. It could not have done so without NARA's Seattle branch.

4. Chief among the materials I have consulted and used at the Seattle NARA branch are the records associated with the Bureau of Indian Affairs (BIA). These include crucially important documents regarding Indigenous concerns such as Indian agents' reports and sources related to fisheries and other subsistence and commercial practices. Many of these sources are unique and are available only at NARA's Seattle branch. For example, the so-called "Roblin Roll" of 1919 is a survey of off-reservation Indigenous communities, representing a significant pattern among Native American people in the late nineteenth and early twentieth centuries and a source that remains vital for Indigenous federal recognition and other claims in the region. In addition to BIA records, I also worked with documents, maps, and other materials from the Army Corps of Engineers, who were responsible for building the Hiram M. Chittenden Locks and the Lake Washington Ship Canal, which dramatically and irrevocably transformed the watersheds of the Seattle region, with enormous consequences for Indigenous people and settlers alike. These sorts of materials were central to the dissertation research that became *Native Seattle*. For my current project, entitled *Wrecked: Navigating the Past in the Graveyard of the Pacific*, I will be looking at records related to marine and maritime histories on the Pacific coast of Oregon and Washington, a region called the "graveyard of the Pacific" for its hundreds of maritime accidents. While I have yet to conduct a detailed survey of holdings at NARA related to this project, I am certain that the holdings in Seattle – most notably sources related to shipping, rescue activity, and ecological cleanup – will be central to my analysis, particularly when set alongside the records related to Indigenous peoples, to which I will be returning as I use shipwrecks to examine historical relationships between Indigenous peoples of the coast and the accidents that took place in their territories.

DECLARATION OF COLL-PETER
ETHAN THRUSH

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

534

5. Without reasonable access to the records contained at NARA in Seattle, the work of numerous scholars, tribal researchers, legal professionals, and other members of the public will be dramatically impacted. Moving the records outside the region will render them largely inaccessible to many researchers, as the cost of travel to new locations beyond the Northwest. For each of these groups, having the diverse records related to federal agencies and other bodies at NARA has meant the difference between a rich scholarship on the region and a lack of collective knowledge about the area's ongoing histories; between tribal sovereignty and the ongoing marginalization of Indigenous communities; and between the protection of key environmental resources and their continued depletion. All told, the National Archives branch at Seattle is fundamentally important to virtually all the major issues faced in the region, and moving the records outside the Northwest will profoundly impact the basic functioning of historical research and advocacy across sectors including, but not limited to, academia and law.

6. I initially learned of the proposed closure and sale of Seattle's NARA branch through a social media post from a Seattle-area journalist and historian. As news of the change spread and historians of various stripes weighed in on the matter, it became clear that professional associations, tribes, and other bodies with distinct interests in access to federal archives had not been informed or consulted properly about the decision. This lack of procedural transparency initially set the historical community "back on its heels," forcing a reactive response, but in the months since, the American Historical Association, federally-recognized tribes, and other entities, along with individual practitioners such as myself, have collectively strategized a response, emphasizing the profound impact that the closure and sale will have on research, writing, and teaching across the region and beyond.

7. The closure and relocation of Seattle's NARA branch will have extraordinary impacts on historical research in the Pacific Northwest and beyond, and will most dramatically affect those with fewer economic resources or political power. Most notably, students in the

DECLARATION OF COLL-PETER        4        ATTORNEY GENERAL OF WASHINGTON
ETHAN THRUSH                                Complex Litigation Division
                                            800 5th Avenue, Suite 2000
                                            Seattle, WA 98104-3188
                                            (206) 464-7744

region, who are often barely scraping by as it is, will be forced to travel greater distances, at great cost, to access critical research materials. Long trips to far-off research destinations are extremely expensive for well-funded faculty such as myself, let alone for students. As one example, I currently have a doctoral student who is beginning a dissertation on ecological restoration along the Duwamish and Columbia rivers. This student lives in Seattle and for several years now, has planned their scholarly trajectory around access to the Seattle NARA branch. Should it be moved, the student will likely be unable to complete their degree program as currently envisioned. Beyond the effects on students, I am also deeply concerned about the consequences of closure and relocation for regional tribes, whose continued dependence on federal archival materials to establish both historical and contemporary claims over their traditional and treatied territories means that they will be deeply harmed by NARA's departure from Seattle.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 2nd day of January 2021 at Vancouver, British Columbia, Canada.

Coll-Peter Ethan Thrush

DECLARATION OF COLL-PETER
ETHAN THRUSH

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

536

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON, et al.,

              Plaintiff,

    v.

RUSSELL VOUGHT, et al.,

              Defendants,

NO.

DECLARATION OF THERESA TREBON

I, Theresa Trebon, declare as follows:

1.     I am the archivist and records manager for the Swinomish Indian Tribal Community. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.     I have been the Swinomish Tribal Archivist and Records Manager since the department was created on January 1, 2007. As archivist and records manager, I am responsible for documenting the tribe's history, both past and present, as well as caring for materials that relate to the history of the tribe. These include documents, oral histories, maps, and collection items from baskets to canoes. I regularly access documents at the National Archives at Seattle to serve a wide range of needs. These include research for the tribe's legal department, research to understand and build the historical record of Swinomish, and genealogical resources for the tribal community. Prior to serving as archivist and records manager for Swinomish, I was employed by organizations such as the Anacortes Museum, and Ebey's Landing National

DECLARATION OF THERESA TREBON      1      ERROR! AUTOTEXT ENTRY NOT DEFINED.

1  Historical Reserve to preserve, protect, and disseminate history. Prior to those organizations, I
2  operated my own business, Continuum History and Research.

3          3.      The Swinomish Indian Tribal Community is a sovereign entity and federally-
4  recognized Indian tribe with approximately 1,000 enrolled members. It is an adjudicated
5  successor in interest to certain tribes and bands of Indians which were party to the 1855 Treaty
6  of Point Elliott, including the Kikiallus, Lower Skagit, aboriginal Samish, and aboriginal
7  Swinomish, whose historical territories included the Samish and Skagit River watersheds and
8  marine areas in northern Puget Sound. It occupies a reservation established under the Treaty
9  of Point Elliott, which is located near La Conner, Washington about an hour north of Seattle.
10 It employs approximately 500 tribal governmental staff who work in a wide variety of tribal
11 programs, several of which are heavily reliant on the National Archives at Seattle, as explained
12 in greater detail below.

13         4.      The Swinomish Tribe has depended on a wide variety of records from the
14 National Archives at Seattle. These include records from RG-75, in particular the records of
15 the Tulalip Indian Agency. These rare documents have not been digitized and are extremely
16 important to the Swinomish Community. First and foremost, the contents of RG -75 at Seattle
17 are essential to reconstructing and understanding the history of the tribe from an organic base.
18 Due to a lack of funds for documenting and preserving tribal history from treaty time [1855]
19 to 2007 when the first tribal archive was created, the tribe has historically lacked the foundation
20 to fully understand its past, how its government was created, the steps taken to establish tribal
21 sovereignty and its treaty rights, land use decisions and more. First-hand access to the RG-75
22 documents at Seattle has been essential to helping rectify that omission. Secondly, and perhaps
23 more importantly, has been the opportunity for tribal members to see, and hold, these original
24 documents in their hands. For tribal members, the original RG-75 documents at Seattle NARA
25 are actually historical artifacts. To hold these documents, to see them with their own eyes, is a
26 physical experience of recognition and connection to their ancestors who have gone before.

DECLARATION OF THERESA TREBON          2          ERROR! AUTOTEXT ENTRY NOT DEFINED.

538

This actual contact with the original piece of paper signed by their grandfather or great-grandmother, etc. cannot be replicated with a digitized version of the same. An example of this is the 1896 petition signed by tribal members to construct the Swinomish Day School on the reservation. Another is the 1925 contract signed by tribal leaders for the F-275 litigation Duwamish et. al v. United States, the first attempt by Swinomish to litigate its treaty rights. Documents like these are priceless artifacts for present-day tribal members to physically interact with and transcend the historical facts on the paper itself. Other key Record Groups at Seattle NARA include, but are not limited to, the following: RG-11, Chinese Exclusion Act documents [Swinomish tribal members intermarried with Chinese aliens]; RG-21, District Court of the United States; RG-49, Bureau of Land Management; and RG-95 United States Forest Service.

5.      The Swinomish Tribe utilizes the documents at Seattle NARA in multiple capacities. These include enforcing tribal sovereignty and treaty rights, tribal government history, litigation, land-use and inheritance issues, and tribal enrollment. For example, the tribe is currently involved in litigation with the Burlington Northern Railroad, which built a railroad line across the reservation in the late 1800s without authorization from the tribe or the United States. The tribe has relied on NARA documents from the 1880s-1890s in order to support its case. The tribe has also prepared the first written and documented history of tribal government from 1855-2020; this publication is primarily based on historical documents found at Seattle NARA. Most importantly to tribal members however, are those documents at Seattle NARA that untangle the threads of family history at Swinomish. These documents are found throughout the subsets of RG-75 records and take a great deal of sleuthing and examination to uncover undocumented genealogical ties.

6.      Another important set of records at Seattle NARA are those of the United States Forest Service, RG-95. Swinomish has only begun to examine the huge array of these original, undigitized records at Seattle which hold vital information on the forest management of the

DECLARATION OF THERESA TREBON                3                ERROR! AUTOTEXT ENTRY NOT DEFINED.

539

1    Mt. Baker-Snoqualmie National Forest and how it has affected water quality and salmon

2    habitat in the Skagit River, the only river on the West Coast that still supports all six species

3    of Pacific salmon originally found in many Pacific Northwest rivers.

4          7.      As Tribal Archivist I have had many communications with Patty McNamee

5    over the preservation of historical records at Seattle NARA. I have also communicated

6    concerns on this same topic to archivists at the National Archive branches in Washington D.

7    C. and at College Park, Maryland.

8          8.      The Swinomish Tribe learned of the impending sale of the Seattle NARA

9    facility in mid-January 2020 via email from colleagues in my field.

