1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON; ALEUTIAN
PRIBILOF ISLANDS ASSOCIATION, INC.;
AMERICAN HISTORICAL ASSOCIATION;
ASSOCIATION OF KING COUNTY
HISTORICAL ORGANIZATIONS;
CENTRAL COUNCIL OF THE TLINGIT &
HAIDA INDIAN TRIBES OF ALASKA;
CHICKALOON VILLAGE TRADITIONAL
COUNCIL; CHINESE AMERICAN CITIZENS
ALLIANCE; CONFEDERATED TRIBES
AND BANDS OF THE YAKAMA NATION;
CONFEDERATED TRIBES OF THE
CHEHALIS RESERVATION;
CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION;
CONFEDERATED TRIBES OF THE COOS,
LOWER UMPQUA AND SIUSLAW
INDIANS; CONFEDERATED TRIBES OF
THE GRAND RONDE COMMUNITY OF
OREGON; CONFEDERATED TRIBES OF
SILETZ INDIANS; CONFEDERATED
TRIBES OF THE UMATILLA INDIAN
RESERVATION; CONFEDERATED TRIBES
OF THE WARM SPRINGS RESERVATION
OF OREGON; COW CREEK BAND OF
UMPQUA TRIBE OF INDIANS; DOYON,
LTD.; DUWAMISH TRIBE; HISTORIC
SEATTLE; HISTORYLINK; HOH INDIAN
TRIBE; JAMESTOWN S'KLALLAM TRIBE;
KALISPEL TRIBE OF INDIANS; THE
KLAMATH TRIBES; METLAKATLA
INDIAN COMMUNITY; MUCKLESHOOT
INDIAN TRIBE; MUSEUM OF HISTORY
AND INDUSTRY; NEZ PERCE TRIBE;
NISQUALLY INDIAN TRIBE; NOOKSACK

NO. 2:21-cv-00002-JCC

FIRST AMENDED COMPLAINT

i

INDIAN TRIBE; OCA ASIAN PACIFIC
ADVOCATES – GREATER SEATTLE;
STATE OF OREGON; PORT GAMBLE
S'KLALLAM TRIBE; PUYALLUP TRIBE OF
INDIANS; QUILEUTE TRIBE OF THE
QUILEUTE RESERVATION; QUINAULT
INDIAN NATION; SAMISH INDIAN
NATION; SAUK-SUIATTLE INDIAN TRIBE;
CITY OF SEATTLE; SHOALWATER BAY
INDIAN TRIBE; SKOKOMISH INDIAN
TRIBE; SNOQUALMIE INDIAN TRIBE;
SPOKANE TRIBE OF INDIANS; SQUAXIN
ISLAND TRIBE; SUQUAMISH TRIBE;
SWINOMISH INDIAN TRIBAL
COMMUNITY; TANANA CHIEFS
CONFERENCE; UPPER SKAGIT INDIAN
TRIBE; WASHINGTON TRUST FOR
HISTORIC PRESERVATION; AND WING
LUKE MEMORIAL FOUNDATION D/B/A
WING LUKE MUSEUM,

                Plaintiffs,

   v.

ROB FAIRWEATHER, in his capacity as
Director of the OFFICE OF MANAGEMENT
AND BUDGET; DAVID S. FERRIERO, in his
capacity as Archivist of the NATIONAL
ARCHIVES AND RECORDS
ADMINISTRATION; ADAM BODNER, in his
capacity as Executive Director of the PUBLIC
BUILDINGS REFORM BOARD; KATY
KALE, in her capacity as the Acting
Administrator of the GENERAL SERVICES
ADMINISTRATION; NATIONAL
ARCHIVES AND RECORDS
ADMINISTRATION; OFFICE OF
MANAGEMENT AND BUDGET; PUBLIC
BUILDINGS REFORM BOARD; and
GENERAL SERVICES ADMINISTRATION,
agencies of the United States,

                Defendants.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.      INTRODUCTION

1.      Without prior notice to Tribes, the State of Washington, or other stakeholders, the federal government is planning to sell the National Archives building in Seattle and scatter its invaluable, irreplaceable, original historical records to facilities in Kansas City, Missouri and Riverside, California. This action shows a callous disregard for the people who have the greatest interest in being able to access these profoundly important records, which include Tribal and treaty records, case files under the Chinese Exclusion Act, and records related to Japanese American internment during World War II. Talmadge Hocker, a Kentucky real-estate executive appointed to the Public Buildings Reform Board by President Trump in 2018, recently stated that his agency's recommended sale of the Archives facility would allow the building to "become a part of the community, as opposed to what it is today."[1] Mr. Hocker's statement underscores the indifference with which Defendants are severing the Pacific Northwest's connection to its own history.

2.      In their haste to dispose of the property, Defendants failed to realize that the Archives facility is legally exempt from being sold under the statute at issue, the Federal Assets Sale and Transfer Act. Moreover, Defendants failed to follow the statute's mandatory procedural requirements or to consult with Tribes and others for whom loss of access to the records will be devastating. Selling the property is unlawful under the Act and must be enjoined before these millions of un-digitized, original records lose their home in Seattle.

3.      This is an action under the Administrative Procedure Act, 5 U.S.C. § 706, to halt the federal government's unlawful and procedurally deficient sale of the National Archives at Seattle facility.

4.      The Federal Archives and Records Center, located at 6125 Sand Point Way NE, Seattle, Washington, 98115, houses the National Archives at Seattle. The facility contains the DNA of our region. It provides public access to permanent records created by Federal agencies

---

[1] https://www.latimes.com/world-nation/story/2020-12-06/national-archives-seattle-sale.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and courts in Alaska, Idaho, Oregon, and Washington. It houses a significant body of tribal and treaty records relating to the federally recognized tribes and native corporations throughout the Pacific Northwest and Alaska, including Treaty records and other records from Bureau of Indian Affairs offices and Indian agencies and schools in Alaska, Idaho, Oregon, and Washington. It also maintains more than 50,000 original files related to the Chinese Exclusion Act of 1882, as well as original records related to the internment of Japanese-Americans in World War II.

5.      The records at the National Archives at Seattle are essential and irreplaceable to this region. History and conservation of it define our past, present, and future. One user described her time at the Archives in a way that is deeply personal but yet relatable to what so many others have felt:

> I had no clue what a powerful experience it would be to hold some of the original Klamath Tribal roll sheets in my hands. To see names I had only heard of written out or even an "X" for those who did not read or write English was a powerful experience. Even more overwhelming for me was seeing my Grandmother Marilynn Hall's handwritten Tribal Council notes from her time as Tribal Secretary. The whole time I reviewed the records, all I wanted to do was share the experience with my family members, knowing how much it would mean to them.

Gabriann Hall, a member of the Klamath Tribes, Historian, and Teacher.

6.      A tribal attorney and frequent user of the National Archives at Seattle describes her experience as follows:

> The word "archives," from the view of law firms, businesses and courts, tends to conjure an image of a records storage facility for "dead files." I view the National Archives at Seattle as a vibrant, special collection *library* . . . . A visit to the National Archives in Washington D.C. inspires awe in every visitor, as the permanent home of the original Declaration of Independence, Constitution of the United States, and Bill of Rights. A visit to the National Archives at Seattle, for native people whose ancestral historical and cultural records are housed there, fills a deep cultural yearning to know, honor and understand the lives and sacrifices of their ancestors. This unique and precious collection includes irreplaceable records that came from this area, that are by and about the native people of this area descendants – held in trust for them and protected by the United States.

Tallis King George, tribal attorney for the Puyallup Tribe of Indians.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

7.      Records at the National Archives at Seattle also hold an important place for Chinese and Japanese American communities. As one advocate explained:

> Most Chinese Americans left few records of their lives and history prior to 1950, but the Archive's record of the exclusion files document families, marriages, lifestyles, occupations, businesses, land ownership, religion, food, medicine, travels to and from China, networking, organizations, and other information that otherwise cannot be obtained.

Connie So, President of OCA Asian Pacific Advocates, Greater Seattle Chapter.

8.      And as another Seattle-area historian and genealogist expounded:

> I can attest to the preciousness and vital nature of the Sand Point National Archives and its staff to our region. The connections made there, and the opportunities to share and transfer knowledge preserved in the facility's records, is immense and cannot be replaced. Records of specific importance are those involving the Chinese Exclusion Act of 1882; as well as the records on the forced removal of Washington residents of Japanese ancestry during WWII 1941-1945 which include anti-Asian organizing by Washington state business owners 1910-1950, records of the War Relocation Authority and documents relating to early Japanese community, business and industry records including logging, railroad, hotels, domestic and fishery, in addition to community organizations and history . . . . The damage [that removal of those records out of Washington State and the Pacific Northwest] will cause to the Chinese and Japanese American communities in the Pacific Northwest cannot be overstated.

Bif Brigman, member of the Minidoka Pilgrimage Planning Committee.

9.      On January 24, 2020, the Office of Management and Budget (OMB) approved a recommendation of a little known federal agency, the Public Buildings Reform Board (PBRB), to sell the Seattle Archives Facility. This facility houses the National Archives at Seattle and is currently occupied and operated by the National Archives and Records Administration (NARA) and is owned by the General Services Administration (GSA).

10.     The PBRB report recommending the sale of the Seattle Archives Facility (the PBRB Report) indicates that the federal records and archival materials at the Seattle facility, including the materials at the National Archives at Seattle, will be removed from the Pacific Northwest and relocated to NARA facilities in Kansas City, Missouri and Riverside, California.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

In announcing the Seattle facility's closure, NARA recognized that its closure "will have a negative impact on researchers, Federal agencies, and other customers that use our facility."[2]

11.    Describing the National Archives at Seattle closure as merely a "negative impact" dramatically understates the value of our history and the Archives. For instance, in 1986, after a decades' long effort, the Klamath Tribes succeeded in persuading Congress to restore the Tribes' federal recognition. The information contained in the National Archives at Seattle was critically important to the Tribes' successful effort at restoration. Donald C. Gentry, Tribal Chairman of the Klamath Tribes, explained the profound effect that removal of these records at the Seattle Archives would have:

> Since restoration, the Tribes have been rebuilding their government, their institutions, and their infrastructure. In doing so, the Tribes relied significantly and repeatedly on access to the National Archives at Seattle for documents, photos, artifacts, audio recordings, and other items of cultural and historical importance related to the Tribes' treaty-making, its history of federal-tribal relations, and its reservation, as well as information collected from Tribal elders and ancestors concerning Tribal culture, tradition and languages. Further, that information has continued to be relevant in reconstructing critical components of institutional, cultural, and traditional infrastructure and knowledge necessary for the Tribes' post-restoration efforts. The Tribal leadership, administration, and membership all rely on ready access to the National Archives at Seattle for such information, access that will disappear if the facility and its resources are moved.
>
> The amount of information in the Seattle Archives is overwhelming and we have significant research left to do still. That information is pertinent to continuing our research on and legal protection of our Tribal rights. As one key example, the Tribes have been involved in a forty-plus years long effort to protect, affirm, and quantify its Treaty-reserved water rights. That matter has involved repeated litigation in federal court (including two arguments up to the Ninth Circuit Court of Appeals) and a decades-long state water rights adjudication (the Klamath Basin Adjudication). These Treaty-reserved water rights are central to our ability to hunt, fish, trap and gather on the lands of the terminated Klamath Reservation, since the water rights support the habitat upon which fish, plant and wildlife species depend. Our staff and attorneys in these cases have spent weeks in the Archives researching historical documents related to land ownership and associated water rights. It remains critically important to the Tribes' ongoing efforts in the Klamath Basin Adjudication to continue to have access to those archival records. Moving the records would be prejudicial to the Tribes' ability to carry out such research for the future of the adjudication.

---

[2] NARA Press Release, Seattle Facility Approved for Closure (Jan. 27, 2020), https://www.archives.gov/press/press-releases/2020/nr20-37.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

These records also have significant potential to help establish and verify our oral histories.

\*\*\* Our way of life goes beyond just the physical world we live in and interact with, beyond our reservation, water, and natural resources. We need access to our songs and ceremonies to reconnect with our traditions, our ancestors, our way of life, and the world around us. We were forbidden from practicing many of our ceremonies in the 1800's by the federal government, and our Tribal children were sent off to boarding schools. In the boarding schools, the nuns severely and brutally punished any Native children who practiced traditional prayers, to the point where our peoples learned it was safer to hide these traditions than risk being beaten. As a result, we have lost access to many essential aspects of what it means to be Klamath, Modoc, and Yahooskin. We continue to practice prayer, but without a better understanding of what we used to practice, these prayers are more modern and assimilated — until we are able to re-establish our traditions, it is harder to properly connect with our world as our peoples had for generations. We have an opportunity to heal by having meaningful access to these resources. Taking away the Archives without any input from us is another familiar violence not unlike those inflicted in boarding schools and by assimilative policies.

Donald C. Gentry, Tribal Chairman of the Klamath Tribes.

12.     In addition to undervaluing the extreme negative impact that removal of archival records from the Pacific Northwest would have on the Tribes and other interest stakeholders, the agencies' hurried decision to sell the Seattle Archives Facility was procedurally flawed and legally infirm. First, the National Archives at Seattle is used for "research in connection with" Federal programs "for agricultural, recreational, or conservation purposes," rendering it ineligible for selection under the Federal Assets Sale and Transfer Act (FASTA).[3] Second, despite a clear statutory mandate in Section 11 of FASTA, OMB and GSA failed to develop or provide the PBRB with the standards, criteria, and recommendations required by the statute.

13.     Moreover, the agencies did not conduct state, local, or tribal outreach or consultation prior to the public announcement of the sale of the facility housing the National Archives at Seattle. Notably, tribal governments were not notified or consulted in advance, notwithstanding the requirements for such consultation under federal policies. And there were

---

[3] FASTA, Pub. L. 114-287, Dec. 16, 2016, 130 Stat. 1463, as amended by Pub. L. 114-318, §7(b), (d), Dec. 16, 2016, 130 Stat. 1616, 1617; Pub. L. 115-141, div. E, title V, §527, div. P, title VI, §608(a), Mar. 23, 2018, 132 Stat. 573, 1105; Pub. L. 115-437, §1, Jan. 14, 2019, 132 Stat. 5563; Pub. L. 115-438, §1, Jan. 14, 2019, 132 Stat. 5564.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

no public hearings held in Washington, Idaho, Oregon, or Alaska, where members of the public could have provided input and information about the National Archives at Seattle and the importance of keeping the facility's records in the Pacific Northwest.

14.    The National Archives at Seattle is the only property among those the PBRB recommended for sale that has profound importance to the region in which it is situated and is regularly used by members of the public. Defendants' clear procedural failures, including the failure to establish the required standards, criteria, and recommendations and the failure to consult with Tribes and other stakeholders, fundamentally distorted the entire selection process, including the recommendation and decision to close and sell the National Archives at Seattle.

15.    Had Defendants followed the statutory requirement to adopt "standards, criteria and recommendations," used accurate data, consulted with tribal governments, or reached out to stakeholders or the public in general, they would have learned that the National Archives at Seattle is routinely used by researchers, historians, and tribes in the Pacific Northwest, often in connection with research for Federal programs for agricultural, recreational, or conservation purposes. They also would have realized the crucial importance of the unique records held at the National Archives at Seattle to all residents of the Pacific Northwest and beyond, including the many federally-recognized tribal governments and native corporations in this region and in Alaska, which has no National Archives facility of its own, and how removal of the facility from the Pacific Northwest would jeopardize public access to these critical federal documents.

16.    The procedurally and substantively deficient recommendation to sell the National Archives at Seattle violates FASTA, federal tribal consultation policies, and the Administrative Procedure Act (APA). The PBRB Report should be invalidated, and this Court should enjoin the sale of the National Archives at Seattle.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## II.     PARTIES[4]

17.     Plaintiff State of Washington is a sovereign entity and brings this action to protect its proprietary interests in access to the National Archives at Seattle, and as *parens patriae* on behalf of its affected citizens and residents. The National Archives at Seattle is a critical resource for state universities—such as the University of Washington and Washington State University—whose faculty, undergraduate and graduate students, and librarians regularly utilize these original records for educational and research purposes in a variety of subject areas. Having substantial local archival resources available has helped state universities to recruit top applicants who are interested in pursuing research in the Western United States. Washington State agencies, including the Department of Natural Resources and the Department of Archaeology and Historic Preservation, also use and/or rely upon documents from the National Archives at Seattle in assessing water rights, water navigability, sediment contamination, and historic preservation, among other State issues and functions. Additionally, researchers, historians, genealogists, and tribes in Washington, as well as private citizens and families, likewise rely on the National Archives at Seattle as an invaluable source of unique historical information. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

18.     Plaintiff Aleutian Pribilof Islands Association, Inc. (APIA) is a tribal organization representing Aleut people in Alaska that assists over 3000 Unangan/Unangas members with economic self-sufficiency, provides health, safety and well-being, and strengthens and preserves Unangax̂ cultural heritage. Towards these ends, APIA maintains a vast library with a continually

---

[4] The description of each Plaintiff is provided by the party in question and represents the views of that party.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

growing collection of books, articles, audio and video recordings, photographs, maps, journals, and archival materials relating to Unangax̂ history, culture, and the environment of the region. Currently, APIA is conducting an inventory, cataloguing and organizing its material to make it more accessible. The material at the National Archives at Seattle is critical towards building and enhancing APIA's collection, as well as towards our goals of cultural preservation. The primary Aleutian language, Unangam Tunuu, is an endangered language with fewer than 90 speakers remaining. APIA's Cultural Heritage programs works with its member tribes to compile and maintain documentation about the language and is working to revitalize and preserve the language through other activities such as digitization of audio recordings, translation, transcription, and transliteration of recorded and written material, and development of cultural curricula. APIA also conducts research and develops programming about traditional ecological practices, traditional food sovereignty, which are critical to Aleut culture and identity. Further, APIA works with the Department of Defense towards environmental remediation though the Native American Lands Environmental Mitigation Program. APIA would be unable to do much of this work without meaningful access to archival materials held in the National Archives at Seattle about Aleut culture, language, history, and ecology. Of particular importance to APIA's collection is the WWII Aleut evacuation and repatriation documentation. During World War II, Aleut villagers were forcibly evacuated and interned in southeast Alaska, where they endured considerable hardship at the hands of the government. This is a very important, yet painful, piece of history to APIA members, and the significance of access to these documents cannot be understated. APIA understands that these archival documents are also critical to the National Park Service in conserving and maintaining the Aleutian World War II National Historic Area. APIA members previously used the federal archives in Anchorage to connect with their family history and their cultural history from this time—before the Anchorage archives too were closed and relocated to Seattle. For Aleutians, the archives do more than just store history about the evacuation, they can also inspire creativity through artistic ventures, and provide an avenue for

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

APIA members to connect with their past. Given the remote nature of the Aleutian Islands, to move the Archives once more beyond Seattle would foreclose almost any meaningful opportunity for APIA employees or members to access these crucial documents and the stories they contain.

19.     Plaintiff American Historical Association ("AHA") is a non-profit membership organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies. AHA is a trusted voice that advocates for history education, works to sustain and enhance the professional work of historians, and promotes the critical role of historical thinking in public life. As the largest organization of professional historians in the world, the AHA represents approximately 11,000 members and serves historians of every historical period and geographical area, and who work in a wide variety of settings. AHA's journal, the *American Historical Review*, is the most widely read and frequently cited professional historical journal in the world. The American Historical Association, chartered by the United States Congress "for the promotion of historical studies, the collection and preservation of historical manuscripts, and for kindred purposes in the interest of American history, and of history in America," depends upon broad public access to National Archives records to fulfill this mission. Its Pacific Northwest members rely on records held at the National Archives at Seattle in their research to support policy development, teaching, publications, advocacy, and interpretation and preservation at private, state, and federal historic sites and museums. The AHA's members use the archives to explore and reveal every aspect of Pacific Northwest and Alaskan history, such as Indigenous history, environmental history, social and cultural history, business and economic history, and governmental history—from policy consideration to policy implementation. AHA members' research supports historical scholarship, teaching, and museum work; informs Pacific Northwest public policy in various contexts, including conservation and resource management; and enables historians to serve as expert witnesses in important cases involving Tribal governments and communities, along with a wide variety of other important issues. The AHA's

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

mandate from the Congress is to act on behalf of "American history, and of history in America." In 1910, the AHA petitioned Congress to construct a national depository after finding that many governmental records from the previous century had been lost or destroyed. The resulting institution became the National Archives and Records Administration. The AHA continues to advocate on behalf of the imperative of NARA's work to ensure that the American people have access to the documents and other materials essential to understanding, and learning from, our past.

20.     Plaintiff Association of King County Historical Organizations ("AKCHO") serves as a centralized resource for and connection between King County's heritage organizations. AKCHO promotes professional standards for the heritage field and advocates for public policy that strengthens King County's heritage and history. AKCHO's membership spans more than 25 individuals and 50 organizations, including large institutions, historic houses, and institutions associated with local governments. Sharing information about where and how to access primary source documents is one way that AKCHO supports its membership as they create exhibits, write publications, and provide educational programming, particularly for children. AKCHO often recommends, and its members rely on, the National Archives at Seattle as an invaluable resource for primary source documents. AKCHO has also arranged tours of the Archives so that historical organizations and individuals throughout King County working on Pacific Northwest historical projects know about the vast resources available there. Access to the Archives is critical to the mission and programs of AKCHO and the heritage organizations it represents. Without it, AKCHO and its members would no longer have access to critical primary source materials relevant to the history and heritage of this region.

21.     Plaintiff the Central Council of the Tlingit and Haida Indian Tribes of Alaska (Tlingit & Haida) is a regional, federally recognized Indian tribe in Southeast Alaska, organized pursuant to section 16 of the Indian Reorganization Act of 1934, as amended, 25 U.S.C. § 5123, and recognized by Congress in the Act of June 19, 1935, Pub. L. 74-152, 49 Stat. 388, as

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  amended *inter alia* by the Act of August 19, 1965, Pub. L. 89-130, 79 Stat. 543, and in Pub. L.