10         9.      Swinomish was not informed of the intent of the Public Buildings Reform

11    Board despite the fact that they had visited Seattle NARA in mid-2020 and were contemplating

12    the sale of the Seattle NARA property. The Tribe's input was not solicited by PRRB despite

13    the fact that the original records at Seattle NARA are of the utmost importance to the

14    Swinomish Indian Tribal Community. And the Tribe only found out about the February 11,

15    2020 meeting allegedly held "for tribes" at Seattle NARA at the last minute from my

16    colleagues in the field. Swinomish did not receive a direct invitation from NARA officials

17    based in Washington D. C. Despite that, representatives from the Swinomish Tribal Archive

18    were able to attend said meeting.

19         10.      Representatives of the Swinomish Tribal Archive conveyed the Tribe's alarm

20    at the proposed PRRB recommendation directly to William J. Bosanko, NARA's Chief

21    Operating Officer at the February 11, 2020 meeting in Seattle, as well as the panel of associates

22    that accompanied him to that meeting from Washington D. C. Additionally, Swinomish has

23    been in contact with Washington state government representatives including the Attorney

24    General, state senators and representatives, to try and halt this monumental decision regarding

25    the tribe's records at Seattle NARA. Responses from Washington state officials have been

26

DECLARATION OF THERESA TREBON      4      ERROR! AUTOTEXT ENTRY NOT DEFINED.

540

supportive of keeping the facility located in the Seattle region where it is centrally located for those needing to fly in [i. e. Alaskan Natives], or drive great distances to utilize its records.

11.     The Swinomish Indian Tribal Community will suffer irreparable harm if the records housed at Seattle NARA are relocated to the Midwest as relayed to us by William Bosanko at the February 11, 2020 meeting. These harms include damage to the tribe's legal department which depends on ready access to these records to establish and enforce treaty rights, as well as other issues such as property disputes. Great harm will result to the tribe's individual members who will be unable to access key documents, and hold them in their very hands, that verify family history and genealogical ties, as well as education and medical records that shed light on present-day traumas for tribal members. One of the greatest harms will be to the tribe itself. Swinomish may not be able to afford the costs of repeated research trips to a facility "in the Midwest" [i. e. plane fare, hotel, food] in order to continue to puzzle out the Tribe's history in all areas of its existence. One trip to Seattle NARA is never enough to uncover the whole story. It takes repeated and concerted efforts to piece together the overall picture of any one issue, whether it is a tribal historical event or interchange with the B.I.A., from the vast collection held at Seattle NARA. After sixteen years of making these trips to Seattle NARA for this very purpose I can honestly attest to the fact that Swinomish has only scratched the surface of its history which is contained there, and I fear that if the records were removed from Seattle, the tribe would not be able to continue its research.

12.     As a historian I have personally depended on the records at Seattle NARA for over forty years and have utilized many record groups there. All are of immense importance to the Pacific Northwest, Alaska, and British Columbia regions. However, since coming to work for the Swinomish Tribe in 2004, and becoming the tribal archivist in 2007, I can honestly say that no records are more crucial to tribal communities in this same region than those held by Seattle NARA. The loss of the ability to examine and learn from these records first hand is

DECLARATION OF THERESA TREBON          5          ERROR! AUTOTEXT ENTRY NOT DEFINED.

541

1  incalculable for Native American tribes here. From my perspective, and that of the Swinomish

2  Tribe, these records must remain in the Seattle area.

3  I declare under penalty of perjury that the foregoing is true and correct.

4

5  DATED this 5th day of January, 2021 near La Conner, Washington.

6

7  Theresa Trebon

8  Theresa Trebon
   Swinomish Tribal Archivist

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF THERESA TREBON          6          ERROR! AUTOTEXT ENTRY NOT DEFINED.

542

1
2
3
4
5
6           **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF WASHINGTON**
7
    STATE OF WASHINGTON, et al.,              NO.
8
                            Plaintiff,        DECLARATION OF
9                                             MARCELLUS TURNER
10          v.
11  RUSSELL VOUGHT, et al.,
12                          Defendants,
13
            I, Marcellus Turner, declare as follows:

            1.      I am Executive Director and Chief Librarian of The Seattle Public Library. I am
14
    over the age of 18 and competent to testify. I make this declaration based on my personal
15
    knowledge.
16
            2.      I have been Executive Director and Chief Librarian at The Seattle Public
17
    Library for nine years. As Executive Director and Chief Librarian, I am responsible for the
18
    operations of the Central Library and 26 branch locations across the City of Seattle. I oversee
19
    approximately 700 employees responsible for delivering public library services to the people
20
    of Seattle, which include those seeking information in the comprehensive National Archives
21
    at Seattle. These archives include documents requested by researchers, historians, genealogists,
22
    students and many others.
23
            3.      The mission of The Seattle Public Library is to bring people, information and
24
    ideas together to enrich lives and build community. As a highly valued and respected public
25
    institution, the Library fulfills this mission by serving the residents of the Greater Seattle
26

metropolitan area, which has a population of nearly 4 million people – larger than any other area in the Pacific-Alaska region. In its Strategic Direction, the Library identifies Seattle culture and history as a service priority, thereby committing to developing local historical collections and providing research and reference services related to the history of the region. Furthermore, the organization maintains a commitment to the City of Seattle's Race and Social Justice Initiative and embeds equity principles in its service design and delivery. The Library's ability to effectively achieve its mission, deliver on its service priorities and honor its commitment to equity is dependent on its own resources, as well as its connections with partner institutions that extend and enhance the value of its services and counts the National Archives and the University of Washington as key partners.

4.     The National Archives at Seattle contains a vast collection of unique, unduplicated and undigitized original records from the Pacific Northwest that are essential for our patrons, researchers, and staff. The records that are kept at the National Archives at Seattle have been deemed important enough to be maintained by the federal government and originate in the Pacific Northwest states of Alaska, Idaho, Oregon and Washington. Therefore, the entirety of the collections is important, and by nature of the regional National Archives program, they have intrinsic local and regional value and interest. Specific collections of interest include: Bureau of Indian Affairs; Bureau of Land Management; Records of land offices; Chinese Exclusion Act Case Files; Federal District, Circuit, and Territorial Court Records; and Naturalization Records. These records and arguably most records held at the National Archives at Seattle have not been digitized and are unavailable online. Historical researchers spend hours reviewing relevant materials, and while online indexes and finding aids can help them focus on particular records, they often need to review record collections in person to determine the most important details. For researchers and historians, there is no substitute for original records. In addition, the National Archives at Seattle staff provide critical

1  expertise in research, retrieval and interpretation of those records for the greater public good,

2  and often with the assistance of volunteers.

3       5.     The Seattle Public Library is committed to providing an in-depth collection of

4  historical materials related to the Pacific Northwest and providing professional reference and

5  referral services. The Library also provides one of the largest genealogy collections in the

6  Pacific Northwest. Whether working with individuals on local history or family history,

7  fulfilling information requests from authors, attorneys, or the news media, or helping students

8  and other government agencies with research efforts, our librarians typically call upon many

9  of our own collections, as well as partner collections for additional resources. We regularly

10  refer our patrons to other institutions, including the National Archives. Any research involving

11  land and property, Native American and tribal rights, or immigrants to the Pacific Northwest

12  are likely to have records of interest at the National Archives at Seattle. Chinese Exclusion Act

13  records and Japanese-American internment records are two examples of important resources

14  documenting the experience of our Asian-American community.

15       6.     Librarians in our Special Collections Department regularly assist patrons with

16  property history research, whether for personal interest or for historic preservation

17  nominations. While most of the latter relate to local preservation initiatives, any nationally

18  significant buildings or buildings connected with the federal government would be referred to

19  the National Archives at Seattle for additional research.

20       7.     The Seattle Public Library first learned of the impending sale of the National

21  Archives at Seattle in mid-January 2020, following local news sources reporting on the closure

22  and discussions among professional affiliates and networks. Had the Library been given an

23  opportunity to provide feedback, we would have urged the federal government to reconsider

24  closure of this critically important research facility. Seattle is the largest metropolitan region

25  within the geographic scope of the National Archives at Seattle, and is, therefore, the most

26  appropriate location for these records. The National Archives' mission "to provide public

access to Federal Government records in our custody and control" is not fulfilled when these records are removed from the region where they originated and where the people who reside are most vested and interested. Further, we agree with the National Archives mission statement "that Public access to government records strengthens democracy by allowing Americans to claim their rights of citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government." These records should remain available to the public in this region so that we can continue to understand our complex past, connect people of all communities to our regional and national story, and hold our government accountable.

8.     As Executive Director and Chief Librarian, I wrote a letter expressing concern and requesting reconsideration of the closure to the Public Buildings Reform Board on behalf of the Library Board, the Library staff and its volunteers. A copy of the letter referenced in this paragraph is attached as Exhibit "A."

9.     The Seattle Public Library mission is to bring people, information and ideas together to enrich lives and build community, and we fulfill this mission, in part, through partnerships with other regional entities. With limited funds and space, the Library prioritizes local and regional records, often partnering with University of Washington Special Collections, Seattle Municipal Archives, King County Archives, Washington State Archives, and other entities to avoid unnecessary duplication and leaving federal records of local or regional importance or origination to the province of the local National Archives. Removal of the National Archives from this area would leave an unfillable void for private citizens, students, government agencies, news media, and businesses who rely on these records for a wide-range of needs. In addition, removal of the National Archives from this region would remove records of prime importance to historically underrepresented or marginalized populations, taking historical and personally valuable information away from populations who may be less-resourced to travel to another location. Aside from Alaska, which did have its own National

1  Archives until 2014, residents of Washington, Oregon, and Idaho can travel to the Seattle

2  archives with relative ease and at a cost substantially less than to, for instance, Missouri or

3  Southern California. People from marginalized groups who are not well-resourced will be

4  further marginalized as they will not be able to afford travel expenses or, barring that, research

5  or copy fees. For others—students, new media, authors, professor and amateur historians,

6  genealogists, etc. — removal of these records to a distant region will have a chilling effect on

7  research and, therefore, on our collective ability to understand and connect with our past.

8      10.    There is immense value in keeping the collection in the Northwest especially

9  after the closure of the Alaska facility back in 2014. When that happened, a promise was made

10  to Alaska residents to keep the files in the Northwest. In addition to being immeasurably

11  important in genealogical research for those with Native American heritage, the records needed

12  to prove tribal citizenship and fishing rights for Northwest tribes are included in this collection.