2  103-454, § 203, 108 Stat. 4792) (1994); see also Native Entities Within the State of Alaska

3  Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs,

4  85 Fed. Reg. 5462, 5466 (Jan. 30, 2020). Tlingit & Haida represents over 32,000 Tlingit and

5  Haida tribal members living in Southeast Alaska, the Pacific Northwest, and throughout the

6  world. The Haida people and Tlingit people have always lived on the sacred and wondrous lands

7  and waters of Southeast Alaska and are the original occupants and guardians of these lands and

8  waters. Tlingit & Haida frequently uses and has a deep interest in the records currently stored in

9  the Federal Archives and Records Center in Seattle. The Seattle Archives facility has records

10 concerning our tribal land claims, including claims over hunting and fishing rights acknowledged

11 and extinguished in section 4(b) of the Alaska Native Claims Settlement Act, 43 U.S.C. 1603(b),

12 and subsequently addressed by Congress in Title VIII of the Alaska National Interest Lands

13 Conservation Act (ANILCA), 16 U.S.C. §§ 3111–3126; genealogical and birth records of our

14 tribal members; the history of the federal Government's interactions with our peoples since 1867,

15 including such episodes as the 1882 bombardment of Angoon by the United States Navy; the

16 creation and use of the Tongass National Forest, Glacier Bay National Park, and Admiralty

17 Island and Misty Fjords National Monuments for conservation, recreation, fisheries, and forestry

18 purposes; the titles and histories of Alaska Native allotments in Southeast Alaska; mineral

19 development in the Tongass National Forest and other federal lands in Southeast Alaska; Alaska

20 Native corporation and State of Alaska land selections in Southeast Alaska; and the history and

21 management of federal Conservation System Units across Southeast Alaska established pursuant

22 to ANILCA. The proposed sale of the Seattle Archives property and the proposed removal of

23 the facility's records to Missouri and California would be severely and adversely impact Tlingit

24 & Haida's and our tribal members' access to and use of these critically important, irreplaceable

25 records.

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     22.     Plaintiff Chickaloon Village Traditional Council is the nine-member governing

2    body of Chickaloon Native Village (CNV; *Nay'dini'aa Na' Kayax*), an Ahtna Dene'

3    (Athabascan) federally-recognized Tribal government located in southcentral Alaska. CNV's

4    Ahtna name is *Nay'dini'aa Na' Kayax*, meaning "the river with two logs across it," and refers

5    to the river where the most recent ancestral village site was located (now called the Chickaloon

6    River, a tributary of the Matanuska River). CNV's ancestral territory spans hundreds of miles

7    between Canada and the Upper Cook Inlet of southcentral Alaska. In 2018, Angela Wade, the

8    Tribe's Tribal Historic Preservation Officer, and Selena Ortega-Chiolero, the CVTC Museum

9    Specialist, verified that the National Archives and Records Administration Seattle facility houses

10   several records related to Chickaloon Native Village's history and Tribal ancestors. These

11   materials include: historical photographs, census rolls, Alaska Native Claims Settlement Act

12   case files, Alaska Road Commission Directive files, and boarding school records. Access to

13   these records is vital to the preservation and perpetuation of CNV's history and cultural

14   heritage. Relocation of these records, to a location farther away and much less accessible from

15   Alaska, would further remove them from us physically, further disrupt our use of our Tribal

16   cultural resources, and potentially inhibit future cultural perpetuation.

17   23.     Plaintiff Chinese American Citizens Alliance of Seattle (C.A.C.A. Seattle) is the

18   Seattle chapter of one of the oldest civil rights organizations in the country. An important part

19   of C.A.C.A. Seattle's mission is to educate the public about the history and contributions of

20   Chinese Americans in the Pacific Northwest. A critical part of that history is the Chinese

21   Exclusion Act and its impact on local communities. The National Archives at Seattle holds many

22   of the most important records about the implementation and impact of the Chinese Exclusion

23   Act on the region. C.A.C.A. Seattle and its members also rely on the records to not just research

24   and understand the impact of the Chinese Exclusion Act on their own families, but also to

25   educate the Pacific Northwest community about the Act and its impact on the region as a whole.

26   These records are central to C.A.C.A. Seattle's efforts to add the Chinese Exclusion Act studies

to the Washington State K-12 curriculum. In 2018, the Chinese Exclusion Act records helped C.A.C.A. Seattle curate and host its commemoration of the 75th anniversary of the repeal of the Chinese Exclusion Act at the Wing Luke Museum. Members also utilize records, including oral histories, housed at the National Archives at Seattle to create art and to tell the stories of both the racial discrimination faced by Chinese American citizens in the Pacific Northwest and the myriad ways that Chinese Americans helped to create and build the city that Seattle is today. Relocation of the National Archives at Seattle would frustrate the mission of C.A.C.A. Seattle by depriving of it of access to many of the most critical historical documents surrounding the history of Chinese Americans in the Pacific Northwest. It would also require a diversion of resources by forcing C.A.C.A. Seattle members to travel or avail themselves of more expensive research options to continue to build out and teach the public about that history.

24.     Plaintiff Confederated Tribes and Bands of the Yakama Nation (Yakama Nation) is a sovereign, federally recognized Native Nation pursuant to its inherent sovereignty and the rights reserved in the Treaty with the Yakamas of June 9, 1855. Treaty with the Yakamas, U.S.–Yakama Nation, June 9, 1855, 12 Stat. 951. The National Archives at Seattle holds decades worth of Yakima Indian Agency (RG 75) records, making it a crucial repository for the Yakama Nation's and its enrolled members' historical documents. These records include, but are not limited to, early Yakama Nation Tribal Council and General Council resolutions, motions, and minutes, federal-Yakama correspondence, land records, photographs, and other media.

25.     Plaintiff Confederated Tribes of the Chehalis Reservation is a federally recognized Indian Tribe located in southwest Washington State. The Tribe's Reservation was created in 1864 at the site of its major villages in its Homeland. The Tribe is active in the protection of the Chehalis River basin and the Tribe's heritage and culture. The Tribe has actively sought to acquire lands within its Homelands that foster the health, safety and welfare of its tribal members. The use of the federal archives and its records are an integral part of the Tribe's

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   protection of the Basin and the gathering of data concerning past generations of Chehalis tribal

2   members.

3       26.    Plaintiff Confederated Tribes of the Colville Reservation (CTCR) is the federally

4   recognized tribe that controls the Colville Indian Reservation, which is located in

5   northeastern Washington, United States. It is the government for its people. The CTCR relies

6   upon the Federal Archives and Records Center in Seattle for access to critical historical,

7   legislative, judicial, and executive documents to support the assertion of our inherent

8   sovereignty. The PBRB's proposal to move stored records to a facility in Kansas City, Missouri

9   and archived records to Riverside, California, will impose undue logistical and financial burdens

10  on conducting research into these collections. Such burdens are in diametric opposition to the

11  federal government's trust responsibility to the CTCR. For example, a significant portion of the

12  records pertaining to the Colville Indian Agency have not been fully indexed, but the staff at

13  NARA's facility in Seattle have the institutional knowledge necessary to the successful

14  navigation of this collection. Moving these records, particularly without them being fully

15  indexed, to locations at which staff is unfamiliar with them will hinder the CTCR's ability to

16  access documents that are crucial within our history and vital to the assertion of our rights. The

17  CTCR were never consulted during PBRB's process of formulating its recommendations, or

18  during OMB's consideration of those recommendations, despite the fact that the closure of this

19  facility will have substantial direct effects on the CTCR and is, therefore, subject to the

20  provisions of Executive Order 13175 - Consultation and Coordination with Indian Tribal

21  Governments. Furthermore, the closure of this facility is a federal undertaking as defined within

22  the National Historic Preservation Act of 1966 that, similarly, mandates consultation with Tribes.

23  Furthermore, the PBRB did not consider the negative impacts of the closure on Tribes and other

24  stakeholders as required by Section 1 l(b)(3) of the Federal Assets Sale and Transfer Act

25  (FASTA).

26

27.     Plaintiff Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians (CTCLUSI) is a federally recognized sovereign tribal nation headquartered in Coos Bay, Oregon. CTLUSI is made up of two bands of Coos Tribes: Hanis Coos (Coos Proper), Miluk Coos; the Lower Umpqua Tribe; and the Siuslaw Tribe. The ancestral territory of CTCLUSI encompasses approximately 1.6 million acres along the Oregon Coast. The history of interaction with the United States significantly impacted CTCLUSI and its people. By the late summer of 1855, CTLUSI people were rounded up, imprisoned, and removed from their lands under force of arms under color of a dishonored and unratified treaty – a treaty of peace and land cession that CTLUSI ancestors signed in good faith which the Senate failed to ratify, and the United States Government refused to honor. In 1954, CTCLUSI was terminated by federal legislation. In 1984, Congress extended federal recognition to CTCLUSI. Since restoration, CTCLUSI has worked tirelessly to maintain its relationship with its lands, resources, and distinct Tribal histories and cultures. CTCLUSI has resumed its roles of stewards and caretakers of the lands and resources that were once managed by its ancestors, including Coos Bay. The National Archives facility in Seattle contains extensive records that are relevant to CTCLUSI's efforts to protect its sovereignty and preserve natural and historic resources important to CTCLUSI and its members. These efforts have included restoration of the Tribe in 1984 and recent efforts to designate portions of Coos Bay as a Traditional Cultural Property on the National Register of Historic Places. Moving the documents from Seattle will add significant expense and difficulty.

28.     Plaintiff Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde") is a federally recognized Indian tribe comprised of more than 30 tribes and bands from western Oregon, northern California, and southwestern Washington. Grand Ronde's reservation was established on June 30, 1857, by Executive Order in partial fulfillment of seven treaties, under which Grand Ronde's antecedent tribes and bands ceded nearly 14 million acres of land across western Oregon. Grand Ronde has approximately 5,400 living members. The National Archives at Seattle contain records that are indispensable to Grand Ronde and its members.

15

Among other things, the Seattle facility houses handwritten minutes of Tribal Council meetings from the 1930's–1950's, early cartographic maps and sketches denoting tribal village sites and trails, Indian agent letters, land ownership records, and tribal ancestry records. Grand Ronde uses the records to help understand and educate its members and the public about Grand Ronde's history and to assist Grand Ronde on matters ranging from self-determination, culture and enrollment to consulting on National Historic Preservation Act and environmental protection matters. In addition, current Grand Ronde members and applicants for membership rely on the National Archives at Seattle to trace their lineage and gather other information necessary to support their applications for enrollment. Many of the Grand Ronde records housed at the National Archives at Seattle are not digitized or otherwise filed and catalogued in a manner that allows them to be discovered or identified without in-person research. In fact, but for the ability to analyze records in-person, Grand Ronde would not have located certain early tribal ordinances and other important historic records. Moving the National Archives facility from Seattle would create a substantial barrier to accessing these important records.

29.     Plaintiff Confederated Tribes of Siletz Indians ("Siletz Tribe") is a federally-recognized Indian tribe located along the Pacific Coast in Oregon. The Siletz Tribe has a long and complicated history with the federal government; at least 27 different tribes and bands of Indians under seven ratified and a number of unratified treaties were all moved to the Siletz Coast Reservation established by Executive Order and confederated together. The Siletz Tribe was terminated by federal legislation in 1954 and was not restored to federally-recognized status until 1977. The Siletz Tribe has struggled since restoration to re-establish its status as a recognized Indian tribe, and to confirm its treaty status and successorship to numerous treaties and tribes and bands of Indians. Ready access to the Seattle Archives has been critical to the Siletz Tribe's legal efforts during the last 50 years. Without that access and the ability to conduct comprehensive cross-referenced research of relevant federal government records, the Siletz Tribe's legal efforts would have been severely compromised and affected.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

30.     Plaintiff Confederated Tribes of the Umatilla Indian Reservation (Umatilla) is a federally recognized tribe currently located in north eastern Oregon, and the inherent sovereign of the rights reserved in the Treaty with the Walla Walla, Cayuse and Umatilla Tribes of Oregon and Washington, June 9, 1855. 12 Stat. 945. The Treaty included perpetual exclusive rights of taking fish in the streams running through and bordering the reservation, and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens. The Umatilla routinely access the National Archives Research Administration (NARA) at the Seattle location to access records related to cultural, agricultural, legal, language, governance, land, ecosystem and conservation of water and natural resources conservation interests. The Seattle NARA holds the records of the Bureau of Indian Affairs (BIA) Portland Area Office and the BIA Umatilla Agency Superintendent for the Umatilla Reservation (RG 75). These records are the only records for the early federal colonization of the Reservation because the BIA administered government services on the Reservation until the 1970's. There are no secondary copies within the tribal government. As recent as 2019 Umatilla staff traveled to the Seattle NARA and researched records involving the federal surveys of the Indian allotments designated for agricultural purposes and those implementing the Reservation boundaries set out by Treaty. Those records date back to the 1800's reflecting expeditions into Umatilla aboriginal territories, and federal operations that span across documents of the BIA, Bureau of Land Management, General Land Office, Department of Agriculture (National Forests) and documents the Umatilla family records, census and membership documents, General Council decisions, and those made by the Board of Trustees, the governing body of the Reservation. In 2018, Umatilla accessed NARA to document historical and cultural ties to the mid and lower Columbia River. The work was funded by the Wanapa Kut Kut working group under a contract of the Army Corps of Engineers, Portland District. That visit yielded digital copies of important documents including Celilo Business Committee minutes,

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

surveyor maps of Celilo Falls, proof of lands allotted to Umatilla members on the Washington side of the Columbia River below present day McNary Dam, individual claims to fishing sites at Cascade Locks, and BIA correspondence related to the establishment of Treaty in-lieu fishing sites, among other documents, maps, and exhibits. Currently, Umatilla can access the Seattle location with a day of travel. Those visits are costly and time consuming for the Tribe and require senior professional level research. Many of the documents are undigitized, a vast quantity are hand written on documents that are over a hundred years old, and the issues are complex. In the early 2000's the Umatilla faced a federal effort to remove and relocate records held by the Umatilla BIA Superintendent to the Lenexa National Archives in Kansas. Umatilla objected effort because the documents are vital Umatilla information, and the records are held as a service to the Umatilla. The solution was for the documents to be returned to the Umatilla. Federal funds were used to pay for the digitization of those records and the copies that Umatilla subsequently provided for the Lenexa archives.  Umatilla would require return of its documents federally held at the Seattle NARA site for a similar process. Further consultation is required to protect Umatilla records at that location and avoid inflicting egregious hardship caused by federal action taken without appropriate consultation again. OMB ignored the Umatilla's written objection that ". . . strongly urges you to decline or reject the disposal of the Sand Point NARA facility." Umatilla Tribes letter to Russel T. Voight, Acting Director Office of Management and Budget, January 27, 2020. There was no known response to the Umatilla objection letter.

31.    Plaintiff The Confederated Tribes of the Warm Springs Reservation of Oregon (the "Confederated Tribes of Warm Springs") is a federally-recognized tribe organized pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984, as amended by the Act of June 15, 1935, 49 Stat. 378. The Confederated Tribes of Warm Springs is legal successor in interest to the Indian signatories of the Treaty with the Tribes of Middle Oregon of June 25, 1855, 12 Stat. 963. It possesses inherent sovereignty and also has a trust relationship with the United States defined by the United States Constitution, the 1855 Treaty, federal statutes, Executive Orders, and court

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

decisions. The Confederated Tribes of Warm Springs exercises its right to self-government and self-determination through numerous programs aimed at protecting the natural environment, conserving natural resources, promoting the safety and well-being of tribal members, and preserving traditional culture. The Confederated Tribes of Warm Springs also advocates for its interests by engaging with federal, state, and private actors across various platforms. Access to information is key to this ongoing mission of self-government and self-determination, and the National Archives at Seattle hold valuable records relating to the sovereignty, history, and culture of the Confederated Tribes of Warm Springs. These documents include early census records and vital statistics, tribal council records, information on reserved treaty rights, maps and land records, language preservation materials, early photographs, written histories, sawmill and lumber production records, and court documents relating to federal court litigation in which the Confederated Tribes of Warm Springs was a party. These documents, most of which are not digitized, are necessary to the Confederated Tribes of Warm Springs' understanding of its history and culture and to advocating for its interests as a sovereign. Moving the documents from their present location in Seattle will add significant difficulty and expense to the task of accessing such information, possibly preventing such access altogether, and will undermine the Confederated Tribes of Warm Springs as it works to carry out its mission.

32.     Plaintiff Cow Creek Band of Umpqua Tribe of Indians ("Tribe") is a federally recognized Indian Tribe located in southwestern Oregon. The Tribe entered into a Treaty in 1854 under which it ceded more than 800 square miles to the United States. The Tribe was restored in 1982 and continues to work to restore its lands for its more than 1,700 members. The National Archives in Seattle houses records that are and were critical to the restoration of the Tribe and the future restoration of the Tribe's ancestral lands.

33.     Plaintiff Doyon, Limited is one of thirteen Native regional corporations authorized by Congress pursuant to the provisions of the Alaska Native Claims Settlement Act of 1971 (ANCSA), as amended, 43 U.S.C. §§ 1601-1629h. Doyon owns approximately 12.5

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

million acres of surface and subsurface lands situated in the Interior of Alaska and is the largest private landowner in the state. The National Archives at Seattle houses many records important to Doyon and its shareholders, including original ANCSA records, pre-statehood Alaska land records, Alaska Census records, Bureau of Indian Affairs (BIA) records for Alaska, and litigation records for the Federal District Court for the District of Alaska. Many of these records are unique, rare, un-digitized, and otherwise unavailable elsewhere. Many of our Alaska Native shareholders have Certificates of Indian Blood (CIBs) that are inaccurate or incomplete. Many of our shareholder records detailing shareholders' Alaska Native blood quantum are based upon original BIA records from the 1970s and earlier. It is critical for Doyon and its shareholders to be able to access BIA records to help correct incomplete or inaccurate CIBs that affect the issuance of new stock to Alaska Natives born after the date of enactment of ANCSA as well as for voting status of other shareholders. Doyon also uses the records stored at the National Archives at Seattle to help protect the subsistence interests of its Alaska Native shareholders. ANCSA extinguished aboriginal hunting and fishing rights for Alaska Natives throughout Alaska. 43 U.S.C. §1603(b). Title VIII of the Alaska National Interest Land Conservation Act of 1980 (ANILCA), 16 U.S.C. §§ 3111–3126, recognized a subsistence preference for rural Alaskans, including Alaska Natives, engaged in hunting, fishing and other subsistence uses on federal public lands included in federal "conservation system unit[s]" as defined in ANILCA, *see* 16 U.S.C. 3102(4).[5] These records are important in the now forty-year history of litigation in state and federal courts to protect Alaska Native subsistence rights in these conservation system units. The Seattle archives facility is therefore used in connection with Federal programs for conservation purposes, namely the Federal subsistence program in Alaska, including research in connection with that program.

---

[5] "The term 'conservation system unit' means any unit in Alaska of the National Park System, National Wildlife Refuge System, National Wild and Scenic Rivers Systems, National Trails System, National Wilderness Preservation System, or a National Forest Monument including existing units, units established, designated, or expanded by or under the provisions of this Act, additions to such units, and any such unit established, designated, or expanded hereafter."

34.     Plaintiff Duwamish Tribe, a party to the Treaty of Point Elliot and known as dxʷdəwʔabš or "The People of the Inside," governs itself pursuant to a constitution adopted in 1925. Its 600+ members are descended from the Duwamish Indian signers to the Treaty, and they include descendants of Chief Seattle. The Duwamish people have resided in the area of Puget Sound since time immemorial. The Duwamish Tribe and its members have a unique interest in the continued presence of the National Archives at Seattle. For over 40 years, they have worked to confirm the Tribe's rightful status as a federally recognized tribe. Direct access to physical records at the National Archives at Seattle has been, and remains, vital to the Tribe and its members in this effort to confirm federal recognition. Members of the Duwamish Tribe and their representatives have used the National Archives to support the Tribe's efforts by, among other things, researching records on early state and pre-state history for the Puget Sound area, including genealogical, anthropological, and historical studies of Washington tribes and, in particular, the Duwamish Tribe. In addition to the records already reviewed, Members know that irreplaceable records not yet reviewed are housed in the National Archives building in Seattle, and the Tribe understands that those records represent important evidence regarding the history of the Duwamish Tribe and important evidence in support of its fight for restoration of status. Moving them would certainly compromise access to those records and raises the risk of their being lost forever and certainly creates extreme hardship for the Tribe's ongoing research efforts. The federal government's unlawful and procedurally improper sale of the real property housing the National Archives at Seattle will result in a substantial burden on the Duwamish Tribe and its members. The closure of the National Archives at Seattle will obstruct the Tribe's and its members' ability to access information relevant not only to federal recognition but also to the preservation of Duwamish history for future generations. This concern is particularly acute for records in the National Archives that the Tribe and its representatives have not yet had an opportunity to review, which includes boxes housing materials not yet digitized and subject to pending research requests.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    35.   Plaintiff Historic Seattle is a public development authority chartered and
2    established by the City of Seattle in 1973 to acquire and rehabilitate historic properties and
3    advocate for the thoughtful and meaningful preservation of historic buildings and landscapes. In
4    that role, Historic Seattle provides educational programs, real estate development services, and
5    historic resources consulting to individuals, community groups, developers, and policymakers.
6    Historical research is an integral component of those projects and programs. Historic Seattle
7    relies upon local and regional primary source materials, including those stored at the National
8    Archives in Seattle, to research buildings, places, and people related to properties it owns or for
9    which it advocates. These primary source materials are particularly important to Historic
10   Seattle's preparation of local landmark applications, National Register of Historic Places
11   nominations, and federal historic rehabilitation tax credit applications. The National Archives is
12   one of the key places to conduct this research in the Pacific Northwest and contains records that
13   cannot be found anywhere else and have not been digitized, including architectural and
14   engineering drawings, historic maps, tribal records, military records, and unique materials
15   related to Washington state and territory. Access to the National Archives is critical to Historic
16   Seattle's efforts to save places that matter and tell the stories of the people associated with those
17   places, which are core components of its mission and programs.