13  It compounds harm to move the collection further away and creates an immense financial

14  barrier for access.

15

16

17  I declare under penalty of perjury that the foregoing is true and correct.

18

19  DATED this 4th day of January, 2020 at Seattle, Washington.
            day        month        year        city        state

20

21

22

23

24  _____

25

26

To: fastainfo@pbrb.gov

To the Public Buildings Reform Board,

On behalf of The Seattle Public Library board of trustees, Library staff, volunteers and myself, we are disappointed in your decision to close the National Archives and Records Administration (NARA) facility in Seattle. This leaves the Northwestern area of the United States with no national archives facility—a move that severely hampers regional research by students, the news media, authors, attorneys, historians, genealogists and many government agencies at all levels.

This decision was made without public meetings and without soliciting comments from stakeholders in the four impacted Pacific Northwest states of Alaska, Washington, Oregon and Idaho. On January 15, 2020, the Washington State Archive (WSA) was informed by NARA after a decision was already made by the Public Buildings Reform Board (PBRB). The PBRB never gave WSA notice of the pending decision, nor did they give the State Archives an opportunity to comment on the proposed decision. To date, the four states have yet to hear from the PBRB, and your website is devoid of any information about the rationale for their decision.

Keeping the collection in the Northwest is especially important since the closure of the Alaska facility in 2014. At that time, a promise was made to Alaska residents to keep the files in the Northwest. In addition to being immeasurably important in genealogical research for those with Native American heritage, the records needed to prove tribal citizenship and fishing rights for Northwest tribes are included in this collection. It compounds harm to move the collection further away and creates an immense financial barrier for access.

We ask that you take these concerns seriously and reconsider your decision to move these archives thousands of miles away from the citizens and organizations who rely on them most. At the very least, we ask that you slow this process down to hear from those impacted by your decision, which is a basic practice of governing.

Thank you for your attention,

Marcellus Turner

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF SHANNON TUSHINGHAM |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, SHANNON TUSHINGHAM, declare as follows:

1.      I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.      I am the Director of the Museum of Anthropology and Assistant Professor of Anthropology at Washington State University (WSU). I have held this position since August, 2015. As Museum Director and Assistant Professor at WSU, I have responsibility for the stewardship of substantial archaeological, ethnographic, and historical collections and archives from the Pacific Northwest, as well as activities related to research, education, and public interpretation.

3.      I have a PhD from the University of California Davis (2009) and more than twenty years of experience as an archaeologist and cultural resource management professional. I have a diverse background in Tribal, academic, and private heritage management, research and education, and publish widely on the prehistory and history of indigenous communities and other topics throughout western North America. I am President-Elect of the Society for

DECLARATION OF SHANNON                    1
TUSHINGHAM

1  California Archaeology, the largest regional archaeological society in the United States, with

2  a membership that is broadly committed to historic preservation throughout the western states.

3       4.     The records housed at the National Archives at Seattle include numerous

4  precious and undigitized materials that are critical to research—not only my own research, but

5  that of my students, my professional and Tribal colleagues, and other members of the public.

6  Of particular concern are historical records including early boarding school records, documents

7  on places, ancestry, and ethnic heritage. Such archives are critical primary data for books,

8  papers, and publications that I, my current and future students and colleagues work on.

9       5.     Much of my work centers on filling in gaps about marginalized, "forgotten" or

10  overlooked individuals in the past. This includes my research on women and indigenous

11  peoples through the early historic or contact period relies upon early records housed at the

12  Archives. Such work is critical to my graduate and undergraduate courses, for instance Time

13  and Culture in the Northwest, Method and Interpretation in Archaeology, Cultural Resource

14  Management, and Historical Ecology in Western North America, as well as my supervision of

15  graduate Masters theses and Doctoral dissertations.

16       6.     Additionally, records housed at the National Archives at Seattle are

17  tremendously important to conservation of critical federally owned collections that are housed

18  at the WSU Museum of Anthropology, including those owned or affiliated with the US Army

19  Corps of Engineers, the Bureau of Land Management, and the National Park Service. Records

20  are also relevant to State owned collections, as well as to the numerous Federally and non-

21  Federally recognized Tribes who are affiliated with these collections. These archives provide

22  critical background information about lands, archaeological and historical sites and nearby

23  places, as well as documentation that is essential to evaluation of historic properties to the

24  National Register of Historic Places (NRHP), Tribal and State historic property registers.

25       7.     I initially learned of the impending sale of the National Archives at Seattle in

26  the news, and only heard about the recent move to quickly move forward with this sale via the

1  Attorney General of Washington. Since then, I have been working with colleagues at WSU to

2  write in protest of the proposed move.

3      8.      The proposed removal of the National Archives will harm my research

4  program, my current and future students' research and education, and efforts by Tribal

5  communities to research their history. Much of our work depends upon local access to primary

6  documents, and the vast majority of the historical records housed at the National Archives in

7  Seattle remain undigitized. Much of historical research involves working with and handling

8  primary documents—an often painstaking and time-consuming process that is often completed

9  by committed local historians, researchers, and other members of the public, and it is

10  unrealistic to think moving archives outside of the area will not adversely impact these

11  activities. Critically, the move will adversely impact conservation of Federal and State-owned

12  collections, as primary documents relating to these materials are housed at the archives.

13      9.      As a Museum Director, academic researcher, cultural resource management

14  professional, and person committed to Tribal collaboration and information sharing, I realize

15  the ethical and legal obligations to the public that archives serve. The primary documents

16  housed at the National Archives in Seattle are precious, and have a vast, largely unrealized

17  potential, and these materials are of fundamental interest to Pacific Northwesterners. Moving

18  the archives extra-locally will undoubtedly impede research by local Tribes, historians,

19  archaeologists, and other individuals and groups, who may find it difficult to travel for

20  financial or other reasons. For these reasons I remain in staunch opposition to the proposed

21  move of the National Archives.

22

23

24

25

26

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    DATED this 5th day of January, 2021 at Pullman, Washington.

4

5                                      *Shannon Tushingham*
                                      _____
6                                      SHANNON TUSHINGHAM
                                      Director of the Museum of Anthropology and
7                                      Assistant Professor of Anthropology
                                      Washington State University

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF SHANNON                    4
TUSHINGHAM

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF LISSA K. WADEWITZ |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Lissa K. Wadewitz, declare as follows:

1.     I am a Professor of U.S. History at Linfield University in McMinnville, Oregon. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge and my expertise as a historian.

2.     I have a Ph.D. in U.S. History from UCLA and have held post-doctoral fellowships at the University of Saskatchewan and Stanford University. I acquired a tenure-track job at Linfield College (now University) in 2007. I achieved tenure in 2013 and was promoted to full Professor in 2020. I specialize in the history of the U.S. West, Native American history, and environmental history. I have published multiple peer-reviewed articles in various academic journals and peer-edited anthologies. My first book, *The Nature of Borders: Salmon, Boundaries, and Bandits on the Salish Sea* (2012) explores the social, regulatory, and environmental history of the shared salmon fishery between British Columbia and Washington State. The book won three book awards from the American Historical Association, the Western History Association, and the North American Society for Oceanic

DECLARATION OF LISSA K.
WADEWITZ

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**553**

History. In addition to receiving several research grants from my home institution, my research has garnered external financial support from several entities including the George A. and Eliza Gardner Howard Fellowship at Brown University, the American Philosophical Society, and the Huntington Library, to name a few.

3.     Archival records are at the heart of historians' research practices. Having access to the historical documents produced by federal agencies is absolutely crucial to our being able to do our work and make sense of how and why past events occurred as they did. Having the ability to sit down and physically process a whole collection allows historians and other researchers to see details and connections that could otherwise be missed. Being in an archive comprised of a full range of regional records also facilitates our ability to do investigative research in as efficient a manner as possible. In conducting research at NARA for my book and related articles, there were multiple occasions when I discovered a revelatory event in one set of records that pushed me to immediately request records from a different federal agency. In this way, I could quickly track down an investigative lead and complete my research in a more efficient manner. At the Seattle NARA facility, I regularly engaged in this practice and my research was more nuanced and complete as a result.

4.     There are numerous record groups housed at the Seattle NARA facility that have been and will continue to be essential to my ongoing research. I spent months researching in several collections that ended up being absolutely vital to the completion of my first book and four other article-length publications that add depth to our understanding of the region's Native-newcomer, inter-ethnic, and environmental history. The U.S. Customs Service records collection (Record Group 36) was one of the most important. These records offered an amazingly rich window into life in the greater Puget Sound/Georgia Strait area of northwestern Washington and southwestern British Columbia. My research focused on the ways in which officials on both sides of the border attempted to police the salmon fishery that straddles the current political border with Canada. The Customs records proved to be pivotal to my ability

DECLARATION OF LISSA K. WADEWITZ

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**554**

to uncover the actions of fishermen, smugglers, and government officials trying to control what quickly became a volatile and chaotic fishery. As of today, an extremely small percentage of these records are digitized. The collection's organization is also such that being able to identify a specific document from the finding aid to request a copy from a distant archive would be impossible. Successful research in many of these larger collections simply does not work that way. Even if finding aids are complete enough to list the sender, recipient, date, and brief topic of a specific document, such information is always incomplete. Historians need to be able to sift through entire collections or large segments of collections to truly understand the nuances of a situation, conflict, or relationship. Often, you need to be able to follow years' worth of correspondence to see how a certain debate or conflict was resolved. It is simply not realistic for researchers to be able to do this sort of in-depth research via online brief descriptions of individual documents. In addition, for most of these collections, such online resources currently do not exist. Another collection that was crucial to my research on these earlier publications and that are used extensively by both historians of the region and Native American tribes are the records of the Bureau of Indian Affairs (Record Group 75). For the period I study (nineteenth and early twentieth centuries), this collection provides unique and vital documentation of the interactions between incoming Euro-American settlers, local Native peoples, and the region's fledgling governing Indian agency. The Circuit Court records (Record Group 21) housed at NARA Seattle also provide a rare look into the history of legal operations in the region and gave me important insights into several controversial court cases involving indigenous peoples and a powerful local fish cannery. I have used these collections extensively and relied on them heavily for my work on the Indians' experience of the dispossession of their fishing locations and the rise of a contested, trans-border salmon fishery that defied easy regulation and contributed to the current Pacific salmon crisis. Given how few of these collections have been digitized and the state of the finding aids available to researchers, being able to spend extensive time systematically working through the collections in person

DECLARATION OF LISSA K. WADEWITZ

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

555

1  cannot be overstated. These collections are one of a kind and their access is absolutely critical

2  for historians wanting to document the Northwest's past.