18   36.   Plaintiff HistoryLink is a 501(c)(3) not-for-profit corporation established in 1997
19   to pioneer innovative approaches to historical research, education, and publishing. Its primary
20   public service activity is production of HistoryLink.org, the free online encyclopedia of
21   Washington state history and the nation's first original encyclopedia of community history
22   created expressly for the Internet. With nearly 8,000 articles about the history of Washington
23   state, HistoryLink.org provides professionally written and edited resources based on research in
24   the primary sources held at archives, libraries, and historical organizations, which tell the stories
25   of Washington and serve as a stepping stone to further research. HistoryLink also publishes
26   books and develops curriculum materials on Washington state history across a broad range of

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

22

1   topics, which are also grounded in the documents and other materials held at those repositories.

2   The National Archives at Seattle (the "Archives") is a key resource for the development of

3   HistoryLink articles, books, tours, and curriculum materials. Its writers have accessed the

4   records there to learn about the history of federal facilities such as Hanford Nuclear Works, Sand

5   Point Naval Air Station, the Hiram Chittenden Locks, and the Lake Washington Ship Canal,

6   significant events such as the passage of the Donation Land Law, the 1962 World's Fair, and the

7   Pig War incident in the San Juan Islands, and biographies of significant people who have shaped

8   the state's history, among many other topics. These records are invaluable because there is often

9   a dearth of secondary sources documenting local history, so historians must rely on archival

10  collections to learn about them. The Archives' collections are particularly important because of

11  the federal government's significant role in shaping the region's infrastructure development, the

12  importance of the relationship between tribal communities and federal departments and agencies,

13  and the role federal treaties, policies, and actions have played in shaping public policy at all

14  levels. Without easy access to the records held at the Seattle facility, HistoryLink would be

15  severely hindered in its efforts to tell the stories of Washington's people, places, and significant

16  events, which would have negative consequences for educators, students, journalists, elected

17  officials, agency personnel, and the general public who use HistoryLink.org to learn about

18  Washington's history.

19          37.     Plaintiff The Hoh Indian Tribe ("Hoh Tribe") is a federally recognized Indian

20  tribe and recognized as the political successor in interest to a signatory tribe to the 1855 Treaty

21  of Olympia. The Hoh Indian Reservation is located at the mouth of the Hoh River on the Olympic

22  Peninsula of Western Washington. The reservation is approximately 670 acres with much of the

23  acreage located in the floodplain of the Hoh River. The Hoh Tribe relies upon access to records

24  maintained in the Sandpoint Archives to support its efforts to protect treaty rights and interest,

25  to educate itself and surrounding communities about the history of Hoh Tribe and its members

26  and to research eligibility for citizenship in the Hoh Tribe. The Hoh Tribe is a small tribe with

1    limited economic development opportunities due to its location on the Olympic Peninsula. The

2    Tribe lacks the financial resources to access these records on a necessary basis if they are moved

3    out of the Pacific Northwest. Relocation of the Sandpoint Archive records away from the

4    Northwest United States will significantly impact the Hoh Tribe's ability to access the records

5    to protect and advocate its rights and document its history.

6          38.      Plaintiff Jamestown S'Klallam Tribe has 545 Tribal Citizens, and 423.56 acres

7    of Trust and Reservation land located in Clallam County, Washington. The S'Klallam territory

8    stretches across the northern Olympic Peninsula and across the Strait of Juan de Fuca to

9    Vancouver Island and beyond. The Tribe's Treaty Rights derived from the Treaty of Point No

10    Point promised them that treaty resources would remain and be protected. 12 Stat. 933 (1855).

11    Instead, Jamestown S'Klallam has had to prove the historical areas where these rights attached

12    by providing historical documentation so their rights could not be erased by the passage of time.

13    As part of the restoration, preservation, and protection of these important rights, the Jamestown

14    S'Klallam Tribe has relied heavily on historical research from the National Archives regarding

15    traditional hunting practices, gathering, fishing rights, and the identification of S'Klallam

16    settlements and cultural sites, as well as documentation of relations with the non-Indian and

17    federal relations with the Tribe's communities. This includes research that was done for the

18    purpose of supporting conservation, management, and protection of cultural knowledge as part

19    of federally funded fisheries and natural resource programs. Similarly, the S'Klallam provided

20    research from the Archives to assist with the U.S. Navy's required compliance with the National

21    Historic Preservation Act. Federal agencies are required to inventory cultural resources on lands

22    they manage to ensure they are not lost. Materials that were critical to this research, found in the

23    local archives, were written communications regarding the orders to destroy the S'Klallam

24    settlement at Port Townsend and forcibly relocate the S'Klallams to the Skokomish Reservation.

25    The geographic disbursement, and even potential for division of the materials, or merely

26    digitizing them, would significantly burden the Jamestown S'Klallam Tribe, and hinder

                                    24

1  compliance with mandatory objectives and conservation goals, and ultimately harm the

2  S'Klallam people by hiding the history of their ancestors in a less accessible site or format.

3  Further, the decision to sell the Archives and move the records housed therein was done without

4  any meaningful Tribal consultation.

5      39.    Plaintiff Kalispel Tribe of Indians is a federally recognized Indian Tribe. The

6  National Archives at Seattle houses documents which are invaluable to the Kalispel Tribe and

7  these archives are utilized extensively. Specifically, this facility holds thousands of the Kalispel

8  Tribe's documents including, but not limited to, photographs, ethnographies, reports, minutes,

9  maps, correspondence, notes from the Kalispel language, and a plethora of other important

10  information. These documents continue to be an important resource that the Tribe needs access

11  to and the Indigenous knowledge recorded in these documents is priceless.

12      40.    Plaintiff the Klamath Tribes is a federally-recognized Indian tribe that has

13  occupied the lands of South Central Oregon and Northern California since time immemorial.

14  The Klamath Tribes, with a current enrollment of 5,611 members, is comprised of three historical

15  tribes: the Klamath Tribe, the Modoc Tribe, and the Yahooskin Band of Paiute Indians. The

16  Klamath Tribes signed the Treaty of 1864 with the United States, ceding over 22 million acres

17  of aboriginal territory and reserving approximately one million acres for a permanent homeland.

18  In 1954, The Klamath Tribes were subjected to the ill-considered and destructive federal policy

19  known as "termination", and for over thirty years were not recognized as an Indian tribe by the

20  United States. As a result of termination, the Tribes were denied the basic rights to which

21  federally-recognized tribes are entitled, including services from the federal government for

22  education, health care, social services, and natural resources protection. In 1986, the Tribes

23  succeeded in persuading Congress to restore the Tribes' federal recognition, and the Tribes have

24  been rebuilding their government, their institutions, and their infrastructure since that time. The

25  Tribes have relied significantly and repeatedly on access to the National Archives at Seattle for

26  documents, photos, artifacts, audio recordings, and other items of cultural and historical

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                          25                  ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 5th Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                           (206) 464-7744

importance related to the Tribes' treaty-making, its history of federal-tribal relations, and its reservation, as well as information collected from Tribal elders and ancestors concerning Tribal culture, tradition and languages. The information contained in the National Archives at Seattle was very important to the Tribes' successful effort at restoration. Further, that information has continued to be relevant in reconstructing critical components of institutional, cultural, and traditional infrastructure and knowledge necessary for the Tribes' post-restoration efforts. The Tribal leadership, administration, and membership all rely on ready access to the National Archives at Seattle for such information, access that will disappear if the facility and its resources are moved.

41.     Plaintiff Metlakatla Indian Community ("Metlakatla") is a federally recognized Indian tribe located in the Southern Alaska archipelago. Metlakatla, with a population of approximately 1,400 members, has the unique distinction of being the only tribe in Alaska with lands set aside in reservation trust status in the state of Alaska—the Annette Islands Reserve, created by Congress in 1891. Metlakatla was founded by Tsimshian peoples who migrated from their ancestral homelands in what is now British Columbia to Metlakatla's current home in Alaska. Metlakatla has a significant interest in the records stored at the National Archives at Seattle, particularly in light of the closures of the Archives in Anchorage. Metlakatla believes that the National Archive contains records related to the founding of Metlakatla, Alaska World War II history and infrastructure on Annette Island, Metlakatla's internal political history, and the history of intertribal, tribal-state, and federal-tribal relationships. The records also likely contain documents important to Metlakatla's traditional fishing and hunting rights, as well as traditional ecological knowledge about plants and medicines. If these documents were transferred beyond the closest major city to our community, our members would be foreclosed from accessing these histories and knowledge permanently.

42.     Plaintiff Muckleshoot Indian Tribe is a federally recognized, self-governing, sovereign Indian Tribe. The Muckleshoot Indian Tribe is the recognized political successor in

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

interest to some signatory tribes and bands to the Treaty of Point Elliott and to the Treaty of Medicine Creek, and as such has the present-day right to exercise the treaty right to fish, hunt and gather, among other rights. *See United States v. Washington*, 384 F. Supp. 312, 365 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676, 692 (9th Cir. 1975). The Tribe is organized under a Constitution and Bylaws ratified by members of the Tribe and approved by the United States Department of the Interior pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984), as amended by the Act of June 15, 1935 (49 Stat. 378). The Muckleshoot Indian Reservation is located in Western Washington between the White and Green River southeast of the City of Auburn and has approximately 3,000 members. The Muckleshoot Indian Tribe relies upon access to records maintained in the National Archives at Seattle to support its efforts to its protect treaty rights and interests. The Muckleshoot Indian Tribe and some of its members have used the National Archives at Seattle for research that confirms Muckleshoot's oral histories, documents genealogy, confirms Muckleshoot's treaty fishing, hunting and other rights, and details Muckleshoot's Indigenous land occupancy and natural and cultural resource use and conservation and Muckleshoot's interactions and relations with other tribal governments and federally appointed agents. Representatives of the Muckleshoot Indian Tribe have used the National Archives at Seattle for decades and continues to use the National Archives at Seattle and records from that facility on a routine basis, including research in connection with federal program for natural resource conservation purposes. Were the records stored at the National Archives at Seattle moved out of the region or state, Muckleshoot and Muckleshoot's members would, practically speaking, no longer have access to those records and Muckleshoot would be irreparably harmed. By joining in this Complaint, the Muckleshoot Indian Tribe does not admit any of the factual allegations of the Plaintiff Duwamish Tribe, and specifically disclaims and denies any allegation herein regarding the "Plaintiff Duwamish Tribe" claims to be a contemporary organization that is a successor in interest to the historic Duwamish Tribe or to be an Indian Tribe or that the self-identified "Plaintiff Duwamish Tribe" is a party to the Treaty of

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Point Elliott. These claims have been rejected by both the federal courts and the Department of the Interior. *See United States v. Washington*, 476 F. Supp. 1101, 1105, 1111, (W.D. Wash. 1979), *aff'd*, 641 F.2d 1368 (9th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982); *see also* Department of the Interior Decision Documents accessible at https://www.bia.gov/as-ia/ofa/025-duwami-wa%20.

43.     Plaintiff Museum of History and Industry (MOHAI) is Washington State's largest independent heritage organization, serving tens of thousands of Washington State residents, visitors and school children each year with exhibits, programs and educational activities related to the history of the Puget Sound region and the Pacific Northwest. As the region's leading resource for history and civics education, MOHAI works closely with the National Archives Seattle branch to research and share the stories of our region, using the invaluable treasures of the NARA Seattle archives to bring a historical perspective to the public discussion of contemporary issues facing the community. Because of their close proximity, MOHAI and the National Archives Seattle branch have partnered over many years on exhibits, public programs, and research projects, and MOHAI has provided a public venue for presenting National Archives materials which otherwise would be largely inaccessible to the general public. MOHAI's annual service to 30,000 students, in dozens of school districts, and its public programs and exhibits which reach over 100,000 area residents each year, would suffer significantly with the loss of the archives in our region, and the opportunity the archives presents for MOHAI to provide Northwest residents with a better understanding of our shared past.

44.     Plaintiff Nez Perce Tribe is a federally-recognized Indian tribe with headquarters on the Nez Perce Reservation in Lapwai, Idaho. The Nez Perce people, the Nimiipuu, exclusively occupied, since time immemorial, thirteen million acres encompassing a large part of what is today Idaho, Oregon, and Washington—stretching from the Bitterroot Mountains to the Blue Mountains. Nez Perce also traveled far beyond this homeland to fish, hunt, gather, and pasture—frequently going east to what is today the state of Montana, and west along the Snake

and Columbia rivers to the Pacific Ocean. Nez Perce actively maintain their connection to the land, water, and resources of their vast homeland. Seasonal rounds and migration patterns for cultural and subsistence uses are carefully coordinated to take full advantage of fish, wildlife, and root crops. These annual cycles correspond not only to the unique resource needs of the Nez Perce and the seasonal availability of their resources but also to the ceremonial activities and social gatherings that occur throughout the year. The Nez Perce's intimate knowledge and continuous use of their homeland over millennia has created a unique and reverential bond between people and place that defines Nez Perce culture and identity. The Nez Perce Tribe relies on the National Archives at Seattle for access to critical historical documents. The sale and subsequent removal of archived materials would have a profound, negative, and irreparable impact to the Nez Perce people. The Tribe has utilized the National Archives at Seattle for the records housed there to gather the necessary research to protect the Tribe's interests and treaty rights. Various programs of the Tribe use this facility to locate historically important and culturally significant archived records and materials that they need to conduct the ongoing business of the Tribe. At one point, documents from the Northern Idaho Agency of the Bureau of Indian Affairs—including enrollment records, family trees of individual Nez Perce families, and superintendent reports from the Lapwai Sanatorium—were transferred to the Seattle facility. The Tribe was assured access would be close in Seattle, and Seattle is already a full day's drive for Nez Perce members. All these records are not only important to the Tribe as a whole but also to each individual enrolled member and their family. The Seattle facility also includes various federal land, census, and other essential information that are used to establish or confirm tribal history and heritage. Tribal members use these files to establish or keep membership in the Tribe. For example, proof of tribal citizenship is required to obtain education funds.

45.      Plaintiff Nisqually is a federally recognized Tribe and signatory to the 1854 Treaty of Medicine Creek. Nisqually's Reservation is located on the Nisqually River in rural Thurston County, 15 miles east of Olympia, Washington. Nisqually has used the National

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Archives Building to do critical research over the years regarding genealogy, treaty rights,

2   traditional knowledge of conservation, educational research for native studies, sovereignty

3   issues, and research on first foods/food sovereignty. The facility provides a place for the next

4   generation to do research and preserve their cultural identity. The diversity in tribes represented

5   at the facility provides mixed families a place to research both sides of their family history. The

6   facility provides irreplaceable and un-digitized original source documents in the Lushootseed

7   language. The Tribe has used the facility to research and identify historical place names,

8   ancestral names, and family and cultural history. The facility houses invaluable teaching tools

9   for tribal students, teachers, and colleges in the region. The records stored at the Seattle facility

10  are of the utmost importance to Nisqually people, the people of Washington State, and the

11  surrounding region. If the records are moved, the Nisqually Tribe, its members, and other

12  Medicine Creek Treaty Tribes will no longer have access to the records and the Tribe will be

13  irreparably harmed. By joining in this Complaint, the Nisqually Indian Tribe does not admit any

14  of the factual allegations of the Plaintiff Duwamish Tribe, and specifically disclaims and denies

15  any allegation herein regarding the "Plaintiff Duwamish Tribe" claims to be a contemporary

16  organization that is a successor in interest to the historic Duwamish Tribe or to be an Indian

17  Tribe or that the self-identified "Plaintiff Duwamish Tribe" is a party to the Treaty of Point

18  Elliott. These claims have been rejected by both the federal courts and the Department of the

19  Interior.

20          46.     Plaintiff Nooksack Indian Tribe is a federally recognized tribe of approximately

21  2,000 members, located in its ancestral homeland in the northwest corner of Washington State.

22  The Nooksack Indian Tribe is a signatory to the Treaty of Point Elliott of 1855. Its name comes

23  from a place name in the Nooksack language and translates to "always bracken fern roots," which

24  illustrates the Nooksack Indian Tribe's close ties to its land and the resources that continue to

25  give strength to its people. The Nooksack reservation is located in Deming, Washington, just 15

26  miles east of Bellingham, 12 miles south of the Canadian border, nestled amongst majestic

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

mountains, lush forest, and the meandering and dynamic Nooksack River. The Nooksack Indian Tribe relies on the Seattle archives facility primarily for research to help determine tribal membership eligibility. One basis for tribal membership in Nooksack is descendance from individual allottees whose allotments were originally homesteads by European settlers. The Tribe is often required to research records at the archives to determine original allotments or homesteads. Further, because the Nooksack Indian Tribe's usual and accustomed fishing stations include the entire Nooksack River basin and adjoining marine waters, including portions of the Mount Baker-Snoqualmie National Forest and of the North Cascades National Park, the Tribe often uses the archives for research to support contracts with the United States Forest Service over issues such as the effects of logging on water quality and instream flows and salmon habitat restoration more generally.

47.     Plaintiff OCA Asian Pacific Advocates – Greater Seattle is a chapter of OCA Asian Pacific Advocates, formerly known as the Organization of Chinese Americans. Founded in 1973, the organization was founded with a vision of uniting Chinese Americans across the United States into one representative voice. Today, OCA has transformed into a national organization dedicated to advancing the social, political, and economic well-being of Asian Pacific Americans in the United States. OCA is nonprofit, non-partisan organization representing over 10,000 people nationally, including affiliates, college affiliates, and general membership. The Greater Seattle Chapter ("OCA-GS") was formed in 1995 as an affiliate of the national OCA organization. Since its inception, OCA-GS has served the Greater Seattle Chinese and Asian American and Pacific Islander American community as well as other communities in the Pacific Northwest. It is recognized in the local community for its advocacy of civil and voting rights as well as its sponsorship of community activities and events. The National Archives facility located in Seattle, Washington is fundamental to our community's conservation and educational efforts relating to immigrant and Native/Indigenous ancestry and history. These Archives house critical information that must remain accessible to the communities, specifically the Northwest

communities, since it holds our histories. For OCA's members and the communities it serves, the Archives provide a critical source of information in the following ways: as an educational resource for our local college and university faculty who rely on access to the Archives for research and classroom teaching purposes; as a critical tool for our Asian and Native/Indigenous communities to learn more about their history, and as a source for two of OCA-GS's former Presidents who published books with historical significance to our community and state; as a source of information that OCA-GS used to support efforts to award the Congressional Gold Medal to our veterans (many of our members, including the current OCA-GS President, are descendants and/or relatives of Japanese, Filipino, and Chinese veterans of World War II); and as critical partners in the conservation of our community's history, including the Chinese Exclusion Act files that cover not only Washington, Oregon, Idaho, and Alaska from the 1850s to 1980s, but also include Chinese who entered the U.S. through any of these states but settled or visited elsewhere in the U.S. Volunteers have carefully created one of the best NARA indices of these files.

48.     Plaintiff State of Oregon is a sovereign entity and brings this action to protect its proprietary interests in access to the National Archives at Seattle, and as *parens patriae* on behalf of its affected citizens and residents. The National Archives at Seattle is a critical resource for the state's largest research universities, including the University of Oregon and Oregon State University, whose undergraduate and graduate students, faculty, and librarians regularly rely on these original records unique to the Pacific Northwest for research, educational, and publication purposes. The federal government has been entrusted with these rare and unique historical archival documents to which local access is essential to tell and preserve our national and regional history. The sale of the Federal Archives and Records Center located at 6125 Sand Point Way NE, in Seattle, Washington, and removal of the records to the proposed locations will undoubtedly damage our state's public learning institutions and the communities and individuals we serve, in addition to having a devastating impact to Oregon tribes that rely on the records for

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

treaty and tribal membership purposes. Access to original records in their context is essential to our public universities' ability to educate scholars and the public and maintain their missions to preserve and enhance knowledge. Many of the documents at Sand Point have artifactual value that cannot be reproduced through digital representations, or that must be viewed in context with other related documents to understand their meaning and significance. Having substantial local archival resources accessible in physical form has helped our state universities to recruit top applicants interested in pursuing research in the Western United States. Our researchers, historians, genealogists, and tribes in Oregon, as well as private citizens and families, continue to rely on the National Archives at Seattle as an invaluable source of unique historical information and will be harmed by the planned removal to more distant locations. The Attorney General is the chief legal officer for the State of Oregon and is authorized by Oregon law to perform all legal services for the State. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Oregon.

49. Plaintiff Port Gamble S'Klallam Tribe ("PGST") is a federally recognized, self-governing tribal government located on approximately 1,700 acres on the Kitsap Peninsula, Kitsap County, Washington. Approximately two-thirds of our over 1,300 enrolled PGST members live on the Port Gamble S'Klallam Reservation—100% of which is held in federal trust status. PGST is a signatory to the 1855 Point No Point Treaty with the United States and was organized pursuant to the federal Indian Reorganization Act of 1934, which was passed by the U.S. Congress in part to "conserve and develop Indian lands and resources." PGST and PGST members use the National Archives at Seattle for research that confirms S'Klallam oral histories; documents S'Klallam genealogy; and confirms PGST Treaty fishing, hunting, and other rights, S'Klallam Indigenous land occupancy and natural and cultural resource use and conservation, and PGST interactions and relations with other tribal governments and federally appointed

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

agents. PGST has used the National Archives at Seattle for decades and continues to use the National Archives at Seattle and records drawn from that facility on a routine basis. In particular, PGST has used and continues to use that facility for research in connection with federal programs for natural resource conservation purposes. Were the records stored at the National Archives at Seattle moved out of the region or state, PGST and PGST members would, practically speaking, no longer have access to those records and PGST would be irreparably harmed.