3       5.     Historians use archival records at NARA Seattle to gain insight into the

4  workings of federal agencies in the past, their interactions with the public, and why certain

5  decisions were made. We also use pertinent manuscript collections to add depth to our

6  understandings of how different types of peoples interacted in the ways they did and to better

7  grasp the challenges confronting the diverse groups of people who already lived in the Pacific

8  Northwest and Alaska, as well as the eclectic newcomers who came to inhabit the region. I

9  could not reconstruct the processes by which Indians lost access to their historical fishing sites

10  without the Bureau of Indian Affairs records. I could not have discovered the continual threats

11  to Indian reservation boundaries by incoming white settlers without those same records. I could

12  not have explained how the rise of the commercial salmon fishing industry facilitated a

13  complex system of fish stealing and fish smuggling across the U.S.-Canada border without

14  access to the U.S. Customs Records. I was able to trace the ways in which different immigrant

15  groups manipulated the international border for fish and employment also via that collection.

16  The Circuit Court Records revealed the importance of Washington's fish traps and the ways

17  the big cannery owners manipulated attitudes toward Indians to maintain control of prime

18  fishing locations. As noted above, all of these collections were vital to my being able to tell

19  the story of Native fishing, Indians' dispossession, and the broader social and environmental

20  impacts of the Pacific salmon commercial fishery. This work has added to our understanding

21  of why so many Pacific salmon are on the endangered species list in the present day.

22       6.     I know from professional experience and my various contacts that the Seattle

23  NARA records are pivotal to the work of multiple state, tribal, and federal agencies. However,

24  others with more personal experience in this area can speak to this issue more directly.

25       7.     I learned of the proposed closure via a posting on Facebook and then a

26  subsequent email from fellow historians and the American Historical Association (AHA). I

DECLARATION OF LISSA K.      4      
WADEWITZ

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**556**

was shocked at the manner in which the Public Buildings Reform Board and the Office of Management and Budget proceeded with the proposed closure with no regard for the impact of this action on the regional community, the tribes, and the work of professional historians. As a taxpayer and professional historian, I would have expected there to be a period of consultation and public feedback prior to any decisions being made. The lack of public review, the heavy-handed manner in which this decision proceeded, and the lack of responsiveness from those agencies feels like a violation of the public trust.

8.      After learning of the pending sale of the NARA archive building in Seattle, I immediately wrote to my federal representatives for Oregon expressing my extreme dismay at the manner in which this decision was made, the complete lack of consultation with key stakeholders, the implications it would have for researchers, tribes, and state agencies. I stressed the very real hardships such a decision would impose on so many of us. My political representatives responded immediately, as did the AHA. I awaited news for additional collective action regarding the decision, which is why I completed this document.

9.      If the Seattle holdings are moved and divided between facilities in Kansas and Southern California, conducting archival research on the Pacific Northwest will become more expensive, time-consuming, difficult, and, for some regional denizens, impossible. Because my job is teaching-intensive, the only time I realistically have to travel to distant archives is during January or the summer months. Currently, I can drive in my own car to the Seattle area to do research at NARA. Once there, I can also conduct related research (if relevant, depending on the project) at other Pacific Northwest libraries and archives that are also important to my work. As a result, I am usually able to make significant progress on my research in one 1-2 week trip. If instead in the future I have to travel to either *or both* Kansas and Riverside, I will be spending thousands more dollars in airfare and car rentals and my research progress will no doubt suffer as a result of the more complicated logistics. I will also then have to find time to travel to these distant locations in addition to the other regional repositories relevant to my

DECLARATION OF LISSA K. WADEWITZ                     5                     ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**557**

ongoing research. This decision, done with absolutely no input from the public, will be
disastrous for the researchers who depend on this archive for access to federal records, it will
impede research progress for all of us, and it will make conducting research far more
inconvenient and expensive.

10.     Historical knowledge is important. Knowing our history can help us all make
better choices for our collective future development. Hampering historians' ability to access
crucial historical documentation will not benefit our society writ large. I urge the federal
agencies involved in this decision to consider what is at stake for so many of us who depend
on the NARA facility in Seattle.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this _2nd__ day of _January, 2021_____, _McMinnville_ at __Oregon_____.
              day           month      year        city          state

_____
Lissa K. Wadewitz

DECLARATION OF LISSA K.
WADEWITZ

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

558

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF LIZABETH (BETSY) WILSON |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Lizabeth (Betsy) Wilson, declare as follows:

1.      I am the Vice Provost for Digital Initiatives and Dean of University Libraries at the University of Washington (UW or University). I submit this declaration in support of the State of Washington's litigation challenging the sale of the Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington, which houses the National Archives at Seattle.

2.      I have compiled the information set forth below through personal knowledge as well as through University personnel who have assisted me in gathering this information from UW. I have also familiarized myself with the litigation in order to understand its immediate impact on the University.

3.      UW is Washington State's largest public research university. I have been the Vice Provost for Digital Initiatives and Dean of University Libraries at UW since 2001, and have been with the UW Libraries since 1992.

1       4.      Prior to joining the University in 1992, I was the Assistant Director of Libraries
2 for Undergraduate and Instructional Services at the University of Illinois at Urbana-
3 Champaign. I have published and presented widely on information literacy, teaching, learning,
4 and technology; cross-sector collaborations; art historiography; global libraries; and
5 assessment and evaluation. I have held leadership positions in the American Library
6 Association (ALA) and the Association of College and Research Libraries (ACRL), including
7 chair of the ACRL Instruction Section, member of ALA Council, and ACRL President. I have
8 previously served on the Board of Trustees of OCLC, a nonprofit membership organization
9 serving over 55,000 libraries and knowledge institutions worldwide and dedicated to the public
10 purposes of furthering access to the world's information and reducing information costs. I am
11 a past chair of the Orbis Cascade Alliance, a regional consortium of 37 academic libraries in
12 the Pacific Northwest that leverages their collective collections and purchasing power to
13 expand information access for scholarship, research, and learning.  I have also served on the
14 Council on Library and Information Resources (CLIR) Board, the Governing Board of the
15 HathiTrust, the Association of Research Libraries (ARL) Board, the Digital Library Federation
16 (DLF) Executive Committee, and as Chair of the Greater Western Library Alliance (GWLA).
17 I am the recipient of the Hugh C. Atkinson Memorial Award, Miriam Dudley Instruction
18 Librarian Award, the Margaret E. Monroe Award, the Distinguished Alumnus Award from
19 University of Illinois' Graduate School of Library and Information Science, and the ACRL
20 Academic/Research Librarian of the Year.
21       5.      As the Vice Provost for Digital Initiatives and Dean of University Libraries at
22 the University of Washington, I have responsibility for management of the entire University
23 of Washington Library system which includes 16 different academic Libraries across three
24 campuses throughout the region: Seattle, Tacoma and Bothell as well as Special, Archival, and
25 Distinctive Collections, one of the largest collections of its kind in the Pacific Northwest. As
26

DECLARATION OF LIZABETH      2      ERROR! AUTOTEXT ENTRY NOT DEFINED.
(BETSY) WILSON

560

Dean, I have fiduciary responsibility for the Libraries as well as development and oversight of the Libraries strategic plan.

6.     The University of Washington is a state institution of higher education in the State of Washington. In fall 2019, the University of Washington had 42,544 enrolled undergraduate students and 16,847 enrolled graduate and professional students. The University of Washington's three campuses offer more than 636 degree options across 312 programs.

7.     The UW Libraries first became aware of the sale in January 2020 through the media.

8.     After learning of the sale, UW along with several other universities in the Pacific Northwest sent a letter asking the federal government to reconsider its decision to sale the National Archives at Seattle. A true and correct copy of that letter is attached hereto as **Exhibit 1**. This letter represents voices from six different academic institutions throughout the region, expressing the import of NARA and its proximity for research specifically and inherently connected to the people and environment of the Pacific Northwest. The letter provides extensive details and examples of the negative impact moving the NARA Archives would have, essentially preventing scholars and community members alike from accessing records and completing critical research work across disciplines. The leadership expressed a shared concern over moving culturally significant archives even farther away from the indigenous and local communities whose histories are preserved within NARA, an act that is particularly grievous given the lack of community engagement, planning and discourse that would typically be required when considering a move of this magnitude. The federal government did not respond to the letter.

9.     The announcement of the sale of the facility that houses the National Archives at Seattle threatens to inflict immediate and ongoing harm on UW its faculty, and its students. As a public university, access to the National Archives directly impacts our ability to educate scholars and the public as well as our mission to preserve and enhance knowledge.

DECLARATION OF LIZABETH (BETSY) WILSON     3     ERROR! AUTOTEXT ENTRY NOT DEFINED.

**561**

1    10.    This regional NARA facility contains historical records spanning across

2    numerous federal agencies, including the Department of Interior, the Bureau of Indian Affairs

3    (inclusive of all reservation communities in the Pacific Northwest and Alaska), the Indian

4    Health Service, Bureau of Land Management, Federal Court Records, and many others. These

5    records contain valuable information—available nowhere else—for generations of current and

6    future researchers on topics related to American Indians, environmental issues, the expansion

7    of the United States in the far West and Pacific, federal power, immigration, and public lands,

8    to name a few. Only a very small portion of these records have been digitized or even

9    microfilmed.

10    11.    Physical access to the National Archives at Seattle is critical for the

11    development of scholarship at UW. Moving the records housed at the NARA facility out of

12    Washington will effectively eliminate UW's access to these materials. The vast majority of the

13    materials utilized by UW have not been digitized, and UW simply does not have the resources

14    to provide the transportation and travel costs to its faculty and students who would need to

15    travel to other states for their research.