50.     Plaintiff Puyallup Tribe is a federally-recognized, sovereign tribal government also recognized by the Treaty of Medicine Creek with the United States (10 Stat. 1132). The Tribe is located in and around the urban core of Tacoma, Washington. It is governed by its own Constitution and Bylaws, a comprehensive code of laws including family protection, housing, fishing, hunting, and land use, as well as its own civil and criminal codes. Members of the Puyallup Tribe have lived, fished, harvested, hunted, protected the environment, and practiced cultural traditions in these areas since time immemorial. The Tribe's government programs numbering over 60 include departments such as historic preservation, fisheries management including the timber, fish & wildlife program, higher education, realty, law enforcement, tribal courts, the law office, business and tax licensing department, and family protective service departments including the Indian Child Welfare department, which all serve to preserve the Tribe's existence, land, culture and to improve the general welfare of over 5,600 members and their families. Many of these departments and others carry out tribal and federal programs, functions, services, and activities under P.L. 93-638 contracts awarded by the Department of Interior pursuant to Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. §§ 5301 et seq.). Archives held at the National Archives at Seattle facility are an irreplaceable documented history of the Tribe's people, lands, natural and cultural resources, and government. With the assistance of expert archivists who have worked with records specific to tribes for decades, the tribal government, individual tribal members, and tribal community members have used and continue to use the National Archives at Seattle for historical research

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

of a wide variety of topics from enrollment, genealogy, archaeology, historical and legal issues involving fishing, hunting, water, land, and government-to-government agreements between the tribes and other governments including the United States government. These irreplaceable archives are primarily un-digitized and do not exist elsewhere. Closure and sale of the National Archives at Seattle and relocation of the archives would pose significant economic burdens and administrative challenges on the Tribe and its membership. Not having the archives readily available, protected, and nearby will affect the Tribe's ability to use this data for all of these essential governmental purposes. By joining in this Complaint, the Puyallup Tribe of Indians does not admit any of the factual allegations of the Plaintiff Duwamish Tribe, and specifically disclaims and denies any allegation herein regarding the "Plaintiff Duwamish Tribe" claims to be a contemporary organization that is a successor in interest to the historic Duwamish Tribe or to be an Indian Tribe or that the self-identified "Plaintiff Duwamish Tribe" is a party to the Treaty of Point Elliott. These claims have been rejected by both the federal courts and the Department of the Interior. See *United States v. Washington*, 476 F. Supp. 1101, 1105, 1111, (W.D. Wash. 1979), *aff'd*, 641 F.2d 1368 (9th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982); see also Department of the Interior Decision Documents accessible at https://www.bia.gov/as-ia/ofa/025-duwami-wa%20.

51.     Plaintiff Quileute Tribe of the Quileute Reservation ("Quileute Tribe") is a federally recognized Indian tribe and signatory tribe to the 1855 Treaty of Olympia. The Quileute Reservation is located at the mouth of the Quillayute River on the Olympic Peninsula of Western Washington, and the Tribe's ceded lands extend for hundreds of square miles, reaching the Olympic Mountains. For decades, the Quileute Tribe has heavily relied upon, and will continue to heavily rely upon, the Sand Point Archives in connection with research for federal conservation programs. In just the past five years, the Quileute Tribe has used the Archives to defend its treaty rights; fulfill its obligations under various federal grant programs, including a climate change study; comply with (and ensure that the United States as its trustee complies

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                35                ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

with) the conservation requirements of numerous federal laws, including but not limited to the National Historic Preservation Act and the National Environmental Policy Act. This Court cited numerous documents obtained from the Sand Point Archives in its 2015 decision adjudicating the Quileute Tribe's treaty fishing area.[6] In just the coming decade, the Quileute Tribe intended to conduct research at the Archives for numerous purposes, including in connection with the ongoing process of moving its reservation out of the tsunami zone (see Pub L. 112-97, 126. Stat. 257), with ongoing habitat and infrastructure restoration projects, and with a National Park Service Tribal Heritage Grant to develop a cultural and language center to protect Quileute culture. The Quileute Tribe's compliance with applicable federal laws and federal conservation program requirements in carrying out these projects has involved, and will involve, continuing reliance upon the Sand Point Archives. The Quileute Tribe lacks the financial resources to access these records if they are moved out of the Pacific Northwest. Thus, relocation of the Sandpoint Archive records away from the Northwest will make it extremely difficult, if not impossible, for the Quileute Tribe to access the records its needs for these crucial federal programs and for tribal cultural preservation. This would cause irreparable harm to the Tribe, both in the form of increased costs of accessing the records and in the cultural harm caused when the Tribe is unable to participate in these programs due to the prohibitive cost of accessing archival records.

52.     Plaintiff Quinault Indian Nation ("Quinault Nation") is a sovereign government and federally-recognized Indian tribe located on the west coast of Washington. The Quinault Nation is a signatory to the Treaty of Olympia (1856), ratified by Congress in 1859 (12 Stat. 971), in which it reserved a right to take fish at its "usual and accustomed fishing grounds and stations" and the privilege of hunting and gathering, among other rights, in exchange for ceding lands it historically roamed freely. Representatives of the Quinault Nation have historically relied on and accessed records housed at National Archives at Seattle pertaining to its enrolled

---

[6] *See United States v. Washington*, 129 F. Supp. 3d 1069, 1073 (W.D. Wash. 2015) (stating that the Court admitted 472 exhibits; numerous of those exhibits were obtained from the Sand Point Archives).

36

1   membership and census records, historic cultural and treaty practices, as well as historic photos

2   and newspaper articles about the Quinault people. The Quinault Nation has a keen interest in

3   continuing to be able to access such historic records at the National Archives at Seattle without

4   the cost and stress of having to travel a longer distance than to Seattle.

5        53.      Plaintiff Samish Indian Nation ("Samish Tribe") is a federally-recognized Indian

6   tribe located in Northwest Washington. The Samish Tribe has had a contentious relationship

7   with the federal government, including the government's position in the late 1960s taken without

8   any final judicial decision that the Samish Tribe was no longer federally-recognized, and the

9   government's opposition to Samish treaty status because the Tribe was not recognized. The

10  Samish Tribe has been involved in continuous litigation for the last 45 years to confirm its treaty

11  status and its status as a federally-recognized tribe. Tribal access to the National Archives in

12  Seattle was and is critical to the Tribe's successful re-recognition litigation, its successful

13  *Carcieri* determination, and its ongoing legal efforts to confirm its treaty status. Moving the

14  Seattle Archives records back East would severely cripple the Samish Tribe's ongoing legal

15  efforts.

16       54.      Plaintiff Sauk-Suiattle Indian Tribe is a tribal nation which is federally recognized

17  by the United States Secretary of the Interior. Representatives of the Tribe were signatories to

18  the Treaty of Point Elliott between the United States and several tribal nations. Because millions

19  of acres of lands and waters in the Pacific Northwest are subject to the exercise of tribal rights

20  reserved in the Treaty, access to the governmental records housed in the Pacific Northwest

21  Regional Archives is often among the most expedient way of resolving the many disputes which

22  arise among tribal and non-tribal people and governments in the Pacific Northwest. The

23  information in such records is often dispositive of such disputes, and this serves the public

24  through the avoidance of litigation.

25       55.      Plaintiff the City of Seattle is a city organized under the laws of the State of

26  Washington, and is the largest municipality within the National Archives's geographic scope. In

37

developing infrastructure throughout its jurisdiction, and in approving private development applications, it relies directly and indirectly on records in the National Archives to understand the limitations imposed by tribal treaty rights. Seattle also operates the Seattle Public Library (SPL), which depends on the National Archives records as well. SPL maintains a central location in Downtown Seattle and 26 branch locations across the City of Seattle, ultimately serving a city population of nearly 4 million people. In its Strategic Direction, SPL has identified Seattle culture and history as a service priority, thereby committing to provide research and reference services related to the history of the region. To deliver on these service responsibilities, SPL depends on the resources of it's partner institutions like the National Archives. The National Archives contains a vast collection of unduplicated and un-digitized original records from Seattle history that are essential for SPL stakeholders, including patrons, researchers, City staff and elected officials, community advocates, news media, developers, and business. Specific collections of interest include: Bureau of Indian Affairs; Bureau of Land Management; Records of land offices; Chinese Exclusion Act Case Files; Federal District, Circuit, and Territorial Court Records; and Naturalization Records. Removing the National Archives from Seattle would substantially limit SPL and its stakeholders from accessing these crucial records. Had the City of Seattle been permitted to comment on the National Archives's removal, it would have detailed how removal will reduce the City's ability to consider the limits tribal treaty rights place on development and how it will deprive the SPL of access to records of tremendous local import.

56.     Plaintiff Shoalwater Bay Indian Tribe (Shoalwater Bay) is a federally recognized Indian tribe in southwestern Washington State along the waters of the Willapa Bay. Shoalwater Bay was established by Executive Order in 1866 and it currently has 440 members. The records housed at the National Archives at Seattle are critical for documenting Shoalwater Bay tribal history and the lives of Shoalwater Bay members' ancestors. Shoalwater Bay has conducted key research at this facility in the process to achieve formal federal recognition and establishment in 1971. Shoalwater Bay tribal staff rely on this facility for original source materials that support

38

1   planning and grants processes as well as various research relating to culture, history, and natural

2   resource projects. The National Archives at Seattle also holds key documents relevant to

3   litigation surrounding Shoalwater Bay's assertion of its tribal fishing rights and the protection

4   and conservation of the fisheries on which those rights depend. In the past, Shoalwater Bay

5   employees have had to rely on the federal archival collection when source material was missing

6   from state collections. Moreover, the National Archives at Seattle holds critical and intimate

7   records on Shoalwater Bay tribal members, including non-digitized hand-written personal

8   correspondence. For example, the Archives has the personal hand-written letters to Shoalwater

9   Bay's first Chairman from his family members while he was in boarding school at Chemawa

10  Indian School. The removal of key historical documents from Seattle to California and Missouri

11  will cause Shoalwater Bay irreparable harm. Removing these documents and placing them up to

12  1,500 miles away removes Shoalwater Bay its history and frays already tenuous connections to

13  its past and its people. This move will make it nearly impossible for Shoalwater Bay to conduct

14  thorough research for grants, cultural projects, and genealogical history, which will create

15  financial harm to Shoalwater Bay and its members, if grants are denied, and immeasurable harm

16  to their collective knowledge. Key officials of the Shoalwater Bay Tribal Council and

17  Administration were notified by a regional tribal association of the plan to close the National

18  Archives at Seattle, but no federal government representative contacted the Tribe in connection

19  with the government's decision to sell the facility. Shoalwater Bay believes that the proposed

20  closure of the National Archives at Seattle is an act of cultural genocide against the Indigenous

21  people on the Willapa Bay.

22          57.     Plaintiff Skokomish Indian Tribe is an Indian tribe with a governing body duly

23  recognized by the Secretary of the Interior. *Indian Entities Recognized and Eligible to Receive*

24  *Services from the United States Bureau of Indian Affairs*, 85 Fed. Reg. 5462 (January 30, 2020).

25  The Tribe is re-organized under the Indian Reorganization Act of June 18, 1934. 48 Stat. 984,

26  987, 25 U.S.C. § 5123; *Theodore H. Haas, Ten Years of Tribal Government under I.R.A*. (1947).

1   The Tribe operates under its Constitution and by-laws first adopted on April 2, 1938, and

2   approved by the Secretary of the Interior May 3, 1938, amended January 15, 1980, as approved

3   by the Secretary of the Interior March 17, 1980. *Id*.; Skokomish Const. The Tribe, as the

4   successor in interest to the Skokomish and Twana people, is a signatory to the Treaty of Point

5   No Point of January 26, 1855 and retains reserved Treaty rights. 12 Stat. 933 (Ratified Mar. 8,

6   1859 and Proclaimed Apr. 29, 1859); *United States v. Washington*, 384 F. Supp. 312, 376-377

7   at Finding Nos. 133-134 (W.D. Wash. 1974). The Tribe is located within the Hood Canal

8   drainage area of the State of Washington. *Id*. The Skokomish's Reservation is defined by an

9   Executive Order and later Proclamations. *Exec. Order of President Ulysses S. Grant*

10  (February 25, 1874). As of December 28, 2020, there are 781 enrolled members of the

11  Skokomish Indian Tribe. For more than a century, the Tribe and its members suffered at the

12  hands of agents implementing policy of the United States, which sought to strip away

13  Skokomish's language, culture, and heritage. Despite having been subject to this adversity to

14  this day the Tribe and its members' cultural identity remains strong, in part due to the ability to

15  rediscover lost knowledge preserved at the National Archives facility in Seattle. The closure of

16  this facility would undoubtedly inflict a most grievous injury upon the Tribe and its members

17  and once again cut off Skokomish's connection to the past. The Tribe relies on this critical

18  facility, for example, amongst other things to: maintain its tribal rolls; secure and preserve its

19  territory and Treaty rights to hunt, gather, and fish; and maintain cultural knowledge. The

20  members would also face undue financial harm if they could not travel to a local facility to

21  conduct their own research into their families' histories, their homeland, their Treaty, and their

22  traditional ways of life.

23       58.     Plaintiff Snoqualmie Indian Tribe is a federally-recognized sovereign Indian tribe

24  and signatory to the Treaty of Point Elliott of 1855 with reserved rights thereunder, with its

25  governmental offices at 9571 Ethan Wade Way SE, Snoqualmie, WA 98065. The Seattle

26  National Archives contain a wealth of historical information about the Snoqualmie people,

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   including but not limited to records from the Tulalip Agency (1861-1950), the Western

2   Washington Agency of the Bureau of Indian Affairs (1950-1975), and the Portland Area Office

3   (1931-1970). Snoqualmie regularly relies on the documents within the Seattle National Archives

4   to support both certain legal endeavors, including its ongoing litigation, and its continuing effort

5   to document the Tribe's ethnohistory. Closure and relocation of the Seattle National Archives

6   would pose significant challenges to Snoqualmie's ability to access these critical and

7   irreplaceable records of its history.

8       59.     Plaintiff Spokane Tribe of Indians ("Tribe") is a federally recognized Indian Tribe

9   located in Eastern Washington. The Tribe's Reservation was established in August of 1877 after

10  the Tribe was forced from its land by the United States government. *Northern Pac. Ry. Co. v.*

11  *Wismer*, 246 U.S. 283, 288 (1918). The Tribe's Reservation borders are the East Bank of

12  Chamokane Creek, the South Bank of the Spokane River, the West Bank of the Columbia River

13  and the Northern Border is the 48th parallel. 1880 WL 32483 (Exec. Ord.). The Tribe's

14  membership of more than 2,700 live within the Reservation and throughout the region. The

15  National Archives in Seattle contains thousands of documents that are pertain to the Spokane

16  Tribe, its people, and its lands. These documents are invaluable in efforts to protect tribal

17  resources, including its lands, waters, and cultural resources. Moving the documents will cost

18  the Tribe significant time, expense, and resources to access these documents at another locations.

19      60.     Plaintiff Squaxin Island Tribe ("Squaxin") is a federally recognized, self-

20  governing tribal government located in Mason County, Washington. Squaxin is a signatory to

21  the 1854 Treaty of Medicine Creek with the United States. Squaxin uses the National Archives

22  at the Sand Point facility to research and document Squaxin genealogy, and conduct historical

23  research in the areas of Treaty rights (particularly fishing and hunting rights), historical political

24  structure, land base occupancy, natural and cultural resource use and conservation, interactions

25  and relations with other tribal governments and federally appointed agents, and uses of

26  Indigenous plants and medicines. In the 1950s and 1960s, Squaxin used the documents at the

41

National Archives at Sand Point to research its political continuity in a battle to prevent termination of the Tribe. From the 1960s and 1970s to the present, Squaxin has used the documents at the National Archives at Sand Point to document its reserved fishing rights under the Treaty of Medicine Creek. Beginning in the 1970s, Squaxin has used the documents at the National Archives at Sand Point to conduct genealogical research to assist the Tribe's support for national Indian Child Welfare legislation. Were the records stored at the National Archives at Seattle moved out of the region or state, Squaxin and Squaxin members would, practically speaking, no longer have access to those records and Squaxin would be irreparably harmed.

61. Plaintiff Suquamish Tribe is a federally recognized Indian Tribe, and is a signatory to the Treaty of Point Elliott, 1855. The Port Madison Indian Reservation, home of the Suquamish Tribe, (7,657 acres) is located across the Puget Sound from Seattle (named for Suquamish Chief Sealth) on the Kitsap Peninsula (named for Suquamish Chief Kitsap) in and around the towns of Suquamish and Indianola. The Suquamish had winter villages at Suquamish, Port Madison. Sandy Hook, Lemolo, Point Bolin, Poulsbo, Silverdale, Chico, Colby, Olalla, Point White, Lynwood Center, Eagle Harbor, Battle Point, Manette, Elwood Point, and Point No Point. The best known winter village was <u>Old Man House</u> at the modern location of Suquamish, the home of Chief Sealth and Chief Kitsap. The Sand Point archives helped the Tribe and its researchers and experts uncover many critical facts about its places and names, its language and history. The Suquamish periodically left their winter residences in the spring, summer and early fall in family canoes to travel to temporary camps at their fishing, hunting, and gathering grounds in and around the Puget Sound. The Suquamish paddled from Old Man House to the Point Elliot Treaty grounds, across the water on the Seattle side. Since treaty time and the hard times immediately thereafter, the Suquamish Tribe has continued to grow. Part of the Tribe's ability to grow and know itself as a Tribe are the unique records that the National Archives at Sand Point have provided to the Tribe's historians, attorneys, linguists, geographers and citizens. Having immediate access to the Sand Point Archives has been critical to the

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Suquamish Tribe's legal efforts to protect its treaty rights, its trust properties, and the Tribe's status as a Tribe during the last 50 years. Those legal efforts continue to this day, and many still require that the Tribe perform additional historical research at the Sand Point Archives. Without access to the Sand Point Facility and the ability to research federal government records related to pre-treaty activities and the Tribe's usual and accustomed areas, the Suquamish Tribe's efforts to demonstrate its presence in the pre-treaty Puget Sound would have been, and will be severely compromised. The National Archives at Sand Point also provide important genealogic and linguistic information to the Tribe's researchers. Without access to the Sand Point archives, the Tribe's ability to research everything from its language to genealogy to locations and usages would be severely compromised. The Tribe cannot afford to send members, contractors or staff to the Midwest or elsewhere for prolonged research stints. The closure of the Sand Point Archives and the removal of the Archival materials will injure this and future generations of tribal scholars from viewing their history in its original context. It will also prevent the Suquamish Department of Education from bringing Suquamish youth to the Archive site to show them the records there and their relation to Suquamish history, geography, and language. The Suquamish governmental offices are located at 18490 Suquamish Way NE, Suquamish, WA 98392. The Suquamish Tribe, by joining this complaint, joins in the pleadings, but neither endorses nor disparages the unrelated claims of any other party advocating the preservation of the Sand Point Archives and reserves its rights to address any other such claim at another place and time.

62.     Plaintiff Swinomish Indian Tribal Community is a sovereign entity and federally-recognized Indian tribe. It is an adjudicated successor in interest to certain tribes and bands of Indians which were party to the 1855 Treaty of Point Elliott, including the Kikiallus, Lower Skagit, aboriginal Samish, and aboriginal Swinomish. The Swinomish Indian Tribal Community has regularly relied on its proximity to the Seattle branch of the National Archives and Records Administration since the facility was created at Sand Point in 1963. The Tribe's needs for a

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

regional repository of federal records have been many and varied. For decades, Tribal staff, attorneys, and outside expert researchers and consultants have depended on Record Group 75 (RG 75), the complex web of record sets from the Bureau of Indian Affairs housed at Seattle NARA which "document the U.S. Federal government's interaction with American Indians." Materials from RG 75, and other record groups at Sand Point, have played critical roles in Swinomish's struggle to enforce tribal sovereignty and the rights reserved for them by the 1855 Treaty of Point Elliott. Additionally, these documents have informed the Tribe's creation of laws and infrastructure that govern reservation life today. Equally important to the Swinomish Indian Tribal Community has been the creation of its own repository in 2007 to preserve and understand its history. The Swinomish Tribal Archive has laid a firm foundation for this work by regularly accessing materials at Seattle NARA. The success of the Tribal Archive to build resources for the community from genealogical databases to timelines that document the history of Swinomish government, health care, education, land use and more, is a direct result of the materials obtained in Seattle. Had this regional branch of the National Archive been located in the middle of the United States, these research trips by Swinomish staff would have been prohibitively expensive and out of reach.

63.     Plaintiff Tanana Chiefs Conference (TCC) is an intertribal organization located in central Alaska and comprised of thirty-seven federally recognized Alaska Native Tribes and five additional Alaska Native communities. TCC is an arm of the tribal governments which created it. *Beversdorf v. Tanana Chiefs Conference, Inc.*, No. 4FA-17-01911 CI, Order of Dismissal (Alaska Super. Ct. Sept. 27, 2017). TCC was formed in 1915 to protect Native land rights, tribal self-determination, and regional Native unity. TCC reorganized as a nonprofit corporation under Alaska law in 1962, shortly after Alaska statehood, and today provides health, education, economic, and social services for Alaska Natives, American Indians, and other eligible individuals throughout a 235,000 square mile region in interior Alaska. TCC has a deep interest in the records currently stored in the Federal Archives and Records Center in Seattle,

1    because (among other things) that facility houses records concerning tribal aboriginal claims,

2    including claims over hunting and fishing rights acknowledged and extinguished in section 4(b)

3    of the Alaska Native Claims Settlement Act of 1971 (ANILCA), 43 U.S.C. 1603(b), and

4    subsequently addressed by Congress in Title VIII of the Alaska National Interest Lands

5    Conservation Act of 1980 (ANILCA), 16 U.S.C. §§ 3111−3126; Alaska tribal organizations;

6    Alaska Native allotments; Alaska Native townsites; educational activities in Alaska Native

7    villages; early religious (mission) activities in village Alaska; World War II (WWII) and post-

8    WWII activities across the interior of Alaska; mineral development in the interior of Alaska;

9    Alaska Native corporation and State of Alaska land selections in the interior of Alaska; and the

10   history and management of federal "conservation system unit[s]" across the interior of Alaska

11   defined in ANILCA, *see* 16 U.S.C. 3102(4). In this last respect, the archives facility houses

12   records leading to the establishment or enlargement (through ANILCA) of several conservation

13   system units of particular interest to TCC and its member Tribes, including the Gates of the

14   Arctic National Park and Preserve, Karuti National Wildlife Refuge, Koyukuk National Wildlife

15   Refuge, Innoko National Wildlife Refuge, Nowitna National Wildlife Refuge, Noatak National

16   Preserve, Yukon-Charley Rivers National Preserve, Yukon Flats National Wildlife Refuge.

17   Pursuant to Title VIII of ANILCA, 16 U.S.C. §§ 3111−3126, the residents of TCC's region

18   exercise specially reserved hunting and fishing rights for subsistence purposes in each

19   conservation system unit addressed in ANILCA, and information concerning the nature and

20   exercise of hunting and fishing activities in these and other areas across the interior of Alaska

21   are housed in the facility. Also housed in the facility are the records of the Federal Field

22   Committee for Development Planning in Alaska, whose research and 1968 report (published by

23   the Government Printing Office) provided a detailed history of the demography and lifeways of

24   Alaska Native people, including hunting and fishing activities, together with much of the

25   background that led to the development of ANCSA.