16    12.    Moreover, the notion that digitization could be a "workaround" solution to

17    access these NARA records is not based in reality given the time and cost that would be

18    required to do so, and is not supported by NARA's track record in that area thus far. For

19    instance, according to the *Journal of Western Archives*,[1] less than 1 percent of the 7,800 cubic

20    feet of the Alaska National Archives have been digitized since the project started in 2014,

21    which includes documents that cannot be digitized. In my experience, some of these materials

22    are too fragile to be sent through a scanner, others may not render a high quality image, such

23    as maps from the Bureau of Land Management and the Bureau of Public Roads that are too

24    wide or long to fit into scanners.

25    _____

26    [1] Llewellyn, Megan E. and Buchanan, Sarah A. (2020) "Will the Last Archivist in Seattle Please Turn
     Out the Lights: Value and the National Archives," *Journal of Western Archives*: Vol. 11: Iss. 1, Article 7,
     *available at* https://digitalcommons.usu.edu/westernarchives/vol11/iss1/7.

13.     In addition, the loss of this regional branch of NARA would greatly hamper research activity at the UW. The Seattle facility is used on a regular basis by University of Washington students, faculty, and staff as well as the broader public in the Pacific Northwest. Researchers of all levels have a network of regional history available to them in the Seattle area. Removal of the National Archives at Seattle will sever NARA from this network of rich resources for Pacific Northwest research. UW Researchers rely on the proximity of NARA's federal records to other complementary, related collections held in these regional facilities; closing NARA would greatly limit their ability to access important historical records on a wide range of subjects.

14.     The records housed at NARA provide critical primary sources to support research and writing across disciplines. UW Librarians frequently (weekly) refer researchers to NARA for materials that we do not have in our own collections and archives. Common subject areas UW Libraries refers to NARA include records related to the military, local Native American history related to tribal rights and treaties, Census/demography, family history, natural resources, law/justice/civil rights or the local built environment. Other popular subjects frequently referred to NARA are records relating to the WWII Japanese Internment in the Seattle area, and the Chinese Exclusion Act. The interconnectedness between UW Special Collections and NARA relating to tribal history, treaties and administration is also a significant and critical relationship many researchers rely upon.

15.     Librarians in Special Collections also regularly assist researchers who visit the UW to use primary sources in conjunction with NARA collections. The complementarity of the two collections enables researchers both domestic and international who visit Seattle to do in-depth research on topics relating to U.S. history. In particular, trade agreements with Pacific Rim countries, public policy relating to the tenures of Senators Jackson and Magnuson and the Hanford Nuclear Reservation are frequent research topics.

16.     As librarians, we at UW Libraries are often a starting point for research and discovery. We guide people through an often complex network of records and systems to identify the resources that are going to be most helpful in answering the research question. Often the final product takes many years to complete. Closure of the Seattle Archives would disrupt ongoing research that relies on the proximity of NARA to its Pacific Northwest constituents. NARA is a central resource for multiple states throughout the region. It is highly utilized, and its staff have years of experience and institutional knowledge that cannot be replicated with an out-of-state facility and staff far removed from the local context. It is imperative that these histories remain within reach of those who utilize them most, to support the pursuit of knowledge where it is most relevant and applicable - here in the Pacific Northwest.

17.     UW faculty and students also heavily rely on access to the Seattle NARA facility to further their research and scholarship endeavors. For instance, Professor Linda Nash from the UW Department of History has used and continues to use the records located at the NARA Seattle facility in her own research on environmental and cultural history. Professor Nash has utilized this material in her publications in major history journals, such as her 2000 article in the *Journal of American History* titled "The Changing Experience of Nature: Historical Encounters with a Northwest River." Professor Nash is currently finishing a book manuscript, funded by an NEH grant and under contract to Oxford University Press, that relies heavily on material from the NARA-Seattle archives by following American water engineers in the decades immediately after World War II as they moved between Washington's Columbia Basin and Afghanistan's Helmand Valley. Having a major collection of archival resources in the local area has allowed Professor Nash to pursue research while teaching, rather than limiting her research to the summer or infrequent research quarters.

18.     Additionally, UW Department of History Professor Michel Kucher teaches classes that often requires utilization of the records at the Seattle NARA facility. Using these

records, students research the history of topics such as the history of land use, national parks, federal cleanup projects, or architectural history of federal buildings or buildings built or restored with federal funds, such as the initial surveys that led to the creation of the UW Seattle campus. Professor Kucher's students have used these records to investigate, for instance, the agricultural history of the South Sound, and various environmental projects such as EPA actions and illegal dumping in the region. These research projects would halt without physical access to the records at the Seattle NARA facility, as only a miniscule percent of these records have been digitized.

19.     Many graduate students, including most graduate students studying U.S. history at UW, make use of the National Archives at Seattle facility at some point in their careers, for research papers, journal articles, or their dissertations. For instance, one UW PhD candidate's thesis focused on the 1968 case of *Mexican-American Federation-Washington v. Naff,* where Mexican Americans in Yakima Valley sued the county, claiming that English literacy tests were being used to deny their right to vote. Although some information about the case exists online, the actual court documents do not; they were instead generated by the District Court for the Eastern District of Washington, where the case was filed, but never digitized. The actual case records, including transcripts, are housed at the Seattle NARA facility. Had these records been moved, this student would likely not have had access to these critically important primary source court documents.

20.     Having substantial local archival resources has helped UW to recruit top applicants who are interested in pursuing research based in the Western United States. Because UW does not have the resources to provide travel budgets for its graduate students, losing this major local resource would be nothing short of devastating to students' development and potential for success in the field.

21.     UW librarians also use the facility for their own research, for both current and past efforts. For instance, Professor Cass Hartnett, a UW Librarian for Government

DECLARATION OF LIZABETH (BETSY) WILSON     7     ERROR! AUTOTEXT ENTRY NOT DEFINED.

565

Publications, Maps, Microforms & Newspapers, teaches LIS526, Government Publications, at the Information School. In this course, students—whose coursework involves visiting the Seattle NARA facility—uniformly come back to class reporting a much more profound understanding of the scope of government functions.

22.    In addition, UW libraries rely on the Seattle NARA Archives & Records Center for their focused, comprehensive government agency archives, just as public and academic libraries in the 5-state Pacific Northwest rely on the UW Libraries for deep, research level collections and expertise. UW librarians are contacted on a weekly basis by researchers, students, and faculty who are often searching for primary documents and records. The staff work with them—who are physically located in the Northwest—to determine the location of the materials that are needed to ensure that the time and resources spent going to different libraries and facilities, including the NARA facility, are minimized. The topics of research vary, from law and civil rights to military records and family history and other areas in between. Both UW-affiliated individuals and members of the public are referred to the NARA facility on a regular basis.

23.    Additionally, UW utilizes a number of records at the Seattle NARA facility in connection with certain agricultural, recreational, and conservation-related federal programs. For instance, the UW Department of History, through the work of Professor Bruce Hevly, utilizes non-digitized records housed as the Seattle facility in connection with their research projects involving the Hanford nuclear site. These records bear on controversial topics related to public health, and the conditions under which the federal government will abandon the Hanford site to state responsibility. And while the Department of Energy has previously promised to make the Hanford records available on line (via a Declassified Document Retrieval System), this service disappeared after only a couple of years and the records are no longer accessible in a digital form.

DECLARATION OF LIZABETH (BETSY) WILSON          8          ERROR! AUTOTEXT ENTRY NOT DEFINED.

566

24. Additionally, the UW currently has a partnership with the National Oceanic and Atmospheric Administration (NOAA) to digitize Civil War-era handwritten U.S. Navy logbooks and muster rolls. The digitization of these logbooks will allow researchers and climate scientists to recover ships' positions, weather records, oceanographic data, and other historical information, and make important observations about weather patterns of the past and present. Moving the records would make them inaccessible for continued research, especially when there is a need to consult the original. Moving the records would also eliminate the opportunity for interested volunteers with extensive local knowledge from assisting with the project equating to a significant loss of knowledge and expertise that would be critical to the project.

25. Researching sites for landmark designation also frequently requires access to the records at the NARA Seattle facility, as well, for properties with ties to federal agencies, such as the UW's Shell House, built during WWI by the U.S. Navy as an airplane hangar.

26. Moreover, moving the records to other locations deprives UW and others of the localized knowledge of the curators and archivists at the Seattle facility. Over time, curators and archivists acquire knowledge and expertise of local complementary collections. Based on their experience they are able to make recommendations to help researchers quickly navigate through various record groups containing relevant documents. In addition, the professional camaraderie that exists between historians, curators and archivists is an important community when researching novel topics. Such a loss would further frustrate UW's ability to find and locate the records critical to furthering its scholarship and educational missions.

27. Finally, losing access to the records at NARA would also severely damage UW's mission. The primary mission of the University of Washington is the preservation, advancement, and dissemination of knowledge, complimentary to the mission of the UW Libraries to advance discovery and enrich the quality of life by connecting people with knowledge. UW scholars represent a diversity of expertise with many programs and courses

1  specifically tied to the culture and environment of the Pacific Northwest. In addition to the
2  university's highly accomplished history department, the College of the Environment is
3  supported by public and private funding of more than $173 million annually to support
4  renowned research on climate, ecology, and natural resource management among other areas
5  of interest. UW's American Indian Studies Center at the University of Washington established
6  in 1970, is one of only a handful of similar academic centers in the US. UW knows by the
7  frequency and types of UW referrals to NARA, how valuable these archives are to the students,
8  faculty and community members who come to us on a regular basis in search of knowledge
9  held within NARA. Removing access to this vital resource is in direct conflict of these
10 missions where preservation and access is imperative to discovery.