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

64.     Plaintiff Upper Skagit Indian Tribe is a federally-recognized, sovereign tribal government and successor in interest to the Treaty of Point Elliot with the United States. The Tribe post Treaty was a "landless" Tribe as its members refused relocation to the Swinomish reservation. The Upper Skagit membership continued to sustain itself in its traditional territories in and around Skagit County and adjacent marine areas. It is governed by its own Constitution and Bylaws, a comprehensive code of laws including family protection, housing, fishing, hunting, and land use, as well as its own civil and criminal codes. Members of the Upper Skagit have lived, fished, harvested, hunted, protected the environment, and practiced cultural traditions in and around the Skagit Basin since time immemorial. The Tribe's government programs include departments such as historic preservation, fisheries management including the timber, fish & wildlife program, higher education, realty, law enforcement, tribal courts, office of Tribal Attorney, and family protective service departments including the Indian Child Welfare department, which all serve to preserve the Tribe's existence, land, culture and to improve the general welfare of over 1,300 members and their families. Many of these departments and others carry out tribal and federal programs, functions, services, and activities under P.L. 93-638 contracts awarded by the Department of Interior pursuant to Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. §§ 5301 et seq.). Archives held at the National Archives at Seattle facility are an irreplaceable documented history of the Tribe's people, lands, natural and cultural resources, and government. With the assistance of expert archivists who have worked with records specific to tribes for decades, the tribal government, individual tribal members, and tribal community members have used and continue to use the National Archives at Seattle for historical research of a wide variety of topics, including taking land into trust to establish its reservation, preservation of its Treaty rights, enrollment, genealogy, archaeology, historical and legal issues involving fishing, hunting, water, land, and government-to-government agreements between the tribes and other governments including the United States government. These irreplaceable archives are primarily un-digitized and do not exist elsewhere.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Closure and sale of the National Archives at Seattle and relocation of the archives would pose

2    significant economic burdens and administrative challenges on the Tribe and its membership.

3    Not having the archives readily available, protected, and nearby will affect the Tribe's ability to

4    use this data for all of these essential governmental purposes.

5        65.    Plaintiff Washington Trust for Historic Preservation (WTHP) is a 501(c)(3)

6    nonprofit advocacy organization dedicated to saving the places that matter in Washington State

7    and to promoting sustainable and economically viable communities through historic

8    preservation. WTHP is Washington's only statewide historic preservation organization. Among

9    other public services and programs, WTHP provides technical advice, financial assistance, and

10   advocacy to local preservation efforts statewide. WTHP has members throughout the state of

11   Washington. The National Archives in Seattle are an important resource for WTHP's advocacy,

12   education, and stewardship programs. Archival research, including at the National Archives, is

13   critical to determine whether and how to protect and advocate for historic resources. For

14   example, WTHP recently used the Archives to complete preservation-related projects funded

15   through the federal Transportation Enhancement and Scenic Byways programs. The records at

16   the Archives are also particularly useful to the efforts of WTHP and its members to develop

17   nominations to the National Register of Historic Places, materials related to the federal

18   Rehabilitation Tax Credit program, and landmark nominations to local city and county historic

19   registers through the Certified Local Government program. Many of the relevant records at the

20   Archives, including property records, correspondence, historic reports, genealogy, military

21   records, photos and other forms of documentation, are available only at the Archives and have

22   not been digitized. Continued access to the Archives is critical to WTHP's mission and programs

23   and to the preservation of historic resources throughout the state.

24       66.    Plaintiff Wing Luke Memorial Foundation (d/b/a Wing Luke Museum) is a

25   museum whose mission is to connect everyone to the dynamic history, cultures, and art of Asian

26   Pacific Americans through vivid storytelling and inspiring experiences to advance racial and

social equity. Founded in 1966 in Seattle's historic Chinatown-International District, honoring Wing Luke, an immigrant and first person of color elected to Seattle City Council in 1962, the Wing Luke Museum is a cultural gathering place for diverse audiences spanning generations and diverse socioeconomic backgrounds. The Wing Luke Museum engages the public in the history, culture, and art of Asian Pacific Americans through community-driven exhibitions, educational resources and programs, guided tours, and neighborhood revitalization activities. The Wing Luke Museum is an affiliate of the Smithsonian Institution and an Affiliated Area of the National Park Service. Research within the National Archives and Records Administration in Seattle has been integral to the creation of many exhibitions at the Wing Luke Museum, especially drawing upon the Chinese Exclusion Files. These records have illuminated the immigration experience for Chinese Americans from the 1850s to 1980s. The records also have been key to its interpretation of the historic Seattle Immigration and Naturalization Service Building. Since the records connect with individuals and their families, research at the National Archives and Records Administration has enabled the Wing Luke Museum to share and explore personal stories within its exhibitions, connecting with its visitors and immersing them in history. Indeed, research at the National Archives and Records Administration has been a powerful way to recover history that would otherwise be lost to Asian Pacific American communities in the Pacific Northwest region and beyond. Through genealogy workshops and family histories donated to the Wing Luke Museum Collections, community members cite how necessary in-person research at the National Archives and Records Administration has been to their findings. Without access to these records, the Wing Luke Museum would be without core exhibition interpretation materials, lose a vital educational resource, and be greatly reduced in its ability to serve the Asian Pacific American communities and the general public overall.

67.     Defendant Office of Management and Budget (OMB) is an agency of the United States, and is the agency responsible under FASTA for providing the PBRB with standards and criteria, as well as reviewing the PBRB's recommendations.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

68.     Defendant Rob Fairweather is the Director of OMB, and is sued in his official capacity.

69.     Defendant Public Buildings Reform Board (PBRB) is an agency of the United States, created through FASTA.

70.     Defendant Adam Bodner is the Executive Director of the PBRB, and is sued in his official capacity.

71.     Defendant General Services Administration (GSA) is an agency of the United States, and is the agency responsible under FASTA for effectuating the sale of federal property.

72.     Defendant Katy Kale is the Acting Administrator for GSA, and is sued in her official capacity.

73.     Defendant National Archives and Record Administration (NARA) is an agency of the United States, whose public mission is: "[T]o provide public access to Federal Government records in our custody and control. Public access to government records strengthens democracy by allowing Americans to claim their rights of citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government."[7]

74.     Defendant David S. Ferriero is the Archivist of NARA, and is sued in his official capacity.

### III.     JURISDICTION AND VENUE

75.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (judicial review of agency action under the APA). The United States has waived its sovereign immunity from this suit pursuant to 5 U.S.C. § 702. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant

---

[7] https://www.archives.gov/about/info/mission.

declaratory relief, injunctive relief, mandamus, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 1361 and 5 U.S.C. §§ 705–706.

76.     The court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1362 in that numerous of the plaintiffs are Indian tribes with a governing body duly recognized by the Secretary of the Interior and the matter in controversy arises under the Constitution, laws or treaties of the United States.

77.     Defendants' actions described herein constitute final agency actions or unlawfully withheld or reasonably delayed agency actions and are therefore judicially reviewable within the meaning of the APA. 5 U.S.C. §§ 704, 706.

78.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which the State of Washington resides and this action seeks relief against federal agencies and their officials acting in their official capacities. *See California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019). Moreover, venue is proper in this Court because the property that is the subject of the action is situated in the Western District of Washington. 28 U.S.C. § 1391(b)(2).

# IV.     STATEMENT OF FACTS

## A.     Factual Background

### 1.     History of the Seattle Archives Property

79.     The National Archives at Seattle is located at 6125 Sand Point Way NE, Seattle, Washington, 98115, in the Hawthorne Hills residential neighborhood of northeast Seattle.

80.     Named for Chief Si'ahl, who was chief of the Duwamish and Suquamish Tribes, Seattle is on Duwamish land. White settlers began arriving in the Seattle area in 1851, and by the mid-1860s, Native people were prohibited from residing in Seattle, including the Duwamish, notwithstanding its status as a party to the Point Elliott Treaty, ratified in 1859. Like the rest of the city, the Seattle Archives facility sits on ill-gotten land.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                                    50                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

81.     As documented by a now-retired senior NARA archivist, the land on which the Seattle Archives facility resides was once a thriving farm operated by members of the Uyeji family, who emigrated from Japan.[8] In the decades leading up to World War II, the Uyeji family lived and worked on the land and operated a "truck farm."

 

*Two members of the Uyeji family in their greenhouse during the 1930s and a picture of the Uyeji family farm. Their home and farm were located on the site of the current Seattle Archives facility. Photos courtesy of Densho, Uyeji Collection.*

82.     In May 1942, when the federal government ordered the forced removal of residents of Japanese ancestry in the area, the Uyeji family and their Japanese-American neighbors were removed from their home and family farm.

83.     The Uyeji family was initially interned at the Pinedale Assembly Center in central California and then later at the Tule Lake Relocation Center in northern California. The Uyeji family were never able to return to their Seattle home.

---

[8] *See* National Archives Researcher News, *Real Property Research at the National Archives at Seattle* by Ken House, at 4–5 (providing the history of the Seattle Archives facility and discussing the Uyeji family), available at https://www.archives.gov/files/research/newsletter/2013-spring.pdf.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                                   51                    ATTORNEY GENERAL OF WASHINGTON
                                                                                            Complex Litigation Division
                                                                                            800 5th Avenue, Suite 2000
                                                                                            Seattle, WA 98104-3188
                                                                                            (206) 464-7744

84.     The land that the Uyeji family had lived on and farmed was parceled, sold, and then subsequently condemned by the U.S. Navy in 1945 in order to build the warehouse that is now used by NARA.



*The greenhouse and farm property in 1944, two years after the Uyeji family were interned. This photo is located in an appraiser's file at the Seattle Archives related to the 1945 condemnation proceeding.*

85.     Since 1963, the warehouse has been a NARA facility, and it currently houses records about the Uyeji family farm—including a key to the front door of the family's former home—as well as records related to the internment of Japanese Americans in the 1940s.[9]

86.     The National Archives at Seattle houses approximately one million boxes of federal records, dating back to the 1840s, from Washington, Idaho, Oregon, and Alaska. This includes military, land, court, tax, and census records for the region.[10]

87.     If these records were to be moved, replicating the direct access currently available to residents of the Pacific Northwest would require a significant financial and time investment, likely including flight and hotel expenses, that is out of reach for many. Despite recent efforts to

---

[9] *See id.* ("Remarkably, one file still contains the front door key to the Uyeji farm house. The subsequent owner mailed the key to Navy officials, and they dutifully filed it.").
[10] https://www.seattletimes.com/seattle-news/terrible-and-disgusting-decision-to-close-national-archives-at-seattle-a-blow-to-tribes-historians-in-4-states/.

digitize some records, only a very small fraction of the millions of records at the Seattle facility are available online. According to Susan Karren, NARA's Seattle director, only ".001% of the facility's 56,000 cubic feet of records are digitized and available online."[11] If the sale proceeds, the records will be inaccessible for an unknown period of time, as they will need to be inventoried, shipped, and reprocessed at their new sites.[12] Moreover, having to submit records requests from afar precludes requestors from browsing the records; the requestor may not know exactly which particular records they seek.

### 2.    Records Housed at the Seattle Archives Property

88.    As discussed below, the National Archives at Seattle houses records that are particularly unique and important to residents of the Pacific Northwest and Alaska, such as census and genealogical records, tribal records, Chinese Exclusion Act records, and Japanese internment records. These records are a crucial part of Pacific Northwest and Alaska history, to which residents currently have direct access. Alaska, whose population is approximately 15% Alaska Natives, no longer has a National Archives facility after its own facility was closed and the records were shipped to the Seattle facility.

89.    Removing these records from the Pacific Northwest will deprive residents of this region with access to valuable and important historical documents. Indeed, upon announcing the pending closure of the National Archives at Seattle, NARA acknowledged: "We recognize that the closure of our facility will have a negative impact on researchers, Federal agencies, and other customers that use our facility."[13] Closure of the National Archives at Seattle is inconsistent with NARA's mission, which is to provide "public access to Federal Government records in our custody and control," recognizing that "[p]ublic access to government records strengthens

---

[11]    https://www2.archivists.org/groups/human-rights-archives-section/more-than-a-warehouse-why-the-closure-of-seattles-national-arch.
[12]    https://www.historyassociates.com/hai-advises-clients-to-plan-ahead-closure-of-the-national-archives-at-seattle-will-impact-litigation-research/.
[13]    NARA Press Release, Seattle Facility Approved for Closure (Jan. 27, 2020), https://www.archives.gov/press/press-releases/2020/nr20-37.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                      53                      ATTORNEY GENERAL OF WASHINGTON
                                                                   Complex Litigation Division
                                                                   800 5th Avenue, Suite 2000
                                                                   Seattle, WA 98104-3188
                                                                   (206) 464-7744

democracy by allowing Americans to claim their rights of citizenship, hold their government accountable, and understand their history so they can participate more effectively in their government."[14]

### a.   Tribal Records

90.   The National Archives at Seattle houses a significant body of Treaty and other records relating to the 272 federally recognized tribal governments in Alaska, Washington, Oregon, and Idaho. These include records from Bureau of Indian Affairs (BIA) offices and federal Indian agencies and schools in Alaska, Washington, Oregon, and Idaho, reports regarding usufructuary activities reserved to numerous Pacific Northwest tribal governments in their Treaties (such as fishing, hunting, and gathering), court cases regarding treaty rights and transcripts of testimony from tribal members in those cases, and other materials of extreme import to the tribal governments in the Northwest.

91.   The National Archives at Seattle also houses records transferred to Seattle when the National Archives facility in Anchorage closed in 2014. The collection that moved from Alaska includes "everything from village census records from before statehood to histories of fur seal hunts in the Pribilof Islands."[15]

92.   Direct access to these records, the vast majority of which are not digitized, is critical for Pacific Northwest tribal governments and Alaska Native Corporations. As Chairman Jeromy Sullivan of Plaintiff Port Gamble S'Klallam Tribe and then Chairman David Bean of Plaintiff Puyallup Tribe of Indians noted in letters to then-Acting OMB Director Russell Vought on January 23, 2020, and on January 24, 2020 (respectively), tribal governments rely on physical access to critical historical documents and, as a result, sale of the Seattle facility will have a "profound, negative and irreparable impact."[16] As Chairman Bean explained, the facility "houses

---

[14] About the National Archives, Mission, Vision, and Values, https://www.archives.gov/about/info/mission.

[15] https://www.alaskapublic.org/2014/06/10/national-archives-departure-impacts-broad-community/.

[16] https://www.documentcloud.org/documents/6671516-National-Archives-Puyallup-and-Port-Gamble.html.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                          54                ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                          800 5th Avenue, Suite 2000
                                                                            Seattle, WA 98104-3188
                                                                                (206) 464-7744

1  critical documents associated with litigation that document the Tribe's effort to protect our treaty

2  rights and territory." *Id.* Chairman Sullivan similarly explained that "[t]he facility also houses

3  critical and hard-to-reproduce historical information related to the area tribes." *Id.* The records

4  are used to confirm tribal oral histories and to develop tribal ethnohistories and to affirm Treaty

5  and other sovereign rights, particularly natural and cultural resource conservation rights. Tribal

6  citizens also seek and use NARA records for scores of different reasons, including to trace their

7  lineage and ancestry, establish tribal citizenship, demonstrate and exercise tribal Treaty fishing,

8  hunting, and other rights, and access Indian school records. Closing the Seattle facility renders

9  these records practically inaccessible for Pacific Northwest tribal governments and Alaska

10 Native Corporations. As John Hollowed, legal adviser to the Northwest Indian Fisheries

11 Commission, told the press following a meeting with NARA staff after closure of the Seattle

12 facility was announced: "Everything of value to the tribes has been taken away by the federal

13 government. Their land, their right to fish, and the worst travesty was taking away their kids."[17]



*Photographs of Metlakahtla (Tsimshean) Children in Metlakahtla, Alaska. Available at the National Archives at Seattle (Box 276).*

_____

[17] https://www.seattletimes.com/seattle-news/frustrated-tribes-finally-get-hearing-with-national-archives-about-sand-point-facility-closure/.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    93.    Now, the impending sale of the National Archives at Seattle and transfer of the

2    historical records housed therein threatens to take away the Pacific Northwest tribal governments

3    and Alaska Native Corporations' access to records of their own history. Shipping these records

4    to Riverside or Kansas City will effectively *eliminate* public access to the records, creating

5    insurmountable obstacles for local tribal governments and citizens and other affected

6    communities in the Pacific Northwest seeking access to critical historical resources.

7                    **b.    Chinese Exclusion Act Records**

8    94.    The National Archives at Seattle also contains more than 50,000 case files related

9    to the Chinese Exclusion Act of 1882, which was passed to limit the number of Chinese laborers

10   entering the United States. The Act was repealed in 1943.

11   95.    Individuals applying for entry or re-entry into the United States under the Chinese

12   Exclusion Act had to go through an extensive application process. The Seattle facility has case

13   files for individuals who entered the United States through ports in Portland and Seattle as well

14   as individuals who entered through ports that were managed by officials in Seattle, including

15   Helena, Montana; Port Townsend, Washington; Portal, North Dakota; Sumas, Washington; and

16   Vancouver, British Columbia.[18] The Seattle facility's case files include identification

17   photographs, biographical information, interrogation notes, copies of federal and local court

18   records, and personal letters and photographs. *Id.*

19   96.    These records have been a critical resource for Chinese Americans in the Pacific

20   Northwest looking for information about their ancestors.[19] As one individual who successfully

21   traced his family history with the help of NARA Seattle staff explained, "[i]t's all there on paper,

22   so you can literally recreate a picture of the village and the family tree through these

23   documents."[20]

---

[18] https://www.archives.gov/seattle/finding-aids/chinese-exclusion-act.
[19] https://www.kuow.org/stories/first-panic-then-a-battle-to-keep-the-national-archives-in-seattle.
[20]    https://iexaminer.org/concerns-raised-about-closure-of-national-archives-in-seattle-which-contains-chinese-exclusion-act-records/.

97.     To help facilitate access to these records, there is a dedicated staff of local volunteers at the Seattle facility working to index the Chinese Exclusion Act case files.[21] The hard work of these NARA Seattle volunteers was profiled in a 2018 *Seattle Times* video, which highlights their efforts in making these files more readily accessible to the public.[22]



*Photograph from the Chinese Exclusion Act case file of Soong May Ling (National Archives at Seattle, RS Case File 1483). As an adult, Soong May Ling, also known as Madame Chiang Kai Shek, played a role in the repeal of the Chinese Exclusion Act.*

### c.     Japanese Internment Records

98.     The closure of the facility will also have a significant impact on the local Japanese American community. In 1940, there were over 14,000 Japanese and Japanese Americans living in Washington State, comprising 11.5% of the population, according to the U.S. Census.[23] As discussed above, the land on which the Seattle facility resides was once a farm operated by Japanese Americans, the Uyeji family, for several decades prior to the Second World War. After the Uyeji family were removed from their home and interned, their land was never returned to them; in 1944, it was condemned by the U.S. Navy in order to build a warehouse. The connection

---

[21] https://www.archives.gov/seattle/volunteer#profiles.
[22]    https://www.seattletimes.com/video/5978784223001/its-like-reading-someones-life-seattles-chinese-exclusion-act-files.
[23]        https://www2.census.gov/library/publications/decennial/1940/population-nonwhite/population-nonwhite.pdf.

between the land on which Seattle facility resides and the records it holds further underscores the profound regional importance of the National Archives at Seattle.

99.      Since 1963, the warehouse has been a NARA facility, and it currently houses records about the internment of Japanese Americans in the 1940s. For instance, the Seattle facility holds records and case files of the United States district and bankruptcy courts in the Pacific Northwest region, including those involving individuals of Japanese descent during World War II. This collection includes also records of criminal cases against Japanese Americans for curfew violations or failure to register for the Selective Training and Service Act.

100.     If the closure of the facility proceeds, these records will be transferred to facilities in Kansas City and Riverside. According to local archivist organizations like Densho, which preserve and share the history of the World War II incarceration of Japanese Americans, physically moving these archives would impede a local family's research into their roots and genealogy.[24] These records are particularly relevant to families whom the federal government forcibly removed from the Pacific Northwest, and those seeking to fully understand the impact of internment.

**B.      Statutory Background**

101.     The Federal Assets Sale and Transfer Act of 2016 (FASTA), Pub. L. 114-287, as amended, establishes a process for selling federal real property on an expedited basis. It was enacted on December 16, 2016. It created an independent reform Board, the PBRB, and a process for the PBRB to make recommendations for property disposals, consolidations, lease reductions, cost containment, and "other efficiencies" across the Federal Government.

102.     FASTA establishes a multi-step process for ensuring the PBRB has the decision making framework and data necessary to make its recommendations before it begins its work.

---

[24]      https://iexaminer.org/concerns-raised-about-closure-of-national-archives-in-seattle-which-contains-chinese-exclusion-act-records/.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

58

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

103.     Section 3 of FASTA excludes certain types of property from its definition of the "Federal civilian real property" and "civilian real property" that are eligible for sale under FASTA. One such exclusion is for "[p]roperties used in connection with Federal programs for agricultural, recreational, or conservation purposes, including research in connection with the programs." Section 3(5)(B)(viii).

104.     Section 11 of FASTA provides: "Not later than 120 days after the date of enactment of this Act, and not later than 120 days after the first day of each fiscal year thereafter until the termination of the Board,"[25] other federal agencies are required to submit "current data" (such as age and condition of the property and operating costs) and "recommendations" of certain "excess" federal civilian real properties and operational efficiencies to the Administrator and the Director of OMB. Section 11(a).

105.     Under Section 11(b), no later than 60 days after the submission deadline for such agency information and recommendations, the Director of OMB "shall (A) review the agency recommendations; (B) develop consistent standards and criteria against which the agency recommendations will be reviewed; and (C) submit to the Board the recommendations developed pursuant to paragraph (2)," which are to be developed "jointly" with the GSA Administrator. Section 11(b)(1)–(2).