11

12

13 I declare under penalty of perjury that the foregoing is true and correct.

14

15 DATED this _5__ day of _January_____, 2021___ at Seattle, WA.

16

17

18                                    *Lizabeth A. Wilson*

19                                    _____
                                     Lizabeth (Betsy) Wilson
20                                    Vice Provost for Digital Initiatives and Dean of
                                     University Libraries
21                                    University of Washington

22

23

24

25

26

# Exhibit 1

February 27, 2020


Russell Vought                          Emily Murphy
Acting Director                         Administrator
Office of Management and Budget         General Services Administration
725 17th Street, NW                     1800 F Street, NW
Washington, DC  20503                   Washington, DC  20405


Adam Bodner                             David Ferriero
Executive Director                      Archivist
Public Buildings Reform Board           National Archives and Records Administration
1800 F Street, NW, Room 5116            8601 Adelphi Road
Washington, DC  20405                   College Park, MD 20740

Dear Acting Director Vought, Administrator Murphy, Director Bodner, and Archivist Ferriero,

We write as the chief librarians of the largest research universities in the Pacific Northwest to express how the sale of the **Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington**, would damage our institutions and the communities and states we serve.  The sale of the center, initially proposed by the Public Buildings Reform Board and recently approved by the Office of Management and Budget, would hurt and diminish the mission and activities of our institutions.  Moreover, we are also deeply concerned by the process by which the decision to sell the facility was reached.  <u>We ask that you reconsider the decision to sell the facility until after further consultation with impacted communities to take public concerns into consideration.</u>


### *Loss of Access to Historical Information and Records for Students, Researchers and the Public*

The federal government has been entrusted with these historical archival documents. Access is essential, particularly for those most interested in ensuring that these documents help to tell and preserve our national and regional history, for learning, and teaching.  The proposed relocation will make these documents even less accessible to scholars and the public, especially our tribal partners.

Pacific Northwest student and faculty research and scholarship will be harmed by this closure. As public universities, access to archives is essential to our ability to educate scholars and the public as well as our mission to preserve and enhance knowledge.

<u>Access to original records in their context</u> – While it has long been a goal to make more records accessible through digitization, digital representations cannot always replace the importance of the original documents. Some documents are important primarily because of their informational value, whereas others also have artifactual value which cannot be reproduced. Moreover, physically handling records and being able to understand each document in connection with other related documents will be a potential loss as those communities losing their records will be further distanced from their histories.

The concerns about the closure of the facility and the relocation of the records are not hypothetical. The following examples illustrate the real impact that would be caused by the relocation of the records.

- **University of Washington (UW)**

**Service to and utilization by UW and the public**:  The Seattle NARA facility is used on a regular basis by University of Washington students, faculty, and staff as well as the broader public in the Northwest.

Researchers of all levels have a complex of regional history available to them in the Seattle area. Individual and groups of researchers planning trips to Seattle can consult with a multitude of archival resources relating to the Pacific Northwest region including those at the University of Washington Libraries Special Collections, the Museum of History and Industry (MOHAI), the Seattle Municipal Archives, and the National Archives, just to name a few. Removal of the National Archives at Seattle will sever the National Archives and Records Administration (NARA) from this network of rich resources for Pacific Northwest research.  Researchers—local, national and international—rely on the proximity of NARA's federal records to other complementary, related collections held in these regional facilities; closing NARA would greatly limit their ability to access important historical records on a wide range of subjects.

In addition, UW librarians are contacted by researchers, students, and faculty who are often searching for primary documents and records.  The staff work with them—who are physically located in the Northwest—to determine the location of the materials that are needed to ensure that the time and resources spent going to different libraries and facilities, including the NARA facility, are minimized.  The topics of research vary, from law and civil rights to military records and family history and other areas in between.  Both UW-affiliated individuals and members of the public are referred to the NARA facility on a regular basis.  Even UW librarians use the facility for their own research, for both current and past efforts.

**Impact on Students**:  More locally, most of graduate students studying U.S. history at UW make use of these archives at some point in their careers, for research papers, journal articles, or their dissertations. In addition, having substantial local archival resources has helped the university to recruit top applicants who are interested in pursuing research based in the Western United States.  Because graduate students, including those at UW, have very little travel funding, losing this major local resource would be nothing short of devastating to students' development and potential for success in the field.

- **Washington State University (WSU)**

**Making Historical Documents Accessible:**  WSU's Center for Digital Scholarship and Curation (CDSC) is currently planning to digitize documents held at the NARA facility in Seattle for the Plateau Peoples' Web Portal making them easily accessible to the public.

The curriculum in the Plateau Peoples' Web Portal has been created by Tribal representatives from each of the partner Tribes. The basis of the curriculum is primary source material from national and regional repositories including the Smithsonian Institution, the Library of Congress, Washington State University's Manuscripts, Archives and Special Collections, Gonzaga University Archives and Special Collections and the Northwest Museum of Arts and Culture.  The curriculum is meant to aid educators and learners in various settings both formal and informal and to help Washington State's public comply with Senate Bill 5433, which requires tribal histories be taught in every grade.

Providing our educators access to these records exposes them to information on the history of the Plateau tribes throughout the inland northwest.  These materials will be selected by our tribal partners and will include the work WSU faculty and students are doing with the Colville and Yakima Nations. However, this work will be cost prohibitive if the collections are moved out of state.

In addition, WSU's Dr. Melissa Parkhurst used the student records at NARA extensively to chronicle the powerful uses of music in the assimilation-based curriculum at Chemawa Indian School, the oldest continuously operating federal boarding school.  Stories from Chemawa students, 1880-2014, are documented in the book, *To Win the Indian Heart: Music at Chemawa Indian School*.  Over 30,000 students have attended Chemawa, an institution that has intimately impacted tribal families and communities across the west.  This project would not have been possible without access to the archives at Sand Point.

**Learning from History:**  The cultural and multigenerational effects of Indian boarding schools on one family's history is the subject of a new exhibit in WSU's Manuscripts, Archives and Special Collection. Dr. Robbie Paul curated the current exhibit in the WSU Libraries department of Manuscripts, Archives, and Special Collections (MASC) titled "Grandfather's Trunk, Spirit of Survival: Three Generations of the Paul Family's Native American Boarding School Experience."   Through access of the public documents at NARA, Dr. Paul pieced together key details of her family's experience by consulting boarding school records in Seattle's Sand Point facility.   Connecting our community to their native heritage, Dr. Paul is able to highlight the experiences of her family in Indian boarding schools where trauma occurred and share the early history of her great-great-grandfather, Chief Ut-Sin-Malikan, the first to see the loss of the old Native American ways and of Nez Perce identity in his lifetime.  Highlighting these experiences are not only connecting the community to the lives of the native people, but educating on the actions of our past so they don't happen again. Without access to the NARA records, this exhibit at WSU's Terrell Library would not have happened.

- **Oregon State University (OSU)**

**Critical resource for faculty research**.  Oregon State University faculty researchers in the liberal arts fields of history and anthropology have relied on the Seattle NARA facility over the past 20 years. For example, the Seattle NARA facility served as a critical resource, providing a rich trove of sources, for the writing of *American Forestry: A History of National, State, and Private Cooperation* (1985), a work focused on federal fire policy and relations between federal agencies, state governments, and private corporations in the Pacific Northwest.  Among the many archives, both national and regional, providing primary source materials, the Seattle Branch was the equal of regional materials for the Southeast Region in Atlanta, the Rocky Mountain Region in Denver, and the forestry related materials in the Pacific Region offices, then in San Bruno, California.

**Relocation Impact on Research Costs and Expenses**:  OSU faculty describe the Seattle NARA archivists as exemplary, with the necessary in-depth knowledge of the collections. The demonstrated knowledge of the archivists has proven essential time and again to assist visiting researchers efficiently and effectively navigate the collections to review and recover missing parts of the region's tribal histories from the 19th and 20th centuries. The archivists' deep familiarity with the facility help faculty understand how the archives are structured to help them prepare in advance and to optimize their time reviewing the collection at the facility itself. Based on faculty experiences at the Seattle NARA facility, there is a

common sentiment that the value of the Seattle facility would best be measured by the importance of regional access to the comprehensive collection of records to be accessed when needed, and the importance of knowledgeable archivists with deep familiarity of the structure and content of the collections to facilitate review and public engagement, not by the amount of time that researchers spend at the facility itself. Relocating the facility will disrupt these essential values of the Seattle NARA facility and further challenge the cost-effective access of these important public records for understanding and communicating Northwest history.

**Impact on Students**.  Just as important, as a result of its relative proximity to campus, countless numbers of Oregon State University graduate students with very limited travel funds have made important use of the Seattle archives over the decades.

- **University of Oregon (UO)**

**Impact on Undergraduate Research:**  Undergraduate classes have conducted research on Northern Paiute History and the indigenous people of the Great Basin, which includes southeastern Oregon. In recent years, more than twenty undergraduate students have traveled to Seattle to perform research on-site, some supported with fellowships and grants, as an integral experience in their development as scholars. Their work at the NARA Seattle facility has supported their publication of peer-reviewed articles; presentations at local, regional, and national academic conferences; and completion of independent, faculty-mentored undergraduate research projects submitted as writing samples for successful graduate school applications. The loss of this regional archive will diminish opportunities for student development and learning across many disciplines. It will become prohibitively expensive for undergraduate training to include experience working with the National Archives, the most significant archive of historical materials in the nation.

**Threatening doctoral training:** The University of Oregon and the Coquille Indian Tribe developed the Southwest Oregon Research Project (SWORP) in collaboration with the Smithsonian Institution. Access to materials housed in Seattle not only documented tribal governance and the history of Oregon's Southwestern tribes but also enabled nearly twenty people to earn graduate degrees, including fourteen PhDs and six master's degree, from the University of Oregon. Access to archival materials and the ability to collaborate easily with tribal leaders was essential. Moving the materials from the region, which is already geographically isolated in terms of travel costs, will harm advanced students' access to materials, scholars, and tribes.  In an era when the public has rightly expressed concern about the increased cost of higher education, moving archival materials to two distant archives, each more than one thousand miles away, will dramatically increase research costs for those studying the history of the Pacific Northwest and the development and administration of federal policy in the region, adding to the financial burden of graduate education. About a third of current UO graduate students in history have research activities that depend upon the archives.