106.     Section 11(b)(3) further directs that in developing these standards, the Director of OMB, in consultation with the GSA Administrator, "shall incorporate the following factors:

(A)    The extent to which the civilian real property could be sold (including property that is no longer meeting the needs of the Government), redeveloped, outleased, or otherwise used to produce the highest and best value and return for the taxpayer.

---

[25] Section 10 of FASTA, as amended, provides that the PBRB "shall cease operations and terminate" six years after the appointment of the Board members. Pub. L. No. 115-437 (Jan. 14, 2019).

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

59

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

(B)   The extent to which the operating and maintenance costs are reduced through consolidating, co-locating, and reconfiguring space, and through realizing other operational efficiencies.

(C)   The extent to which the utilization rate is being maximized and is consistent with non-governmental industry standards for the given function or operation.

(D)   The extent and timing of potential costs and savings, including the number of years, beginning with the date of completion of the proposed recommendation.

(E)   The extent to which reliance on leasing for long-term space needs is reduced.

(F)   The extent to which a civilian real property aligns with the current mission of the Federal agency.

(G)   The extent to which there are opportunities to consolidate similar operations across multiple agencies or within agencies.

(H)   The economic impact on existing communities in the vicinity of the civilian real property.

(I)   The extent to which energy consumption is reduced.

(J)   The extent to which public access to agency services is maintained or enhanced."

107.   Additionally, Section 11(c) mandates that these standards "shall incorporate and apply clear standard utilization rates to the extent that such standard rates increase efficiency and provide performance data." The utilization rates "shall be consistent throughout each applicable category of space and with nongovernment space utilization rates." *Id*.

108.   Section 11(d) provides that, after developing these standards and incorporating the relevant utilization rates, the Director of OMB "shall submit the standards, criteria, and recommendations developed pursuant to subsection (b) to the [PBRB] with all supporting information, data, analyses, and documentation." Section 11(d)(1). FASTA also directs that the "standards, criteria, and recommendations developed pursuant to subsection (b) shall be

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                                   60                   ATTORNEY GENERAL OF WASHINGTON
                                                                            Complex Litigation Division
                                                                            800 5th Avenue, Suite 2000
                                                                            Seattle, WA 98104-3188
                                                                            (206) 464-7744

published in the Federal Register" and transmitted to certain congressional committees and to the Comptroller General of the United States. Section 11(d)(2).

109.    Section 12 of FASTA sets forth the duties of the PBRB, and directs the PBRB to "identify opportunities for the Government to reduce significantly its inventory of civilian real property and reduce costs to the Government." Section 12(a).

110.    The PBRB was initially charged with identifying "not fewer than five Federal civilian real properties that are not on the list of surplus or excess as of [180 days after Board members are appointed] with a total fair market value of not less than $500,000,000 and not more than $750,000,000" ("High Value Assets"). Section 12(b)(1)(A).

111.    Section 12(b) directs the PBRB to identify the High Value Asset properties "not later than 180 days after Board members are appointed[.]" Section 12(b)(1). In identifying the High Value Assets, the PBRB is instructed that it "shall consider the factors listed in section 11(b)(3)." Section 12(b)(3).

112.    The PBRB must then transmit the list of High Value Assets to the Director of OMB and to Congress as "Board recommendations," which are subject to the approval process in Section 13 of FASTA. Section 12(b)(1)(B).

113.    Under Section 12(b)(5): "Not later than 60 days after approval of Board recommendations" any "Federal agencies with custody, control, or administrative jurisdiction over the identified properties shall submit a Report of Excess to the General Services Administration."

114.    Section 12(c) directs the PBRB that it "shall perform an independent analysis of the inventory of Federal civilian real property and the recommendations submitted pursuant to section 11." Section 12(c).

115.    Section 12(d) permits the PBRB to "receive and consider proposals, information, and other data submitted by State and local officials and the private sector," and requires the

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

61

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Board to "consult with State and local officials on information, proposals, and other data that the officials submit to the Board." Section 12(d)(1)–(2).

116.    Section 12(f) directs that the PBRB "shall conduct public hearings" and that "all testimony at such a hearing shall be presented under oath."

117.    Section 13 provides that within 30 days after receiving the PBRB's recommendations, the Director of OMB shall "conduct a review" and transmit to the PBRB and Congress a report approving or disapproving of the recommendations. Section 13(a)–(b). If the Director does not transmit to Congress an "approval and certification" within this timeframe, the PBRB's multiple-round identification process under Section 12 begins anew. Section 13(d).

118.    Should the Director of OMB transmit the recommendations to Congress, Federal agencies must "immediately begin preparations to carry out the Board's recommendations" within 60 days, and "initiate all activities necessary" to do so within two years. Section 14(a)(1). All recommended actions are to be completed within six years. Section 14(a)(2). However, when acting on a recommendation of the PBRB, the Act obligates federal agencies to "continue to act within the Federal agency's existing legal authorities." Section 14(c)(1)(A).

**C.     Federal Tribal Consultation Policies**

119.    In its dealings with tribal governments and tribal citizens, the federal government is charged with "moral obligations of the highest responsibility and trust" and should be "judged by the most exacting fiduciary standard." *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942). One of the United States' responsibilities to tribal governments is to meaningfully consult with them prior to taking action or making decisions of tribal implication.

120.    Executive Order 13175 on Consultation and Coordination with Indian Tribal Governments directed the "establish[ment] [of] regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications," to, among other things, "strengthen the United States government-to-government

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

62

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

relationships with Indian tribes."[26] Defendant Fairweather and PBRB, GSA, and NARA must consult not only with tribal governments pursuant to Executive Order 13175; according to P.L. 108-199, they must also "consult with Alaska Native Corporations on the same basis as Indian tribes under Executive Order No. 13175."[27]

121.   On November 5, 2009, President Barack Obama issued a Tribal Consultation Memorandum For the Heads of Executive Departments and Agencies affirming that "executive departments and agencies . . . are charged with engaging in regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and are responsible for strengthening the government-to-government relationship between the United States and Indian tribes."[28] The Memorandum acknowledges: "History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results." Therefore, President Barack Obama directed each federal agency to submit to Defendant OMB's Director "a detailed plan of actions the agency will take to implement the policies and directives of Executive Order 13175."

122.   According to Defendant OMB, Executive Order 13175 and President Obama's November 5, 2009, Tribal Consultation Memorandum binds "all Federal agencies," including Defendants PBRB, OMB, GSA, and NARA. Defendant GSA's Policy Toward Native American and Alaskan Tribes, for example, pledges that "GSA will consult, to the greatest extent practicable and to the extent permitted by law, with tribal governments prior to taking action or formulating policies that will significantly or uniquely affect those particular tribal governments or their tribal trust resources."

---

[26] https://www.federalregister.gov/documents/2000/11/09/00-29003/consultation-and-coordination-with-indian-tribal-governments.

[27] Pub. L. 108-199, Div. H, § 161, 118 Stat. 452 (Jan. 23, 2004), *as amended* Pub. L. 108-447, Div. H, Title V, § 518, 118 Stat. 3267 (Dec. 8, 2004).

[28] https://obamawhitehouse.archives.gov/the-press-office/memorandum-tribal-consultation-signed-president.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

123.     Defendant GSA likewise acknowledges the importance of "Tribal Consultation" on its website, recognizing that "[t]he United States has a unique legal and political relationship with Indian tribes and a special relationship with Alaska Native entities as provided in the Constitution of the United States, treaties, and federal statutes."[29] Nevertheless, neither GSA nor any other Defendant contacted any of the Plaintiff Pacific Northwest tribal governments and Alaska Native Corporations in connection with the sale of the National Archives at Seattle *before* the decision to sell that facility was made and approved.

124.     On January 23, 2020, Chairman Sullivan of Plaintiff Port Gamble S'Klallam Tribe wrote to then Acting Director of OMB (Vought) to express opposition to the decision to sell the National Archives at Seattle and transfer the historical records housed therein:

> The Sand Point Center is very important to the 272 federally-recognized tribes in the Pacific Northwest (Washington, Oregon and Idaho) and Alaska. Ours is merely one of them . . . . [O]ur Tribe relies upon the Sand Point Center for access to critical historical documents. Among many important historical materials housed at Sand Point are the original copies of correspondence between Governor Stevens, Indian agents, and Tribal leaders during treaty negotiations in the mid-19th Century, as well as original drafts of the treaties themselves. The facility also houses critical and hard-to-reproduce historical information related to the area tribes.
>
> If the Sand Point Center is closed, all of its archival materials will need to be moved. We understand the records will be sent all the way to Kansas City, Missouri and other archived materials will be sent to Riverside, California. Obviously, such new locations will make it much harder for our Tribe and those in the Pacific Northwest and Alaska to access these historically important and culturally significant archived records and materials. A sale of the Sand Point Center will undoubtedly have an impact on tribes. In fact, it will be a profound, negative and irreparable impact. Yet the Public Buildings Reform Board, the National Archives and Records Administration, the Office of Management and Budget, nor any other federal agency has engaged in government-to-government consultation as required by Executive Order 13175. Worse, the federal agencies did not even alert Tribes about the proposed sale. We learned about it through a news source.

125.     On January 24, 2020, Chairman Ron Allen of Plaintiff Jamestown S'Klallam Tribe also wrote then Acting Director of OMB (Vought), "urgently requesting that the sale and

---

[29] GSA, Tribal Consultation, https://www.gsa.gov/node/79654.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

64

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

transfer of the Sand Point Archive must be slowed down, carefully analyzed, and ultimately reconsidered and reversed." Chairman Allen continued:

> Under the FASTA process, the OMB must make its decision to approve or deny the sale within days. If OMB gives the green light, the sale process then gets fast-tracked under FASTA's guidelines. Doing so without having consulted with the area Tribes is improper and the process should and must be halted and analyzed correctly.
>
> The recommendation for sale is on a fast track under FASTA's expedited timelines. The impacts from the transfer of the archived materials, which represent the archived history and information on the 272 Federally recognized Tribes in the Pacific Northwest and Alaska, will be profound and irreparable. And yet, this decision has been made without following the government-to-government consultation requirements of Executive Order 13175. *** [N]owhere during this process were the area's Tribes consulted as required under Section 5(a) of E.O. 13175, despite the clear "Tribal implications" of this move.

126. On February 6, 2020, Chairman Rodney Cawston of the Confederated Tribes of the Colville Reservation also wrote then Acting Director of OMB (Vought) in "unequivocal opposition" to the decision to sell the National Archives at Seattle, explaining:

> The CTCR were never consulted during PBRB's process of formulating its recommendations or during OMB's consideration of these recommendations, despite the fact that the closure of the facility will have substantial direct effects on the CCTR and is, therefore, subject to the provisions of Executive Order 13175 – Consultation and Coordination with Indian Tribal Governments. Furthermore, the closure of this facility is a federal undertaking as defined within the National Historic Preservation Act that, similarly, mandates consultation with Tribes. Furthermore, the PBRB did not consider the negative impacts of the closure on Tribes and other stakeholders as required by Section 11(b)(3) of the Federal Assets and Sale and Transfer Act (FASTA). . . . [W]e urge OMB to reverse its decision to approve PBRB's recommendations regarding the closure and sale of NARA's facility and to engage in meaningful consultation with the CTCR and other affected Tribes prior to taking any further action regarding the facility . . .

127. On February 11, 2020, *after* the decision to sell the National Archives at Seattle was made and approved, NARA officials conducted a meeting with a few tribal officials at that facility. No more than forty people were allowed to attend the meeting and only three tribal representatives were permitted to address NARA officials with concerns about the decision to sell National Archives facility in Sand Point and transfer the historical records housed therein. NARA officials gave only three business days' notice of the meeting. No federal officials with

1   policymaking authority attended the meeting. Officials and representatives for Plaintiffs Port
2   Gamble S'Klallam, Samish, and Siletz Tribes, advised NARA officials the meeting was not a
3   consultation as contemplated by Executive Order 13175.

4       128.   On February 24, 2020, Chairman Sullivan wrote NARA officials in follow up to
5   the February 11, 2020, meeting, expressing that Plaintiff Port Gamble S'Klallam Tribe is
6   "primarily concerned with ensuring the collections maintained by the National Archives Records
7   Administration at the Sand Point facility, remain accessible in the Pacific Northwest."

8       129.   Defendants have never consulted with any affected tribal governments or Alaska
9   Native Corporations, including Plaintiffs Aleutian Islands Pribilof Association, Confederated
10  Tribes of the Chehalis Reservation, Chickaloon Village Traditional Council, Confederated
11  Tribes of the Colville Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw
12  Indians, Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Confederated Tribes of the
13  Grand Ronde Community of Oregon, Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel
14  Tribe of Indians, The Klamath Tribes, Metlakatla Indian Community, Muckleshoot Indian Tribe,
15  Nisqually Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute Tribe
16  of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Sauk-Suiattle Indian
17  Tribe, Shoalwater Bay Tribe, Confederated Tribes of Siletz Indians, Skokomish Indian Tribe,
18  Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Tanana Chiefs
19  Conference, Central Council of the Tlingit & Haida Indian Tribes of Alaska, Confederated
20  Tribes of the Umatilla Indian Reservation, Confederated Tribes of the Warm Springs
21  Reservation of Oregon, and Confederated Tribes and Bands of the Yakama Nation regarding
22  either the sale of the National Archives at Seattle or the transfer of the historical records housed
23  therein.

24      130.   These Plaintiffs, based on Executive Order 13175 and the Obama Tribal
25  Consultation Memorandum, as well as on experience and observation of agency consultation
26  practices prior to and since the adoption of those authorities, believe that one or more of

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

66

1    Defendants PBRB, OMB, GSA, and NARA may have adopted an internal policy requiring tribal

2    consultation that governs these circumstances, and further believe that the evidentiary support

3    for the existence and applicability of such federal internal tribal consultation policies could likely

4    be developed after a reasonable opportunity for further investigation or discovery.

5    **D.    The National Archives at Seattle Is Exempt from Sale under FASTA**

6          131.    "Properties used in connection with Federal programs for agricultural,

7    recreational, or conservation purposes, including research in connection with the programs," are

8    exempt from sale under FASTA. Section 3(5)(B)(viii).

9          132.    The National Archives at Seattle falls within the Section 3(5)(B)(viii) exemption.

10         133.    The National Archives at Seattle is used for "research in connection with" a

11   variety of "Federal programs for agricultural, recreational, or conservation purposes." For

12   example, research at the National Archives at Seattle is frequently undertaken in conjunction

13   with nominations to the National Park Service's National Register of Historic Places, which is

14   "part of a national program to coordinate and support public and private efforts to identify,

15   evaluate, and protect America's historic and archeological resources."[30] Seattle Archives

16   research is also used to develop signage and educational materials for national parks, trails, and

17   conservation areas. And Pacific Northwest tribal governments and Alaska Native Corporations

18   frequently consult the National Archives at Seattle for research used to vindicate rights that are

19   established or protected by ecological conservation, agricultural, and recreational programs of

20   the Federal government, and to implement federally funded programs under the Indian Self

21   Determination and Education Assistance Act, among other statutes.

22         134.    Research at the National Archives at Seattle also is frequently required for both

23   the federal government, tribal governments, and others to comply with numerous federal laws

24   for conservation, including the National Historic Preservation Act, 54 U.S.C. § 306102 *et seq.*

25   (NHPA).

26   _____

[30] National Register of Historic Places, https://www.nps.gov/subjects/nationalregister/index.htm.

135.     The NHPA requires that each federal agency establish a "preservation program" for the protection of historic property. The National Park Service has established a Tribal Preservation Program to "assist Indian tribes in preserving their historic properties and cultural traditions through the designation of Tribal Historic Preservation Offices (THPO) and through annual grant funding programs."[31] The grant funding programs for historic preservation include Tribal Historic Preservation grants to assist tribes in complying with the National Historic Preservation Act,[32] Tribal Heritage Grants to assist tribal governments with cultural and historic preservation projects,[33] and numerous other federal preservation grant programs administered by the National Park Service's State, Tribal, Local, & Grants Division.[34]

136.     The NHPA requires the federal government agencies to identify whether a federal action "has the potential to cause effects on historic properties," including "possible historic properties not yet identified" and sites that "may possess religious and cultural significance" to tribal governments. *See* 36 C.F.R. §§ 800.3–.4. If the federal action has such potential, the NHPA obligates the federal agency to consult with the appropriate State Historic Preservation Officer and/or Tribal Historic Preservation Officer, involve the public and other consulting parties, and determine how to resolve potential adverse effects. *See* 36 C.F.R. §§ 800.3–.6. To comply with the NHPA and related federal agency preservation programs and federal preservation grants, the federal government, tribal governments, and states regularly consult archival records to identify the significance of the site at issue and the potential stakeholders who must be consulted.

137.     The federal government also delegates its conservation, agricultural, and recreational related research duties to Indian tribes and, where authorized, tribal organizations, under the Indian Self-Determination and Education Assistance Act, Pub. L. 93-638 (ISDEAA). Under "638" or self-governance funding agreements, Indian tribes and, where authorized, tribal

---

[31] https://www.nps.gov/thpo/index.html.
[32] https://www.nps.gov/thpo/grants/index.html.
[33] https://www.nps.gov/thpo/tribal-heritage/index.html.
[34] *See generally* https://www.nps.gov/orgs/1623/index.htm.

organizations assume responsibility for implementation of federal programs, for example, to conserve natural and cultural resources. For example, Plaintiff Port Gamble S'Klallam Tribe has assumed federal program and research responsibilities to mitigate the environmental effects of climate change and conserve forestry and fish and game habitat on and around the Kitsap and Olympic Peninsulas:

> Since at least 2015, the Tribe has received federal Cooperative Landscape Conservation—Climate Adaption funding from the Interior Department as part of our self-governance funding agreement . . . . The Tribe has used those federal program dollars to conduct a climate change impact assessment within our usual and accustomed Treaty fishing areas. In particular, the Tribe has researched on behalf of the United States the causes of high temperatures and low oxygen levels in Western Washington rivers and streams that threaten salmon species . . . . Through the Northwest Indian Fisheries Commission, the Tribe has received additional monies from the Interior Department under a 2018 contract for "Modeling Elk Response to Ecological Changes in Warming Climate." . . . Most recently, the Tribe received federal program dollars to research and study the risk to tribal shellfish resources from accelerating bluff erosion . . . Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with all of these federal climate change-related conservation program and research efforts.

> For many years, the Tribe has also received self-governance funding from the Interior Department for forestry management on the Kitsap and Olympic Peninsulas . . . . With federal [Timber, Fish and Wildlife] dollars, Tribal Natural Resources Department staff research and study impacts to wetlands and salmon streams caused by certain logging projects on the Kitsap and Olympic Peninsulas. Tribal Natural Resources Department staff have also used records obtained by the Tribe from the National Archives at Seattle in connection with such federal forestry and habitat conservation efforts.

> Jeromy Sullivan, Tribal Chairman of the Port Gamble S'Klallam Tribe.

138.    In addition, NARA has its own programs for conserving archival documents including those housed at the Seattle Archives Facility. NARA's Conservation Division is generally responsible for document conservation.[35] NARA also has a unit known as the "Document Conservation Laboratory" or "Conservation Lab." According to NARA's website, the Conservation Lab "is responsible for conservation activities which contribute to the prolonged usable life of records in their original format. Among other activities, the

---

[35] https://www.archives.gov/preservation/preservation/conservation-division.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

69

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Conservation Lab "repairs and stabilizes textual records (un-bound papers, bound volumes, and cartographic items) and photographic images among the holdings of [NARA] and provides custom housings for these records as needed."[36]

139.   NARA's website defines "Conservation" as follows: "Conservation attempts to preserve records in their original format. Conservators examine records and assess their condition and the materials which comprise them. Conservators then recommend remedial treatments to arrest deterioration to improve condition. As they perform the recommended treatments, conservators carefully document the condition of the record as well as the procedures performed and materials used."[37]

140.   NARA also conducts conservation-related activities as to documents housed at the National Archives at Seattle.

141.   In addition, the National Archives at Seattle is used for "research in connection with" NARA's conservation-related activities, because its conserved records are available to and used by researchers, historians, genealogists, tribes, and others.

**E.     Defendants Failed to Comply with FASTA's Procedural Requirements**

142.   Despite FASTA's passage in 2016, a quorum of five PBRB members were not sworn in until May 2019.

143.   As the PBRB publicly acknowledged in its High Value Assets Report to OMB, it "encountered significant challenges as it developed the [High Value Asset] disposal recommendations" required by FASTA.[38] Specifically, FASTA required the PBRB, not later than 180 days after a quorum of members was appointed, to identify for disposal not fewer than five Federal civilian real properties, that were not on the list of surplus or excess, with a total fair

---

[36] https://www.archives.gov/open/plain-writing/examples/preservation-programs-before.html.
[37] Id.
[38] High Value Assets Report: Key Findings and Recommendations Pursuant to the Federal Asset Sales and Transfer Act of 2016 (hereinafter, the "PBRB High Value Assets Report"), at 12, available at https://www.pbrb.gov/assets/uploads/20191227%20High%20Value%20Assets%20Report%20as%20Required%20by%20FASTA.pdf.

market of not less than $500 million and not more than $750 million, and transmit the list of properties to the Director of OMB as Board recommendations. FASTA, Section 12(b)(1). According to the agency, "FASTA's aggressive timeframe forced the PBRB to focus on properties already for sale and unneeded vacant land that can be sold quickly."[39]

144.    In addition to challenges caused by FASTA's accelerated statutory timeframe, the PBRB faced additional "formidable" challenges "due to the procedure and time required to qualify the PBRB as an independent agency."[40] As a result, "PBRB members did not have Government ID's for over 2 months after being sworn in, and the PBRB had no staff for the first 4 months, leaving substantial work to be accomplished in just 8 weeks."[41]

145.    On October 31, 2019, approximately five months after a quorum of the Board was established, the PBRB notified OMB that it was submitting its first set of recommendations pursuant to Section 11 of FASTA. The PBRB included with its three-page letter a one-page list of fourteen High Value Asset properties that it recommended for disposal. One of those properties was the National Archives at Seattle. The only information contained on the list was the name, location, and custodial agency of each property.