**University-Public Collaborations:** A faculty member has for more than twenty years worked closely with the Basque communities in Oregon, Idaho, and Nevada, sharing extensive source materials housed in Seattle. This work, and similar project to broaden public access to archival materials, will no longer be possible if the collections in Seattle are spread to archives in southern California and Missouri. The very act of moving these records to distant archives means that researchers studying the history of the Pacific Northwest will have no access to vital records for a period of years, while they are readied for shipment, shipped, unpacked, and inventoried. Thus, even ignoring the additional cost and time

involved in traveling to distant archives, for a long period of time, none of these vital records will be available at all. That means important research cannot be done, which will impact graduate students who are currently researching and writing dissertations and faculty scholars who are writing books on the history of the Pacific Northwest. At present, the archives in Seattle are vital resources for the research of nine doctoral history students at the University of Oregon, who are depending on the Seattle records center to be able to graduate and launch their careers. Moreover, a faculty research project about Oregon's public lands, which has engaged rural community members throughout the state, will be significantly delayed. Moving the archives will have a dramatic impact on the ability of these scholars to complete their research within externally imposed deadlines and thwart the research of even more scholars of the Pacific Northwest moving forward.

- **University of Alaska (UA)**

**Making Alaska records more inaccessible:**  The National Archives facility in Anchorage, Alaska, was closed in 2014 and the records from that location were relocated to Seattle.  This was a blow to the region and researchers interested in the history of Alaska, which was a federal territory between its purchase from Russia in 1867 and when it achieved statehood in 1959. With the pending move of materials from Seattle to California as a result of this sale, Alaska records will now be even further away from their source.  Since Seattle is the repository for records created by Federal agencies in Alaska, Idaho, Oregon, and Washington, citizens from all of these states, including the students and faculty at the University of Alaska, will be impacted as they will have to travel much further to see most records since only a small percentage of these are digitized.

The removal of records from the state to a location even farther away, will make it much more challenging for Alaskan researchers to access all of the resources they need. Alaskans also express discontent with the move, which exports our own history to facilities where there are no subject specialists to assist those in need of information, making it harder to find.  Locking up information in far-flung repositories is the opposite of the current trend of making archives more accessible and usable to everyone.

**Alaska records have been moved before:**  We must also note that, when the decision was made in 2014 to close the Anchorage facility, NARA leadership indicated at that time that the records would be digitized, and that an effort would be made to reach out to stakeholders to prioritize records for processing. To date, no update has been provided regarding the digitization process.

If the sale of the property and the relocation of the materials do occur, the University of Alaska recommends that portions of the proceeds from the sale of the facility be used to subsidize researcher travel costs and for digitization of archival collections to make them publicly on line.

***Lack of Consultation with Stakeholders***

In addition to the negative impact the sale would have on our institutions collectively, as noted above, we are also troubled by the lack of local consultation with communities in Seattle and in the Pacific Northwest more broadly.  The PBRB's own initial submission dated October 31 states, in part, that

> "*The Board has undertaken extensive effort to work with local and state officials [emphasis added]* as well as Members of Congress for each recommended property to ensure the Board's solution and the ultimate sale meet the needs of the local community and return value to the federal government…"

Furthermore, the board's amended recommendation list from December 27 states as Step 5 of the process to developing the list of targeted facilities that the PBRB, "*Solicit[ed] input from stakeholders and public*," *[emphasis added]* including seeking municipal engagement.

As members of the stakeholder community—both in physical proximity as well as being the users of the facility—we respectfully disagree that the stakeholders were appropriately consulted.  While we acknowledge that the legislation that created the PBRB does not call for a public comment period, we believe that the stakeholders should have been engaged in a public and meaningful manner.

By contrast, the final December 27 recommendations state that, with respect to future outreach:

> *The PBRB and GSA will actively solicit input from the developer community [emphasis added]* and work with city officials to understand and clarify redevelopment plans for this site. By reducing uncertainty around future entitlement, and increasing certainty around transaction timelines, qualified developers can increase the amount paid for the property.

We further note that while the public meeting held in the Los Angeles area on July 24 was actually held at the very same Laguna Niguel facility that was targeted for sale and included representatives from the City of Laguna Niguel on the agenda, no outreach of that kind occurred in the Pacific Northwest.  As the federal records facility representing four entire states, we believe that similar outreach and consultation efforts should have taken place.

***Conclusion***

While we can appreciate the desire and need to consolidate federal facilities, for the reasons outlined above, <u>we ask that you reconsider your decision to close the Federal Archives and Records Center</u> and request that you engage in a more consultative process with the stakeholders.

Sincerely,


Lizabeth Wilson
Dean, University Libraries
University of Washington

Jay Staratt
Dean, Libraries
Washington State University


Faye A. Chadwell
Donald and Delpha Campbell University Librarian
Oregon State University

Mark Watson
Interim Dean, Libraries
University of Oregon


Karen Jensen
Director of Libraries
University of Alaska Fairbanks

Stephen Rollins
Dean, Consortium Library
University of Alaska Anchorage


Cc:    Washington Congressional Delegation
       Oregon Congressional Delegation
       Alaska Congressional Delegation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF DR. JOSH WISNIEWSKI |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Dr. Josh Wisniewski, declare as follows:

1.      I am an anthropologist for the Port Gamble S'Klallam Tribe and Jamestown S'Klallam Tribe, signatories to the 1855 Point No Point Treaty with the United States. I am over the age of 18 and competent to testify. I make this Declaration based on my personal knowledge.

2.      I received a Ph.D. in anthropology from the University of Alaska Fairbanks in 2011, having published my dissertation, "Come on Ugzruk, Let Me Win: Experience, Relationality, and Knowing in Kigiqtaamiut Hunting and Ethnography." I taught as an Adjunct Professor of Anthropology for the University of Alaska in 2009 and 2010, and have taught in the same capacity at Northwest Indian College from 2012 to present. I began work for the Port Gamble S'Klallam Tribe as the Tribe's anthropologist in 2010. From 2011 to 2015, I also served as the Port Gamble S'Klallam Tribe's Tribal Historic Preservation Officer

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**577**

(THPO), I helped the Port Gamble S'Klallam Tribe create the THPO office in 2011. I currently serve as an anthropological consultant for both the Port Gamble S'Klallam Tribe and Jamestown S'Klallam Tribe, as I have since 2015.

3.     Since at least 2001 I have extensively researched and utilized historical records on file with the  U.S. National Archives and Records Administration (NARA) to carry out research in the following areas of importance to the Port Gamble S'Klallam and Jamestown S'Klallam Tribes and other Pacific Northwest indigenous peoples: the impacts of colonization in Native American and Alaska Native communities; Native American and Alaska Native subsistence hunting and fishing practices; Treaty Rights; and Commercial Fisheries.

4.     Beginning in 2001, through 2003 while studying for my Master of Arts in Anthropology at the University of Alaska Anchorage and working for the U.S. Army Corps of Engineers, I conducted anthropological research at the former National Archives facility at Anchorage. This anthropological research at that facility examined the impacts of federal Civil Aeronautics Administration (CAA), later the FAA airfields and field stations in rural Alaska, based on case studies of five Alaska Native Villages. I researched Federal Aviation Administration (FAA) records at the National Archives facility at Anchorage from 2001 to 2003, culminating in a Master's Thesis entitled "Enclaves and outposts: FAA field stations and mechanisms of state formation in rural Alaska contexts" completed in 2005. This research also resulted in a monograph published by the U.S. Army Corps of Engineers entitled: "Understanding the effects of FAA Field Stations on Rural Alaska: Perspectives from Employees and Communities."

5.     In 2014, the National Archives facility at Anchorage, which opened in 1990, was closed and its records were moved to the National Archives facility in Seattle, which was of devastating impact to the Alaskan anthropological and historical research community and

DECLARATION OF DR. JOSH WISNIEWSKI                    2          **Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**578**

Alaska Native villages and corporations. Practically speaking, that closure has resulted in a loss of access to historical records for anthropologists, Alaska Native Tribes and tribal members as well Alaska Native corporations, non-profits, and shareholders.

6.     I have conducted extensive anthropological research at the current National Archives facility at Seattle since 2010. My research at that NARA facility began when I helped the Port Gamble S'Klallam Tribe create its Tribal Historic Preservation Office Program (THPO) for purposes of cultural resource conservation and preservation including the identification and protection natural and cultural places and landscapes of historic significance to the S'Klallam Peoples. For that work, I was paid by the Tribe with U.S. Department of the Interior program funds for Natural Resources and Cultural Resources conservation and research, as well as U.S. National Park Service Tribal Historic Preservation Grant monies. My research included but was not limited to locating, retrieving, and inventorying Annual Reports to the Commissioner of Indian Affairs (ARCIA) and other historic records generated by federal Indian agents in the Pacific Northwest dating back to Treaty times in the mid-1850s. From 2011 to 2015, I visited the National Archives facility at Seattle for research purposes at least annually, if not bi-annually. On at least three occasions, I spent two work weeks conducting anthropological research at that facility. My research at the facility was instrumental in the development and operation of the Port Gamble S'Klallam THPO office and subsequent research in support of the conservation and preservation of cultural resources of importance to the Port Gamble S'Klallam Tribe, including Traditional Cultural Properties (TCPs).

7.     From 2013 to 2015, I utilized the National Archives facility at Seattle to research and affirm S'Klallam Treaty hunting and conservation rights, specifically historic S'Klallam use areas on the Olympic Peninsula. My research involved locating, retrieving, and inventorying mid-nineteenth century Treaty records, most notably correspondence,

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

journals, minutes, reports, and maps generated by George Gibbs an early ethnographer of Tribes in western Washington, Secretary of the Western Washington Treaty Commission and surveyor. In 2015, I produced a report on my research findings on behalf of the Port Gamble S'Klallam Tribe and Jamestown S'Klallam Tribe entitled "Review and Critique of WDFW's Methodology and Conclusion Regarding S'Klallam Hunting, Including Additional Evidence of S'Klallam Hunting on Western Olympic Peninsula." From 2013 to 2015, I visited the National Archives facility at Seattle for research purposes over at least 21 days. On at least two occasions, I spent an entire work week conducting anthropological research at that facility. For that work I was also paid by the Tribe with U.S. Department of the Interior program funds for Natural Resources and Cultural Resources conservation and research.