146.    On November 27, 2019, OMB notified the PBRB that it disapproved of the recommendations due to a lack of supporting information or financial execution plan. OMB gave the PBRB 30 days to resubmit its recommendations.

147.    On December 27, 2019, the PBRB submitted a revised list of twelve High Value Asset properties to OMB, and this time included a "High Value Assets Report" that included the purported bases for its designation of the twelve properties, including the National Archives at Seattle.

148.    On January 24, 2020, OMB summarily accepted the PBRB's recommendations.

---

[39] Id.
[40] Id. at 12.
[41] Id.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

71

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

149.    Throughout this process, OMB did not satisfy even its most basic statutory obligations under Sections 11(b) through 11(d) of FASTA, including the requirement that it work with the GSA Administrator to develop, submit, and publish "consistent standards and criteria against which the agency recommendations will be reviewed" as well as "recommendations" to the PBRB based on those standards and criteria.

150.    Upon information and belief, OMB did not develop, and has never developed, the standards, criteria, and recommendations required by Section 11(b) of FASTA. As the PBRB explained in its High Value Assets Report: "Unfortunately, the PBRB did not benefit from the Section 11 FASTA directive that OMB, in consultation with GSA, develop standards and criteria to use in evaluating agency submissions and making recommendations to the PBRB. To the best of PBRB's knowledge, the standards and criteria were never developed."[42] In its discussion of "OMB Engagement" in its Report, the PBRB further explained that "defined standards, criteria, and recommendations would have significantly reduced the PBRB's challenges."[43]

151.    By failing to develop these statutorily-required standards, criteria, and recommendations, OMB also failed to comply with numerous other statutory requirements, including: "submit[ting] the standards, criteria, and recommendations developed pursuant to [Section 11] subsection (b) to the Board with all supporting information, data, analyses, and documentation"; publishing its "standards, criteria, and recommendations" in the Federal Register; and transmitting its standards, criteria, and recommendations to the Committee on Transportation and Infrastructure of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Environment and Public Works of the Senate, the Committees on Appropriations of the House of Representatives and the Senate, and the Comptroller General of the United States, as specified in FASTA. Section 11(d).

---

[42] PBRB High Value Assets Report at 10.
[43] *Id.* at 12.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

72

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

152.    OMB's failure to develop the standards, criteria, and recommendations required by Section 11(b) of FASTA is particularly difficult to understand given that President Trump appointed all of the individuals to the PBRB and, therefore, controlled the statutory timetable on which the PBRB had to identify and transmit to OMB a list of not fewer than five High Value Assets for disposal with a fair market value between $500–750 million. OMB could have developed its standards, criteria, and recommendations prior to or immediately after the President appointed a quorum of PBRB members, but failed to do so.

153.    According to the PBRB High Value Assets Report, agencies submitted their recommendations of properties that could be sold or otherwise disposed of to the Director of OMB and the GSA Administrator on December 7, 2018, and then submitted their recommendations for leaseback opportunities on June 6, 2019.[44] FASTA required the OMB Director, in consultation with the GSA Administrator, to develop "consistent standards and criteria against which the agency recommendations [were to] be reviewed," and recommendations based on those standards and criteria by "[n]ot later than 60 days" after those agency submission deadlines. OMB's complete failure to satisfy Congress's directive to promulgate these standards, criteria, and recommendations violated the law.

154.    In addition, OMB's failure to develop and publish its standards, criteria, and recommendations in the Federal Register and transmit them to the Committee on Transportation and Infrastructure of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Environment and Public Works of the Senate, the Committees on Appropriations of the House of Representatives and the Senate, and the Comptroller General of the United States, as required by FASTA, also lessened the ability of both the public and Congress to oversee this important process.

---

[44] PBRB High Value Assets Report at 7.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

73

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

155.     And because it never developed its own standards, criteria, and recommendations as required by FASTA, OMB lacked the statutorily-prescribed factual basis upon which to review and assess the PBRB's recommendations.

156.     The PBRB High Value Assets Report candidly acknowledges that "defined standards, criteria, and recommendations [from OMB] would have significantly reduced the PBRB's challenges." The PBRB High Value Assets Report details other "challenges in gathering the data needed to support decision making for complex real estate transactions," and specifically acknowledges "extraordinary issues with data gaps and data integrity" in the data contained in the Federal Real Property Profile (FRPP),[45] which it "relied heavily on" for its decisionmaking.[46] As one witness testified at a PBRB public meeting, the Board's data suffered from numerous and obvious problems, such as incorrectly showing a federal building was located "in the middle of an ocean."[47]

## F.     Defendants Failed to Consult with Tribes and Other Stakeholders

157.     The PBRB compounded its errors by failing to obtain public input from state, local, or tribal officials in the Pacific Northwest. No public hearings were held in Washington, Idaho, Oregon, or Alaska. And in the four public meetings that were held (two in the District of Columbia, one in Denver, Colorado, and one in Laguna Niguel, California), there was no public identification of and/or discussion of the facility housing the National Archives at Seattle being recommended for sale.[48]

---

[45] The Federal Real Property Profile is the former government-wide inventory of information about the nature, use and extent of the Federal government's real property assets. It was developed in 2004 and housed within GSA. https://www.gsa.gov/policy-regulations/policy/real-property-policy/asset-management/federal-real-property-profile-frpp/frpp-frequently-asked-questions.

[46] Id.

[47] Transcript of PBRB Meeting held on June 17, 2019, at 107, https://www.pbrb.gov/assets/uploads/Public%20Meeting%20Transcript%20June%2017%202019%20(1).pdf.

[48] See Transcript of PBRB Meeting held on June 17, 2019, https://www.pbrb.gov/assets/uploads/Public%20Meeting%20Transcript%20June%2017%202019%20(1).pdf; Transcript of PBRB Meeting held on July 16, 2019, https://www.pbrb.gov/assets/uploads/PBRB%20Public%20Meeting%20July%2016%2C%20Agenda.pdf; Transcript of PBRB Meeting held on July 24, 2019, https://www.pbrb.gov/assets/uploads/Public%20Meeting%20July%2024th%20Laguna%20Niguel%20Notes.pdf; Transcript of PBRB Meeting held on July 25, 2019,

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

74

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

158.    Moreover, by failing to consult with tribal officials prior to recommending the facility housing the National Archives at Seattle for sale and the resultant transfer of the historical records housed therein, the PBRB failed to account for the agency tribal consultation policies that bind OMB, GSA, and NARA, and failed to consider the tribal importance of the records housed there. In an October 2020 PBRB meeting, one of the PBRB's members conceded that tribal governments had not been consulted with respect to its selection of properties, stating that "[w]ith respect to tribal entities, I guess, that hasn't been brought to our attention before that there was an interest there," even while acknowledging "if they are a stakeholder in a property, certainly we would want to consult with them."[49] By this time, the Federal Government had received extensive feedback from tribal governments and other stakeholders who expressed their opposition to the sale after learning of it in January 2020.

159.    As a result, the decisions to recommend and approve both the sale of the facility housing the National Archives at Seattle and the transfer of the historical records housed therein were made without the necessary consultation with Pacific Northwest tribal governments and Alaska Native Corporations, who will be severely impacted by the closure of the National Archives at Seattle.

160.    There also was no informed consideration of the significant negative impact that closure of the National Archives at Seattle will have on "public access to agency services[.]" Section 11(b)(3)(J).

161.    The legislative history of FASTA emphasizes, the "requirement to consider whether public access to agency services is maintained or enhanced in the standards and criteria the Board use to develop its recommendations," and notes that "OMB is responsible for developing th[ose] standards and criteria," and that the requirement should "help prevent

---

https://www.pbrb.gov/assets/uploads/Notes%20Denver%20Public%20meeting%20July%2025th%202019%20(1).pdf.

[49]    Transcript of PBRB Meeting held on Oct. 1, 2020, at 23:8-24:10, https://www.pbrb.gov/assets/uploads/October%201%202020%20Public%20Meeting%20-%20Agenda%20and%20Presentation.pdf.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

75

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

unintended, negative consequences of transferring agency services."[50] Based upon the lack of information solicited regarding the public's use of the National Archives at Seattle facility, and OMB's failure to develop standards and criteria incorporating the issue of public access, the type of "unintended, negative consequences" Congress sought to prevent have resulted here.

162.    These numerous multi-agency procedural and substantive failures render the decision to sell the National Archives at Seattle contrary to FASTA and thus a legal nullity. Defendants' failure to consult with Pacific Northwest tribal governments and Alaska Native Corporations also violates federal and agency-specific policy requiring such consultation.

163.    In October 2020, the PBRB posted meeting minutes on its website which disclosed that the PBRB, in consultation with GSA and OMB, had decided to bundle the National Archives at Seattle with the other eleven High Value Asset properties, and would bring all 12 properties to market "by early 2021," rather than selling the properties individually over the course of the year as previously planned.[51] PBRB officials claimed that the COVID-19 pandemic's effects on the commercial real estate market justified its new sales approach and timeline.[52]

164.    Despite significant public interest in the planned closure and sale of the National Archives at Seattle, Defendants never reached out to interested stakeholders—in particular, to state and tribal officials—to notify them of Defendants' plans to bring all twelve federal properties to market "by early 2021."[53]

---

[50] Committee Statement and Views, Purpose and Summary of H.R. 4465 (FASTA), https://www.congress.gov/114/crpt/hrpt578/CRPT-114hrpt578-pt2.pdf at 18 (discussing "Public access consideration").
[51] See PBRB website, "Updates," https://www.pbrb.gov/; Materials and Transcript of PBRB Meeting held on Oct. 1, 2020, https://www.pbrb.gov/assets/uploads/October%201%202020%20Public%20Meeting%20-%20Agenda%20and%20Presentation.pdf.
[52] PBRB website, "Updates," https://www.pbrb.gov/.
[53] Id.

# V.   CLAIMS FOR RELIEF

### Count I
### *By All Plaintiffs against All Defendants*
### Violation of the Administrative Procedure Act, Section 706(2)—
### Agency Action in Excess of Statutory Authority and Contrary to Law

165.   Plaintiffs reallege and reincorporate by reference the allegations in each of the preceding paragraphs.

166.   This Court must "hold unlawful and set aside agency action" that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

167.   As described above, FASTA applies only to the sale of "Federal civilian real property" and "civilian real property."

168.   Excluded from the definition of "[f]ederal civilian real property" and "civilian real property" are "[p]roperties used in connection with Federal programs for agricultural, recreational, or conservation purposes, including research in connection with the programs." FASTA, Section 3(5)(B)(viii).

169.   The National Archives at Seattle is used for "research in connection with" a variety of "Federal programs for agricultural, recreational, or conservation purposes." For example, research at the National Archives at Seattle is frequently undertaken in conjunction with nominations to the National Park Service's National Register of Historic Places, which is "part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect America's historic and archeological resources."[54] Seattle Archives research is also used to develop signage and educational materials for national parks, trails, and conservation areas. And Pacific Northwest tribal governments and Alaska Native Corporations frequently consult the National Archives at Seattle to vindicate rights that are established or protected by ecological conservation, agricultural, and recreational programs of the Federal

---

[54] National Register of Historic Places, https://www.nps.gov/subjects/nationalregister/index.htm.

77

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

government, and to implement federal programs using federal funds pursuant to statutes such as the Indian Self Determination and Education Assistance Act.

170.   In addition, the National Archives at Seattle is a property used in connection with NARA's preservation programs for conservation of records because it houses records subject to such conservation. Moreover, those conserved records are available to be used by researchers, historians, tribes, and others, meaning the facility is also used for "research in connection with" NARA's conservation programs.

171.   Accordingly, the National Archives at Seattle is not a "Federal civilian real property" eligible to be sold under FASTA.

172.   The actions taken by Defendants to nevertheless prepare for and effectuate the sale of the National Archives at Seattle are in excess of statutory authority under FASTA, and must be invalidated and set aside.

173.   Absent declaratory and injunctive relief vacating Defendants' recommendation to sell the National Archives at Seattle and/or prohibiting the sale from going into effect, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

174.   The Court should enjoin and vacate the agencies' actions to prepare for and effectuate the sale of the National Archives at Seattle as contrary to law and *ultra vires* under 5 U.S.C. § 706(2).

## Count II
### *By All Plaintiffs against GSA, OMB, Fairweather, and Kale*
### Violation of the Administrative Procedure Act, Section 706(1)—
### Agency Action Unlawfully Withheld or Unreasonably Delayed

175.   Plaintiffs reallege and reincorporate by reference the allegations in each of the preceding paragraphs.

176.   This Court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

78

177.     Agency action may be unlawfully withheld or unreasonably delayed where, *inter alia*, Congress has provided a timetable that the agency failed to meet; the delayed action is a relatively high agency priority; or the delay prejudices the interests of stakeholders or the public. *See Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*"); *Agua Caliente Tribe of Cupeno Indians of Pala Reservation v. Sweeney*, 932 F.3d 1207, 1216 n.7 (9th Cir. 2019). The court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80.

178.     Sections 11(b)–11(d) of FASTA require OMB, in consultation with GSA, to provide the PBRB with certain standards, criteria, and recommendations, which must incorporate, *inter alia*, standard utilization rates for the properties in question. This requirement must be completed "not later than 60 days after" the deadline for other federal agencies to submit their recommendations under Section 11(a). OMB's standards, criteria, and recommendations, along with "all supporting information, data, analyses, and documentation," must be submitted to the PBRB, and "shall be published in the Federal Register" and transmitted to numerous congressional committees and the Comptroller General of the United States.

179.     These requirements are a core function of FASTA, and ensure that public interests are adequately accounted for when deciding whether to sell federal property.

180.     OMB, in consultation with GSA, had a discrete statutory duty to "develop consistent standards and criteria against which the agency recommendations will be reviewed," and OMB and GSA had a discrete statutory duty to "jointly develop recommendations to the [PBRB] based on th[ose] standards and recommendations," and lacked discretion to decline to do so.

181.     OMB also had a discrete statutory duty to submit the standards, criteria, and recommendations required by Section 11 to the PBRB, along with all supporting information, data, analyses, and documentation, and lacked discretion to decline to do so.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

79

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

182.   In addition, OMB also had a discrete statutory duty to publish its standards, criteria, and recommendations in the Federal Register and to transmit the same to certain congressional committees specified by FASTA and to the Comptroller General of the United States, and lacked discretion to decline to do so.

183.   OMB failed to complete any of its Section 11 obligations. As a result, the PBRB undertook its analysis and made its recommendations without the standards, criteria, and/or recommendations of OMB and GSA and without OMB's supporting information, data, analyses, or documentation. And because it never developed its own standards, criteria, and recommendations, OMB lacked the statutorily-required standards against which to review the PBRB's recommendations.

184.   Despite this fundamentally flawed process, OMB nonetheless approved PBRB's recommendations under Section 13.

185.   OMB's failure to develop its own standards, criteria, and recommendations as required by Section 11 of FASTA; its failure to provide its standards, criteria, and recommendations along with its supporting information, data, analyses, and documentation to the PBRB; its failure to publish its standards, criteria, and recommendations in the Federal Register; and its failure to transmit the same to certain congressional committees specified by FASTA and to the Comptroller General of the United States, are agency actions unlawfully withheld or unreasonably delayed that should be compelled under 5 U.S.C. § 706(1).

186.   The Court should grant declaratory relief and issue a writ of mandamus requiring OMB to perform its duties under FASTA prior to any sale of the National Archives at Seattle.

**Count III**
*By All Plaintiffs against All Defendants*
**Violation of the Administrative Procedure Act, Section 706(2)—**
**Agency Action in Excess of Statutory Authority and Contrary to Law**

187.   Plaintiffs reallege and reincorporate by reference the allegations in each of the preceding paragraphs.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

80

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     188.    This Court must "hold unlawful and set aside agency action" that is, *inter alia*,

2  "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or

3  "without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

4     189.    As set forth above, FASTA establishes certain procedural requirements that must

5  be met during the process of making recommendations and decisions to sell federal property.

6  These procedural requirements were not met during the process that resulted in the

7  recommendation and decision to sell the National Archives at Seattle. OMB failed to develop

8  and transmit to the PBRB the standards, criteria, and recommendations required by Section 11

9  of FASTA, or to provide the agency with the supporting information, data, analyses, and

10  documentation. OMB also failed to publish its standards, criteria, and recommendations in the

11  Federal Register and to transmit the same to certain congressional committees specified by

12  FASTA and to the Comptroller General of the United States.

13     190.    As a result of these procedural violations, the subsequent actions taken by

14  Defendants to prepare for and effectuate the sale of the National Archives at Seattle are void *ab*

15  *initio*. They are in excess of statutory authority under FASTA, and must be invalidated and set

16  aside.

17     191.    Absent declaratory and injunctive relief vacating Defendants' recommendation

18  to sell the National Archives at Seattle and/or prohibiting the sale from going into effect,

19  Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' illegal

20  actions.

21     192.    The Court should enjoin and vacate the agencies' actions to prepare for and

22  effectuate the sale of the National Archives at Seattle as contrary to law and *ultra vires* under 5

23  U.S.C. § 706(2).

24

25

26

1

**Count IV**
*By Plaintiffs Aleutian Islands Pribilof Association, Confederated Tribes of the Chehalis*

2

*Reservation, Chickaloon Village Traditional Council, Confederated Tribes of the Colville*
*Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians, Cow Creek*

3

*Band of Umpqua Tribe of Indians, Doyon, Ltd., Confederated Tribes of the Grand Ronde*
*Community of Oregon, Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of*

4

*Indians, The Klamath Tribes, Metlakatla Indian Community, Muckleshoot Indian Tribe,*
*Nisqually Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute*

5

*Tribe of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Sauk-*
*Suiattle Indian Tribe, Shoalwater Bay Tribe, Confederated Tribes of Siletz Indians,*

6

*Skokomish Indian Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal*
*Community, Tanana Chiefs Conference, Central Council of the Tlingit & Haida Indian*

7

*Tribes of Alaska, Confederated Tribes of the Umatilla Indian Reservation, Confederated*
*Tribes of the Warm Springs Reservation of Oregon, and Confederated Tribes and Bands of*

8

*the Yakama Nation against All Defendants*
**Violation of the Administrative Procedure Act, Sections 706(1) and 706(2)—**

9

**Failure to Engage in Tribal Consultation**

10

11        193.    Plaintiffs Aleutian Islands Pribilof Association, Confederated Tribes of the

12    Chehalis Reservation, Chickaloon Village Traditional Council, Confederated Tribes of the

13    Colville Reservation, Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians,

14    Cow Creek Band of Umpqua Tribe of Indians, Doyon, Ltd., Confederated Tribes of the Grand Ronde

15    Community of Oregon, Hoh Indian Tribe, Jamestown S'Klallam Tribe, Kalispel Tribe of

16    Indians, The Klamath Tribes, Metlakatla Indian Community, Muckleshoot Indian Tribe,

17    Nisqually Indian Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe of Indians, Quileute Tribe

18    of the Quileute Reservation, Quinault Indian Nation, Samish Indian Nation, Sauk-Suiattle Indian

19    Tribe, Shoalwater Bay Tribe, Confederated Tribes of Siletz Indians, Skokomish Indian Tribe,

20    Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Tanana Chiefs

21    Conference, Central Council of the Tlingit & Haida Indian Tribes of Alaska, Confederated

22    Tribes of the Umatilla Indian Reservation, Confederated Tribes of the Warm Springs

23    Reservation of Oregon, and Confederated Tribes and Bands of the Yakama Nation ("Count IV

24    Tribal Plaintiffs") reallege and reincorporate by reference the allegations in each of the preceding

25    paragraphs.

26

194.    Under the APA, this Court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). This Court must also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

195.    An agency must comply with its own internal policies even if those policies are more rigorous than procedures required by the APA.

196.    Where a federal agency has established a policy requiring prior consultation or coordination with affected tribal governments, and therefore created a justified expectation that each affected tribal government or Alaska Native corporation will receive a meaningful opportunity to express its views before policy or decisions are made, that opportunity must be given.

197.    Defendants failed to consult or coordinate with affected Pacific Northwest tribal governments and Alaska Native Corporations or fully comply with OMB, GSA, PBRB, and/or NARA tribal consultation policies and other federal-tribal consultation law and policy prior to recommending and authorizing the sale of the facility housing the National Archives at Seattle and transfer of the historical records of use and interest to affected Pacific Northwest tribal governments and Alaska Native Corporations, including Count IV Tribal Plaintiffs. Defendants unlawfully withheld or unreasonably delayed consultation or coordination with Count IV Tribal Plaintiffs.

198.    Defendants' agency actions are illegal, arbitrary, and capricious, and abuses of discretion.

199.    Absent declaratory and injunctive relief vacating Defendants' recommendation to sell the National Archives at Seattle and transfer the records housed therein and/or prohibiting that sale and transfer from going into effect, Count IV Tribal Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

83

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

200.   The Court should enjoin and vacate the agencies' actions to prepare for and effectuate the sale of the National Archives at Seattle under 5 U.S.C. § 706(2) and compel agency consultation under 5 U.S.C. § 706(1).

## VI.   PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court:

a.    Declare that OMB, Fairweather, GSA, and Kale have unlawfully withheld or unreasonably delayed the performance of their mandatory duties under FASTA;

b.    Issue a writ of mandamus requiring OMB, Fairweather, GSA, and Kale to perform their duties under FASTA prior to any sale of the facility housing the National Archives at Seattle;

c.    Issue a writ of mandamus requiring Defendants to perform their duties under federal-tribal consultation law and policy prior to any sale of the facility housing the National Archives at Seattle and any transfer of the historical records housed therein;

d.    Declare that the National Archives at Seattle is ineligible for selection under FASTA and therefore, the actions of Defendants to prepare for and effectuate the sale of the National Archives at Seattle are in excess of statutory authority and are *ultra vires*, and that such actions are vacated and set aside;

e.    Declare that the actions of Defendants to prepare for and effectuate the sale of the National Archives at Seattle are not in accordance with law, in excess of statutory authority, without observance of procedure required by law, and are ultra vires, and that such actions are vacated and set aside;

f.    Declare that the actions of Defendants to prepare for and effectuate the sale of the National Archives at Seattle are illegal, arbitrary, and capricious, and abuses of discretion for want of consultation or coordination with affected tribal governments and Alaska Native Corporations and violate the agencies' own tribal consultation policies, and that such actions are vacated and set aside;

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC                    84                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1          g.      Issue a preliminary and a permanent injunction prohibiting Defendants from

2    taking any further actions to effectuate the sale of the National Archives at Seattle;

3          h.      Award Plaintiffs their costs and reasonable attorneys' fees; and

4          i.      Award such other and further relief as the interests of justice may require.