8.     From 2015 to 2017, I utilized the National Archives facility at Seattle in connection with a U.S. Naval Facilities Engineering Command contract with the Port Gamble S'Klallam Tribe. My work, which was also undertaken for the Jamestown S'Klallam Tribes, was commissioned pursuant to Section 110 of the National Historic Preservation Act and involved documenting historic properties associated S'Klallam use and occupancy of so-called Naval Magazine Indian Island in Jefferson County. My research involved locating, retrieving, and inventorying mid to late nineteenth and early twentieth century correspondence and annual reports generated by federal Indian agents assigned to the S'Klallam Peoples, including agents originally assigned to a Port Townsend federal field office. In 2017, I published my research findings to the U.S. Navy in a report entitled "Evaluation of S'Klallam and Chemakum Places of Historical and Cultural Significance at Naval Magazine Indian Island, Jefferson County, Washington." My research is being used to identify, conserve and preserve historic S'Klallam Traditional S'Klallam places, landscapes, archeological sites on Indian Island including former village sites and culturally significant shellfish and plant harvesting sites on Naval Magazine Indian Island. From 2015 to 2017, I

DECLARATION OF DR. JOSH
WISNIEWSKI                                    4                    **Galanda Broadman PLLC**
                                                                   8606 35th Avenue NE, Ste. L1
                                                                   Mailing: P.O. Box 15146
                                                                   Seattle, WA 98115
                                                                   (206) 557-7509

580

visited the National Archives facility at Seattle for research purposes over at least twenty days. On at least two occasions, I spent an entire work week conducting anthropological research at that facility. I estimate over fifty percent of my research findings for the U.S. Navy were derived from my anthropological research at the National Archives facility at Seattle.

9.     From 2013 to 2017, I also visited the National Archives facility at Seattle for other federally funded anthropological research. I undertook anthropological research there for the Port Gamble S'Klallam Tribe and/or Jamestown S'Klallam Tribe regarding historic S'Klallam Treaty hunting, and conservation on the Olympia Peninsula. I also conducted anthropological research there for the Port Gamble S'Klallam Tribe in connection with a U.S. Army Corps of Engineers permit for a debris cleanup along Port Gamble Bay pursuant to Section 106 of the NHPA. I prepared a summary TCP evaluation for the Port Gamble S'Klallam Tribe in regard to the Army Corps' permit. For these research projects, I visited the National Archives facility at Seattle at least quarterly from 2013 to 2017.

10.    If the historic records currently stored and preserved at the National Archives facility at Sand Point in Seattle are moved out of the region, the Tribes will suffer significant hardship and financial burden to carry out historical research for the purposes of Treaty and federal conservation and historic and cultural preservation and the protection. The Tribes would lose access to that facility and the records stored there both during and after any records relocation process, which would impact my ability to help the Port Gamble and Jamestown S'Klallam Tribes with their ongoing conservation and research work. Movement of the archives out of the region would require increased travel costs, lodging, per diem, and related expenses. These costs are currently much lower due the physical location of the National Archives in Northeast Seattle. In reality, closing that facility would prevent or inhibit Tribal use of the National Archives for research and conservation objectives.

DECLARATION OF DR. JOSH WISNIEWSKI

5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**581**

11.     To carry out historical research at the National Archives I rely upon knowledgeable NARA staff who possess specific experience and expertise in the regional collections at the Sand Point archives. This includes utilizing materials such as Indian Claims Commission (ICC) reports and findings and materials from different regional Indian Agencies and census data. Often times I have needed a specific original document that should be in a certain collection based on the document type. On more than one occasion NARA archivists have assisted in finding that document, which I could not find myself because it was filed in a different or lesser known collection based on historic circumstances. Access to archival staff familiar with specific regional collections is a critical dimension of conducting  research in the National Archives. Moving the regional collection out of the Pacific Northwest will inhibit researchers such as myself from conducting conservation and historic and cultural preservation  research for federally recognized Tribes and their federal program partners. This will not just impact the Port Gamble and Jamestown S'Klallam Tribes but also all federally recognized Tribes in the Pacific Northwest region and Alaska.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of January, 2021 at Seldovia, Alaska.

_____
DR. JOSH WISNIEWSKI
Anthropologist
Port Gamble S'Klallam Tribe and
Jamestown S'Klallam Tribe

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiff, | DECLARATION OF THOMAS D. WOOTEN |
| v. | |
| RUSSELL VOUGHT, et al., | |
| Defendants, | |

I, Thomas D. Wooten, declare as follows:

1.    I am elected Chairman of the Samish Indian Nation ("Samish Tribe"), a federally-recognized Indian tribe. I am over the age of 18 and competent to testify. I make this declaration based on my personal knowledge.

2.    I have been Tribal Chairman since 2005, and on the Tribal Council since 1997. I am responsible for representing the Tribe in all governmental and policy matters. I have been intimately involved in the Tribe's litigation seeking to confirm its status as a federal-recognized Indian tribe, in seeking treaty rights, and in protecting and advancing the Tribe's sovereign status. Prior to serving as Tribal Chairman, I was Vice-Chairman and a Council member. My father Robert Wooten served as Tribal Chairman from 1973 to 1976.

3.    The Samish Tribe is organized under a tribal constitution adopted pursuant to Section 16 of the Indian Reorganization Act. The Samish Tribe was a signatory tribe to the 1855 Treaty of Point Elliott. The Tribe's aboriginal territory includes a large part of the San Juan Islands and neighboring coastal area, and the Tribe and its members include a significant

percentage of members who reside in Canada on Vancouver Island and nearby territory. The Samish Tribe has a long and complex history. It did not move permanently to any of the reservations established by the Point Elliott Treaty, and for the most part remained off-reservation. Federal interaction with the Tribe was somewhat limited because the Tribe did not have a distinct assigned land base and the federal government's mistaken position for a long time was that only tribes located on reservations were entitled to federal recognition and treaty status. While no formal action was ever taken by the federal government to terminate the existence or legal status of the Samish Tribe, because of the lack of a reservation the federal government began treating the Samish Tribe in the early 1970s as unrecognized and not entitled to treaty status. The Samish Tribe has been continuously involved in federal court litigation since the early 1970s to confirm and re-recognize its legal status and treaty rights. That litigation continues to the present day.

4. The records present in the Sandpoint Archives have been critical to the Samish Tribe's efforts. These records document in great detail the Samish Tribe's history, existence and movement as documented by the federal government in reports, correspondence, actions and decisions. The records include both local Indian agent and Indian superintendent documentation as well as correspondence and documentation from upper levels of the Department of Interior and other federal agencies. These records have been accessed by the Samish Tribe's Archives Department to assemble a history of the Samish Tribe, and have been accessed and used by consultants retained by the Tribe, including but not limited to historians, anthropologists and others investigating the Tribe's history and writing reports supporting the Tribe's legal efforts.

The Samish Tribe has used the records available in the Sandpoint Archives in its 27 year successful legal effort to achieve re-recognition as a federally-recognized Indian tribe. These records increased the documentation the Samish Tribe was able to present in the early 1970s in support of its failed effort to obtain treaty fishing status by tenfold or more, leading

1  to successful re-recognition. The Samish Tribe accessed the Sandpoint Archive records in

2  support of its effort from 2001 to 2010 to reopen the treaty fishing rights decision that had been

3  issued against the Tribe. Most recently, these records have been critical in supporting the

4  Samish Tribe's efforts pursuant to the Supreme Court's Carcieri decision to document the

5  Tribe's continuous existence as a tribe from treaty time through 1934, and to document that

6  the tribe was "under federal jurisdiction" during this entire time. Without access to the

7  Sandpoint Archive records, the Tribe's legal efforts would likely have been unsuccessful.

8        The Samish Tribe's experience in litigating its status as a federally-recognized tribe

9  and in documenting its status under the *Carcieri* decision emphasizes the critical need for

10  retaining local access at Sandpoint to tribal historical records. The Samish Tribe's federal

11  acknowledgment litigation lasted from 1979 to 1996. Over 500,000 pages of documents were

12  generated during that litigation. At the end of that litigation and eventual success by Samish,

13  and closure of the case, the federal government moved the Samish Tribe's federal

14  acknowledgment records back east to the East Coast and to Kansas City. When the Samish

15  Tribe's eligibility to acquire land in trust under the *Carcieri* decision was raised by neighboring

16  tribes, the Department of Interior and specifically the Solicitor's Office had to review the

17  Samish Tribe's federal acknowledgment records as part of its investigation into whether the

18  Samish Tribe qualified to take land into trust. This "*Carcieri* determination" by the federal

19  government for the Samish Tribe was delayed at least five years because the Solicitor's Office

20  lacked resources, personnel and funding to travel back east to review the Samish Tribe's entire

21  federal acknowledgment file. If those records had been available locally at the Sandpoint

22  Archives, the federal government and Samish Tribe would have been able to more easily access

23  those records to support the Tribe's *Carcieri* determination. Closing the Sandpoint Archive

24  and moving all those records back East will have a similar deleterious effect on the Samish

25  Tribe's continuing legal efforts.

26

5.     The Samish Tribe first learned of the impending closure of the Sandpoint Archive and the moving of the records located there back East in the news media and from other tribes. No federal agency or federal government representative contacted the tribe in connection with the federal government's decision to sell the National Archives at Seattle, or consulted our Tribe with regard to the negative, deleterious impact closure would have on our Tribe.

6.     Closure of the Sandpoint Archive will have a significant adverse impact n the Samish Tribe and its ongoing efforts to establish its treaty status, to establish its eligibility to obtain land in trust under the Indian Reorganization Act, and to protect its legal rights and status from infringement by nearby tribes. Family histories and genealogies are an important part of the Archives and the Tribe regularly accesses those records to investigate applicants for eligibility for tribal membership. The Samish Tribe has only one piece of land in trust without any economic development, and the Tribe lacks the financial resources to access these records on a necessary basis if they are moved back East. Relocation of the Sandpoint Archive records away from the Northwest United States will significantly impact the Tribe's ability to protect and advocate its legal status and rights.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this _24_ day of _Dec_ _20_ at _____, _____.
               day          month      year           city           state

Thomas D. Wooten

DECLARATION OF THOMAS D. WOOTEN
4
ERROR! AUTOTEXT ENTRY NOT DEFINED.

586