5          DATED this 25th day of January 2021.

6                                ROBERT W. FERGUSON
                            Washington State Attorney General
7

8                                */s/ Lauryn K. Fraas*
                            LAURYN K. FRAAS, WSBA #53238

9                                NATHAN BAYS, WSBA #43025
                            KRISTIN BENESKI, WSBA #45478

10                               SPENCER COATES, WSBA #49683
                            Assistant Attorneys General

11                               Lauryn.Fraas@atg.wa.gov
                            Nathan.Bays@atg.wa.gov

12                               Kristin.Beneski@atg.wa.gov
                            Spencer.Coates@atg.wa.gov

13                               *Attorneys for Plaintiff State of Washington*

14                               ALEUTIAN PRIBILOF ISLANDS ASSOCIATION,
                            INC.
15

16                               */s/ Geoffrey D. Strommer*
                            GEOFFREY D. STROMMER, WSBA #43308

17                               Hobbs Straus Dean & Walker, LLP
                            215 SW Washington Street, Suite 200

18                               Portland, OR 97214
                            503.242.1745

19                               GStrommer@hobbsstraus.com
                            *Attorney for Plaintiff Aleutian Pribilof Islands*

20                               *Association Inc.*

21

22

23

24

25

26

FIRST AMENDED COMPLAINT          85          ATTORNEY GENERAL OF WASHINGTON
NO. 2:21-cv-00002-JCC                      Complex Litigation Division
                                                800 5th Avenue, Suite 2000
                                                Seattle, WA 98104-3188
                                                (206) 464-7744

| | |
|---|---|
| 1 | AMERICAN HISTORICAL ASSOCIATION |
| 2 | */s/ Harry H. Schneider, Jr.* |
| | HARRY H. SCHNEIDER, JR., WSBA #9404 |
| 3 | Perkins Coie LLP |
| | 1201 Third Avenue, Suite 4900 |
| 4 | Seattle, WA 98101-3099 |
| | 206.359.8000 |
| 5 | hschneider@perkinscoie.com |
| 6 | */s/ Alison M. Dreizen* |
| | ALISON M. DREIZEN, *admitted pro hac vice* |
| 7 | Carter Ledyard & Milburn LLP |
| | Two Wall Street |
| 8 | New York, NY 10005 |
| | 212.238.8855 |
| 9 | dreizen@clm.com |
| | *Attorneys for Plaintiff American Historical* |
| 10 | *Association* |
| 11 | |
| 12 | ASSOCIATION OF KING COUNTY HISTORICAL ORGANIZATIONS, HISTORIC SEATTLE, |
| | HISTORYLINK, MUSEUM OF HISTORY AND |
| 13 | INDUSTRY, and WASHINGTON TRUST FOR |
| | HISTORIC PRESERVATION |
| 14 | |
| | */s/ Paul J. Lawrence* |
| 15 | PAUL J. LAWRENCE, WSBA #13557 |
| | ALANNA E. PETERSON, WSBA #46502 |
| 16 | Pacific Law Group |
| | 1191 2nd Avenue, Suite 2000 |
| 17 | Seattle, WA 98101-3404 |
| | 206.245.1700 |
| 18 | alanna.peterson@pacificalawgroup.com |
| | paul.lawrence@pacificalawgroup.com |
| 19 | *Attorneys for Plaintiffs Association of King County* |
| | *Historical Organizations, Historic Seattle,* |
| 20 | *HistoryLink, Museum of History and Industry, and* |
| | *Washington Trust For Historic Preservation* |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

86

CENTRAL COUNCIL OF TLINGIT & HAIDA
INDIAN TRIBES OF ALASKA, DOYON, LTD.,
and TANANA CHIEFS CONFERENCE

*/s/ Richard D. Monkman*

LLOYD B. MILLER, *admitted pro hac vice*
RICHARD D. MONKMAN, WSBA #35481
Sonosky, Chambers, Sachse, Miller & Monkman,
LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
907.258.6377
lloyd@sonosky.net
rdm@sonosky.net
*Attorneys for Plaintiffs Doyon, Ltd., Tanana Chiefs
Conference, and Central Council of Tlingit & Haida
Indian Tribes of Alaska*


CHICKALOON VILLAGE TRADITIONAL
COUNCIL*

* *Appearance of counsel forthcoming*


CHINESE AMERICAN CITIZENS ALLIANCE

*/s/ Darin Sands*

DARIN SANDS, WSBA #35865
HEIDI B. BRADLEY, WSBA #35759
Bradley Bernstein Sands
P.O. Box 4120, PMB 62056
Portland, OR 97208-4120
503.734.2480
dsands@bradleybernsteinllp.com
hbradley@bradleybernsteinllp.com
*Attorneys for Plaintiff Chinese American Citizens
Alliance*

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

87

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    CONFEDERATED TRIBES AND BANDS OF THE
     YAKAMA NATION

2

3    */s/ Ethan Jones*
     ETHAN JONES, WSBA #46911
4    ANTHONY ARONICA, WSBA #54725
     Yakama Nation Office of Legal Counsel
5    P.O. Box 151, 401 Fort Road
     Toppenish, WA 98948
6    509.865.5121
     ethan@yakamanation-olc.org
7    anthony@yakamanation-olc.org
     *Attorneys for Plaintiff Confederated Tribes and Bands*
     *of the Yakama Nation*

8

9    THE CONFEDERATED TRIBES OF THE
     CHEHALIS RESERVATION

10

11   */s/ Harold Chesnin*
     HAROLD CHESNIN, WSBA #398
12   Office of Tribal Attorney
     Confederated Tribes of the Chehalis Reservation
13   420 Howanut Road
     Oakville, WA 98568
14   360.529.7465
     hchesnin@chehalistribe.org
15   *Attorney for Plaintiff The Confederated Tribes of the*
     *Chehalis Reservation*

16

17   CONFEDERATED TRIBES OF THE COLVILLE
     RESERVATION

18   */s/ Marty M. Raap*
     MARTY M. RAAP, WSBA #27962,
19   *application for admission forthcoming*
     Office of the Reservation Attorney
20   Confederated Tribes of the Colville Reservation
     P.O. Box 150
21   Nespelem, WA 99155
     509.634.2533
22   Marty.Raap.ORA@colvilletribes.com
     *Attorney for Plaintiff Confederated Tribes of the*
23   *Colville Reservation*

24

25

26

---

FIRST AMENDED COMPLAINT                    88            ATTORNEY GENERAL OF WASHINGTON
NO. 2:21-cv-00002-JCC                                         Complex Litigation Division
                                                             800 5th Avenue, Suite 2000
                                                             Seattle, WA 98104-3188
                                                                (206) 464-7744

1

2

CONFEDERATED TRIBES OF COOS, LOWER
UMPQUA AND SIUSLAW INDIANS, and
SPOKANE TRIBE OF INDIANS

3

*/s/ Richard K. Eichstaedt*
RICHARD K. EICHSTAEDT, WSBA #36487

4

SCOTT WHEAT, WSBA #25565
Wheat Law Offices

5

P.O. Box 9168
Spokane, WA 99209

6

509.209.2604
rick@wheatlawoffices.com

7

scott@wheatlawoffices.com
*Attorneys for Plaintiffs Confederated Tribes of Coos,*

8

*Lower Umpqua and Siuslaw Indians, and Spokane*
*Tribe of Indians*

9

10

CONFEDERATED TRIBES OF THE GRAND
RONDE COMMUNITY OF OREGON

11

*/s/ Nathan Alexander*

12

NATHAN ALEXANDER, WSBA #37040
Dorsey & Whitney, LLP

13

701 Fifth Avenue, Suite 6100
Seattle, WA 98104-7043

14

206.903.8791
alexander.nathan@dorsey.com

15

*Attorney for Plaintiff Confederated Tribes of The*
*Grand Ronde Community of Oregon*

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

89

1  CONFEDERATED TRIBES OF SILETZ INDIANS,
   HOH INDIAN TRIBE, and SAMISH INDIAN
2  NATION

3  */s/ Craig J. Dorsay*
   CRAIG J. DORSAY, WSBA #9245
4  LEA ANN EASTON, WSBA #38685
   KATHLEEN GARGAN, WSBA #56452
5  Dorsay & Easton LLP
   1737 Northeast Alberta Street, Suite 208
6  Portland, OR 97211
   503.790.9060
7  craig@dorsayindianlaw.com
   leaston@dorsayindianlaw.com
8  katie@dorsayindianlaw.com
   *Attorneys for Plaintiffs Hoh Indian Tribe, Samish*
9  *Indian Nation, and Confederated Tribes of Siletz*
   *Indians*
10

11  CONFEDERATED TRIBES OF THE UMATILLA
12  INDIAN RESERVATION

13  */s/ Naomi Stacy*
   NAOMI STACY, WSBA #29434
14  Lead Attorney, Office of Legal Counsel
15  46411 Timíne Way
   Pendleton, OR 97801
16  541.429.7400
   naomistacy@ctuir.org
17  *Attorney for Plaintiff the Confederated Tribes of the*
18  *Umatilla Indian Reservation*

19  THE CONFEDERATED TRIBES OF THE WARM
20  SPRINGS RESERVATION OF OREGON

21  */s/ Tyler J. Moore*
   TYLER J. MOORE, WSBA #39598
22  Karnopp Petersen, LLP
23  360 SW Bond Street, Suite 400
   Bend, Oregon 97702
24  541.382.3011
   tjm@karnopp.com
25  *Attorneys for Plaintiff The Confederated Tribes of the*
   *Warm Springs Reservation of Oregon*
26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

COW CREEK BAND OF UMPQUA TRIBE OF
INDIANS

/s/ Gabriel S. Galanda
GABRIEL S. GALANDA, WSBA #30331
ANTHONY S. BROADMAN, WSBA #39508
RYAN D. DREVESKRACHT, WSBA #42593
Galanda Broadman PLLC
P.O. Box 15416
8606 35th Avenue NE, Suite L1
Seattle, WA 98115
206.557.7509
gabe@galandabroadman.com
anthony@galandabroadman.com
ryan@galandabroadman.com
*Attorneys for Plaintiff Cow Creek Band of Umpqua
Tribe of Indians*


DUWAMISH TRIBE

/s/ Bart J. Freedman
BART J FREEDMAN, WSBA #14187
BENJAMIN A. MAYER, WSBA #45700
ENDRE M SZALAY, WSBA #53898
NATALIE J. REID, WSBA #55745
ADAM N. TABOR, WSBA #50912
THEODORE J. ANGELIS, WSBA #30300
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
206.370.7580
bart.freedman@klgates.com ben.mayer@klgates.com
endre.szalay@klgates.com
natalie.reid@klgates.com
adam.tabor@klgates.com
theo.angelis@klgates.com
*Attorneys for the Duwamish Tribe*


JAMESTOWN S'KLALLAM TRIBE

/s/ Lauren P. Rasmussen
LAUREN P. RASMUSSEN, WSBA #33256
Law Offices of Lauren P. Rasmussen, PLLC
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
206.623.0900
lauren@rasmussen-law.com
*Attorney for Plaintiff Jamestown S'Klallam Tribe*

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

91

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

KALISPEL TRIBE OF INDIANS

2

/s/ Lorraine A. Parlange

3

LORRAINE A. PARLANGE, WSBA #25139
Senior Tribal Attorney

4

934 Garfield Road
Airway Heights, WA 99001

5

509.789.7603
lparlange@kalispeltribe.com

6

Attorney for Plaintiff Kalispel Tribe of Indians

7

THE KLAMATH TRIBES

8

/s/ Edmund Clay Goodman

9

EDMUND CLAY GOODMAN, WSBA #37347
Hobbs Straus Dean & Walker, LLP

10

215 SW Washington Street, Suite 200
Portland, OR 97214

11

503.242.1745
egoodman@hobbsstraus.com

12

Attorney for Plaintiff The Klamath Tribes

13

METLAKATLA INDIAN COMMUNITY

14

/s/ Geoffrey D. Strommer

15

GEOFFREY D. STROMMER, WSBA #43308
Hobbs Straus Dean & Walker, LLP

16

215 SW Washington Street, Suite 200
Portland, OR 97214

17

503.242.1745

18

GStrommer@hobbsstraus.com
Attorney for Plaintiff Metlakatla Indian Community

19

20

MUCKLESHOOT INDIAN TRIBE

21

/s/ Mary M. Neil

MARY M. NEIL, WSBA #34348

22

ROBERT L. OTSEA, JR., WSBA #9367
DANIELLE BARGALA, WSBA #52718

23

39015 172nd Avenue S
Auburn, WA 98092

24

253.939.3311
rob@muckleshoot.nsn.us

25

mary.neil@muckleshoot.nsn.us
danielle.bargala@muckleshoot.nsn.us

26

Attorneys for Plaintiff Muckleshoot Indian Tribe

1

NEZ PERCE TRIBE

2

*/s/ Julie S. Kane*
JULIE S. KANE, WSBA #19138

3

Office of Legal Counsel
P.O. Box 305

4

Lapwai, ID 83540
208.843.7355

5

juliek@nezperce.org
*Attorney for Plaintiff Nez Perce Tribe*

6

NOOKSACK INDIAN TRIBE

7

*/s/ Charles N. Hurt, Jr.*
CHARLES N. HURT, JR., WSBA #46217

8

Office of Tribal Attorney
Senior Tribal Attorney

9

5047 Mt. Baker Hwy, P.O. Box 63
Deming, WA 98244

10

360.598.4158
churt@nooksack-nsn.gov

11

*Attorney for Plaintiff Nooksack Indian Tribe*

12

13

NISQUALLY INDIAN TRIBE

14

*/s/ Heidi Petersen*
HEIDI PETERSEN, WSBA #43413,

15

*application for admission forthcoming*
Attorney, Nisqually Indian Tribe

16

4820 She-Nah-Num Drive SE
Olympia, WA 98513

17

360.456.5221
petersen.heidi@nisqually-nsn.gov

18

*Attorney for Plaintiff Nisqually Indian Tribe*

19

OCA ASIAN PACIFIC ADVOCATES – GREATER

20

SEATTLE

21

*/s/ Bernadette Connor*
BERNADETTE CONNOR, WSBA #45844,

22

*application for admission forthcoming*
1800 Cooper Point Road SW, Suite 12

23

Olympia, WA 98502
206.552.9666

24

byconnor@gmail.com
*Attorney for Plaintiff OCA Asian Pacific*

25

*Advocates – Greater Seattle*

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

93

1      ELLEN F. ROSENBLUM
          Attorney General of Oregon

2

          */s/ Carla A. Scott*
3      CARLA A. SCOTT WSBA #54725
          Senior Assistant Attorney General
4      Trial Attorney
          100 SW Market Street,
5      Portland, OR 97201
          Tel (971) 673-1880
6      Fax (971) 673-5000
          Carla.A.Scott@doj.state.or.us
7      *Attorneys for Plaintiff State of Oregon*

8

9      PORT GAMBLE S'KLALLAM TRIBE

10      */s/ Rogina D. Beckwith*
          ROGINA D. BECKWITH, WSBA #36241
11      Port Gamble S'Klallam Tribe Legal Department
          31912 Little Boston Road NE
12      Kingston, WA 98346
          360.297.6242
13      ginab@pgst.nsn.us
          *Attorney for Plaintiff Port Gamble S'Klallam Tribe*

14

15      PUYALLUP TRIBE OF INDIANS

16      */s/ Alec S. Wrolson*
          ALEC S. WROLSON, WSBA #54076
17      FELECIA L. SHUE, WSBA #49911
          LOIS Y. BOOME, WSBA #54883
18      LISA A.H. ANDERSON, WSBA #27877
          3009 E. Portland Avenue
19      Tacoma, WA 98404
          253.573.7877
20      alec.wrolson@puyalluptribe-nsn.gov
          felecia.shue@puyalluptribe-nsn.gov
21      lois.boome@puyalluptribe-nsn.gov
          lisa.anderson@puyalluptribe-nsn.gov
22      *Attorneys for Plaintiff Puyallup Tribe of Indians*

23

24

25

26

FIRST AMENDED COMPLAINT         94
NO. 2:21-cv-00002-JCC

THE QUILEUTE TRIBE OF THE QUILEUTE
RESERVATION

*/s/ Lauren J. King*
LAUREN J. KING, WSBA #40939
Foster Garvey, P.C.
1111 Third Ave., Suite 3000
Seattle, WA 98101
206.447.6286
lauren.king@foster.com
*Attorney for Plaintiff Quileute Tribe*


QUINAULT INDIAN NATION

*/s/ Karen Allston*
KAREN ALLSTON, WSBA #25336
LORI BRUNER, WSBA #26652
Senior Assistant Attorneys General
Quinault Indian Nation Office of Attorney General
P.O. Box 613
Taholah, WA 98587
360.276.8211, ext. 1400
lbruner@quinault.org
kallston@quinault.org
*Attorneys for Plaintiff Quinault Indian Nation*


SAUK-SUIATTLE INDIAN TRIBE

*/s/Jack W. Fiander*
JACK W. FIANDER, WSBA #13116
General Counsel
Sauk-Suiattle Indian Tribe
5318 Chief Brown Lane
Darrington, WA 98241
360.436.0139
towtnuklaw@msn.com
*Attorney for Plaintiff Sauk-Suiattle Indian Tribe*

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

95

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

CITY OF SEATTLE

*/s/ Jeremy F. Wood*
JEREMY F. WOOD, WSBA #51803
Assistant City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
206.684.8200
jeremy.wood@seattle.gov
*Attorney for Plaintiff City of Seattle*


SHOALWATER BAY TRIBE

*/s/ Geoffrey D. Strommer*
GEOFFREY D. STROMMER, WSBA #43308
Hobbs Straus Dean & Walker, LLP
215 SW Washington Street, Suite 200
Portland, OR 97214
503.242.1745
GStrommer@hobbsstraus.com
*Attorney for Plaintiff Shoalwater Bay Tribe*


SKOKOMISH INDIAN TRIBE

*/s/ Earle David Lees, III*
EARLE DAVID LEES, III, WSBA #30017
Director of the Skokomish Legal Department
Skokomish Indian Tribe
N. 80 Tribal Center Road
Skokomish Nation, WA 98584
360.877.2100
elees@skokomish.org
*Attorney for Plaintiff Skokomish Indian Tribe*

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

96

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

SNOQUALMIE INDIAN TRIBE

2

*/s/ Rob Roy Smith*
ROB ROY SMITH, WSBA #33798

3

RACHEL B. SAIMONS, WSBA #46553
Kilpatrick Townsend & Stockton, LLP

4

1420 Fifth Avenue, Suite 3700
Seattle, WA 98101

5

206.467.9600
rrsmith@kilpatricktownsend.com

6

rsaimons@kilpatricktownsend.com
*Attorneys for Plaintiff Snoqualmie Indian Tribe*

7

8

SQUAXIN ISLAND TRIBE

9

*/s/ David Babcock*
DAVID BABCOCK, WSBA #31737

10

Attorney, Squaxin Island Tribe
3711 SE Old Olympic Hwy

11

Shelton, WA 98584
360.432.1771

12

dbabcock@squaxin.us
*Attorney for Plaintiff Squaxin Island Tribe*

13

14

SUQUAMISH TRIBE

15

*/s/ James Rittenhouse Bellis*
JAMES RITTENHOUSE BELLIS, WSBA #29226

16

Director, Office of Tribal Attorney
Suquamish Tribe

17

P.O. Box 498
Suquamish, WA 98392

18

360.394.8501
Shelton, WA 98584

19

360.432.1771
rbellis@suquamish.nsn.us

20

*Attorney for Plaintiff Suquamish Tribe*

21

22

23

24

25

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

97

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1                  SWINOMISH INDIAN TRIBAL COMMUNITY

2                  */s/ Emily Haley*

3                  EMILY HALEY, WSBA #38284
                      Office of the Tribal Attorney
                      11404 Moorage Way

4                  La Conner, WA 98257
                      360.466.3163

5                  ehaley@swinomish.nsn.us
                      *Attorney for Plaintiff Swinomish Indian Tribal*

6                  *Community*

7

8                  UPPER SKAGIT INDIAN TRIBE

9                  */s/ David S. Hawkins*
                      DAVID S. HAWKINS, WSBA #35370

10                General Counsel
                      Upper Skagit Indian Tribe

11                25944 Community Plaza Way
                      Sedro-Woolley, WA 98284

12                360.854.7016
                      dhawkins@upperskagit.com

13                *Attorney for Plaintiff Upper Skagit Indian Tribe*

14                WING LUKE MEMORIAL FOUNDATION d/b/a
                      WING LUKE MUSEUM

15

16                */s/ Gloria Lung Wakayama*
                      GLORIA LUNG WAKAYAMA, WSBA #11892

17                Harris & Wakayama, PLLC
                      601 Union Street, Suite 2600

18                Seattle, WA 98101
                      206.621.1818

19                glwakayama@hmwlaw.com
                      *Attorney for Plaintiff Wing Luke Memorial*

20                *Foundation d/b/a Wing Luke Museum*

21

22

23

24

25

26

FIRST AMENDED COMPLAINT          98          ATTORNEY GENERAL OF WASHINGTON
NO. 2:21-cv-00002-JCC                           Complex Litigation Division
                                          800 5th Avenue, Suite 2000
                                          Seattle, WA 98104-3188
                                          (206) 464-7744

1

## **DECLARATION OF SERVICE**

2

I hereby declare that on this day I caused the foregoing document to be electronically

3

filed with the Clerk of the Court using the Court's CM/ECF System which will send notification

4

to all counsel of record.

5

DATED this 25th day of January, 2021, at Seattle, Washington.

6

*/s/ Lauryn K. Fraas*

7

LAURYN K. FRAAS, WSBA #53238
Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT
NO. 2:21-cv-00002-JCC

99